1  COMMONWEALTH OF PENNSYLVANIA: IN THE COURT OF COMMON PLEAS

2                                    : OF DAUPHIN COUNTY, PENNSYLVANIA

3        VS                          :

4  TYSHAUNT LOVE                     : No. 937 CR 2002

5

6                    TRANSCRIPT OF PROCEEDINGS

7                          VOLUME I

8

9            BEFORE:   HONORABLE BRUCE F. BRATTON

10           DATE:     Monday, September 12, 2005
                       Tuesday, September 13, 2005
11
             PLACE:    Courtroom No. 3
12                     Dauphin County Courthouse
                       Harrisburg, Pennsylvania
13

14

15 APPEARANCES:

16     SEAN M. McCORMACK, Esquire
       Chief Deputy District Attorney
17
       JAMES P. BARKER, Esquire
18     Deputy District Attorney

19

20        For - Commonwealth

21

22     PAUL W. MULLER, Esquire
       Chief Deputy Public Defender
23
       NATHAN C. GIUNTA, Esquire
24     Assistant Public Defender

25        For - Defendant

COPY

```
1                    INDEX TO WITNESSES

2   FOR COMMONWEALTH          DIRECT   CROSS   REDIRECT   RECROSS

3   Georgen Cronin Vol. I      32       60      70/74       72
    Johanna Johnson
4     Iftikhar-Khan Vol. I    168      177       188        189
    Zachary Belcher Vol. II     6       17        26         30
5   Socorro Roman Vol. II      31       45        66         68
    Wayne Ross Vol. II         75      107        --         --
6     (Qualifications)         69       73        --         --
    Jeanette McCurdy Vol. II  116      122       128        130
7   Leroy Lucas Vol. II       131      170        --         --
    Michael Kurtz Vol. II     184      200       202        204
8     (Qualifications)        183       --        --         --
    LeeAnn Singley Vol. II    209      228       240         --
9     (Qualifications)        206       --        --         --
    Stacy Harris Vol. II      243      248       256        259
10  Barbara Brown Vol. II     264      269     284/288    286/289
    Candace Mills Vol. II     291      296       308        310
11  Kwajalyn Jackson Vol. II  312      318       325         --
    Tamara Williams Vol. II   326      330       340        340
12  Daelene Saez Vol. II      341      347       352        352
    Tawana Poteat Vol. II     354      369       388         --
13  Wendy Harris Vol. II      388      392       398         --
    John Goshert Vol. III
14    (No jury)                 5       10        --         --
    Donald Heffner Vol. III
15    (No jury)                14       20        23         --
    Sean McCormack Vol. III
16    (No jury)                24       29        --         --
    Lydel Muldrow Vol. III     60       66        76         77
17  Elijah Massey Vol. III     78       81        90         --
    Joseph Zimmerman Vol. III  91       97        --         --
18  Matt Taylor Vol. III      104      133       145         --
    Michael Maloney Vol. III  146      150        --         --
19  Donald Heffner Vol. III   207      234       241         --

20

21
    FOR DEFENDANT             DIRECT   CROSS   REDIRECT   RECROSS
22  Michelle Bailey Vol. III  245      250       252         --
    Joseph Zimmerman Vol. III 254       --        --         --
23  Elijah Massey Vol. III    259       --        --         --

24

25
```

DAUPHIN COUNTY COURT REPORTERS

```
 1
                          INDEX TO EXHIBITS
 2   FOR COMMONWEALTH              MARKED            ADMITTED
     No. 1 Vol. I                   54                  244
 3   No. 2 Vol. I                   54      Vol. II       9
     No. 3 Vol. I                   54      Vol. II      13
 4   No. 4 Vol. I                   54      Vol. II      28
     No. 5 Vol. I                   57      Vol. II      40
 5   No. 6 Vol. I                   58      Vol. II      93
     No. 7 Vol. II                  --                   95
 6   No. 8 Vol. II                  --                   90
     No. 9 Vol. II                  --                   94
 7   Nos. 10 & 11 Vol. II           --                   97
     No. 12 Vol. II                 --                  100
 8   No. 13 Vol. II                 --                  101
     No. 14 Vol. II                 --                  104
 9   No. 15 Vol. II                 --                  118
     Nos. 16-21 Vol. II             --                  140
10   Nos. 22-26 Vol. II             --                  146
     Nos. 27-28 Vol. II             --                  146
11   No. 29 Vol. II                 --                  154
     No. 30 Vol. II                 --                  159
12   No. 31 Vol. II                 --                  161
     No. 33 Vol. II                 --                  157
13   No. 34 Vol. II                 --                  155
     Nos. 35-39 Vol. II             --                  163
14   No. 42 Vol. II                 --                  154
     No. 43 Vol. II                 --                  158
15   Nos. 44-45 Vol. II             --                  162
     Nos. 46-49 Vol. II             --                  168
16   No. 50 Vol. II                 --                  195
     Nos. 51-52 Vol. III            --                  244
17   Nos. 63-65 Vol. III            --                  244

18

19

20   FOR DEFENDANT
     No. 1 Vol. II                 177                  177
21

22

23

24

25
```

P R O C E E D I N G S

Monday, September 12, 2005
Morning Session

1
2
3
4
5       THE COURT:  Now are we ready to proceed with
6  the case of Tyshaunt Love?  Is there anything counsel
7  needs to address to me outside of the courtroom?
8       MR. MULLER:  Can we approach?
9       THE COURT:  Sure.
10       (A discussion is held at sidebar off the
11  record.)
12       MR. BARKER:  May it please the Court, this is
13  the case of Commonwealth versus Tyshaunt Love, No. 937
14  CR 2002, the charge is murder of the first degree.
15       Your Honor, at this time we're prepared to go
16  to a jury trial; however, there are a number of
17  outstanding motions before the Court.  We'll begin with
18  the Rule 600 motion.  The Commonwealth received last
19  Wednesday a copy of the Defense motion and we have not
20  had an opportunity to prepare and fully answer.  I
21  would note it appears I think Mr. Muller and I agree on
22  this.  What we're talking about is everything from
23  October of 2002 up until today's date basically
24  relating to the appeals by the Commonwealth; is that
25  correct?

DAUPHIN COUNTY COURT REPORTERS

```
 1           MR. MULLER:   That's accurate, Your Honor.
 2           THE COURT:   It's from 2002 until earlier this
 3    year.
 4           MR. MULLER:   Until -- well, it was first listed
 5    for trial again March 14th.
 6           THE COURT:   March of this year and since then
 7    the time has been at the Defense request.
 8           MR. MULLER:   No -- since then, yes, I'm
 9    sorry -- since March 14th.  There's been a change in
10    counsel several times.
11           MR. McCORMACK:   Your Honor, starting with the
12    second appeal, Defense counsel notes in the motion on
13    February 12, 2004 there was an agreement reached
14    between the parties and the Court whereby the
15    Commonwealth would withdraw its petition for allocatur
16    in the first appeal and that we would agree that the
17    Defendant could be released on bail.  In return the
18    Court certified the Commonwealth's appeal as well as
19    the Defense appeal.
20           With respect to that the Defense is saying that
21    that was, I guess, was a bad-faith appeal.  I would
22    point out that in Commonwealth versus Brown the
23    Superior Court held that when the Defense agrees to a
24    continuance then the time is not counted against the
25    Commonwealth and we would suggest that that agreement
```

1  among the parties constitutes exactly such an

2  agreement.

3         MR. MULLER:  We're just going to address issue

4  by issue.  I think it was very clear from the Defense

5  perspective that we are not agreeing to that as a

6  continuance.  There was never an agreement.  In fact,

7  Mr. Batson who had the case at that time representing

8  Mr. Love was very vociferous asserting time and time

9  that there were Rule 600 implications to all these

10 appeals by the Commonwealth.  He brought them up.

11        THE COURT:  In fact, it was -- one of those was

12 an issue which was being preserved for consideration by

13 the Superior Court by that agreement in February of

14 2004, was it not?

15        MR. McCORMACK:  And the Defense chose not to

16 pursue that appeal.

17        THE COURT:  Later.

18        MR. MULLER:  That was the denial of the --

19 starts back when there was a continuance from September

20 to December 2002.  Your Honor ruled that that counted

21 against the Defense and not the Commonwealth and

22 Mr. Batson challenged that and at that time he was

23 asserting a Rule 600 issue.

24        THE COURT:  Don't get me wrong; I don't think

25 that issue has been waived by the failure to take it

1  up.  That's not the point.  The point is there was an

2  agreement reached and there was in the words of

3  contract law a consideration on both sides, was there

4  not?

5          MR. MULLER:  From my understanding from reading

6  the agreement and everything that came before and

7  after, there was an agreement to let them appeal.

8  There was never an agreement to continue to assert that

9  was Rule 600 implications that came up continually in

10  the various hearings in front of Your Honor regarding

11  in October of 2002 and subsequent to that.

12          THE COURT:  After February of 2004 there's been

13  nothing.  There's been -- there has -- there have been

14  no hearings.

15          MR. MULLER:  It's been in the appellate court.

16          THE COURT:  It was, in fact, that issue that I

17  had certified as part of this agreement for appeal, was

18  it not?

19          MR. MULLER:  The Rule 600.

20          THE COURT:  Yes.

21          MR. MULLER:  The Rule 600 as it existed before

22  that.

23          THE COURT:  After certifying it for appeal it

24  has not been brought to my attention in any other

25  hearing since then.  So I don't recall that we had any

1 other hearings.

2        MR. MULLER:  You have not had jurisdiction.

3        THE COURT:  It has been at the appellate court.

4        MR. MULLER:  Yes.

5        THE COURT:  I just wanted to make sure I

6 understood that.

7        MR. MULLER:  Just to reiterate though, correct

8 me if I am wrong, Mr. Barker, I don't know -- I know

9 Mr. Batson didn't pursue the nunc pro tunc appeal

10 regarding the previous Rule 600 hearing.

11        THE COURT:  Didn't the Defendant's agreement to

12 proceed in February of 2004 include it was clearly, as

13 I recall, to withdraw a pending Commonwealth's petition

14 to the Supreme Court.

15        MR. MULLER:  Yes.

16        THE COURT:  To certify the then existing

17 dispute Mr. Batson had brought up on several occasions

18 concerning the computation of time for Rule 600

19 purposes to that point and to certify the issue that

20 Superior Court said was not properly certified on the

21 Commonwealth side that had to do with disqualification

22 of Mr. Batson from the case that they would be

23 certified to appeal to appellate courts.  Doesn't that

24 imply or contain with it necessarily the fact that this

25 court then moves as jurisdiction and then the matter is

1  on appeal and that some further delay was unavoidable?

2      MR. MULLER:   I don't know if it was

3  unavoidable.  As I indicated there's no agreement

4  within -- there's nothing within that February 12th

5  agreement as to the Defendant waiving Rule 600 or

6  anything.  In fact, the only thing for Defense, there

7  was that agreement to reduce his bail or actually set

8  bail so he's permitted to get out of jail because of

9  the length of time.

10      Mr. Batson was very clear beforehand that he

11  thought that he had Rule 600 implications them

12  appealing the first time.  In fact, Your Honor,

13  according to the record, expressed the same concerns

14  prior to the first appeal, you know, that essentially

15  the Commonwealth must be willing to bear the risk that

16  the appeal delay could have Rule 600 implications.  It

17  was argued again on the record several times.  I think

18  each delay by the Commonwealth they should be aware of

19  the possible Rule 600 implications.

20      THE COURT:  And when a matter is on appeal

21  generally, doesn't Rule 600 -- isn't it stayed as a

22  general rule until --

23      MR. MULLER:   It's got to be a valid appeal.

24      THE COURT:  It has to be non-frivolous, good

25  faith, words to that effect.

1          MR. MULLER:   Words to that effect.

2          THE COURT:  All right.  So now you're asking me

3   to determine whether or not the appeal was

4   non-frivolous and in good faith or not.

5          MR. MULLER:   I think our position comes down

6   to -- Your Honor, the first appeal was quashed among

7   other reasons because of the Commonwealth versus

8   Cosnek, which had come down in the interim period of

9   time -- C-O-S-N-E-K -- holding that they, the

10  Commonwealth, couldn't seek an interlocutory appeal

11  unless it was an issue relating to the exclusion of

12  evidence or something along those lines.  The

13  Commonwealth, in fact, pretty much laid out what the

14  proper procedure would have been at this point.  The

15  Commonwealth chose through this agreement in February

16  to try and appeal the issue again even knowing the

17  terms of Cosnek and what it required and failed,

18  ultimately failed to meet any of the requirements

19  necessary to perfect that appeal.  The deadlines and

20  time lines were missed.  It didn't qualify as a timely

21  filing in any way, shape or form.  It wasn't pursuant

22  to 1311 or 1711, knowing what the consequences were,

23  knowing what the exception was that was carved out of

24  Cosnek, the system broke down.  I mean, there was no

25  system.  The Commonwealth broke down.  There was no

1  effort to perfect this appeal in a legal timely manner.

2       MR. McCORMACK:  May I respond?

3       THE COURT:  You may have foregone your issue by

4  issue.

5       MR. McCORMACK:  I apologize.  I was working

6  backwards starting with this.  The original appeal was

7  under ruling 311-D of appellate procedures.  At that

8  time we were permitted to proceed under that rule.

9  However, the Cosnek decision came down which said Rule

10  311-D only relates to the admission or exclusion of

11  evidence.  Therefore, the Superior Court quashed our

12  appeal based on an intervening change in the law to say

13  that our appeal was not in good faith -- I think

14  doesn't really follow from that.

15       Now, there was one other procedural error that

16  was thrown into the first opinion basically.  However,

17  I would point out once the Superior Court determined we

18  had no jurisdiction, any comments there were after were

19  not only -- were rather gratuitous.  When you have no

20  jurisdiction you have no right to say anything.

21  Beyond that the fact that we botched the appeal doesn't

22  change the fact that the appeal had merit and that's

23  what you look for with good-faith appeals.

24       THE COURT:  How did you botch the second --

25       MR. BARKER:  The second one we didn't botch

1   that.  The Superior Court determined that the procedure
2   that they suggested we use was not a valid one and I
3   would go back to the first opinion which is the
4   concurrence by Judge Kline where he says while the
5   Commonwealth cannot request certification of
6   interlocutory appeal from an adverse pretrial order
7   under PA RAP 1311 under procedural law by that court, I
8   would had hoped not deemed untimely and the
9   Commonwealth would attempt to do that on remand.
10  That's what we tried to do and what the Superior Court
11  determined that would have had been done all the way
12  back 30 days after the original order from which we
13  were appealing.  Despite the fact that there's no way
14  we could have known that we had to do that because
15  under the law at that time we didn't.

16        We do what they tell us to do to get this issue
17  before them and we're told you can't do that and yet
18  now we're being told we did all that in bad faith.  We
19  continue to believe our appeal had merit.  It never
20  reached the Superior Court, never reached the merits of
21  our appeal.  To say we're acting in bad faith doesn't
22  follow in the fact procedurally we couldn't get it in
23  front of them.

24        MR. MULLER:  Except the Superior Court notes
25  even if you go back to the decision in Cosnek and the

13

1   denial of the first appeal or quash of the first appeal
2   because of that, that the Commonwealth still, you
3   know -- that was decided November 24, 2003, the Cosnek
4   decision.  The agreement is in February of 2004.  The
5   Commonwealth didn't file their notice of appeal, I
6   think, until March some time and this Honorable Court
7   doesn't certify the order until April and they are
8   saying even if we go and say, you know, talk about the
9   good-faith reliance to the pre-Cosnek cases, which
10  allowed the interlocutory appeal pursuant to Rule 311,
11  the Commonwealth still didn't meet the time allowed.
12          THE COURT:  That wasn't the basis it was thrown
13  out the second time.  It wasn't they didn't meet the
14  time line after the February agreement.  It was that in
15  order to meet the time line of the Superior Court then
16  established on the second -- on their second opinion
17  they could have filed the appeal, the certification,
18  everything that same day of February and the Superior
19  Court would still have thrown it out.
20          MR. MULLER:  In February they would have
21  because I think they are saying the Commonwealth should
22  have done something within 30 days after the November
23  24th opinion by Superior Court.  Not the -- the January
24  -- they are saying Cosnek was decided November 24th of
25  2003.

```
1        THE COURT:  Right.  Through this case back then
2   in -- I'm not sure when it was -- January, if I recall,
3   issued its decision in the first appeal.  I think
4   that's the right time line.
5        MR. MULLER:   Okay.
6        THE COURT:  And said, at least one of them
7   said, well, at least they could maybe remand, go ahead
8   and seek certification and everything moves forward
9   when they go back.  The reason it's thrown out is not
10  because it took another two months, three months,
11  whatever, to get everything back up to Superior Court,
12  it was then they say, oh, wait, looking at it again you
13  needed to do all that back in 2002.
14       MR. MULLER:  Yet what they seem to be saying in
15  their opinion even if that wasn't the case even they
16  should be allowed to post-Cosnek, they didn't do that
17  in a timely fashion.
18       MR. McCORMACK:  Your Honor, my response to that
19  would be the case was still on appeal because the
20  allocatur petition until it was returned, not only the
21  praecipe for the distention, the record has to be
22  returned.  We can't do anything until it's remanded.
23       THE COURT:  I understand your position.
24  Anything else?
25       MR. McCORMACK:  No, Your Honor.  I believe that
```

1   covers it.  Once again the appeals -- the only point I

2   would add, I guess you actually indicated by certifying

3   the appeal that there was at least grounds for

4   differences of opinion and we would suggest that that

5   shows this was a reasonable appeal, that our issues did

6   have some merit to them.  I understand Your Honor

7   disagrees with it.  That shows it's not a frivolous

8   appeal.  In fact, we believe that would be the law of

9   the case.

10          THE COURT:  Anything else, Mr. Muller, on this

11  issue?

12          MR. MULLER:   Not on that issue.

13          THE COURT:  Well, Mr. Barker, you're absolutely

14  right I think at least to the extent I was and I remain

15  not necessarily fully convinced that my determination

16  of qualification issue was free of all that and

17  certainly, one, that given the state of case law at

18  that time at the very least was open to dispute.  It

19  was, I thought, a valid reason to take the case up and

20  it was one that while it did not end up being truncated

21  by the Cosnek decision, I still thought remained

22  sufficiently uncertain at the time that I blessed an

23  agreement that was reached between the Commonwealth and

24  the Defendant that would allow both that issue and the

25  Rule 600 issue raised by Mr. Batson on several

```
 1  occasions and maybe I'm wrong.  My recollection was
 2  that he had filed notice of appeal from my earlier Rule
 3  600 decision, but I could be wrong.
 4          MR. MULLER:  He did but withdrew it a week
 5  later.
 6          THE COURT:  He withdrew it.  I'm half right.
 7  In any case the point being the agreement was reached
 8  in February of 2004.  The rejection of the appeals --
 9  of the appeals filed by the Commonwealth by the
10  Superior Court thereafter based mostly upon matters
11  that could not have been addressed at that time and
12  even had they been addressed would not have apparently
13  satisfied the Superior Court which would have led to
14  much the same result and I believe certainly the appeal
15  and the procedure is somewhat torturous here, getting
16  it presented was in good faith and was not frivolous on
17  the part of the Commonwealth and, therefore, motion to
18  dismiss -- the time during the appeal therefore while
19  the matter was on appeal does not run for Rule 600
20  purposes and the motion to dismiss on that basis is
21  therefore denied.  Next.
22          MR. MULLER:  Your Honor, Defense had filed
23  notice -- filed a notice of intent to introduce other
24  crimes, wrongs or acts pursuant to Pennsylvania Rule of
25  Evidence 404-B that was filed last week, Your Honor.
```

1   With the intent of putting the Commonwealth on notice

2   we were going to attempt to introduce evidence

3   regarding LaQuan Williams, aka, Kazar, their alternate

4   suspect in this case, and the evidence would be threats

5   he had made to the victim in this case because he

6   believed her to be a snitch, turned him into the police

7   when he was arrested and he was arrested in Virginia

8   earlier that year.  We also asserted in that motion

9   that we would attempt to introduce evidence regarding

10  his prior rape and attempted homicide of one Vanessa

11  Ames, which occurred one year prior to the incident,

12  same date, December 20 of 1995 and this incident at

13  hand was December 20, 1996, and we had substantial

14  discussion at sidebar about this, Your Honor.  There is

15  a statement from a Larry Fennell, F-E-N-N-E-L-L, who

16  heard --

17          THE COURT:  Your motion refers to it as

18  testimony -- you intend to offer testimony of

19  Mr. Fennell.

20          MR. MULLER:  I will get to that.  This is just

21  to lay groundwork though.  He's alleged to have heard

22  LaQuan Williams threaten Iris Belcher, the victim in

23  this case, over her snitching on him.  As I indicated

24  at sidebar we have not been able to procure the

25  presence of Mr. Fennell.  He apparently is in North

1    Carolina.  The phone number we have for him is

2    disconnected.  We have not been able to get him up here

3    for that purpose; also, to have testimony of a Barbara

4    Brown who may or may not have heard the same threat Mr.

5    Williams made against Iris Fennell.  Even in addition

6    to that, although it's not contained in the motion,

7    certainly it can be boot strapped on it, there was one

8    occasion where I believe it was Barbara Brown who heard

9    Iris on the telephone telling the person on the other

10    end, no, no, I didn't snitch on you.  It wasn't me.

11        THE COURT:  Barbara Brown, you're offering her

12    testimony that she heard Mr. Williams say what?

13        MR. MULLER:  We haven't had the opportunity to

14    speak to Ms. Brown.  But according to the reports --

15    two things according to Mr. Fennell's statement, she

16    was also involved in the phone conversation when the

17    threat was made.  It's unclear whether she was still on

18    the phone when the threat was made or not.  But it

19    seemed the phone calls occurred or the phone call was

20    at the same time but the other issue --

21        THE COURT:  If she heard LaQuan Williams say

22    anything you believe that she would testify that she

23    heard him say...

24        MR. MULLER:  I know you snitched on me.

25        THE COURT:  And a threatening comment to the

1  victim in this case.

2          MR. MULLER:  Yes.

3          THE COURT:  Or alternatively that he knew or

4  was under the belief that the victim in this case had

5  turned him in or otherwise provided assistance in the

6  prosecution of another case.

7          MR. MULLER:  Correct.  And as I indicated,

8  Larry Fennell was really our prime witness.

9          THE COURT:  Further as to Barbara Brown you

10 want to offer testimony that she was present during a

11 telephone conversation.

12          MR. MULLER:   Allegedly with LaQuan.

13          THE COURT:  Which the victim was having with a

14 third party whom Barbara Brown believes to be -- I'm

15 not sure how she came to that belief -- believed to be

16 LaQuan.

17          MR. MULLER:  Yes.

18          THE COURT:  And heard not LaQuan say anything

19 but heard the victim in this case say, no, I didn't

20 turn you in.

21          MR. MULLER:  Essentially the same, emphatically

22 she didn't snitch.  She didn't turn him in.  She would

23 never do that.

24          THE COURT:  All right.

25          MR. MULLER:  And that's in regards to that

1  issue, if you want to address that.

2       THE COURT:  Let's talk about those things,

3  Mr. McCormack.  Let's talk about those first two,

4  Mr. Fennell and Ms. Brown, before we deal with the

5  testimonial or the use of prior testimony from the Ames

6  rape trial -- LaQuan rape trial.

7       MR. McCORMACK:  Let me start with Larry

8  Fennell.  Larry Fennell gave a statement to the police.

9  I'll give you some of the things I agree with and some

10  of the things I disagree with.  What Mr. Muller is

11  saying, Larry Fennell gave a statement to the police.

12       THE COURT:  Wait a minute.  No, no; Mr. Muller

13  said he was going to be -- you're saying because

14  Mr. Fennell is not available to you you want to use the

15  statement from police records?

16       MR. MULLER:  No, no; I said it was our intent

17  to offer Mr. Fennell to that matter, but we've been

18  unable to procure his appearance.  I wasn't sure

19  whether you wanted -- okay.  Then my point is he's not

20  here.  It's hearsay within hearsay.  There's no

21  possibility for anyone, in front of the jury, either

22  the Defense or the Prosecution, to testify how he knew

23  Kazar was on the phone or any of the circumstances.

24       THE COURT:  Kazar for the record being a

25  nickname for LaQuan.

1          MR. McCORMACK:  LaQuan Williams.  Larry Fennell

2    isn't here.  I don't believe there's any exception to

3    the hearsay rule that is going to allow them.

4          MR. MULLER:   We're not disputing that.

5          THE COURT:  Let's deal with the real issue.

6    If Mr. Fennell -- are you withdrawing this notice of

7    intent or if he should magically appear you still might

8    want to present him.

9          MR. MULLER:  If he appeared we would want to

10   present him but that doesn't appear likely.

11         THE COURT:  If he were to walk in the

12   courtroom, can he testify that he heard Mr. Williams

13   make threatening comments concerning the victim in this

14   case?  What's the Commonwealth's position as to that?

15   What's the Commonwealth's position?

16         MR. McCORMACK:  I'm scanning what I would

17   expect him to actually say.  My position is still

18   that's hearsay.

19         THE COURT:  No question it's hearsay.  I don't

20   think Mr. Muller disagrees it's hearsay.  But is it an

21   exception to the hearsay rule?

22         MR. McCORMACK:  As we indicated to Your Honor

23   at sidebar, you know, we feel honest review of that

24   that perhaps there may be an exception involving a

25   present sense impression while on the phone with

1  somebody he says is Kazar or LaQuan Williams, whether

2  how well he knew LaQuan Williams certainly is an issue.

3  I don't believe --

4          THE COURT:  That's a foundation question too

5  we'll have to address at the time.

6          MR. McCORMACK:  I don't believe that just

7  because LaQuan Williams may have told somebody that

8  Iris snitched on him that in and by itself makes that

9  evidence so relevant that that comes into court here.

10  Especially the fact LaQuan Williams won't be present in

11  court at any time.

