1    COMMONWEALTH OF PENNSYLVANIA: IN THE COURT OF COMMON PLEAS

2                                : OF DAUPHIN COUNTY, PENNSYLVANIA

3          VS                    :

4    TYSHAUNT LOVE              : No. 937 CR 2002

5

6                    TRANSCRIPT OF PROCEEDINGS

7                         VOLUME II

8

9          BEFORE:   HONORABLE BRUCE F. BRATTON

10         DATE:    Wednesday, September 14, 2005
                    Thursday, September 15, 2005

11

12         PLACE:   Courtroom No. 3
                    Dauphin County Courthouse
13                  Harrisburg, Pennsylvania

14

15   APPEARANCES:

16       SEAN M. McCORMACK, Esquire
         Chief Deputy District Attorney
17
         JAMES P. BARKER, Esquire
18       Deputy District Attorney

19

20         For - Commonwealth

21

22       PAUL W. MULLER, Esquire
         Chief Deputy Public Defender
23
         NATHAN C. GIUNTA, Esquire
24       Assistant Public Defender

25         For - Defendant

## INDEX TO WITNESSES

| FOR COMMONWEALTH | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Georgen Cronin Vol. I | 32 | 60 | 70/74 | 72 |
| Johanna Johnson Iftikhar-Khan Vol. I | 168 | 177 | 188 | 189 |
| Zachary Belcher Vol. II | 6 | 17 | 26 | 30 |
| Socorro Roman Vol. II | 31 | 45 | 66 | 68 |
| Wayne Ross Vol. II | 75 | 107 | -- | -- |
| (Qualifications) | 69 | 73 | -- | -- |
| Jeanette McCurdy Vol. II | 116 | 122 | 128 | 130 |
| Leroy Lucas Vol. II | 131 | 170 | -- | -- |
| Michael Kurtz Vol. II | 184 | 200 | 202 | 204 |
| (Qualifications) | 183 | -- | -- | -- |
| LeeAnn Singley Vol. II | 209 | 228 | 240 | -- |
| (Qualifications) | 206 | -- | -- | -- |
| Stacy Harris Vol. II | 243 | 248 | 256 | 259 |
| Barbara Brown Vol. II | 264 | 269 | 284/288 | 286/289 |
| Candace Mills Vol. II | 291 | 296 | 308 | 310 |
| Kwajalyn Jackson Vol. II | 312 | 318 | 325 | -- |
| Tamara Williams Vol. II | 326 | 330 | 340 | 340 |
| Daelene Saez Vol. II | 341 | 347 | 352 | 352 |
| Tawana Poteat Vol. II | 354 | 369 | 388 | -- |
| Wendy Harris Vol. II | 388 | 392 | 398 | -- |
| John Goshert Vol. III (No jury) | 5 | 10 | -- | -- |
| Donald Heffner Vol. III (No jury) | 14 | 20 | 23 | -- |
| Sean McCormack Vol. III (No jury) | 24 | 29 | -- | -- |
| Lydel Muldrow Vol. III | 60 | 66 | 76 | 77 |
| Elijah Massey Vol. III | 78 | 81 | 90 | -- |
| Joseph Zimmerman Vol. III | 91 | 97 | -- | -- |
| Matt Taylor Vol. III | 104 | 133 | 145 | -- |
| Michael Maloney Vol. III | 146 | 150 | -- | -- |
| Donald Heffner Vol. III | 207 | 234 | 241 | -- |

| FOR DEFENDANT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Michelle Bailey Vol. III | 245 | 250 | 252 | -- |
| Joseph Zimmerman Vol. III | 254 | -- | -- | -- |
| Elijah Massey Vol. III | 259 | -- | -- | -- |

```
                          INDEX TO EXHIBITS
FOR COMMONWEALTH              MARKED                    ADMITTED
No. 1 Vol. I                   54                        244
No. 2 Vol. I                   54      Vol. II            9
No. 3 Vol. I                   54      Vol. II           13
No. 4 Vol. I                   54      Vol. II           28
No. 5 Vol. I                   57      Vol. II           40
No. 6 Vol. I                   58      Vol. II           93
No. 7 Vol. II                  --                        95
No. 8 Vol. II                  --                        90
No. 9 Vol. II                  --                        94
Nos. 10 & 11 Vol. II           --                        97
No. 12 Vol. II                 --                       100
No. 13 Vol. II                 --                       101
No. 14 Vol. II                 --                       104
No. 15 Vol. II                 --                       118
Nos. 16-21 Vol. II             --                       140
Nos. 22-26 Vol. II             --                       146
Nos. 27-28 Vol. II             --                       146
No. 29 Vol. II                 --                       154
No. 30 Vol. II                 --                       159
No. 31 Vol. II                 --                       161
No. 33 Vol. II                 --                       157
No. 34 Vol. II                 --                       155
Nos. 35-39 Vol. II             --                       163
No. 42 Vol. II                 --                       154
No. 43 Vol. II                 --                       158
Nos. 44-45 Vol. II             --                       162
Nos. 46-49 Vol. II             --                       168
No. 50 Vol. II                 --                       195
Nos. 51-52 Vol. III            --                       244
Nos. 63-65 Vol. III            --                       244




FOR DEFENDANT
No. 1 Vol. II                 177                       177
```

DAUPHIN COUNTY COURT REPORTERS

<u>Wednesday September 14, 2005</u>

<u>Morning Session</u>

1
2
3
4       (The jury entered the courtroom at 8:41 a.m.)
5       THE COURT:  Good morning, ladies and gentlemen.
6  Welcome back.  Mr. McCormack, are we ready to proceed
7  with calling your next witness.
8       MR. McCORMACK:  Yes, Your Honor.  I would call
9  Zachary Belcher.
10      MR. MULLER:  For the record, I did inquire
11 whether the appropriate witnesses were sequestered and
12 I've been informed that they are.
13
14           ZACHARY BELCHER,
15 Having been sworn, was examined and testified as
16 follows:
17      THE COURT:  While Mrs. Kaufman is getting the
18 notebooks, I also forgot to mention to you yesterday,
19 ladies and gentlemen, a confirmation of the schedule is
20 that we'll try to start close to 8:30 as we can, take a
21 break mid-morning for 10 or 15 minutes to allow all of
22 us to refresh ourselves.  Lunch as close to the noon
23 hour as we can make it, usually for an hour and 15 to
24 an hour and a half.  That allows me to take care of a
25 few business items over that period of time.

1        We'll reconvene around 1:30 and have a

2  mid-afternoon break.   Yesterday because the voir dire

3  process went into the lunch hour and pushed everything

4  back.   We went through the afternoon and I don't

5  generally do that -- we try to break between 4, 4:30 so

6  you can safely get home.

7        No one around the courthouse should ever try to

8  talk to you about this case.   You wear these blue and

9  white jury badges for a couple of reasons, one of which

10  is so everyone can keep track of who is who in the

11  courtroom.   Even on the street you may find people

12  involved in these proceedings, people from the court

13  staff see you on the street, they recognize you as

14  being jurors or see the badges, they may shy away from

15  you.   They are not trying to be rude.   They are trying

16  to avoid even the appearance of any inappropriate

17  contact with you concerning the case because, as I

18  said, you're to have no outside influence.   Everything

19  is to be based upon testimony here.

20        I'll be talking more at the closing about just

21  how we don't ever want to hear where you are, what

22  you're thinking until you render a verdict here in

23  court at the end of the case.   No one should ever make

24  an effort to try to discuss the case with you.   If

25  anyone does, your obligation is to bring that to my

```
 1  attention and let me know about it.  Are we ready to
 2  proceed?
 3           MR. McCORMACK:  Yes, Your Honor.
 4
 5                      DIRECT EXAMINATION
 6
 7  BY MR. McCORMACK:
 8      Q    Sir, please state your name for us.
 9      A    Zachary Marvin Belcher, B-E-L-C-H-E-R.
10      Q    And how are you employed?
11      A    By Millers Sunoco.
12      Q    Are you related in any way to Iris Belcher?
13      A    Yes.
14      Q    How are you related to Iris Belcher?
15      A    She's my sister.
16      Q    Now, I'm going to ask you about December 20,
17  1996.  Where were you staying on the 19th into the 20th
18  of 1996?
19      A    1942 Kensington Street.
20      Q    Who lives there?
21      A    Socorro Roman.
22      Q    Who is she to you?
23      A    She's like a mother figure to me.  She's just a
24  friend, however --
25      Q    And have you known her a long time?
```

DAUPHIN COUNTY COURT REPORTERS

1    A    Yeah, a long time.

2    Q    When you stay over her house, what happened

3 that winds up bringing you into this courtroom today?

4    A    We were getting up to do yard work that

5 morning.  Upon entering the yard I see a little bit of

6 smoke, smell food burning.  I thought my sister left

7 something on the stove.  I made my way to her

8 apartment.

9        Upon entering the apartment the Defendant,

10 Tyshaunt Love, was coming down the stairs at which

11 point he stops and makes his way back up the steps for

12 several seconds.  He comes down and he informed me my

13 sister wasn't moving and he needed help.

14    Q    Did you notice smoke, the smell, what did you

15 notice?

16    A    Probably the smell.

17    Q    And just so we have an idea, can you kind of

18 describe where Socorro's yard is as compared to where

19 your sister's apartment is?

20    A    Directly off to the side of it you can see her

21 whole apartment, back window from the side of the

22 backyard.

23    Q    How long do you think it took you to get from

24 Socorro's backyard to your sister's back door?

25    A    Maybe ten seconds if that.

```
 1      Q    I want to break this down a little bit to find
 2  out as much detail as possible what you did.  So you
 3  leave Socorro's yard and you arrived at your sister's
 4  door?
 5      A    Back door.
 6      Q    Back door; what does that enter into?
 7      A    The kitchen area.
 8      Q    Do you say anything, do anything, is the door
 9  open?  What happens?
10      A    I just opened up the door and walked in.
11      Q    When you opened up the door, what do you see?
12  What's the first thing that catches your attention?
13      A    The stove, the food burning on the stove in a
14  frying pan.
15      Q    On top of the stove?
16      A    Yes.
17      Q    I'm going to show you what's been marked as
18  Commonwealth Exhibit No. 2.  Can you take a look at
19  that?  Now, do you recognize what that is a picture of?
20      A    Yes.
21      Q    You indicated that when you came into the home
22  that you noticed some food on top of the stove.  Did
23  you notice if the oven door was open or closed?
24      A    It was closed.
25      Q    On that item there, is it slightly different
```

1  than what you observed when you first came in?

2      A    Yes.

3      Q    However, for the items on top of the stove, did

4  they appear to be, the items, in the position that you

5  saw them when you came in?

6      A    Yes.

7      Q    Was there any smoke coming from those items or

8  anything?

9      A    A little bit.

10      Q    And just so we're sure on the record, does that

11  appear to be your sister's kitchen?

12      A    Yes, it does.

13          MR. McCORMACK:  Your Honor, I would move for

14  the admission of Commonwealth Exhibit No. 2.

15          MR. GIUNTA:  No objection.

16          THE COURT:  It's admitted.

17          (Whereupon, Commonwealth Exhibit No. 2 is

18  admitted into the record.)

19          MR. McCORMACK:  At this time may I publish it

20  to the jury?

21          THE COURT:  Are you going to pass it around?

22          MR. McCORMACK:  I was going to place it on

23  the...

24          THE COURT:  That's fine.

25  BY MR. McCORMACK:

1    Q    As the jury looks at that again you were

2  indicating that the food items on top of the stove

3  appear to be the way that you saw it on December 20th

4  when you went into your sister's apartment; is that

5  correct?

6    A    Yes.

7    Q    The only difference in the photograph is that

8  the door is open.  When you went in that door was shut?

9    A    Correct.

10    Q    Now, so you come in you notice the stove.  When

11  you first come in, you went through this pretty

12  quickly.  When you first come in, do you see the

13  Defendant instantly?  How long is it before you see the

14  Defendant come down the stairs?

15    A    Two or three seconds.

16    Q    He comes down the stairs.  Does he come all the

17  way down?

18    A    Halfway down.

19    Q    Does he see you when he comes down?

20    A    Yes.

21    Q    You say he did what?

22    A    Walks back up the steps.

23    Q    And how long was it before he came back down

24  the steps?

