1          MR. MULLER:  No objection.

2          THE COURT:  It's admitted.

3          (Whereupon, Commonwealth Exhibit No. 13 is

4    admitted into evidence.)

5          MR. McCORMACK:  May I publish this to the jury,

6    Your Honor?

7          MR. MULLER:  No objection.

8          THE COURT:  All right.  Proceed.

9    BY MR. McCORMACK:

10   Q    Dr. Ross, I'm going to ask you to just briefly

11   come down again and show us where the spatter marks

12   are.

13   A    On this photograph you'll note her knee, right

14   knee, right thigh, right lower leg, and there's a small

15   circular bloodstain less than a millimeter in size

16   noted to the medial right thigh, right knee and right

17   leg region.  I counted thirty on the right side and

18   somewhere around thirty on the left side as well.

19   Q    Thirty spatter marks?

20   A    Right, little red marks you can see here.

21   Q    On the upper -- sort of the left center of that

22   photograph there's some red marks there.  Are they the

23   same transfer marks that we were just looking at a

24   moment ago?

25   A    Yes.

1    Q    If you could retake the witness stand.

2    A    Yes, sir.

3    Q    Now, you mentioned before about the void.  So

4  the marks are essentially from those red transfer marks

5  down; is that fair to say?

6    A    That's fair.

7    Q    There's no blood essentially -- and you correct

8  me if I'm saying something wrong -- there's no blood

9  above those transfer marks?

10    A    That's correct.

11    Q    I'm going to show you two photographs, one

12  being Commonwealth Exhibit No. 8, which we had

13  previously looked at and then Commonwealth Exhibit

14  No. 14.  They are two different views of Iris in her

15  home.  You note in the autopsy report something about

16  rigor.  What's rigor?

17    A    When you die your muscles become rigid or hard.

18  But that takes time.  When you first die you go limp

19  and everything just basically falls and conforms to the

20  object that you're falling on.  If you fall on the

21  floor, your arms and legs will conform to that pattern.

22  So then if I fall face down and you move my body and

23  have me on my side, after a number of hours, my arm

24  stays straight up in the air -- I'm dead -- defying

25  gravity.  Rigor mortis; that tells me the body has been

1  moved because it shouldn't defy gravity.  This is a

2  dead person.  They have no energy left.  It tells me

3  that the body has been moved from a different position

4  to where it is now.

5      Q    Or perhaps something that was propping up the

6  body has been moved?

7      A    That's a possibility, sure.

8      Q    When you look at that photograph -- we had a

9  witness just prior to you, Socorro Roman, who's stated

10  when she came in, that she noted -- she just said the

11  term rigor.  Do you note any of that from the

12  photographs that you see there?

13     A    Yes.

14     Q    What tells you that?

15     A    Both arms are up in the air and that indicates

16  to me that the muscles are rigid or rigor mortis is

17  present in the body.

18         MR. McCORMACK:  At this time, Your Honor, could

19  I publish to the jury Commonwealth Exhibit No. 8 and

20  also I move for the admission of Commonwealth Exhibit

21  No. 14, and ask to publish that also.

22         MR. MULLER:  You have no objection to the

23  admission of 14, right?

24         MR. MULLER:  That's correct.

25         THE COURT:  Let's discuss this at sidebar.

1          (Whereupon, Commonwealth Exhibit No. 14 is

2  admitted into the record.)

3          (A discussion is held at sidebar off the

4  record.)

5          THE COURT:   In accordance with our discussion,

6  go ahead with publication.

7  BY MR. McCORMACK:

8     Q    I want to start with Commonwealth Exhibit 8.

9  You mentioned about the arms.  Do you see that

10  evidenced here?

11    A    Yes.

12    Q    And would what you were saying also include the

13  hand, the way the hand is set?

14    A    It's projecting up in the air.  It should be

15  flopped down on the chest.  At this point in time it's

16  defying gravity.  That's an indicator that she's in a

17  different position and the left hand as well is up off

18  of the floor.

19    Q    I'm going to show you Commonwealth Exhibit

20  No. 14.  Again, we see both arms in this photograph and

21  we see the blood that you described earlier also; is

22  that correct?

23    A    That's true.

24    Q    On the hands?

25    A    That's true.

1    Q    And the left arm does that appear to be off,

2   above the carpet not laying flat on the carpet?

3    A    Yes.

4    Q    One thing I forgot to ask you, you noted that

5   when you were doing the exam of the body you started

6   out just doing an overview of the body.  You noticed

7   she only had two items of clothing on.

8    A    Correct.

9    Q    And that she had no underwear or pants,

10  anything like that on?

11   A    Correct.

12   Q    Did you do any examination to try to make a

13  determination whether there was any attempt or any

14  evidence of a sexual trauma or any evidence of trauma

15  on Iris's -- any part of her body?

16   A    Yes.

17   Q    Genitalia?

18   A    Yes.

19   Q    What did you find when you did that

20  examination?

21   A    I examined her breasts and I examined her

22  genitalia and anal rectal region.  I did sperm/semen

23  analysis, what we call a rape kit.  I examined the

24  inside of the legs for bruises and I didn't see any

25  trauma at all.  It's my understanding there was no

1  sperm or semen found as well.

2      Q   So you did, when you say a rape kit, you

3  actually took samples, took swabbings; is that correct?

4      A   I looked inside the vaginal introitus, inside

5  the rectal region, looked in the other areas.  I

6  examined for trauma or bruises or tears or lacerations,

7  and I also take swabs of the areas and put that on

8  glass slides and swabs were analyzed by the laboratory.

9      Q   Now, you also noted that you didn't notice any

10 bruising on the interior thighs either; is that

11 correct?

12     A   Right.  There's no bruising anywhere.

13     Q   And you noticed the same thing with the

14 breasts.  There was no bruising there?

15     A   No bruises to the breasts either.

16         MR. McCORMACK:  If I could have one moment,

17 Your Honor.

18         THE COURT:  Certainly.

19         MR. McCORMACK:  Your Honor, if we could

20 approach before I ask my next question.

21         THE COURT:  Sure.

22         (A discussion is held at sidebar off the

23 record.)

24 BY MR. McCORMACK:

25     Q   Now, doctor, as part of doing an autopsy and

 1  being a pathologist, did you reach an opinion, any

 2  opinions in this case?

 3      A    Yes.

 4      Q    Did you reach an opinion as to the cause of

 5  death?

 6      A    Yes, I did.

 7      Q    What was your opinion as to the cause of death?

 8      A    My opinion to a reasonable degree of medical

 9  certainty the cause of death is multiple gunshot wounds

10  to the head and other significant conditions would be

11  blunt trauma and strangulation.

12      Q    And the manner of death?

13      A    I reached that opinion to a reasonable degree

14  of medical certainty and that is a homicide.

15          MR. McCORMACK:  At this time I don't have any

16  further questions of Dr. Ross.

17          THE COURT:  Cross-examine.

18

19                    CROSS EXAMINATION

20

21  BY MR. MULLER:

22      Q    Dr. Ross, let's start there with your opinion.

23  The cause of death is multiple gunshot wounds.

24      A    Sure.

25      Q    So the strangulation isn't what killed her,

1  correct?

2      A    True.

3      Q    You would have been able to determine that

4  based on various factors?

5      A    Reasonably so.

6      Q    And blunt trauma that you talked about wasn't

7  the cause of death either?

8      A    True.

9      Q    Of the two gunshot wounds you're not able to

10 determine which was fired first?

11     A    Not with utmost scientific certainty; I can

12 give views but to answer your question not without most

13 certainty.

14          THE COURT:  Not to a reasonable degree of

15 medical certainty.

16          THE WITNESS:  Correct, not to a reasonable

17 degree of medical certainty.

18 BY MR. MULLER:

19     Q    As I understand it Commonwealth Exhibit No. 11

20 showing the bite mark on the back of the left wrist, as

21 I understand from your earlier testimony eventually

22 that was confirmed to be a bite mark, correct?

23     A    True.

24     Q    And when we talk about rigor, you told the jury

25 it takes time for rigor to set in?

1    A    True.

2    Q    It depends on various conditions though,

3 correct?

4    A    True.

5    Q    Whether the environment is warm, whether it's

6 cold, correct?

7    A    Environment is a key factor.

8    Q    How does that affect if it's warm?  Does rigor

9 set in faster or slower?

10    A    If it's warm rigor sets in faster.  If the

11 temperature, to answer your question, ambient

12 temperature is warm, the body is warm for any reason,

13 it will set in faster.

14    Q    And if it's cold it will set in slower?

15    A    Slower.

16    Q    Would taking the body temperature at the scene

17 or when it's discovered help determine time of death?

18    A    Not from my perspective.

19    Q    What would be utilized to determine time of

20 death?

21    A    The scene, by the police department, rigor

22 mortis and morbidity, you're referring to what -- blood

23 pools when you die and if you set in there for a

24 certain period of time or even before you set there, it

25 will blanch originally.  If I die forward then I move

1   the body backward and I press and I press around I'll

2   see blanching if it's within a couple of hours and the

3   blood will move from one area to the other, but if I'm

4   lying for a long period of time set to 12 hours or more

5   in one position it will stay fixed.

6       Q     When you say if, you're referring to what?

7       A     Morbidity.

8       Q     Taking the ambient temperature of the location

9   where the body is found and temperature of the body

10  itself, is not going to determine an approximate time

11  of death?

12      A     Not from our perspective.  I looked at

13  everything together in conjunction.

14      Q     I understand that.  What I'm asking, is that a

15  valid way of determining an approximate time of death

16  if what you have is if all of the ambient temperature

17  and the temperature of the body at the time of

18  discovery and nothing else, is it possible to determine

19  an approximate time of death?

20      A     In my opinion not to a reasonable degree of

21  medical certainty, degree of scientific certainty.  If

22  I can answer the question just people do temperature

23  probes.  I know the coroner's office has done

24  temperature probes and contrary to that view I don't

25  accept all the science.  I believe I would look at the

1  science.  I would testify about the science, testify

2  about all the other things.

3        I rely on the scene.  I rely on rigor and

4  morbidity.  I think they help me more than doing the

5  temperature probe.  I think it can be misguided.

6    Q    You don't agree with it but some people do?

7    A    I wouldn't put it in that vain.  I wouldn't put

8  it in this vain because there's science out there, but

9  that's my view.

10   Q    There was soot on the knuckles of the left

11 hand?

12   A    True.

13   Q    Now, was there any hope of getting some

14 stippling?

15   A    Stippling.

16   Q    Was there any stippling in the soot of the left

17 knuckles?

18   A    No.

19   Q    And you indicated which one had stippling

20 present on it?

21   A    Well, they both did and to answer your

22 question, yes.

23   Q    You talk about defensive wounds on her hands,

24 correct?

25   A    I did.

Q   Are you referring to just her hands, arms, anywhere else or just the hands?

A   Primarily the hands.

Q   She would have made contact with someone or something to incur those wounds?

A   True.

Q   I notice from some of the photographs of the hands she had a number of rings on her hands, correct?

A   She does.

Q   Back at the issue of rigor you indicated that the right hand when it was over the body, that it was unnatural because the wrist wasn't laying perfectly flat.  Is that essentially it?

A   It's up in the air.

Q   And the left hand or left arm, is somewhat up in the air too, correct?

A   Yes, up in the air.

Q   But not very far up in the air on that photograph?

A   A few inches up.

Q   Referring to Commonwealth Exhibit No. 8 is the photograph of her face and what you determined to be a gunshot wound to the cheek.

A   True.

Q   I believe it's the right cheek.  You indicated

1   that there was blood flowing uphill, correct?

2      A    True.

3      Q    Would that -- was it blood from the wound or

4   because I notice there was a lot of blood around the

5   nose and other side of the face or could you determine

6   it was blood coming from the other side when she was

7   laying down?

8      A    The blood was coming from the wound coming

9   forward uphill.

10     Q    You had nothing to do with determining what the

11  handprints are or whose they were or anything like

12  that?

13     A    True.

14     Q    You took the -- I guess you referred to as tape

15  lifts?

16     A    I did.

17     Q    And that would have been the palm of the hand

18  impression on the body?

19     A    The whole body, I tape up the whole body.

20     Q    How do you do that?

21     A    I have tape, a special kind of tape that I

22  express on the face, on the neck, and all the other

23  areas of the body and I put it on a plastic backing.

24     Q    And then what becomes of that?  I mean, what's

25  that used for?

1    A    I give it to the police department.  If they

2  deem to they have it analyzed for fibers and things of

3  that sort.

4    Q    And there was some reference to fingerprints as

5  well that were lifted?