12          MR. MULLER:  It's more than saying I know she

13  snitched on him, according to Larry's statement I knew

14  she snitched on me.  Then he was to come back to

15  Harrisburg and kill her.  Actually he said I'm going to

16  kill that bitch.

17          THE COURT:  Over the Commonwealth's objection

18  if Mr. Fennell is available and on a first person

19  understanding and observation or hearing of the

20  statement with proper foundation, I'll permit it.

21  Ms. Brown.  Mr. McCormack, what's the Commonwealth's

22  position with Ms. Brown?

23          MR. McCORMACK:  What we said at sidebar, Your

24  Honor, who was Iris Fennell even on the phone with when

25  she's on the phone, and Ms. Brown supposedly heard one

1  side of a conversation.  She didn't hear the other side
2  of the conversation.  She doesn't know exactly what
3  they were talking about or all those things.  She has
4  to make inferences based upon the side of the
5  conversation.
6        THE COURT:  Unless there is foundation laid
7  that she was, in fact, more of a party to the
8  conversation and better able to identify voices, has
9  proper background, as long as she can do that.  If she
10 cannot do that, of course, then the question of whether
11 or not it's sufficiently established even who was
12 making the third party statement I would not permit it.
13 With that proper foundation my ruling is the same; if
14 she can, in fact, identify who the person was that made
15 that statement other than by I assume type comments or
16 based other than on her own personal observations and
17 hearing, then I'll allow it.  But if she can't do that
18 then I won't.
19        Now, Mr. Muller, the second portion of your
20 proffer or notice dealt with the intention to introduce
21 evidence regarding Mr. Williams prior conviction he was
22 convicted I believe of.
23        MR. MULLER:  Not of the conviction itself, of
24 the act; I don't think he was convicted until 1997.
25        THE COURT:  I understand he was convicted of

1  rape.

2          MR. MULLER:  Rape, unlawful restraint.

3          MR. McCORMACK:  Rape, criminal attempt

4  homicide, unlawful restraint; he was found not guilty

5  of aggravated assault.

6          THE COURT:  As to an incident involving another

7  victim, Vanessa Ames.  What exactly is it you are

8  intending to introduce and because I wasn't sure what

9  it was you were proposing here?  Do you have portions

10  of testimony?  Do you have transcripts?

11          MR. MULLER:  There was a trial in this case

12  that took place on May 14th and May 15, 1997.

13  Prosecuted by Doug Marsico of the District Attorney's

14  office, and Ms. Ames was obviously put on the stand

15  both direct and cross-examined and I'll lay out some of

16  the similarities.

17          THE COURT:  Your proffer then is to establish

18  what you believe to be...

19          MR. MULLER:   The MO.

20          THE COURT:  Modus operandi; consistency of plan

21  or conduct in commission of the two crimes.

22          MR. MULLER:   Correct.

23          THE COURT:  Asserting they are -- there's

24  something unique enough that this evidence would tend

25  to show that someone other than the Defendant,

1  Mr. Love, committed the crime and even more so that

2  Mr. Williams was the perpetrator of the killing of Iris

3  Belcher.

4          MR. MULLER:   Correct.

5          THE COURT:   What exactly is it you're offering

6  or intending to offer?

7          MR. MULLER:   We would offer based on her

8  testimony back at that trial -- well, first, I think

9  both in these cases they were single women who knew the

10  perpetrator.

11          THE COURT:   I really meant you're intending to

12  read portions of the transcript from that earlier

13  trial.

14          MR. MULLER:   Correct.

15          THE COURT:   Portions of the testimony that was

16  offered in that proceeding by...

17          MR. MULLER:   Vanessa Ames.

18          THE COURT:   The victim in that proceeding.

19          MR. MULLER:   On direct examination with the

20  Commonwealth.

21          THE COURT:   Okay.  I understand.  As to...

22          MR. MULLER:   Once again as to how Mr. Williams

23  carried out that crime and the similarities to the

24  crime at hand.

25          THE COURT:   Okay.  Exactly.  Let's deal first

1   with, is this even a 404 issue?  I don't know that it

2   necessarily is.  It is certainly a hearsay question, is

3   it not?

4          MR. McCORMACK:  I believe it's certainly a

5   hearsay issue.  I also think potentially since 404 goes

6   to character evidence, here we're talking about the

7   character of a person that will never be heard or seen

8   in this courtroom, how we were impeaching them.  Most

9   of the time this testimony is introduced by the

10  Commonwealth against the Defendant.  In fact, in trying

11  to find case law concerning someone trying to put in

12  modus operandi of somebody not the party to the trial,

13  I couldn't find anything specifically on point.  So,

14  you know, it's an area that really isn't -- at least it

15  doesn't appear to me in the search I was doing -- an

16  area that's been developed in any way, shape or form.

17  I believe that I am at a serious disadvantage in the

18  fact that we introduce the testimony of Vanessa Ames

19  from a trial transcript without Vanessa Ames saying

20  anything.  Certainly my office prosecuted that case.

21  Essentially we say that LaQuan did that rape, but the

22  questions that were asked at the trial were asked to

23  elicit answers to gain a conviction against LaQuan

24  Williams.  They were not asked in order to compare that

25  particular case and the scene there with the scene in

1  this particular case and that was never part of that

2  case in any way, shape or form.

3          THE COURT:  So our record is clear here, my

4  understanding in the Ames case is, that there was a

5  brutal sexual assault involving restraining of the

6  victim.   There were -- I don't want to short circuit

7  this.  I want to make sure the record is correct.  That

8  the victim was beaten, pistol whipped in essence, that

9  there was evidence, testimony about the gun being

10 placed to her head by the Defendant and that the gun

11 misfired or did not fire for whatever reason, that the

12 Defendant in that case had taken the victim or had made

13 efforts to clean the crime scene by means of wiping

14 down surfaces he may have touched.

15         MR. MULLER:  Correct.

16         THE COURT:  And that he attempted to also kill

17 her by use of a knife.

18         MR. MULLER:  Yes, he slit --

19         THE COURT:  He did something.  He cut her and

20 left her essentially for dead, still restrained, if I

21 recall.  Now, it's that evidence that you want to put

22 into the record in this case, correct?

23         MR. MULLER:  Yes.

24         THE COURT:  Now, how do I know, based on the

25 record before me, whether this is or is not sufficient

1   pattern or practice or MO to constitute, to be

2   sufficiently relevant in the proceeding before us

3   without hearing some testimony about what the crime

4   scene was in this case?  I need to hear that testimony,

5   don't I, to make that determination?

6            MR. McCORMACK:  I think you do, Your Honor.

7            THE COURT:  We know -- I don't think anyone is

8   disputing that Vanessa Ames is not available to

9   testify.

10           MR. MULLER:  From the Defense we have not been

11  able to locate her as indicated at sidebar.

12           THE COURT:  You sent an investigator to try to

13  find her.

14           MR. MULLER:  The last indication we had she was

15  somewhere in New York.  I had the investigator look in

16  Lancaster.  My investigator actually went to five

17  addresses in Lancaster where Vanessa Ames had been

18  listed, but she was -- I think four were abandoned

19  houses and the other one was not her's, and the last

20  indication we had from someone that she had moved to

21  New York.

22           MR. McCORMACK:  I haven't attempted to

23  ascertain her whereabouts.

24           THE COURT:  She's unavailable today.

25           MR. McCORMACK:  Well, like I said, I haven't

DAUPHIN COUNTY COURT REPORTERS

1  tried to make an effort to see where she was.  I know

2  the trial transcript -- I believe she indicated she was

3  living up in New York with her parents.  I don't know

4  whether they made any effort to try to attempt to

5  ascertain where her parents were.

6        MR. MULLER:  I don't know who her parents are.

7  The Court's indulgence.

8        THE COURT:  Sure.

9        MR. McCORMACK:  Your Honor, I want to note for

10  the record, I have the trial transcript from that case,

11  Docket 339 CD 1997, Commonwealth versus LaQuan

12  Williams.  In that a series of questions were asked of

13  Ms. Ames and Ms. Ames indicated that she was residing

14  in the state of New York, that she was living there

15  with her mother, her parents.  She was asked if she was

16  working and she indicated that she was working at the

17  welfare building where she lives.  I'm not aware of

18  what efforts the Defense has made.  I understand they

19  are saying they checked maybe some phone records to see

20  if they can find some Vanessa Ames that lives in the

21  area, what effort they made to find her in New York.

22  I myself am not willing to concede the issue she's

23  unavailable.

24        THE COURT:  That was my purpose under 802 only

25  use prior testimony if she was unavailable.  Before we

1   even get to the issue whether or not this testimony is

2   under the 404 analysis sufficient -- well, under --

3   under 404 the prejudice outweighs the probative value;

4   secondly, probative value sufficient makes it relevant

5   to the issues here today, and those are the two things.

6   What have they done to try to find her?

7           MR. MULLER:   The things I indicated earlier, I

8   mean, all we have from the transcript is where she may

9   have lived at that time in the state of New York.   I

10  don't know what was done up to this point as far as New

11  York.   Locating someone in a state is somewhat

12  difficult.   We don't have the investigative resources

13  for that.

14          THE COURT:   If you don't have a social security

15  number that makes it very, very difficult.   I trust you

16  don't have that information.

17          MR. McCORMACK:   Here's part of the problem,

18  gets back to my issues.   We're beating a dead horse.

19  All this information exists in the initial case.   I

20  don't know for a fact whether that's on the initial

21  police report, her social security number, and stuff,

22  but routinely that type of information is on the

23  previous case.   Her file has been sequestered at your

24  order because their office represented LaQuan Williams

25  and here they are now blaming LaQuan Williams on a case

1   that is still on appeal, the case that the District

2   Attorney's office agreed on appeal that he should be

3   entitled to DNA testing that may come back for a new

4   trial.  Now their office is accusing their former

5   client of committing this murder because of the fact

6   he's saying that he committed this rape.  That

7   information may be contained in that old case, some of

8   the information about where --

9          THE COURT:  You're not saying that's the only

10  source of that information.  That information would

11  still be available in the original format in the

12  Commonwealth's or the police files, would it not?

13         MR. McCORMACK:  It probably would be.

14         THE COURT:  That was part of the risk, of

15  course, if something only existed in those files.

16  That's part of the risk under the Defendant's continued

17  representation through the PD's office.  That horse has

18  been beaten almost to be an unrecognizable mess on the

19  side of the highway in this case.  Let's not dwell on

20  that.

21         Assuming he's unavailable, what do I need to

22  hear to decide whether or not the probative value

23  outweighs the prejudice?  Is someone going to tell me

24  how these two things are or are not similar?

25         MR. McCORMACK:  I'm prepared to present

```
 1   testimony how they are not.

 2

 3                   GEORGE CRONIN,

 4   having been sworn, was examined and testified as

 5   follows:

 6

 7                DIRECT EXAMINATION

 8

 9   BY MR. McCORMACK:

10       Q    At this time, sir, could you please state your

11   name?

12       A    George Cronin, C-R-O-N-I-N.

13       Q    With whom are you employed?

14       A    The Pennsylvania State Police.

15       Q    What do you do for the Pennsylvania State

16   Police?

17       A    I'm in the criminal investigation assessment

18   office for Troop H, Harrisburg.

19       Q    What is the criminal investigation assessment

20   office or what is that?

21       A    My prime duty is to investigate a homicide and

22   serial sex offenders who include pedophilia adults who

23   commit multiple sexual crimes or murder.  I, in fact,

24   provide input with regards to modus operandi, signature

25   aspect of offender/victim dynamics and interpretation
```

DAUPHIN COUNTY COURT REPORTERS

1  of crime scene evidence.

2      Q    Tell me what type of training gives you the

3  ability to be able to do those things for the State

4  Police.

5      A    I had specific training with regards to the

6  aforementioned aspects of investigation going all the

7  way back to 1992.  I've been a member of this unit for

8  about 16 years now and this would include training at

9  the FBI academy, training at various seminars.  I read

10  extensively on the subject matter and have a great deal

11  of investigative experience in this regard.

12      Q    And when you talk about let's say an MO, what

13  are the types of things that you would look for to

14  determine whether or not it's an MO?

15      A    Modus operandi, what an offender does to

16  accomplish the crime, the steps he takes to select a

17  target, to commit the act and to evade detection.  An

18  MO is something we see that changes over time.  In

19  other words, an offender begins a criminal career.  As

20  he becomes successful he learns what works and what

21  does not work.  Another way of putting that, he becomes

22  criminally sophisticated over time.

23          So for instance, look at a burglary; a burglary

24  at the beginning of a career is throwing rocks through

25  a front window of a residence.  He learns that attracts

1  attention.  He goes to the back of the house and using

2  a slim jim to pry open the back door.  As he moves

3  along his criminal career --

4      Q    You were asked by me to evaluate certain cases

5  and individuals in this particular case.  Is that true?

6      A    Yes.

7      Q    And have you had an opportunity to review --

8  why don't you tell me what items you reviewed.

9      A    I've reviewed the police investigative file

10  with regards to the murder of Iris Fennell and the rape

11  of Vanessa Ames.  I had an opportunity to discuss these

12  cases with the investigators.  I reviewed lab reports,

13  courtroom testimony, crime scene photographs, and with

14  regards to the Fennell investigation, I was actually

15  assisting proactively the lead investigator, Donald

16  Heffner, back in 2003 it was.

17      Q    2003?

18      A    Yes.  I had been at the crime scene.

19      Q    Not at the crime scene in '96 but 2003 you

20  visited where the crime occurred?

21      A    Yes, sir.

22      Q    And you also had taken some witness statements

23  in this case?

24      A    Yes, I have.

25      Q    You said you viewed crime scene photographs.

1  Which crime scene are we talking about?

2      A    I reviewed photographs from the Ames' rape and

3  the murder of Iris Fennell.

4      Q    Now, in the course of -- for lack of a better

5  term, I'll use profiling one crime scene against the

6  other.  Were you ever able to reach any conclusions

7  concerning the different crime scenes?

8      A    Between Ames and Fennell?

9      Q    Between Ames and Fennell.

10     A    Yes, sir.

11     Q    And --

12          THE COURT:  Are we referring to the victim

13  here?  I have referred to her as Iris Belcher.

14          MR. McCORMACK:  Iris.

15          THE COURT:  Fennel, F-E-N-N-E-L?

16          MR. McCORMACK:  That's correct.

17          THE COURT:  Just so it's the same person.

18          MR. McCORMACK:  Yes, sir.

19  BY MR. McCORMACK:

20     Q    Take us through what you know of the Vanessa

21  Ames' rape that occurred on December 20, 1995.

22     A    The offender in this case, the accused,

23  Mr. Williams approached the apartment in the early

24  morning hours on the 20th.  The weather conditions were

25  cold.  I understand there was snow on the ground.  He

DAUPHIN COUNTY COURT REPORTERS

1  used a ruse, if I could refer, ruse to enter the
2  apartment, knocked on the door and had a conversation
3  about duck tape or something.  He gains entrance into
4  the apartment.
5      When he's in the apartment he manages to engage
6  the victim in conversation to the point where she
7  achieved a level of comfort.  They actually did sit
8  together in the living room; something about a
9  cigarette.  So he spends a little bit of time with her
10 there and as she gets up to move away she's not
11 expecting an attack.  He strikes her on the back of the
12 head with what appears to be a gun.  That's his way of
13 asserting control over her at that time by rendering
14 her vulnerable, I should say, or stunned her.
15     At that point the phone rings and that's a
16 diversion in the attack.  He puts the gun down.  She
17 moves to recover the gun.  He disables the telephone.
18 There's a struggle over the gun and he hits her again.
19 Again takes her under control.  He has control over her
20 at that point and moves her into the bedroom.  She is
21 not unconscious.  But rather she is clearly under his
22 control.
23     I note that the testimony describes a period of
24 time when she was bound to the bed and duct tape was
25 applied.  I would note nothing to suggest that she

1  proactively tried to resist.  It indicates to me at

2  that point she was under his control completely.

3         What we don't see is any excessive violence.

4  He has stopped beating her.  He's done what he needs to

5  do to control that victim.  She's on the bed.  Tape is

6  applied to her head.  She's bound, and there's a sexual

7  assault that occurs.

8         I would note too of interest in this case is

9  when the duct tape is applied he allows her to see and

10 he puts tape over her mouth, and she states that she

11 can't breathe very well.  He takes the time to cut a

12 slit in the mouth where the tape is so she can breathe.

13 This is not a man that's about excessive violence at

14 this point.

15        MR. MULLER:   Your Honor, I'm going to object

16 to the commentary.  I thought we were having a witness

17 testify as to the crime scene not as to the nature of

18 the perpetrator or the person.

19        THE COURT:   I don't know that we have a proper

20 foundation for that.  Frankly I think he's going to

21 speculation as to mental state.

22        MR. McCORMACK:   I can certainly go through more

23 foundation.  Your Honor, I'm putting a witness up to

24 rebut their claims, but they haven't given me a

25 specific -- this is exactly why I say all of this is

1  exactly the same so that the proof that LaQuan Williams

2  did this rape is the proof that he committed this

3  crime.  So I'm trying to address --

4        THE COURT:  I understand.  I don't know that we

5  need to speculate into mental state of the individual

6  at the time of the act.  We're looking at what was

7  actually done.

8        MR. MULLER:  If I have to show common scheme

9  or something like that.  It's acts.  It's not what

10  someone was thinking.

11        THE COURT:  I don't know that we need to get

12  into the speculation as to the mental state of the

13  perpetrator in the Ames case only to see what it was

14  that was done.  I appreciate that the officer is trying

15  to share with me his conclusion.  But I don't know that

16  we -- frankly, what he just said, certainly duct tape

17  is somewhat inconsistent with what you had made mention

18  at the sidebar conversation what was going on.  But I

19  need to hear what went on not a supposition of what was

20  going on in the guy's mind at the time the crime was

21  being committed.

22        MR. McCORMACK:  As I indicated at sidebar,

23  that's the reason I had Corporal Cronin because he

24  understands the case.  He spent time with the cases and

25  is much better than my misspeaking that I made.

1      THE COURT:  That's fine.

2      MR. MULLER:   I don't object to the factual

3  testimony as to the crime scene.  I object to the

4  criminal profiling.

5      THE COURT:  We will be walking a fuzzy line

6  here.  You're suggesting that from one crime scene one

7  can develop the inference that at the other crime scene

8  it was the same person.  There is a certain amount of

9  projection and an explanation that I'm willing to

10  permit, but I don't want to get into psychoanalysis of

11  the perpetrator in each case.  I assume he's seen the

12  investigative reports, knows the statements that were

13  made and the motion itself sets forth the areas that

14  are being proffered as being identical or at least

15  similar.  That's what we want to focus on.

16      MR. McCORMACK:  I haven't seen the motion

17  itself but from all our discussion --

18      MR. MULLER:   It was delivered to the DA's.

19      THE COURT:  It was delivered to me today.  You

20  may use my copy.

21  BY MR. McCORMACK:

22    Q   Corporal, you indicated that as this was going

23  on at some point in time he cut a hole in the duct tape

24  that was across the mouth.  You indicated that the

25  victim was allowed to -- nothing was put across her

1 eyes at this point in time.  You did indicate that

2 there was some point in time he gained control of her.

3 He had her in the bedroom and that there was some type

4 of binding.  Can you describe in detail as best you can

5 how was she secured in the bedroom?

6     A    Each leg was secured on opposite sides of the

7 bed so her legs were spread and her genitals were

8 exposed.  Her head is duct taped down and from the

9 testimony I was not able to determine how her hands

10 were secured.

11    Q    Now, was there an attempt to -- so you

12 indicated up to this point from the -- at least the

13 reports that you reviewed and the trial transcript she

14 had been hit twice?

15    A    Yes.

16    Q    Now, she is in the bed and does he attempt --

17 do anything further?

18    A    Yes.

19    Q    What occurs?

20    A    After she is bound and immobilized, he attempts

21 vaginal penetration, which was unsuccessful.  He

22 manipulates her position.  He attempts anal

23 penetration, which again is unsuccessful.  He

24 manipulates the person again and this time inserts his

25 penis in her mouth, leaves to obtain Vaseline from the

1   bathroom, comes back and vaginally rapes Ms. Ames.

2       Q    Now, when he was in the bathroom he indicated
3   he went and got some Vaseline?

4       A    Yes, sir.

5       Q    Did he do anything else in the bathroom at any
6   particular time?

7       A    Yes, he does.

8       Q    What did he do in the bathroom?

9       A    Following the assault with Ms. Ames he
10  unsecures her in some manner.  It's not clear to me but
11  it allows him to transport her to the bathroom.  In the
12  interim apparently put water in the bathtub.  He either
13  puts her or directs her in the bathroom.

14      Q    You mean Ames?

15      A    Ames in the bathtub.

16      Q    Then what happens?

17      A    Then they leave the bathroom.  Mr. Williams
18  puts Ms. Ames -- he secures her.  He dresses himself,
19  sits and apparently he engages her in conversation and
20  there's some testimony about a cigarette being
21  consumed.  During this time he undresses again and
22  vaginally rapes Ms. Ames again.

23           Following this assault he goes to the bathroom,
24  retrieves some towels and begins cleaning up the scene.
25  During this activity he placed a wet towel or damp

1    towel against Ms. Ames' head and ostensively puts a

2    firearm to her head with the towel as a buffer and

3    pulls the trigger on the gun.  Ms. Ames testifies

4    hearing a click.  The gun misfired.  I believe the

5    testimony is three.  This towel obstructs her view.

6    She can't see.  The next thing she talks about is

7    feeling dampness around her shoulders.  There's some

8    testimony that Mr. Williams called her name, moved her

9    leg and in his mind apparently thought she was deceased

10   and he leaves the scene.

11        Q    Now, these are -- this is -- what you just

12   recited are certain facts that you gleaned from the

13   transcript and the reports; is that correct?

14        A    Yes, sir.

15        Q    The portion of time as he had her in the tub,

16   do you know what he himself was doing?  Pardon me.

17   After he gets her out of the tub where does she go

18   after?

19        A    Back in the bed.  He dries her off, puts her

20   back in the bed.

21        Q    What does he do after that then?

22        A    It's my recollection that he gets dressed and

23   maybe some clean up that goes along.

24        Q    He puts his clothes on?

25        A    Yes, sir.

1     Q    The wiping down of everything to the best of

2    your recollection, does that occur prior to the second

3    attempt at rape after the bath or prior -- or after?

4    Does that make sense?

5     A    I'm not sure.  I believe it may be after the

6    second.  It's definitely before he cuts her throat.

7     Q    Realizing you're working from memory, so we get

8    this right, on page 65 if you can -- starting on page

9    64, just briefly read that so your recollection is

10    fresh.

11     A    He made --

12          THE COURT:  Read it out loud?

13          MR. McCORMACK:  In fact, that might be the

14    clearest way to do it, Your Honor.

15          THE COURT:  In order to keep her from being mad

16    at you, read very slowly.

17          THE WITNESS:  From the top of page 64.  This is

18    the answer to a question.  Then he made me get out of

19    the tub and laid me back on the bed, and he had at

20    first put his clothes on.  After he put me in the tub

21    of water he puts his clothes on.  When he put me in the

22    tub of water, took me back out, put me on the bed,

23    strapped me down and put his clothes on.

24          What did he do after that?

25          Then he started wiping down his fingerprints,

1    and then he decided to take his clothes off again and

2    rape me.

3           Question:  Let's go back.  Now after you were

4    taken out of the bathtub and retied to the bed and the

5    Defendant starts putting his clothes back on, how does

6    he wipe down, and with what, his fingerprints?

7           The answer is, with the towel.

8           Question:  What towel are we talking about?

9           Answer:  It was a green or burgundy towel.  I

10   don't know which one.

11          Question:  Did he use that towel to dry you

12   off?

13          Answer:  The green one.

14          Question:  In what manner did he use one of the

15   towels to wipe things down for prints?

16          Answer:  What do you mean?

17          Question:  Well, when was he doing -- describe

18   to the jury where did he wipe with the towel and what

19   room did he go into?

20          Answer:  He wiped down the headboard,

21   refrigerator, things he touched in the kitchen and I

22   guess things he touched in the living room.  He wiped

23   them down with the green towel.

24          Question:  Did you see him wipe the

25   refrigerator down or don't you recall?

 1          Answer:  No, I don't recall.  I mean, he went

 2  in there wiping everything down because he said they

 3  won't trace something.  Something he was saying to that

 4  effect.

 5          Question:  What happened after he got done

 6  wiping things down?

 7          Answer:  He came back to the room, took his

 8  clothes off again and that's when he raped me for the

 9  last time.

10  BY MR. McCORMACK:

11      Q    Thank you.

12          Actually after he raped her for the last time

13  did he do anything?  Perhaps where you just ended.

14      A    Continuing to page 65 halfway down, the

15  question before we get to the last third, and he wiped

16  fingerprints; what kind of time period between when he

17  wiped it down and when he took his clothes back off?

18  He came and sat down and smoked a cigarette.  He

19  started drinking.

20          Question:  Where was this at?

21          Answer:  In the bedroom.  He was sitting on the

22  bed in the bedroom, sitting on the floor in the bedroom

23  and he smoked a cigarette.

24      Q    How long a time period was it that he smoked a

25  cigarette there?

1     A    The testimony is five to ten minutes.

2     Q    Then after he smoked the cigarette is when he

3 raped her for the third time?

4     A    Yes, sir.

5     Q    Do you recall how long a period of time it was

6 that he raped her that third time?

7     A    I believe it's a shorter period of time than

8 the first vaginal penetration.

9     Q    On page 66 in the middle.

10    A    Question:  How long did he engage in that?

11          Answer:  About ten minutes.

12    Q    Did he engage in that course of conduct until

13 he ejaculated?

14    A    She said she's not sure.  The lab reports

15 weren't sure he ejaculated.

16    Q    As to the state of his clothing at the time

17 when her head is wrapped in that damp towel, does she

18 describe whether he was still naked, whether he had his

19 clothes back on?