25    A    About four or five seconds.

1    Q    Now, what does he say again when he comes down
2  the steps?
3    A    The first words were help, and he said
4  something to the effect that my sister wouldn't wake up
5  or that she wouldn't move.
6    Q    And then what happens?
7    A    I immediately went back to Socorro's house and
8  called 911.
9    Q    And what -- does the Defendant say anything
10 else to you at any point in time?
11   A    I don't know if he was speaking to me but he
12 did say things.  He was saying if Kazar did anything to
13 Iris that he was going to kill him.
14   Q    He was mentioning Kazar at this point?
15   A    Yes.
16   Q    Now, do you see where the Defendant goes when
17 you go to call 911?
18   A    No.
19   Q    Do you see him at any time after you leave the
20 apartment?
21   A    Yes.  When I got into Socorro's home and got on
22 the phone I heard him coming in behind me.  That's when
23 he  started making comments about Kazar.
24   Q    Where did you go after you call 911?
25   A    I went back to set on the steps for the

1  paramedics at my sister's apartment.

2      Q    That's where you sit until they come?

3      A    Yes.

4      Q    Let me ask you a couple of questions here, did

5  you have any problems seeing the Defendant when you

6  were in the kitchen?

7      A    No.

8      Q    You said there was some smoke though?

9      A    Yes.

10     Q    You could still see the Defendant?

11     A    Yes.

12     Q    I'm going to show you what's been marked as

13  Commonwealth Exhibit No. 3.  Do you recognize that

14  floor plan?

15     A    Yes.

16     Q    And does that appear to be a floor plan of the

17  first floor of your sister's apartment or house?

18     A    Yes.

19     Q    The kitchen area you were just describing?

20     A    Yes.

21         MR. McCORMACK:  At this time I move for the

22  admission of Commonwealth Exhibit No. 3.

23         THE COURT:  Without objection?

24         MR. GIUNTA:  No objection.

25         THE COURT:  It's admitted.

```
 1            (Whereupon, Commonwealth Exhibit No. 3 is
 2  admitted into the record.)
 3            MR. McCORMACK:  I ask permission to publish
 4  this to the jury.
 5            THE COURT:  Permission granted.
 6            MR. McCORMACK:  And with the Court's
 7  permission, can the witness come down and point things
 8  out for the jury?
 9            THE COURT:  As long as you keep your voice up
10  so we can all hear you.
11  BY MR. McCORMACK:
12      Q    Point to us the door that you came in.  Can
13  everyone see that?
14      A    (The witness complies.)
15      Q    Where is the stove that you noticed the burning
16  food?
17      A    Over this way right here -- (indicating.)
18      Q    Where are the stairs that the Defendant was
19  coming down?
20      A    Right here -- (indicating.)
21      Q    Where were you when you saw the Defendant
22  coming down the stairs?
23      A    Right about here -- (indicating.)
24      Q    Part way, for the record, part way, maybe a
25  quarter of the way into the kitchen past the door
```

14

1 towards the center of the kitchen?

2    A    Yes.

3        MR. McCORMACK:   Thank you.   You can retake the

4 stand.

5 BY MR. McCORMACK:

6    Q    Now, when you were outside working in the yard,

7 had you noticed if anybody was out at that time in

8 other yards?

9    A    No.

10    Q    You didn't notice?

11    A    I didn't notice at all.

12    Q    Did you at any point in time hear anyone

13 screaming, maybe banging on the door, yelling Iris's

14 name or anything like that at any point in time?

15    A    No.

16    Q    Just so the record -- I know you refer to

17 them -- I think I pointed over in that direction --

18 just to be sure, the person that you were saying was

19 coming down the stairs at Iris's house, is that person

20 present in the courtroom today?

21    A    Yes.

22    Q    And could you point him out for us.

23    A    (The witness complies.)

24        MR. McCORMACK:   For the record he has pointed

25 over toward the Defendant, Your Honor.

DAUPHIN COUNTY COURT REPORTERS

1           THE COURT:  The gentleman you're pointing to is

2   wearing what?

3           THE WITNESS:  A vest, gray shirt.

4           THE COURT:  All right.  The record reflects

5   that he identified the Defendant.

6           MR. McCORMACK:  They are all the questions I

7   have at this time.

8           THE COURT:  Before you cross, I'm a little

9   confused, Mr. Belcher, on the last exhibit, I want to

10  make sure the record is clear, the door you came into,

11  what does the exhibit have written on it so that we

12  know when someone reads the transcript what it was you

13  pointed out.

14          THE WITNESS:  Door.

15          THE COURT:  It says door at the upper left part

16  of the exhibit, right?

17          THE WITNESS:  Right.

18          THE COURT:  Now, the stairs that you pointed

19  to, running along the right side.

20          THE WITNESS:  (Nods head.)

21          THE COURT:  The bottom of the stairs is to the

22  top of the exhibit.

23          THE WITNESS:  Yes.

24          THE COURT:  As he goes to -- the bottom of the

25  stairs goes up to the second floor.

1    THE WITNESS:  Correct.

2    THE COURT:  I heard in opening statements or

3  otherwise that there was at the top of the stairs

4  there's a wall of some sort similar to what's in front

5  of the jury.

6    THE WITNESS:  Yes, sir.

7    THE COURT:  So someone coming down the stairs,

8  that wall I assume is above the kitchen.

9    THE WITNESS:  Um-hum.

10    THE COURT:  As one is coming down the stairs it

11  would be on the person's left.

12    THE WITNESS:  Yes.

13    THE COURT:  So as one comes down the stairs

14  you're not looking straight down into the kitchen until

15  you get pretty far down the stairs.

16    THE WITNESS:  You don't have to get too far

17  because it turns into like poles, wooden poles.

18    THE COURT:  That was my question.  So the

19  ceiling -- I'm sorry -- the ceiling of the kitchen is

20  the base of that wall.

21    THE WITNESS:  Yes.

22    THE COURT:  Upstairs.

23    THE WITNESS:  Yes.

24    THE COURT:  As one comes down you can see the

25  feet.

1           THE WITNESS:  Um-hum.

2           THE COURT:  And legs before you see the whole

3     person.

4           THE WITNESS:  Yes.

5           THE COURT:  That's what I wanted to make sure I

6     understood.  There's a triangle of poles supporting the

7     wall upstairs.

8           THE WITNESS:  Yes.

9           THE COURT:  As a person comes down to that

10    landing, right?

11          THE WITNESS:  Yes.

12          THE COURT:  All right.  I understand.  Go

13    ahead.

14          MR. GIUNTA:  Thank you, Your Honor.

15

16                    CROSS EXAMINATION

17

18    BY MR. GIUNTA:

19       Q    Good morning, Mr. Belcher.

20       A    Good morning.

21       Q    You indicated that on the morning of the 20th

22    you woke up around 10:30, correct?

23       A    Somewhere around 10:30, close to 11:00.

24       Q    After that you went outside.  You indicated you

25    were doing yard work, but you were cleaning the dog

1   cages with Socorro Roman?

2        A    I don't remember what I was doing, but it was

3   something in the yard.

4        Q    And you approximately live about 50 yards away

5   from Iris's place?

6        A    Yes.

7        Q    And was there any houses separating you?  Was

8   it a direct 50 yards?  Were their houses or fences

9   separating?

10       A    A fence.

11       Q    And you indicated that it took you about ten

12  seconds or so to get from where you were at to Iris's

13  place, correct?

14       A    Yes.

15       Q    Now, you indicated from that point that morning

16  you smelled smoke, correct?

17       A    Yes.

18       Q    You saw the smoke coming from the apartment?

19       A    Yes.

20       Q    When you saw the smoke coming from the

21  apartment, was it coming out the door?

22       A    I would imagine so, yes.

23       Q    And you ran over there?

24       A    Yes.

25       Q    And you entered the back door leading into the

1  kitchen, correct?

2      A    Yes.

3      Q    And it's your testimony that as you walked in,

4  you saw Mr. Love coming down the stairs.  You had only

5  been there 2 or 3 minutes, correct?

6      A    Yes.

7      Q    And you saw him coming down the stairs,

8  correct?

9      A    Yes.

10     Q    And you indicated in your testimony that you

11  saw him come down the stairs, pause and go back up the

12  stairs for 4 to 5 seconds, correct?

13     A    Yes.

14     Q    Now, in 1996 this was the day this occurred on

15  the 20th, do you remember speaking with Investigator

16  Matt Taylor?

17     A    I remember speaking with somebody.  I'm not

18  sure of his name.

19     Q    When you spoke to him, you told him that that

20  morning when you walked in Tyshaunt Love had come down

21  the stairs and said to you, help, I need help.

22         MR. McCORMACK:  I'm going to object.  I think

23  he has to refresh his recollection first.

24         THE COURT:  I think that's so.  That's proper.

25         MR. GIUNTA:  Your Honor, may I approach?

1          THE COURT:  Certainly.  What is it you're

2  giving to the witness to refresh his recollection?

3          MR. GIUNTA:  This is Investigator Taylor's

4  report on December 20, 1996.

5  BY MR. GIUNTA:

6      Q    You had a moment to review your statement to

7  Investigator Taylor, correct?

8      A    Yes.

9      Q    And after reviewing that, do you remember what

10  Mr. Love said to you when he came down the stairs?

11      A    Yes.

12      Q    And could you tell the Court what he said to

13  you?

14      A    Help, my sister needs help, she's not moving.

15      Q    And at that point you indicated that -- did you

16  say that that statement back that morning on the 20th,

17  did you indicate that he went back up the stairs at

18  that point?

19      A    It doesn't say on there, no.

20          MR. McCORMACK:  Your Honor, objection because

21  this is not a statement of the witness.  This is

22  instead an officer's report.  It's a summary of a

23  statement so it's not proper impeachment.

24          THE COURT:  It's not a verbatim statement of

25  this witness signed by the witness; is that right?

1  This is a report of the officer.

2          MR. GIUNTA:  This is a report.

3          THE COURT:  I don't think that's proper to

4  impeach the report --

5          MR. GIUNTA:  I'll rephrase the question.

6  BY MR. GIUNTA:

7      Q    Do you recall telling Investigator Taylor at

8  that point that Mr. Love went back up the stairs?

9      A    I don't recall telling him that.

10     Q    Now, you indicated that when you walked up to

11 the apartment that you went back to 1942.

12     A    Kensington Street.

13     Q    At that point it was yourself and Mr. Love,

14 correct?

15     A    Yes.

16     Q    And the two of you went back there and you

17 dialed 911, correct?

18     A    Right.

19     Q    And at that point your testimony was, you

20 didn't go back to the house, correct?

21     A    No, I didn't.

22         THE COURT:  You didn't go upstairs?

23         THE WITNESS:  No.

24         THE COURT:  I was confused.  My fault.

25 BY MR. GIUNTA:

1    Q    And whenever you stayed at the apartment, you
2  waited for the 911 or the paramedics to come?
3    A    Yes.
4    Q    And you didn't see where Mr. Love went at that
5  point, did you?
6    A    No.
7    Q    Do you recall telling Investigator Taylor that
8  you went -- that Mr. Love and Socorro Roman went back
9  to Iris's house?
10    A    I do recall that.
11    Q    Do you recall telling Investigator Taylor at
12  that point you saw Tyshaunt Love and Socorro Roman head
13  towards Socorro's apartment?
14    A    Socorro's apartment?
15    Q    Or towards -- back to her house?
16    A    Yes.
17    Q    You indicated when you entered into the house
18  that you saw something burning on the stove?
19    A    Yes.
20    Q    And could you tell immediately what it was?
21    A    No.
22    Q    When you went into that room was it smoking?
23    A    A little smoking.
24    Q    And you were able to see Mr. Love, correct?
25    A    Yes.

1   Q    You were able to observe the area in the
2  kitchen?
3   A    Yes.
4   Q    On this picture you pointed out where the stove
5  was, correct?  Could you also indicate where the
6  refrigerator is in this?
7   A    It's over --
8        MR. GIUNTA:  Your Honor, may he come down?
9        THE COURT:  Sure.  Keep your voice up.
10       THE WITNESS:  It's over in this area.
11 BY MR. GIUNTA:
12   Q    Towards the -- next to where the shower area
13  is?
14   A    Yes.
15        MR. GIUNTA:  For the record Mr. Belcher
16  indicated the refrigerator is located next to the
17  opening where the shower/bathroom area would be in
18  between -- next to the bathroom door.
19        THE COURT:  Thank you.
20 BY MR. GIUNTA:
21   Q    When you entered the kitchen that morning, you
22  didn't see any blood, correct?
23   A    No.
24   Q    And you indicated that you were close with your
25  sister, correct?