6    A    We tried.

7    Q    What?

8    A    We tried.

9    Q    You tried?

10    A    The goal is you have the blood.  What is a

11  bloodstain?  I know it's blood.  I knew it was blood.

12  Two, I also used what we call a red fluorescent powder.

13  The police usually use black.  I use red florescent

14  powder.  I put it on there and in hopes I could raise

15  ridge detail because I was convinced they were hand

16  impressions.  If I could find enough ridges to make

17  print identification that was the goal.

18    Q    You indicated that you were convinced they are

19  hand impressions?

20    A    I was.

21    Q    I mean, did you go by the same criteria,

22  reasonable degree of medical certainty that it was a

23  handprint or you just -- you were convinced they were

24  handprints?

25    A    I would say in legal language they were

1   consistent with handprints.

2       Q    You yourself never went to the scene itself?

3       A    I had not gone to the scene.

4            MR. MULLER:  The Court's indulgence.

5            THE COURT:  Granted.

6            MR. MULLER:  I apologize, Your Honor.

7            THE COURT:  It's all right.

8            MR. MULLER:  That's all I have.

9            THE COURT:  Any redirect, Mr. McCormack?

10           MR. McCORMACK:  No redirect for Dr. Ross.

11           THE COURT:  Given the hour we'll break for

12  lunch.  We'll reconvene at 1:30.  Leave the notebooks

13  in the envelopes and pens, leave them on your chairs.

14  We'll pick them up and safeguard them over the lunch

15  hour.  But remember you may not discuss this case or

16  any of the testimony or evidence that you heard or seen

17  amongst yourselves or with anyone else.  Have a good

18  lunch.

19           (The jury exited the courtroom at 11:58 a.m.)

20

21

22

23

24

25

<u>Wednesday, September 14, 2005</u>

<u>Afternoon Session</u>


1

2

3

4        MR. MULLER:  Can we approach before the while

5   the jury comes in?

6        THE COURT:  Sure.

7        (A discussion is held at sidebar off the

8   record.)

9        THE COURT:  Once in every proceeding, ladies

10  and gentlemen, I like to beat you back into the

11  courtroom to show that you I can do that.

12        Welcome back from your lunch break.

13  Mr. McCormack, are you ready to proceed?

14        MR. McCORMACK:  Yes, I am, Your Honor.  At this

15  time I would ask Jeanette McCurdy to come forward.

16

17              JEANETTE McCURDY,

18  having been sworn, was examined and testified as

19  follows:

20

21              DIRECT EXAMINATION

22

23  BY MR. McCORMACK:

24   Q    Ma'am, can you tell us your name, please?

25   A    Jeanette McCurdy.

1    Q    Where do you live?

2    A    I live at 1940 and a half Kensington Street.

3    Q    Do you live close to Socorro Roman?

4    A    Yes.

5    Q    Does she have a nickname?

6    A    Cookie, two doors away.

7    Q    Did you live there back in 1996?

8    A    Yes.

9    Q    Your backyard, does it have anything behind it?

10   A    It was a garage.

11   Q    Do you know who Iris is?

12   A    Yes.

13   Q    Where was Iris living back in December of 1996?

14   Do you know where she was living?

15   A    Yes.  Her apartment was attached to my garage.

16   Those two buildings were attached.

17   Q    Ms. McCurdy, I'm going to show you an exhibit

18   which we have marked as Commonwealth Exhibit No. 15.

19   Can you take a look at that?

20   A    Yes, that's her apartment.

21   Q    Is that your garage?

22   A    This is the garage right here at 1940 and a

23   half.  It has the address on it.

24        MR. McCORMACK:  At this time I would move for

25   the admission of Commonwealth Exhibit No. 15.

1       MR. MULLER:  No objection.

2       THE COURT:  It's admitted.

3       (Whereupon, Commonwealth Exhibit No. 15 is

4  admitted into the record.)

5       MR. McCORMACK:  Could I briefly publish it to

6  the jury?

7       THE COURT:  Without objection?

8       MR. MULLER:  No objection.

9       THE COURT:  Thank you.

10  BY MR. McCORMACK:

11      Q    Ma'am, can you see that screen?

12      A    Yes.

13      Q    The garage as we look at this screen is the

14  brown part that says 1940 and a half?

15      A    Right.

16      Q    That's your garage?

17      A    Yeah.  That belongs to me and the apartment

18  belonged to the next door neighbor.

19      Q    And it doesn't -- looks like it's 1941?

20      A    Well, that's 1941.  That street which is like a

21  little alley that goes up is called McCleaster Street.

22      Q    Okay.  December 20, 1996, were you in your

23  backyard at some point during the day?

24      A    Yes, I was.  I was working a little bit out in

25  the yard cleaning it up.

1    Q    Do you recall at some point seeing something

2    that brings you into this courtroom here today?

3    A    Yes.  Someone -- the back door to her apartment

4    opened up.

5    Q    Is that different than the door we were just

6    looking at?

7    A    Yes.  It's the back door.  You go down the

8    steps and get out the back door.  It was hardly ever

9    used, but it was used that day.  It makes a noise when

10   it opens.  I looked up and saw a man and a woman coming

11   out and I said hello and she said hello.

12   Q    The man that you saw coming out, is that man in

13   the courtroom here today?

14   A    Yes.

15   Q    Could you point him out or describe what he's

16   wearing?

17   A    I see him from here.  He has on -- I don't know

18   if it's gray or a blue suit.

19        MR. MULLER:  We'll stipulate she's pointing to

20   the Defendant.

21        THE COURT:  The record will so reflect.

22   BY MR. McCORMACK:

23   Q    Ma'am, you have not -- as a witness you have

24   attended some previous hearings in this case?

25   A    Yes, that's right.

1    Q    And you had an opportunity to view a young

2    woman on the witness stand by the name of Guillermina

3    Cruz; is that correct?

4    A    That's right.

5    Q    Was Guillermina Cruz the person that you saw

6    this man with on that morning?

7    A    Well, it was a young girl and I saw the back of

8    her head okay.

9    Q    So you saw him exiting with a young girl?

10   A    Yes.

11   Q    And you saw the back of her head?

12   A    Yes.

13        THE COURT:  So the answer to the question,

14   you're not sure if that's who that young lady was, you

15   didn't get a good enough look?

16        THE WITNESS:  No, I didn't.

17   BY MR. McCORMACK:

18   Q    But he was with a young lady?

19   A    He was with a young lady, yes.  I did see her

20   when they had the temporary hearing and she testified.

21   Q    Okay.

22   A    Over on 29th Street, I can't think of the name.

23   Q    Like a district justice office?

24   A    Yeah.

25   Q    You're saying you saw that girl.  You can't

1  positively, as you sit here today, say that was the

2  same girl or are you saying that?

3    A    No.  I can't really positively say that.  All I

4  saw that day was the back of her head.

5    Q    But you did see him with a young girl?

6    A    Um-hum.

7    Q    You have to say yes or no.

8    A    Yes.

9    Q    Now, was there, except for the fact this was

10  unusual that somebody was coming out of that door at

11  that time, later on was there something a little bit

12  more exciting that happened?

13    A    Yes.  I saw smoke coming out of her apartment

14  at the bottom where they came out which is where the

15  kitchen and the bathroom are.  Okay, and Zach and

16  Cookie were over in Cookie's yard.  I yelled for Zach

17  that there was smoke coming out of his sister's

18  apartment, and he went over to check it right away.

19    Q    Were you ever asked to call 911 or anything

20  like that?

21    A    Yes, I called 911.

22    Q    Do you remember who asked you to call?

23    A    Yes, Cookie did.

24        MR. McCORMACK:  One moment, Your Honor.  They

25  are all the questions I have at this time, Your Honor.

1          THE COURT:  Cross-examine.

2

3                    CROSS EXAMINATION

4

5  BY MR. MULLER:

6      Q    How long have you lived at that address?

7      A    Since 1979.

8      Q    And do you recall what time you were outside

9  that day?

10     A    No, not exactly, but it was daylight.  I mean,

11 it was either, you know, early afternoon or morning, I

12 don't know which.

13     Q    You testified today that you were out back

14 cleaning up?

15     A    Yes.

16     Q    Do you recall talking to an investigator or

17 police officer the day this happened?

18     A    Yes, I did.

19     Q    You probably don't remember his name?

20     A    No, I don't.  I'm sorry.

21     Q    Was it a black gentleman?

22     A    I don't even remember that.

23     Q    For the record I'm referring to Investigator

24 Massey.  Do you recall telling him that between 12:15

25 and 12:30 you were in your backyard with your dog?

1      A     Well, that's possible because I have a dog and

2  I take her out in the backyard.

3      Q     And you gave another statement seven years

4  later around March 6 of 2003, I believe it was, with

5  Investigator Heffner and maybe someone from the State

6  Police.  Do you recall giving a statement in 2003?

7      A     No.

8      Q     You don't recall being down at the police

9  station to give another statement?

10     A     No.

11     Q     Back when you talked to Investigator Massey the

12 day of the incident, do you recall telling him at that

13 time that you were out back with your dog and that you

14 were confronted by Zach and Socorro, Socorro being

15 Ms. Roman or Cookie?

16     A     Yeah.

17     Q     And that they were asking you to call 911?

18     A     Yes.

19     Q     So the two of them came out or came over and

20 asked you to call 911?

21     A     They talked to me from the yard.

22     Q     Okay.  And then you told him that you went

23 inside and you called 911?

24     A     Yes, because I didn't have a portable phone.  I

25 had to go inside.

124

1    Q   You didn't tell them or you didn't tell

2 Investigator Massey back then that you had seen anyone,

3 correct?

4    A   I don't know.

5    Q   You didn't -- do you recall telling

6 Investigator Massey that you heard nothing out of the

7 ordinary and could offer nothing additional in the

8 interview?

9    A   Well, I meant I didn't hear anything unusual at

10 the house.  But when the door opened it made a loud

11 noise.  That's why I looked up.  That's why they hardly

12 ever use the back door.

13    Q   They hardly ever use it?

14    A   No.

15    Q   You were familiar with Iris, correct?

16    A   Yeah.

17    Q   Do you know how long she lived there?

18    A   No.

19    Q   Had it been a long time, a short time?

20    A   Well, it wasn't a long time.

21    Q   Now, in 2003 do you recall telling the police

22 that you were out in your yard pulling weeds when Zach

23 and --

24    A   Yeah, that's right.

25    Q   Do you recall what the weather was like that

1    day?

2        A    No.

3        Q    December 20th, was it cold?

4        A    I really can't tell you.  That's nine years

5    ago.

6        Q    I understand.  Now, in 2003 do you recall

7    telling the police then that you saw smoke coming out

8    and you ran or you --

9        A    I didn't have to run.  I just called Zach.

10       Q    So you called Zach.  Where was Zach?

11       A    He was over in the next yard, Cookie's yard.

12            THE COURT:  Called, you don't mean telephone

13   call.

14            THE WITNESS:  No.  I just called across the

15   yard.

16            THE COURT:  Okay.

17   BY MR. MULLER:

18       Q    Back in 1996 you didn't tell the police you had

19   seen -- that you had seen anyone coming in and out of

20   the apartment, correct?

21       A    I don't remember.

22       Q    And do you remember when you went to this

23   hearing at District Justice Zozos?

24       A    Yeah.

25       Q    And when was that?

1   A   I don't know the exact date.

2   Q   Do you know which year?

3   A   No.

4   Q   Was it a number of years ago?

5   A   Yeah, it was.

6   Q   And at that time Mr. Love was there, correct?

7   A   Yes.

8   Q   Probably sitting at a table not too different

9   than this?

10   A   Right.

11   Q   Identified as a Defendant?

12   A   Yes.

13   Q   Did you see him when he was living with Iris?

14   A   No, never.

15   Q   You never saw him?

16   A   No.

17   Q   How often did you go out back or go to your

18   garage, I mean, every day or --

19   A   Well, sometimes, yes, but see, the people who

20   lived in that garage, I'm sure they did it too, you

21   always went out the front way because it was easier and

22   you could park your car there and get in the car.

23   Q   So in 2003 did you go to the police or did

24   Detective Heffner come to you?

25   A   They came to me.

1    Q    At any time did you have Cookie's grandson with

2    you?

3    A    Yes, I did.

4    Q    That day?

5    A    Well, she brought him over and asked me to take

6    him.

7    Q    When did that occur?

8    A    Well, that was after they discovered that

9    something had happened to Iris.  She wanted to get him

10   over to her house or my house.  I mean, he was just a

11   little guy.

12   Q    We heard testimony that he was two years old?

13   A    That's right.

14   Q    How long did you have him?

15   A    I didn't have him very long because I gave him

16   to Rick; because he could better handle him than I

17   could.  I'm not accustomed to handling children.