20    A    I believe he was dressed.

21    Q    Now, what I want to do is direct your attention

22 to the second crime scene that we were discussing here

23 this morning, being the one involving the victim in

24 this case, Iris Belcher or Iris Fennel.  Did you review

25 the police reports in this case?

1    A    I did.

2    Q    And you've had an opportunity to review the

3    photographs in this case?

4    A    Yes, sir.

5    Q    And I think you also mentioned that at some

6    point in 2003 you actually for yourself went and viewed

7    the scene as it was in 2003?

8    A    Yes, sir.

9    Q    In 2003 somebody else was living in the

10   residence; is that correct?

11   A    Yes, sir.

12   Q    Now, describe the scene for the court from your

13   review of the records and the photographs of the crime

14   scene that was present essentially when the police

15   arrived December 20, 1996 at the McCleaster house where

16   Iris Fennel --

17   A    The investigative report and the evidence

18   indicate that the assault begins in the kitchen.  There

19   was blood splattered which is consistent with a

20   physical beating, blunt trauma being applied to

21   someone.  It creates a condition on the body of the

22   victim where there's open wounds and a great deal of

23   blood begins to be lost.  The blood spatter in the

24   case, there's various velocity of bloods.  We have

25   spray patterns present, also drops being -- drops on

1  the floor, significant amount of blood, indicative of a

2  violent encounter.  The assault appears to continue up

3  the stairs where there's blood and hair evidence into

4  the second level, into a bedroom area.  There's also

5  blood evidence in the living room area that joins this

6  bedroom.

7         Within the bedroom the scene is chaotic.

8  There's things strewn about.  There's stereo equipment

9  stacked at one point but knocked aside; mattress askew.

10 All these things are indicative of a very violent

11 assault in the bedroom area.

12        I would note also that the focus of the attack

13 clearly is the face.  There's evidence of significant

14 violence directed at the victim's face.  The victim

15 suffers from a broken nose, bruises and lacerations to

16 her face and head.

17    Q    From your review of the case was there any

18 evidence either through the autopsy or any subsequent

19 laboratory testing that there was any sexual assault

20 against Iris Fennel?

21    A    There was no evidence of sexual assault.  In

22 fact the autopsy reflects Ms. Fennel was menstruating

23 at the time.  If someone penetrated you with an object

24 there would have been some evidence of that

25 penetration.

1        To contrast that with the Ames' incident
2   whereupon treatment at the hospital there was
3   significant irritation and pain noted by the doctors in
4   the vaginal vault of the victim Ames.
5       Q    The crime scene on McCleaster Street in 1996 in
6   comparison of the photographs, how would you describe
7   the 1995 rape of Ms. Vanessa Ames and that crime scene
8   as to what is found in 1996 at the Iris Fennel home,
9   the difference between two of them?
10      A    The differences are significant.  The first
11  crime scene represents an individual who was under
12  control.  This is an individual --
13           MR. MULLER:  Objection, Your Honor.  This is
14  speculation again going into his --
15           THE COURT:  Now it's comparison.  I'm going to
16  allow it, to compare the scene.
17           MR. MULLER:  I understand that.  Now he's
18  talking about a person under control.
19           THE COURT:  I take it as going to the
20  psychoanalysis of the person just that the crime scene
21  was -- let me see if I can move this forward a bit.
22  The crime scene was not one of chairs and furniture
23  upset or being broken, stereos overturned.  Everything
24  was reasonably ordered.
25           THE WITNESS:  Yes, sir.

1          THE COURT:  I understand that point.
2    BY MR. McCORMACK:
3        Q    And the crime scene where Iris Fennel was found
4    not was reasonably ordered?
5        A    It was chaotic.
6        Q    Was there any evidence -- well, you indicated
7    that there was evidence of blood and other items at
8    that particular crime scene.
9        A    At the Fennel murder, yes, sir.
10       Q    From what you have been able to view of the
11   crime scene involving Iris Fennel and review of autopsy
12   reports and other reports, were you able to make an
13   analysis as to whether the location and the manner in
14   which Iris Fennel's body was found appeared consistent
15   with perhaps how she would have been when she was
16   killed?  Was the crime scene changed in any way?
17       A    In my opinion, yes.
18           MR. MULLER:  I'm going to object.  I don't know
19   what his foundation is.
20           THE COURT:  I'm not sure I do either.  I'm
21   not sure I followed the question all that clear.  What
22   are you asking?
23           MR. McCORMACK:  Is the body located, when the
24   police arrived at the location where it would appear
25   from the crime scene where she was -- actually where

```
 1   her body fell.
 2        MR. MULLER:  What does this have to do in
 3   comparison with Vanessa Ames?
 4        THE COURT:  I don't know.
 5        MR. McCORMACK:  It's our theory of the case,
 6   Your Honor, that this Defendant in this particular case
 7   was staging this crime scene to make it appear that
 8   LaQuan Williams committed this crime.  He was familiar
 9   with the Defendant.  He was familiar with LaQuan
10   Williams.  Many people were.  Seems like everybody in
11   town in that area was aware of the fact that he was on
12   the run for this particular rape and the Defendant --
13        THE COURT:  Okay.  What's the basis that this
14   witness is going to know that?
15        MR. McCORMACK:  I can get into all that.
16        THE COURT:  He'll be able to testify as to a
17   change of position at the time of death.
18        MR. McCORMACK:  I can simply ask him what he
19   bases that on.
20        THE COURT:  That's fair enough.  Objection
21   overruled.
22   BY MR. McCORMACK:
23      Q   What do you base that on?  Can you give us some
24   detail why you believe that?
25      A   Sir, I have specific training and recent case
```

1    experience with regards to crime scene staging,

2    particularly a murder, in the last few years.  Both

3    cases --

4           THE COURT:  I'm not so much concerned about

5    your experience.  I'm concerned with what's the basis

6    upon which you draw the conclusion as to the Fennel

7    murder scene?

8           THE WITNESS:  The first thing that I looked at

9    was the crime scene photographs.  It is apparent from

10   where she lay and in her final position that was not

11   where she died.  When a body stops functioning or death

12   occurs, changes happen subtly first but more pronounced

13   over time.  One change is rigor mortis, stiffening of

14   the muscle.  From the crime scene photographs the elbow

15   is elevated off the floor and off her chest.  It's

16   indicative of rigor.  That's indicative of a body that

17   has been moved after rigor, witness statements,

18   paramedic reports that the body is cold.  We have a

19   witness that attempts to do first aid and of course the

20   body is cold.  That's indicative of a period of time,

21   significant period of time after death.

22          We have a witness at the scene that puts the

23   victim on a mattress lying flat with her shirt pulled

24   up, breasts exposed.  That is not the position we find

25   her in in the photographs when the police arrive, and

1  finally she's posed in a sexual, provocative manner.

2  Again, I've seen this several times, and as she lay on

3  the floor her legs are spread.  One leg is under a

4  mattress and one lays on top.  It's not in a position

5  that's consistent with her being shot.  All those

6  things taken together and lack of any kind of sexual

7  trauma or evidence of any sexual activity whatsoever,

8  indicates to me that the body has been moved and

9  positioned purposely and, therefore, the crime has been

10  staged.

11 BY MR. McCORMACK:

12      Q    Also from the autopsy was there any notation

13 concerning blood spatter or blood evidence in the

14 region where her clothing would be?

15      A    Yes, there was.  The autopsy report makes great

16 reference to areas that are void of blood spatter and

17 evidence where one would expect it to be if she was

18 undressed when the assault had occurred.  In other

19 words, she was dressed when the assault began and

20 there's blood evidence that indicates that.  So after

21 the assault stops, bleeding stopped, she was undressed.

22      Q    In particular there was a void in the area kind

23 of from the waist to mid thigh?

24      A    Yes, sir.

25      Q    But there was some blood evidence lower down,

1  from the thigh down?

2      A    Yes, sir.

3           (Whereupon, Four Photographs are produced and

4  marked for identification as Commonwealth Exhibit

5  Nos. 1 through 4.)

6  BY MR. McCORMACK:

7      Q    Corporal Cronin, I'm going to show you four

8  photographs.  Are these some of the photographs you

9  have reviewed prior to your testimony today?

10     A    Yes, sir.

11     Q    I ask you to take a look at Commonwealth

12 Exhibit No. 1, which is the one right on top.

13          THE COURT:  Are these consecutively numbered

14 one, two, three and four?

15          MR. McCORMACK:  Yes, Your Honor.

16 BY MR. McCORMACK:

17     Q    Commonwealth Exhibit No. 1, you were just

18 describing for the Judge the state that the body was

19 found with the legs, one leg on top of the mattress and

20 one leg below the mattress.  Can you describe what

21 Commonwealth Exhibit No. 1 is?

22     A    Commonwealth Exhibit No. 1 depicts the body as

23 found by the police when they arrived, and closer

24 examination shows that the legs are spread so the

25 vaginal area is exposed.  The left arm is elevated off

1  the ground, right arm elevated off the body.  She's on

2  her back.  The shirt is down and her head is turned to

3  the left.

4      Q    If you could look at Commonwealth Exhibit

5  No. 2.  What is Commonwealth Exhibit No. 2?

6      A    This offers a second photograph of the position

7  of the body from a closer perspective.  From this

8  position we see an obvious gunshot wound to the right

9  side of her face, significant bleeding, trauma to the

10  face, blood spatter to her shirt.  There's a better

11  perspective of the position of her arms.  We can see

12  what appeared to be defensive injuries -- I'm sorry --

13  assault injuries to her arms, blood on her hands.

14  There is a blood pattern across the cheek almost from

15  the perspective of the photograph it's almost

16  horizontal.

17      Q    Is there also blood evidence in a basket that

18  appears perhaps a foot away from her head?

19      A    Yes, there is.

20      Q    Commonwealth Exhibit No. 3, could you look at

21  that exhibit.  Tell me what you see in Commonwealth

22  Exhibit No. 3.

23      A    This is a position of the victim, again she lay

24  on the floor, from a different perspective about 90

25  degrees from photograph No. 2, and there's a scale that

1  appears on the victim's face.  Again, we have more of a

2  different perspective of the blood pattern, injury

3  patterns.

4        Now, the blood that appears to be emitting from

5  the wound that is, for purpose of the record, a

6  blackish circle, what appears to be gun powder with a

7  black circle in the middle of it on her -- appears to

8  be the right jaw bone about halfway, two thirds of the

9  way between her chin and the back of her jaw.

10     Q    You mentioned before a horizontal line of blood

11  that appears in this photograph also.

12     A    Yes, it is.

13     Q    Does that blood appear to be flowing uphill

14  from the position that her face is there?

15     A    Yes.  I know what you mean.  That is not the

16  pattern -- the flow pattern is not consistent with how

17  she lay here.  This is another indicator that the body

18  has been moved postmortem.

19     Q    And then the final photograph, Exhibit 4, could

20  you describe what that is?

21     A    This is a photograph from the perspective of

22  approximately where the victim lay depicting the

23  condition of two of the mattresses within the bedroom.

24  This photograph depicts a blood smear, as much as two

25  perhaps more blood smears; additional evidence of a

1 sock that matches the sock that's on her right foot.

2   Q   And, in fact, her foot has one sock on and her

3 other foot has no sock?

4   A   That's correct, and the one that is on is in

5 such a condition it appears that someone or something

6 had begun to remove it from the foot.

7   Q   Removed a little bit from the foot?

8   A   That's correct.

9   Q   It wasn't on tight.

10   MR. MULLER:   Objection; to speculation.

11   THE COURT:   I understand.   It's not necessary.

12 Sustained on the objection.

13   (Whereupon, a Photograph is produced and marked

14 for identification as Commonwealth Exhibit No. 5.)

15 BY MR. McCORMACK:

16   Q   Corporate Cronin, I'm showing you Commonwealth

17 Exhibit No. 5.   Can you take a look at that photograph?

18   A   Yes.

19   Q   You just described to the Court the state of

20 the sock that was still on her foot.   Does that

21 photograph accurately depict what you were describing?

22   A   It does.

23   Q   In addition to what you describe there is also

24 blood evidence that appears to be on the bottom of her

25 socks?

1     A    Yes.

2     Q    From what you described about blood on both the

3 first floor and in both rooms, because you mentioned

4 there was some blood evidence in the living room as

5 well as the bedroom where she was found, was there any

6 evidence that that blood was being cleaned up?

7     A    There's a photograph within the inventory of

8 pictures that depicts a bottle of Clorox in the kitchen

9 and there is what appears to be some wipings on a wall

10 in the kitchen near the bottle of Clorox.

11         (Whereupon, a Photograph is produced and marked

12 for identification as Commonwealth Exhibit No. 6.)

13 BY MR. McCORMACK:

14     Q    I'm going to show you Commonwealth Pretrial

15 Exhibit No 1.  Is that what you are just describing?

16     A    Yes, it is.

17     Q    You say there is some evidence of wiping.  What

18 do you mean by wipings?

19     A    There appears to be a differential color

20 pattern to the wall and a darker spot appears to be

21 what I would consider consistent with a wipe or splash

22 on that wall.

23     Q    Of that particular picture you have knowledge

24 through that picture?

25     A    Yes, sir.

1    Q    When you were at the scene you weren't able to
2  do a comparison?

3    A    No, sir.

4    Q    Is there anywhere else in the house, whether or
5  not one particular spot, where Clorox was found?  Was
6  there evidence that someone had wiped different areas
7  down?

8    A    I don't recall any.

9    Q    And that includes the bedroom where her body
10 was found?

11   A    Yes, sir.

12        MR. McCORMACK:  They are all the questions I
13 have.

14        THE COURT:  Your call, Mr. Muller, cross or
15 lunch break.

16        MR. MULLER:   I call lunch.

17        THE COURT:  Me too.  We're going to recess
18 until at this point 2:15.

19        (A lunch break is taken from 12:48 p.m. to
20 2:27 p.m.)

21

22

23

24

25

60

1          Monday, September 12, 2005

2              Afternoon Session

3

4      (The jury entered the courtroom at 2:27 p.m.)

5      THE COURT:  Corporal, you can retake the

6  witness stand.  We note for the record the Defendant is

7  not present at this moment.

8      MR. MULLER:  My colleague, Mr. Giunta, just

9  went out to look for him.

10     THE COURT:  I can't imagine there's -- well,

11  tell me if you object.  I told him we were going to

12  start at 2:15.  I gave everyone ten minutes extra.

13     MR. MULLER:  I think for this portion we're

14  fine to proceed.

15     THE COURT:  You're cross-examining.

16

17              CROSS EXAMINATION

18

19  BY MR. MULLER:

20     Q    Is it corporal?

21     A    Yes, sir.

22     Q    So in the -- you looked over both cases and if

23  I understand correctly at least initially in the

24  Vanessa Ames' case, Mr. Williams approached the

25  apartment in the early morning hours, correct?

1   A   That's my understanding.

2   Q   He used some sort of ruse to enter?

3   A   Yes.

4   Q   And when you say that you mean he said he was

5   there for something or for some other reason?

6   A   Correct.   There was no forced entry.

7   Q   Okay.   He managed to engage her in conversation

8   to achieve a level of comfort?

9   A   Yes, sir.

10   Q   And then he struck her with a gun?

11   A   Yes, sir.

12   Q   When she wasn't expecting it?

13   A   Yes, sir.

14   Q   And he didn't bring the duct tape with him.   It

15   was there?

16   A   Yes, sir.

17   Q   And from the testimony, her testimony back

18   then, it would appear she's not the one he was angry

19   with.   He was angry because her boyfriend was sleeping

20   with his girlfriend?

21   A   I disagree with that, sir.

22   Q   Well --

23   A   The testimony, as I read it, sir, is, that

24   that's what he said to her.

25   Q   Yes.

1    A    There was no evidence of that introduced into
2  that trial and then that statement, in fact, his
3  girlfriend denies there was any such activity therefore
4  no basis for the statement he made.

5    Q    That's what he suspected?

6    A    That's what he said.

7    Q    Okay.  And his girlfriend testified for him at
8  the trial?

9    A    I think she just testified.  As I understand
10 it, there was no relationship, no love loss between the
11 two.

12   Q    That wasn't my question.  She testified on his
13 behalf at the trial.

14   A    At this moment I don't recall if she's a
15 prosecution witness or defense witness.

16      MR. McCORMACK:  I'll stipulate she was called
17 by the Defendant.

18      THE COURT:  All right.   Thank you.
19 BY MR. MULLER:

20   Q    You did not view that scene as you viewed this
21 scene; is that correct?

22   A    No, sir.

23   Q    There was a struggle in the kitchen area then
24 he moved her to the bedroom?

25   A    Yes, sir -- as I understand it, this was the

63

1   living room.  There was a couch present and that was

2   the site of the initial assault.  Then they moved to

3   the bedroom.

4        Q    And at some point he attempted to clean the

5   scene using a wet towel left at the scene thinking she

6   was dead and in this case someone -- there was no

7   forced entry in this case, correct?

8        A    In the Ames' case?

9        Q    No, in the Love case, Tyshaunt Love, Iris

10  Fennel.

11       A    No, sir, no forced entry.

12            MR. MULLER:  The Court's indulgence.

13  BY MR. MULLER:

14       Q    The victim in this case was acquainted with

15  Mr. Williams?

16       A    I'm sorry.  The Fennel case?

17       Q    Yes.

18       A    Yes, sir.

19       Q    And I guess, so the record is clear, Ms. Ames

20  was also acquainted with Mr. Love, she knew him?

21       A    Yes, sir.

22       Q    In this case the victim was beaten, correct?

23       A    Fennel?

24       Q    Yes.

25       A    Yes, sir.

1    Q    You indicated you reviewed the records of each

2  case including police reports, correct?

3    A    Yes, sir.

4    Q    So you're familiar with an allegation that she

5  had turned him into the police at some point?

6    A    Yes, sir.

7    Q    And you're familiar with several people saying

8  that either she was afraid of him because of that or

9  that he had threatened to kill her because of that?

10   A    She was afraid of him.  I don't recall any

11  direct threats against her.

12   Q    Did you read the statements in the case?

13   A    Yes, sir, but there was a great number of them.

14   Q    Do you recall this person named Larry Fennel?

15   A    I heard his name this morning, yes, sir.

16   Q    Do you recall reading his statement?

17   A    I remember something.

18   Q    Involving a phone call with LaQuan Williams?

19   A    Yes, sir.

20   Q    And in that phone call a threat on Iris's life

21  is made because she snitched?

22   A    Yes, sir.

23   Q    Do you recall a witness by the name of Kwajalyn

24  Jackson that was interviewed in this case?

25   A    No, sir.

1    Q    Go back.   Cause of death, the cause of death in

2  Iris's case was a shot to the head?

3    A    I'm sorry?   Gunshot wound to the head.

4    Q    Yes.

5    A    Yes, sir.

6    Q    And Mr. McCormack asked you about there was a

7  bottle of bleach there and maybe something was wiped

8  down next to the bleach or not.

9    A    Correct.

10        THE COURT:   In the kitchen.

11        THE WITNESS:   In the kitchen next to the

12  refrigerator, first floor.

13  BY MR. MULLER:

14    Q    Yes.   You spoke about rigor mortis and the body

15  being moved in this case.

16    A    Yes, sir.

17    Q    In the one photo the Commonwealth introduced to

18  you, a close-up picture of her head on the carpet?

19    A    Yes, sir.

20    Q    There was quite a puddle of blood beneath her

21  nose and the head, correct?

22    A    Yes, sir.

23    Q    So she was alive or bleeding there, correct?

24    A    No, sir.

25    Q    How can you determine that?

66

1    A    I'm certainly not a pathologist.  She received

2 two wounds in the head from a gunshot, a significant

3 amount of injury even postmortem will continue to run

4 from the wound sites.

5    Q    It is your allegation that she wasn't moved

6 right away because we talked about the postmortem

7 bleeding.  This is Commonwealth Exhibit No. 3 -- may I

8 approach the witness?

9         THE COURT:  Certainly.

10 BY MR. MULLER:

11    Q    So we're on the same page here, indicating or

12 showing blood pooling beneath her somewhat.

13    A    Yes, sir.

14    Q    You're indicating that could be postmortem?

15    A    Yes.

16    Q    I understand you're not a pathologist.  Do you

17 have any indication of how long?

18    A    No indication, no indication of time I should

19 say.

20    Q    In this case I believe you stated that it was

21 chaotic, the apartment had been thrown about, the

22 contents.

23    A    The Fennel scene.

24    Q    As if someone was looking for something.

25    A    I didn't say that.

1    Q    What is it you made of the blood on the bottom
2 of her foot, the sock?

3    A    It would appear to me she stepped in blood.

4    Q    But did that indicate anything to you about the
5 crime scene?

6    A    She stepped in blood.  There was blood present
7 for her to step into.

8    Q    The blood spatter you spoke of, did you make
9 that determination based upon photographs or anything
10 else?

11    A    Photographs.

12    Q    Did you review the lab reports as to
13 identification of the blood, as to whose it is?

14    A    I don't specifically recall the report
15 regarding the blood in the kitchen.

16    Q    You don't recall?

17    A    As I sit here.

18    Q    The lab reports regarding the blood found on
19 her or others?

20    A    There was some lab reports regarding blood
21 analysis.

22    Q    Back to the issue of whether she was sexually
23 assaulted, you indicated I guess from the autopsy that
24 she was menstruating.

25    A    That's correct.

1    Q    And why did you say there would have been
2  evidence of penetration based on that?
3    A    When there's sexual activity especially close
4  to the time of death evidence of that sexual activity
5  will be present during autopsy.
6    Q    What does that mean?  Are you talking sperm
7  or --
8    A    Sperm will certainly be an indication, some
9  kind of irritation or perhaps trauma to the vaginal
10  vault, perhaps some kind of evidence present on the
11  vulva or the anus depending on what kind of activity.
12    Q    I guess what I'm trying to determine is, you
13  indicated on direct because she was menstruating there
14  would have been evidence of penetration?
15    A    I said, sir, because she was menstruating
16  during autopsy shows no evidence of sexual assault.
17    Q    So that the fact that she was menstruating had
18  nothing to do with whether they could have determined
19  whether there was penetration.  That's what I gathered
20  from your direct testimony.
21    A    Menstruation is evident at autopsy and there
22  was a lack of sexual activity.  If there was sexual
23  activity it would have been revealed through an
24  autopsy.
25    Q    How so?

1       A     Perhaps the question is better for the

2   pathologist.   In the autopsy report there would have

3   been some indication of sexual activity, in my

4   experience, whether consensual or otherwise.

5       Q     When you say evidence of sexual activity, what

6   are you referring to in your experience?

7       A     Evidence of spermatozoa, evidence of

8   irritation, trauma that I previously described, foreign

9   hairs.

10          MR. MULLER:  The Court's indulgence.

11  BY MR. MULLER:

12      Q     I guess in the Vanessa Ames' case there was at

13  least back then a question about whether there was any

14  DNA evidence such as spermatozoa or anything else,

15  correct?

16      A     Well, no, sir, as I read the report, there was

17  ample evidence of spermatozoa present on several --

18  three articles of clothing and in her vaginal vault.

19          MR. MULLER:   That's all I have.

20          THE COURT:  Any redirect?

21          MR. McCORMACK:  Yes, Your Honor.

22

23

24

25

<div align="center">REDIRECT EXAMINATION</div>

BY MR. McCORMACK:

Q   You were asked by Mr. Muller about whether the fact that anybody, Larry Fennel being named.  He gave you -- indicated that LaQuan Williams either knew or had threatened Iris because she had snitched on him. Are you aware of LaQuan Williams' statement to the police where he indicates that it wasn't Iris he believed did it that instead it was Candi Mills that snitched on him?

A   Yes, I read that.

MR. McCORMACK:  If I could have one moment, Your Honor.

BY MR. McCORMACK:

Q   Are you also aware through your investigation or through your contact with this case where LaQuan Williams is currently?

A   Yes.

Q   Where is he?

A   In New York state.

Q   And for what reason is he up there?

A   He's awaiting trial on several rape cases.

Q   Did you have an opportunity to review some of the reports from those rape cases?

1    A    I did.

2    Q    Comparing those cases, in those cases was there

3 any attempt to kill anyone?

4    A    No, sir.

5    Q    The type of violence that you described at the

6 Iris Fennel scene, in those reports, is there any

7 evidence of that type of violence that he has up in New

8 York?

9    A    Yes, there is as a matter of fact.  The first

10 documented rape Williams has uses a blindfold and binds

11 the victim.  There are spermatozoa at every rape he

12 commits.  He has displayed concern for leaving evidence

13 at every scene with the exception of his semen.  He

14 blindfolds the first victim he assaults.  The other

15 victims he assaults are total strangers to him and the

16 possibility of identification is slim.  Those are

17 nighttime attacks, late, late at night and he attacks

18 in concealed areas.

19    Mr. Williams is very concerned about leaving

20 evidence behind and you also see a progression in his

21 criminal sophistications, as I testified to earlier, he

22 begins his raping career, which terminated with the

23 assault on Ms. Ames.

24    Q    So when you answered my question, you were

25 comparing that to Vanessa Ames not Iris Fennel?

72

1    A    That's correct.

2         THE COURT:  I thought the question you asked

3    was, was there a type of violence that you saw in the

4    Iris Fennel murder scene.

5         THE WITNESS:  No, sir.

6         THE COURT:  Than the other LaQuan Williams'

7    cases.

8         THE WITNESS:  I'm sorry.  I misunderstood you.

9    I was comparing the previous four rapes with the Ames

10   case not the Fennel case.

11   BY MR. McCORMACK:

12   Q    You believe the -- those previous rapes, the

13   New York ones don't have blood all over the house, in

14   every room of the house, mattresses strewn about, those

15   sorts of things.

16   A    No, they don't.

17        MR. McCORMACK:  They are all the questions I

18   have.

19        THE COURT:  Any recross?

20        MR. MULLER:  Just a few.

21

22                 RECROSS EXAMINATION

23

24   BY MR. MULLER:

25   Q    From your review of the record, you're aware

DAUPHIN COUNTY COURT REPORTERS

1  that Candace Mills gave a statement.  She's the one who

2  told Iris where LaQuan was.  Are you familiar with

3  that?  Mr. McCormack asked you, didn't LaQuan say it

4  was Candace Mills who turned him in or snitched on him?