24

```
1      A     Yes.
2      Q     And you had been to her apartment numerous
3  times, right?
4      A     Yes.
5      Q     The times that you were at the apartment -- you
6  are close with her, correct?
7      A     Yes.
8      Q     You would talk regularly?
9      A     Yes.
10     Q     And your recollection, she's never indicated to
11 you that she was having any problems with Mr. Love,
12 correct?
13     A     No.
14           THE COURT:  No, she never said that?
15           THE WITNESS:  No, she never indicated that she
16 had any problems with Mr. Love to me.
17 BY MR. GIUNTA:
18     Q     That evening you didn't hear any, as
19 Mr. McCormack asked, you didn't hear any screaming that
20 day?
21     A     No, I didn't.
22     Q     You never heard any gunshots, correct?
23     A     No.
24     Q     And are you familiar with the fact that
25 Mr. Love stayed at the apartment?
```

1    A    Yes.

2    Q    With Iris?

3    A    Yes.

4    Q    Are you familiar that anybody else would stay

5 at that apartment?

6    A    Sometimes, yes.

7    Q    And who would that be?

8    A    Kazar, sometimes Candi.

9    Q    When you say Kazar, that's LaQuan Williams,

10 correct?

11    A    As I understand it, yes.

12    Q    Just a couple of last questions for you.  That

13 morning on December 20th when you were outside, it was

14 cold out, correct?

15    A    Yes.

16    Q    And what time do you remember you indicated in

17 your statement -- what time did you go outside?

18    A    Probably 11:00.

19    Q    11:00?

20    A    Probably, yes.

21    Q    When you went over to Iris's apartment, was the

22 door open or was it closed?

23    A    It was unlocked.  I remember that much.  I

24 don't remember if it was open or closed.

25    Q    When you walked in, do you remember the burning

1  on the stove, what it was?

2      A    No.

3      Q    Do you remember whether it was on top of the

4  stove or in the oven?

5      A    On top of the stove.

6      Q    You indicated that you were there with Socorro,

7  correct?

8      A    Yes.

9      Q    And did she have her grandson present with her

10  that day at her place --

11      A    I don't remember.

12      Q    -- when you stayed there at 1942 Kensington

13  Street?  You don't remember?

14      A    No, I don't remember.

15      Q    Prior to this you had the opportunity to review

16  your testimony today with Mr. McCormack, correct?

17      A    Some of it, yes.

18      Q    And about how long ago before you -- before

19  today did you have a chance to meet with him?

20      A    About a week.

21      MR. GIUNTA:  Thank you for your time.

22      THE COURT:  Any redirect, Mr. McCormack?

23      MR. McCORMACK:  Yes, Your Honor.

24

25

```
 1                    REDIRECT EXAMINATION

 2

 3   BY MR. McCORMACK:

 4       Q    I'm showing you Commonwealth Exhibit No. 4.

 5   When Judge Bratton was asking you some questions, he

 6   asked you about the stairs and the make up of the

 7   stairs and you mentioned something about some spindles,

 8   you could see someone coming down the stairs.

 9       A    Yes.

10       Q    Commonwealth Exhibit No. 4, have you had an

11   opportunity to look at that?

12       A    No.

13       Q    Could you please take a look at that?  Does

14   that appear to be your sister's kitchen?

15       A    Yes.

16       Q    Does that appear to be the same stove --

17   although this time the stove door is closed -- does

18   that appear to be the same stove as Commonwealth

19   Exhibit No. 2?

20       A    Yes.

21       Q    The one with the food on top?

22       A    Yes.

23       Q    The spindles that were being mentioned during

24   your testimony, are they present on the stairs?

25       A    Yes.
```

1            MR. McCORMACK:  I would move for the admission
2    of Commonwealth Exhibit No. 4 at this time.
3            THE COURT:  Without objection?
4            MR. GIUNTA:  No objection.
5            THE COURT:  It's admitted.
6            (Whereupon, Commonwealth Exhibit No. 4 is
7    admitted into the record.)
8            MR. McCORMACK:  Can I publish it to the jury?
9            THE COURT:  To be accurate you referred to
10   those as poles.
11           THE WITNESS:  Yes.
12           THE COURT:  He's referring to as spindles.
13   BY MR. McCORMACK:
14       Q    Can you see the photograph from there?
15       A    Yes.
16       Q    The poles that you saw going up the stairs,
17   which side of the photograph are they on?
18       A    The left.
19       Q    The left side as you look at the photograph,
20   correct?
21       A    Yes.
22       Q    How did you know Kazar was staying there?
23       A    I heard it.
24       Q    It wasn't something you saw?
25       A    I didn't see it myself.

1     Q     Who did you hear it from?

2     A     Just people on the street.

3     Q     You said Candace was staying there.  Do you

4  know Candi's last name?

5     A     No, sir.

6     Q     Was your sister saving money for something?

7     A     I think to buy a car.

8     Q     And had she talked to you about money?

9     A     I heard her talking --

10          MR. GIUNTA:  Objection, Your Honor.  This is

11  beyond the scope of my cross examination.

12          THE COURT:  Seems like it to me, Mr. McCormack.

13          MR. McCORMACK:  Then I reserve the right to

14  recall him as a witness again to get through it.

15          THE COURT:  Approach.

16          (A discussion is held at sidebar off the

17  record.)

18          THE COURT:  Objection overruled at this point,

19  but I don't want to expand that to say you have a free

20  hand also.

21  BY MR. McCORMACK:

22     Q     You said your sister was saving for a car.  She

23  told you this?

24     A     Yes.

25     Q     Had she told you in particular what kind of car

1    she wanted to get?

2        A    It was a truck.

3        Q    And had she asked you to do anything?

4        A    To go with her to look at it.

5        Q    Had you done that yet?

6        A    Not yet.

7        Q    It was around the same time frame?

8        A    Yes.

9            MR. McCORMACK:  I don't have any further

10   questions.

11           THE COURT:  Any recross, Mr. Giunta?

12           MR. GIUNTA:  Just one.

13

14                 RECROSS EXAMINATION

15

16   BY MR. GIUNTA:

17       Q    That was a couple of days prior before you were

18   going to go look for a car, correct?

19       A    Yes, sir.

20       Q    And you indicated when you were shown the

21   pictures of the spindles, that was on the left side of

22   the kitchen?

23       A    Yes.

24       Q    And next to the stove in this area, correct?

25       A    Yes.

1    Q    When you went into the kitchen that morning,
2  did you turn off any of the burners on the stove?
3    A    No, I didn't.
4         MR. GIUNTA:  Thank you.  That's all.
5         THE COURT:  Anything else?
6         MR. GIUNTA:  That's it.
7         THE COURT:  Thank you, Mr. Belcher.  You may
8  step down.
9         MR. McCORMACK:  At this time I call Socorro
10 Roman.
11
12              SOCORRO ROMAN,
13 having been sworn, was examined and testified as
14 follows:
15
16              DIRECT EXAMINATION
17
18 BY MR. McCORMACK:
19    Q    Ma'am, could you please state your name for us?
20    A    Socorro Roman.
21    Q    And where do you live?
22    A    1938 Kensington Street.
23    Q    Did you live there back in 1996?
24    A    No.
25    Q    Where were you living back in 1996?

1    A    1942 Kensington Street.

2    Q    How far away was that from McCleaster Street?

3    A    Back alley.

4    Q    Back alley to your house?

5    A    Um-hum.

6    Q    How far away -- were you familiar with the

7  woman by the name of Iris Belcher or Iris Fennel?

8    A    Yes.

9    Q    How far away were you living from her?

10   A    Just a house away from her.

11   Q    On December 20, 1996, do you recall what

12  happened on that morning that brings you into court

13  today?

14   A    Yes.

15   Q    Can you describe for the jury what you were

16  doing in the morning?

17   A    I got up early that morning, and I was going

18  into my backyard.  I think I was putting out the trash.

19  I asked Zach -- he was staying with me at that time,

20  and Zach's brother -- to go help me, and we went out

21  and I was in the front.  Zach was behind me.  He said,

22  mom, I smell something burning.  So I took a sniff.  I

23  said yeah.  He walked back and he said the smoke is

24  coming from Iris's house.  So I thought go back over

25  there and see what's going on.  I thought she was

1 sleeping.  He went and I stayed in the backyard, across

2 from the backyard I could see him.  He said, mom,

3 something is wrong.  I'm calling Iris and she wouldn't

4 answer.  I said, what do you mean something is wrong?

5 He said, she won't answer me.

6      I went to my house, went to the front and went

7 up to the side of the house, to Iris's house and

8 Zach -- I met him so he kept going to my house and I --

9    Q   Let me slow you down a little.

10    A   On the side of the house he was coming from

11 Iris's house and I was going to her house.

12    Q   He was coming in your direction back to your

13 house?

14    A   Yes.

15    Q   Then what happened?

16    A   He went to the house and I kept going to Iris's

17 house.  I don't know his name.  That guy --

18    Q   You're pointing across the courtroom.

19      THE COURT:  Who are you pointing to?

20      THE WITNESS:  The guy with the glasses.

21      THE COURT:  What is he wearing?

22      THE WITNESS:  The vest.

23      MR. MULLER:  We'll stipulate she's identifying

24 Mr. Love.

25      THE WITNESS:  Mr. Love, okay.  He went -- he

1 was coming.  I went to Iris's.  So he followed me and

2 on the way going up the side of the house he tells me I

3 was with Iris yesterday and me and her got into an

4 argument and she disappeared.  I spent all night

5 looking for her and I couldn't find her.  So I told him

6 I hope nothing happened to Iris.  That's what I told

7 him.  I went inside the house.  Then I went and the

8 stove was on.  So I turned off the stove.  I sort of

9 like went upstairs.  I had my grandson with me.  As you

10 go up the bedroom is right there.  So the living

11 room --

12 BY MR. McCORMACK:

13     Q     Your grandson was with you?

14     A     Yeah.  He was like two years old.

15     Q     You go in; you turn off the stove you say?

16     A     Yes.

17     Q     Do you recall how many burners were on, if you

18 remember?

19     A     Just one; it was a skillet.  I think it had

20 like four pieces of chicken.

21     Q     Did you spend a long time by the stove?

22     A     No.  I just went in and just turned it off.

23     Q     Okay.  Then what happened?

24     A     Then I went upstairs.

25     Q     What did you find when you went upstairs?

1    A    I went upstairs.  I went in.  I looked to my

2  right, which is the bedroom, and I seen -- I went to

3  the living room.  I set my grandson down on the couch

4  and I came back in.

5    Q    Let me ask you this, when you came up the

6  stairs you said you immediately took your grandson to

7  the living room.  Did you -- were you able to see

8  something when you came up those stairs?

9    A    Yes.

10    Q    What did you see?

11    A    I seen her laying down.  She was laying down.

12    Q    Did you have any difficulty seeing her?

13    A    No, no.

14    Q    So you put your grandson down, and where do you

15  go after you put your grandson in the living room?

16    A    I went straight to the room to see her.  I sort

17  of, like, bent over her and I felt her pulse, touched

18  like here -- (indicating) -- touched over here and then

19  tried to --

20    Q    I'm sorry to keep interrupting you.  You just

21  touched two parts of her body.

22    A    I touched here -- (indicating.)  I touched for

23  the pulse.

24    Q    On her wrist?

25    A    And up in here -- (indicating.)

```
 1      Q    Underneath her neck and the temple?

 2      A    Yeah.

 3      Q    On her body, touching the right wrist, the left

 4 side of the neck and the left side of the head; am I

 5 right about that?

 6      A    Yes.

 7      Q    So you were checking to see about first aid I

 8 think when I interrupted you.

 9      A    Yes.

10      Q    Were you able to -- how did she appear to you?

11 Did you get any pulse or anything like that?

12      A    I didn't get a pulse from her.  I get no pulse

13 from her.

14      Q    How did she -- how did her body feel when you

15 touched her?

16      A    She was cold.  She had rigor mortis.  She's

17 laying -- she was laying there with a little pajama

18 top.

19      Q    Where was she laying?

20      A    Excuse me?

21      Q    Where was she laying?

22      A    At the end of the bed; the box spring was

23 right, but the mattress was like tilted, and she was at

24 the end of the bed.

25      Q    Her --
```

DAUPHIN COUNTY COURT REPORTERS

1          THE COURT:  On the floor?

2          THE WITNESS:  Not on the floor, no.  Her head

3     was -- head was at the bottom of the bed and her body

4     was up.

5          THE COURT:  On the box spring.

6          THE WITNESS:  On the mattress, yeah.  The

7     mattress was tilted like at an angle.

8          THE COURT:  Partially off the box spring.

9          THE WITNESS:  Yes.

10          THE COURT:  I understand.

11     BY MR. McCORMACK:

12     Q     You're saying all of her body or part of her

13     body was on the mattress?

14     A     The top of the body was almost at the end of

15     the mattress.

16          MR. MULLER:  I'm sorry.  I didn't hear the

17     first part.