18   Q    The hearing you went to at District Justice

19   Zozos' office, that was well before 2003; is that

20   right?

21   A    I don't know the exact date.

22   Q    Was it soon after this incident?

23   A    I don't think so, no.  I don't know.

24   Q    You don't know?

25   A    No.

1    Q    When you saw Mr. Love at that hearing, you

2  didn't go to the police then and tell them this story

3  about seeing him that day in the apartment, did you?

4    A    No.

5         MR. MULLER:  That's all I have.

6         THE COURT:  Redirect?

7

8               REDIRECT EXAMINATION

9

10 BY MR. McCORMACK:

11   Q    Ms. McCurdy, in the last couple of weeks you

12 and I talked over the phone a few times, correct?

13   A    Right.

14   Q    You expressed to me that you really didn't want

15 to come in here; is that correct?

16   A    That's right.

17   Q    In fact, you wanted to get your doctor to write

18 a note for you?

19   A    That's right.

20   Q    What were you going to try to get a note for?

21        MR. MULLER:  I'm going to object to relevance

22 at this point.

23        THE COURT:  What's the relevance to that?  How

24 is that within the scope?

25        MR. McCORMACK:  It's relevant, within the scope

```
 1   of cross.  He asked her did she go to the police and
 2   did the police after hearing that she had seen that man
 3   earlier rather than the police approaching her; she's
 4   really reluctant to be here.
 5           THE COURT:  Well, that's a fair question.  I
 6   think she made that clear the reason she went to the
 7   doctor, is not relevant.
 8           MR. McCORMACK:  That's fine.
 9   BY MR. McCORMACK:
10      Q    Now, you're indicating you weren't sure you had
11   given a statement.  I ask you to take a look at a
12   typewritten statement there and tell me if you
13   recognize that or any of the markings on it.
14      A    Yeah.
15      Q    If you could go to the last page, is that your
16   signature on the bottom of the last page?
17      A    Yes, it is.
18      Q    Now, you were asked a question on page 8 of
19   that, second question down, in fact I highlighted it.
20   Read that to yourself if you could.
21           MR. MULLER:  Mr. McCormack, where are you
22   referring her to?
23           THE WITNESS:  Yeah, that's right.
24   BY MR. McCORMACK:
25      Q    Had anyone from the police before 2003 ever
```

1  asked anything else about this case?

2      A    No.

3      Q    In fact, you were asked by Detective Heffner

4  why didn't you tell the police this before.  What was

5  your answer?

6      A    No one asked me.

7          MR. McCORMACK:  No further questions.

8          MR. MULLER:  Briefly.

9

10                  RECROSS EXAMINATION

11

12  BY MR. MULLER:

13      Q    The day of the incident Detective Massey spoke

14  to you and asked you what you knew, correct?

15      A    The day of the incident, yes.

16          MR. MULLER:  That's all I have.

17          MR. McCORMACK:  That's all.

18          THE COURT:  Thank you very much.

19          THE WITNESS:  You bet.  Thank you.

20          MR. McCORMACK:  Can Ms. McCurdy be excused?

21          MR. MULLER:  No objection.

22          THE COURT:  You're excused, Ms. McCurdy.  You

23  may leave.

24          MR. McCORMACK:  At this time I call Officer

25  Leroy Lucas.

LEROY LUCAS,

having been sworn, was examined and testified as

follows:


DIRECT EXAMINATION


BY MR. McCORMACK:

Q    Please state your name for us.

A    Leroy Paul Lucas.

Q    What do you do for a living?

A    I work for the Harrisburg Police Department

Criminal Investigation Division forensic unit.

Q    What does all that mean?

A    Well, the forensic unit processes major crime

scenes through photographs, searching for latent

fingerprints and the collection and preservation of all

evidence relating to a particular crime.

Q    How long have you been with the Harrisburg

Police Department?

A    Sixteen years and 14 years in forensics.

Q    Do you go through any special type of training

to be in forensics?

A    Numerous.

Q    Can you give us an example of some of the

training of your background?

1    A    Well, my education, I graduated from the

2    University of Pittsburgh, Pennsylvania law enforcement

3    academy down in Shippensburg and the FBI national

4    academy.   There were numerous Pennsylvania State Police

5    classes that I've attended for evidence collection,

6    fingerprinting, comparison of fingerprints, palm prints

7    and numerous other classes put on by various other law

8    enforcement organizations.

9    Q    Have you I'm assuming in your 16 years, 14

10   years in forensics, have you processed crime scenes in

11   the past?

12   A    Yes, I have.

13   Q    And prior to 1996 had you processed crime

14   scenes?

15   A    Prior to '96, yes.

16   Q    In this particular case did you process the

17   crime scene in this case?

18   A    Yes, I did.   I think it was December 20th I

19   received a phone call from our communications system at

20   my residence and they informed me of a homicide scene

21   at McCleaster Street, 1941 McCleaster Street, and had

22   requested that I respond to the scene and process the

23   scene.

24   Q    Now when you say you processed the scene, walk

25   us through what you would do.   You arrive.   Let's say

1    you go through the front door of this residence, what

2    do you do when you go in?

3    A    That's correct.  When you arrive on the scene,

4    outdoor scenes are usually taped off with police tape

5    so that no unauthorized personnel is within the crime

6    scene.  This particular scene was inside doors.  To my

7    recollection there was no crime scene tape outside the

8    residence.  There might have been a couple of officers

9    outside walking around to make sure no unauthorized

10   persons went to the residence.

11          Once I entered the residence, I spoke to I

12   believe it was Sargent Drobenak, Sergeant Woodring,

13   both retired since then and they briefed me on the

14   crime scene.

15          After briefing I believe Graham Hetrick the

16   county coroner was there, and one of his assistants,

17   Matthew Clark.  I spoke to them.  They showed me where

18   the deceased was and the rest of the crime scene and

19   after that I took photographs of the crime scene, the

20   entire crime scene which basically started -- not that

21   it started but where I started was the living room and

22   proceeded through the residence to the bedroom and then

23   downstairs to the kitchen.  I photographed the entire

24   house.  I assisted the county coroner with removing the

25   deceased from the scene and after that I collected all

1    the evidence that I needed to collect.

2        Q    Did you also photograph the scene?

3        A    Yes, I did.

4        Q    Can you tell us what you found when you arrived

5    at the scene just in general terms what the scene

6    looked like when you arrived?

7        A    Walking in the front door, I observed some

8    bloody shoe prints or footprints in the dining or

9    living room.  I observed a couple of mattresses by the

10   front door.  I believe there was a Christmas tree in

11   the living room, a couple of sofas; proceeding through

12   the residence from the living room to the bedroom, I

13   saw a bedroom that was disorganized, three mattresses

14   were laying on top of each other, clothes all over the

15   place, tipped over items and the deceased was laying on

16   the floor kind of in a north, northeast, southwest

17   direction.  She was laying on her back.  She was -- her

18   clothing was a T-shirt, gray T-shirt and a bra, and I

19   believe one sock which was on the right foot, a pair of

20   blue Jeans, clothes all over the place; some hair on

21   the floor.  I believe it was on -- I'm not quite sure

22   about that.  A stereo system that was knocked over.

23          Proceeding downstairs there was blood going

24   downstairs into the kitchen.  There's a landing area at

25   the bottom of the steps and in the kitchen there was I

1    think some food item that was on top of the stove.  The

2    stove was open.  There was a Clorox bottle sitting

3    beside the stove on the floor and blood on the floor,

4    refrigerator, cabinets, basically all over the place.

5        Q    What I'm going to do is, ask you to look at

6    some photographs.   Did you photograph the different

7    things that you were just describing for us?

8        A    Yes, I did.

9        Q    And typically before you pick something up,

10   before you physically go pick something up and put it

11   somewhere, what process do go through?

12       A    Well, you have Latex gloves on.  Sometimes I

13   place --

14       Q    Actually before that.

15       A    Yes.

16       Q    Is there a way you document the item where it

17   is found?

18       A    I usually write -- most items are -- all items

19   that I collected at this crime scene I believe were

20   placed in paper bags, and I put Playtex gloves on and

21   photographed.

22       Q    You photographed it before you pick it up?

23       A    Yes, to give an idea where the item is located

24   at.

25       Q    I'm going to walk you through the house and the

1  items that you noted and that you photographed in the

2  house.  I'm going to work through the house starting

3  down in the kitchen and working our way upstairs.  I'm

4  going to show you what has been marked as Commonwealth

5  Exhibit No. 2.  It's already been admitted and the jury

6  has already seen it.  You have described for us the

7  stove that you saw.  Does that appear to be the way

8  that you found it?

9       A    That was the way it appeared when I was at the

10  crime scene.

11      Q    So you photographed it the way you found it?

12      A    That's correct.

13      Q    Now, there was another photograph taken later,

14  another photograph taken at some time that -- this is

15  Commonwealth Exhibit No. 4 -- that shows the Clorox

16  bottle and the stove.  This is a photograph that's

17  already been admitted and was shown to the jury.

18  There's a Clorox bottle and the stove was closed.  Was

19  that the way you found it when you arrived at the

20  house?

21      A    You mean the stove door or the Clorox?

22      Q    The stove door closed, if you recall.

23      A    I don't recall.  I would have to look at the

24  negatives to see the sequence of the photographs.  I

25  have it, counselor.

1      Q    You're able to tell from the back?

2      A    Yes.  Exhibit No. 2 is photograph No. 3 of roll

3   five of six, and Exhibit No. 4 is photograph No. 9,

4   which is of roll five of six.  So this would be the

5   first, photographed the way I saw it, and after I

6   picked up the door to the stove you could see the

7   Clorox bottle.

8      Q    Okay.

9      A    So this is the first photograph, Exhibit 2, and

10  this would be the second one, Exhibit 4.

11          THE COURT:  You're saying you took all these

12  photographs?

13          THE WITNESS:  That's correct, Judge.

14  BY MR. McCORMACK:

15     Q    What you did, was the numbers you're talking

16  about written on the back of the photographs, three of

17  six would mean what, like, you gave us an R number,

18  what is that?

19     A    R-five is roll five of six.  There was six

20  rolls of photographs taken at the crime scene.  Both of

21  these exhibits are out of roll No. 5.

22     Q    I'm going to show you a series of photographs,

23  if you can look at them one at a time and tell us what

24  they are one at a time.  Look at them one at a time and

25  see if you recognize what they are then I'll ask you

1   some questions about that.  If you could read off the

2   exhibit numbers of each one you look at.

3           Okay?  Let's start with Exhibit 16, and can you

4   tell us what Exhibit 16 is.  In what room it was taken

5   and what evidentiary value.  Why did you take that

6   photograph?

7       A    Exhibit No. 16 is photograph No. 2 of roll four

8   of six.  It's a picture of the refrigerator and the

9   kitchen downstairs of McCleaster Street.  In the

10  photograph you can see a refrigerator with a ruler or

11  yardstick laying up against the refrigerator and some

12  blood spatter on the refrigerator.

13          MR. MULLER:  Objection to the term blood

14  spatter.  I assume at this point you're talking

15  suspected blood spatter.

16          THE WITNESS:  Suspected blood spatter.

17          THE COURT:  That's okay for cross examination.

18  I don't know if it's a basis for an objection.  We

19  already have the answer.

20  BY MR. McCORMACK:

21      Q    You've been a crime scene investigator for 14

22  years; is that correct?

23      A    That's correct.

24      Q    Why don't we run through each of the

25  photographs and identify what they are and then we'll

1  see if they appear to be accurate and correct.  We ask

2  permission to move them into evidence and show them to

3  the jury.

4      A    Exhibit No. 19, photograph No. 8, roll five of

5  six, this photograph depicts a yardstick on the floor

6  of the kitchen area of McCleaster Street along with

7  part of the refrigerator and two smaller rulers which

8  are laid on the side in front of the refrigerator.

9          Coming off of Exhibit No. 20 is a photograph,

10  No. 10, roll five of six.  It's a small ruler laying on

11  the kitchen floor of McCleaster Street.

12          Commonwealth Exhibit No. 21 is a photograph,

13  No. 11, roll five of six, which depicts the kitchen

14  area of McCleaster Street and the top left-hand corner

15  you can see part of a yardstick.  Commonwealth Exhibit

16  No. 18 is photograph No. 17, roll five of six, which

17  depicts the south wall, the floor, the kitchen floor of

18  McCleaster Street, which depicts a paper bag with some

19  products in it, a yardstick and two smaller measuring

20  sticks.