5      A    There's a statement to that effect, yes.

6      Q    And are you also familiar with the statement

7  from Candace Mills which says she is the one that gave

8  the information to Iris and that Iris was the one that

9  turned on him?

10     A    I recall an interaction between Mills and Iris.

11     Q    You're also familiar with the fact that the

12 victim's blood in this case was on LaQuan Williams'

13 boot?

14     A    Yes, I am.

15     Q    Do you know or not from your review of the

16 record that LaQuan used crack cocaine?

17     A    That's my understanding.

18     Q    And that he was known to carry a gun?

19     A    I knew he had a gun when he attacked Ames and

20 he had a gun at an attack in New York.

21     Q    I'm assuming in the Vanessa Ames' case after he

22 slit her throat there was blood at the scene?

23     A    Yes.

24          MR. MULLER:  That's all I have.

25          THE COURT:  Anything further?

```
 1                    REDIRECT EXAMINATION

 2

 3  BY MR. McCORMACK:

 4     Q    My follow up to that, when you reviewed the

 5  record other witnesses also put a gun in Tyshaunt

 6  Love's hand?

 7     A    Yes, sir.

 8     Q    And also that there is a lot of witnesses that

 9  put the relationship between Tyshaunt Love and Iris

10  Fennel on --

11          MR. MULLER:  I object.  This is beyond the

12  scope.

13          THE COURT:  I think it is too, certainly beyond

14  the scope of the most recent recross.

15          MR. McCORMACK:  The only reason I brought it

16  up, talking about the fact that LaQuan Williams

17  happened to carry a gun, somebody said that doesn't

18  mean that's related.

19          THE COURT:  I don't think it has anything to do

20  with the signature nature of the two crimes or lack

21  thereof.

22          MR. McCORMACK:  They are all the questions I

23  have.

24          THE COURT:  All right.  Thank you, corporal.

25  You may step down.
```

1        Wait a minute.  I'm going to ask a question.

2   Is there anything so unique or unusual about either of

3   the two offenses we heard so much about, that is the

4   Vanessa Ames' rape scene and the Iris Fennel murder

5   scene, is there anything so unique or unusual that you

6   would think that either of them, for lack of a better

7   term, fingerprint of a particular person doing both?

8        THE WITNESS:  I'm quite comfortable saying

9   Williams did not kill Iris Fennel and the reason I

10  would say that, sir --

11       THE COURT:  But answer my question.  Is there

12  anything about the two scenes that would leave you, as

13  a criminal investigation assessment officer, to

14  determine that there is an identity of a person who did

15  each of these crimes?

16       THE WITNESS:  By process of elimination I would

17  classify the Fennel case a domestic homicide and

18  because Williams does not have the emotional investment

19  or the interest to the level that a significant other

20  would have with regards to Fennel --

21       THE COURT:  Putting aside what you're saying

22  are motives, as to the physical scene and the way the

23  victim was assaulted or handled or the crime scene

24  itself, is there anything there that is of, quote,

25  signature quality that would lead you to believe, to

1  conclude as a CI assessment officer, that these two

2  crimes were probably committed by the same person?

3          THE WITNESS:  Ames and Fennel?

4          THE COURT:  Yes, Ames and Fennel.

5          THE WITNESS:  No, sir.

6          THE COURT:  Does anyone have any questions

7  after that?

8          MR. MULLER:  No, Your Honor.

9          MR. McCORMACK:  No, Your Honor.

10          THE COURT:  Any other testimony to be taken on

11  this issue?

12          MR. McCORMACK:  I have no further testimony.

13          THE COURT:  Any testimony offered by the

14  Defendant?

15          MR. MULLER:  No, Your Honor.

16          THE COURT:  We'll start with Mr. Muller.  What

17  is your summary argument why I should allow the

18  introductions of portions of the transcript of

19  Ms. Ames' testimony at the rape trial at Docket --

20          MR. McCORMACK:  No. 339 CD 1997.

21          THE COURT:  Why should I allow that to be

22  introduced in these proceedings?

23          MR. MULLER:   Just to reiterate what I said

24  before, Your Honor, even under his -- Corporal Cronin's

25  testimony, LaQuan Williams approached the parties in

1  the early morning hours.  It's alleged here that this

2  happened in the early morning hours.  He used some sort

3  of ruse to enter.  There's no forced entry.  There's no

4  forced entry in this case.  He managed to engage in

5  conversation to get a level of comfort, strikes the

6  victim with a gun, ultimately moves to the bedroom.  In

7  each case the victim is moved to the bedroom.

8          While the victim may or may not have been

9  raped, nonetheless, who's to predict what could or did

10  happen at that time; maybe there was a reason he shot

11  her at that time instead of raping her first.  I don't

12  know.  The attempt to shoot Ms. Ames in the head,

13  shooting Ms. Fennel in the head, wetting the rags to

14  wipe down some of the locations in the Ames' case and

15  at least part of the police investigation in this case

16  is seemed to be trying to show bleach was used to try

17  to wipe down something in this case.  That's all I

18  have.

19          MR. McCORMACK:  Your Honor, we would argue the

20  crimes are not so similar as the last questions that

21  you were asking Officer Cronin, not so similar that

22  would lead someone in the prima facie that one crime

23  tends to show the guilt of someone else in the other

24  crime.  I'll take some of the examples and things

25  Mr. Muller just stated.  The common thing, a ruse used

1  to enter the apartment.  We have no clue what was used

2  to enter the apartment in Iris's case.  We know that

3  one was used in Vanessa Ames.  We don't know that's the

4  case here.

5          We don't know that Iris didn't perhaps answer

6  the door and the attacker immediately burst in behind

7  the door.  Just because there was no force that the

8  door was jimmied doesn't mean this wasn't a forcible

9  entry perhaps in this particular case.  There was blood

10 all over this house and I know we haven't introduced

11 all of the pictures at this point in time.  We had a

12 description of blood being on the floor of the kitchen,

13 blood being spattered about the walls and the

14 appliances in the kitchen.  We have evidence of her

15 being taken up the stairs, blood being there.  We have

16 evidence of hair being perhaps pulled out of her head

17 at the top of the stairs, and then you have the room

18 itself.  That is just literally torn apart in the

19 pictures.  I don't know if we in the course of doing

20 this showed you these photographs, and the corporal

21 indicating that he believes the body was moved at some

22 point in time.  In fact one particular witness

23 indicates that she saw the body on the bed and when she

24 comes back moments later -- this is all before the

25 police arrived -- puts the sheet on the body; the body

1  is in a different portion.  This is no evidence --
2  although we had a very meticulous scene in Vanessa
3  Ames.  It was brutal.  The fact that he raped her and
4  then tried to cut her throat, but it was meticulous.
5  He comes in asking her for the very same duct tape that
6  he then uses to enact these crimes.  He at one point in
7  time in the middle of everything takes a break and is
8  smoking a cigarette.

9         He takes the time to dress.  He takes the time
10 to undress, a much more organized scene than what you
11 have here and what seemed to be evidenced from the
12 actual -- raises inferences before you actually see the
13 scene, a chaotic crime scene.  There was no body
14 cleaning.  There was body cleaning in the other case.
15 He spent the time, put her in the tub.  There's no body
16 cleaning here.  There's no evidence that he took any of
17 the wet clothes that are found in any particular place
18 in the house.  I think they were by the refrigerator
19 that he used those to try to wipe down the body, wipe
20 any evidence off the body except for the fact the rags
21 and a picture of what appears to be some type of bleach
22 that may or may not have been splashed on the wall.
23 Every other piece of blood in the house was apparently
24 ignored, and as we indicated in our theory, this case,
25 if there are any similarities, the biggest one being

1  the fact her legs are spread wide open.  She had no

2  underwear on.  That was in fact staging by this

3  Defendant to reflect the glare of the police off of him

4  on to another man.  I would indicate to the Court that

5  this is not a modus operandi going on here.  Corporal

6  Cronin testified about the things that happened in New

7  York.  In those rapes bindings were used and that in

8  particular I think that's what I think the Court may

9  have been trying to see when you talk about fingerprint

10  or signature, anything we can see from one crime to the

11  other that this Defendant or that LaQuan Williams did

12  that would led you to believe, yeah, he did this one

13  too because when you look at it the rapes are brutal

14  and the fact that somebody knew their rapist is not

15  unusual.  The fact there was some violence involved in

16  a potential rape would not be unusual.  You know, you

17  just keep taking it one step after another.  There's

18  nothing that says that LaQuan Williams would be the

19  person that did this.  So I would ask you to keep out

20  all of that evidence.  In particular certainly since

21  Vanessa Ames, you know, I'm not conceding the fact that

22  she's unavailable at this point in time.

23          THE COURT:  I'm not so sure I accept the fact

24  that she's unavailable.  Even if she were I don't find

25  anything so extraordinarily similar in the facts of

1  that earlier case and the one here today that leaves me

2  to believe it would be admissible under 404-A.  If it

3  were the other way around certainly would not be

4  admissible against this Defendant, and I believe the

5  analysis in my brief as to what constitutes such

6  admissible evidence would be fair reading what's good

7  for the goose is good for the gander.  In that manner

8  of speaking I wouldn't allow it if it were the other

9  way around and I won't allow it in this case.  Motion

10 of the, I guess, it's a response to -- motion to not

11 permit the -- not to permit the Defense's introduction

12 of evidence as contained in the notice of intent to

13 introduce the other crimes, if that is the motion by

14 the Commonwealth that motion is granted.

15         MR. McCORMACK:  I do so believe.

16         THE COURT:  Now, what else do we have to deal

17 with?

18         MR. MULLER:  May we approach?

19         THE COURT:  Sure.

20         (A discussion is held at sidebar off the

21 record.)

22         THE COURT:  Just so the record is clear,

23 earlier in the proceeding we had had a motion to

24 require disclosure or review of Children and Youth

25 records with respect to one of the witnesses,

1  anticipated witnesses, those records were the subject
2  of a conference we held on Friday during which I
3  advised counsel both from the Commonwealth and from the
4  Defense that Children and Youth had had at my request
5  produced copies of their files for our review.   My law
6  clerk and I reviewed those records carefully and as we
7  reported on Friday, that there was nothing -- there was
8  nothing in any of those records that related or even
9  made mention of this case or any of the individuals
10 involved.   Fair enough.
11        MR. MULLER:   Your Honor, are we going to get a
12 chance to review the questionnaire before they are
13 brought down?
14        THE COURT:   We stand in recess until tomorrow
15 morning where we'll begin voir dire.
16        (Court is adjourned at 3:17 p.m.)
17
18
19
20
21
22
23
24
25

1          Tuesday, September 13, 2005

2                Morning Session

3

4          THE COURT:  What is it we need to deal with

5   before selection of jurors?

6          MR. MULLER:  I would like to colloquy my client

7   on the record what he wishes to do regarding a judge

8   trial or a jury trial.

9          THE COURT:  Fair enough.

10         MR. McCORMACK:  This is the case of the

11  Commonwealth versus Tyshaunt Love, 937 CR 2002, the

12  charge is murder.  The Defendant is present in court

13  with his attorneys, Mr. Muller and Mr. Giunta.

14         MR. MULLER:  Your Honor, we had a brief

15  conversation with you a little while ago and indicated

16  to you my client had indicated to me he was thinking

17  about choosing a waiver trial rather than a jury trial.

18  There are a number of issues decided if that were the

19  case.  Mr. Giunta and I have talked with Mr. Love about

20  this.  I conferred with the District Attorney on some

21  of the issues as well.

22         At this point I would like to put Mr. Love on

23  the record for him to tell the Court what it is he

24  wishes to do.

25         Mr. Love, you indicated which way you really

1   want to go at this point.  Do you wish to have a waiver

2   trial, which is a judge trial, or a trial by jury in

3   this case?

4           THE DEFENDANT:  Well, Your Honor, I'm not

5   really trying to make things more complicated.  We've

6   been through a long time period and everybody has been

7   working hard.  I don't want to make this complicated.

8   I believe you are a fair man.  You've had this case for

9   quite a while.  I've seen you in other cases.  You

10  don't pick either way.  You're fair.  You remind me of

11  my granddad.  I was just thinking I'm, like, well, you

12  have heard the case and you have been hearing it and I

13  was like maybe, I'm saying to my attorney, maybe it

14  would be best for somebody that's heard like

15  everything, trying to get to the truth to preside over

16  it.  A jury might hear certain parts and certain of

17  this and it may, like, this was very emotional for

18  everybody that's involved, family members, me also.  I

19  don't know if they are going to like --

20          MR. McCORMACK:  Judge, I would object to him

21  giving a speech to you.

22          THE DEFENDANT:  I'm sorry.

23          THE COURT:  I don't think he's trying to

24  influence the Court certainly in any way.  The truth,

25  Mr. Love, is that we need to get on with this and make

1  a decision.  It's not a matter for me to question you

2  as to why you might or might not want to proceed in

3  this fashion.  If you have issues or questions that you

4  wish to discuss, you discuss them with Mr. Muller not

5  with me.

6       The question I guess actually is, because I

7  guess the Commonwealth too has some input whether or

8  not this proceeds as a jury trial or nonjury trial

9  proceeding, at least the first question is, do you wish

10 to waive your right as a criminal Defendant charged

11 with a homicide in this case to -- do you wish to waive

12 your right to a jury trial or not?

13      THE DEFENDANT:  Well, I believe that would be

14 depending on who would be the judge.

15      MR. MULLER:  Okay.  I think what he's

16 indicating is, he would lean towards a judge trial if

17 it's going to stay in this courtroom.

18      THE COURT:  I can't guarantee that, and the

19 reason for that very briefly, Mr. Love, I've heard

20 testimony now that may or may not have ever come in in

21 part of the case in chief, the actual trial of the

22 case.  That raises issues as to whether or not my

23 decision might be tainted by having heard arguments of

24 counsel that a jury would never hear, hearing from the

25 State Police corporal that the jury may never hear in

1 the jury proceeding maybe.  It is inappropriate then

2 for me, depending on what each side would submit as

3 their arguments on that issue, maybe that it would be

4 inappropriate for me to stay in the case on that basis.

5 That being the case I may have to step aside and let

6 some other judge be assigned to hear the evidence and

7 the testimony and the witnesses who would be presented

8 at the trial and make the decision, and that's

9 something I can't predict in advance.  We don't really

10 let Defendants or anyone else select who is going to be

11 their judge.

12          So the question again is, do you wish to waive

13 your right to a jury trial on these charges at this

14 docket or not?

15          THE DEFENDANT:  I don't want to complicate

16 things.  I'm not going to waive my right and pick the

17 jury and proceed --

18          THE COURT:  You feel though you had an

19 opportunity to talk with Mr. Muller about all of this

20 right?

21          THE DEFENDANT:  We talked briefly and I think

22 for the little bit of time we spoke, he made it very

23 clear and you just made it.

24          THE COURT:  You understand what's going on

25 here?

1           THE DEFENDANT:  Yes, sir.

2           THE COURT:  Let's get the jurors down and

3      proceed with voir dire.

4           (The jury panel entered the courtroom at 9:18

5      a.m.)

6           THE COURT:  Good morning, ladies and gentlemen.

7      All of you I think have seen me once before earlier

8      this week.  It's now day two.  Welcome to Courtroom

9      No. 3 in the Dauphin County Courthouse.  My name is

10     Bruce Bratton.  I'm the eighth judge on this court, the

11     newest member of the bench coming up on my fourth

12     anniversary, not the youngest member of the bench.

13          Have you seen the video on your jury duty?

14     Have you been through the voir dire process perhaps

15     once?  All right.  Most of you know the proceeding

16     here.

17          We're here in the case which is docketed to 937

18     CR -- that's just part of the docket number -- 2002.

19     The Commonwealth is bringing an action in this case

20     against Tyshaunt Love, the Defendant, charging him with

21     murder, criminal homicide.  The first step in our -- in

22     the criminal trial process is the selection of the

23     jury.  The first step in that process is the process

24     called voir dire.  Voir dire is simply, as most of you

25     probably already know, is a time when the lawyers have

1    an opportunity to ask questions of prospective jurors

2    who in order to determine if there may be some reasons

3    why one or another of the potential jurors might not be

4    appropriate to hear this case.  The whole concept here

5    is to try to produce a jury of 12 individuals -- they

6    will be selecting a couple of alternates in this case

7    as well -- who can hear this case objectively and be

8    fair to each side and render a verdict as to whether or

9    not the Commonwealth proves the Defendant's guilt or

10   not, and we'll talk about burdens of proof later in the

11   proceedings.

12          Most of the questions asked of the members of

13   the prospective jury are of the nature or in the style

14   of: Have any of you or members of your family ever been

15   somewhere or done a certain thing?  If that question is

16   to be answered by you affirmatively, just simply raise

17   your hand to indicate that you are answering

18   affirmatively.  If there are follow-up questions asked

19   of you individually because of the nature of the

20   acoustics of this room, this is a great place for me to

21   sit and see what's going on but it's a very difficult

22   place for me to hear anything except that which is

23   coming through the microphones up in front.  So here

24   are the rules, please follow them if you are called

25   upon individually with follow-up questions.  Please

1   stand up.  It helps to get your voice a little higher

2   in the atmosphere so I can hear better.  Please keep

3   your voice up.  We are taking down everything that is

4   being said in the room here by the court reporter.  She

5   needs to hear you as well.

6          Also, although it is terribly impersonal and I

7   apologize for it, it is the only way we can keep track

8   of who is answering questions or saying what amongst

9   you, is to either know your names or we find it easier

10  just to use the juror number that was assigned to you

11  at the beginning of this trial term yesterday morning.

12  That should mean that we have Juror No. 263 to my

13  immediate left and we have Juror 119 in the back.

14  Looks like you're in the right position too.  Thank

15  you.  Hopefully everyone else is in the right seats so

16  we'll be able to keep track of everyone.  I know it's

17  difficult for the court reporter to try to say the guy

18  in the white shirt with horizontal stripes, or looking

19  up the name.

20         None of the questions put to you are intended

21  to be and you should not deem them to be prying into

22  your personal lives unnecessarily.  Most of the

23  questions are going to be simply about your knowledge

24  or what you understand about this case or about these

25  proceedings.

1          If on the other hand someone asks a question
2    and the answer to it will cause you anxiety or make you
3    feel uncomfortable to answer in a room full of people,
4    you do have this privilege, and that is, that you may
5    ask me for the right to come up here and we will turn
6    off the microphone.  We still have the court reporter
7    present taking down what is said, but we can try to
8    address those uncomfortable things, if any, here at
9    sidebar outside at least of the hearing of the entire
10   rest of the room.  I doubt that will come up, but if it
11   does I want you to know you have that option.
12         Let me introduce a couple of folks who are
13   participating in these proceedings to begin with.  The
14   Commonwealth, which has the burden of proof in this
15   case -- we'll talk about that more later in the
16   proceeding -- is represented here by the District
17   Attorney's office, and this case, by the Chief Deputy
18   District Attorney, Sean McCormack.
19         MR. McCORMACK:  Good morning.
20         THE COURT:  And with him is Deputy District
21   Attorney James Barker.
22         MR. BARKER:  Good morning.
23         THE COURT:  I'll allow you to discuss who your
24   main witnesses are and the police officers involved
25   during voir dire.  The Defendant in this case, as I

1  said, is Mr. Tyshaunt Love.   Mr. Love, please rise and

2  just let, if you could, just make a little turn so

3  everyone can get a look.   Thank you, Mr. Love.   He's

4  represented in these proceedings by Attorney Paul

5  Muller.

6            MR. MULLER:   Good morning.

7            THE COURT:   And with him is Nathan Giunta.

8            MR. GIUNTA:   Good morning.

9            THE COURT:   Thank you, gentlemen.   Essentially

10  I think I have the dates correct here.   The charges

11  that are brought here are that on December 20, 1996 a

12  lady by the name of Iris Belcher, also known as Iris

13  Fennel, was shot and killed in the city of Harrisburg.

14  The Commonwealth has brought this charge against

15  Mr. Love accusing him of the responsibility for her

16  death.

17            I guess we should broach a couple of things

18  first before I turn it over to the lawyers.   First off,

19  I have been told -- and we cannot predict with a great

20  deal of accuracy about these things -- I am told that

21  the presentation of testimony in this case is likely to

22  eat up all of this week and potentially run into Monday

23  and Tuesday and maybe Wednesday of next week.

24            It's difficult, as I said, when I talked to you

25  yesterday morning, we sometimes cannot predict the

1  availability of witnesses and how long their testimony

2  will actually take.  Now, other than that

3  inconvenience does any member of the jury panel have an

4  emergency or a critical need not to be here into next

5  week?  Please rise.

6          JUROR NO. 3:  I am president of Local 1489 and

7  I have a commitment to be in Atlantic City from Sunday

8  until Wednesday of next week.

9          THE COURT:  And this is a business trip?

10         JUROR NO. 3:  Yes, conference for, a water

11 conference for a national utility.

12         THE COURT:  For which a substitute in your

13 organization could not attend?

14         JUROR NO. 3:  No.  The arrangements were made.

15         THE COURT:  Thank you.  You may be seated.  I

16 saw another hand.

17         JUROR NO. 148:  I work for the Commonwealth and

18 I'm responsible for a program to be given -- a speech

19 at the Hershey Medical Center next week.  I ask if I

20 could be excused afterward or should be excused the

21 whole week.

22         THE COURT:  When exactly are these meetings for

23 the presentation scheduled?

24         JUROR NO. 148:  The 21st and the 22nd, I think

25 Wednesday and Thursday of next week.

```
1        THE COURT:  And this is a computer program?
2        JUROR NO. 148:  No.  It's a public program.
3        THE COURT:  The program is what you're doing at
4  Hershey?  You work for the Department of Health?
5        JUROR NO. 148:  Yes.
6        THE COURT:  Thank you.  There is a likelihood
7  that during the proceeding you as jurors -- we will be
8  shown some photographs and hear some testimony that
9  will be -- could be deemed by some people to be
10 somewhat unsettling.  Is there anyone that believes
11 their constitutions are such they would be unable to
12 view such evidence or hear such testimony?
13        JUROR NO. 19:  If it's really gross I don't
14 like them.
15        THE COURT:  I don't know if I know how to
16 define gross.
17        JUROR NO. 19:  A lot of blood and stuff I
18 can't -- when I'm watching television I turn it off.  I
19 can't handle it.
20        THE COURT:  All right.  Thank you.
21        MR. MULLER:  I think that's No. 143.
22        THE COURT:  Thank you for correcting me.
23        JUROR NO. 29:  I can't deal with any kind of
24 blood, seeing it.  I'll be laying on the floor.
25        THE COURT:  Even a description.
```

94

```
 1          JUROR NO. 29:  (Nods head.)
 2          THE COURT:  Any others?  All right.  Thank you
 3   very much.  We'll talk more in a while.  At this point
 4   I'm going to turn it over to counsel.  The order of
 5   presentation throughout these proceedings is
 6   established by long held rules because the Commonwealth
 7   for example has the burden throughout most of the
 8   proceedings, the Commonwealth gets to be first.  It has
 9   nothing to do with my choice of who gets to go first.
10   Mr. McCormack, if you're ready.
11          I missed that.  Before you can answer the
12   questions that are asked of you -- I should have done
13   this earlier -- please rise, raise your right hand so
14   your answers will be given under oath.
15          (The jury panel is sworn.)
16          THE COURT:  One moment, Mr. McCormack.  Juror
17   No. 143 and 29, the statements you made concerning your
18   sensitivity to graphic materials, would those questions
19   change now -- would your answers change now that you're
20   under oath?
21          JUROR NO. 143:  No.
22          JUROR NO. 29:  No.
23          THE COURT:  Both answered no.  Juror No. 3 and
24   148, would the information you provided earlier change
25   now that you are under oath?
```

1          JUROR NO. 3:  No.

2          JUROR NO. 148:  No.

3          THE COURT:  Thank you very much, gentlemen.

4   Mr. McCormack proceed.

5          MR. McCORMACK:  Thank you, Your Honor.

6          (Whereupon, Mr. Sean McCormack asks questions

7   of the prospective jury panel.)

8          MR. McCORMACK:  Thank you for your patience,

9   ladies and gentlemen.

10          THE COURT:  Thank you, Mr. McCormack.

11   Mr. Muller, proceed.

12          (Whereupon, Mr. Paul Muller asks questions of

13   the prospective jury panel.)

14          THE COURT:  Can I see counsel one more moment?

15          (A discussion is held at sidebar off the

16   record.)

17          THE COURT:  Ladies and gentlemen, thank you for

18   your patience.  That's called a sidebar conference.

19   You'll see more of those who are involved in this

20   courtroom and for those who go to other courtrooms.

21   This is the only mechanism we have whereby the lawyers

22   can discuss matters, which are not of importance to you

23   or not necessary for your knowledge as jurors here.  I

24   know and so does my mother, it doesn't -- it's rude to

25   whisper when there's guests in the house, but there's

1   no other way for us to do that.  I apologize for doing

2   that if it offends you.

3            The following jurors shall be excused for this

4   jury.  As they call your names, please rise, go to the

5   doorway.  The tip staff will direct you back to the

6   assembly area.

7            By the way, not being selected to serve on a

8   jury and this is only the first phase in the process --

9   is not a personal slap in the face of anyone.  You

10  should not take this personally.  You have performed a

11  valuable service by sitting through a jury selection

12  process.  I want to make sure you understand how much I

13  appreciate it.  Juror number -- these are the numbers

14  from yesterday -- Juror No. 137; Juror No. 25; Juror

15  No. 227; Juror No. 143; Juror No. 3; Juror No. 198;

16  Juror No. 148; Juror No. 92; Juror No. 64 -- actually

17  64, 29, 245, 196, 175, 161 and 119, that last group, by

18  the way, being as a result of mathematics -- we brought

19  in extra jurors and they can just not be reached -- all

20  of those are excused.  Did you get that right?