18     BY MR. McCORMACK:

19     Q     You said the top of the body --

20     A     Was at the end of the mattress.

21     Q     Did you notice anything?  Did you notice

22     anything else?  I was just asking where her body was

23     positioned.  How about did you notice anything about

24     her face?

25     A     She had a hole like right over here --

1  (indicating.)

2      Q    You're pointing to your jaw bone?

3          MR. MULLER:  For the record she is pointing to

4  her left jaw bone, correct?

5          THE WITNESS:  Yeah.

6  BY MR. McCORMACK:

7      Q    You saw a hole on her jaw bone.  Was there

8  anything that you noticed about the hole?

9      A    There was blood.

10      Q    Okay.  After you described her bullet hole that

11  you saw on her jaw bone, did you see -- you mentioned

12  about her head, where it was on the mattress, the top

13  of her body I think you said.  Where were her legs and

14  what position were her legs in?

15      A    Her legs -- they were on the bed at the bottom

16  of the bed.

17      Q    Were they in a position or any clothing that

18  you noticed?

19      A    What she had was the little top; that's all she

20  had and I --

21      Q    Any underwear or anything?

22      A    No underwear; she was exposed.  What I did

23  was --

24          MR. MULLER:  I'm sorry.

25          THE WITNESS:  She was exposed.  She had nothing

1  on.  What I did was, I took a blanket she had.  It was

2  a blanket, and right -- I covered her, and I turned

3  around and I looked at her and said that he should have

4  covered her.

5  BY McCORMACK:

6      Q    You told who that?

7      A    Mr. Love.

8      Q    You did -- what was that, you said a sheet?

9      A    It was a sheet to cover her just right over

10 her.

11     Q    Do you remember what color the sheet was?

12          THE COURT:  I'm sorry.  Was that a question?

13 BY MR. McCORMACK:

14     Q    Yes.  Do you remember what color the sheet was?

15     A    It was just -- I don't remember, just a sheet,

16 little flowers on it.

17     Q    I want to show you what's been marked as

18 Commonwealth Exhibit No. 5.  Could you take a look at

19 the photograph for us?  Do you recognize what that is a

20 photograph of?

21     A    That's the room.

22     Q    That's the room that you've been describing for

23 us, the bedroom where Iris was found?

24     A    Yeah.

25     Q    Does it appear that Iris is in that, in that

```
 1  photograph at all?
 2       A    No.
 3       Q    You don't see Iris in there?
 4       A    No -- I do see her.
 5       Q    Is she covered by something?
 6       A    Yeah.
 7       Q    What's she covered with?
 8       A    Covered with a sheet, but this is not the way I
 9  saw her.
10       Q    That's not the way you saw her?
11       A    No.  It seems like she's on the floor in this
12  picture.
13       Q    That's not where you saw her?
14       A    No, no.
15            MR. McCORMACK:  Your Honor, I would move for
16  the admission of Commonwealth Exhibit No. 5 at this
17  time.
18            MR. MULLER:  No objection.
19            THE COURT:  It's admitted.
20            (Whereupon, Commonwealth Exhibit No. 5 is
21  admitted into the record.)
22            MR. McCORMACK:  Can I publish that to the jury?
23            THE COURT:  Yes.
24            MR. McCORMACK:  I'll put that photo back up
25  here and we also have it on the screen.
```

BY MR. McCORMACK:

Q    Ms. Roman, you're telling us that, in fact, it's probably best if you could step down for us just briefly.  Here's a pointer for you.  If you could come over here, in fact, you could stand right over here.  You say that you see a body in this photograph.  Where do you see the body covered by the sheet?

A    Right here -- (indicating.)

Q    For the record you're pointing directly to the center of the photograph, and the color of the sheet that you see there again is what color?

A    It's like a red or purple.

Q    You say that the position of her body on the floor is not where you saw it when you came in with the Defendant; is that correct?

A    Correct.

Q    You said that the body was more where?

A    The body was -- her head was like right over here and her body was up here -- (indicating.)

Q    You're now touching the bottom left as you look at the photograph.  The bottom right-hand corner of the photograph up on the mattresses kind of where the foot is?

A    This is more or less where her head was.  Her body was up here -- (indicating.)

1    Q    That's more where?

2         MR. MULLER:  That's more where the head was?

3         THE WITNESS:  Her head was right here and body

4    was over here.  She was on the mattress.  She wasn't on

5    the floor.

6    BY MR. McCORMACK:

7    Q    Again, the head was more towards where on the

8    picture?  It's depicted -- her leg and foot were more

9    where her head was; is that correct?

10   A    Yes.  The body was over here.  Her head was

11   down here.  Her legs was facing that way.

12   (Indicating.)

13   Q    Her legs were going off toward the right center

14   side of the photograph?

15   A    Yes.

16   Q    If you could go back up to the stand.  You put

17   the sheet over her for what reason again?

18   A    She was -- she was exposed.  She was nude.  She

19   had nothing on.

20   Q    After you make these observations, you attempt

21   to see if she's alive and you don't get any pulse.  Do

22   you go anywhere else?  Do you do anything?  What

23   happens next?

24   A    After that I sort of like -- I was cold.  I got

25   up.  I sort of walked by him.  I got my grandson, and I

```
 1    went downstairs and went outside.  My neighbor was on
 2    the porch.  I told her to call the cops, and she said
 3    is she okay?  I said just call the cops.  So I walked
 4    to my house.  Zach was out there, and my husband.  Zach
 5    went upstairs to the house.  I told --
 6         Q    I'm sorry.  Who went upstairs?
 7         A    Zach.
 8         Q    Let me back up a little so we all understand.
 9    You come out, you say you talk to the neighbor.  What
10    was her name?
11         A    Jeanette McCurdy.
12         Q    You tell her to call 911?
13         A    Yes.
14         Q    You run into your husband.  What did you say?
15         A    He was outside with Zach all the time.
16         Q    He was outside with Zach?
17         A    Yes.
18         Q    Did I hear you mention your son?
19         A    My grandson, I had him.
20         Q    You had him in your arms?
21         A    Yes.
22         Q    And Zach was walking back up towards the house?
23         A    I told my husband.
24         Q    You said you motioned to him?
25         A    I motioned to him what was going on.
```

1   Q    Then where did you go?

2   A    Went inside the house, my house.

3   Q    Where was the Defendant at this time?

4   A    I don't know.  I don't know because I spent --

5   I went inside the house.  I told Zach.  Rick was there.

6   That's my husband, and Zach was sitting on top of the

7   freezer, and Rick and I was just talking to him, trying

8   to calm him down a little bit, and I left my grandson.

9   I came back outside.  Mr. Love, I didn't see him

10  around.  He wasn't with us.

11  Q    Okay.  After you went back outside did you go

12  anywhere else?

13  A    I waited for the police to come.

14  Q    Then what did you do?

15  A    When they came in I walked out with them.

16  Q    Back into Iris's house?

17  A    Yes.

18       MR. McCORMACK:  If I could have one moment,

19  Your Honor.

20       THE COURT:  Sure.

21  BY MR. McCORMACK:

22  Q    Prior to -- prior to you going up to the house

23  and going right back to the beginning, prior to going

24  up to the house and noticing the smoke, did you notice

25  anybody else outside in their yard or anything else?

1    A    No.

2    Q    And did you hear at any time any yelling, for

3  example, anyone calling out the name of Iris or anyone

4  pounding on any doors or anything like that?

5    A    No.

6    Q    What time did you think you came out of your

7  house the first time you came out of your house?

8    A    It was trash day.  I think around 9:00 or

9  something like that.

10        MR. McCORMACK:  They are all the questions I

11 have at this time, Your Honor.

12        THE COURT:  Cross-examine.

13        MR. MULLER:  If I could just have a moment.

14

15              CROSS EXAMINATION

16

17 BY MR. MULLER:

18    Q    Ms. Roman, you talked to the police several

19 times that day, correct?

20    A    I talked to them, yeah, twice.

21    Q    The first person you talked to was a female

22 police officer, correct, a black female police officer?

23    A    She was there, yeah.

24    Q    You talked to her?

25    A    I don't --

1    Q    You don't recall?

2    A    I think it was the officers that was there that
3  I talked to the first one.  We talked to him.  Nothing
4  like explaining what happened.  I think it was him.

5    Q    I think somewhat later in the day they took you
6  down to the police station to give a statement, right?

7    A    Um-hum.

8    Q    When you've indicated to Mr. McCormack that you
9  probably went out there around 9:00 --

10    A    Yeah, it was early.

11    Q    -- do you recall what time you woke up that
12  day?

13    A    We didn't go to sleep that night.

14    Q    You didn't go to sleep that night?

15    A    No.

16    Q    But you didn't hear anything either?

17    A    No.

18    Q    Do you recall -- well, the other officer who
19  took your statement that day down at the police
20  station, that was Investigator Taylor.  Do you remember
21  him?

22    A    Yeah.

23    Q    Do you recall telling him you got up at 6:00
24  that morning?

25    A    I wouldn't say that.  We didn't go to sleep.

1    Q    Maybe you can explain that.  What do you mean
2  you didn't go to sleep?

3    A    We stayed up all night.

4    Q    We being who?

5    A    It was -- it was my husband.  It was Zach.  It
6  was me.  We just played cards, just stayed up, just
7  clowning around.

8    Q    You never went to sleep that night and you're
9  indicating that you went out back around 10:00?

10   A    I went out there maybe 9:00.

11   Q    Do you recall telling Detective Taylor you went
12  out back around 11:45 to clean dog cages?

13   A    I used to work at the post office.  Back then
14  my two days off were Thursday and Friday.  The trash
15  went out Thursday.

16   Q    Okay.  When you say it went out on Thursday,
17  what do you mean?

18   A    Huh?

19   Q    You mean it was picked up on Thursday?

20   A    The trash.

21   Q    The trash is picked up on Thursday?

22   A    Yeah.

23   Q    We're talking about Friday morning, aren't we?

24   A    Yeah.

25   Q    So you don't recall telling Detective Taylor

```
 1   that you went out back at 11:45 to clean dog cages,
 2   correct?
 3       A    11:45?  I don't think 11:45.  I know I went
 4   out -- it was early -- going to go back out in the
 5   backyard.  I go out back and ask Zach to go with me.
 6       Q    It's yes or no.  Do you remember telling him
 7   that or not?
 8       A    I might have.  I mean, I don't know the time
 9   exactly.  It was early.
10       Q    You agree you talked to him that very day about
11   this back on December 20th?
12       A    Yeah.
13       Q    Now, your grandson, your two-year-old grandson,
14   where was he?
15           THE COURT:  At what time?
16   BY MR. MULLER:
17       Q    When you were out back cleaning dog cages,
18   where is your grandson?
19       A    He's inside the house.
20       Q    And you had him -- according to your testimony,
21   you took him into the apartment when you went over
22   there?
23       A    Yes.
24       Q    Wasn't your husband home?
25       A    Yeah, he was home.
```

DAUPHIN COUNTY COURT REPORTERS

49

1    Q    You didn't leave the grandson in the house

2  though with your husband?

3    A    When I went back to the backyard, I think it

4  was the TV, I put it on so he could watch it.  So when

5  I walked by to get him, I mean, to go, I picked him up

6  to go with me.  I didn't know what I was going to find.

7    Q    When the police came, for instance, Officer

8  Bailey, this black female police officer, did you have

9  your grandson with you outside when you met her?

10   A    Yeah.  He was in the house with me.

11   Q    No, no, outside, when you met her.  Were you

12 outside with your grandson when you met up with Officer

13 Bailey one of the first officers to come there?

14   A    I didn't see her outside in the apartment.

15   Q    Who?  Officer Bailey you saw in the apartment?

16   A    Yeah.

17   Q    According to your testimony you had your

18 grandson with you.  You went to the scene.  You went

19 upstairs and you put him in the living room, right?

20   A    Yes.

21   Q    You never had to leave the area to drive and

22 get your grandson, did you?

23   A    I never what?

24   Q    Did you ever leave the area to go pick up your

25 grandson somewhere?

1    A    No.

2    Q    He was with you at that time?

3    A    He was with me.

4    Q    Do you recall telling the police you had to
5    leave the area and leave the apartment to go get your
6    grandson?  At one point you had to drive to go get your
7    grandson?

8    A    Drive, no.

9    Q    So that never happened.  When you --

10   A    I'm misunderstanding.  I had to drive someplace
11   to pick up my grandson?

12   Q    Yes.

13   A    No.  It's just two houses away.  He was with me
14   so...

15   Q    You've given a number of statements.  We
16   already talked about the two you gave to the police
17   that day.  You talked to the police twice.  You gave
18   one official statement, right?