21          Commonwealth Exhibit No. 17 is photograph

22  No. 4, roll five of six, which depicts part of the

23  landing area at the bottom of the steps leading to the

24  kitchen, the south wall a yardstick and two smaller

25  measuring sticks remain on the floor of the kitchen

1  area.

2     Q     All right.  You recognized all of those

3  photographs?

4     A     Yes, I do.

5     Q     Are they photographs taken by you?

6     A     That's correct.

7     Q     And they accurately depict the crime scene as

8  you found it on December 20, 1996?

9     A     That's correct.

10        MR. McCORMACK:  I would move for the admission

11  at this time of Commonwealth Exhibit Nos. 16 through

12  21.

13        MR. MULLER:  No objection.

14        THE COURT:  They are admitted.

15        (Whereupon, Commonwealth Exhibit Nos. 16

16  through 21 are admitted into the record.)

17        MR. McCORMACK:  Can I publish these to the jury

18  by placing them up on the screen?

19        THE COURT:  Without objection.

20        MR. MULLER:  No objection.

21        THE COURT:  Please proceed.

22  BY MR. McCORMACK:

23     Q     I'm showing you Commonwealth Exhibit No. 16.

24  You had described the refrigerator, the point to where

25  there appears to be some blood on the refrigerator.

1    A    Here, here and here.

2    Q    For the record you pointed out three spots on

3    the refrigerator door that you identified as apparently

4    blood evidence at the scene.

5    A    That's correct.

6    Q    What's the purpose of a ruler?

7    A    To measure the distance from the floor to the

8    height of the suspected blood spatter.

9    Q    I'm going to show you Commonwealth Exhibit

10   No. 17.  What is Commonwealth Exhibit No. 17 again?

11   A    This area here is a landing at the bottom of

12   the steps leading from the bedroom down to the kitchen.

13   This is the kitchen floor.  This is the south wall of

14   the kitchen, and these are suspected blood droplets and

15   spatter, some over here; most of them are in here.

16   Q    I'm going to show you Exhibit 18.  Can you

17   describe what 18 is?

18   A    Which is the kitchen floor of McCleaster

19   Street; the yardstick.  This is the south wall.  This

20   is the paper bag with some products in it and two

21   little measuring yardsticks, with blood spatter most of

22   them in this area.

23   Q    I'm going to show you Commonwealth Exhibit 19.

24   What does 19 show?

25   A    It's the kitchen floor of McCleaster Street

1    depicting a part of the refrigerator, yardstick and a

2    couple of small measuring apparatus, right here, with

3    suspected blood and down in this area.

4         Q    Now, you just showed off to the left-hand side

5    as you look at the photograph, the left-hand side of

6    that photograph what you believe to be some suspected

7    blood, is that correct, right where you're pointing

8    right there?

9         A    Yes, that's correct.

10        Q    I'm going to show you Commonwealth Exhibit

11   No. 21.  That appears to be the same potential blood

12   evidence that you were just describing?

13        A    Appears, yes, that's correct.

14        Q    And Exhibit 20, does that appear to be a

15   closer --

16        A    Closer shot of the same area, yes.

17        Q    So you found blood in various areas of the

18   kitchen not just all in one concentrated area but

19   spread out within the kitchen?

20        A    That's correct.

21        Q    Now, I'm going to work you from the downstairs

22   kitchen up the stairs to the second floor of the house.

23   I'm going to show you Commonwealth Exhibit No. 25.  Do

24   you recognize Commonwealth Exhibit No. 25?

25        A    Yes.  This is the top of the stairs leading

1  down to the kitchen from the bedroom area.

2      Q    Were there things that you found or saw or

3  observed when you were in that house on the stairs and

4  the surrounding area?

5      A    Yes.

6      Q    What type of stuff did you observe?

7      A    I saw small suspected blood droplets and

8  spatter.

9      Q    I'm going to show you Commonwealth Exhibit

10 No. 24.

11     A    Yes.

12     Q    Do you recognize that?

13     A    Yes.  That's basically the same photograph with

14 a wider angle leading from the bedroom downstairs

15 towards the kitchen.

16     Q    Commonwealth Exhibit No. 23, where are we now

17 on the photograph?  First of all, do you recognize it?

18     A    Yes, I do.

19     Q    What is that a photograph of?

20     A    This is a photograph of the landing at the top

21 of the stairway, which is basically in the bedroom area

22 and it depicts a small scale in the photo with, I

23 believe -- I think maybe some blood droplets or hair.

24 I can't really pick out what that is.

25     Q    I'm going to show you Commonwealth Exhibit

1  No. 26.  Can you tell me where you believe -- what you
2  believe that photograph to be?
3      A    Yes.  This is just a close up of the last
4  photograph you looked at, Commonwealth Exhibit No. 23,
5  which is at the top of the stairs on the landing,
6  bedroom area leading down into the kitchen, and it
7  depicts a scale of what appears to be a tuft of hair.
8              THE COURT:  The scale being a small ruler type?
9              THE WITNESS:  That's correct, Your Honor.
10  BY MR. McCORMACK:
11      Q    Are you able to tell from that photograph or
12  location of where that was in the house?
13      A    It's right outside of the living room going to
14  the bedroom area at the top of the stairway.
15      Q    I'm going to show you Commonwealth Exhibit
16  No. 22.  Can you take a look at that?
17      A    Yes, sir.
18      Q    Can you tell me what that is?
19      A    It depicts a small measuring scale of what
20  appears to be a suspected blood droplet.
21      Q    I want to show you two exhibits, No. 28 and 27.
22  Did you as part of your duties as the forensics
23  selection person take measurement of the house and
24  later draw a diagram of the house?
25      A    Yes, I did.  I'm not quite sure of the date,

1    but I took the measurements and these are not to scale.

2    But they are depictions of the measurement for the rest

3    of us.

4        Q    I'm going to show you what has been admitted in

5    as Commonwealth Exhibit No. 3.  If you could work from

6    3 then forward what each of those are.

7        A    Commonwealth Exhibit No. 3 is a drawing of the

8    kitchen at McCleaster Street depicting countertops and

9    sink area, a bathroom, shower, sink, the rear door and

10   the steps, three steps.  I think there was maybe ten

11   steps going from the top to the bottom, but there's

12   only three here.  That's Commonwealth Exhibit No. 3.

13           THE COURT:  Can you hand that up, please?

14           THE WITNESS:  Commonwealth Exhibit No. 28 is

15   the bedroom area which depicts four steps leading down

16   into the kitchen area.  There's a -- the picture

17   indicates a door leading from the kitchen area, bedroom

18   area, two closets, and one window, and Commonwealth

19   Exhibit No. 27, depicts the living room area which in

20   the living room basically a scale of 15 feet by 9 by 12

21   feet 8, and there's a front door and there's a door

22   leading from the living room to the bedroom area as

23   well as to four other windows.

24       Q    You prepared these items that you're describing

25   now.  You're the one who drew these?

1    A    That's correct.

2    Q    Commonwealth Exhibit No. 3 is already in

3  evidence.  I would move for the admission of

4  Commonwealth Exhibit Nos. 27 and 28.

5         MR. MULLER:  No objection.

6         MR. McCORMACK:  And also 27 and 28 being the --

7  diagrams of the bedroom being 28; 27 being the living

8  room, and in photographs 22 through 26 I would also

9  move for admission of those photographs.

10        MR. MULLER:  No objection.

11        THE COURT:  They are all admitted.

12        (Whereupon, Commonwealth Exhibit Nos. 22

13  through 26, 27, 28 are admitted into the record.)

14        MR. McCORMACK:  With the Court's permission,

15  can I publish them to the jury?

16        THE COURT:  Without objection, I presume.

17        MR. MULLER:  Without objection.

18  BY MR. McCORMACK:

19    Q    I'll just quickly -- I'll place up Commonwealth

20  Exhibit No. 25.  These are the stairs that you were

21  describing; is that correct?

22    A    That's correct, that leads from the bedroom

23  down to the kitchen.

24    Q    It's hard to see from the darkness and

25  magnification of some of the spots, that's some of the

1  things that you are photographing that you were

2  referring to as possibly be blood?

3      A    That's correct.

4      Q    And there was also some potential blood along

5  that white side?

6      A    I think the first step has some, second step

7  and third step along the side there.

8      Q    I'm going to show you Commonwealth Exhibit

9  No. 23, a little bit more carpeted.  Is this the top of

10  the stairs?

11      A    That's correct, in the bedroom area.

12      Q    This would be considered in your mind the

13  bedroom area of the house?

14      A    That's correct.

15      Q    And you have one of those little ruler

16  measurement type of things there?

17      A    That's correct.

18      Q    And what is that a picture of?

19      A    You can see it's right here, a little hair

20  clump.

21      Q    I'm going to show you Commonwealth Exhibit

22  No. 26.  I can actually zoom out a little.  First you

23  said that this was somewhere in the vicinity of the top

24  of the stairs; is that correct?

25      A    That's correct.  This is the rug in the bedroom

1    and down here is the living room.  So you go from this

2    room into this room, bedroom.  This is a carpet at the

3    top of the stairs.

4         Q    The bedroom was carpeted; the living room was

5    not?

6         A    That's correct.

7         Q    Just to reference things for us, I'm going to

8    put up Commonwealth Exhibit No. 28.  Roughly where did

9    you find that clump of hair if you can first orient us?

10        A    Down here would be the living room area.

11   Here's the door from the living room into the bedroom.

12   This is would be the top of the landing, the rug and

13   this is all ruged (sic.) over here.  Closet, this was a

14   little closet over here; a window, steps leading down

15   to the kitchen, which is underneath this room here, and

16   the hair was found.  This is a landing at the top.

17   There's a landing also down here at the bottom of the

18   stairs but the clump of hair was found in this area

19   over here.

20        Q    Roughly above where it says door on that

21   picture?

22        A    That's correct.

23        Q    I'm going to put up Commonwealth Exhibit

24   No. 26.  Is this a magnification of that clump of hair

25   that you were describing?

```
 1    A    That's correct.

 2    Q    Now, the hair was collected; is that correct?

 3    A    Yes, sir, it was.

 4    Q    After the hair was collected, what happened to

 5  the hair?

 6    A    I took it back to the station up to our office,

 7  to the lab.  After I attended the autopsy collecting

 8  some hair from the victim, the hair that was collected

 9  from the crime scene and the hair that was collected

10  from the victim at the autopsy was sent out to the

11  Pennsylvania State Police lab for analysis.

12    Q    So at the autopsy you also collected -- you

13  were present at the autopsy?

14    A    Yes, I was.

15    Q    You collected hair and it was taken from Iris

16  Fennel's body?

17    A    Yes.

18    Q    And you sent both hair you collected at the

19  scene and hair from the body to be sent to the lab for

20  comparison?

21    A    Comparison, um-hum.

22    Q    Officer Lucas, I'm going to ask you,

23  collectively marked -- I marked the bag.  There are

24  items inside.  Tell us what those items are inside.

25         MR. McCORMACK:  Exhibit 40?
```

1        MR. McCORMACK:  I premarked some exhibits, some

2   of them are a little out of order.

3        THE WITNESS:  You just want these.

4   BY MR. McCORMACK:

5        Q    They appear to be -- well, you tell me, are

6   your initials or anything on there?

7        A    No.  My initials are not.  Evidently this is

8   the hair that was in the container that I collected

9   from the crime scene and once it got to the lab they

10  took the hair out of the container and put it on slides

11  and I assume that these are, since they are not opened,

12  are slides with the hair that I collected from the

13  crime scene.

14       Q    You didn't prepare those.  I'll wait for the

15  lab tech to ask her that.  But you initially collected

16  the items?

17       A    I collected the hair, put it in that container

18  and put it in that envelope and sealed it, sent it to

19  the lab.

20       Q    Moving into the bedroom, you observed, I

21  believe you already testified, you observed Iris's body

22  in the bedroom, correct?

23       A    That's correct.

24       Q    I'm going to show you Commonwealth Exhibit

25  No. 2.

1          MR. McCORMACK:  Can we approach, Your Honor,

2    very briefly?

3          THE COURT:  Sure.

4          (A discussion is held at sidebar off the

5    record.)

6    BY MR. McCORMACK:

7     Q    I'm showing you Commonwealth Exhibit No. 41

8    here.  Can you describe what that depicts?

9     A    This is a picture of the deceased in the

10   bedroom laying on her back in a northeast, southwest

11   direction, has a small scale laying on her chest and a

12   small closet area which depicted in the drawing with a

13   basket, bunch of papers, looks like videotapes.

14    Q    I'm placing back up -- you just mentioned small

15   closet.  In the bedroom diagram, are we talking about

16   the closet here in the north?