21  Everyone from 64 on -- 64, 29, 245, 196, 175, and 161

22  and 119.

23            MR. MULLER:  May we approach again?

24            THE COURT:  Sure.

25            (A discussion is held at sidebar off the

1    record.)

2

3          THE COURT:  Ladies and gentlemen, the process

4    is close here.   As you are called by seating position

5    here, please follow the tip staffs' instructions over

6    and take a seat in the jury box.  We will be moving

7    chairs around to let folks getting in and out of the

8    back.

9          (The jury is seated in the jury box.)

10         THE COURT:  Gentlemen, before excusing the

11   remainder of the panel, is there anything you would

12   like to bring to my attention why this jury should not

13   be sworn in this case?

14         MR. MULLER:  May we approach?

15         THE COURT:  Yes.

16         (The following discussion is held at sidebar:)

17         MR. MULLER:  A Batson challenge, Juror

18   number seated as No. 13, Juror No. 39, Rosemary Diggs,

19   a black female.  We'll do the groundwork.  My client is

20   African American, a recognized minority group.  Out of

21   the first page of 36 potential jurors, there were, I

22   believe, four African Americans, one other minority, I

23   believe the man is Pakistani or Indian.  Out of those

24   three of the African Americans were struck for cause

25   that left one African American, No. 39, Rosemary Diggs.

1  Commonwealth struck her as their second strike.

2  In addition, the only other remaining minority

3  was No. 172, seated as No. 2, Shaktisin Rathod, who

4  indicated I believe by his name and appearance either

5  Pakistani.  The final panel contains no minorities.  So

6  we're lodging a Batson challenge regarding Commonwealth

7  No. 2 strike, Rosemary Diggs and Commonwealth No. 3

8  strike of Shaktisin Rathod.

9  MR. McCORMACK:  The first thing I would ask the

10  Court to do is make a ruling whether there's prima

11  facie showing that the Commonwealth was using its

12  challenges for racial purposes.  The case law -- the

13  case law is written, if I put my reasons on the record

14  prior to you making a ruling it's presumed that you

15  ruled that there was a prima facie ruling.  Now I will

16  state -- I will put my reasons on the record.

17  THE COURT:  It seems to me by striking the only

18  two and I'm accepting it for this purpose only -- two

19  non-white, non-Caucasian jurors from the jury seems to

20  establish a prima facie case.

21  MR. McCORMACK:  Then with that said as to Juror

22  No. 39, Rosemary Diggs, who was my second strike, she

23  answered in the questionnaire she is less likely to

24  believe the testimony of a police officer, and I would

25  note for the record I also struck Juror No. 17, Lucinda

1  Marie Bixler, who is white for the exact same reason,

2  and No. 242, Amanda Werner, for the exact same reason.

3  I mention Lucinda Bixler, was Commonwealth strike

4  No. 5.  Amanda Werner was Commonwealth strike No. 1.

5          MR. MULLER:  Just for clarification No. 5

6  you're saying Juror No. 17.

7          MR. McCORMACK:  Yes.

8          MR. MULLER:  Yes.

9          MR. McCORMACK:  She answered the same question

10 as No. 9; she would not be able to believe the

11 testimony on the questionnaire.  She originally had,

12 No. 9, I don't want -- sometimes when you check those

13 boxes, that's your initial inclination.

14         MR. MULLER:  Maybe they just made a --

15         MR. McCORMACK:  That's my reason.  You can

16 analyze your side of the case.  As to Juror No. 172,

17 which was my strike No. 3, there are two reasons.  One,

18 the man owns a hotel.  I believe he owns one of the

19 transient type hotels out in West Hanover Township.

20 The client -- I'm concerned about the clientele that

21 may come through one of those motels.  Also he was not

22 originally from this area.  He's from Bucks County.

23 What ties he has in this area was another reason I

24 struck him.

25         MR. MULLER:  I'm sorry.  I didn't hear that

```
 1  last part.  I don't think I understood it -- he's from

 2  Bucks County -- what ties he has to a crime that

 3  occurred in 1996 here.  You asked that question during

 4  voir dire, if anyone knew about it.

 5          MR. McCORMACK:  I asked if anyone knew about it

 6  whether he would care about it.

 7          MR. MULLER:  If I could just respond, the owner

 8  of a hotel, I don't understand quite honestly as a race

 9  neutral reason --

10          MR. McCORMACK:  We arrest a lot of people out

11  of those hotels, the clientele out of those hotels.

12  It's not the best hotel.

13          MR. MULLER:  You assumed he did.  Do you know

14  which motel he owns or this is just an assumption?

15          MR. McCORMACK:  It's an assumption.  I'm not

16  going to take a chance on a homicide case to guess the

17  wrong way.

18          MR. MULLER:  And in regards to not originally

19  from the area, I don't think that's a valid reason.  I

20  think that's just like saying he looked at me

21  cross-eyed.

22          THE COURT:  With all due respect, someone who

23  looks at me cross-eyed is a good reason to exercise a

24  preemptory challenge.  If you get a bad vibe from

25  someone, someone has a facial expression that these are
```

1  preemptory.  This is not a challenge for cause.  He's

2  only required to show race neutral decision making

3  process as to each of the strikes.  Am I misstating

4  that?

5          MR. MULLER:  No.  But it's got to be a valid

6  reason, valid reason.  They can't give you any reason.

7  I don't understand not originally from the area.  I

8  mean, there's a number of people on that jury on their

9  questionnaires checked they lived in Chester or other

10  places before and none of those were struck.

11          MR. McCORMACK:  I don't believe -- I don't

12  recall anybody else.  That was one that stood out to me

13  that in the last ten years lived outside the area.

14  That wasn't my primary reason.  My primary reason is

15  the hotel.

16          MR. MULLER:  I'm done.

17          THE COURT:  The Batson challenge is overruled.

18  I'm accepting the jury as seated unless you have other

19  objections to make.

20          MR. MULLER:  Could we make the juror

21  questionnaires for these people part of the record?

22          THE COURT:  Yes.  I don't have a problem with

23  that.

24          MR. McCORMACK:  I would ask that it not only be

25  these jurors but every juror that we had here.

1          THE COURT:  All jurors after strikes.

2          MR. McCORMACK:  Yes.

3          THE COURT:  All jurors after strikes for cause.

4   Or do you want all of them?

5          MR. MULLER:  We should do all of them.

6          THE COURT:  We'll get them in.

7          (The discussion is concluded.)

8          THE COURT:  Mrs. Kaufman, ladies and gentlemen,

9   before you begin your obligation as jurors in this case

10  you must take an oath to perform your office as

11  discussed during voir dire.  Please rise and raise your

12  right hand.

13          (The jury panel is sworn.)

14          THE COURT:  Ladies and gentlemen, given the

15  hour and that you've been sitting in this courtroom as

16  I have for a long time already, I'm going to give you

17  your lunch recess right now.  I'll tell you more about

18  how we're going to go about this process, your role and

19  your function when you return.  I don't want to make

20  you sit here and listen to me gab anymore.  You are

21  excused for lunch.  You'll hear me say this repeatedly,

22  you have heard nothing more than general descriptions

23  of the case.  You are not permitted during these

24  proceedings from now until the time you enter the jury

25  box to begin deliberations, you are not permitted to

1   discuss this case and your opinions about it, any of

2   the evidence that's been heard.  Wait until the end of

3   the case and all the evidence is in.  Then you

4   deliberate together.  I'll tell you more about that

5   after lunch.  Right now enjoy your lunch break.  Follow

6   the tip staff.

7          We'll reconvene about 1:45 p.m.  I need to

8   speak with counsel.

9          (The jury exited the courtroom at 12:11 p.m.)

10          THE COURT:  At the request of counsel during

11   our last sidebar discussion and the Batson challenge

12   having been raised by the Defendant, I agreed that we

13   will take from one of the binders of the jury

14   questionnaires, questionnaires filled out by each

15   member of the jury panel as originally brought into the

16   room; all 45 is that what you want?

17          MR. MULLER:  Yes.

18          THE COURT:  And we'll mark them as Court

19   Exhibit No. 2, and we'll mark each of them in order as

20   they appeared in the original panel listing as A

21   through whatever it gets up to at 45, which will go

22   into double A's after running out of the letters of the

23   alphabet.

24          We still had pending the Defendant's motion in

25   limina that was handed to me yesterday.

1          Mr. McCormack, I believe you said you didn't

2     believe there was too much that was actually in dispute

3     here.  Let's go through it.  Referring to the

4     Defendant's motion dated September 12, '89, if I could

5     skip No. 1 and come back to No. 1.

6          MR. McCORMACK:  For No. 2, the issue of Daelene

7     Saez indicated that Iris had gone to the psychic, said

8     he's going to kill me.  Iris was upset with the

9     information.  I can seek the testimony from Daelene

10    Saez.

11         THE COURT:  Your motion is granted.  You're not

12    going to -- you don't oppose it.

13         MR. McCORMACK:  That's correct.

14         THE COURT:  Motion as to Daelene Saez's

15    statements as set forth in the motion in limina is

16    granted.

17         MR. McCORMACK:  2-A, as I understand what the

18    proposed testimony for 2-A, again Daelene Saez, would

19    be that she was asked during her statement, did you

20    ever hear Cuzzo threaten her?  The next was, did you

21    ever see her bruises?  She had a bruise on her check

22    one time, a couple of bruises on her arm and scrape on

23    her knee.  She said the scrape came from being drunk.

24    She would always find excuses for the bruises.  One

25    time her eye was red.  I remember her saying she didn't

1  know what was wrong with her eye, but it was kind of
2  puffy.  There will be additional testimony where
3  another witness will indicate that Iris had a
4  black-and-blue eye.  Iris indicated the black eye came
5  from the Defendant.
6        THE COURT:  Stick with the motion as it's
7  presented unless you just told me, does she have any
8  independent knowledge of the source of the injuries she
9  observed?  You're not objecting to the testimony that
10  there were bruises, scratches or cuts observed.
11        MR. MULLER:  No.
12        THE COURT:  It is any statement as to the
13  cause.
14        MR. McCORMACK:  Okay.
15        THE COURT:  Unless she had some independent
16  observation or basis for making that statement other
17  than speculation or hearsay.
18        MR. McCORMACK:  Okay.  To the best of my
19  knowledge she does not have an independent basis.
20  Under those constraints I believe with that --
21        THE COURT:  2-A is granted.
22        MR. McCORMACK:  Melissa Coleman -- now we're on
23  3 -- I would have to ask her when the date is of this
24  pulling her out of the bar.  What I'm trying to
25  establish here is a pattern by the Defendant of

1  attempting to exert his control over Iris Fennel during

2  the period of their relationship.  I would indicate

3  that this is something that occurred during the period

4  of their relationship and then this all culminated --

5  culminated, my theory is, culminated on the 19th to the

6  20th when the Defendant lost control of Iris.  I would

7  indicate that I do seek to introduce the testimony that

8  Iris would be grabbed by her clothing essentially and

9  being yelled at by the Defendant.

10        She was -- what the testimony would be is

11  Tyshaunt came in the Olympic bar, grabbed her by the

12  clothing, yelling at her.  I guess she was supposed to

13  meet him and was late.  This is part and parcel of our

14  case and our argument that the Defendant --

15        THE COURT:  Are you saying the time frame is

16  just not relevant at all?

17        MR. McCORMACK:  The time frame is not relevant.

18  It is part of the relationship.  I'm not trying to

19  establish what happened right next to the day before

20  the homicide, but this is the way this Defendant

21  treated her in the relationship and when he no

22  longer --

23        THE COURT:  If there is a single incident,

24  quote, pattern of the relationship.

25        MR. McCORMACK:  It's a single incident from

1  this witness.  It's not a single witness from the scope
2  of my witnesses.  I have other witnesses including
3  Daelene Saez who would say she also witnessed this type
4  of thing, not the same one, not the same one at the
5  Olympic bar.  They are not all going to come in to
6  testify about this one time.  They are going to testify
7  to a pattern.
8       MR. MULLER:  I guess our point, it really
9  coalesces with averment No. 1 about Barbara Brown
10 witnessing something a year and a half before.  It
11 becomes more prejudicial than probative just because
12 something happened year and a half before Barbara
13 Brown's allegation, Mr. Love snatched Iris by the arm,
14 just regarding what snatched means or entails in this
15 case.  It was a year and a half before.  Now Melissa
16 Coleman is the same year before, a year and a half
17 before.  I don't think that supports their theory or is
18 probative that someone had an altercation a year and a
19 half ago to now come and say a year and a half later,
20 you know, we're going to say that's why he killed her.
21      MR. McCORMACK:  My point is, when you add them
22 all up to show the course of their relationship this is
23 the way he treated her.  If she wasn't where he wanted
24 her he would pull her out of the place.  In addition
25 Barbara Brown also indicated that the Defendant told

1   her that if he couldn't have Iris no one could.  This
2   is the type of relationship that he had.  This was his
3   mine set.  That's what I'm trying to get the jury to
4   see.
5          THE COURT:  I don't know without hearing more
6   and knowing the context within which this is likely to
7   be presented whether I can -- I don't know that I know
8   enough to rule upon the motion in limina.  If it is a
9   series of events over some defined period of time not
10  all bunched two years prior just grabbing her two years
11  prior, I don't know how probative that is if you're
12  suggesting this incident that occurred prior, that
13  established a longer term pattern, but in order to do
14  that we do need to have some time references, don't we,
15  Mr. McCormack?  I'm just saying -- standing alone I
16  would be inclined to grant the motion in limina but
17  with your proffer that it will be one of several
18  witnesses testifying concerning that nature of the
19  relationship and assuming that it is not something that
20  may have been a series of events distant in the past,
21  then I would be inclined to allow it if we can put a
22  time frame on it whatsoever on these series of events.
23  It's one thing to say it's a pattern because it
24  happened last year, it happened earlier this year, it
25  happened in the summertime and then it happened last

1  month when she was killed at the end of the year.  It's
2  another thing to say that there were incidents a year
3  and a half or two years prior and that's all the
4  evidence there is.

5          MR. McCORMACK:  I understand what you're
6  saying.  I don't believe Melissa Coleman is here this
7  morning.  So I would have to find out from her the time
8  frame.

9          THE COURT:  I'm trying to understand your
10  proffer.  Are you suggesting more than one or two
11  witnesses who will testify to more than one or two
12  events but over what definable period of time even if
13  it's approximate?

14          MR. McCORMACK:  I'd say the last six months of
15  Iris's life.

16          THE COURT:  Well, there's a reference to a --

17          MR. McCORMACK:  I have to check with Barbara
18  Brown, the summer of '95.  Somebody may say in a
19  statement the summer of '95 when they are interviewed.
20  I don't know if she was interviewed in 2001 as a lot of
21  witnesses were; whether that date is the exact date or
22  not I have to confirm that.

23          THE COURT:  I guess my ruling is to not grant
24  the motion in limina yet.  Feel free to bring it to my
25  attention.  The testimony as it's proffered during the

1    course of the trial has not been the proper subject of

2    foundation of time or if there's been no other

3    testimony and you can put no time frame on it at all, I

4    think that's a legitimate --

5         MR. McCORMACK:  There may be as many as ten

6    witnesses to go towards this relationship.  So then

7    Melissa Coleman, we'll come back to that.

8         MR. MULLER:  Actually there's a 3-A about --

9    hearing about the couple fighting.  One of the

10   statements she referred to she heard they fought,

11   something to that effect.  It seems pretty clear that

12   she was not present for that.

13        MR. McCORMACK:  Yeah.  If she's not present for

14   it and Iris isn't telling her about it, I'm not seeking

15   that.

16        THE COURT:  All right.  Then just as it is

17   stated in 3-A I think proper subject in limina.

18        MR. McCORMACK:  For No. 4, Candi Rader, that

19   her entire testimony be excluded; the part that I'm

20   willing to agree with Candi Rader, Candi Rader was the

21   Defendant's girlfriend prior to Iris.  Candi Rader

22   indicated to the police that the Defendant pulled a gun

23   on her.  I think although I would like to get that in,

24   I don't believe when you weigh the prejudicial versus

25   the probative value that there's enough nexus to be

1   able to do that in this particular case.

2         However, there is more to Candi Rader's

3   testimony.  She would be able to put a gun in the

4   Defendant's hand, the fact that the Defendant did at

5   least during a certain time period possessed a handgun

6   that he placed to her head, that he possessed a

7   handgun.  Also Candi Rader, a few weeks prior to Iris

8   being killed, was with the Defendant.  The Defendant

9   had called her up.  I think he wanted her to take him

10  to help find -- he wanted to buy a Ford Bronco.  They

11  had a conversation where he was talking about her

12  moving back in with him, them getting an apartment

13  together, that he had furniture, talking about his

14  relationship with Iris was not going very well.  This

15  is all within a two-week time period prior to her

16  death.

17        MR. MULLER:  Just for clarification, speaking

18  of the Ford Bronco, my reading of everything is Iris

19  was looking to find a Ford Bronco.

20        MR. McCORMACK:  On this particular day she went

21  down --

22        MR. MULLER:  That's correct.  I do see that

23  now.

24        MR. McCORMACK:  And that he was also going to

25  provide the furniture, which was described as the cream

1  leather or white or something.  I would also suggest to

2  the Court that that's the very same furniture that was

3  in Iris Fennel's home, the furniture that he was going

4  to provide to this relationship.  In any case, that's

5  the type of testimony I would like to get in from Candi

6  Rader.  I don't know if you object to the second part.

7  I know the major concern was the gun.

8         MR. MULLER:  I think it was relevant if it's

9  determined to be relevant then.

10        THE COURT:  Well, the fact that he possessed or

11  had possessed at some time a firearm seems to be

12  relevant.

13        MR. MULLER:  I'm not sure there's a time frame

14  on that either.  Obviously they were

15  boyfriend/girlfriend well before the relationship.

16        THE COURT:  Nothing is obvious to me.  I

17  haven't heard anything.

18        MR. McCORMACK:  In addition, the Defendant has

19  been questioned by the police, giving answers such as

20  this:  Did you ever possess a handgun when you lived in

21  Harrisburg?  And his answer was no.  Candi Rader will

22  say, yes, he possessed a handgun when he was in

23  Harrisburg.

24        THE COURT:  Do you intend to introduce that

25  evidence to impeach the Defendant if he testifies?

1          MR. McCORMACK:  I plan to introduce the

2     Defendant's statements during his case in chief and

3     showing which parts of his statements contradict other

4     evidence.

5          THE COURT:  Are they contradicted by other

6     evidence?

7          MR. McCORMACK:  Or contradicted by other

8     evidence.

9          THE COURT:  I think the issue of possession of

10    a firearm is relevant.  I don't see any reason not to

11    allow that to come before the jury.  The conversation

12    between Ms. Rader and the Defendant as to the sale or

13    purchase of a vehicle --

14         MR. MULLER:  I think they went to look at the

15    vehicle.

16         MR. McCORMACK:  That's just the background.

17    That's not the important part of the testimony.  The

18    important part of the testimony is him talking to her,

19    why don't you try to get an apartment for me and her,

20    don't worry about furniture, I have furniture.  He said

21    they were having problems, that is, meaning him and

22    Iris were having problems.  She was going her way.  He

23    was going his.  He was planning something.  He wouldn't

24    tell her what he was planning and thinking about

25    getting a place together.  And this was December 4,

1   1996 when this conversation took place.

2           THE COURT:   There's the relevance.

3           MR. MULLER:   We're talking about the couch

4   again.

5           MR. McCORMACK:   Talking about the conversation.

6           MR. MULLER:   I think they can possibly show

7   that's relevant.

8           THE COURT:   All right.   And you're not going to

9   be introducing any evidence from Ms. Rader's testimony

10  from her of an assault with a weapon by the Defendant

11  during their relationship.

12          MR. McCORMACK:   I already instructed her she's

13  not to discuss that.

14          THE COURT:   If that was the main thrust of the

15  motion in limina to that extent the motion is granted

16  in all other respects.

17          MR. McCORMACK:   I ask to reserve to use that

18  type of testimony if the Defendant puts his character

19  for peaceableness at issue, if he were to testify or

20  something like that.   For example, I've never

21  threatened any one in my life.

22          MR. MULLER:   The Rules of Evidence would allow

23  that.

24          THE COURT:   I think that's fair.   The only

25  thing we're dealing with in the motion in limina which

1  I have deemed to be as to evidence that will produce in

2  your case in chief.

3       MR. McCORMACK:  For No. 5, Candace Mills, there

4  are certain things Iris told Candace Mills and there

5  are certain things Candace Mills heard about Iris.

6  The things Candace Mills actually was told by Iris, I

7  would seek to introduce the things that she heard, for

8  example, she heard in the bar that someone is saying

9  these two were breaking up.  I would not seek to

10  introduce that.

11      MR. MULLER:  Once again as long as a proper

12  foundation is laid for that kind of testimony.

13      THE COURT:  As to Iris's statement.

14      MR. MULLER:  Yes.

15      THE COURT:  The victim's statement.

16      MR. MULLER:  We understand it could be

17  admissible under the Rules.

18      THE COURT:  All right.  Street knowledge or

19  what she had heard from other unidentified sources,

20  granting the motion toward that.

21      MR. McCORMACK:  As for No. 6, Tamara Williams,

22  Tamara Williams is a woman who heard something by

23  Joanne Smith.  I don't plan on introducing that.  There

24  are other things from Tamara Williams I plan on

25  introducing.

1          THE COURT:  Without objection that motion in
2     limina, item No. 6, is granted.
3          MR. MULLER:  If I may while we're doing this to
4     add one more, there's a witness, Socorro Roman, who was
5     reinterviewed in 2003, stated to the police something
6     to the effect she saw evil in my client's eyes.  We
7     would seek to exclude any testimony like that.
8          MR. McCORMACK:  I'm not familiar with that one.
9     What I anticipate Socorro Roman would say, when she was
10    alone with the Defendant in the residence, just her and
11    the Defendant and Iris's body, that she was fearful of
12    the Defendant, of that whole situation.  I mean, I
13    certainly wouldn't be asking her to say she saw evil in
14    his eyes.
15         THE COURT:  Her state of mind, her present
16    sense impressions are admissible, aren't they?
17         MR. MULLER:  Once again with the proper
18    foundation.
19         THE COURT:  Without over-characterizing or
20    over-dramatizing; you're not objecting to her statement
21    she's fearful or afraid of the Defendant.
22         MR. MULLER:  No.
23         THE COURT:  In the context of course.
24         MR. MULLER:  Yes.
25         MR. McCORMACK:  I'll also instruct her to make

1  sure she doesn't say that phrase that you object to.

2       THE COURT:  What about Barbara Brown's

3  testimony again or have we covered that, we need to see

4  how it comes up in context.

5       MR. McCORMACK:  I would like to talk with her

6  one more time.

7       THE COURT:  And the time frame.  All right.

8       MR. MULLER:  One more thing before we adjourn,

9  I don't know if Mr. McCormack is intending to use

10 photographs in his opening statements but...

11      MR. McCORMACK:  I wasn't going to use

12 photographs in my opening statement.  What I was going

13 to use is a map of the city of Harrisburg to orient the

14 jury to the different locations so they have an idea in

15 their minds where they are and drawings of the house.

16      MR. MULLER:  I'm obviously referring to the

17 crime scene photographs.

18      MR. McCORMACK:  I'm not using any crime scene

19 photos during opening.  For the record, an official

20 Dauphin County map I'm handing out, by the Dauphin

21 County government.

22      THE COURT:  Any objection?

23      MR. MULLER:  No.

24      THE COURT:  Notes, note taking?

25      MR. McCORMACK:  I believe the jury should be

1  allowed to take notes.  It's a complicated case, for
2  keeping the names straight.  I've had the problem
3  myself.
4       MR. MULLER:  We don't have an objection with
5  that.
6       THE COURT:  The rules provide now -- I wanted
7  to make sure if anyone had any objection to it.
8       MR. MULLER:  It's my understanding they are
9  collected at the end of the day.
10       THE COURT:  We will essentially keep them in
11  this room until the end of the trial.  They will not
12  have the notebooks available until after opening
13  statements are concluded.  They will be gathered up
14  before closing arguments are made and gathered up and
15  retained here in the safe until at the end of each day
16  and at any noontime recess, just retained in the room
17  with one of the court staff present at all times to
18  make sure that no one disturbers them.  I will give
19  them instructions on the use or their decision to use
20  or not to use the notebooks that are provided them.
21  They will be given back to them at the time they begin
22  their deliberations.
23       At the end of the case the notes/notebooks are
24  themselves -- we will have the jurors remove the sheets
25  on which they've taken notes, leave them in the

1    envelopes.  We can at least reuse the notebooks that

2    weren't used fully, and then the envelopes are taken

3    and shredded without anyone observing what's on them.

4             MR. McCORMACK:  The shredding, yes, Your Honor.

5             THE COURT:  Without anyone observing them

6    whatsoever.

7             MR. McCORMACK:  Yes, Your Honor.

8             MR. MULLER:  Yes.

9             (A lunch recess is taken from 12:37 p.m. to

10   1:48 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       Tuesday, September 13, 2005

2            Afternoon Session

3

4       (The following discussion is held in chambers.)

5       THE COURT:  Have a seat, Mr. Abramczyk.  We

6  decided to do this here, which we would have done too

7  during voir dire.  Thank you for being forthright

8  mentioning to someone that you did recognize someone

9  who's on the Commonwealth's witness list.

10      MR. McCORMACK:  Not on the --

11      JUROR NO. 12:  Not on the list.  She was among

12  all those people.  When I was called to go to the jury

13  box I looked over and I saw Missy.

14      THE COURT:  What's her name?

15      JUROR NO. 12:  Missy.  Jerry Livingston's

16  daughter.  Her father was sheriff years ago.  I knew

17  her father, and I know her dad and I know her.  I don't

18  know what her connection is to the case.

19      THE COURT:  She's not going to be called as a

20  witness.