19   A    I gave one in the courthouse, I mean.

20   Q    The police station?

21   A    Yeah, the police station.

22   Q    And you talked to an officer or two at the
23   scene?

24   A    Yeah, more or less what happened.

25   Q    March 23 of 2001 you gave a statement -- do you

1   recall that -- with Detective Heffner?

2       A   Yes.

3       Q   And then March 6th of 2003 you gave a

4   statement.  Again that would have been, I believe,

5   Detective Heffner and someone from the State Police.

6   Do you recall giving that statement?

7       A   Yes.

8       Q   When you're out back with Zach, who sees the

9   smoke or smells the smoke first?

10      A   Zach.

11      Q   Zach does.  Do you recall telling Officer

12  Bailey that you both did?

13      A   I have -- no, not like that; I mean, Zach said

14  he smelled something burning.

15      Q   Do you recall approximately 2001 on that

16  statement saying that you both walked around and saw

17  smoke?

18      A   Yeah.  When he said I smell something burning,

19  I said me too.  He goes, there's smoke, and I looked.

20      Q   You both saw the smoke.  Back in 1996 do you

21  recall telling Officer Bailey that you saw Mr. Love

22  coming out the rear door?

23      A   That I said -- no.

24      Q   You don't recall saying that?

25      A   No.

1     Q    Do you recall telling Officer Bailey that you
2  and Zach went into the apartment together through the
3  rear door?
4     A    No.
5     Q    Do you recall telling Investigator Massey and
6  another officer at the scene that day that you and Zach
7  entered the apartment and saw Mr. Love coming
8  downstairs?
9     A    No.
10    Q    Now, when Zach came back to your house,
11 Mr. Love was right behind him, correct?
12         THE COURT:  I'm sorry?
13 BY MR. MULLER:
14    Q    When Zach came from Iris's house back to your
15 house, Mr. Love was right behind him, he was with him?
16    A    Yes.
17         THE COURT:  Thank you.
18 BY MR. MULLER:
19    Q    You told Investigator Taylor that the day of
20 the incident do you recall -- I think you testified to
21 this today -- but in your 2001 statement you said that
22 you went over and halfway over you ran into Mr. Love?
23    A    No.  He's like -- he went up with Zach; went up
24 the alley he was behind me, yeah.  I didn't run into
25 him.  He was like right behind me.

1   Q   So when you're going over to the house after

2   Zach got back, you didn't run into Mr. Love coming back

3   to your house or from Iris's house to your house?

4   A   No.

5   Q   When in 2003 you told the police you went to

6   Iris's house you encountered Mr. Love and Zach had

7   already left at that point, that's not what happened

8   though, is it?

9   A   No.

10  Q   According to you, Zach told you he was calling

11  for Iris and not getting an answer when he went over

12  there.

13  A   Yes.

14  Q   In 2003 you told the police that you then went

15  over to Iris's home and as indicated you ran or

16  encountered Mr. Love in Iris's place.  That's not what

17  happened either, is it?

18  A   No.

19  Q   When today you're saying that you went out and

20  told this neighbor Jeanette McCurdy to call 911?

21  A   Yes, she was in the back.  She was in the back,

22  and she said -- she's next door to me, our yards meet,

23  and she's always in the front and in the back.  She

24  went to the back.  Then she went to the front.  When

25  she got to the front I was coming.  So I told her so

1 she was aware was my entrance (sic) and Zach entrance

2 (sic) of what happened.

3     Q    It was you who told her to call 911?

4     A    Yeah.

5     Q    Did you ever tell the police that you told Zach

6 to call 911 or, let me rephrase that.  Do you recall in

7 2003 saying that you left the apartment and told Zach

8 to call 911?

9     MR. McCORMACK:  Your Honor, at which point are

10 we talking about?  There's two times she was in the

11 house.

12     THE COURT:  Well, try to clarify if you would,

13 Mr. Muller.  It's a tad confusing.

14     MR. MULLER:  Okay.

15 BY MR. MULLER:

16     Q    Back in 2003 you told the police --

17     MR. MULLER:  The Court's indulgence.

18 BY MR. MULLER:

19     Q    The first time, I guess, you told the police

20 back in 2003 that you had gone over to the apartment.

21 Mr. Love was behind you.  You went up and saw the

22 victim in the bedroom.  You checked for a pulse and

23 those things and then you left the residence at that

24 point and instructed Zach to have a neighbor call 911.

25 That's not how it happened though.

DAUPHIN COUNTY COURT REPORTERS

1    A    I know Jeanette was out there, and Zach was

2  where I live.  He was just outside leaning.  I might

3  have told him to call the cops.  I know I told Jeanette

4  to call the cops.

5    Q    Did you ever tell the police you called the

6  cops, you called 911?

7    A    No, I didn't call the cops.

8    Q    You don't recall saying that?

9    A    No.  I didn't call the cops.

10   Q    Now, the day of the incident do you recall

11  telling Investigator Taylor that Zach went in first and

12  you went over two to three minutes later after Zach and

13  Mr. Love came back to the house.  Does that sound

14  approximate for the times?

15   A    Zach went in.  I went in, and from their yard

16  and my yard he said something is wrong.

17   Q    Would that be accurate he and Mr. Love came

18  over about two or three minutes later and you went over

19  to the apartment then?

20   A    He told me I'm calling, she won't get up.

21       MR. McCORMACK:  Your Honor, these, again, are

22  summaries from police reports.  I would object because

23  Mr. Muller is misquoting and paraphrasing what the

24  reports actually say.

25       MR. MULLER:  That's what cross examination is

1  for.

2        THE COURT:  He's asking if she recalls making

3  the statement or not.

4        MR. McCORMACK:  He's inferring to the jury

5  that's what Matt Taylor has in his report and it's not.

6        THE COURT:  You are free to point that out

7  during redirect.  Mr. Muller is at risk if he is in

8  fact misquoting.

9        MR. MULLER:  Understood.

10  BY MR. MULLER:

11     Q    Now, when you talk about Zach saying he called

12  Iris, you're talking about when he went to the

13  apartment after you saw the smoke and he called up to

14  her, right?

15     A    Yeah.

16     Q    He went there and yelled for her something to

17  that effect?

18     A    Yeah.

19     Q    After --

20     A    From the backyard he just told me in my

21  backyard, he said, mom, something is wrong.  I'm

22  calling and she's not answering.

23     Q    When you left with your grandson, had the

24  paramedics come at that point?  Before you left with

25  your grandson had the paramedics come to the apartment?

1    A    Before I left?

2    Q    You indicated in your testimony that your

3  grandson, you had taken your grandson and put him in

4  the living room.

5    A    Um-hum.

6    Q    You also indicated that at some point you took

7  him and took him home?

8    A    No, they weren't there.

9    Q    You weren't there when the paramedics arrived?

10    A    No.  I mean, I had left when they came in.

11  When they came then I was there but I took my grandson

12  out.

13    Q    You were there when the paramedics came and

14  that's when you took your grandson out; is that

15  correct?

16    A    No.

17    Q    I'm misunderstanding then.

18    A    When I see what happened, I left.  I took my

19  grandson to the house and then the cops and everybody

20  came, I came back.

21    Q    Okay.  Did you go into the apartment again?

22    A    Yeah.

23    Q    When the cops were there?

24    A    Um-hum.

25    Q    Is that a yes?

1    A    Yes.

2    Q    And did you see the paramedics at that time?

3    A    Yeah, they were there.  I was in the living

4 room.

5    Q    But they were there when you went back in,

6 right, they were already there?

7    A    I came back and they all came in.

8    Q    How long had Iris lived there?

9    A    I would say a couple of months, two or three

10 months.

11    Q    And Mr. Love lived there with her, correct?

12    A    I think so.

13    Q    Had you seen him before?

14    A    I seen him previously that day, and I seen him

15 other times.

16    Q    I don't recall from your direct testimony, you

17 had been to the apartment before?

18    A    Yes.

19    Q    How recently to December 20th had you been to

20 that apartment?

21    A    I know the apartment because the apartment used

22 to belong to my daughter.  When she moved, Zach moved

23 in.  When Zach moved out Iris moved in.

24    Q    Okay.  When were you in the apartment, I mean,

25 when they moved in?

1    A    When Iris was there.

2    Q    When Iris lived there had you been to the

3 apartment?

4    A    Oh, yeah.

5    Q    And prior to December 20th, when had you been

6 there?

7    A    I was there like I want to say like a month

8 before it happened.

9    Q    The door to the kitchen was open when you got

10 there, right?

11    A    Yes.

12    Q    And there was still smoke?

13    A    Um-hum, yes.

14    Q    So after you went in and you checked on her and

15 you put this sheet on her, and the sheet you didn't

16 cover the whole body, correct?

17    A    I covered her from the chest down.

18    Q    You covered from the chest down?

19    A    Yes.

20    Q    Do you recall telling the police you just

21 covered her from the waist down with a sheet?

22    A    I just covered her from the chest down.

23    Q    After you covered her you then -- how long were

24 you in there with Mr. Love before you took your

25 grandson out?

1    A    I don't know.  I covered her and whatnot and
2  took my grandson and left.

3    Q    And Zach was still back at your house?

4    A    Yes.

5    Q    At that point?

6    A    Yes.

7    Q    The fence, that was between the yards.  That's
8  a high fence?

9    A    Between where Iris lives?

10   Q    Yes.

11   A    No.

12   Q    Between your yards where you were and where
13 Iris was.

14   A    The yard between me and Iris, that's where
15 Ms. McCurdy lives.

16   Q    And I believe you indicated in one of your
17 interviews that Zach had to run around a high fence.

18   A    A six foot fence around my backyard.

19   Q    That's what he had to run around to get to
20 Iris's?

21   A    He went through the front.  He went through the
22 front into the house.

23   Q    You mean your house?

24   A    Yeah.

25   Q    So he went --

1    A    Through the house.

2    Q    -- through the house.  Let me go back.  Where

3  are you cleaning dog cages?  Was it out back or out

4  front?

5    A    It was in the back.

6    Q    And the back is where -- that's where

7  McCleaster Street is, the alley?

8    A    Right.

9    Q    You two are cleaning dog cages and Iris's

10  apartment is on McCleaster, the alley.

11  Mr. McCormack indicated it's a garage apartment type

12  set up?

13    A    Yes.

14    Q    And so Zach you're saying ran into your house

15  out on Kensington and around --

16    A    Yes.

17    Q    What it is?

18    A    It's like a six-foot fence, lock on it, and

19  when we're cleaning --

20    Q    You're talking about the backyard?

21    A    Instead of going to the house and get the keys

22  and instead he goes through the house and it's only

23  like a house between.

24    Q    Are you able to see through this fence?

25    A    Yes.

1    Q    Did you go to Iris's apartment the same way?

2    A    Yes.

3    Q    You went out front and around?

4    A    Um-hum.

5    Q    You indicated -- when you went in there, was

6 this skillet on the stove and you thought there was

7 chicken in the skillet?

8    A    There was chicken in the skillet.

9    Q    You're sure?

10    A    Yes.

11    Q    It wasn't anything else.  It had to be chicken.

12    A    It was chicken.

13    Q    When you came back in when the police were

14 there, were you able to see -- you went to the living

15 room so did you go through the bedroom again or did you

16 come through the living room?

17    A    I came in -- oh, God.

18    Q    Just for clarification, you indicated at this

19 point you walk back to your grandson or took your

20 grandson back to your house?

21    A    Um-hum.

22    Q    When the police came you got back to Iris's

23 apartment?

24    A    Yes.

25    Q    How did you enter Iris's apartment that time?

```
 1      A    I guess through the back.  I mean, I guess
 2 through the front.
 3      Q    Through the front.
 4      A    Yeah.
 5      Q    Did you ever have a chance to look in the
 6 bedroom again where Iris was when you came back?
 7      A    No, I didn't go back there.
 8      Q    Where was Mr. Love at that point?
 9      A    In the living room.
10      Q    And the police were there?
11      A    Yeah.
12      Q    And the sheet you grabbed had been on the bed,
13 right?
14      A    Yeah.
15      Q    So you grab the sheet off the bed and put it
16 over Iris?
17      A    I just covered her.  All I did was reached and
18 cover her.
19           MR. MULLER:  The Court's indulgence.  I'm
20 sorry.
21 BY MR. MULLER:
22      Q    How long were you back in the apartment after
23 the police were there?  Do you recall, I mean,
24 approximately?
25      A    From there I went straight down to the police
```

1   station.

2       Q    Okay.  They took you down?

3       A    Um-hum.

4       Q    At that time did they ask you to describe the

5   scene when you went there?