17    A    That's correct.

18    Q    Northeast corner?

19    A    That's correct.

20    Q    And that's in the area of where Iris's head was

21   found -- head was when you arrived?

22    A    That's correct.

23    Q    And I'm going to show you Commonwealth Exhibit

24   No. 14, previously marked and viewed by the jury.  Who

25   is that a photograph of?

1    A    It's a larger angle of the deceased depicting a

2  small scale on her left forearm area, measuring scale;

3  the same closet, basket, papers, partial deck of

4  playing cards, part of the mattress, and the deceased

5  on the floor.

6          THE COURT:  May I see it?

7  BY MR. McCORMACK:

8    Q    I'm going to show you Commonwealth Exhibit

9  No. 5.  Is Iris's body in that photograph?

10   A    Yes, sir.

11   Q    Now, it's covered with something; is that

12 correct?

13   A    That's correct.  It's covered with a maroon bed

14 sheet.

15   Q    Now, because --

16         MR. McCORMACK:  I can show this picture to the

17 jury again, Your Honor?

18         THE COURT:  Sure.

19         MR. MULLER:  No objection.

20 BY MR. McCORMACK:

21   Q    As you're standing taking this photograph

22 somewhere around where the top of the stairs or a

23 little bit past there --

24   A    That's correct.

25   Q    -- the wall that the stairs come up would be

1 behind you; is that correct?

2     A    Yes, that's correct.

3     Q    The little closet that you were just talking

4 about we just pointed to on the diagram, that's up on

5 the left center of the photograph a little bit?

6     A    That's correct.

7     Q    Do you see a little basket in there?

8     A    Yes.

9     Q    In this area right here?

10    A    That's correct.

11    Q    The blue object up front was that object there

12 when you were in the bedroom?

13    A    Yes.

14    Q    The weight bench?

15    A    Yes.

16    Q    Did you find any evidence by the weight bench?

17    A    I found some hair underneath the weight bench.

18 I also found, I think it was a 38 caliber cartridge.

19    Q    I'm going to show you Exhibit No. 29.  Do you

20 recognize Exhibit No. 29?

21    A    Yes, I do.

22    Q    And what is Exhibit 29 a photograph of?

23    A    It depicts a pocketbook, the coroner's gurney

24 with the deceased laying on it.  There's a hat.

25 There's an iron.  I believe that's a -- something on

1    the left side was a live 38 cartridge.

2       Q    I'm going to show you Commonwealth Exhibit

3    No. 42.  Could you look and see what that is?

4       A    Yes.  It's a live 38 Smith & Wesson Remington

5    cartridge.

6       Q    Does that appear to be the cartridge you just

7    described in the photograph that we were just looking

8    at, Exhibit 29?

9       A    That's correct.

10          MR. McCORMACK:  Your Honor, I move for the

11   admission of Exhibit 29, the photograph, and Exhibit

12   42, the actual shell itself.

13          MR. MULLER:  No objection.

14          THE COURT:  Both are admitted, 29 and 42.

15          (Whereupon, Commonwealth Exhibit Nos. 29 and 42

16   are admitted into the record.)

17          MR. McCORMACK:  That's correct.  Can I publish

18   the photograph to the jury?

19          MR. MULLER:  No objection.

20          THE COURT:  Sure.

21   BY MR. McCORMACK:

22      Q    The shell that you have with you, is that the

23   same shell as depicted in this photograph here?

24      A    Yes, it is.

25      Q    You had mentioned before that when you were in

1  the bedroom there was a television set.  You can't

2  recall whether the television was on or not.  You

3  photographed that bedroom?

4      A    Yes, I did.

5      Q    I'm going to show you Commonwealth Exhibit

6  No. 34.  Do you recognize what that is a photograph of?

7      A    It's a photograph of part of the bedroom, with

8  a wall leading down into the kitchen area; stereo

9  equipment, jacket, some equipment, television, and I'm

10  not quite sure what that black gray thing is.  It's

11  laying partially on the mattress.  I'm not sure what

12  that is.

13      Q    Is Exhibit 34 an accurate depiction of the

14  scene as you photographed it that day?

15      A    That's correct.

16          MR. McCORMACK:  I move for the admission of

17  Commonwealth Exhibit No. 34.

18          MR. MULLER:  No objection; no objection with

19  publishing it.

20          THE COURT:  Thank you.  It's admitted.

21          (Whereupon, Commonwealth Exhibit No. 34 is

22  admitted into the record.)

23  BY MR. McCORMACK:

24      Q    Does it appear that the television that you

25  photographed there is indeed on?

1    A    Yes.

2    Q    The stereo equipment, can you point out where

3  the stereo equipment was?

4    A    The stereo equipment, there's a piece here and

5  a piece over here, and I'm not sure if this is -- that

6  might be a DVD player or something.  I'm not quite

7  sure.

8    Q    I'm going to show you Exhibit No. 33.  Again

9  that's a photograph of the weight bench?

10   A    That's correct.

11   Q    And it also has a portion of one of the

12  mattresses next to it?

13   A    That's correct.

14   Q    Does it appear that the mattress has some blood

15  on it?

16   A    Yes.

17   Q    Is that an accurate depiction of the scene at

18  the time that you photographed it?

19   A    Yes, it is.

20        MR. McCORMACK:  The Commonwealth would move for

21  the admission of Commonwealth Exhibit No. 33.

22        MR. MULLER:  No objection; no objection to

23  publishing it.

24        THE COURT:  Thank you.  They are admitted.

25

1          (Whereupon, Commonwealth Exhibit No. 33 is

2     admitted into the record.)

3     BY MR. McCORMACK:

4          Q     So we can go through this, the blood that you

5     were just describing is here in the center of the

6     photograph?

7          A     Here and where the measuring apparatus is, and

8     I believe over in this area -- (indicating.)

9          Q     You had also mentioned before about gathering

10    hair in the area of the weight bench.  Do you see any

11    of that here?

12         A     Right in this area here -- (indicating.)

13         Q     Over in the -- next to the hat there?

14         A     That's correct.

15         Q     When you saw Iris's body you mentioned

16    something about one foot having a sock on it; is that

17    correct?

18         A     Yes.  I believe it was the --

19         Q     I'm going to show you Commonwealth Exhibit

20    No. 5.  Do you recognize Commonwealth Exhibit No. 5?

21         A     Yes, I do.

22         Q     Let me make sure that's the proper number on

23    that.  Actually let me get a different number.  Some of

24    these photographs were numbered for something else as

25    for the trial, Commonwealth Exhibit No. 43, is that the

1  sock that you described for the jury earlier in your

2  testimony?

3      A    That's correct.

4      Q    And does that accurately depict the scene of

5  her foot as you saw it on that date?

6      A    Yes, it does.

7          MR. McCORMACK:  I move for the admission of

8  Commonwealth Exhibit No. 43.

9          MR. MULLER:  Once again, no objection; no

10  objection to publishing it.

11         THE COURT:  Thank you.  It's admitted.

12         (Whereupon, Commonwealth Exhibit No. 43 is

13  admitted into the record.)

14         MR. MULLER:  The Court's indulgence.

15         MR. McCORMACK:  Your Honor, Mr. Muller and I

16  were discussing perhaps saving some time with the

17  photographs, ahead of time, put the photographs up --

18  move for their admission, if there's no objection, put

19  the photographs up and we can go right to the screen.

20         THE COURT:  I understand.  You have shared all

21  these photographs with each other before today?

22         MR. McCORMACK:  They have copies of the

23  photographs.

24         THE COURT:  If you have any objection you'll

25  make that known before they are displayed.

```
 1            MR. MULLER:  Exactly, Your Honor.
 2  BY MR. McCORMACK:
 3     Q    Is this the same mattress right next to the
 4  weight bench in the photograph we saw before?
 5     A    Yes.
 6     Q    It's a little bit further down the mattress?
 7     A    That's correct.
 8     Q    Her right foot was found in this position when
 9  you arrived; is that correct?
10     A    That's correct.
11            MR. McCORMACK:  I'm looking at 30.  This is
12  Commonwealth Exhibit No. 30.  I move for the admission
13  of Commonwealth Exhibit No. 30.
14            MR. MULLER:  No objection.
15            THE COURT:  It's admitted.
16            (Whereupon, Commonwealth Exhibit No. 30 is
17  admitted into the record.)
18  BY MR. McCORMACK:
19     Q    A portion of this photograph --
20            THE COURT:  To make our record clear, you see
21  them before they are displayed.  As soon as it's
22  displayed have it identified.
23            MR. McCORMACK:  That's what I plan on doing.
24  BY MR. McCORMACK:
25     Q    I placed a portion of that photograph up on the
```

DAUPHIN COUNTY COURT REPORTERS

1  screen.  Do you recognize what that is?

2      A    Yes.  That's the bedroom area of McCleaster

3  Street with the deceased.

4      Q    And it appears to be -- is it an accurate

5  photograph?

6      A    Yes, it is.

7      Q    Does it appear that was her left leg, the other

8  leg?

9      A    Yes.

10      Q    That one appears to be somewhat underneath or

11  obscured by the mattress?

12      A    That's correct.

13      Q    Up on the top of that photograph, do you see

14  the white object up there?

15      A    Yes.

16      Q    That white object up there, is that Iris's

17  other sock, if you recall?

18      A    I don't recall.  I thought the other sock was

19  down by her other leg.

20      Q    Did you notice or observe, when you were in the

21  house, any type of blood evidence up in this area here

22  of that bottom mattress or box spring?  I'm pointing

23  pretty much center top of the photograph there.

24      A    Yes.  That's how the scene was when I was

25  taking the photographs, and that appears to be blood.

1   There's a pool of blood on the top and like a smear or

2   drag mark from the pool of blood down across the

3   mattress.

4       Q    I'm going to show you a closer photograph and

5   ask if you recognize what this is for the record.

6   We're looking at Photograph No. 31.

7           MR. McCORMACK:  I would move for the admission

8   of that photograph at this time.

9           MR. MULLER:  No objection.

10          THE COURT:  It's admitted.

11          (Whereupon, Commonwealth Exhibit No. 31 is

12  admitted into the record.)

13  BY MR. McCORMACK:

14      Q    Is that a better view of that area of blood

15  that you were just discussing?

16      A    Yes.  It's basically the same photograph just a

17  different angle.

18      Q    Now you can see part of her foot?

19      A    Yes.

20      Q    And part of her foot there is partially under

21  the mattress there?

22      A    The heel area of the foot is under the

23  mattress, yes.

24      Q    I'm going to show you Commonwealth Exhibit

25  Nos. 44 and 45.  Do you recognize those two exhibits?

1    A    Yes, I do.  It's the bedroom area of the crime

2 scene.  Both photographs -- one depicts the deceased

3 and the other one, Exhibit 45, depicts two mattresses.

4 44 is with the deceased.

5            MR. McCORMACK:  I move for admission of

6 Commonwealth Exhibits 44 and 45.

7            MR. MULLER:  No objection.

8            THE COURT:  They are admitted.

9            (Whereupon, Commonwealth Exhibit Nos. 44 and 45

10 are admitted into the record.)

11 BY MR. McCORMACK:

12    Q    You mentioned before about the sock being

13 closer to the body.  Does it appear in this exhibit,

14 Commonwealth Exhibit No. 44, does that appear to be the

15 other sock that you said was next to the leg?

16    A    I believe so.

17            MR. McCORMACK:  At this time I would move for

18 the admission and I would ask the officer to identify

19 them, Commonwealth Exhibit Nos. 35, 36, 37, 38 and 39.

20 They are all photographs of the living room and I

21 shared them with counsel and it's my understanding he

22 has no objection to their admission.

23            MR. MULLER:  That's correct.

24            THE COURT:  They are admitted.  Thank you.

25

1          (Whereupon, Commonwealth Exhibit Nos. 35
2    through 39 are admitted into the record.)
3    BY MR. McCORMACK:
4        Q    I'm showing you Commonwealth Exhibit No. 35.
5    Do you recognize what this is a photograph of?
6        A    Yes, this is the living room area of McCleaster
7    Street leading into the bedroom.
8        Q    In the center of this photograph as depicted
9    right now I focused in over by where the blue vase is
10   above the one couch.
11       A    Yes.
12       Q    And next to the blue vase does that appear to
13   be a telephone?
14           MR. MULLER:  Your Honor, I would object to the
15   leading nature of some of these questions.
16           THE COURT:  Please try to avoid that.  I
17   understand you're doing it in the interest of time.
18   The witness must testify.
19           THE COURT:  Do you know what that item is that
20   Mr. McCormack pointed out?
21           THE WITNESS:  I really don't know what it is,
22   but it appears to be a telephone.
23   BY MR. McCORMACK:
24       Q    Just real quick, Commonwealth Exhibit No. 36,
25   you found some blood evidence.  Did you find any blood

1  evidence in the living room?