21      MR. McCORMACK:  She's not going to be called as

22  a witness.

23      JUROR NO. 12:  White, short blond hair.  I saw

24  her and I saw her walking back in.  She said, Alan, can

25  I say hello to you?  I said sure.  She said I was just

1  as surprised to see you as you were to see me.  She may

2  just know these people.

3        THE COURT:  There's been no discussion about

4  the case between you and her.

5        JUROR NO. 12:  None whatsoever.

6        THE COURT:  Does her having a relationship at

7  this point, some relationship with the Commonwealth's

8  witnesses going to effect your ability to sit and

9  decide this case fairly based only on the testimony and

10 evidence presented?

11       JUROR NO. 12:  Not at all; I have no problem

12 with it.  I was shocked to see her.  I didn't know that

13 she knew anybody, and I still don't know what her

14 connection is to the case.

15       THE COURT:  Any questions from either of you?

16       MR. McCORMACK:  No questions.

17       MR. MULLER:  No.

18       THE COURT:  One thing, sir, I want you to know,

19 you should not, I'm telling you, do not try to contact

20 her at any time.  We're not going to sequester you

21 folks.  Don't try get in touch with her to find out

22 what that connection is.  I'll be telling everyone the

23 same thing.  Keep your deliberations and your efforts

24 free of any outside influences whatsoever.  All right?

25       JUROR NO. 12:  Fine.  I just figured -- it just

1  happened -- before we went my further.  I'm fine with

2  it.

3          THE COURT:  Better to mention it than not.

4          (The end of the in-chambers discussion.)

5          (The jury entered the courtroom at 2:07 p.m.)

6          THE COURT:  Ladies and gentlemen, sorry to keep

7  you waiting.   Ladies and gentlemen, I hope you enjoyed

8  your lunch break.

9          During the voir dire process while waiting for

10  the lawyers to do their work, I sometimes share a

11  little trivia knowledge about today's date just to pass

12  the time while the lawyers were doing their work.  But

13  now we're getting down to the serious part of your

14  functions and responsibilities.

15          Jury duty is, as I think I told the jury panel,

16  one of the most serious duties of citizenship of this

17  country and this state.  You're going to decide whether

18  or not Mr. Love is guilty of the crime charged by the

19  Commonwealth of Pennsylvania.  How you do your job is

20  every bit as important as how the attorneys involved in

21  the case do their job and how I do mine.

22          Your job essentially is to pay close attention

23  to everything that is said and done in this courtroom

24  so that you can perform your duties.  I tell jurors,

25  your function as jurors is both an easy job and a

1  difficult one.  The easy part is that you're not
2  required to actively and pro-actively participate in
3  these proceedings.  You do not ask questions.  We won't
4  ask you questions during the course of the proceedings.
5  You sit and observe what is going on and what is being
6  presented in the nature of testimony or other evidence
7  during the course of this trial.
8          The difficult part is that you will sit long
9  periods of time and you're sitting in a room with very
10  high ceilings with a little bit of resonance as a
11  result of the ceiling, and it can be sometimes a little
12  difficult for people to continue to pay attention
13  during the entire course of the testimony and any
14  particular witness or all of the witnesses in the
15  entire trial.
16          I appoint each of you to be the keeper or the
17  helpmate of all the members of the jury who are next to
18  you so that you are your brothers and sisters' keeper.
19  In Judge Bratton's courtroom a tap on the elbow if you
20  notice someone having a problem paying attention or
21  keeping focused on what's going on is not considered an
22  assault.  So I appreciate it if you would help me.
23  You all need to pay close attention.  It is the
24  evidence upon which you will be making your decision.
25  If you haven't heard it you will -- your decision has

1    the risk of being flawed.

2           The Commonwealth in this case charges Mr. Love

3    with the crime of murder.  That charging is

4    accomplished -- still didn't get my copy yet, did I? --

5    is done by the filing of a piece of paper called an

6    information.  It is only an accusation of a crime.  It

7    is not evidence that you should consider as evidence in

8    any way as to the Defendant's guilt.

9           The fact that a charge has been brought is not

10   evidence of guilt.  The Constitution of the United

11   States and the Constitution of this Commonwealth

12   granted to the Defendant, Mr. Love, a presumption of

13   innocence.  That means the Defendant in this case is

14   presumed innocent unless and until through the

15   testimony of witnesses and other evidence the

16   Commonwealth proves guilt beyond a reasonable doubt.

17   It is the District Attorney as counsel for the

18   Commonwealth which has the sole burden in this criminal

19   prosecution of proving guilt beyond a reasonable doubt.

20          The Defendant under our Constitution has an

21   absolute constitutional right to remain silent.  He is

22   not obligated to carry any burden whatsoever in these

23   proceedings.  He is not obligated to present any

24   evidence and he is not required to testify.  It's his

25   decision whether or not he chooses to waive those

1  constitutional rights and take the stand.  I have no

2  right to even ask him right now if he has made that

3  decision.  He'll make that decision as the trial

4  progresses, and should he choose not to testify or to

5  produce no evidence, you may not in the performance of

6  your oath that you took this morning when you received

7  the responsibility as jurors in this case, you may not

8  hold it against him or draw any adverse inference about

9  his guilt or innocence should he choose not to testify

10  or offer any evidence.

11          Now, here's the way things proceed.  We start

12  with opening statements of counsel.  Opening statements

13  are a chance when the lawyers will address you, for

14  lack of a better example, they lay out a road map for

15  you of what each of them anticipates the testimony will

16  be during the course of the trial.  What they tell you

17  is not evidence.  It's not testimony itself.  It's only

18  what the lawyers expect.  Your decision will be based

19  on the evidence which comes from this witness stand and

20  other evidence presented to you not what the lawyers

21  say the evidence will likely be.

22          The order of march is determined, as I said, by

23  the burden of proof and rules of court.  The

24  Commonwealth addresses you first.  Mr. McCormack, I

25  presume, will give you an outline of what he believes

1  the evidence will be.  When he is concluded,

2  Mr. Muller, I presume, will have an opportunity to

3  address you if he wishes, but he also has the option if

4  he wishes to defer opening statement until later in the

5  proceeding.  It's his decision to make at that time.

6      You -- even though I just told you what the

7  lawyers tell you is not evidence, you should listen

8  carefully to what they say because unlike CSI or The

9  Practice or Ally McBeal, any of the numerous courtroom

10 dramas or comedies on television, we don't have

11 scriptwriters.  Evidence presented by witnesses who are

12 called at one time usually give their -- whatever

13 information he or she may know and, therefore, the

14 story that you are to hear may not come in in a

15 logical, chronological sense, in all cases so what the

16 lawyers tell you in opening statements may help you to

17 be ready to hear the testimony and know where the

18 puzzle fits together in time or relationship.

19      These lawyers, of course, understand too that

20 an opening statement is a chance to address with you

21 their expectations of what the evidence is.  It is not

22 argument and they know from their experience it is not

23 their time to make impassioned pleas to you during

24 opening statements.

25      Again, television has some of us thinking that

1 courtrooms are different than they are in reality.

2 When the opening statements are concluded the

3 Commonwealth again because the Commonwealth bears --

4 the only party that has the burden of proof here calls

5 witnesses and presents evidence.  The lawyers will ask

6 questions of those witnesses.  In doing so please

7 remember the question themselves are not evidence, but

8 you have to listen to the questions in order to

9 understand what the answers are that you're given.

10        Each witness called by the Commonwealth then

11 will be subject to cross examination, which is just

12 additional questions being asked by the Defense

13 counsel.  Again, what the lawyers tell you or say

14 during questioning is not itself evidence unless of

15 course a witness adopts the question as his or her

16 answer.

17        When the Commonwealth has concluded presenting

18 all of its witnesses and all of its evidence, the

19 Commonwealth will rest its case.  At that point then,

20 as I said, if the Defendant chooses to offer evidence

21 or to testify or to offer any testimony or any other

22 witnesses then the order of course of questioning and

23 cross examination reverses, and when the case is

24 entirely concluded all of the evidence that is to be

25 presented has been presented to you, then the lawyers

have one last opportunity to talk with you in closing argument. At that point we do reverse the order. The Defense counsel has the opportunity to talk with you first and to review with you the evidence as he believes it was presented and to present to you logic and argument and reasons why you should reach a conclusion of not guilty; followed by the closing arguments of the District Attorney who will likewise go through the evidence with you; in doing so present his arguments as to why you should return a verdict of guilty.

During the course of questioning, by the way, is one usually where the bulk of my job gets done at least during the trial. There is likely to be times when one or another of the lawyers will stand and say they have an objection to a question that has been asked or some evidence that has been offered. In so doing, they are doing their job to try to exclude evidence which they believe does not meet the requirements of Pennsylvania's Rules of Evidence and that, therefore, should not be considered by you.

In some cases the number of objections are large. In other cases there are few. I have no way of predicting what will happen. During the course of the proceedings my job is to make -- decide those questions

1  of law as to whether or not an objection is properly
2  stated or if it is not.
3       If I find that the evidence should not be
4  presented to you objected to, then I'll sustain the
5  objection.  If I find that the evidence is permitted to
6  be considered by you, then I'll overrule that
7  objection.  You must -- you must understand that we
8  will ofttimes discuss legal issues raised by such
9  objection at sidebar.  I already told you I'm sorry we
10 have to do it that way.  Don't strain to hear what we
11 are talking about.  It's matters of law that are not of
12 your concern.  If you have the ability to read lips at
13 a distance, don't do that.  These are matters not of
14 your concern.  If you disagree with something, if you
15 know anything about it, the lawyers in making the
16 objection or you understand the question, it's
17 something you would really like to know about and I
18 have said, no, I sustained the objection, you're not
19 going to hear it then.  You must abide by that and you
20 must follow all of the instructions that I give you
21 throughout the trial including those now at the end of
22 the case.  At the end of closing arguments I'll give
23 you your final instructions on what the law is
24 applicable to the charges that have been brought in
25 this case.

1          It's not my job, however, to be the judge of
2    what the facts are, who, what, when, where, why and
3    how, go into making your decision as to whether or not
4    the Commonwealth has met its burden or not, met its
5    burden of proving guilt beyond a reasonable doubt.
6    You're what some lawyers refer to, as jurors, as the
7    Supreme Court.  When it comes to deciding what the
8    facts are that's what your major job is.
9          You will be -- this is a relative new
10   development in Pennsylvania practice procedure -- you
11   will be given notebooks.  You will be permitted to take
12   notes in this trial.  This is anticipated to be
13   lengthier than other trials.  The rules provide for
14   giving you notepads and pens.  You're permitted to take
15   notes during the course of the trial if you wish.  You
16   cannot take notes during opening statements.  We don't
17   give you those until the conclusion.  You won't be
18   during closing arguments -- won't be permitted to take
19   notes during any closing arguments.  You are not
20   obligated to take notes if you choose not to.
21   Ultimately you decide for yourself whether you wish to
22   do that.  In your ultimate deliberation and decision it
23   to be based upon your recollection of the evidence as
24   you heard it.
25         If you do take notes, part of your obligation

1  in watching this trial is to consider and observe the

2  demeanor of the witness, of each witness, and try to --

3  part of your job is to determine how much you choose to

4  believe of a witness's testimony and how much weight

5  you choose to give to the testimony that you heard.

6  You can only do that by observing the witnesses during

7  their testimony.  Don't let note taking distract you

8  from that obligation and that is a concern that we

9  always have.

10        We want the notes to help you, to refresh your

11  recollection of the testimony and should only be deemed

12  and treated as supplements, not a substitute for your

13  memory of what the evidence and testimony was.

14        It should not take precedent over your

15  independent recollection of what the evidence has

16  proven to be the facts of this case.  Those who choose

17  to take no notes or few notes should not be

18  overinfluenced by jurors who take notes.  You will be

19  allowed to have the notes with you during

20  deliberations.  You shouldn't be overinfluenced by the

21  fact that others took many notes if you took a few or

22  none.  It's just as easy to write something down wrong

23  just as to remember something wrong.  Keep that in

24  mind, and the notes themselves are entitled to no

25  greater weight, as you discuss the evidence to try to

1    determine what the facts are, then your independent

2    recollection and memory of what went on during these

3    proceedings.  Just don't let the notes, in other words,

4    get too large as you undertake your deliberations.

5           Each time we adjourn for a break whether for a

6    midsession break or a lunch break, we'll ask you to put

7    the notebooks back in the envelope that will have your

8    names on them, leave them in the courtroom to make sure

9    they are safeguarded.  Your notes are confidential.  No

10   one will see them not even me during the course of the

11   proceedings, and when the proceedings are concluded the

12   rules we have adopted in Pennsylvania provide your

13   notes -- we'll talk more about this at the end -- your

14   notes will be taken out of the notebooks and put back

15   in the envelopes and the envelopes are confidentially

16   destroyed without anyone ever reading them.  That frees

17   up any concern about what you're writing down, and they

18   are destroyed immediately after the proceeding.

19          It is vitally important that you do pay close

20   attention to the testimony.  We have -- we have a court

21   reporter here who is taking down everything that is

22   said.  If you cannot hear, I want you to get my

23   attention if you're not hearing what's going on.  I can

24   adjust the sound through our electronic devices here

25   that I'm learning to use the sound system.  It works

1    pretty well.  If you miss something, get my attention.

2    If it's something that is important we can have the

3    court reporter read back small portions.  It does slow

4    down the proceeding.  We don't want to interrupt more

5    frequently than necessary.  Please pay close attention,

6    and we don't have the ability -- you will not be given

7    a transcript of all the testimony at the end of the

8    case.  It's your recollection that is going to govern

9    your deliberations and your decision making.

10        You will be deciding in many cases the

11   credibility of the witnesses.  Credibility in the law

12   means truthfulness and accuracy.  You're going to watch

13   each witness testify.  Listen to the testimony, and

14   your job is to decide whether to believe some or all or

15   none of what each witness testifies about and you

16   decide what weight you choose to give to each witness's

17   testimony.  It's necessary for you to use your common

18   sense here and make that same decision that you do in

19   your everyday life as to whether or not you believe

20   what someone you probably have never met is telling

21   you.  It's very, very important.

22        A couple of things here.  Your decision must be

23   based only on the evidence that's presented during the

24   proceeding.  You may not expose yourself to any outside

25   influence whatsoever.

1           I've learned to -- now that the 21st century is
2    upon us, caution you, do not conduct any legal research
3    or other research on line.  Just don't do it.  If you
4    hear of a location, an address, do not conduct your
5    independent investigation, don't drive by the place to
6    see what it looks like.  Do not discuss this matter, as
7    I said earlier this morning, with anyone including with
8    each other during the course of these proceedings until
9    you begin deliberations at the end of the proceedings.
10   We have gone through an expensive process here already
11   of selecting this jury to hear this case, and while we
12   are certain your family members and your friends are
13   intelligent and insightful individuals, we did not ask
14   them to render a decision in this case.  That's your
15   job; so therefore, don't talk about the case with
16   anyone at home.  We've already had a reference that
17   there has been some media coverage of this proceeding
18   even before we selected the jury.
19           I simply say, turn away if you see such a
20   thing.  I know it's likely to happen.  I am making it
21   very clear to each and every one of you, if someone
22   points out to you that they heard or saw something
23   about the case that you're sitting on a jury, that you
24   should tell that person you cannot discuss it and do
25   not wish to hear anything they have to say about it.

1    If you happen to see a newspaper or someone brings to
2    your attention that there's an article in the paper,
3    please do not read it.  The most you can do is, save
4    them for me until the trial is done.  I'll read them
5    all.  For the time being, don't read anything in the
6    press about this.  Again, I don't say that because I
7    believe The Patriot News or any other media outlet
8    intentionally misstates anything, but ofttimes the
9    person writing the article or reciting the news isn't
10   in the courtroom and didn't hear the evidence.  You
11   actually will be some of the few to hear every word of
12   the evidence.  While they don't intend to get it wrong,
13   sometimes they do.  And it's your recollection of the
14   testimony that was unaffected by outside influences
15   that must direct and guide your decision.
16          Don't read newspapers, listen to radio reports
17   about it.  Change the station.  If it comes on
18   television, please leave the room.  Don't be influenced
19   by any outside influence at all.
20          You should also be very cautious about arriving
21   at quick decisions and conclusions or reaching fixed
22   opinions early.  Your job is to hear, as I said, all of
23   the evidence, to consider all of the testimony before
24   you reach your final verdict.  You should keep an open
25   mind throughout the entire proceeding and wait until

1  all of the evidence is in before you start forming

2  opinions as you undertake your deliberations.

3       Now, with that as your preliminary

4  instructions, I think we are now prepared to move

5  forward into opening statements.  Is there anything

6  else you believe, gentlemen, you believe I should

7  instruct the jury at this time?

8       MR. McCORMACK:  No, Your Honor.

9       MR. MULLER:  No, Your Honor.

10      THE COURT:  Are you prepared to proceed,

11  Mr. McCormack?

12      MR. McCORMACK:  Yes, Your Honor.  On December

13  20, 1996 it was nine years ago Iris Fennel was found

14  shot twice in the bedroom of her house on McCleaster

15  Street in the city of Harrisburg.  She was found about

16  noon on the 20th.  I talked to you during the voir

17  dire process, during the jury selection process and I

18  already hinted to you -- actually I didn't even hint --

19  I told you straight out this is a case that the

20  Commonwealth will be attempting to prove to you is as a

21  result of a domestic incident.  A domestic violence

22  type relationship between Iris Fennel and her

23  boyfriend, Tyshaunt Love, the Defendant.

24      We will use the Defendant's owns words.  We

25  will be showing you the things that he has said, he has

1  said, if I can't have her no one can.  We will attempt

2  to give you some insight into that man's mind, and many

3  of the things that you will hear are going to be his

4  words and the thoughts that he had as he expressed them

5  to the police or as he expressed them out on the street

6  to Iris and her friends.

7          The relationship between Tyshaunt Love and Iris

8  Fennel had been deteriorating for some time.  It didn't

9  just happen on December 19th and December 20, 1996,

10  that the two of them suddenly had a problem and one of

11  them wound up dying.  This had been building for some

12  time.  The relationship was more than just a

13  boyfriend/girlfriend relationship.  You will also hear

14  testimony that it was a business relationship, that the

15  two of them were involved in dealing drugs together.

16          They would often fight.  They would have

17  arguments.  Sometimes Iris would be somewhere.  She

18  would be late or she would have had to meet him

19  somewhere and she wasn't there.  He would go and find

20  her and when he would find her he would grab her up

21  and/or snatch her and pull her from where she is or

22  was.  Control.  This Defendant wanted to exert control

23  over Iris Fennel.

24          Now, you will hear during the course of the

25  testimony that in many ways this was a give-and-take

1  relationship.  Sometimes if they had arguments Iris
2  would give back the argument as much as he would give
3  it to her.
4        But the issue that you will be hearing during
5  the course of this trial is what was in his mind, as to
6  his thoughts about how this relationship should be
7  going, how should she be acting when he wanted her to
8  act in a particular way.
9        As I said, they were loosely involved in a drug
10 relationship together, sold crack cocaine, and you will
11 hear testimony she was pretty good at it.  In fact,
12 there was a little bit of a competition among drug
13 dealers up on the Allison Hill section of Harrisburg,
14 and Iris, especially Iris, was pretty good at it.  She
15 knew what times to get up in the morning so she can
16 catch the drug fiends coming out and looking for their
17 morning fix.  She knew what time of the morning and
18 what place in Harrisburg to be to catch the truck
19 drivers that are driving on our interstates, making a
20 stop here in Harrisburg, trying to get their fix on
21 crack cocaine.
22        And you will hear testimony that by all
23 accounts Iris was the one who was the better hustler on
24 the street between her and this Defendant, and in many
25 ways this Defendant financially and other ways began to

1  rely on Iris Fennel, began to rely on, live off of her

2  in some ways.  In fact you will hear testimony, this

3  again from the Defendant's own words, from what he told

4  the detectives, he would buy drugs from her to go out

5  and sell and sometimes he wouldn't be able to get the

6  amount of drugs he wanted from her because he still

7  owed her money for the last time.

8          That's the type of relationship that these two

9  people had.  They also lived together.  They were

10 living together on McCleaster Street in the city of

11 Harrisburg.  I'll give you evidence where that is in

12 Harrisburg city.

13         December 19, 1996 their relationship reached

14 the breaking point and Iris Fennel put him out.  She

15 was kicking him out of the house.  You will hear

16 evidence of a packed bag, of the Defendant looking for

17 places to live.  You will hear evidence that he had to

18 leave, and, in fact, the time that this occurred he was

19 probably returning to the house to get some of his

20 items out of the house.

21         So on December 19 when he was kicked out of the

22 house, his night of obsessively looking for Iris,

23 trying to regain control over a woman who was asserting

24 her own control in the relationship began.  When I talk

25 about obsessiveness, you will hear testimony of

1   numerous phone calls that this Defendant was making on

2   that night and again these will be from the Defendant's

3   statements the things that he said starting early in

4   the evening before he gets to the bar.  He gets to the

5   bar before Iris does, and you'll hear about a

6   particular bar that they hung out in and Iris wasn't at

7   the bar.  She's not there for a few hours.  What's he

8   doing?  Calling her, calling her, calling someone three

9   or four phone calls in a half-hour time period.  Over

10  the course of the night from the early evening hours to

11  the early morning hours numerous phone calls.  So many

12  phone calls he himself can't say the number of phone

13  calls that he makes.

14          He supposedly was searching for Iris.  He tells

15  the police that at least twice, if not three times, he

16  went over to her house searching for her at the

17  McCleaster Street house they had shared.  He tells the

18  police, kind of giving them time frames, perhaps he

19  went earlier in the evening, maybe caught a ride with a

20  Domino's Pizza guy who would have taken him over to the

21  house.  He went in the house later on, maybe some time

22  around 2 or 2:30 he was at the house.  He went into the

23  house and neither time does he see Iris in the house

24  according to his statements.

25          But that's the only thing about his

1  statements -- you're going to hear all the different

2  statements, and you're going to see how some of the

3  things in his statements don't match up with other

4  things that he has said and they don't match up with

5  other evidence you're going to hear during the course

6  of this trial.

7        For example, the Defendant being at her house

8  at 2:30 or roughly around 2, 2:30 in the morning and

9  Iris wasn't there.

10        Well, the very first witness you'll hear from

11  is Johanna Johnson.  Johanna Johnson was on the phone

12  with Iris Fennel around that same time frame and she

13  was home.

14        Johanna Johnson had Iris's daughter.  Iris had

15  a daughter, Brittany.  Back in 1996 Johanna had custody

16  of Brittany and just before Christmas, a few days

17  before Christmas, they were talking on the phone for a

18  long period of time.  They were talking on the phone

19  about Christmas coming up, about gifts being bought,

20  about food, preparations being made for the Christmas

21  holidays.

22        The Defendant's mind-set at this time of the

23  morning, some time around 2:30 in the morning, is, you

24  know, I'm getting tired of asking so many people about

25  Iris and where she is.  He recognized himself.  He was

1  starting to annoy people how many times he was asking
2  where she was, and he also indicates that he comes to
3  the realization that she was probably out cheating on
4  him.  This is something that he tells the detectives.
5  He's been looking for her all night.  She's probably
6  out cheating on him.

7          Now, ladies and gentlemen, during the course of
8  this trial sometimes the evidence and sometimes the
9  testimony will be just as chaotic as the lifestyle
10 these two people lived.  As I indicated, they are both
11 involved in dealing drugs.  There will be people that
12 come over to the house, strangers come to the house to
13 buy drugs.  People would sometimes flop at the house,
14 sometimes just stay at the house.  They didn't really
15 live there, wasn't their permanent address, but if they
16 needed a place to stay they would stay there also.
17 There were a number of people that had access to this
18 house.

19         To give you kind of a primer as to who are some
20 of the people you'll hear from and trying to keep track
21 of the people you're going to hear about sometimes can
22 be difficult.  They all have nicknames.  Some of them
23 have different names.  I ran through a whole long list
24 of names in the jury selection process.  I appreciate
25 all your patience during that.  I had to go through the

1    list of names to see who knows who.  A lot of those

2    people have nicknames.  Who is who?  Well, first of

3    all, Tyshaunt Love, the Defendant, his nickname is

4    Cuzzo.  When he was in New York a lot of friends from

5    New York called him Schoolboy.

6          When he came down to the Harrisburg area his

7    friends down here call him Cuzzo.  Any time you hear a

8    witness referring to Cuzzo, they are talking about the

9    Defendant.  Any time you hear a witness saying Cuzzo,

10   they are talking about the Defendant, or Schoolboy,

11   they are talking about the Defendant.  The Defendant is

12   at the time approximately 21 years of age.  He had come

13   down to Harrisburg from New York.