6       A    Yeah.

7       Q    And you told them what you knew at that time?

8       A    Yeah.

9       Q    You told them how you found the victim?

10      A    Yes.

11      Q    I believe you told them pretty much what you

12  said today.  You took her pulse.

13      A    Yes.

14      Q    After -- do you recall telling, I believe this

15  once again was Investigator Taylor, at this interview

16  where Iris was lying at the time southeast corner of

17  the bedroom?

18      A    I don't know where.  You go up the steps.

19      Q    And when you go up the steps to the bedroom and

20  there's some sort of a bannister or wall there by the

21  steps?

22      A    Yes.

23      Q    And you turn into the bedroom?

24      A    Yeah.

25      Q    Where are the mattresses?  Where's the bed?

1    A    They are on the -- as go up they are on the
2  right.

3    Q    On the right?

4    A    Um-hum.

5    Q    If I'm coming up the stairs and I turn into the
6  bedroom, they are going to be right here next to the
7  bannister?

8    A    No, on the other side.

9    Q    The other side.  After you give your statement
10 down at the police station you then just go home,
11 correct?

12   A    Yes.

13   Q    And prior to today have you had an opportunity
14 to review your testimony with Mr. McCormack or anyone
15 else?  Have you met with Mr. McCormack in the last week
16 or two?

17   A    Yes.

18   Q    To talk about your role in this case and your
19 testimony?

20   A    Yes, I come testify, yeah.

21   Q    Did you have a chance to review your prior
22 statements when you met with Mr. McCormack?

23   A    The first time I meet Mr. McCormack and he
24 asked me what happened and I explained to him what
25 happened.

1          THE COURT:  That doesn't really answer the

2    question that was asked though.  The question was, did

3    you review, in preparation for today, did you review

4    all the statements you have given to the police?

5          THE WITNESS:  No.  I mean, he asked me.  He

6    called me the first time to meet him and he asked me to

7    explain, tell him what I had said.  I did tell him if

8    he put it out to me and read it to me, no.

9          THE COURT:  You did not review written

10   statements you had given before.

11         THE WITNESS:  He had it in front of him and I

12   told him all what had happened.

13   BY MR. MULLER:

14      Q    When you met with him was Detective Heffner

15   there as well?

16      A    Yes, he was.

17         MR. MULLER:  That's all I have.

18         THE COURT:  Any redirect?

19         MR. McCORMACK:  Yes, briefly.

20

21                REDIRECT EXAMINATION

22

23   BY MR. McCORMACK:

24      Q    When you came and met me, I think it was last

25   week when we met.  I didn't put a statement right in

1  front of your face and ask you to read it, correct?

2      A    That's correct.

3      Q    And, in fact, I asked you just tell me what you

4  remember.

5      A    Right.

6      Q    Other than the statements that you gave the

7  police where you gave the statement and then you signed

8  the statement, you've never been given the opportunity

9  to review anybody else's police reports to make

10 connections and those sorts of things?

11     A    Right.

12          MR. MULLER:  I ask for clarification when he

13 says anyone else's police reports, police reports

14 concerning her and her statement.

15          MR. McCORMACK:  Oh, yes.

16 BY MR. McCORMACK:

17     Q    Mr. Muller was asking a series of questions

18 about Matt Taylor may have this in his report; Michelle

19 Bailey may have this in her report; Corporal Cronin may

20 have this in his report.  None of those reports you sat

21 down and read and said, hey, this is right and this is

22 wrong.

23     A    No.

24          MR. McCORMACK:  I don't have any further

25 questions.

1        MR. MULLER:  Just briefly.

2

3                    RECROSS EXAMINATION

4

5    BY MR. MULLER:

6        Q    You would agree that your memory was much

7    fresher back in 1996 than it was in say 2003 regarding

8    this incident.

9        A    Back then when it happened, yeah.

10        MR. MULLER:  That's all I have.

11        THE COURT:  Thank you.  In accordance with my

12    set schedule or plan schedule, we'll take a break right

13    now.  Please put your notebooks in the envelope with

14    the pens, leave them on the chairs.  You're excused for

15    a 15-minute recess.  Do not talk about this case or

16    anything you heard this far.

17        (A break is taken from 10:19 a.m. to 10:38

18    a.m.)

19        THE COURT:  Call your next witness.

20        MR. McCORMACK:  At this time the Commonwealth

21    calls Dr. Wayne Ross.

22

23                    WAYNE ROSS,

24    having been sworn, was examined and testified as

25    follows:

```
 1                    DIRECT EXAMINATION
                      (On Qualifications)
 2

 3   BY MR. McCORMACK:

 4        Q    Sir, can you please state your name for us.

 5        A    My name is Wayne Ross, R-O-S-S.

 6        Q    What do you do for a living?

 7        A    I work for the coroner's office here in Dauphin

 8   County.  I'm the forensic pathologist who performs the

 9   autopsies on people that die and try to figure out why

10   they die.

11        Q    And you are contracted to do that by the

12   Dauphin County Coroner's office?

13        A    Yes, I work for the coroner.

14        Q    You said you're a forensic pathologist?

15        A    Yes.

16        Q    Tell us what that is.

17        A    I'm a physician.  I went to medical school at

18   Jefferson Medical College.  I did six years of training

19   in pathology at Emory University in Atlanta.  I'm board

20   certified in anatomic and forensic pathology, and I

21   spent the last 15 years working for medical examiners'

22   offices in Atlanta and New Jersey as well as offices in

23   Pennsylvania.  I worked here since the early 90's and I

24   autopsy people when they die and I look inside the body

25   and I try to figure out why they do.
```

1        In cases of trauma I'll look at the trauma to
2   the body.  I'll document in photographs.  The police
3   will take pictures of it, and I will try to figure out
4   what happened.  If it's gunshot wounds, to figure out
5   where they are, get the bullets out, look to see if
6   there's any bruises or abrasions or bite marks, if
7   there's any other transfer of evidence on the body,
8   blood prints, handprints, things of that sort.
9        Q    Do you keep up -- I mean, you said you went to
10  medical school, you had worked in medical examiners'
11  offices in other states.  I think you said Georgia
12  being one of them.
13       A    Georgia.
14       Q    Did you keep up -- is there continuous training
15  that you do to keep up on this area?
16       A    Yeah.  There's multiple types of training.
17  I'm a licensed physician in Pennsylvania so you have 50
18  credits a year to do all the training during the year,
19  and then in addition I'm a member of a bunch of
20  organizations, forensics organizations, bloodstain
21  organizations.  I have their journals or articles I
22  read all the time and keep up on the stuff all the
23  time.  I teach at Hershey Medical Center at Penn State,
24  assistant clinical professor in pathology.  I have
25  residents from the pathology department that come and

1  train with me.  I have a resident here today.  She was

2  training with me for the month.  I teach and keep up on

3  all lectures.

4      Q    Autopsies, you perform autopsies more than just

5  suspected crimes.  You perform all the autopsies here

6  in Dauphin County?

7      A    All the autopsies, yes.

8      Q    That could be even if someone is involved in an

9  auto accident?

10     A    Auto accident, heart attack, suicide, we look

11  at them all.

12     Q    Have you testified in either Dauphin County or

13  other places as an expert in the field of forensic

14  pathology?

15     A    Yes.

16     Q    And where have you testified as an expert?

17     A    Multiple counties, Lancaster, York, Lackawanna,

18  Scranton, all over the place.

19     Q    Dauphin County?

20     A    Here I testified, you know, numerous times.

21     Q    Have you testified in other states?

22     A    I have.

23     Q    What other states have you testified in?

24     A    Pretty much all the states, but at least I

25  could name a few, New Jersey, New York, Virginia, all

1  over the place.

2      Q    Do you always testify for the Commonwealth, for

3  the state, the government?

4      A    The majority of the time for the Commonwealth

5  because I work for the government and I do the autopsy.

6  But I also work for the defense and I do cases for the

7  defense and I testify for the defense as well.

8      Q    In addition to teaching at Hershey Medical

9  Center, do you teach at any other type of seminars or

10  anything in the area of forensics?

11      A    Students from university hospitals that come

12  and intern with us, that's No. 1.  No. 2, yes, I

13  lecture all over the place.

14      Q    Have you written any papers?

15      A    I've written around 10 or 11 papers.

16      Q    What was the topic of those papers?

17      A    Some were forensic related, dealing with

18  suicides, things of that sort.  Some were dealing with

19  blood problems, various types of anemias and studying

20  blood, things of that sort.

21      Q    How many autopsies do you do a year in Dauphin

22  County?

23      A    I do in Dauphin County about 150, 130 or 150

24  here.

25      Q    You also do autopsies in Lancaster County?

1    A    In Lancaster County.

2    Q    Combined how many autopsies do you do a year?

3    A    Over 400 a year.

4    Q    In fact, you were performing some autopsies

5 yesterday; is that correct?

6    A    We did seven yesterday.

7         MR. McCORMACK:  They are all the questions I

8 have on his qualifications.  I'm not sure if,

9 Mr. Muller --

10        MR. MULLER:  Briefly.

11

12                    CROSS EXAMINATION
13                    (On Qualifications)

14 BY MR. MULLER:

15   Q    You indicated you work for the coroner.  But

16 the coroner is not paying you to be here today, are

17 they?

18   A    No.

19   Q    The District Attorney's office is paying you to

20 be here, correct?

21   A    Yes.

22   Q    And although you state you testified for the

23 defense too, the majority of the times it is for the

24 Commonwealth, correct?

25   A    Sure.

1      Q      And when we talk to the jury, you're talking

2  about 80 or 90 percent?

3      A      90 percent at least, yes.

4      Q      And how long does it take to perform an

5  autopsy, average?

6      A      Hours.

7            MR. MULLER:  That's all I have.

8            MR. McCORMACK:  At this time the Commonwealth

9  would offer Dr. Ross as an expert in the field of

10  forensic pathology.

11            MR. MULLER:  No objection.

12            THE COURT:  Without objection we'll accept him

13  as an expert.  Ladies and gentlemen, most of the

14  witnesses who testify in these proceedings -- and you

15  may have picked this up from television -- are not

16  permitted to express an opinion.  That most witnesses,

17  the lay witnesses, simply testify as to what they see

18  or heard, basic facts.

19            Experts fall into a slightly different

20  category.  An expert is someone who because of

21  specialized training or skill or experience in a field

22  of science or technology has a specialized

23  understanding, and therefore, we permit that person to

24  testify and during the testimony to express an opinion.

25  You should understand that your job as jurors, however,

1   does not change simply because we have accepted

2   Dr. Ross and qualified him to testify as an expert.

3   You've heard his recitation of those qualifications.

4   You should consider them as you should consider all of

5   his testimony as you would any other witness in

6   determining what credibility, what truthfulness and

7   accuracy determinations you wish to make as to his

8   testimony.  Proceed, Mr. McCormack.

9

10                  DIRECT EXAMINATION

11

12  BY MR. McCORMACK:

13      Q    Let me follow up with one thing.  Mr. Muller

14  asked you are you working for the District Attorney's

15  today.  In fact, you're going to bill us after your

16  testimony is done; is that correct?

17      A    Right.

18      Q    And, however, you weren't asked to consult on

19  this case.  You actually performed the autopsy in this

20  particular case; is that correct?

21      A    Right.  The coroner called me up and asked me

22  to do the autopsy.

23      Q    And that had nothing to do with the District

24  Attorney's office hiring you to do the autopsy?

25      A    No.  The District Attorney's office and

1  coroner's office are separate.

2      Q    And the conclusions that you reached -- when

3  you reach a conclusion, do you write a report?

4      A    Yes.

5      Q    And the conclusions that you reached in your

6  report are sent to who?

7      A    The coroner.

8      Q    Now, on --

9          MR. MULLER:  Can I follow up on that?  That's

10  kind of just redirect on my cross on qualifications.

11          THE COURT:  I've already received him as a

12  qualified expert.  We're not going to rehash this.  I'm

13  not sure why we're talking about it right now.

14          MR. McCORMACK:  I just wanted to make it clear

15  when he did the autopsy who he was working for.

16          THE COURT:  We already heard that in his

17  qualification testimony.

18  BY MR. McCORMACK:

19      Q    You started to mention a little bit earlier, I

20  want to go into a little more detail.  You get notified

21  by the coroner's office that there is someone who died

22  and there needs to be an autopsy.  Where are the

23  autopsies performed?

24      A    At the coroner's office here off Paxton Street.

25      Q    When an autopsy is performed, how do you start

1    the autopsy?  Where did you start?

2         A    I talk to Graham Hetrick who can tell me about

3    the case.  He told me what was going on.  He was at the

4    scene, and I go and I look at the body.  I look for

5    presence or absence of clothing on the body, look for

6    fibers, any fibers, take them off the body.  I look for

7    bloodstain evidence and I look for trauma.