2      A    Yes.  There was some on the floor, some on that

3  vase that was just depicted in the previous picture and

4  some on the sofas.

5      Q    I'm showing you Commonwealth Exhibit No. 39.

6          MR. MULLER:  Can we go back?  What was No. 36?

7          MR. McCORMACK:  36 is this one.

8          MR. MULLER:  What is that?

9          THE WITNESS:  The sofa that would be on the

10  west side of the living room.

11         MR. MULLER:  Thank you.

12         THE WITNESS:  That would be the area leading --

13  that particular photograph or picture would be leading

14  into the bedroom.

15  BY MR. McCORMACK:

16     Q    You mentioned the blue vase.  I'm going to show

17  you Commonwealth Exhibit No. 39.  Do you recognize that

18  exhibit?

19     A    Yes, I do.  That's the blue vase that sits

20  above the sofa that was just depicted and with a small

21  measuring device on it measuring suspected blood on the

22  vase.

23     Q    I'm going to show you Commonwealth Exhibit

24  No. 38.  Do you recognize what that is?

25     A    Yes.  That's the front door to 1941 McCleaster

1    Street and two mattresses with the mirror by the front

2    door.

3        Q    Okay.  Now, you also collected some items, some

4    items at the scene, is that correct, in fact, many

5    items at the scene?

6        A    Many, many.

7        Q    We heard testimony from Dr. Ross of blood lifts

8    where he attempted to get a fingerprint off of the leg

9    area of Iris Fennel.  Were you present at the autopsy?

10       A    Yes, I was.

11       Q    You were present when he attempted to do that?

12       A    That's correct.

13       Q    You indicated that among the trainings that you

14   had you've been trained in fingerprint analysis?

15       A    That's correct.

16       Q    In fact, you do -- you were the primary person

17   who analyzed the fingerprints over at the Harrisburg

18   police?

19       A    Now, yes.

20       Q    I'm going to show you Commonwealth Exhibit

21   No. 46.  Do you recognize that?

22       A    It's a tape lift of the area I suppose Dr. Ross

23   testified to regarding latent prints on the right thigh

24   area of the deceased.

25       Q    Were you able to, your department able to do

1    anything with that?  Was there enough?

2         A    I'm not sure if it's a fingerprint.  It looks

3    like an impression.  There's certainly no pattern

4    recognition and any ridge detail that you can actually

5    do anything with it.  I'm not quite sure what it is.

6              THE COURT:  If we took a break right now, would

7    this give you an opportunity to premark some of these?

8    Why don't we do that.  You may step down.  We're going

9    to take our mid-afternoon break, ladies and gentlemen.

10   You know the drill already.  Books in the envelopes,

11   leave them on the chair.  Enjoy your break.  Don't talk

12   about this case or any evidence.  We'll see you back in

13   about 10 or 15.

14             (A brief recess is taken from 3:03 p.m. to

15   3:23 p.m.)

16             THE COURT:  Mr. McCormack, please proceed.

17   BY MR. McCORMACK:

18        Q    Now, I want to show you some exhibits, Exhibit

19   No. 48.

20             THE COURT:  Is my numbering off or are you

21   skipping No. 47?  That's fine.

22   BY MR. McCORMACK:

23        Q    I'll show you Exhibit No. 48.  Can you tell me

24   what Exhibit No. 48 is?

25        A    It's a voter registration card for Tyshaunt

DAUPHIN COUNTY COURT REPORTERS

1  Love.

2      Q     Where was that found?

3      A     It was found at the crime scene.  I'm not

4  exactly sure what room.

5      Q     I'm going to show you Commonwealth Exhibit

6  No. 47.  Can you take that item out of the bag?  Tell

7  us what that item is.

8      A     Exhibit 47 is a store receipt from the Giant

9  Food store, Store No. 9, dated 12/19/96.

10     Q     Dated 12/19/96, and what was the time that is

11  stamped on that?

12     A     The time is 2312 hours, which would be 11:12

13  hours at night.

14     Q     11:12 p.m.?

15     A     That's correct.

16     Q     I'm going to show you Commonwealth Exhibit

17  No. 49.  Actually I'll place this on top of the stack.

18  When you were at the autopsy -- let me ask you this,

19  when Iris's body was removed from the scene and taken

20  away by the coroner's office how is that done?

21     A     She was placed into a white body bag just by

22  lifting her up from the floor and put her in the body

23  bag, zipping the body bag, putting it on a carrier and

24  then carrying it out of the house.

25     Q     And when you were at the autopsy, was she then

1  removed from that bag?

2     A    Yes.  When the autopsy was conducted she was

3  taken out of the body bag and put on the table.

4     Q    When was Item 49, the exhibit there in front of

5  you, when was that discovered?

6     A    Item 49 was discovered at the autopsy when she

7  was taken out of the body bag.

8     Q    What is 49?

9     A    49 is a three of diamonds playing card.

10    Q    And where was it found?

11    A    It was found I believe on her back attached to

12 her clothing.  She had a small white type T-shirt on,

13 gray T-shirt.  I'm sorry.

14           MR. McCORMACK:  At this time I move for the

15 admission of Commonwealth Exhibit Nos. 47, 48 and 49.

16           MR. MULLER:  No objection.

17           THE COURT:  Did you already do 46?

18           MR. McCORMACK:  If I haven't moved for it, I

19 would move for the admission of Commonwealth Exhibit

20 No. 46.

21           MR. MULLER:  No objection.

22           THE COURT:  46, 47, 48 and 49 are all admitted.

23           (Whereupon, Commonwealth Exhibit Nos. 46, 47 48

24 and 49 are admitted into the record.)

25 BY MR. McCORMACK:

1    Q    We haven't brought them all into the courtroom.

2  You also gathered up items of clothing from Iris at the

3  autopsy?

4    A    At the autopsy, yes; there was one sock, a

5  brassiere, brown brassiere and short gray T-shirt.

6    Q    Did your department also gather evidence from

7  the Defendant in this case?

8    A    Yes.

9    Q    Your department, not necessarily you, but

10  you're aware of your department gathering some

11  evidence?

12    A    That's correct.

13    Q    And your Department also gathered some evidence

14  from a man by the name of LaQuan Williams?

15    A    Yes.

16    Q    All that evidence would have been processed

17  through you even if it was collected by someone else?

18    A    That's correct.

19        MR. McCORMACK:  Can I have one moment?  At this

20  time they are all the questions I have for Officer

21  Lucas.

22        THE COURT:  Cross-examine.

23

24

25

CROSS EXAMINATION

BY MR. MULLER:

Q    Do you recall when you arrived at the scene in your report?  Do you know?

A    It was the 20th of December.  I think around 1:30 in the afternoon, 1:32, something like that.

Q    You indicated there were a number of people present at that time?

A    That's correct.

Q    From your department?

A    Yes and the coroner's office.

Q    You were the only one taking the photographs?

A    I believe the coroner's office took some photographs but from our department, police department, I was the only one.

Q    Just so I'm clear, you took the photos right after, assuming after you got there?

A    That's correct.

Q    We've seen these photographs.  What's been described as suspected blood or blood spatter on various items and on the floor and things like that.

A    That's correct.

Q    You were responsible, for wont of a better term, collecting those, and how did you do that?

1    A    By using some of the suspected blood, may have
2  been wet, I just used a sterile small white cloth patch
3  to soak the blood up, put it in an air ventilated
4  container and put it in a bag.  The other blood that
5  might have been dry, I used distilled water and soaked
6  the patch and soaked up the blood.

7    Q    And that's the normal procedure for collection
8  of blood?

9    A    Yes.

10    Q    And what did you do --

11    A    You can do it with gloves and a pair of
12  tweezers and place it in the small container, place it
13  in the paper bag.

14    Q    What do you do with it after that?

15    A    After that I take them back to the lab, take
16  them out of the bag, put them on the counter and let
17  them dry out.

18    Q    Then what?

19    A    Then I packaged them, seal them up in bags,
20  small envelopes and send them off to the lab to be
21  analyzed.

22    Q    And when you said the lab, are we talking about
23  State Police lab?

24    A    Yes.

25    Q    That's what you did in this case as well?

1    A    Yes.  Whether I sent all of them out or not I'm

2    not quite sure looking at my report, but yes, that's

3    correct.

4    Q    So the various photographs we've seen that you

5    identified with suspected blood in these areas, those

6    are the areas you would have tested as well?

7    A    Maybe, maybe not; maybe just photographs of

8    areas where the measuring apparatus would have been to

9    kind of get an idea of how high or how wide the

10   suspected blood spatter would be.

11   Q    Okay.  For instance, I'm looking at

12   Commonwealth Exhibit No. 45, showing the blood on the

13   mattress.

14   A    Yes.

15   Q    Would you have tested that blood?  There's no

16   measuring device that's why I'm asking.

17   A    I think I cut a piece of mattress off.  I

18   probably cut that out rather than measuring it, and I

19   know I sent it to the lab.

20   Q    And the spots on the floors?

21   A    The spots on the floor, some of them might have

22   been collected, some maybe not.  The ones that I would

23   have collected, I believe all of the blood samples went

24   out to the lab.

25   Q    And I notice there's possibly some sort of

1  linoleum tiles in the kitchen.

2      A    Yes.

3      Q    Upstairs was carpet.  Would you cut out

4  sections of carpet to send out?  Did you just use your

5  process to retrieve the blood?

6      A    I don't recollect seeing any blood on the

7  carpet; maybe a small speck at the top of the stairs.

8  But other than that I don't really recall any blood on

9  the rug at all.

10     Q    You don't recall cutting out any samples from

11 the carpet?

12     A    I don't believe so.

13     Q    When you photographed Commonwealth Exhibit

14 No. 2, was the photograph of the stove with the door

15 open --

16     A    Yes.

17     Q    -- I believe you indicated that's how you found

18 it.  Did you -- was there something still in the oven

19 that you recall?

20     A    Not that I recall.  I remember somebody telling

21 me at the scene when I first arrived that something was

22 in the oven and it was burning and creating smoke; not

23 at the time that they got there or when I got there

24 prior.

25     Q    Whatever was in the oven had been removed by

1    the time you got there to photograph it?

2        A    Definitely.

3        Q    Other than the photograph that I'm showing you,

4    Commonwealth Exhibit No. 2, were there -- I mean, did

5    you take close-up photos of any of the other items in

6    general, the only photo that you took of that area?

7        A    In the kitchen?

8        Q    Yes.

9        A    On the --

10       Q    On the stove.

11       A    I have to look through all the photographs, but

12   I think basically it was that one and the one with the

13   door closed, maybe one other one.

14       Q    You're referring to Commonwealth Exhibit No. 4?

15       A    That's correct, yeah.

16       Q    I assume you're the one that closed the door to

17   get that photograph?

18       A    I probably did, yes.

19       Q    When -- from your Photograph No. 34, for

20   instance, the one with the television and some other

21   items --

22       A    Yes.

23       Q    -- what I'm looking at in this photograph,

24   where is that on the diagram?  I mean, would it be back

25   in this corner?

1     A    The TV?

2     Q    Yes.

3     A    I believe it's -- if I could see the photo;

4  again, I think it's right in this area here.

5     Q    I mean, would this be the bannister?

6     A    This is the bannister here -- (indicating) --

7  which goes right here.  The stereo system down in this

8  area, here is the TV, the mattresses.

9     Q    When we talk about the mattresses they are

10  generally in this area?

11     A    Yes.  The weight bench was like over in here --

12  (indicating) -- and some clothing hanging on this wall

13  here, jackets, whatnot, mattresses would have been in

14  this area here -- (indicating.)

15     Q    By looking at some of the photos, I'm not sure

16  if there's a photograph of this area directly.  What I

17  want to ask --

18     A    I don't believe.  I think maybe one of the

19  photographs depicts maybe just part of this area here

20  but nothing over in this area.  I don't think so.

21     Q    I'm looking at Commonwealth Exhibit No. 31, for

22  example, and it looks like the mattress is up against

23  the wall.  Could you show me which wall the mattress is

24  up against?

25     A    This one here -- (indicating.)

1     Q     It doesn't look like there's any room there.
2 It's right up against the wall?

3     A     At least the one corner of it is.

4     Q     And do you recall was there much space over
5 here?  (Indicating.)

6     A     Not really.  It's a pretty small room.

7     Q     I'll refer you back to 34.  The television;
8 there's a radiator there.

9     A     The radiator is up in this area right here --
10 (indicating.)

11     Q     Then it looks like a very narrow gap where all
12 that is and the mattresses?

13     A     With the mattresses and radiator it's very
14 small.

15          (Whereupon, a Photograph is produced and marked
16 for identification as Defendant's Exhibit No. 1.)