14         Iris Fennel, I already told you once before

15   during this process that she also sometimes was known

16   as Iris Belcher.  Iris Belcher and Iris Fennel are the

17   same person.  She had a nickname.  Her nickname is

18   Blondie.

19         Guillermina Cruz, I mentioned her, her

20   nickname -- she's going to play a big part of this

21   case -- Guillermina Cruz goes by the nickname of

22   Toothie or sometimes Tootie, Toothie or Tootie.  A lot

23   of people don't know people's real names.  That's where

24   it gets confusing.  Guillermina Cruz is Toothie or

25   Tootie.  LaQuan Williams, his name I didn't mention

1   before; LaQuan Williams is sometimes -- he's also
2   known -- I don't have it up on the screen -- Rasheed.
3   LaQuan Williams, his name in Harrisburg is Kazar.
4   Another one of the guys who came down from New York to
5   the city to Harrisburg.  He's another drug dealer in
6   the city of Harrisburg, Kazar.  Any time you hear the
7   name of Kazar it is LaQuan Williams.
8           You'll hear about a man, Anthony Knight.  I
9   asked about him during voir dire.  He's also known as
10  Maurice Apkin.  His nickname is Black or sometimes he's
11  called New York Black.  Anthony Knight and Guillermina
12  Cruz back in 1996 were boyfriend and girlfriend.  In
13  fact, Guillermina Cruz may have been carrying Anthony
14  Knight's child back in December of 1996.  When I say
15  boyfriend/girlfriend, sometimes that term can be a lot
16  looser with these individuals than you might consider
17  boyfriend/girlfriend.  It may not be an exclusive
18  boyfriend/girlfriend situation.  That gives you an idea
19  of some of the people that you will be hearing about
20  during the course of this trial.
21          Where are these places?  I already mentioned a
22  bunch of places.  Where is McCleaster Street?  I talked
23  about a bar called Fav's bar.  It's also called
24  Midnight bar.  Olympic bar, the Kentucky Fried Chicken,
25  14th and Market Street, Fav's, these people frequented,

1  and you're going to hear testimony about.  I'll give
2  you a real quick orientation on that.  I know you can't
3  read the names yet.  This is City Island so we have an
4  idea.  City Island; we ourselves are right here.  This
5  is Market Street, this yellow band here.  If you
6  continue up Market Street past the courthouse over
7  Cameron Street you start to go up the hill.  When you
8  start to go up that kind of steep hill, that's the
9  beginning of the area named Allison Hill in this
10  section of Harrisburg.
11          Market Street is now here.  Here's Cameron
12  Street, come up the hill.  McCleaster Street, the house
13  that Iris was living in, the house Iris was found dead
14  in is right here.  Here's McCleaster Street.  Again
15  here's Market Street.  Here's McCleaster Street.  To
16  give it the term street is a very loose term, it's more
17  an alleyway.  McCleaster Street really is more an
18  alleyway.  It appears as much to be where a series of
19  garages are behind other homes than an actual street,
20  but it's called McCleaster Street.
21          In fact, some of the garages have been
22  converted into homes.  The Kentucky Fried Chicken is
23  right here.  Here's Market Street.  Here's the Kentucky
24  Fried Chicken; Fav's bar is right here; 13th and
25  Market; here's Fav's bar, and the Olympic bar, Derry

1    Street and 14th Street.  Here's one more time,

2    McCleaster, the Olympic bar, Fav's bar, and the

3    Kentucky Fried Chicken.

4            Fav's bar was the hub of drug activity on

5    Allison Hill at the time in 1996, a lot of drug dealers

6    and buyers all kind of gathered in the area of the bar.

7    They would hang out and you will hear Iris was at the

8    bar.  The Defendant is at the bar.  You will hear some

9    of the witnesses that were at the bar or see things

10   that occur outside of that bar.

11           That's where things are -- to kind of give you

12   an orientation on that, the house itself can be a

13   little confusing at times, even which door is the front

14   door and which door is the back door.  The house is

15   built on a hill.  Like I said, it looks like it used to

16   be a garage.  It's built on a hill.  It has two

17   entrances.   The McCleaster Street entrance actually

18   enters into the second floor of the house.  The other

19   entrance enters into the kitchen, which is the first

20   floor of the house.  Here's a diagram of the kitchen.

21   If somebody wants to get to that kitchen from this door

22   here being the door, they have to walk along the

23   outside of the building.  There's a pathway, some steps

24   that go down on the outside of the building, come

25   around and there's a couple of steps that go down.

1  This door, when you come through this door, you are now

2  in the kitchen area.  The only things on the first

3  floor are the kitchen and the bathroom.  The shower

4  here; this is the bathroom.  This is the kitchen.  Then

5  what you have is you have a landing and the steps go up

6  to the second floor.  You have the stove, countertops,

7  sink, some more countertop.  Then you have a

8  refrigerator in this area here.  That's the first floor

9  of this house.

10         The second floor of the house when you come up

11  those steps, you come up the steps and you're in the

12  bedroom.  The steps actually lead to the bedroom, and

13  there's only one bedroom in this house, lead to the

14  bedroom.  There is a bannister.  I believe the

15  bannister is about 4-feet high, a bannister somewhat

16  similar to this bar in front of you.  So as you come up

17  the stairs it kind of opens up into a kind of loft-type

18  area.  You come up to the area, it's open right into

19  the bedroom area.

20         If you were to continue up the stairs and just

21  walk straight, you wind up going into the living room.

22  There is a bedroom.  Come down here here's the living

23  room.  There's a series of windows in the living room

24  and here's the door that I said comes off on McCleaster

25  Street entering into the second floor of the house.

1          You're going to hear testimony from witnesses

2    that said they were knocking on Iris's door, the door

3    off the alleyway, a lot of people instead of calling it

4    McCleaster Street, the door off the alleyway.  When

5    they got no answer on the door, they went over to the

6    windows and tapped on the windows looking in.  That's

7    the area of the house they are going to be talking

8    about.  Obviously since 1996 is when this crime

9    occurred.  It's been a long journey to get here.  It's

10   been a nine-year journey to get here.

11          During the time frame, this case has been

12   marked by many different things -- I've already talked

13   about part of it -- been marked by the fact that Cuzzo,

14   Tyshaunt Love, the Defendant, has changed his story.

15   The story that he told the police on December 20, 1996

16   is not the same as the last story that he told

17   Detective Heffner back in 2002.  So some of the things

18   have changed in the Defendant's story.  Guillermina

19   Cruz, Toothie -- remember I told you that she is going

20   to play a key role in this case -- Guillermina Cruz is

21   not the most cooperative witness in the world.

22   Guillermina Cruz, I would like to say, some of the

23   officers when we discussed this case, is hot and cold.

24   Some days she's happy, other days she's not, and she

25   doesn't want any part of this case.

1          She has backtracked on her statements.  Your
2    guess is as good as mine at this point in time as I
3    begin the trial whether she's going to be on that
4    witness stand because at the moment she's not being
5    cooperative.
6          Now, she has testified at a preliminary
7    hearing.  It's an earlier stage of this case, where she
8    testified to what occurred and what she says occurred
9    on December 20th.  If she is unable to be in this
10   courtroom you may hear that testimony.  You may hear
11   her words from a previous proceeding as to what she
12   would have said if she was here during the course of
13   this trial.  Like I said, I don't know if she's going
14   to be in this chair or not at this point in time as we
15   begin this case.
16         LaQuan Williams, Kazar; Kazar has a smear of
17   blood on his shoe, very small -- he was wearing
18   Timberland boots -- where the eyelet is, and the
19   shoelace, a little bit on the shoelace and a little bit
20   on the eyelet.  He had blood on his shoe.  Back in
21   1996, 1997 when we did DNA testing back then, the
22   results were -- I may not have the exact number -- a 1
23   in 600 chance that that is the victim's blood on his
24   shoe.  As we've done this case, we reanalyzed this
25   using the more recent types of DNA testing, and now it

1  is almost certain that the blood on his shoe is Iris
2  Fennel's blood.
3       We also intend to introduce testimony during
4  the course of this trial of an altered crime scene that
5  when the police arrived and saw Iris where she was
6  laying in this room with her underwear taken off and
7  her body naked from the waist down, her face pummeled,
8  bullet wound, close range, and you will see -- they
9  will talk about a powder burn, is just black from the
10 burning powder on her cheek because the muzzle of the
11 gun was so close, and a second wound through her lip,
12 which we don't know the order of the wounds.  I say
13 it's the second wound, probably the one that killed her
14 instantly when this bullet went through the lip and
15 ended in the brain.
16      You will see blood evidence throughout the
17 house and you will see areas where it will appear that
18 Iris was or at least where Iris's body may have been
19 and then dragged.  You'll hear about drag marks, that
20 it would appear that there's a pooling of blood here
21 and something was moved across that.  If you just think
22 of a puddle of water, I go like this with my foot,
23 there's going to be dragging of that water with my
24 foot.  You will hear testimony that this is an altered
25 crime scene.  That all adds to what I say may initially

1  be confusing in this case.

2  But as the evidence unfolds we intend to be

3  introducing testimony to show that this Defendant was a

4  man ultimately angry, that he could no longer possess

5  Iris Fennel.  He could no longer control her.  He was

6  losing control and she was exerting control.

7  As I said, these are his words, insight into

8  his thought process, she's probably out with some dude

9  cheating on me.

10  Now, the Defendant, when he talked to the

11  police, he said he met Toothie sometime around 2:30 --

12  remember Tootie is Guillermina Cruz -- he met Tootie

13  some time after 2:30 in the morning.  The Defendant,

14  when he talks to the police on December 20, 1996, he

15  tells the police that he was with Guillermina Cruz from

16  that time frame about 2:30 in the morning, somewhere

17  around there, until 10:00 in the morning.  They were

18  together.  They were somewhere up on Balm Street with

19  some other head, some crack addict who allowed him to

20  flop on a couch for $15 that night with Guillermina

21  Cruz, that they got up around -- up some time around

22  10:00 in the morning.  You will see through the course

23  of the evidence and the testimony that comes into this

24  case Iris was probably killed much earlier than 10 a.m.

25  in the morning.

1          The time period covered his alibi.. He was with
2     Guillermina Cruz.  He was with Tootie.  The problem
3     with him is his alibi says she witnessed him murdering
4     Iris Fennel.  His alibi says he killed Iris.  You'll
5     hear how all of that came out during the course of this
6     trial when how initially she went to the police, stuck
7     to the party line.  I was with him.
8          Then the very next day she changed her story,
9     and then she eventually said that she was with him when
10    he committed the murder over on McCleaster Street.
11         The testimony is going to be that when
12    Guillermina Cruz was with Tyshaunt Love at that house
13    at Balm Street, she got up in the morning, not 10 a.m.
14    in the morning but much earlier.  There's no exact
15    time, but she recalls there being school buses or some
16    type of buses going around.  It was kind of that time
17    period, talking about December here too, still partly
18    dark out and still kind of becoming dawn that morning
19    hour -- that they go over to McCleaster Street where
20    Iris lives for the purpose -- the Defendant asked
21    Tootie to go with him, to help him move some of the
22    items out of the house because he was moving out.
23         In fact, the Defendant told the police that
24    when he talked to this pop-pop guy on Balm Street, he
25    rented a couch from him that night.  He was waiting for

1  him to have a room to move into to actually live at

2  that house.  At that point in time more evidence that

3  their relationship was done and that Iris Fennel was

4  putting him out.

5          Now, let me go back one.  Tootie being the T,

6  Cuzzo being C and I being Iris, they go into the bottom

7  entrance of the house and they are in the kitchen, and

8  when they are in the kitchen area you can imagine what

9  Tootie says happened is, when she comes in Iris sees

10  Cuzzo come in.  When she says, Cuzzo, why are you

11  bringing this 16 year old girl into this house, into

12  her house and the reaction is immediate, what are you

13  doing bringing her into my house, a respect type issue,

14  and Iris and Tootie get into a verbal battle pretty

15  quickly, maybe over boyfriends, who is sleeping with

16  whose boyfriend, but they get into an argument and they

17  also probably exchange blows, maybe a slap between each

18  of them, C being Cuzzo and T being Tootie; whatever the

19  case may be, Cuzzo quickly steps between them and takes

20  control of the situation and he starts beating Iris

21  about the head.

22          All of this happening in the kitchen.  We don't

23  know -- I have depicted here by the door -- we don't

24  know what took place by the door, by the stove.  We

25  don't know the exact place.  I'm just putting it up for

1 graphic showing so you have an idea of what we're
2 talking about, but they get into a confrontation.
3 Cuzzo starts beating on Iris and Iris starts bleeding
4 pretty quickly.  We know Iris is bleeding in the
5 kitchen because Iris's blood is on the floor.  It's on
6 the refrigerator, is over by the stove, is on various
7 parts of the kitchen.  So they moved at some point in
8 time around that kitchen, which path they made, I don't
9 know.  But at some point in time either Iris, Cuzzo,
10 the Defendant, one or both of them and definitely
11 Cuzzo, winds up by the stove.  The stove is important
12 because that's where Iris reportedly keeps her gun and
13 it actually might be a gun that her and Cuzzo shared
14 together.  But that's where a gun is kept and at some
15 point in time during this struggle he has in his
16 possession a gun, and not only is he hitting her with
17 his fists but he's also hitting her with the gun, and
18 all this time now she is bleeding.
19         You're going to hear from Dr. Ross that her
20 nose was broken.  If you could imagine a broken nose,
21 blood coming from a broken nose.  You're going to see
22 pictures of Iris after she was dead, all the blood.
23 Her hands are just drenched in blood.  You can imagine
24 the blood that would have been happening at this time
25 period and we have evidence of that blood not only in

1 the kitchen area but then over by the stairs and then

2 up the stairs, and this whole incident now moves from

3 the kitchen and it moves up the stairs.  Again we have

4 evidence of blood leading up those stairs.

5          Iris isn't willingly going up those stairs.

6 This is the Defendant still hitting on her, still

7 grabbing her, still hitting her with the gun to get her

8 to go up the stairs.  He's grabbing her by the hair and

9 forcing her up those stairs with a good hold of her

10 head going up those stairs, and they come up the

11 stairs.  You will hear some evidence that some hair is

12 found in the vicinity of the top of the stairs.  Now,

13 Tootie stays downstairs.  As they go up the stairs,

14 Tootie stays in the kitchen, and while she's here in

15 the kitchen, a couple of things are going on.  She

16 hears screaming.  She's hearing yelling.  She hears

17 screaming, hears both Cuzzo and Iris upstairs

18 screaming.  What they were screaming about, it's better

19 you just hear what they say, what those witnesses say

20 rather than me paraphrasing them.  There's screaming

21 going on upstairs.  It sounds like there's an assault

22 continuing upstairs, and then she hears a gunshot and a

23 thud, and it gets quiet, and she goes to peek to see

24 what's going on upstairs, and she goes part way up the

25 stairs and she doesn't have to go all the way up the

1   stairs.   Remember there's a bannister.   She gets part

2   way up the stairs.   When she gets part way up the

3   stairs she sees Cuzzo standing in the bedroom.   She

4   sees Cuzzo standing in the bedroom with his arm

5   extended as if he has a gun in his hand, and she hears

6   a gunshot as Cuzzo is probably firing across the room

7   to the far side of the room down towards the floor.

8          She also sees something else.   Now, she never

9   sees Iris again.   She doesn't go all the way up to the

10  top of the stairs and look into the room.   She gets

11  part way up, sees this.   What she sees -- something

12  else, when her and Cuzzo arrive, when her and the

13  Defendant arrive in the house there was a hint that

14  perhaps somebody else was in the house besides Iris.

15  There was, I believe, a television or something that

16  sounded like it was on upstairs.   They are downstairs.

17  It sounded like somebody was moving around upstairs.

18  As she's watching what unfolds on the second floor with

19  that gunshot she sees Kazar.   She sees LaQuan Williams

20  in that bedroom.   Where he came from where he was

21  during the entire assault she doesn't know.   But she

22  sees that he's in the bedroom and she sees him leave

23  that bedroom and go into the living room.

24          By the way, the blood doesn't come up the steps

25  and go into the bedroom and end there.   There is blood

1  evidence in the living room too.  What was going on in
2  that second floor was something that was violent and it
3  was something that caused blood to be in multiple rooms
4  in that second floor, and, as I said before, you're
5  going to hear evidence that Kazar had blood, a small
6  smear, small rub of blood on his shoe.
7           After seeing all this Tootie doesn't wait
8  around to see what's going on.  She goes down the
9  stairs, goes out that exit in the kitchen and Cuzzo
10  quickly follows in behind her.
11          The Defendant appears some time between 9,
12  10:00 somewhere in that time frame -- the time frame
13  changes over the years -- originally it was some time
14  around 10:00 maybe now 9:00.  He appears up in front of
15  the Fav's bar, Kentucky Fried Chicken area inquiring
16  about Iris.  Either he's asking people where Iris is or
17  people are saying to him, hey, where is Iris?  And in
18  any case he had a quick conversation with some of the
19  other girls that are dealing drugs in the Harrisburg
20  area.  At the time, in fact, I believe one witness will
21  testify she was actually in the middle of a transaction
22  selling some drugs to somebody else.  They were kind of
23  happy this day because Iris wasn't on the block.  They
24  were making more money because Iris was the one doing
25  all the hustling out there, and that she sees Cuzzo and

1   that Cuzzo then leaves that area right there and goes

2   into a park, hangs out in this park, sits in the park

3   for a little bit of time.

4           The Defendant indicates that he goes to the

5   Kentucky Fried Chicken, gets something for breakfast,

6   but the Defendant indicates he was looking all over for

7   Iris, asking people about Iris; the same thing the

8   night before, where's Iris?  Where's Iris?  Have you

9   seen Iris?  Where's Iris?  The Defendant is making

10  phone calls back to the house trying to find Iris.

11  Back at the house she's not answering the phone.  She's

12  probably dead at the time.

13          Yet it isn't until close to noon, ladies and

14  gentlemen, when he's looking for Iris all over the

15  place, it isn't until close to noon the testimony will

16  show that he actually goes back to the house, some time

17  after 11:30 that morning when he goes back to the house

18  and this isn't us saying that.  This is the Defendant

19  saying that in his words in his statements to the

20  police.

21          He's concerned about Iris.  He's looking for

22  Iris, but he doesn't go back there until the day is

23  half over.  It's shortly after 12:00 on the 20th that

24  the Defendant is found in that McCleaster Street home

25  with his ex-girlfriend's body.

1          Now what happened is, you were introduced
2    during the voir dire process, the jury selection, to
3    Zachary Belcher, Iris's brother.  Zachary was staying
4    with a woman by the name of Socorro Roman.  She kind of
5    helped to raise him.  In fact, I believe he may
6    sometimes call her mom, and she was doing some work in
7    the yard and she asked him to take the trash out.  They
8    kind of mutually at the same time smelled smoke because
9    Iris was cooking earlier in the morning.  They smelled
10   smoke.  Zachary goes over to check it out and bangs on
11   the door, calls in the house.  There's no answer.  He
12   winds up going to the kitchen and when he goes into the
13   kitchen as he enters he sees the Defendant coming down
14   the stairs, and then the Defendant quickly went back up
15   the stairs, and then a moment or two later the
16   Defendant comes down and tells Zachary there's
17   something wrong with Zachary's sister.  We got to call
18   somebody.  She's not moving.  I don't know.  I can't
19   wake her.  They go running out of the house.  Now the
20   Defendant also comes back to the house and with Socorro
21   Roman she's going back out.  He's in the house by
22   himself again.
23          That's where we were nine years ago December
24   1996.  As I said, it's taken a long time to get to this
25   courtroom.  It's taken a long time to get this case

1 started.

2       You're going to hear lots of evidence during

3 the course of this trial.  I anticipate that the

4 Defense is going to tell you that Tootie is lying.

5 Tootie made this whole thing up.  Remember Tootie is

6 his alibi.

7       The blood is on Kazar.  So Kazar must have done

8 it.  Remember I asked you before, keep your minds open.

9 Listen to all the testimony.  Just because DNA says her

10 blood is on his shoe, you have to make a decision more

11 than just DNA says it, therefore, he must have been the

12 one who did it not the Defendant.  You're going to

13 match that evidence together to see if that adds up.

14 We're suggesting it doesn't add up.  We're suggesting

15 nine years later we end up right back where we started

16 and that is with the Defendant's words -- if I can't

17 have her no one can.  That's where this case is going

18 to end, ladies and gentlemen.  Thank you.

19       THE COURT:  Thank you, Mr. McCormack.

20 Mr. Muller.

21       MR. MULLER:  Thank you, Your Honor.  Good

22 afternoon.  Such technology, such equipment.  That's

23 quite the razzle dazzle display for that.  Don't be

24 confused by smoke and mirrors.  They spent nine years

25 going through this, trying to pin this case on Tyshaunt

1  Love.  That's why they have thirty witnesses that they
2  dragged out from here and there and brought forth.
3          I apologized to my daughter for borrowing this.
4  This is actually a simple case.  The Commonwealth, this
5  is their case in essence, trying to make a square peg
6  fit into a round hole.  They can't do it.  Guillermina
7  Cruz, who Mr. McCormack has indicated may or may not be
8  here, is what they built this case on.  At the time
9  she was a 16 year old girl, and they structured their
10 case around her and her statements and her testimony.
11 The only problem is she's never been consistent.  She
12 wasn't there.  She was there.  She was there with him.
13 No.  Only Mr. Love was there not her.   It was her,
14 Mr. Love and Kazar was in there.  She tells someone
15 else, no, it was her, her boyfriend, Anthony Knight,
16 and a friend of her boyfriend's most assuredly not
17 Mr. Love are the ones who are there that night.
18          Johanna Johnson, the one on the phone,
19 apparently was the last one to speak to Iris that
20 morning in those early morning hours between 1 and
21 2:30.  Well, at some point towards the end of that
22 phone conversation Iris tells her someone is there, and
23 she was apprehensive and scared that someone was
24 outside.  When she gets back on the phone she tells
25 Johanna it's a friend, not a romantic friend, just a

1   male friend that's there.

2          Yet a little while later she sounds very

3   scared, and she doesn't want Johanna hanging up on her.

4   This is around 2:30.  Someone comes to that apartment

5   at 2:30 on the 20th.  Someone or more than one person

6   comes to the apartment at that time.  From the victim's

7   own mouth it's not him.  It's not Mr. Love.

8          The time of death, going to be a lot of playing

9   around how to determine that.  We know someone came at

10  2:30.  We know she was dead by the next morning.

11  Burned chicken; there was smoke coming out that next

12  morning because Iris had been cooking.  Among other

13  things she had rotisserie chicken of some sort in the

14  oven in that kitchen on the bottom floor.

15         It was roasted.  It was burned to a crisp by

16  the time smoke had come.  The oven was on still.  She

17  was cooking this chicken when she was talking to

18  Johanna.  She told Ms. Johnson that she was cooking

19  this chicken.  There were receipts from Giant, 11:30

20  the night before.  She bought this chicken the night

21  before, very late at night.  She tells Ms. Johnson I'm

22  cooking this chicken.  She was asking advice how to

23  cook it or what to do with it.

24         Someone came to that apartment at 2:30, and

25  that's someone or those people killed Iris, and we know

1   that because of the burned chicken.  Otherwise, you
2   have to believe that Iris had this chicken cooking
3   somehow she's not killed until 8, 9, 10 in the morning.
4   Yet all the while from 2:30 until then she let the
5   chicken cook and burn and fill the house with smoke.
6   It makes no sense.  The Commonwealth is fixated on
7   Mr. Love as the suspect, fixated on him, the boyfriend.
8   Tumultuous relationship, it had to be him, and they put
9   the cart before the horse, the whole investigation.
10          Instead of looking at the evidence to see where
11  it leads they decided it's Tyshaunt Love, the evidence
12  shall lead to Mr. Love.
13          Mr. McCormack made a comment about how Mr. Love
14  has changed his stories.  Well, I guess over nine years
15  people change their stories somewhat.  You should hold
16  the Commonwealth's witnesses to the same fire.  This is
17  the only case I ever had where witnesses' memory
18  improves, not just improves dramatically over the years
19  from 1996 talking to the police until 2001 and then
20  2003.  All these details, everything since remembering,
21  which just so happens fits in with what the
22  Commonwealth wants to happen.
23          You've heard about Investigator Heffner taking
24  over this case in 2000.  Lo and behold there's a
25  dramatic memory cure for all these witnesses.  In fact,

1    one of the officers writes in her report and she was a

2    responding officer that day on the 20th of December

3    1996, that in March of 2001 she spoke to Investigator

4    Heffner and at that time she noticed that she omitted

5    important information from the report.  Five years

6    later a police officer notices she omitted important

7    information from her report after talking to Detective

8    Heffner.  How could that be?  How could five years

9    later, oh, yeah, Detective Heffner reminded me of

10   something.  Kind of fits in with the theory we're

11   following that year.

12           The thing about Iris and Tyshaunt is they did

13   have a tumultuous relationship and yet all these people

14   who knew them, it was really Iris who wore the pants in

15   that family.  It wasn't Tyshaunt.  I mean, in so many

16   words, her friends, their acquaintances described him

17   as being wimpy.  You saw -- you heard Mr. McCormack

18   describe, you know, what a bloody scene that was.

19   You'll hear how she was beaten, how she was shot, and

20   he tries to -- the main physical evidence, Kazar,

21   LaQuan Williams had blood, the victim's blood, Iris's

22   blood on his boot.  A boot confiscated from him the

23   next day.  There is no blood evidence connecting

24   Mr. Love to that scene.

25           Kazar was, you'll hear from witnesses, a feared

1  person.  Kazar, who Iris had previously snitched on and

2  turned into the police, Kazar who just so happens had

3  showed up in town that week and lo and behold Iris ends

4  of being killed and lo and behold the blood is on

5  Kazar's boots.

6         Guillermina Cruz, Toothie, as I said, indicated

7  she was there, wasn't there, was with someone, was with

8  someone else, was with different people.  This has gone

9  on and on with her.

10        She only mentions Kazar being there probably

11  around 2001, five years later after multiple meetings

12  with the police, interviews back and forth.

13        Now Mr. McCormack told you that the DNA

14  evidence how it wasn't real exact back in '96.  They

15  retested it in '96.  It was exact, more exact, pretty

16  determinative that it was the victim's blood on Kazar's

17  boot.  Lo and behold then Guillermina Cruz comes up

18  with this story, oh, by the way, he was there too.

19  Kazar was there.  Tyshaunt Love wasn't there.  Someone

20  came to that apartment.  Some people came to that

21  apartment at 2:30 in the morning on December 20, 1996.

22  Those people killed Iris.  From the phone calls we know

23  it couldn't have been Tyshaunt.