8         Q    This is before you do any cutting or anything

9    like that?

10        A    Exactly.  We examine the body first and look

11   for what we call trace evidence.  We want to try to

12   find out if there's a connection between what's on the

13   exterior of the body and anything else.

14             So this body I found blood patterns.  I did a

15   tape lift.  I did some stains on the leg, trying to

16   raise fingerprints, blood prints on the thighs.  There

17   was a bite mark.  I would have the forensics dentist

18   look at the bite mark on the wrist; two gunshots

19   wounds, strangulation.  Before I could figure all that

20   out I would look at everything, have the police

21   photograph, and photographs are made available to the

22   District Attorney and defense attorneys, police

23   department, and whoever else who wants to review the

24   case.

25        Q    Now, you do your external review of the body.

1    What do you typically do next?

2        A    I do an internal -- once I see what I've got I

3    document gunshots wounds.   I document where they are,

4    if there's soot, gunpowder residue, trauma, bruises,

5    abrasions.   I go through and I outline where they were.

6    In this case there's 27 different areas of trauma to

7    the body, bruises and abrasions apart from the gunshot

8    wounds, apart from the strangulation.   Then I document.

9    And then we did all our trace stuff.   Then I do an

10   internal examination.   I look inside the brain.   I

11   recovered the bullet from the brain, from the jaw.   I

12   looked at x-rays that were performed, found the bullet,

13   and I look inside the neck, the chest and abdomen and

14   the organs, see where the trauma is, and if there's any

15   natural diseases or anything else going on in the body.

16       Q    Now, when you performed this particular

17   autopsy, let's start with -- and let me -- what date

18   did you perform the autopsy?

19       A    December 21, 1996.

20       Q    And when you performed this particular autopsy,

21   your external examination, let's start from the top of

22   the body to the bottom.   Starting with the head, what

23   things did you notice to Iris Belcher's head that you

24   note relevant here today?

25       A    I should say she measured about 5 feet 6 plus

1    or minus, 130 pounds, and she had on basically a shirt

2    and brassiere.  So I could see that right away she had

3    no underpants on.  I could see the fingerprints on the

4    thighs.  I looked at her head and I could see two

5    glaring gunshot wounds.  The gunshot wounds to the

6    right jaw and to the left lip.  Her whole face was

7    swollen, beat up pretty bad.  She had a huge abrasion

8    or scrape over her cheek, bruises on her cheek and

9    abrasions all over her face.

10        Q    Any swelling noted?

11        A    Swelling was noted to the right side of the

12   face particularly -- pretty swollen, and I dissected

13   out her facial structures.

14        Q    What do you mean by dissected?

15        A    Well, I had to cut unfortunately to look for

16   the bullet.  I didn't get the bullet out.  It was in

17   the left cheek, and she had bruises all over her face

18   underneath.  The bruises were so deep they went into

19   the underlying fat.

20        Q    How did the bruising occur?

21        A    You're beat up, punched, kicked.

22        Q    I guess I got to be more specific in my

23   question.  What causes bruising?  I understand you get

24   hit by something.  What is the bruising?  What happens?

25        A    When a loading force -- when a loading force

1   hits the skin it compresses the skin against the bone.

2   Your blood vessels in there they hemorrhage, blood

3   dissecting underneath.  If you have a bruise on your

4   body or fall and hit yourself basically blood is

5   collected underneath.

6       Q    When you say that the bruising was deep, what

7   is that significant of?

8       A    Severe trauma.

9       Q    Severe trauma?

10      A    Yeah.  It's not just a bruise.  Sometimes you

11  get bruises on the outside of your skin.  This was down

12  deep into the fat.  She was beat up pretty bad.

13      Q    Did you notice anything about -- you already

14  mentioned about the jaw bone.  Did you notice anything

15  about her nose or anything like that?

16      A    Her nose was broken.  She broke her septum.  In

17  addition though it was twisted from right to left.

18  She definitely when she died was lying on that nose and

19  it was twisted like this -- (indicating.)  It was like

20  that or else it wouldn't have stayed twisted like that,

21  and primarily mention about the big abrasion on her

22  face on the right side.

23      Q    And you said you compared an abrasion to like a

24  scrape?

25      A    Pretty big scrape, it's some firm object

1  striking that area.

2      Q    You mentioned two bullets wounds.  Where was

3  the one?  You mentioned on the jaw.  Where was the

4  other one?

5      A    One was on the jaw and one was to the left

6  lip -- (indicating.)

7      Q    Right now you have your finger up to your lip,

8  left side of the lip and the lower lip, correct?

9      A    Correct.

10     Q    Moving down from the head to the neck, did you

11 notice anything on her neck?

12     A    Bruises to the right side of the neck which

13 alerted me to the possibility of strangulation.

14     Q    Did you look to see whether you felt there was

15 a strangulation or not?

16     A    Well, I looked inside the neck.  The neck

17 structures, Adam's apple, your hyoid bone, and I looked

18 at these areas and there was a fresh fracture,

19 hemorrhage noted to the right hyoid bone.  It's a

20 U-shape bone under your jaw.  When the neck is pulled

21 back my hyoid bone is exposed.  So if someone is

22 strangling somebody they break it and this was broken.

23     Q    Did you note on the outside any results of

24 bruising, any distinct outlines of anything in

25 particular?

1    A    There were four linear contusions on the right

2  side of the neck, right side, went up along the right

3  to beneath the mandible.  I could see four which told

4  me a pattern there.  You try to reconstruct in your

5  mind what would that pattern be, due to the ligature or

6  manor both causing the strangulation.

7    Q    When you say ligature, what do you mean by

8  ligature?

9    A    It's a very general term.  Ligature can be as

10  simple as a rope or string or something like that,

11  something -- clothing used to twist around the neck.

12  That combination with force from the hand or arm or

13  something like that can cause compression in those

14  areas so a combination of those.  Compression to the

15  areas cause a person to be strangled.

16    Q    In this particular case did you notice any

17  ligature marks?

18    A    I didn't notice any distinct ones.  If someone

19  were to say are these consistent with ligature marks,

20  the answer would be yes.  Are they consistent with just

21  a clothing pattern and compression from a manual

22  component either a hand or an arm or something like

23  that; leaving clothing impressions, causing the

24  strangulation?  The answer would be yes as well.

25    Q    Moving from her neck down to her chest, abdomen

1   and back, did you notice any trauma to her chest,

2   abdomen or back?

3       A    No.

4       Q    Moving to her extremities, her upper arms, did

5   you note any injuries to her arms or hands?

6       A    Yes.

7       Q    What did you notice with her hands and arms?

8       A    She had nine different wounds to the areas.  I

9   noticed bruising and abrasions some of which I said are

10  compatible with defending herself.  I noticed a bite

11  mark.  I wasn't sure if it was a bite mark.  Could have

12  been a bite mark back to the left wrist region which

13  was confirmed by the forensic dentist to be a bite

14  mark.

15          I noticed soot from the gun on her left hand so

16  that means that that hand was in proximity of the gun

17  when it was fired.

18      Q    What's soot?

19      A    Soot, when you shoot a gun -- soot is carbon.

20  If you ever seen bullets in guns and they have

21  gunpowder.  When a bullet is fired the gunpowder

22  explodes.  The gun powder comes out of the gun, when it

23  comes out it will leave black marks; black marks on his

24  hands, black marks around the gunshot wounds in both

25  areas.  That's what soot is per se.  When a gun is

1    close to the area of the body being fired upon it will

2    leave soot typically if its contact is right next to

3    it.   If it's inches, about a foot or so away, what we

4    call close-range gunshot wounds it will leave evidence

5    of soot even 2 feet, even 3 or 4 feet out you can get a

6    soot pattern, depends on the gun.   I can go down the

7    list.   The bottom line is, it's pretty close when the

8    shots were fired.

9         Q    When you find soot on the hand, you didn't

10   notice any bullet wounds in the hand, did you?

11        A    No.

12        Q    So when you find soot on the hand, what does

13   that led you to believe?

14        A    One or two things, either the most obvious

15   scientific answer is the gun is being fired near the

16   hand so the soot coming out of the end of the barrel,

17   the hand is near the barrel, it's coming out from the

18   gap.   I haven't seen the gun.   I don't know if there

19   was a gun to be found in the case.   If there's a gap

20   there then it comes out the gap.   Sometimes a gap, the

21   cylinder of the gun that will do it as well.   That hand

22   is near the gun.   Typically speaking, a person

23   defending themselves, trying to knock the gun away,

24   just near the gun when it's fired.   So in this case

25   with the two shots, the hand would be up in proximity

1 of either to the jaw or the lip or somewhere in that

2 area when those shots were fired.

3     Q    And you noted that on the left hand?

4     A    Correct.

5     Q    Did you notice anything else with the arms or

6 hands?

7     A    Well, the right middle finger was broken.  It

8 was broken; bruises and contusions to the hands

9 comparable with defense wounds, consistent with her

10 defending herself, fighting off an attacker.

11     Q    How would you be able to tell they were defense

12 wounds?

13     A    Well, if you look at the whole thing together,

14 look at the whole body, she was beat up about her face.

15 What would she do with her hands?  Throw her hands up

16 so you don't get beat up.  You would see bruises and

17 abrasions to your hands.  So she had them around there.

18 That's typical thinking that goes into it from a

19 forensic standpoint.

20     Q    Did you note anything else concerning the arms

21 and hands and that area there?

22     A    Not from a trauma standpoint, no.  I mean, I

23 had a lot of blood on the hands, a lot of blood caked

24 on the hands, and there was blood -- blood draining

25 from the gunshot wound coming forward and there was

1  some impact spatters to the lower legs.

2      Q     I'll get to the legs in a second.  You

3  mentioned when talking about the head, that there was a

4  fracture to the nose?

5      A     There was.

6      Q     Is that the type of injury, the injury you

7  noted that would be bleeding a lot?

8      A     It would bleed sure, a lot.

9      Q     All right.  Moving down then to the legs.  You

10  say you noted impact spatter?

11      A     Two sets of bloodstains.  I saw multiple

12  circular bloodstains kind of lined up, hand

13  impressions.  I did everything within my power to bring

14  up ridge detail for the police to try to identify whose

15  hand impressions they were, and I don't know if they

16  ever found anything or not.  I don't think they did.

17  I worked on that.  Other things I noticed referred to

18  impact spatters.  There's a small circular bloodstain

19  less than a millimeter to the inside of her thighs and

20  her lower legs.  There's blood there.  There was no

21  blood to the right around the crotch area.

22      Q     I know you're kind of pointing -- could you

23  stand up for us?

24      A     The blood I'm talking about is on the thighs;

25  what I thought was hand impressions.  The second thing

1   I noticed, a small circular bloodstain, a millimeter to

2   the inside of the legs.  Those bloodstains were coming

3   from the gunshots.  I know they are coming from the

4   gunshots, a millimeter or less tells me -- we refer to

5   as back spatter.

6            MR. MULLER:  I object to that.  There's nothing

7   in the report.

8            THE COURT:  Approach, please.

9            (The following discussion is held at sidebar:)

10           MR. MULLER:  Your Honor, this is in reference

11  to a discussion we had in chambers yesterday regarding

12  Dr. Ross's testimony.  I had lodged a preemptive

13  objection at that time as to any opinion testimony

14  regarding blood spatter evidence because his opinion in

15  this report does not contain such an opinion or data.

16           THE COURT:  Mr. McCormack, I thought --

17           MR. McCORMACK:  I believe there is some.

18           THE COURT:  You had said yesterday he wasn't

19  going to be talking about this stuff.

20           MR. McCORMACK:  He mentioned in the report

21  blood spatter.  That's what I'm asking him to talk

22  about.

23           MR. MULLER:  He's explaining -- giving an

24  opinion what the blood spatter means.

25           THE COURT:  We're concerned about moving the

1  body.

2          MR. McCORMACK:  I'll move on.

3          THE COURT:  All right.  Thank you.  Objection

4  is sustained.

5          (The discussion is concluded.)

6  BY MR. McCORMACK:

7      Q    Now, you mentioned that there was a void area?

8      A    Void area?

9      Q    When you're doing an autopsy you mean you have

10  areas that -- obviously looking for areas that have

11  blood or have some type of evidence.  Can it be

12  significant to you for areas that don't have evidence?

13     A    It's equally significant.  Bloodstain analysis

14  when you're looking at the body you look at the areas

15  where the blood is as well as where it is not.