17 BY MR. MULLER:

18     Q     I'm going to show you Defense Exhibit 1 and ask
19 if you recognize that.

20     A     Yes.  This is the bedroom of the deceased.

21     Q     What area does that show?  Could you just point
22 it out on the diagram?

23     A     It shows this area up in here -- (indicating.)
24 It shows part of the radiator, part of the window and
25 some of it shows all three of the mattresses.

1    Q    You have measurements on this diagram, correct?

2    A    What's that, sir?

3    Q    You have measurements of the room on the

4 diagram?

5    A    Yes.

6    Q    And the east wall, I guess this would be -- how

7 long is that?

8    A    It looks like 7 foot 7 inches.  I can't see it

9 from here.  From this corner here down to here is 7

10 feet 7 inches.  Here to here is 2 feet 1 inch, and from

11 here to here is 2 feet.

12    Q    So approximately a little over 11 feet?

13    A    7, 8, 9, 10, 11 feet 1 inch -- or 8 inch.

14         MR. MULLER:  For the record I move for the

15 admission of Defense Exhibit 1.

16         MR. McCORMACK:  No objection.

17         THE COURT:  It's admitted.

18         (Whereupon, Defendant Exhibit No. 1 is admitted

19 into the record.)

20         MR. MULLER:  Do you have any objection to

21 publishing it?

22         MR. McCORMACK:  No.

23 BY MR. MULLER:

24    Q    What's showing right now is what you just

25 identified as that corner?

1    A    That's correct.

2    Q    You said on direct that there was a -- there

3    were bloody footprints in the living room?

4    A    Shoe prints or sneaker prints or boot prints

5    whatever they were.

6    Q    Were they bloody?  Was there a blood tread

7    mark?

8    A    Yes.

9    Q    Did you take any sample of that?

10    A    Sample of the blood?

11    Q    Yes.

12    A    I can't recollect.

13    Q    Did you photograph it?

14    A    Yes.

15    Q    And what did you do with those photographs

16    then?  Did they go to anyone?

17    A    Just into the case file; I assume everybody has

18    a copy of them.

19    Q    As I understand it, the hair you found was that

20    small clump at the top of the stairs and some of it

21    under the weight bench?

22    A    That's correct.

23    Q    And that's what you collected as samples of the

24    hair?

25    A    From the crime scene, yes.

1    Q    And that was sent off to the Pennsylvania State
2  Police lab as well?
3    A    Yes, it was.
4    Q    This live 38 cartridge found near or under the
5  weight bench, was that processed for fingerprints?
6    A    Yes, it was.
7    Q    Were you the one who processed it for
8  fingerprints?
9    A    Yes, I did.
10   Q    What was the result of that?
11   A    No latent fingerprints were developed from the
12  cartridge.
13   Q    Just if you could explain what that means.
14   A    A latent fingerprint is the hidden -- basically
15  it's a hidden print.  You can't see it.  So if you use
16  a paper or this item here, which was Exhibit No. 42, it
17  would be super glued and if there were any latent
18  prints on there it would be developed by the superglue,
19  and in order to collect those you would have to use a
20  powder or a chemical to collect the latent off there,
21  and the latent is basically a hidden fingerprint, you
22  can't see it.  So this was processed with a superglue
23  process.  If there was a latent on there it would
24  become white, you would photograph it, you would
25  collect it off the casings.  If you have a suspect,

1 compare the latent fingerprint from the cartridge to

2 the suspect fingerprint.

3     Q    As you indicated you found no prints?

4     A    That's correct.

5     Q    Is there any more advanced procedure to examine

6 that at another lab aside from what you just described?

7     A    No.

8     Q    After -- let me, the blood lift that was

9 introduced with the suspected blood lift from the right

10 thigh No. 46 --

11     A    Yes.

12     Q    -- what was done with that?  Was that also sent

13 to the Pennsylvania State Police or you just had

14 that --

15     A    No.  Through the years of my doing fingerprint

16 comparisons and analysis there was no need to send it

17 any place.  There's no ridge detail or pattern

18 configuration to it, and I'm not quite sure whether

19 it's even a fingerprint.  It's certainly an indentation

20 on the victim's thigh area, but whether it's an

21 indentation from somebody putting their finger or palm

22 print on there, I don't know because there's nothing

23 there.

24     Q    After the body is moved, do you also photograph

25 anything?

1    A    Basically no.  Once a body is removed I go

2  around and collect the evidence that I've already

3  photographed and basically release the scene.

4    Q    Commonwealth Exhibit No. 48 was introduced,

5  referred to a voter registration card?

6    A    Yes.

7    Q    I was a little confused.  You're the one who

8  collected that from the scene?

9    A    I probably did.

10    Q    Do you recall where?

11    A    No, I don't.  I was looking through the

12  photographs this morning.  I really don't see anything

13  in the photographs of all the 206 photos that were

14  taken pictures of that voter registration card.  I'm

15  not quite sure why I didn't photograph it, but I

16  collected it from the scene.

17    Q    Fair enough.  Your property report indicates

18  tape lifts were taken from other areas of the victim.

19  Is that something you did?

20    A    Dr. Ross would have done that at the autopsy.

21    Q    And would they have been turned over to you at

22  that point?

23    A    I would have collected them and taken them back

24  to the office, to our lab, prepared the necessary PSP

25  lab sheet for comparison of hairs or fibers.

1     Q    Is that -- is that what the tape lifts were

2  for, hairs and fibers?

3     A    That's correct.

4     Q    You indicated you collected some clothing items

5  from Ms. Belcher at the autopsy?

6     A    Yes, three pieces I believe.

7     Q    And did you collect any clothing items from the

8  apartment itself?

9     A    I have to look in my property record.  I don't

10  think so.  There was some clothing that was hanging on

11  the wall, like a jacket, that may have had suspected

12  blood on it.  I may have collected that, but I don't

13  think anything else.  I have to look in my property

14  record.

15     Q    Okay.

16          MR. MULLER:  That's all I have.

17          THE COURT:  Any redirect, Mr. McCormack?

18          MR. McCORMACK:  No, Your Honor.

19          THE COURT:  All right.  Officer, you may step

20  down.

21          THE WITNESS:  Thank you, Judge.

22          MR. McCORMACK:  Your Honor, at this time I

23  would call Michael Kurtz.

24

25

1    MICHAEL KURTZ,

2  having been sworn, was examined and testified as

3  follows:

4

5    DIRECT EXAMINATION
     (On Qualifications)

6

7  BY MR. McCORMACK:

8    Q    Could you please state your name?

9    A    Michael John Kurtz, K-U-R-T-Z.

10   Q    And, Mr. Kurtz, by whom are you employed?

11   A    I am employed by the Commonwealth of

12  Pennsylvania at the Pennsylvania State Police DNA

13  laboratory in Greensburg.

14       MR. McCORMACK:  Your Honor, with the Court's

15  permission because Mr. Kurtz has come all the way from

16  Greensburg, myself and Mr. Muller discussed we agreed

17  he can be taken out of order of witnesses.

18       THE COURT:  That's fine.

19  BY MR. McCORMACK:

20   Q    I'm going to ask you a few questions about your

21  background, actually a little bit about your training.

22   A    I have a bachelor of science degree from the

23  University of St. Francis in biology.  I have graduate

24  degrees, electives, in biology from the University of

25  Virginia through the FBI Academy.  I have completed an

1   extensive training program of hundreds of samples

2   covering a six-month period at the Pennsylvania State

3   Police DNA laboratory prior to my starting case work.

4   I've been a case work analyst for approximately 12

5   years and I am a supervisor at the DNA laboratory.

6           MR. McCORMACK:  Your Honor, I would offer

7   Mr. Kurtz as an expert in the field of DNA analysis.

8           MR. MULLER:  I have no questions.  I have no

9   objection.

10          THE COURT:  Good.  We'll accept Mr. Kurtz as an

11  expert as offered.  Please proceed.

12

13                  DIRECT EXAMINATION

14

15  BY MR. McCORMACK:

16      Q    What are your specific duties at the

17  laboratory?

18      A    I'm a supervisor.  I supervisor eight forensic

19  scientists.  Additionally I do case work, that is, I

20  analyze cases; administrator duty laboratory safety

21  officer I conduct training of new employees.

22          I mean, I would assume most people have heard

23  of DNA and have seen it on television, especially the

24  TV shows we have today.

25      Q    Give us very brief, what is DNA?

1    A    DNA is a biochemical component found in every

2  cell that has a nucleus.  It determines the genetic

3  makeup of who you are.  It determines your physical

4  characteristics.  99 percent -- 98, 99 percent of DNA

5  we have is the same.  We all have two hands, two eyes,

6  two feet.  There are some differences because of hair

7  color.  These are regions of DNA that do not provide a

8  code for hair color, just space between the coding

9  regions.  We have found that in those coding regions

10  they vary by length from person to person.  We can

11  measure that length.  We look at 16 different sites, 16

12  different chromosomes.  By that we can go and develop a

13  profile for the DNA and see if it would match a known

14  sample, would match to an evidentiary sample, for

15  example.

16    Q    Is that what's sometimes called a DNA

17  fingerprint?

18    A    Sometimes they call it a fingerprint.  It's

19  more a profile than a fingerprint.

20    Q    When you're looking at the gene or when you're

21  looking at the chromosomes --

22    A    Let me give you an example of how it works.

23  The DNA has a base,  and these basis repeat.  Let's say

24  you have a sequence that repeats itself, C-A-T.  In my

25  gene chromosome one at a certain spot, C-A-T may repeat

1    itself at seven times and maybe eight times to the

2    other.  We get one from each parent.  It may repeat ten

3    times on one chromosome and 12 times on the other.

4         My type would be, that would be a 7/8.  His

5    type would be a 12/13, and at different sites along

6    different chromosomes different repeats, repeat

7    different number of times.  When you have that many

8    repeats you can go and develop a profile that is very

9    discriminating in nature.

10   Q    So these are known areas.  These are areas that

11   are known to scientists to go and to look and these

12   patterns will appear?

13   A    That is correct.

14   Q    And it's the number of times that these

15   patterns appear that gives you the numbers that you

16   just said like 7/8; is that correct?

17   A    That's correct.  It's an indication of the

18   length of the chromosome.  The area that we're looking

19   at seven repeats of a sequence is shorter than ten

20   repeats.  We can separate that out.  We separate that

21   out through our process.

22   Q    What's your process?

23   A    Basically what we do, we go and extract the DNA

24   out of the cell.  Think about like washing clothes,

25   take a sample, a stain, we put in another solution,

1   apply a warm water bath.  After we get the DNA
2   extracted the areas we want to look at we go and tag or
3   mark with a fluorescent -- and we make numerous copies
4   of that so we can go and have enough of that area to
5   see.  It is separated out in a jell or a small tube.
6   Smaller amounts of the DNA get through faster than a
7   larger amount.  Smaller sizes migrate quicker than the
8   larger ones, like a marathon race, the guys who are
9   really professional get out front and guys like me, if
10  I were there, would be bringing up the rear.  So you
11  have a separation of the fragments, and we can identify
12  that as those fragments come across the window.
13  There's a laser light that comes in, hits that tag I
14  told you about, gives off a color and the computer
15  picks up that color and then we can go and analyze the
16  length by which it comes across that window.
17      Q   Do you actually have like a, for lack of a
18  better term, like a pan with this jell in it?  How is
19  the jell set up?
20      A   The jell actually is -- it's vertical jell.  It
21  sits, runs up and down.  Some of the older jells were
22  horizontal.  In our case we run vertical jell.  Clamp
23  the jell buffer tray on the top and the buffer tray on
24  the bottom.  What you do, the jell has little wells in
25  it.  You take your samples of DNA, put each in the

1  wells.  It's subject to an electric current.  DNA has a

2  negative charge so it will migrate through the jell

3  toward the positive charge.  It's the make up of the

4  jell that restricts how the DNA -- how fast it moves

5  through the jell.

6      Q    You said the small ones go down from the

7  positive to the negative faster?

8      A    Yes.

9      Q    And that's what you look how far they go in the

10  jell?

11     A    As they are coming across you see them coming

12  across.  Scan No. 25, this one came off.  Scan No. 30,

13  this one came off, all the way down the line.  There

14  also is a ladder that tells you, okay, this is 50 base

15  pairs.  This is a hundred in length, 150 in length,

16  yellow comes off between 50 and a hundred.  It's a 75

17  length.  That's how you measure the size of the

18  fragment you're measuring.