24        Mr. McCormack plays up that statement about she

25  was probably out cheating on me.  You'll hear through

1  witnesses that kind of reoccurrence in this
2  relationship whether him or her cheating on one or the
3  other.   There's nothing that makes that statement at
4  this time any more suspect than what it was.   They
5  cheated on each other.   It was kind of a routine.
6  You'll hear their friends.   They are back and forth
7  with each other.   They would fight.   They make up, get
8  back together, fight, make up, get back together, time
9  and again.
10       As to the times -- as to was she kicking him
11  out, was he moving?   You'll hear from witnesses that he
12  had talked to others about moving out a month before.
13  So I don't think this is a huge surprise that Iris
14  wanted to kick him out, was any surprise whatsoever.
15  Sounds like they were headed down that road for quite
16  some time.
17       If that's the Commonwealth's theory of the case
18  as to why he killed her, it had to be him who killed
19  her, it's not a good theory.   It's a weak theory in
20  other ways.   What they are telling you he was planning
21  to move, she was kicking him out and so in the master
22  plan of Tyshaunt Love, he had been arranging this for a
23  month, probably spur of the moment, over-controlling,
24  he was obsessive and did it on the spur of the moment
25  that night.   They can't have it every way.   A square

1 peg in a round hole.  The case does not fit together.

2 They chose a suspect and now they spent years to make

3 the evidence fit and it doesn't and I think you'll come

4 to that conclusion when you hear all the evidence and

5 testimony.  Thank you.

6 　　　　THE COURT:  Thank you, Mr. Muller.  I'm going

7 to ask you one question.  Are you folks all okay to

8 proceed with testimony now?  Does anyone need a break?

9 Is everyone okay?  All right.  Let's proceed.  If

10 you're ready at this point call your first witness.

11 　　　　MR. McCORMACK:  I call Johanna Johnson

12 Iftikhar-Khan.

13 　　　　MR. MULLER:  The Defense would request a

14 sequestration order.

15 　　　　THE COURT:  Mr. McCormack, Mr. Muller has

16 requested a sequestration order.  Do you have any

17 objection to that?

18 　　　　MR. McCORMACK:  I have no objection.  I'm not

19 sure if there are -- I have no objection.  I have the

20 officer asking the witnesses to leave.

21 　　　　THE COURT:  Ladies and gentlemen, before we

22 begin the testimony, just so you know, a sequestration

23 order is simply, actually become routine in almost any

24 proceeding.  All witnesses are asked to leave the

25 courtroom until such time they actually offer their

1    testimony.  It is just an effort to keep one witness's

2    testimony from changing the other witness's testimony

3    of those who may be called later to avoid the

4    possibility of a changing of record because of the

5    testimony.  It's quite normal.

6         Now Mrs. Kaufman.

7

8         JOHANNA JOHNSON IFTIKHAR-KHAN,

9    having been sworn, was examined and testified as

10   follows:

11

12        DIRECT EXAMINATION

13

14   BY MR. McCORMACK:

15        Q    Ma'am, please state your name for us.

16        A    Johanna Johnson Iftikhar-Khan.

17        Q    If you could spell your last name.

18        A    I-F-T-I-K-H-A-R, hyphen, K-H-A-N.

19        Q    How did you know Iris Fennel, Iris Belcher?

20        A    Actually I knew Iris from the time she was

21   about five or seven because my sister lived near her

22   mom and her grandmother so that's when I met her

23   originally.  Then her and my son, Larry, became

24   childhood sweethearts by the age of about ten.  So I

25   knew her from my sister and our family has known each

1    other, and then from her and my son being childhood

2    sweethearts at a very young age.  They went on to have

3    a child together.  I have her daughter, Brittany.

4        Q    You're raising Brittany?

5        A    Yes, I am raising Brittany.

6        Q    How old is Brittany today?

7        A    Thirteen.

8        Q    Would you see, even though you say your son and

9    her had a relationship and had a child, would you see

10   Iris often?

11       A    Yes.

12       Q    And back in 1996 leading up to the day that she

13   died, would you speak with Iris often?

14       A    Almost every day.

15       Q    How would you usually wind up speaking with

16   her?

17       A    By phone or either in person.

18       Q    On December 20th or December 19th, December 20,

19   1996, did you have an opportunity to speak with Iris?

20       A    Yes, I did.

21       Q    How did you wind up speaking with Iris?

22       A    I called her on the phone.

23       Q    Do you have an idea what time frame that you

24   called her?

25       A    I'm sure it was 1:00 a.m.

1    Q    And what was the purpose of calling Iris at

2 that time?

3    A    Well, for a couple of days before that I

4 couldn't get ahold of her on the phone, and I couldn't

5 get ahold of her at her house.  So that December 19th I

6 called her about three times and Brittany wanted to

7 talk to her and I wanted to talk to her just to see

8 what she was doing.

9    Q    This is the night before, and I know it gets

10 confusing.  You said the 19th the evening of the 19th,

11 the night of the 19th.

12    A    Into the 20th.

13    Q    You're talking about, you said, 1:00 --

14    A    But --

15        THE COURT:  One at a time.

16        THE WITNESS:  I was trying to call her.

17 Originally I started to call her December 19th and

18 Brittany -- before Brittany went to sleep she wanted to

19 talk to her mommy, and she fell asleep and at 1:00 I

20 decided it was going to be my last time to try to call

21 her because we were still up cooking postellies.  It's

22 a long process.

23 BY MR. McCORMACK:

24    Q    What's a postellie?

25    A    Postellie, it's a Spanish dish, primarily

1  Puerto Rican dish made with green bananas, plantain,

2  platano and yautia and you have to cut them and fill

3  them and then grind them or grate them with a grater,

4  and then also a process of cutting meat, chopping meat

5  and making a mixture with meat and you place that on to

6  wax paper and you put the mix, which the mix is the

7  green bananas, and the -- yautia and plantain, you put

8  the mix on the wax paper and the meat goes inside and

9  you kind of pull it together and wrap it down and fold

10 it over so that none leaks out, and you do the same

11 thing with another one, place it on top, use something

12 similar to kite string, tie them together.  You do two

13 together after you get -- we never do two of them at

14 one time.  We usually do a hundred at a time for the

15 holiday.

16     Q    It takes a while to make these, I would

17 imagine.

18     A    It usually takes -- back then it would take us

19 a day and a half, two days.  It was usually a family

20 job.  We did it all together.

21     Q    This is something you would do for the holidays

22 at least back then?

23     A    Yes.

24     Q    Now, so you and your family, some of the family

25 members at the house including your daughter was going

1    through the process that night?

2         A    Yes.  Myself and my children and Brittany and

3    my granddaughter, even at four, if you know how to do

4    this you get to grate the banana.

5         Q    Did Brittany get an opportunity to talk to her

6    mom that night?

7         A    No, she didn't.

8         Q    How come?

9         A    She went to sleep, and Iris wasn't home at the

10   time.  She would try to call her when Brittany was

11   still awake.  When I called Iris at 1:00 I told her

12   that Brittany wanted to talk to her.  She asked me to

13   put Brittany on the phone.  I didn't want to wake her

14   up.  I didn't want her to start crying for her.

15        Q    You had full custody of Brittany at the time?

16        A    I have joint custody with Iris and with my son,

17   Larry.  But primary physical custody was with me.

18        Q    And so Brittany doesn't get to talk to her mom.

19   Her mom asked to talk to Brittany but Brittany was

20   already asleep?

21        A    Yes.

22        Q    How long do you think?  What were you talking

23   to Iris about?

24        A    We were talking about the postellies because I

25   told her she had to come over and help wrap them the

1  next day, and she said she would come and wrap one and

2  cook it and eat it because, you know, that's what she

3  wanted to do.  She said, I'll help you wrap one you

4  wrap and cook it and eat it, and she would start

5  laughing.  She liked to joke a lot.

6      Q    How long were you talking to her on the phone

7  at about 1:00?

8      A    Originally we talked around 45 minutes and then

9  one of us, which I think it was me, told her I would

10  call her back in ten minutes because we had to transfer

11  the meat so that the meat didn't get overcooked.  I

12  needed to get up and do that.  Even though my kids help

13  me I don't trust them doing the meat part.  You need an

14  expert to do that.

15      Q    About 45 minutes you said.  You called back ten

16  minutes later.

17      A    Yes.

18      Q    Did you call back ten minutes later?

19      A    Yes.

20      Q    Do you get Iris?

21      A    Yes.

22      Q    And how long do you think you talked to Iris on

23  this occasion?

24      A    We talked until -- altogether we talked until

25  about 2:40, maybe 2:45.  But around 2:30 there was an

1  interruption.

2      Q    Tell me about the interruption I heard about.

3      A    At 2:30 she said that there was someone in

4  front of her house, and I asked her if they were

5  knocking on her door, and she said, no, they were

6  tapping on her window, and I told her to ask who was

7  there using a man's voice because she told me she was

8  home alone, and so she didn't use a man's voice.  She

9  used her own voice, and she asked who was there, and

10 they told her who was there, and she opened the door,

11 and the person said, what's up, Iris, and she said hi

12 to him.

13     Q    And these are things that you're hearing

14 through the phone?

15     A    Yes.

16     Q    Did Iris ever identify to you who it was that

17 was at the door at 2:30 in the morning?

18     A    She did identify who it was.  It wasn't a name

19 that I recognized.  It's one that I also don't

20 remember.

21     Q    It wasn't important for you at the time?

22     A    Yes, it was important for me, but at the same

23 time a mouse ran across my kitchen floor so I kind of,

24 like, didn't catch the whole name.

25     Q    Now, you say that phone call was interrupted at

1    2:30.  It sounded like you might have still been on the

2    phone another 10, 15 minutes.  She actually stayed on

3    the line?

4        A    Yes.

5        Q    Tell me what happened.

6        A    Originally after she let the person in, we

7    talked for a few more minutes.  She said, okay,

8    Johanna, I have company.  Now I'm hanging up on you.  I

9    said, no, you're not hanging up now that you have

10   company.  You're going to stay on the phone talking to

11   me.  We used to joke back and forth with each other.

12   She said, no, let me hang up.  I told her, no, I'm not

13   letting you hang up.  I'm downstairs by myself.  I'm a

14   big chicken.  I told her you have to wait until I'm

15   done doing what I'm doing to hang up.  Then after we

16   talked a little bit longer I told her, I said for

17   Isaiah to come downstairs with me, who is my middle

18   son.  I said I'll call him downstairs.  You can hang

19   up.  I laid the phone down on the speaker and went to

20   the steps and called him, and he came down the steps.

21   As he was coming down the steps I told her for her to

22   hang up now because Isaiah was downstairs with me.

23       Q    Did she hang up then?

24       A    We talked for a couple of more minutes then we

25   hung up.

1    Q    That's the last time you talked to Iris?

2    A    Yes.

3    Q    Did you have plans -- what were Iris's plans

4 for, like, the holidays?

5    A    Iris's plans were on the 20th after I got off

6 work I was supposed to meet her at the Rite Aid on 20th

7 and Derry, and we were supposed to finish Christmas

8 shopping for Brittany.  She was going to get her a

9 Barbie Jeep, the kind of battery powered Barbie Jeep

10 and a life-size Barbie, the two things she wanted her

11 to have for Christmas, and we were going to finish

12 Christmas shopping for everybody else that she didn't

13 have a chance to shop for and she was going to come

14 spend from that day, the 20th, until Christmas at my

15 house to help with the postellies and making Christmas

16 cookies and all the other preparations we had for

17 Christmas.

18    Q    Obviously this was the last time you talked to

19 her.  You said she planned on calling you the next day

20 afternoon when you got out of work, that's when you

21 planned on contacting one another again?

22    A    I was actually supposed to -- the agreement was

23 that she would meet me at the Rite Aid, and it was kind

24 of an informal thing, that I would call her to make

25 sure because whenever we had plans I would double check

1   and make sure that she was going to be there at the

2   time as a reminder.

3       Q    You found out when that Iris was dead?

4       A    On the 20th about 12:00, maybe a little bit

5   after 12, noon.

6       Q    Who told you?

7       A    My son Larry called me at work.

8       Q    I'm going to show you what has been marked as

9   Commonwealth Exhibit No. 1.  Do you recognize that

10  picture?

11      A    Yes.

12      Q    What is that a picture of?

13      A    It's a picture of Iris.

14      Q    In fact that's a picture that you provided to

15  me?

16      A    Yes.

17           MR. McCORMACK:  No further questions.

18           THE COURT:  Cross-examine.

19

20                    CROSS EXAMINATION

21

22  BY MR. MULLER:

23      Q    Ma'am, may I just call you Johanna?

24      A    That's fine.

25      Q    Your son was the father of the baby?

1    A    Of Brittany, yes.

2    Q    They must have been quite young when they had

3 the child?

4    A    Yes, they were.

5    Q    Did you always have custody of Brittany?

6    A    I didn't always have custody of Brittany.  She

7 always lived with me from the time she was three weeks

8 old.  Her and Iris moved in with me and Brittany always

9 stayed with us.

10    Q    How long have you had Brittany without Iris

11 living with you?

12    A    Well, Iris was there primarily the first two

13 years full time with Brittany and me, and then she got

14 her own apartment for a short time, and then she came

15 back home and then she got another place of her own and

16 came back home and...

17    Q    What about this time, December of '96, how long

18 had you had, as you referred to, primary custody?

19    A    Primary custody, I was granted primary custody

20 of Brittany in May of 1996.

21    Q    So that's six or seven months that you had had

22 her, correct?

23    A    Yes.

24    Q    And had there been any issues regarding that

25 custody between you and her or your son?

1        A     What type of issues do you mean?

2        Q     Well, I'm sorry.  Your son's name is...

3        A     Larry.

4        Q     Was Larry involved in that as far as the

5    custody issues?

6        A     The custody, it was agreed that it was an

7    agreement that us three reached that we would share

8    joint legal custody of Brittany with primary physical

9    custody of Brittany remaining with me because that was

10   the house that she grew up in.

11       Q     And you said that was agreed upon?

12       A     Yes.

13       Q     Was that agreed upon after some contentious

14   times or was it amicable?

15       A     Well, I don't know if they were very

16   contentious.  It was just there was some things in

17   Iris's life that I didn't agree with and at one point

18   she came and got Brittany.  On Iris's birthday of 1996

19   she came and got Brittany and took her, said she wasn't

20   going to bring her back because she was mad at me.

21       Q     Yeah?

22       A     And she was angry because I didn't call her for

23   her birthday.

24       Q     When was her birthday?

25       A     January 26th.

1    Q    Okay.  You knew she was involved in the drug

2  trade?

3    A    Well, at that point I knew that a guy that she

4  was dating by the name of Eric Magill was involved in

5  the drug trade.  Later, probably in August of '96 when

6  someone told me that Iris was selling drugs, and I

7  asked her.  She said no and I chose to believe her.

8    Q    You didn't approve of how she was living

9  though?

10    A    I didn't approve of her friends.

11    Q    You've indicated to Mr. McCormack that you

12  talked to her almost every day?

13    A    Yes.

14    Q    But you hadn't talked to her for several days

15  at that point?

16    A    Yes.

17    Q    Was that unusual?

18    A    Yes.

19    Q    Had you talked to her about that when you

20  finally talked to her?

21    A    Yes.

22    Q    And she told you she had been there, correct?

23    A    Yes.

24    Q    That evening before when you were trying to

25  call her --

1    A    Yes.

2    Q    But she ultimately admitted that wasn't true?

3    A    Yes.  She kind of laughingly told me that she

4    was there and that she had a cold.  That was the kind

5    of relationship, like, we had.  She liked to joke a

6    lot, liked to laugh a lot.  She knew when I told her I

7    called her three times before that she wasn't there

8    and --

9    Q    You finally got ahold of her at 1 a.m.

10   A    Yes.

11   Q    Is that unusual to talk at 1:00?

12   A    No.

13   Q    You two would talk at those kind of hours?

14   A    We talk any time of day.  She can call me any

15   time of day or night.

16   Q    When did Brittany go to bed?

17   A    Probably around 10:00 that night.

18   Q    So you had tried to call before 10?

19   A    Yes.

20   Q    With Brittany and then you called back at 1:00?

21   A    Well, I called back at a little bit after 10

22   and I believe a little bit after 11.

23   Q    After 10 and after 11 and then 1 a.m.

24   A    Yes.

25   Q    10 and 11 you didn't reach her?

1    A    No, I didn't.

2    Q    You knew she was dating Mr. Love, correct?

3    A    Yes, I did.

4    Q    And you knew him by his nickname as well?

5    A    I only knew him by Cuzzo.

6    Q    Cuzzo?

7    A    Yes.

8    Q    When you were talking with her I guess between

9    1 and 1:45 and approximately 2 to 2:30, it was at that

10    2:30 point she said someone was knocking on the window?

11    A    Yes.

12    Q    And when you were talking with her initially

13    you talked about the postellies but you had also been

14    talking to her about cooking chicken, correct?

15    A    Yes.

16    Q    And she had told you that she had chicken in

17    the oven, correct?

18    A    She was going to put it into the oven.

19    Q    Did you have a chance to review your prior

20    statements with the District Attorney before today?

21    A    Yes.

22    Q    Getting ready for your testimony?

23    A    I don't -- I don't remember.

24    Q    You reviewed your statement?

25    A    Yes.

1   Q    How recently?

2   A    Maybe a few weeks ago.

3   Q    One of the statements you gave was October 3 of

4  '98, really your only statement.  That was written out.

5  You also talked to the police back in '96, correct?

6   A    Yes.

7   Q    Back in '98, referring to the phone

8  conversation, you indicated that she had asked when the

9  chicken was going to be done.  You told her shortly

10 because she put it in when we first started talking?

11  A    Yes.

12  Q    The chicken was in when you called the first

13 time?

14  A    She put it in when we were talking.

15  Q    Okay.  You were telling her it would be done

16 shortly?

17  A    Yes.

18  Q    You indicated at some point a mouse ran across

19 the floor?

20  A    Yes.

21  Q    Your floor or her floor?

22  A    My floor.

23  Q    Is that why you hung up at quarter of two?

24  A    No, no.

25  Q    That's when she told you someone was at the

1    window?

2         A      No.   She told me someone was at the window at

3    2:30, and I asked her who it was or whenever she opened

4    the door, she said, oh, that's whoever it was.

5         Q      As you told the District Attorney it's not a

6    name that you knew?

7         A      It wasn't a name that I recognized.

8         Q      And do you recall talking to one of the police

9    officers back in 1996 when this happened?

10        A      I do recall talking to someone.  I don't know

11   who it was.

12        Q      I think it might have been Detective Massey.

13        A      I'm not sure.

14        Q      Do you recall telling them Iris said the name

15   of the person she was allowing in but you couldn't

16   remember because Iris told you and she saw a mouse run

17   across the kitchen floor?

18        A      No, I saw the mouse run across the floor.

19        Q      Do you recall telling them back then that Iris

20   sounded alarmed when she heard the knock?

21        A      You mean when she heard the tap on the window?

22        Q      Okay.  She sounded alarmed at that point?

23        A      She said she was scared because she was home

24   alone.

25        Q      And then she opens the door and she let's

DAUPHIN COUNTY COURT REPORTERS

1  somebody in, correct?

2  A    Well, she asked who it was first and then they

3  told her who it was and she told me and then she opened

4  the door.

5  Q    And you had also indicated to the police back

6  in 1998 that she indicated it wasn't a romantic friend.

7  Do you recall that?

8  A    Yes.

9  Q    I guess I'm a little confused about the

10 chronology of the phone calls and what happened when,

11 as you told to Mr. McCormack.  You're saying today you

12 talked to her after 2:30.  I mean, you didn't hang up

13 at 2:30.

14 A    We didn't hang up right when that person came

15 in because I wouldn't let her hang up.  We just kept --

16 I guess you have to understand we kind of had a, like a

17 joking relationship.  We did things to get on each

18 other's nerves, to make each other laugh, and every

19 time she kept saying I'm going to hang up, I kept

20 saying, no, she can't hang up just because she had

21 company now.

22 Q    Do you recall telling the police after she left

23 this person or persons in that you noticed a different

24 tone from her voice?

25 A    I don't recall that.

1    Q    And she didn't want to hang up at that point

2    and you told her to hang up.  I know you relayed this

3    relay between what you two did?

4    A    Those hours once you got her on the phone she

5    didn't always want to hang up.  She liked to talk.  We

6    liked to talk.

7              MR. MULLER:  If I could approach the witness.

8              THE COURT:  Certainly.

9    BY MR. MULLER:

10   Q    I'm showing you a copy of page 2 of your 1998

11   statement.  Let me actually set the stage when you gave

12   this statement to the police.  Did you get a chance to

13   review it afterwards, you signed it?

14   A    I don't remember signing it.

15   Q    You do remember giving the statement?

16   A    I do remember giving a statement.

17   Q    And if you could review that last -- second

18   paragraph, last sentence or two.

19             THE COURT:  Read it to herself.

20             MR. MULLER:  Yes.

21             THE WITNESS:  Okay.  I read it.

22   BY MR. MULLER:

23   Q    Do you recall now telling the police she

24   sounded different and didn't want you to hang up?

25   A    I don't recall that.

1    Q    You agree that's what it says?

2    A    I agree that's what it says.  I don't know what

3  context she may have sounded different.

4    Q    You talked about not approving of the people

5  Iris hung out with.

6    A    Yes.

7    Q    And you were familiar with the gentleman by the

8  name of Kazar?

9    A    I didn't really know him, no.

10   Q    You knew who he was though?

11   A    I heard his name.

12   Q    And at some point close in time to the 19th or

13  20th she told you she was afraid of Kazar, correct?

14  Let me present you with your statement, page 3 of your

15  statement, two-thirds of the way down.

16   A    That's what it says.

17   Q    That's what it says?

18   A    Um-hum.

19        MR. MULLER:  The Court's indulgence.

20  BY MR. MULLER:

21   Q    After you hung up around 2:30 or so that

22  morning you didn't try calling her again?

23   A    No, I didn't.

24        MR. MULLER:  Thank you.

25        THE COURT:  Thank you, Mr. Muller.

1          THE COURT:  Mr. McCormack, any redirect?

2          MR. McCORMACK:  Yes, Your Honor.

3

4                  REDIRECT EXAMINATION

5

6  BY MR. McCORMACK:

7     Q    Ma'am, Mr. Muller just showed you a portion of

8  your statement from 1998 and I believe when you

9  testified on direct initially you said that something

10 about wanting your son Isaiah to come down the stairs.

11 Do you know what I'm talking about?

12    A    Yes.

13    Q    Tell me that again who wanted to hang up and

14 you had a concern about Isaiah.

15    A    Iris wanted to hang up because I'm a big

16 chicken and I was downstairs by myself.  I didn't want

17 to hang up until somebody came downstairs with me.

18    Q    And that was after -- that was after the male

19 had arrived.  You heard the male arrive over the phone

20 at Iris's house.

21    A    Yes.  I heard him say, what's up, Iris, and I

22 heard her saying hi to him.

23    Q    And that was after she had indicated to you it

24 wasn't a romantic friend?

25    A    Yes.

1    Q    She wanted to hang up at that point.  You

2    wanted to keep her on the line?

3    A    Yes.

4    Q    Mr. Muller showed you a part later on.  You

5    wanted to get off the line and she wanted to stay on?

6    A    Right.

7         MR. McCORMACK:  Those are all the questions I

8    have.

9         MR. MULLER:  Just real brief for clarification.

10

11                   RECROSS EXAMINATION

12

13   BY MR. MULLER:

14   Q    When she wanted to stay on the line, was that

15   after you noticed a different tone in her voice from

16   what you read in your statement?

17   A    Yes, that's what I read in my statement.

18        MR. MULLER:  That's all I have.

19        THE COURT:  Thank you very much.  You may step

20   down.

21        THE COURT:  Timing is always an issue, ladies

22   and gentlemen, as often happens.  The witness that

23   would next logically be called for the Commonwealth's

24   case is suspected to take a little longer than the time

25   I would like to keep you here this afternoon.  So you

1  get a little break on the first day.  We'll let you go

2  home a little earlier.  Put your notebooks back in the

3  envelope and leave your envelopes, leave the envelopes

4  just on your chairs, please.  You're excused to your

5  homes for the evening.  Please remember, do not discuss

6  this case amongst yourselves or with anyone else.  Be

7  back at the courthouse tomorrow morning so we can start

8  up at 8:30.  I'll try to be on the nose with that if I

9  can.  With that you're excused for the evening.

10        (The jury exited the courtroom at 4:08 p.m.)

11        THE COURT:  I understand you have a motion.

12        MR. McCORMACK:  Yes, Your Honor.  I would pass

13  up a motion.  I have also attached an affidavit.  The

14  Commonwealth witness as you heard me say in my opening,

15  she may not even appear.  As you know we had

16  conversations yesterday with her counsel and I also

17  relayed to the Court some conversations I had with

18  her -- counsel being Allen Welch -- when she indicated

19  last week that she didn't want to -- well, she had

20  concerns and went down to the Public Defender's office

21  to try to get an attorney.  She indicated to me she

22  doesn't want any part of this case.  She's fearing for

23  her life, and that today she was told she had to be

24  back here today.  She's been under subpoena.  In fact

25  she was subpoenaed by Detective Heffner on Monday when

1  she came in.  She forget her subpoena and actually came

2  to our office to get a copy of the subpoena and we

3  subpoenaed her yesterday.  She did not appear here

4  today.  I had my office make a phone call to her

5  residence, her boyfriend's, who I believe -- whose name

6  is Clifford, who indicated that she had already

7  departed for the courthouse.  That's where he thought

8  she was going today.  She has never shown and hasn't

9  signed in.  I saw Mr. Welch this morning.  I asked Mr.

10  Welch if he had any contact with her, and he's

11  indicated no.

12        So I am asking through this motion that nominal

13  bail be set.  This order would be to ask for her

14  apprehension, issue a warrant for her arrest, when she

15  gets arrested be brought before you so that you can set

16  bail as a material witness in this case.

17        THE COURT:  Mr. Muller.

18        MR. MULLER:  No position.

19        THE COURT:  I'm signing the order to issue a

20  warrant to have her brought in to address the bail

21  question at that time.

22

23

24

25

CERTIFICATE

I hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me on the hearing of the above cause, and that this is a correct transcript of the same.

_____
Joanne M. Kohn
Official Court Reporter

The foregoing record of the proceedings of the above cause is hereby approved and directed to be filed.

_____   _____
Date                         Bruce F. Bratton, Judge

DAUPHIN COUNTY COURT REPORTERS