16     Q    There could have been a number of explanations

17  but there could have been something either blocking or

18  somehow stopping --

19          MR. MULLER:  Objection.  Leading.

20          THE COURT:  Sustained.  Let the witness answer

21  questions.

22  BY MR. McCORMACK:

23     Q    What would cause it?

24     A    A void area is due to an intervening object

25  taking up the bloodstains.  I would expect bloodstains

1    being present there.  Had there not been an

2    intermediate object such as underwear, nothing along

3    that sort, the fact that the underwear was not present

4    at the time and the fact I did not have bloodstains

5    there at the time told me what we refer to as a void

6    area or absent area of bloodstaining that I expected to

7    find.

8         Q    Dr. Ross, you mentioned that as part of your

9    autopsy you did dissect and find certain items of

10   evidence in particular I think you said bullet

11   fragment.

12        A    Deformed bullets, yes.

13        Q    Dr. Ross, I'm going to show you two exhibits

14   here.  They will be numbered Exhibits 6 and 7.  I want

15   you to look at six first and leave the packaging.  The

16   packaging is labeled as to what's contained in there.

17             Commonwealth Exhibit No. 6, could you get that

18   out of its container and tell us what Commonwealth

19   Exhibit No. 6 is?

20        A    I will take a glove.

21        Q    The question was, what is that?

22        A    It's a bullet.

23        Q    Where did you recover that bullet from?

24        A    The left jaw.

25        Q    I'm going to show you what was marked as

1    Commonwealth Exhibit No. 8.  Take a look at that.

2            Do you recognize that being Iris Belcher who

3    you performed an autopsy on on December 21, 1996?

4        A    Yes.

5        Q    You mentioned there was a bullet wound to the

6    jaw area.  Is that evidenced on that photograph?

7        A    Yes.

8            MR. McCORMACK:  Your Honor, I move for the

9    admission of Commonwealth Exhibit No. 8.

10           MR. MULLER:  No objection.

11           MR. McCORMACK:  I ask to publish it to the

12   jury.

13           MR. MULLER:  May we approach?

14           THE COURT:  Yes, sure.  Proceed.  Permission

15   granted.

16           (A discussion is held at sidebar off the

17   record.)

18   MR. McCORMACK:

19       Q    Doctor, if you could please step down for us,

20   mindful of where the jury is so that they can all see

21   what you're pointing to.  Where is the bullet wound

22   that you are discussing?

23       A    It originates along the right jaw.  This black

24   area of soot and stippling is around an entrance hole

25   I'm pointing to with the pointer.

Q    What's stippling?

A    This is gunpowder.  It does not actually burn
up as it comes out of the gun, and it comes out in
whole pieces.  It impacts and leaves scrapes or
abrasions.  We know them as burn marks around and on
the skin.  And you judge the amount of soot and
stippling and that helps me judge how far away the gun
is when it's fired.  If I just saw soot there it would
just be a contact gunshot wound.  If I saw soot with
stippling then I say it's a close range gunshot wound,
a foot or so or less.

Q    Do you note any of the other injuries that you
are describing for the jury earlier, any bruising?

A    Yes.  There is a large abrasion to the right
cheek.  You can see blood coming out of the nose here.
One, blood flowing forward to the front of the jaw,
coming out the gunshot wound.

Q    From the position of the body is there blood
flowing forward, would that appear to be uphill?

A    Yes.  That this body has been moved and you
know that because this flow pattern is inconsistent in
which the way she was found.  This flow pattern
indicates her head was down and gravity -- once blood
occurs gravity will cause the blood to flow downward.

Q    Okay.  The bullet that you had, which was

1   Commonwealth Exhibit No. 6, that is the one you took

2   out of her jaw; is that correct?

3       A    Correct.  It went -- entered the right side,

4   the right jaw.  It went front to back, right to left

5   and upward about a foot or so away -- excuse me -- a

6   foot or less away when it was fired and then goes

7   through the right jaw, goes through both cheek areas

8   and I got it beneath the left jaw, left cheek area.

9       Q    You found the bullet sort of on the other side

10  of the face?

11      A    Clean through the face on the opposite side of

12  the face.

13      Q    You said -- the direction was what again?

14      A    Front to back.

15      Q    What does that mean?

16      A    The gun -- you try to orient the gun based upon

17  the path and relationship with the face.  So the gun is

18  fired relative to the direction in which I find it.

19  The bullet I found was going front to back relative to

20  the body, from the right to left direction and it's

21  going upward.  So no matter how this head is positioned

22  that shot was fired in that sort of direction.

23          MR. McCORMACK:  At this time I move for the

24  admission of Commonwealth Exhibit No. 6, the bullet

25  which he recovered.

1        MR. MULLER:  No objection.

2        MR. McCORMACK:  If I could publish that to the

3   jury across the screen rather than pass it.

4        THE COURT:  Without objection?

5        MR. MULLER:  No objection.

6        (Whereupon, Commonwealth Exhibit No. 6 is

7   admitted into the record.)

8   BY MR. McCORMACK:

9        Q    This is the object that you took from the, I

10  would imagine, left side of her face?

11       A    Correct.  That's the bullet we recovered.

12       Q    Now, you also mentioned a second gunshot wound

13  to the face, the lip area.  I'm going to show you what

14  has been marked as Commonwealth Exhibit No. 9.  Keep

15  your voice up and remembering that the court reporter

16  now is on the other side of the room.  Could you tell

17  us what that is a photograph of?

18       A    This is a photograph of Iris Belcher taken

19  under my direction, photograph of her left lip which

20  shows a gunshot entrance wound.

21       Q    Did you recover a bullet from that wound?

22       A    Yes, I did.

23       Q    And where did you recover that bullet?

24       A    It was in her head.

25       Q    Where in her head?

1       A    In the back of the head; this gunshot had gone

2   through the lip, through the mouth, went through the

3   skull; after that it went through the brain stem,

4   sliced the brain stem in half, then went through the

5   right cerebellum.  There was a bullet in the back of

6   the head that I recovered.

7           MR. McCORMACK:  I would move for the admission

8   of Commonwealth Exhibit No. 9 at this time, Your Honor.

9           MR. MULLER:  No objection.

10          THE COURT:  It's admitted.

11          (Whereupon, Commonwealth Exhibit No. 9 is

12  admitted into the record.)

13          MR. McCORMACK:  I ask to publish this

14  photograph to the jury.

15          MR. MULLER:  No objection.

16          THE COURT:  All right.  Permission granted.

17  BY MR. McCORMACK:

18      Q    The wound that you just described for us, could

19  you point out where it is on that photograph?

20      A    To the left lip, left lower lip.

21      Q    For the record you're pointing to the area that

22  is the blackish area in the left lower lip?

23      A    Correct.

24      Q    And that bullet you indicated you recovered in

25  the back of the head?

1      A     Correct.

2      Q     You've identified Commonwealth Exhibit No. 7 as

3  being that bullet?

4      A     Correct.

5            MR. McCORMACK:  At this time I move for the

6  admission of Commonwealth Exhibit No. 7, Your Honor.

7            MR. MULLER:  No objection.

8            THE COURT:  It's admitted.

9            (Whereupon, Commonwealth Exhibit No. 7 is

10  admitted into the record.)

11            MR. McCORMACK:  May I publish that to the jury?

12            MR. MULLER:  No objection.

13            THE COURT:  Permission granted.

14  BY MR. McCORMACK:

15      Q     This is the bullet that you recovered?

16      A     Yes.

17      Q     From her head?

18      A     Yes.

19      Q     From the two shots, having examined both shots

20  and -- let me back up.  What was the direction of this

21  particular wound?

22      A     This one is the front to back, left to right

23  and upward.  So this one because of the stippling, some

24  soot but more stippling is 2 feet or so or less when

25  the shot is fired and would be going from front to

1   back, left to right, all relative to her body, and

2   upward.   The gun is positioned relative to her lip and

3   her head it would be.   The shot would be going upward

4   through her face and into her brain.

5        Q    Which of the two wounds, or could you tell us

6   whether it's both, which of the two wounds would have

7   been fatal?

8        A    The one to the lip was immediately fatal.   As

9   soon as she gets that shot she's out as soon as it goes

10  through the brain stem.   As soon as it gross through

11  the brain stem that's it.

12       Q    That would be the second one that we were

13  discussing?

14       A    That's correct.

15       Q    You, at the autopsy, cannot tell which shot was

16  fired first?

17       A    True.

18       Q    If you could retake the stand.

19            I'm going to show you a series of other

20  photographs.   You had mentioned that you had noticed

21  certain wounds to her hand.   I want to show you

22  Commonwealth Exhibit No. 10.   This is a photograph of

23  what?

24       A    The back of her left hand.

25       Q    Any of the things that you were describing to

1  the jury earlier about wounds, soot, and those sorts of

2  things, are they evidenced in that photograph?

3      A    Yes.

4      Q    And what in particular is evidenced in that

5  photograph?

6      A    There's blood on the hand, soot to the back of

7  the second finger, and there's a bite mark noted to the

8  back of the left wrist.

9      Q    In fact, I'm going to show you Commonwealth

10 Exhibit No. 11.  Does that better illustrate any of the

11 injuries that you were talking about?

12     A    Yes, the bite mark.

13         MR. McCORMACK:  Move for admission of

14 Commonwealth Exhibit Nos. 10 and 11.

15         MR. MULLER:  No objection.

16         THE COURT:  They are admitted.

17         (Whereupon, Commonwealth Exhibit Nos. 10 and 11

18 are admitted into the record.)

19         MR. McCORMACK:  If I could publish them to the

20 jury?

21         MR. MULLER:  No objection.

22         THE COURT:  Proceed, Mr. McCormack.

23 BY MR. McCORMACK:

24     Q    Dr. Ross, as I look at the photograph kind of

25 up towards the knuckle area, what is that?

1    A    Soot.

2    Q    That's the gunpowder soot you were talking

3 about?

4    A    That's gunpowder, yes.

5         THE COURT:  Which photograph is that?

6         MR. McCORMACK:  This is No. 10, Your Honor.

7 BY MR. McCORMACK:

8    Q    And you had mentioned that there was a good

9 amount of blood on that hand?

10    A    There is.  You can see it on the fingers in

11 particular and the back of the hand.

12    Q    I want to put up photograph No. 11.  Again this

13 is the left hand?

14    A    Yes.

15    Q    You mentioned a potential bite mark.  Is that

16 evidenced in this photograph?  Do you need to look at

17 the photograph?

18    A    Okay.  Now I'm fine.  That's fine.

19    Q    The marks that we see in the center of the

20 photograph kind of in the wrist type area?

21    A    Yes.

22    Q    On the photograph, is that what you described

23 as potentially a bite mark?

24    A    Yes, yes, there are contusions back there.  I

25 thought they were bite marks or could be bite marks.

1     Q    You described for us some marks on the upper

2   thighs.  You were describing two things on the legs,

3   some spatter and you were also describing some of what

4   you called smears or smudges?

5     A    Contact blood transfer marks.

6     Q    Transfer is simply literally the blood is being

7   transferred from one place to another?

8     A    By an intervening object.

9     Q    Could be a hand that could brush up against

10  something?

11    A    As a general proposition, yes.

12    Q    I'm going to show what has been marked as

13  Commonwealth Exhibit No. 12.  The things that you were

14  just describing as being the transfer marks, are they

15  exhibited on that?

16    A    Yes.

17    Q    And again describe what portion of the body

18  they were on?

19    A    On both thighs, front of the thighs I could see

20  bloodstain marks.

21         MR. McCORMACK:  I would move for the admission

22  of Commonwealth Exhibit No. 12.

23         MR. MULLER:  No objection.

24         THE COURT:  It's admitted.

25

1          (Whereupon, Commonwealth Exhibit No. 12 is

2     admitted into the record.)

3          MR. McCORMACK:  Could I publish that to the

4     jury, Your Honor?

5          MR. MULLER:  If you're going to focus on the

6     thighs, no objection.

7     BY MR. McCORMACK:

8      Q    The marks that are displayed on the screen

9     right now, what you described as being on the upper

10    thighs, is that what you were just describing, what the

11    jury is looking at at this moment?

12     A    Yes.

13     Q    Now, you mentioned that there was a -- there

14    was some spatter or little drops on her legs, correct?

15     A    Correct.

16     Q    I show you a photograph marked as Commonwealth

17    Exhibit No. 13.  I recognize not all of the blood

18    spatters are contained there, but is there evidence of

19    the blood spattering that you are talking about?

20     A    Yes.

21     Q    Or little drops of blood?

22     A    Yes.

23     Q    Again, you indicated that there was blood --

24          MR. McCORMACK:  If I could I'll move for

25    Exhibit 13 to be introduced into evidence.