19     Q    That's the process that you go through to get

20  to your analysis?

21     A    That is correct.  We have computers that assist

22  us in doing this.

23     Q    Are there different types of DNA testing?  We

24  just don't hear about DNA testing.  Has it evolved over

25  time?

1      A    Yes, it has.  Back in the early '90s the

2   primary testing was known as restriction fragment

3   length polymorphisms.  What that was, basically the

4   same technique we're using now.  The fragments were

5   extremely long.  You needed a lot of DNA to go and do

6   that process.  Today I can get DNA out of a single head

7   hair.  For example, where in 1996 that would not have

8   been a sufficient quantity to go and do the testing.

9   Another type of testing followed known as a polymarker.

10  What that did was specific changes in sequence in the

11  chromosome.  For example, you can have T-H-E-I-R,

12  T-H-E-R-E or T-H-E-Y-'-R-E.  All different words but

13  they all sound alike.  Certain spots, chromosomes might

14  be just different speaking of what was in that area,

15  and they can go and isolate and determine that then we

16  have now what is known as PCR, Polymerase Chain

17  Reaction, short tandem repeats.  What we're doing is

18  the same as RFLP but we use a much smaller range and we

19  need much, much less material or material that may have

20  been exposed to weather or extremes in environment and

21  has been degraded somewhat.  We can then go and get

22  information from this we would never have gotten

23  before.

24      Q    The bottom line is between the early 90's and

25  2000 we've come a long way as you can do a lot more

1    with a smaller sample today than you would have back in

2    1996?

3        A    That is correct.  That is correct.

4        Q    In this particular case, was the Pennsylvania

5    State Police laboratory, were you -- were you working

6    in the laboratory in 1996?

7        A    Yes, I was.

8        Q    Were you asked to examine DNA at that

9    particular time in this case?

10       A    Yes, I was.

11       Q    Did you bring your results from that?

12       A    Yes, I did.

13       Q    What in particular were you looking at in 1996?

14       A    In this case we received three known reference

15   standards, Item K1 was from Iris Fennel.  Item K2 or

16   Known 2, was taken from Tyshaunt J. Love, and Item K3

17   was taken from Rasheed L. Williams.

18            Additionally we received a stain from a blue

19   and black knit ski hat, which was K1.  Q2 was a stain

20   from the metal hook and shoelace from a Timberland

21   hiking shoe and a stain sample cut off a white T-shirt.

22   Q3 or Question 3 --

23       Q    When you're doing this testing, you don't

24   know -- you don't have the names, you don't know who

25   any of these people are or how they relate to anything?

1    A    Other than they may have been identified as a,
2  you know, the victim or somebody that was involved in
3  the case, elimination standard, but I get very little
4  information on the background of the case.

5    Q    What type of testing was done in -- actually I
6  made a mistake.  Back in 1997 the report you're
7  referring to now is September 12, 1997; is that
8  correct?

9    A    That's correct.

10    Q    What type of testing did you do back then?

11    A    Polymarker testing and RFLP testing on
12  different ones of the samples.

13    Q    RFLP is the older of the two?

14    A    That's correct.

15    Q    PCR is the newer?

16    A    Polymarker was a type of PCR testing, that's
17  correct.

18    Q    When you did the testing back in 1997, did you
19  have any type of matches at that particular time?

20    A    Yes, I did.  I had the specimen from Item K1,
21  the blood sample from Iris Fennel, matched the DNA from
22  the specimen Item Q2, which was a sample taken from the
23  metal hook and shoelace on a Timberland hiking shoe and
24  at that point in time the rarity of the sample, of the
25  profile developed was approximately one in 23,800 from

1   the Caucasian population; approximately one in 600 from

2   the African American population; approximately one in

3   8,200 from the Hispanic population.

4       Q    You just threw statistics out on us.  I get the

5   impression when I watch television that if there's DNA

6   he says said this is it positively.  Is that the way it

7   really works?

8       A    It gives you rarity of the profile.  In this

9   case you could use a small amount of sample; however,

10  there was very few low sites or areas looked at.  What

11  you do, you go get as much discrimination power as the

12  newer technique where you look at 16 areas.  In this

13  case we looked at only 6 sites so you don't -- it's not

14  very discriminating.  However, you can get results off

15  of that that you would not have been able to get off

16  RFLP.  There was not a sufficient amount of DNA to do

17  that.

18      Q    The statistics that you said one in 23,800 in a

19  Caucasian population, what does that mean?

20      A    That is the expected rate of occurrence of that

21  profile in the Caucasian population using a data base

22  of unrelated people.

23      Q    One of the data bases that was collected at the

24  one in 23,800, this could show up in this pattern?

25      A    When I say that data base, what we did was, we

1   collected 150 samples, typed them and that gives us a

2   frequency of the different alleles or types that are

3   there, and once you do that you know that it's like 40

4   percent of the population is possibly blood type O.

5   We see blood type O, 40 percent of the people having

6   it.

7        In this case what happens, you determine a

8   frequency for each type at each site and then once you

9   know that you can multiple across those sites and that

10  will go and provide you generally how rare that profile

11  is.  So again it's not a very discriminating system

12  because you're not looking at the number of sites and

13  there's only a few alleles or types there so you don't

14  get a lot of discrimination.

15       Q    The number for the African American population,

16  one in 600, that's not really a very high number or a

17  rare typing; is that correct?

18       A    That is correct.

19       Q    You might find -- in the general population you

20  might find somebody else, with that population sort of

21  a one in 600 chance of finding someone else?

22       A    That's correct.

23       Q    Now, you told the jury that there's some

24  progress made in DNA and, in fact, the Harrisburg

25  police back in 2001 requested, actually at the end of

1    2000, the Harrisburg police requested that your

2    laboratory retest this evidence with the new

3    procedures?

4         A    Yes, we did.

5         Q    And do you have those results here with you?

6         A    Yes, I do.

7         Q    And again what items did you test in 2000,

8    2001?

9         A    We tested the metal hook and shoelace from the

10   Timberland hiking shoe.  After the original testing

11   whatever remaining DNA was there was saved and dried

12   down that also was retested.  We had a stain sample

13   from the lower front of Iris Fennel's T-shirt; the

14   stain sample cut from Iris Fennel's white sock was also

15   tested, and also we redid the known standards under the

16   new system.

17        Q    What did you find in this test?

18        A    In this test the blood sample from Iris Fennel,

19   Item K1, matched the profile from the metal hook and

20   shoelace from the Timberland hiking shoes.  That was

21   identified as Q2.  The stain sample cut from the Iris

22   Fennel's T-shirt, Q4, and the stain sample cut from the

23   sole of the white sock, Item Q5, all 16 sites that we

24   looked at and the probably of randomly selecting how

25   rare this profile is across 16 sites is one in 6.3

1  quintillion from the Caucasian population; one in 1.2

2  quintillion from the African American population; and

3  approximately one in 1.1 quintillion from the Hispanic

4  population.

5      Q    The quintillion has more people than exist on

6  the earth currently?

7      A    That is correct.

8      Q    You mentioned before about the fact -- I'm

9  going to mark this as an exhibit.

10          I want to make sure we're talking about the

11  same report here.  I marked this Commonwealth Exhibit

12  50.  Does this appear to be the same report that you're

13  looking at there, what you brought with you?

14     A    Yes, it is.

15     Q    Now, there's a second page.  The second page of

16  that report, it's a chart with a list of numbers; is

17  that correct?

18     A    That is correct.

19          MR. McCORMACK:  At this time I would move for

20  the admission of Commonwealth Exhibit No. 50.

21          MR. MULLER:  No objection.

22          THE COURT:  It's admitted.

23          (Whereupon, Commonwealth Exhibit No. 50 is

24  admitted into the record.)

25  BY MR. McCORMACK:

1    Q    If you could, what does the second page

2  describe?  What is it?

3    A    It's a visual representation of the type or

4  profile that was developed from each of the samples.

5  Going down the side is what is known as loci, another

6  name for the site.  Each one of them is identified by a

7  name in this case.  Let's say the first one says

8  D3S1358, that's a chromosome.

9    Q    Let me interrupt you.

10         MR. McCORMACK:  Permission to publish to the

11  jury and show it while he talks about it.

12         MR. MULLER:  No objection.

13         THE COURT:  All right.  Proceed.

14  BY MR. McCORMACK:

15    Q    So they can have a visual of what you're

16  talking about, if you could actually -- it might be

17  easier to just step down for us.

18    A    No problem.

19    Q    I'll give you a pointer.  Take into

20  consideration the court reporter is here.  Now make

21  sure they can all see up here across the top.  You

22  can't see it.

23    A    These are the items that were tested, Q2 and

24  the original Item Q2.  That was tested.  Additional Q4

25  and Q5, these are the known standards, identified K1,

1  K2 and K3.

2       What you have going down the column here is the

3  allele loci or site and consider this as an address on

4  a chromosome.  This is on chromosome D3S1358.  It's

5  1358 site that they found, and at this site you have

6  two numbers and that is the number of repeats of a

7  sequence, how many times it repeated on one chromosome

8  and the second chromosome, No. 3 in this case, it was

9  15 times and 16 times.

10      Q    You had told us before you gave the example of

11  yourself.  You had repeating seven times from your

12  mother's side and eight times from your father's side.

13  Is that what we're talking about here?

14      A    That's correct.  You can see here this

15  reference sample, like a good example, here is TPOX, K1

16  is the 6/10 at this person.  It's a 9/11 at K2.  K3

17  it's a 7/8.  So it differs from person to person and

18  could possibly be the same in two people 15/16 and

19  15/16.  It's not a very long area so there are not a

20  lot of types at each site because you're going over 16

21  sites.  You get various variability.  While this person

22  and this person share the same type at D3 and at D16,

23  they are entirely different.  That's how you can -- if

24  you go down you can see, as you go down that each

25  person varies for the most part across the whole

1 profile. This would be the representation of a

2 profile.

3      Now once we have this representation of profile

4 from the question samples, then we can compare it to

5 the known references and what you can see here is if

6 you go down each one of these sites and compare it to

7 the known references that were provided, that this

8 profile and this profile and this profile all match

9 this profile but they do not match this profile or this

10 profile.

11      Now, this here was what was remaining of the

12 original evidence that was left from the original

13 cutting, and you'll see some variations here, like

14 here. We don't have the six and the nine here. What

15 has happened here because a smaller amount of DNA that

16 we had what is known as an allele I can drop out this

17 profile is still consistent with this profile but this

18 profile here, which was from the original extraction

19 matches K1.

20    Q   Just so we're clear on the record, you're

21 testifying K1 is -- again can you tell us who K1?

22    A   A dry blood sample from Iris Fennel and Q2 is

23 the metal hook and shoelace from the Timberland hiking

24 boot.

25    Q   Okay.

1    A    That was presented to us.

2    Q    And that's the same area that was tested on

3  that boot back in 1997?

4    A    Same extract.  It's the same material.  It was

5  the material that was saved and sealed up.  When they

6  resubmitted the case, they resubmitted that and tested

7  that as well.

8    Q    To boil it down, K1 being the known sample of

9  Iris Fennel and the boot, hiking boot, shoelace and

10  metal hook, you say there's a match there?

11    A    There's a match there and...

12    Q    And you also say in Q4 was that the stain

13  sample cut from her T-shirt?

14    A    From her T-shirt is this one.

15    Q    That's her blood on her T-shirt?

16    A    That's correct.

17    Q    And I think you said Q5 matches, also cut from

18  the sole of her sock, and again the blood on the sole

19  of her sock is Iris Fennel's blood?

20    A    It matches Iris Fennel.  Rarity of the profile,

21  I don't believe it's different from two different

22  people.

23    Q    You believe they are from the same person?

24    A    In my opinion.

25    Q    Now, you just told us some of the things that

1  the DNA can tell us.  The DNA, can it tell us when it
2  got on the boot?
3      A    No, it cannot.
4      Q    Can the DNA tell you how it got on the boot?
5      A    No, it cannot.
6      Q    The DNA, what it tells you is that it's
7  consistent with Iris's blood and that's what it tells
8  you?
9      A    That's it, yes.
10        MR. McCORMACK:  I don't have any further
11  questions.
12        MR. MULLER:  Briefly.
13
14              CROSS EXAMINATION
15
16 BY MR. MULLER:
17     Q    So back in 1997 it was a one in 600 chance
18 or --
19     A    That's correct, because the discriminatory
20 power of the test we were doing at that time were not
21 as powerful as we have now.
22     Q    And we're talking about one in 600 chance of
23 matching or being -- I don't want to say.  What would
24 the appropriate term be?
25     A    It gives you a one in 600, gives an estimate of