1  COMMONWEALTH OF PENNSYLVANIA: IN THE COURT OF COMMON PLEAS

2                                : OF DAUPHIN COUNTY, PENNSYLVANIA

3        VS              :

4  TYSHAUNT LOVE          : No. 937 CR 2002

5

6              TRANSCRIPT OF PROCEEDINGS

7                   VOLUME III

8

9        BEFORE:    HONORABLE BRUCE F. BRATTON

10        DATE:    Friday, September 16, 2005
                   Monday, September 19, 2005
11                 Tuesday, September 20, 2005

12        PLACE:    Courtroom No. 3
                    Dauphin County Courthouse
13                  Harrisburg, Pennsylvania

14

15  APPEARANCES:

16     SEAN M. McCORMACK, Esquire
       Chief Deputy District Attorney
17
       JAMES P. BARKER, Esquire
18     Deputy District Attorney

19

20        For - Commonwealth

21

22     PAUL W. MULLER, Esquire
       Chief Deputy Public Defender
23
       NATHAN C. GIUNTA, Esquire
24     Assistant Public Defender

25        For - Defendant

DAUPHIN COUNTY COURT REPORTERS

# INDEX TO WITNESSES

| FOR COMMONWEALTH | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Georgen Cronin Vol. I | 32 | 60 | 70/74 | 72 |
| Johanna Johnson Iftikhar-Khan Vol. I | 168 | 177 | 188 | 189 |
| Zachary Belcher Vol. II | 6 | 17 | 26 | 30 |
| Socorro Roman Vol. II | 31 | 45 | 66 | 68 |
| Wayne Ross Vol. II | 75 | 107 | -- | -- |
| (Qualifications) | 69 | 73 | -- | -- |
| Jeanette McCurdy Vol. II | 116 | 122 | 128 | 130 |
| Leroy Lucas Vol. II | 131 | 170 | -- | -- |
| Michael Kurtz Vol. II | 184 | 200 | 202 | 204 |
| (Qualifications) | 183 | -- | -- | -- |
| LeeAnn Singley Vol. II | 209 | 228 | 240 | -- |
| (Qualifications) | 206 | -- | -- | -- |
| Stacy Harris Vol. II | 243 | 248 | 256 | 259 |
| Barbara Brown Vol. II | 264 | 269 | 284/288 | 286/289 |
| Candace Mills Vol. II | 291 | 296 | 308 | 310 |
| Kwajalyn Jackson Vol. II | 312 | 318 | 325 | -- |
| Tamara Williams Vol. II | 326 | 330 | 340 | 340 |
| Daelene Saez Vol. II | 341 | 347 | 352 | 352 |
| Tawana Poteat Vol. II | 354 | 369 | 388 | -- |
| Wendy Harris Vol. II | 388 | 392 | 398 | -- |
| John Goshert Vol. III (No jury) | 5 | 10 | -- | -- |
| Donald Heffner Vol. III (No jury) | 14 | 20 | 23 | -- |
| Sean McCormack Vol. III (No jury) | 24 | 29 | -- | -- |
| Lydel Muldrow Vol. III | 60 | 66 | 76 | 77 |
| Elijah Massey Vol. III | 78 | 81 | 90 | -- |
| Joseph Zimmerman Vol. III | 91 | 97 | -- | -- |
| Matt Taylor Vol. III | 104 | 133 | 145 | -- |
| Michael Maloney Vol. III | 146 | 150 | -- | -- |
| Donald Heffner Vol. III | 207 | 234 | 241 | -- |

| FOR DEFENDANT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Michelle Bailey Vol. III | 245 | 250 | 252 | -- |
| Joseph Zimmerman Vol. III | 254 | -- | -- | -- |
| Elijah Massey Vol. III | 259 | -- | -- | -- |

## INDEX TO EXHIBITS

| FOR COMMONWEALTH | MARKED | | ADMITTED |
|---|---|---|---|
| No. 1 Vol. I | 54 | | 244 |
| No. 2 Vol. I | 54 | Vol. II | 9 |
| No. 3 Vol. I | 54 | Vol. II | 13 |
| No. 4 Vol. I | 54 | Vol. II | 28 |
| No. 5 Vol. I | 57 | Vol. II | 40 |
| No. 6 Vol. I | 58 | Vol. II | 93 |
| No. 7 Vol. II | -- | | 95 |
| No. 8 Vol. II | -- | | 90 |
| No. 9 Vol. II | -- | | 94 |
| Nos. 10 & 11 Vol. II | -- | | 97 |
| No. 12 Vol. II | -- | | 100 |
| No. 13 Vol. II | -- | | 101 |
| No. 14 Vol. II | -- | | 104 |
| No. 15 Vol. II | -- | | 118 |
| Nos. 16-21 Vol. II | -- | | 140 |
| Nos. 22-26 Vol. II | -- | | 146 |
| Nos. 27-28 Vol. II | -- | | 146 |
| No. 29 Vol. II | -- | | 154 |
| No. 30 Vol. II | -- | | 159 |
| No. 31 Vol. II | -- | | 161 |
| No. 33 Vol. II | -- | | 157 |
| No. 34 Vol. II | -- | | 155 |
| Nos. 35-39 Vol. II | -- | | 163 |
| No. 42 Vol. II | -- | | 154 |
| No. 43 Vol. II | -- | | 158 |
| Nos. 44-45 Vol. II | -- | | 162 |
| Nos. 46-49 Vol. II | -- | | 168 |
| No. 50 Vol. II | -- | | 195 |
| Nos. 51-52 Vol. III | -- | | 244 |
| Nos. 63-65 Vol. III | -- | | 244 |

| FOR DEFENDANT | | |
|---|---|---|
| No. 1 Vol. II | 177 | 177 |

Friday, September 16, 2005

Morning Session

MR. BARKER:  Before we begin the hearing on the admissibility of Guillermina Cruz's preliminary hearing transcript, I think there are a couple of matters to clear up ahead of time.  The first thing is one of the cases that was provided to us as authority yesterday, Commonwealth versus C.A.N.D.L.E.S, 778 A Second 7131, C-A-N-D-L-E-S, that's been vacated.  We would suggest if the Court was planning on relying on that, you may want to rely on the newer investigation, which is a 2005 Westlaw 18 1996 1.

MR. MULLER:  I would note that that case was just concluded because it was referring to the Johnson case, which is the case we are relying on and gives another explanation of the Johnson opinion.

THE COURT:  All right.  Let's deal with this -- don't we need to make a record first to determine the preliminary matter of availability?

MR. BARKER:  Yes, Your Honor.  I just simply wanted to clear that up.  If Your Honor wants to segregate the hearing, do availability first.

THE COURT:  That's the sine qua non.

MR. BARKER:  Commonwealth calls Chief John

1  Goshert.

2

3                    JOHN GOSHERT,

4  having been sworn, was examined and testified as

5  follows:

6

7                  DIRECT EXAMINATION

8

9  BY MR. BARKER:

10      Q    Please state your full name and spell your

11  last.

12      A    John Goshert, G-O-S-H-E-R-T.

13      Q    How are you employed?

14      A    I'm a detective with the Dauphin County

15  Criminal Investigation Division.

16      Q    What is your rank?

17      A    I'm the chief county detective.

18      Q    Now, as part your duty, did you begin

19  conducting an investigation into the whereabouts of

20  Guillermina Cruz?

21      A    I did.

22      Q    When did that begin?

23      A    I was contacted by Mr. McCormack on -- in the

24  afternoon hours of September 14th.

25      Q    That would have been Wednesday of this week?

1     A    If you say so.

2     Q    And what was the purpose of the contact?

3     A    He contacted me and indicated that there was a

4  material witness warrant sworn out for that young lady

5  and asked that the Criminal Investigation Division make

6  efforts to locate her.

7     Q    As a result of that what efforts have you made

8  to locate Ms. Cruz?

9     A    We've done a number of things.  The first thing

10  we did was, Detective Walborn, who is a United States

11  deputy marshal, in addition to him being a Dauphin

12  County detective, conducted an on-line intelligence

13  search on the young lady's name to see if he could come

14  up with any investigative leads that could have

15  concluded in prison in another location, any other

16  information relative to addresses, phone numbers and so

17  forth.  He was able to locate a cellular phone number

18  which he turned over to Detective Heffner to further

19  investigate.

20          Also, we made contact with the Patriot News

21  Dauphin County Crime Stoppers and gave them a wanted

22  flyer on the young lady and asked them to possibly

23  publish that in the paper.

24     Q    Did they do that?

25     A    They did.  That was published in the paper on

1  September 15, 2005.

2          I have a copy here of the news article that was

3  requested.  It offered a reward if she was located and

4  so forth.

5          Also on the 14th, we entered her in the

6  national crime information center computer as a wanted

7  person so that if any police officers, law enforcement

8  officers nationwide would stop her and run her

9  information in the computer it would come back a hit

10  that in fact she was a wanted person here in Dauphin

11  County.

12          In addition to that, we had the Dauphin County

13  communication center send out a BOLO to all law

14  enforcement agents here in Dauphin County advising them

15  that she was a wanted person, that we were looking for

16  her.

17      Q    A BOLO is a be-on-the-lookout?

18      A    Yes.

19      Q    Anything else?

20      A    Yeah.  What I did, I have an e-mail list of all

21  the chiefs of police in Dauphin County, and I sent a

22  flyer that was made by the Harrisburg Bureau of Police

23  and I mailed that flyer to every chief of police in

24  Dauphin County.

25          In addition to all the chiefs of police, I

1  tried to e-mail anyone else I thought would be perhaps

2  a source that they would come in contact with her, that

3  included representatives from the Dauphin County Adult

4  Probation and Parole.  They have a lot of street

5  contact with people.  The Capitol police, I mailed to

6  representatives there.  I mailed to a representative

7  from the Pennsylvania State Police, Trooper Olwiler,

8  the intelligence officer for Troop H, hoping that

9  perhaps he could enter that into his intelligence data

10  base to come up with information relative to her.

11      THE COURT:  You said mailed, you mean e-mail?

12      THE WITNESS:  Yes, sir.

13  BY MR. BARKER:

14      Q    Was there anything else?

15      A    Yeah.  We decided that we would canvass some of

16  the local motels to determine if we could locate her at

17  any of those or if anyone had any knowledge of her at

18  any of the hotels.  We canvassed 28 hotel/motels.  That

19  would have been done the evening of September 14th and

20  then I hit a couple of them on my way to work on the

21  15th.  We did 28 of them.

22      Also, we left a flyer at each one of them

23  asking them to check the registry to see if she was

24  registered or if they did see her to please contact the

25  contact information on the flyer.

 1        In addition then we went to five different car
 2  rental agencies here in Dauphin County and did the same
 3  thing, left a flyer at those locations and asked if
 4  they recognized her, if, you know, she had rented a car
 5  or anything recently.
 6        The only other thing, we did receive one crime
 7  stoppers tip that was received yesterday in the
 8  afternoon hours and the information was that perhaps
 9  the young lady was in the Lebanon, Pennsylvania area.
10  The location they gave they couldn't give an exact
11  location.  They thought it was the 500 block of 11th
12  Street in Lebanon, Pennsylvania.
13        So what I did with that information, I called
14  an individual, Sergeant Brett Hopkins, who is assigned
15  to the Lebanon County drug task force.  I called him
16  last evening and asked him if he was familiar with the
17  area of the 500 block of 11th Street in Lebanon.  He
18  said that he was, that it was a drug area known to him.
19  And so I e-mailed him a copy of the flyer and gave him
20  the information and he has my contact information, if
21  he could ask around down there, and I contacted him as
22  a drug person because the caller had indicated that
23  they thought maybe she was staying with somebody at
24  someone's house down there on 11th Street who had
25  recently been arrested by the Lebanon authorities for

 1  drugs.  That's why I reached out to him.  He said that

 2  they make a lot of arrests there.  It was kind of hard

 3  for him to narrow that down.  He said nonetheless he

 4  would try and do something with that.

 5      Q    As a result of all of these efforts, have you

 6  been able to locate Guillermina Cruz?

 7      A    Not so far.

 8      Q    And could you give me an approximation of how

 9  many of your detectives have been involved in the

10  search?

11      A    That would have been myself, Sergeant Garver,

12  Sergeant Maloney, Detective Walborn, Detective Wood,

13  that would have been it.

14          MR. BARKER:  No other questions.

15          THE COURT:  Cross.

16

17                  CROSS EXAMINATION

18

19  BY MR. MULLER:

20      Q    Detective Goshert, you weren't contacted by the

21  District Attorney until the afternoon of the 14th.

22      A    Yes, that's the first.

23      Q    That would have been on Wednesday?

24      A    I don't know.  I'm not good, you know -- if you

25  say so.  He said so.  I would agree with you.

1    Q    You indicated Detective Walborn conducted an

2  on-line intelligence search, what does that really

3  consist of?

4    A    Well, it's a -- the United States marshals have

5  a web site that anyone that's a deputy marshal or

6  United States marshal can utilize.  It goes into

7  various search engines.  It determines whether the

8  individual is in prison somewhere.  It checks various

9  search engines.  That's where they came up with the

10  cell phone number.

11    Q    And that's the only thing they came up with?

12    A    Yeah.

13    Q    You indicated that was turned over to

14  Investigator Heffner, correct?

15    A    That was indicated to me, yes, sir.

16    Q    You didn't follow up on that particular aspect?

17    A    Not on that particular one, no.  I noticed when

18  I ran a Metro check there was a Harrisburg city address

19  and Detective Heffner indicated that he was going to

20  try to work with that address and with her family.

21    Q    No responses on the NCIC or the BOLO?

22    A    No.

23    Q    The canvassing of local motels, are you talking

24  Dauphin County or more than Dauphin County?

25    A    Well, Dauphin County, the only ones we did out

1  of Dauphin County were off of Exit 18. There's some

2  motels off of Exit 18 there.

3     Q    Where is that?

4     A    Off 83, that would be York County; actually

5  some in Cumberland, some of them in York County.  There

6  was a number that were checked over there.

7     Q    Do you know how many?

8     A    I will look for you.  Off the Exit 18 there was

9  the Rodeway Inn, Comfort Inn, the Fairfield Inn, Motel

10  6 and Travel Inn, five.

11    Q    So the other 23 were in Dauphin County?

12    A    Yes.

13    Q    Nothing in Lebanon County?

14    A    No.

15    Q    And how do you locate motels?  I don't know how

16  many there are.  How do you go about that?

17    A    Well, I tried to check motels that -- you know,

18  we didn't go to the Hilton or something like that.  I

19  try to check motels that were more the economy, lower

20  end motels.  If someone would be trying to avoid

21  authority they might stay in that type of choice.

22    Q    Did you go through the yellow pages and then

23  start driving around?

24    A    Basically, yeah.  There's motels that are like

25  that, and there's a strip of them on Eisenhower

1  Boulevard. I went to them. There's some on Union

2  Deposit Road. There's a number of them on Route 22; a

3  number of them in the city, and that's the ones we

4  tried to do.

5      Q   I assume the car rental agencies were in

6  Dauphin County?

7      A   Yes.

8      Q   No information got back to you about this tip

9  in Lebanon?

10     A   Not so far.

11     Q   You mentioned it was you and four other

12  detectives at CID involved in this?

13     A   Correct.

14     Q   Was yours the predominant role?

15     A   Me personally?

16     Q   Yes.

17     A   No. I think we all pretty much shared it. My

18  predominant role, I had contact on the drug end down in

19  Lebanon. So I was able to call him. I believe the

20  city did some other efforts, Detective Heffner.

21         MR. MULLER: That's all I have.

22         MR. BARKER: No redirect, Your Honor.

23         THE COURT: Thank you, Lieutenant Goshert.

24         MR. BARKER: The Commonwealth calls Detective

25  Heffner.

1                    DONALD HEFFNER,

2    having been sworn, was examined and testified as

3    follows:

4

5                    DIRECT EXAMINATION

6

7    BY MR. BARKER:

8        Q    Please state your full name and spell your

9    last.

10       A    My name is Detective Donald Heffner,

11   H-E-F-F-N-E-R.

12       Q    How are you employed?

13       A    Harrisburg Bureau of Police, Criminal

14   Investigation Division.

15       Q    How long have you been a detective?

16       A    Since 1997.

17       Q    How long have you been a police officer?

18       A    Since 1992.

19       Q    Now, let's go back earlier in the week first.

20   Were you in contact with Guillermina Cruz on Monday?

21       A    Yes.

22       Q    Where was that?

23       A    That was here at the courthouse.  She attended

24   court.  She had told us that she wasn't going to

25   testify on that day.

1    Q   Now, as a result of her telling you that, did

2  you tell her she had to be here?

3    A   I witnessed Sean McCormack -- later witnessed

4  Sean McCormack and later Officer Muldrow told her she

5  had to be here Tuesday.

6    Q   You served her with a subpoena Saturday, not

7  last Saturday I think it was the first of September.

8    A   That Saturday I personally served her at her

9  residence at 1407 South 15th Street, Apartment 103.  I

10  talked to her at that time and she assured me she would

11  be here.  I handed her the subpoena and she took it

12  with her hand and that was it.

13    Q   In fact, on Monday at least she showed up?

14    A   Yes.  She was here Monday, and I also witnessed

15  the victim/witness coordinator, the person who calls

16  the witnesses, witness coordinator for the District

17  Attorney's office handed her another subpoena Monday

18  morning.

19    Q   That would have been Kelly Anderson?

20    A   Yes.

21    Q   Have you seen her again this week?

22    A   No.  I talked to her boyfriend, Clifford, on

23  the 12th.  I think it was around 5:30.  He asked me if

24  Guillermina was going to jail Tuesday morning.  I told

25  him no.  I said she had an attorney.  Just come to the

courtroom and follow her attorney's advice. That
didn't mean she was going to jail. Make sure she's
here Tuesday morning.

Q    Now, as a result of her failure to appear, did
you make any efforts to locate her?

A    Yes. On the 13th the honorable Judge Bratton
signed a bench warrant for her. I gave that
information to Captain Baldwin, commander of CID,
active chief since our chief is in Mississippi. With
twenty other officers, they put out a flyer. They put
my phone number down as a contact person. This was
distributed to all members of the Harrisburg Police
Department and also to Chief Goshert of Dauphin County
CID. I also gave a copy of the warrant to Officer
Muldrow. On the 14th of September 2005 Harrisburg
police entered the residence at 1407 South 15th Street,
Apartment 103.

Q    Just to clarify, was that the prior residence
that you had discussed giving her the subpoena?

A    Yes. That is the residence and has been the
residence for years.

MR. MULLER: What was the address?

THE WITNESS: 1407 South 15 Street, Apartment
103; at the time we arrested Clifford inside the
residence. Guillermina and her children were gone.

1  Clifford provided no information to the whereabouts of

2  Guillermina.

3  BY MR. BARKER:

4      Q    What day was that the officer went in there?

5      A    The morning of the 14th; also on the 14th we

6  checked another address on Allison Hill.  It was a bad

7  address.  We went to her grandmother's house at 1325

8  Vernon Street.  She was not there.  Also contacts were

9  made with Chief Wolf of northern Lebanon regional

10  police department.  I believe to check 2024 Spruce

11  Street.

12      Q    And why did you check that address?

13      A    That's the residence of her mother Eugena

14  Camacho.  She was close to her mother.  In fact, her

15  mother was here with her on Monday.

16          MR. MULLER:  The Spruce Street address is

17  Lebanon.

18          THE WITNESS:  Yes.

19  BY MR. BARKER:

20      Q    Was she located at that address?

21      A    No.

22      Q    I'm sorry.  Go ahead.

23      A    On the 14th I also contacted Lebanon City

24  police and spoke to the duty lieutenant and requested a

25  warrant service be conducted at her sister's residence

1  where we had arrested her boyfriend before at 62 North

2  12th Street in Lebanon.

3      Q    Was that done to your knowledge?

4      A    Yes, and that was in an abandon structure.  She

5  had left it several weeks prior.  Correction.  Those

6  contacts were on the 13th.

7      Q    We heard a little bit of testimony about a cell

8  phone number located and provided to you.

9      A    Yes.

10     Q    What did you do with that?

11     A    The cell phone number I contacted it's a bad

12 cell phone number, no longer connected.  There's no way

13 for us to get the records in an immediate turnaround.

14     Q    When you say an immediate turnaround --

15     A    It takes me a couple of weeks if they rush it

16 for me.

17     Q    And you're referring to, they, you're talking

18 about the phone companies?

19     A    Phone companies; that could go on for months.

20 Also on the 14th here at the courthouse I spoke to

21 Yesenia Cruz Camacho, sister of Guillermina.  She

22 advised me that Guillermina dropped off the kids with

23 her and told her she was going to go to jail the next

24 day and left the residence.

25     Q    Did she report knowing where her sister is?

1    A    No.  So I asked her to go home and try to

2    locate her sister.  So I called her at her

3    grandmother's residence at 1325 Vernon and I spoke to

4    Yesenia Cruz again.

5              MR. MULLER:  What date is this now?

6              THE WITNESS:  The 14th.

7    BY MR. BARKER:

8    Q    How do you spell Yesenia?

9    A    Y-E-S-E-N-I-A.

10   Q    And did she report getting any further

11   information locating her sister?

12   A    No.  In fact, when I told her the efforts that

13   have been being made to find her sister, that we were

14   publishing her picture and her information throughout

15   the area she became very upset with me.  I then spoke

16   to her boyfriend again, Clifford.

17             MR. MULLER:  Are we still on the 14th?

18             THE WITNESS:  Yes.  Clifford said that he had

19   no information for me for the whereabouts of his

20   girlfriend, Guillermina.  Also throughout the 14th and

21   the 15th I received several phone calls providing

22   information where Guillermina lived.

23             THE COURT:  From...

24             THE WITNESS:  From an anonymous informant due

25   to the crime stoppers tip and the motels.  The

1 information provided were old addresses. I received

2 the addresses on Vernon Street that already had been

3 checked. I received information about a mom living in

4 Lebanon. I received information that her sister,

5 Yesenia, worked at the Red Roof and also received the

6 fact that Guillermina lived at 1407 South 15th Street.

7 All this information had been previously checked by

8 police.

9 BY MR. BARKER:

10    Q   Including the Red Roof?

11    A   That was done by Chief Goshert.

12    Q   Did you have any further information or any

13 other way to try to locate Guillermina Cruz?

14    A   No.

15    MR. BARKER:  No other questions, Your Honor.

16    THE COURT:  Cross.

17

18               CROSS EXAMINATION

19

20 BY MR. MULLER:

21    Q   Investigator Heffner, you've been dealing with

22 Ms. Cruz for a number of years now, correct?

23    A   Since 2001.

24    Q   You obviously had contact information over that

25 period of time, correct?

1     A   Yes, and contact information is what I used for

2  Lebanon.  That's how I was able to get the Lebanon

3  addresses, that's how I knew about 62 North 12th

4  Street.  Her family moves a lot.  So the contact this

5  month may not necessarily be the contact next month.

6     Q   Did you have an opportunity to utilize that

7  cell phone number that they talked about?

8     A   No.  Like I said before, that would have --

9  would have taken weeks.

10     Q   That's not the question.  Did you ever use that

11  cell phone number?  Did you ever call her on that

12  number?

13     A   No.

14     Q   That was an unfamiliar number to you?

15     A   I wasn't familiar that she had a cell phone.

16     Q   And when's the first time you went to make

17  contact with her after Monday?

18     A   I never -- I guess the first time I was trying

19  to convince her --

20     Q   Let me rephrase it.  You indicated she was here

21  Monday.

22     A   Yes.

23     Q   And you had contact of some sort with her then?

24     A   Yes.

25     Q   A warrant was issued the afternoon on Tuesday?

1    A    Around five; that was the last thing we did

2 here Tuesday.

3    Q    Did you do anything Tuesday?

4    A    Yes.  That was when we were calling, would have

5 been the 13th, we were calling Lebanon, and that's when

6 the flyer was put out.  That's when Chief Goshert was

7 involved in this with the flyers and then he started

8 working on it.

9    Q    Did you go to any of the addresses that day?

10    A    I was in contact with the family.  I was

11 calling the family and speaking to them.  We decided to

12 hit the residences first thing in the morning.

13    Q    After when -- so it was the next day that you

14 went to where her boyfriend was?

15    A    Right.  Officers went to the boyfriend's house.

16    Q    Did you talk to her boyfriend that day?

17    A    Yes.

18    Q    He didn't tell you anything?

19    A    No.

20    Q    Did he indicate to you the last time he saw

21 Ms. Cruz?

22    A    He's saying she went to court on the 13th.  She

23 was headed for court.

24    Q    Tuesday morning?

25    A    Yes.

1    Q   Now, her sister spoke to you and told you that

2 Ms. Cruz had dropped her children off.  We're talking

3 about four children, correct?

4    A   Yes.

5    Q   And that was on Wednesday, if I'm following

6 your chronology?

7    A   Wednesday I talked to her sister, Yesenia, but

8 Guillermina had dropped off the children Tuesday.

9    Q   Do you know when on Tuesday?

10    A   No.  Some time Tuesday; let me back up --

11 dropped them off Monday.  She told her she was going to

12 be arrested Tuesday.

13    Q   But she didn't tell anyone where she was going

14 to the best of your investigation?

15    A   They had not told me where she was at.  That's

16 the best way to answer that question.

17    MR. MULLER:  That's all I have.

18    THE COURT:  Any redirect?

19    MR. BARKER:  One quick follow up.

20

21              REDIRECT EXAMINATION

22 BY MR. BARKER:

23    Q   While making all efforts, you've also been in

24 court all day every day this week?

25    A   I get out of here like you.

1          MR. BARKER:  No further questions, Your Honor.

2          MR. MULLER:  Nothing further.

3          MR. BARKER:  The Commonwealth calls Sean

4    McCormack.

5

6                    SEAN McCORMACK,

7    having been sworn, was examined and testified as

8    follows:

9

10                  DIRECT EXAMINATION

11

12   BY MR. BARKER:

13       Q    Please state your name and spell your last for

14   the record.

15       A    Sean Maurice McCormack, M-c-C-O-R-M-A-C-K.

16       Q    How are you employed?

17       A    I'm a chief deputy District Attorney here in

18   Dauphin County.

19       Q    You're the lead prosecutor on this case?

20       A    That's correct.

21       Q    Now, did you meet with Guillermina Cruz on

22   Monday?

23       A    I met with Guillermina Cruz on Monday on three

24   occasions.  The first time I saw Guillermina Cruz I

25   came down into the District Attorney's office.  I was

informed that she was at the front counter. She was in
the morning before court started. I attempted to speak
with her there. She indicated to me she was only in
the District Attorney's office at that time to get a
copy of her subpoena because she forgot to bring her
subpoena to court. She appeared she didn't want to
speak with me. Kelly Anderson, the victim/witness
coordinator in our office, had the file and presented a
copy of her subpoena printed out for her and handed
that to her through the window of our front counter.

Q    When did you speak to her again?

A    I then spoke with her at the break, I believe,
of the lunch break sitting outside the courtroom. When
she was sitting outside the courtroom I had a brief
conversation with her which actually started outside
the courtroom and then moved downstairs to the lobby of
the courthouse by the front doors, by where the
fountains are.

I discussed with her at that time about her
testifying and trying to find out why she was
indicating she did not wish to testify. She was
indicating to me that she was afraid, that she was
scared, who was going to look out for her family, those
types of things she kept saying.

I would note also her mother was present at

1  that time saying similar things. The police aren't

2  going to do anything for them after this case is over;

3  who's going to watch out for them. I informed her that

4  it didn't matter whether she wanted to testify or not;

5  that she was going to have to testify; that I was

6  calling her as a witness; that she was subpoenaed and

7  that she was going to be here every day this week until

8  she got to the witness stand; and then whatever she

9  said she would have to say.

10         I also advised her that I was aware that Allen

11  Welch was appointed as her attorney and that he would

12  be back after lunch. She indicated that she was going

13  to pick up her children and then return at 2:30;

14  however, when we came back up to court after lunch

15  break -- I don't recall what time it was. But it was

16  before 2:30; she was sitting outside and that's when I

17  saw her for the third time that day, and when I saw her

18  sitting out there I walked around the courthouse to see

19  if I could find Allen Welch. I found him in one of the

20  other courtrooms and I brought him over to her.

21      Q   And do you know why Allen Welch was appointed

22  to represent her?

23      A   He was appointed because last Thursday she --

24  after receiving a phone call from our office asking her

25  to come in and speak with me to prepare for trial, she

 1  refused to do so.  She then went down to the Public

 2  Defender's office.  It's my understanding she spoke to

 3  Paul Muller from the Public Defender's office.  Not

 4  long after that he called me and we had a meeting with

 5  Judge Bratton later on that day.

 6      Q    Now, you indicated there was a third

 7  conversation and that was...

 8      A    The third conversation was really just hooking

 9  her up with her attorney.

10      Q    Did you actually see them together then?

11      A    I saw them talking together.

12      Q    Did you see Guillermina Cruz again that day?

13      A    I did not.  We had suggested when we were at

14  sidebar speaking with the Judge -- in fact, the Judge

15  suggested that perhaps Allen Welch, Guillermina Cruz

16  and myself go meet to discuss the options and her fear

17  of testifying and those sorts of things.  I saw Allen

18  Welch later that evening.  He indicated that it wasn't

19  going to happen that night.  That would have been

20  Monday night.  Guillermina didn't fully trust him and

21  she told him she wanted a second opinion.

22      Q    Now, we heard a little bit of testimony about

23  Guillermina telling her sister that she was going to

24  jail.  Do you know anything about that?

25      A    Not personally other than what Detective

1  Heffner told me.

2      Q    And did she appear on Tuesday?

3      A    I did not see her on Tuesday in the morning.  I

4  then started the process of having a material witness

5  warrant drawn up.  Over the lunch hour I completed that

6  by writing out the affidavit and having that notarized

7  and at the break, at the end of the court day, Judge

8  Bratton issued the warrant for her arrest.  I then

9  provided that to -- I believe Officer Muldrow was given

10  a copy of that.  I think he was actually the one that

11  went and filed that and placed it into whatever process

12  it began.

13      Q    Once again so we're clear about this, during

14  the day that they were preparing the material witness

15  warrant you were in court all day?

16      A    I was in court also.

17      Q    Including with Judge Bratton who issued the

18  warrant?

19      A    Yes.

20          MR. BARKER:  Nothing further.

21          THE COURT:  Cross-examine.

22

23

24

25

CROSS EXAMINATION

BY MR. MULLER:

Q    You met -- she's in the hallway, I guess, Monday, right?

A    Yes.  She was right outside the door here.

Q    Going back to last week and the conference you had and I had with the Judge on Thursday, you would agree with me that that was over her request for counsel because of her concerns about testifying?

A    Yeah, that's what that was about.  I did not -- she kept saying every time she talked to our office that she was going to be here on Monday.  You know I'm going to be there.  I'm going to say what I'm going to say.  There was a discussion whether she needed counsel for when she was on the witness stand not necessarily that she wasn't going to appear.

Q    And the last time she was back on Monday was after lunch; is that accurate?

A    I saw her in the hallway sitting not on the same bench, in the area just generally outside this courtroom sitting there with her mother.

Q    That was prior to the afternoon session?

A    That was prior to the afternoon session, yes.

Q    Did you ever have a meeting with Mr. Welch and

1  Ms. Cruz --

2      A    I never had a meeting with Mr. Welch and

3  Ms. Cruz.  He indicated that she had left that evening,

4  that she had gone home.

5      Q    -- at the end of that day?

6      A    At the end of that day, and then I did see him

7  the next morning and she had not contacted him at all

8  nor had he seen her.  I'm talking about Tuesday night.

9      Q    At that point she was requesting someone else?

10     A    I think what -- you're asking when he told me

11 about that she wanted a second opinion?

12     Q    I guess it would have come from him?

13     A    Yes.

14          MR. MULLER:  Nothing further.

15          MR. BARKER:  No redirect, Your Honor.

16          THE COURT:  Thank you, Mr. McCormack.

17          MR. BARKER:  Your Honor, that would be all we

18 have on this aspect of the hearing, the unavailability

19 of the witness.

20          THE COURT:  Any other?

21          MR. MULLER:  We have nothing to present.

22          THE COURT:  All right.  Does someone want to

23 summarize positions here?  I assume we're all agreeing

24 it's dealing with Rules of Evidence 804.

25          MR. BARKER:  Yes, Your Honor.

THE COURT: Is unavailability a true issue here, Mr. Muller?

MR. MULLER: It does not appear to be.

THE COURT: I find the witness to be unavailable within the meaning of Pennsylvania Rule of Evidence 804.

Now, what is it that the Commonwealth then is proposing to use as evidence under that rule?

MR. BARKER: Your Honor, we are proffering the preliminary hearing testimony of Guillermina Cruz from the hearing that was conducted on March 5 of 2002 out at Dauphin County Prison. Mr. McCormack appeared for the Commonwealth and Monty Batson then of the Public Defender's office appeared for the Defendant.

THE COURT: Should we make a copy of that as an exhibit in these proceedings?

MR. BARKER: That would be a good idea, and I made a copy for that purpose.

THE COURT: The preliminary hearing transcript from March 5, 2002 has been marked as Commonwealth Exhibit 54.

MR. BARKER: The Commonwealth intends to proceed by having Mr. McCormack ask the questions as he did at that time and then have Jason McMurry of our office in the role of Guillermina Cruz and answer the

1 questions as they are in the transcript.

2        MR. MULLER:  Can we approach on this issue?

3        THE COURT:  Do we need to do that?  There's no

4 jury present.  If you wish we can.

5        MR. MULLER:  Our witness is Mr. Batson who has

6 another hearing.  I'm just wondering if there's an

7 expedient way to do that.

8        MR. BARKER:  Your Honor, I'm sorry.  When I

9 said we're proffering that I thought Your Honor was

10 asking whether we intend to do it in front of the jury.

11        MR. MULLER:  I thought you were talking

12 about --

13        THE COURT:  No, no.  We're getting there, but

14 that's not the way I understood it either.  Mr. Barker,

15 is the Commonwealth proffering the inclusion of the

16 entire transcript of the preliminary hearing?  I'm not

17 familiar with the transcript.  Does it contain

18 testimony of anyone else or are there matters not to be

19 included?  It is only her testimony?

20        MR. BARKER:  It would only be Guillermina

21 Cruz's testimony.  I guess we would leave it to the

22 Defense.  What happened was, Mr. Batson called Ms. Cruz

23 during the Defense's case and I believe we would be

24 proffering our own testimony when we called Ms. Cruz.

25 I guess I should defer to Mr. McCormack.

1     MR. MULLER:  Your Honor, if I may, there were

2 only two witnesses at the hearing, Ms. Cruz and

3 Investigator Heffner.  I think we're talking about

4 Ms. Cruz's testimony.

5     MR. McCORMACK:  Logistically I envision if

6 Defense chose to do so could read their questions to

7 the same witness being on the stand, Mr. McMurry.

8     THE COURT:  I'm confused even further now by

9 the statement she was called as a Defense witness at

10 the preliminary hearing.

11     MR. BARKER:  Yes, Your Honor.

12     MR. MULLER:  It was brief.  I believe it was a

13 page or two at the end of the hearing related to one

14 question.

15     THE COURT:  She had already testified as a

16 Commonwealth witness.

17     MR. McCORMACK:  Yes.

18     THE COURT:  I was confused.  I thought you were

19 saying actually the cross examination then by the

20 Commonwealth that was being proposed.  She was called

21 as a Commonwealth witness. That's what you're

22 proposing to be read into the record.

23     MR. BARKER:  We have no objection if the

24 Defense wanted to read that small portion for which

25 they called her at the preliminary hearing.

1    THE COURT:  All right.  There are numerous

2  instances of argument.  We would propose to redact

3  objections that were raised, that kind of thing.

4    MR. MULLER:  There were references to a

5  conflict issue which obviously wouldn't come in in

6  front of a jury.

7    THE COURT:  I understand.  I understand.

8  What's your objection?

9    MR. MULLER:  I don't think the Defense, the

10  Defendant had a full and fair opportunity for cross

11  examination at that point because we had not been

12  provided with all relevant material and impeachment

13  materials including and probably not limited to her

14  statement to the police of February 19 of 2001; her

15  grand jury testimony of March 28, 2001; the statements

16  of numerous other witnesses who contradict her

17  testimony and phone calls she had with Investigator

18  Heffner prior to that hearing date and knowledge of --

19  two things involving Anthony Knight, aka, Black, that

20  he had taken her the day after the incident and

21  sequestered her for about a week before; and her

22  statement of December 28, 1996, and in this period of

23  time after 1996 up to and including the preliminary

24  hearing on March 5, 2002, Anthony Knight had sent her

25  letters and made numerous threats to her about her

1 testifying.

2          THE COURT:  You're saying those facts were not

3 disclosed.

4          MR. MULLER:  No, no, they were not.  What I'm

5 able to determine, Your Honor, at that March 5, 2002

6 preliminary hearing where Mr. Batson from my office

7 represented Mr. Love, he was presented by Mr. Love's

8 family, I guess, with a preliminary hearing transcript

9 from the March 18, 1997 preliminary hearing in this

10 matter where Mr. --

11          THE COURT:  What was the date again?

12          MR. MULLER:  March 18, 1997 -- where Mr. Love

13 was represented by Attorney Jerry Russo and I believe

14 they may have also had the January 17, 1997 preliminary

15 hearing transcript where Mr. Love was represented by

16 Attorney James Rowland, and there's some indication

17 Mr. Batson had a copy of the December 28, 1996

18 statement to the police by Ms. Cruz, and it appears

19 that was so because that was made part of the record at

20 the preliminary hearing on March 18, 1997 when

21 Mr. Russo was representing Mr. Love.

22          I would also add that at that March 5, 2002

23 preliminary hearing Mr. Batson was prevented from

24 asking Ms. Cruz about anything that happened after she

25 left the house.  That was objected to by the

1  Commonwealth and he was never able to get into that
2  issue as to what happened after that, and that's
3  significant because as the Commonwealth has stated in
4  their opening they are trying to show that these times
5  don't make sense.  Obviously if we had any information
6  from her and what appears from her statements later on,
7  what we got later on, she talks about Mr. Love coming
8  up to her later that day and telling her to make up
9  this story.  She talks about that happening at a
10 certain time.  There was no information about that back
11 at the preliminary hearing.  And in regards --

12        THE COURT:  You have me at a bit of a
13 disadvantage.  Was that material discussed during the
14 course of the preliminary hearing?  Is that part of the
15 testimony that's being proffered by the Commonwealth?

16        MR. MULLER:  No.  I'm saying -- I guess I'm
17 trying to present what we're saying was not available.

18        THE COURT:  A written statement that she had
19 given that contained information about post presence at
20 the scene of the crime.

21        MR. MULLER:  After the scene of the crime, what
22 she did after that and what she allegedly did with
23 Mr. Love after that.  Obviously in regards to the grand
24 jury testimony I know the rules about what we're
25 allowed to have and not allowed to have until the

witness actually testifies.

THE COURT: Here at the trial.

MR. MULLER: Correct, and ultimately we were presented with some of her grand jury testimony that the Commonwealth determined we were allowed to have. That was at a much later date; even that wasn't available back then, and it had, in fact, the Defense had been specifically precluded that by court order from Judge Clark. So that was unavailable to the Defense back in 2002 at the preliminary hearing.

THE COURT: As a result of that you're saying that the Defendant did not have adequate opportunity to cross-examine Ms. Cruz at the March 2002 preliminary hearing?

MR. MULLER: Correct.

THE COURT: All right.

MR. MULLER: As they would today if she were here.

THE COURT: Mr. Barker.

MR. BARKER: The purpose of cross examination is to impeach. While there's a lot of materials they need to be impeachment materials, to simply say we didn't have something didn't suffice. For example, the two statements that were given in 2001 to Investigator Heffner are consistent with the preliminary hearing

1 testimony, therefore, whether or not they had those

2 would be irrelevant to this issue.

3       THE COURT: How do we know that without making

4 it part of the record?

5       MR. BARKER: I would be happy to do that, Your

6 Honor. With respect to the discussions with Black,

7 which would have been Ms. Cruz's boyfriend at the time,

8 I don't know how you impeach a witness by saying you

9 were threatened not to say what you're saying now.

10 That corroborates the witness.

11       MR. MULLER: As to someone else not the

12 Defendant.

13       MR. BARKER: I'm not sure I understand that.

14       THE COURT: Well, me neither exactly but...

15       MR. BARKER: I would also note we were told

16 that the Public Defender's didn't have any of this

17 information. First of all, they represented

18 Guillermina Cruz when she was adjudicated delinquent

19 for fleeing after the crime apparently at Black's

20 insistence. So for them to say they didn't know about

21 any of that back then is --

22       MR. MULLER: Well, that's assuming that we

23 violated professional rules of conduct and the Rules of

24 Evidence and someone in my office went and obtained

25 that evidence from a file which we can't do. That's

1  why we conflict something out.

2      MR. BARKER:  Which assumes you violated rules

3  of ethics by your current client by not doing that.

4  That was the problem.

5      MR. MULLER:  No.  It would be if that was

6  available to another attorney and that wouldn't have

7  been available to another attorney representing

8  Mr. Love.

9      THE COURT:  We've already trampled this field

10 rather thoroughly I think.

11      MR. MULLER:  I object to the continued

12 insinuation of a violation of conduct.  That's been up

13 and down in the court enough.

14      THE COURT:  The question ultimately is then --

15      MR. BARKER:  They also did nothing to subpoena

16 juvenile probation records.  I believe I have to go

17 back through this transcript in detail.  I believe

18 Guillermina Cruz was even cross-examined on her

19 adjudication.  I have to go through this a little bit.

20      MR. MULLER:  It was objected to.

21      MR. BARKER:  To say that they didn't know about

22 that again is inconsistent with the transcript even if

23 it was objected to and not delved into.  The cross

24 examiner would plainly -- knew about it, knew the

25 question.

1          MR. MULLER:  The cross examiner, do you have a

2     juvenile record?  Were you arrested for any -- logical

3     question.  It was objected to by the Commonwealth.

4     Credibility is not an issue at the preliminary hearing,

5     which was mentioned numerous times by Mr. McCormack at

6     the 2002 preliminary hearing.

7          MR. BARKER:  Once again I'm still not hearing

8     how it impeaches Guillermina Cruz.  The fact she

9     continued to say what she's saying, and again the new

10    statements were consistent with that, as to these other

11    witnesses.

12         THE COURT:  Are you -- you're then saying to me

13    that at the time of this hearing there were no prior

14    inconsistent statements by this witness that would have

15    aided in the cross examination or impeachment of this

16    witness at the time?

17         MR. BARKER:  Almost.  Her December 20, 1996

18    statement was inconsistent.  The Defense had that.

19    That's the one.

20         THE COURT:  That's what I meant.  There were

21    none that are not already disclosed.

22         MR. BARKER:  That's correct.

23         MR. MULLER:  I would disagree with that.  As an

24    example her grand jury testimony on March 28, 2001 at

25    least the portions we've been allowed access to, she

1  denied seeing Kazar at the apartment that night.

2      MR. BARKER:  Which is consistent with her

3  statement back in 1996 that three people in the house

4  at the time of the murder were herself, Iris and

5  Tyshaunt Love.

6      MR. MULLER:  Which is inconsistent with her

7  testimony at the preliminary hearing on March 5, 2002.

8      MR. BARKER:  Which information was already

9  available to the cross examiner.

10      THE COURT:  In the form of a written statement.

11      MR. BARKER:  Yes.

12      MR. MULLER:  Which written statement are we

13  talking about?

14      MR. BARKER:  The January 28, 1996 statement --

15  December, I'm sorry, December 28th.

16      THE COURT:  I need to read the transcript.  I

17  need to see the statements that were available, what

18  information was available and what information was

19  available to the prosecution but not available to the

20  cross examiner.

21      MR. BARKER:  I agree, Your Honor.  I believe as

22  far as the facts go we're in agreement.  It's what you

23  do with them.

24      THE COURT:  Why don't we mark those statements

25  that were available.  Identify them for the record

1  similarly marking those that were available to the
2  Commonwealth but not to Defense counsel at the time and
3  identify those as well for the record so that I can
4  then perhaps over the lunch hour take a look at them
5  and make my ruling.

6        MR. BARKER:  Your Honor, for these purposes if
7  acceptable we'll write at the top and we'll show them
8  to you which one is available and not available.

9        MR. MULLER:  That's fine.

10       THE COURT:  I assume we're going to continue
11 the numbering system.

12       MR. MULLER:  If I could bring up another
13 collateral issue, as you've seen the number of
14 witnesses, after they presented the witness we're
15 presented with full grand jury testimony to
16 cross-examine that witness one at a time.  I'm not sure
17 how we would even be able to do that.  Obviously
18 Ms. Cruz has testified before a grand jury.  Obviously
19 after they put her up they would have to present us
20 with that after direct.  In this case they are
21 suggesting reading in her preliminary hearing testimony
22 as her direct then we would be given her full grand
23 jury testimony.  I don't know what it contains.  I
24 think the previous ones have contained quite a bit of
25 cross examining questioning.  I don't know how that

1  would work in this case, now to get her full grand jury

2  testimony after they want to put her in in this manner

3  and not be able to cross-examine the witness on her

4  grand jury testimony.

5           THE COURT:  Mr. Barker.

6           MR. BARKER:  I think again they have to show

7  impeachment material just to say that --

8           THE COURT:  No, no.  I don't want to step on

9  your toes here, Mr. Muller.  I think what he's saying,

10 assuming we were to say okay she's unavailable, as I

11 already ruled, and this testimony was back in 2002

12 offered at the time when there was adequate opportunity

13 to cross-examine her, if, if assuming your innuendo

14 that's the ruling and then you read this testimony,

15 does that not in essence mean that the Commonwealth is

16 proffering that testimony as if the witness were here

17 and in essence saying by implication otherwise that

18 this is what the witness would have testified to if she

19 were here, therefore, it's the testimony today then you

20 would be obligated to provide full grand jury testimony

21 of this witness.  Now what?

22          MR. BARKER:  As far as the Defense cross

23 examining this witness --

24          THE COURT:  Today.

25          MR. BARKER:  -- today, the opportunity was back

1 at the preliminary hearing and they had available to

2 them all of the tools of impeachment that were

3 available then.

4     MR. MULLER:  Collateral issue.

5     MR. BARKER:  And in effect they don't have a

6 right to cross-examine her today.  If they wish to

7 rebut her testimony that's a separate matter.  But --

8     THE COURT:  Well, could I -- how would they

9 effectively do that?  That's what Mr. Muller is asking.

10     MR. BARKER:  That's up to them, Your Honor.

11 They had their opportunity for confrontation and cross

12 examination at the preliminary hearing.  If they choose

13 to they can always introduce the testimony through the

14 transcript and I believe Mr. McCormack is indicating to

15 me we would not object to that.

16     THE COURT:  Presenting the testimony from the

17 grand jury.

18     MR. BARKER:  That's correct.

19     MR. MULLER:  How do I question her on that

20 though?  For instance, you saw Candace Mills, 27 pages

21 of grand jury testimony from her.  That in a lot of

22 ways is a gold mine for cross examination as to certain

23 things and get her to explain them in more detail and

24 going on with that.  The logic is circular -- full fair

25 opportunity at the prelim three years ago to question

1  this witness but we didn't have grand jury testimony

2  from this witness, but even that being the case we had

3  a full and fair opportunity that we won't have.

4        THE COURT:  In the ordinary course you would

5  not have grand jury testimony available to you at the

6  preliminary hearing either.

7        MR. MULLER:  I understand that.  That's a risk

8  they take when they proceed through a grand jury

9  indictment and you get to a point like this.  I mean,

10  we're talking about this Defendant's right here.

11        THE COURT:  Why would you be -- why would you

12  object to reading those portions of the grand jury

13  testimony of this witness and pointing out that it is

14  inconsistent with what was just presented as the

15  testimony she had given on March 2, 2001 -- March 5,

16  2002?

17        MR. MULLER:  I wouldn't object to having the

18  portions of the grand jury testimony come in just as I

19  would be asking her on the stand.  The problem is,

20  where do I go from there?  I can't follow up on those

21  issues that are raised by her grand jury testimony as I

22  would be able to do with Candace Miller and the other

23  witness.  I'm sorry.  I'm getting names confused.  But

24  how do I follow up on that?  How is that the equivalent

25  of full and fair?

1          THE COURT:  You want me to say that's
2    equivalent of her being here, it is not.  The rule
3    itself that I'm dealing with, the Rule of Evidence that
4    says the transcripts of prior proceedings may be read
5    if the witness is unavailable and if at the time of
6    that testimony there was, rule said, an adequate
7    opportunity for cross examination.  So as of March 5,
8    2002 was there an adequate opportunity to cross-examine
9    her.  As you yourself pointed out, Mr. Muller, the
10   question you're now raising is collateral.  If I make
11   that determination and the testimony is read, then
12   what?  Well, I don't think that we are required to
13   somehow equate the reading of the testimony with the
14   presence of the witness.  Her unavailability leaves us
15   all with a less than truly satisfactory result.  That's
16   what the Rule of Evidence we're dealing with provides.
17          MR. MULLER:  My concern, I guess, Your Honor --
18          THE COURT:  An opportunity for adequate cross
19   examination, however, as to the admissibility of this
20   transcript is not what's adequate today.  It's what was
21   adequate at the time.  That's the issue.
22          MR. MULLER:  I guess what I'm saying is, if it
23   weren't protected grand jury testimony, if it was
24   another statement given to police or given to the
25   Commonwealth, we would have been arguing we were

1 entitled to that to have full and fair cross

2 examination back in 2002. Now we're in this

3 predicament because the law --

4     THE COURT: The collateral issue you're back to

5 saying it wasn't adequate at the time.

6     MR. MULLER: I think it's both. It's arising

7 now because we can't have a witness on the stand. I

8 think it goes back to then because they chose to have

9 secret testimony that had it been taken in any other

10 form, the argument today, they didn't give it to us

11 back then, that was, whatever might have been in there.

12 I don't know. But it could have been impeachment

13 evidence. But we don't know that. We don't even know

14 that today. So fine, the rule says adequate

15 opportunity to cross examination but it doesn't address

16 the issue of secret testimony.

17     THE COURT: So I should see the grand jury

18 testimony as well.

19     MR. BARKER: I agree. Once again I made a copy

20 for that purpose.

21     THE COURT: Mark it.

22     MR. MULLER: Do I also get a copy of that?

23     THE COURT: Is there any reason not to?

24     MR. McCORMACK: The only problem is the

25 difficulty of grand jury testimony the rule does not

1  provide for that.  I'm not seeking to prosecute
2  anybody.
3         MR. MULLER:  Yet.
4         MR. McCORMACK:  For that I don't want to be
5  prosecuted for breaking the rule.  That's the
6  difficulty with these rules.
7         THE COURT:  The proffering of this witness's
8  testimony right now I think within the spirit of the
9  rule you can provide it to him without violation.
10        MR. BARKER:  Fair reading of the rule,
11 Guillermina Cruz has already testified.
12        THE COURT:  I think that's true.  At this
13 point -- how are you marking these so my records are
14 correct?
15        MR. BARKER:  Your Honor, I have marked the
16 statement of December 20, 1996 as Commonwealth Exhibit
17 55.
18        THE COURT:  That was the one that was available
19 to the Defense at the time of her testimony.
20        MR. BARKER:  That's correct.  The statement of
21 December 28, 1996, Commonwealth Exhibit 56, and that
22 also was available; Commonwealth Exhibit 57 is a
23 statement of February 19 of 2001.  That was not
24 available.
25        THE COURT:  To the Defense.

DAUPHIN COUNTY COURT REPORTERS

1        MR. BARKER: Correct. Commonwealth Exhibit 58

2  would be a statement of March 24, 2001. That also was

3  not available to the Defense.

4        MR. MULLER: What was the date again?

5        MR. BARKER: March 24, 2001.

6        MR. MULLER: If I could just review this for a

7  minute. You can continue.

8        MR. BARKER: Commonwealth Exhibit 59 would be

9  the grand jury transcript. That's dated March 28,

10  2001. That was not available.

11        THE COURT: Any other statements,

12  correspondence or the like, anybody, that would have

13  been a prior statement of this witness that was in the

14  Commonwealth's hands that was not available to the

15  Defendant at that time? Mr. Barker.

16        MR. BARKER: Not that I'm aware of unless the

17  Defense can point me in a direction, Your Honor.

18        THE COURT: Any other materials that was made

19  available to the Defendant that I have not heard about

20  as to Ms. Cruz's prior statement?

21        MR. MULLER: Just for clarification, I don't

22  think it's limited to statements of testimony. Are

23  they talking about impeachment of evidence? And I

24  guess what I'm saying, formal statements -- I mean,

25  statements made to anyone, to the Commonwealth, other

1  officers or anything like that that were reduced to a
2  formal statement would also be considered as to whether
3  it was available or unavailable for full and fair cross
4  examination.

5  THE COURT: Are you suggesting I need to hear
6  testimony as to what other reports may have been
7  available to the Commonwealth but not made available to
8  the Defendant at the time of the preliminary hearing?

9  MR. MULLER: As of that date, yes. The Court's
10  indulgence. The thing that occurs to me, Your Honor,
11  obviously you haven't heard it, but Investigator
12  Heffner reports there were phone calls between Ms. Cruz
13  and Investigator Heffner and statements that were
14  recorded from -- I guess she was leaving messages for
15  Investigator Heffner.

16  MR. BARKER: Your Honor, I didn't hear how that
17  would be impeachment evidence.

18  MR. MULLER: The Court's indulgence. Your
19  Honor, there's a discrepancy I want to clarify.

20  THE COURT: All I want at this point is I need
21  to know, Mr. Muller, from the Defense what is it that
22  you believe existed at the time of the preliminary
23  hearing in March of 2002 that was not disclosed to you
24  and which constitutes valid impeachment and
25  inconsistent statements or otherwise impeachment

1 issues? The point being that it's not a question of is

2 there other material. You have an obligation I believe

3 to point out how it would have, the unavailability at

4 the time, impeded inadequate cross examination of the

5 witness.

6      MR. BARKER: Your Honor, before you leave just

7 to correct something. Mr. Muller pointed out

8 Commonwealth Exhibit 57 dated February 19, 2001 is a

9 typo. That should have been 2002. Again that was not

10 available and I had indicated that previously.

11      THE COURT: Not made available to the Defendant

12 at the time.

13      Mr. Muller, do you have anything at this point

14 to bring to my attention to supplement? I'll review

15 them over the lunch hour. Shortly thereafter we'll

16 take up testimony until I consider this matter.

17      (A brief recess is taken from 10:07 a.m. to

18 10:23 a.m.)

19      THE COURT: Put on the record what you think,

20 on behalf of the Defendant, believed is material or

21 information that should have been made available to

22 you, to the Defense, but were not. If they are not

23 already part of an exhibit, mark copies of them and get

24 them on the record.

25      MR. MULLER: The grand jury testimony is not

1  part of the exhibit.

2      THE COURT:  Yes, it is.

3      MR. MULLER:  If you're talking about grand jury

4  testimony dated March 28, 2001, I believe that's what

5  it is.  In addition to that, Your Honor, referring to

6  the statement of March 24, 2001, she's asked why she

7  gave two different versions of her story, and in one

8  then she says essentially back then they were telling

9  me to tell just what they wanted to hear so we could be

10  out of town quicker; may or may not consider that

11  impeachment.  I would think that was -- would be

12  important to ask if someone was telling me what to say.

13  In addition, as mentioned before, the Defense is being

14  prevented from asking her, Ms. Cruz, about what they

15  did after they left the victim's apartment because her

16  statements indicate she saw him later at certain places

17  or place and the time frame becomes important in there

18  as to who was doing what when.

19      Her December 20, 1996 statement, her first

20  statement, which obviously is entirely contradictory of

21  everything else and her grand jury --

22      THE COURT:  Wait a minute, that statement I was

23  just told was made available to the Defense prior to

24  the time of the preliminary hearing, December 20, 1996.

25      MR. BARKER:  Yes.  It was given over in

1  discovery in the first case for one thing.

2  MR. MULLER: I don't know, Your Honor. That's

3  why I had Mr. Batson here to testify earlier to see

4  about that.

5  THE COURT: I thought someone told me the

6  transcript actually had reference to that statement.

7  MR. BARKER: That's the 28th.

8  THE COURT: Will I need to have testimony on

9  that issue then as to whether or not that statement of

10  December 20, 1996 was or was not turned over?

11  MR. BARKER: I suppose we would need

12  Mr. Rowland. Probably he represented him at the time.

13  MR. MULLER: Jerry Russo really.

14  MR. McCORMACK: I believe at the time of

15  discovery it was Mr. Rowland. Attorney Rowland had the

16  case. Attorney Russo had the case by the time of the

17  third preliminary hearing. Attorney Rowland had the

18  case again. He had it at the time it was dismissed.

19  THE COURT: If the parties do not agree as to

20  what statements were or were not available to the

21  Defense at the time, then I guess we need to have a

22  hearing on that issue. When can we do that?

23  MR. BARKER: I'll call Mr. McCormack.

24  MR. McCORMACK: The day I provided the

25  discovery during the first prosecution.

1       MR. MULLER:  Mr. Batson had a hearing to go to

2   so he could not stay.

3       MR. BARKER:  I would reference page 46 of the

4   preliminary hearing transcript from March 5, 2002.

5   There's a reference of the December 20, 1996 statement

6   and that's at line 18.

7       MR. MULLER:  It's not a reference to the

8   statement.  It's a reference to December 20th.

9       MR. BARKER:  I agree, Your Honor.  Your Honor,

10  if we need to have a hearing, I suppose I have to put

11  Mr. McCormack on the stand to say that he provided

12  discovery.  In fact, he's still under oath.  I can do

13  it from here if you like.

14      THE COURT:  He doesn't need to refer to any of

15  his files to see if he has documentation to say that

16  was done and to whom it was provided.

17      MR. McCORMACK:  I don't have the exact dates.

18  I know for a fact I turned over her statements to the

19  attorney in the first case.

20      THE COURT:  To which attorney?

21      MR. McCORMACK:  Attorney Rowland.

22      THE COURT:  And are you testifying here today

23  then, Mr. McCormack, that the statement which was been

24  marked as Commonwealth Exhibit 55, that being the

25  statement of Guillermina Cruz of December 20, 1996, was

1  turned over to Mr. Rowland representing this Defendant
2  and at some time prior to the preliminary hearing of
3  March 5, 2002?
4          MR. McCORMACK:  Yes.  I would also note --
5          THE COURT:  Do you know when that would have
6  approximately been?
7          MR. McCORMACK:  I know it was some time after
8  July of 1997 because I did have a letter from
9  Mr. Rowland indicating that he had not yet received his
10 discovery from me at that point in time, and it was
11 some point after then that I provided them discovery.
12         THE COURT:  Well, March 4, 2002, the day before
13 the hearing or...
14         MR. MULLER:  Mr. Rowland was done in March of
15 1998 when they originally dismissed the case.
16         THE COURT:  Some time in that time frame.
17         MR. McCORMACK:  Yes, in that time frame.
18         THE COURT:  In July of '97, in March of '98.
19         MR. McCORMACK:  Yes, and she also in her
20 preliminary hearing transcript, very first preliminary
21 hearing, essentially reverse -- reverted back.  Her
22 testimony was essentially reverting back to the
23 original statement.  She told the police that she had
24 never gone over to the house.  That's why --
25         THE COURT:  You're referring to a transcript of

1 a hearing not part of my record.

2       MR. BARKER: Not that one.

3       THE COURT: I did not know it was an issue. Is

4 it an issue?

5       MR. BARKER: Apparently it is. I can go make a

6 copy of this and provide it to the Court.

7       MR. McCORMACK: That's essentially what she

8 does at the preliminary hearing and the Commonwealth

9 asked for a continuance.

10       THE COURT: I'm sorry. Which preliminary

11 hearing?

12       MR. McCORMACK: The very first, January 17,

13 1997 at District Justice Zozos. As she began

14 testifying it became evident to myself and Dianna

15 Woodside, the lead prosecutor at that time --

16       MR. BARKER: Your Honor, I'm also looking at

17 the notes of testimony of the preliminary hearing of

18 March 18, 1997 in which Mr. Russo used that statement

19 in cross examination.

20       THE COURT: Used which statement?

21       MR. BARKER: The December 20, 1996 statement.

22       MR. McCORMACK: Would you agree Mr. Russo had

23 that statement in '97?

24       THE COURT: It was available to the Defense.

25       MR. MULLER: To one of the prior defense

1  attorneys in '97.

2      THE COURT:  So you still want to call

3  Mr. Batson?

4      MR. MULLER:  Only if we have to make an issue

5  out of whether the defense attorney in 2002 had that.

6      THE COURT:  I'm asking, is that an issue?

7      MR. MULLER:  I think it's a legal issue then as

8  to whether if the Defendant's prior attorney had it.

9  That then imputed to the subsequent attorney doing a

10 preliminary hearing years later.

11     MR. BARKER:  Same attorney who received

12 documents apparently had been given them previously

13 such as the December 28, 1996 statement.

14     THE COURT:  Which somehow made it to

15 Mr. Batson's hands somehow.  I suppose we have to ask

16 Mr. Batson how he got some and not all.

17     MR. BARKER:  I believe the Defendant's father

18 brought those documents and provided them to

19 Mr. Batson.  This Defendant had access to all of those

20 documents.

21     MR. MULLER:  I wouldn't agree to the assertion

22 it was all the documents.

23     MR. BARKER:  Which is in his attorney's file.

24     MR. MULLER:  I don't want to get into hearsay

25 of Mr. Batson but essentially if he testified, I think

1 he would have testified that he had the preliminary

2 hearing transcript from the two prior hearings and he

3 had this statement to the police from December 28th of

4 '96. I think that's clear from the preliminary hearing

5 record.

6      THE COURT: That he used those.

7      MR. MULLER: There was no use of a statement of

8 December 20th.

9      THE COURT: He's going to say he did not have

10 it.

11      MR. MULLER: He did not have it.

12      THE COURT: That's not what I -- is he going to

13 say I did not have it?

14      MR. MULLER: That was my understanding.

15      MR. BARKER: Our response would be, is he going

16 to say they were not available?

17      THE COURT: That's right. That's the issue.

18      MR. MULLER: I understand that, Your Honor.

19      THE COURT: When is he going to be here, if we

20 have to have a hearing on this point if you're not

21 willing to concede that they were available to the

22 Defendant?

23      MR. MULLER: We could probably have him here

24 after lunch.

25      THE COURT: Let's do it at 1:30 then, hear that

1    little bit of testimony, I guess, for what it's worth.

2         MR. MULLER:  If I could continue then.  The

3    other issue, whatever is her grand jury testimony we've

4    been presented with it, I haven't read through it.

5    It's 82 pages.  I don't know if I could say there's

6    impeachment material in there or not at this point.

7         THE COURT:  I understand that.  I was asking

8    what other stuff you believe there would be, what other

9    documents or materials you believe were not -- were not

10   disclosed that did or may have contained as far as you

11   know impeachment quality information?

12        MR. MULLER:  That would be it.

13        THE COURT:  All right.  Thank you.  Try to get

14   him back here at 1:30 if you would, please.  We'll hear

15   that testimony and try to make a ruling at that point.

16        Mr. McCormack, who's your next witness?

17        MR. McCORMACK:  Officer Lydell Muldrow.

18        THE COURT:  And a series of officers

19   thereafter.

20        MR. McCORMACK:  Yes, sir.

21        THE COURT:  Let's get the jury in the room if

22   we're all ready.

23        (The jury entered the courtroom at 10:39 a.m.)

24        THE COURT:  Good morning, ladies and gentlemen.

25   I apologize for keeping you this long.  The matters we

1   were discussing just became a bit more complex than I

2   had expected.  But we're ready to proceed with the

3   testimony again in this matter.  Mr. McCormack.

4           MR. McCORMACK:  At this time I call officer

5   Lydell Muldrow.

6

7                   LYDELL MULDROW,

8   having been sworn, was examined and testified as

9   follows:

10

11                  DIRECT EXAMINATION

12

13  BY MR. McCORMACK:

14      Q    Officer, could you please state your name for

15  the record?

16      A    Lydell Muldrow, M-U-L-D-R-O-W.

17      Q    And by whom are you employed?

18      A    The city of Harrisburg Police Department.

19      Q    And how long have you worked for the Harrisburg

20  Police Department?

21      A    Over twenty years.

22      Q    Now, on December 20, 1996, were you working

23  that date?

24      A    Yes.

25      Q    And at some point during that day did you

1  respond to 1941 McCleaster Street?

2    A    Yes.  Shortly after 12:00, it was about 12:08,

3  when I received the dispatch and I arrived at

4  approximately 12:13.

5    Q    And what happened when you arrived?

6    A    As I arrived I observed a Capitol regional

7  ambulance parked just east of the house.  We pretty

8  much arrived simultaneously.  We walked in.  I knocked

9  on the door.  Initially I knocked on the door.  I could

10  hear a commotion inside the home, sounded like crying,

11  a lot of movement inside the home.  I could hear a male

12  and female voice.  One responded.  The male that

13  responded to the door, seated next to counsel, opened

14  the door, appeared nervous, very sweaty and I asked him

15  what happened, and he said something is wrong with my

16  girlfriend, and at this time he directed me.  I entered

17  by the living room area and he directed me to a doorway

18  between the living room and was now known as the

19  bedroom area.

20        As I was approaching the bedroom area, I was

21  greeted by a Hispanic female approximately in her 40's.

22  She was very upset.  She was hollering that she tried

23  CPR on her, on the lady that was in the bedroom.  She

24  didn't say who it was, and I was trying to determine --

25  I directed the ambulance crew to follow me towards the

bedroom.  I stood in the doorway.  I could see a female
body laying on the ground, and I directed the ambulance
crew to go in and check her as I cleared the scene.

Q    Now, did you make any notes, notations or
anything about the way the house appeared, for example,
how did the bedroom appear?

A    The bedroom was in a disarray.  I could see
that there was stuff kind of thrown about, mattresses
lying on the floor.  Throughout the house there was
things packed up.  It appeared that someone was moving
out.

Q    Do you recall the words that the Defendant said
to you when he greeted you at the front door?

A    Yes.  Well, when he greeted me at the front
door, he said something is wrong with my girlfriend.
He also, as I was trying to gain preliminary
information in reference to the name of the victim, if
he knew what was wrong with her, did she have any
medical conditions, at this point I did not know what
had happened.  I didn't know if there was a crime that
existed.  I didn't know if she was dead or alive.  As I
was asking preliminary questions walking towards the
bedroom area, he indicated that he tried to get -- I
asked him questions like, were you here?  Do you know
what happened?  And he said, well, I was trying to get

in all night. I couldn't get ahold of her. I couldn't
get in the house. I don't know what's going on. He
also made statements that her brother was here and I
asked him are you the brother. He said no. The
brother left and then he said -- I asked who found her,
and he said he did and then he said they both found
her, and then he flipped and said the Hispanic female
that was there found her. He pretty much was changing
back and forth in his statements to me.

Q    You put a direct quote in your report. Do you
recall what your quote was in the report?

A    I would have to review that report.

Q    I'll show you a copy of your report. The
highlighted area there if you could just read that to
yourself and see if that refreshes your recollection.

A    Yes.

Q    What did the Defendant say to you, one of the
things that you actually took notes enough to put in
your report?

A    He said I don't know what happened to her. I
was trying to get in the house all night but couldn't.

Q    He also indicated to you that at one point he
indicated to you that he found her?

A    Yes.

Q    Now, at some point later did you wind up taking

1  custody of an item out of -- taken an item -- let me

2  rephrase -- taken custody of an item into evidence from

3  the Defendant?

4      A    Yes.  Once we secured the scene we maintained

5  witnesses until the detectives arrived.  At that point

6  we did a preliminary pat down and after a brief

7  interview by the detectives I was directed to take

8  items -- check Mr. Tyshaunt Love for items that might

9  be contained in any pockets, anything that might be

10 dangerous, anything of that nature.

11     Q    Did you find anything when you were going

12 through his pockets?

13     A    Yes.  I found some items in his pocket, pen,

14 other items that I collected.

15     Q    Were those items logged into evidence?

16     A    Yes, they were.

17     Q    I'm going to show you what's been marked as

18 Commonwealth Exhibit No. 60.  Can you get the outside

19 of the envelope.  There's two items in there.  Can you

20 get those items out?  You mentioned a pen.  I think I

21 saw you take a pen out of there?

22     A    Yes.

23     Q    What was the other item?

24     A    It's a slip of paper.  It has on the back of

25 the paper a phone number, and it also has a name and

then on the front of the paper it has Giant Food as a

receipt and it indicates some type of payroll

government check that appears to have been cashed

maybe.

Q    On what date was the check cashed?

A    12/20/96, and it indicates the time here

appears to be 11:19.

Q    You briefly said it at the beginning of your

testimony, just so we're clear, the person speaking who

answered the door, do you remember which door you went

into?

A    Yeah.  I went into what I considered to be the

front door, the main door right off McCleaster Street.

Q    That opens up into what?

A    Opens into the living room area of the home.

The living room area is actually -- probably consider

the second floor because there was a lower floor that

didn't appear to be a basement.  It did open out into a

backyard type area.

Q    Now, the person that greeted you at the door,

made the statements that you testified to and who that

receipt came from, is that person in the courtroom here

today?

A    Yes.  He's seated next to counsel.

Q    Can you just tell us what he's wearing?

1  A He's wearing a white shirt, a vest, glasses.

2    MR. McCORMACK: May the record reflect that he

3 identified the Defendant.

4    THE COURT: Yes.

5    MR. McCORMACK: They are all the questions I

6 have at this time. Thank you.

7    THE COURT: Cross-examine.

8

9        CROSS EXAMINATION

10

11 BY MR. MULLER:

12  Q You indicated you received a dispatch at 12:08?

13  A I looked at the dispatch log as I reviewed some

14 of my reports prior to the proceeding. I believe it

15 was a 12:08 dispatch time.

16  Q You would have received that after dispatch

17 received the call, correct, or something to that

18 effect?

19  A Yes.

20  Q Okay.

21  A The dispatch time is the time they sent the

22 call to me. It could have been sent either through a

23 computer or by radio.

24  Q Do you recall which?

25  A In most priority type calls like this there may

be an assault, something of that nature -- they can
dispatch me both ways, dispatch me by a computer.  I
would hear ringing in my computer or at that time it
was a ring and lately there's a voice now, but I
believe at that time it was a ring that came over my
computer indicating that I had a call.

Q   The call was regarding a female not breathing?

A   That's correct.

Q   When you arrived at the scene, where was the
ambulance?

A   The ambulance, if I could recall, they were
parked just east of the doorway of 1941 McCleaster
Street.

Q   Were they on McCleaster Street?

A   They were on McCleaster Street.

Q   Was there anyone in the ambulance?

A   I believe so.  I believe when I pulled up they
stepped out of the ambulance and I believe we all
walked to the door.  Normal procedure, I clear the
scene prior to the ambulance crew entering the home and
make sure there's no one present and apparent dangers
that come to the ambulance crew.

Q   In your police report you stated that as you
entered the room one of the Capitol regional ambulance
attendants had examined the body and it was cold,

1  correct?

2      A    Yes.

3      Q    So one of the attendants was in there before

4  you, correct?

5      A    If we're referring to the bedroom, that's

6  correct.  I directed them in the bedroom.  As I looked

7  in the bedroom I stood between the doorway -- I was

8  mostly concerned with maintaining the two witnesses and

9  getting preliminary information in reference to what

10 may have happened, you know, if the victim had a

11 medical problem, what happened; because at the time I

12 didn't know what was going on.  I didn't actually

13 physically completely enter that room until the

14 ambulance crew announced that the body was cold.

15     Q    So you testified you heard a commotion.  What

16 do you consider a commotion?

17     A    I heard a lot of what sounded like female

18 crying.  I could hear a male's voice, and I couldn't

19 make out exactly what they were saying.  They sounded

20 very excited, very worried.  There was some movement.

21 I could hear some movement inside the home.  I could

22 hear.

23     Q    You knocked on the door?

24     A    That's correct.

25     Q    And when Mr. Love answered the door he directed

1 you to the bedroom?

2     A    Not initially; he kind of stood there at first.

3 I asked him what was going on and he said something is

4 wrong with my girlfriend.  At that point I began to

5 move in towards the living room, move into the house

6 and he accompanied me towards the bedroom.

7     Q    You made a report of this back at that time,

8 correct?

9     A    Yes.

10     Q    And do you know when you would have done that

11 report?

12     A    There's a time indicated on the report but

13 probably would have been an hour or maybe two hours

14 after the scene was secured.

15     Q    There's a time of 13:47.  What would that

16 reflect?

17     A    That would reflect the time I initiated my

18 report, that's correct.

19     Q    And the purpose of the report is to get

20 important facts down at the time, correct?

21     A    The purpose of my reporting as the initial

22 responding officer is to detail my initial

23 observations.

24     Q    When you're trained at the academy in police

25 reports, the reason you make a report is to memorialize

1  information, correct, because you may not be available?

2      A    What I was told the reason to make a report is

3  to refresh my memory of the events that occurred, to

4  document information in reference to a particular

5  event.

6      Q    Pertinent information?

7      A    Yes.

8      Q    That's the reason for the report?

9      A    Yes.

10      Q    On your report you state that after you asked

11  Tyshaunt if the victim had any medical problems and you

12  said moments after you arrived he indicated yes, he

13  didn't know what problems she may have had, he then

14  blurted out, I don't know what happened to her. I was

15  trying to get into the house all night but couldn't.

16  Then you have in your report, I asked him if he was the

17  one who found her and he stated yes. You had a chance

18  to review your report?

19      A    Yes, I have.

20      Q    That is what's contained in your report,

21  correct?

22      A    At the time this incident was occurring.

23      Q    That is what is contained in your report?

24      A    Yes, that's correct.

25      Q    Nothing about him saying the brother found her.

1 He found her. You kind of indicated he flipped-flopped

2 on that, correct?

3     A    He was worried about so many things.

4     Q    Yes or no.

5     A    Can you repeat the question?

6     Q    There's nothing in your report about him saying

7 the brother had found her, then he found her, then he

8 flipped-flopped?

9     A    That's correct. No, that's not in there.

10     Q    That's what you're saying today eight and a

11 half years later?

12     A    I'm saying that because after I continued to

13 talk to him I determined that he was actually the one

14 that found her. He indicated that he found her. That

15 was his final statement to me. He has given numerous

16 statements.

17     Q    That's not in your report that this potential

18 witness was jumbling his statement and saying

19 contradictory things?

20     A    No, it wasn't.

21     Q    How long have you been a police officer?

22     A    Over twenty years.

23     Q    So back then you would have been an employee

24 for over ten years back in 1996?

25     A    Yes.

1    Q    What was your rank?

2    A    At that time it was corporal.

3    Q    You were a patrol officer?

4    A    I was a patrol supervisor.

5    Q    In '96?

6    A    Yes.

7    Q    You said some things were packed up. You

8 mentioned some mattresses against a wall, correct?

9    A    I recall seeing a mattress against the wall,

10 yes, that's correct.

11    Q    What else was packed?

12    A    There was some stereo equipment.

13    Q    Where was that?

14    A    I can't recall where the equipment was located.

15 It was equipment of things packed as I recall

16 throughout the living room area and the bedroom.

17    Q    When you say packed, what are you referring to?

18    A    It looked like it was taken apart and packed up

19 as if somebody was either moving it out or moving it

20 in.

21    Q    Packed in the box or just things lying

22 together?

23    A    I can't recall if it was in a box or not.

24    Q    You don't recall that now?

25    A    I can see the stereo equipment. It wasn't

packed in the box.

    Q    You can visually see it?

    A    I can't recall.

    Q    You can't recall which room but you recall the stereo?

    A    Yes.

    Q    You went in the front door and this Hispanic female was in the bedroom with the victim, correct?

    A    She was coming from the bedroom, that's correct.

    Q    She was coming from the bedroom.  She told you she had tried to do CPR?

    A    Yes.

    Q    You indicated you took custody of these items including this receipt from Giant, right?

    A    Yes.

    Q    And you read into the record what was printed on there.  But you have no knowledge if that's correct or not.  You have no knowledge of this receipt other than that?

    A    Yes, other than it was printed on there.

    Q    You're not an investigator.  You didn't look into that or do anything with that, did you?

    A    No, I just collected it.

    Q    Did you also collect clothing?

1    A    Yes, I believe I did collect his clothing.

2    Q    From Mr. Love?

3    A    Actually I believe I may have collected the

4  clothing, packaged it and logged it.  I took it down

5  from the scene and logged it.

6    Q    You logged in the clothing?

7    A    Yes.

8    Q    And there's a time of 2128 on that report.

9  Would that be accurate?

10    A    If it says 2128, the time I logged it in, that

11  would be incorrect.

12    Q    Well, I show you what I have.  If you could

13  just identify what that is and what information is on

14  there.

15    A    This appears to be a property record sheet.

16    Q    Whose?

17    A    It's a property record sheet initiated by me.

18  It has my name and my badge number and that's reporting

19  officer.

20    Q    Is there a time or date on it?

21    A    Yes.  The date is 12/20/96 and it does reflect

22  a time of 2128 hours.

23    Q    And it reflects that time in another area too,

24  does it not, on the first page?

25    A    That's correct.

1    Q    And where is that?

2    A    That would be listed as Item 2 and also listed

3 as 2128 hours.

4    Q    If I could go through with you briefly, you

5 confiscated a jacket/shirt?

6    A    According to that report, I viewed that report,

7 it does appear that I collected that but if it was 2128

8 hours it has a possibility that based on the computer

9 system that --

10    Q    I'm not concerned about the exact time.  It's

11 just you had a hand in taking these items?

12    A    It appears to be that way, yes.

13    Q    You don't recall actually doing it?

14    A    I don't recall.

15    Q    Item No. 2 is listed as a down jacket?

16    A    Yes.

17    Q    Green with blue lining?

18    A    Yes.

19    Q    Item No. 3, off-white Fruit of the Loom

20 T-shirt?

21    A    Yes.

22    Q    Item No. 4, pair of jeans?

23    A    Yes, long pants size 34.

24    Q    Item No. 5, pair of boots?

25    A    Yes.

1  Q   Item No. 6, a cap?

2  A   Yes.

3  Q   And then 7 and 8 were I think the Commonwealth

4  introduced the receipt and the pen?

5  A   Yes.

6  Q   If you had taken anything else it would have

7  been in this record, correct?

8  A   Yes.

9  Q   And at some point you did observe the victim on

10  the floor, correct?

11  A   Yes.

12  MR. MULLER:  That's all I have.

13  THE COURT:  Redirect?

14

15  REDIRECT EXAMINATION

16

17  BY MR. McCORMACK:

18  Q   Just one thing; the thing I asked you about

19  before what he blurted out, I don't know what happened

20  to her.  I was trying to get in the house all night but

21  couldn't.  You put that in the report in quotation

22  marks; is that correct?

23  A   Yes.

24  Q   Why would you put something in quotation marks

25  in your report?

1  A  Because I asked him questions more than once.
2  It's very hard.  He was excited, and he appeared to be
3  nervous.  Sometimes his answers were incoherent.  I
4  couldn't understand what he was saying.

5  Q  My question, why when you wrote the report did
6  you put quotation marks around that phrase?

7  A  Later when we stopped I asked him again.  He
8  indicated to me exactly what I put, that phrase.  It
9  stuck out because at that time he was more coherent,
10  more calm.

11  MR. McCORMACK:  I have nothing further.

12

13  RECROSS EXAMINATION

14

15  BY MR. MULLER:

16  Q  Well, when someone answers a direct question
17  you don't always put that in quotation marks?

18  A  No.

19  Q  So after that when you said I asked him if he
20  was the one who found her, he stated yes, the question
21  is in quotation marks?

22  A  Yes.

23  Q  He didn't change what he told you.  He told you
24  I don't know what happened to her.  I was trying to get
25  in the house all night but couldn't.

1    A    Yes, yes.

2         MR. MULLER:  That's all I have.

3         MR. McCORMACK:  Nothing further, Your Honor.

4         THE COURT:  Thank you, officer.  You may step

5    down.

6         MR. McCORMACK:  I call Detective Massey.

7

8              ELIJAH MASSEY,

9    having been sworn, was examined and testified as

10   follows:

11

12              DIRECT EXAMINATION

13

14   BY MR. McCORMACK:

15   Q    Could you state your name for the record,

16   please?

17   A    Elijah Quinn Massey, M-A-S-S-E-Y.

18   Q    By whom are you employed?

19   A    Harrisburg Bureau of Police, assigned to the

20   Criminal Investigation Division.

21   Q    How long have you worked for the Harrisburg

22   police?

23   A    Twenty-three years.

24   Q    How long have you been a detective?

25   A    For about 18 of those years.

1    Q    Back in December of 1996, you were a detective
2 at that time?

3    A    Yes.

4    Q    And did you have an opportunity or an occasion
5 to respond to 1941 McCleaster Street on December 20,
6 1996 at that point in time?

7    A    Yes.

8    Q    Tell me, do you know when you arrived there?

9    A    I arrived at about 1325 hours, which is about
10 1:25 p.m.

11    Q    Now, when you arrived, what was your role at
12 the scene?

13    A    To assist the lead investigator who at that
14 time was Detective Stilo, Detective Matt Taylor, assist
15 patrol officers in looking at the scene, secure
16 everything, review what had happened and talk to any
17 witnesses who were there.

18    Q    What did you find when you arrived at the home?

19    A    The home was, which appeared to be a garage
20 that was converted into a one-bedroom apartment, going
21 into the door of this dwelling was very dark in the
22 room initially.

23         Once we went throughout we discovered the
24 deceased female that we found.  There was blood
25 throughout the entire area where the body was located.

1 Also a piece of evidence I did find in the kitchen area

2 was a plastic trash bag that was full of wet rags.  It

3 was lodged between the refrigerator and I believe a

4 cupboard was also in the kitchen area.

5      Q      Detective, I'm going to show you Commonwealth

6 Exhibit No. 53.  It's a photograph; if you could

7 familiarize yourself with that photo at this time.  Do

8 you recognize it?

9      A      Yes.

10      Q      What is it a photo of?

11      A      Refrigerator in the kitchen area; lodged

12 between the refrigerator and the wall is a plastic

13 trash bag, a garage bag.  It was light green in color.

14 This bag is full.  As we look at it it was full of wet

15 rags.

16      Q      Now, there was also -- when Iris's body was

17 removed from the scene was anything relating to

18 Tyshaunt Love found?

19      A      Yes, what was removed under her body was an

20 identification.

21      Q      You say some sort of identification was found

22 underneath where her body was?

23      A      Yes.

24      Q      And that identification was for who?

25      A      It was from Tyshaunt Love.

1     Q    And then as part of your portion of the

2  investigation -- you said you weren't the lead

3  investigator.  That was Matt Taylor?

4     A    Yes.

5     Q    He was the second one?

6     A    Yes.

7     Q    You supported them.  How did you support them?

8     A    In addition to locating whatever we found at

9  the crime scene I spoke to several people who were

10  neighbors, who were family members of Iris Fennel.

11         MR. McCORMACK:  They are all the questions I

12  have, Detective Massey, at this time.

13         THE COURT:  Cross.

14

15                CROSS EXAMINATION

16

17  BY MR. MULLER:

18     Q    Detective, when did you arrive at that scene?

19  Do you recall?

20     A    It was December 20th of 1996 at about 1325

21  hours.

22     Q    In normal time that would be?

23     A    1:25 in the afternoon.

24     Q    Do you recall who was there when you arrived?

25     A    I believe our patrol officers, Officer Muldrow

1   and also Officer Bailey were present.  There would have

2   been other officers.  I don't recall.  Just those two

3   right now.

4       Q   And the coroner was there I assume?

5       A   The coroner had not arrived yet.

6       Q   While you were there the coroner arrived?

7       A   Yes.

8       Q   When you arrived at the scene, do you recall

9   how you entered the apartment?

10      A   I believe by way of the main entrance, which

11  would have taken me into the living room area.

12      Q   Once you go through the door you're in the

13  living room?

14      A   Yes.

15      Q   And you talked to a number of people that day,

16  that afternoon?

17      A   Yes.

18      Q   Let me take it in forward in the order you have

19  it in your report.  You talked to a Jeanette McCurdy,

20  correct?

21      A   Yes.

22      Q   When did you talk to her?

23      A   At about 1:45 p.m.

24      Q   And what did she tell you?

25      A   She said on that day between 12:15 and 1230

hours she was in her backyard with her dog.  She was
confronted by Zach -- I believe I'm pronouncing the
name correctly -- Socorro Roman, who are related to
Iris Fennel -- they requested she dial 911 because
something is wrong with Iris.  Ms. McCurdy indicated
she returned inside her home and contacted Harrisburg
police.

Q    And then what did she tell you?

A    She said she heard nothing out of the ordinary
and could give no additional information.

Q    The interview was concluded?

A    Yes.

Q    Who do you talk to next?

A    Ms. Roman, one relative that had Ms. McCurdy
call 911.

Q    Ms. Socorro we are talking about?

A    Yes.

Q    And when did you talk to her -- excuse me --
when did you talk to her?

A    At about 4:50 p.m. same day.

Q    In her statement she told you at that time that
it was Zach who saw smoke coming from the home?

A    Yes.

Q    And that they telephoned the home?

A    Yes.

1    Q    They decided to walk to the home and see why
2  there was smoke?
3    A    That's correct.
4    Q    She told you they both approached the rear
5  door?
6    A    Yes.
7    Q    And it was open?
8    A    Yes.
9    Q    As they entered Mr. Love was coming down the
10  steps?
11    A    That's correct.
12    Q    And he told them to call the police because
13  something was wrong with Iris?
14    A    Yes.
15    Q    Then you spoke to a Tamara Williams?
16    A    That's correct.
17    Q    You listed black female 19 years old?
18    A    At the time, yes.
19    Q    And she was related to the victim how?
20    A    Her sister.
21    Q    She relayed to you that she had called a number
22  of times, called her sister a number of times?
23    A    Yes.
24    Q    Let me go back.  When did you talk to her?
25    A    On the same day.

1    Q   And she gave you times when she called and

2 didn't get an answer, correct?

3    A   That's correct.

4    Q   And those times were what?

5    A   On the 18th she attempted to call her and

6 couldn't remember the time.  But she called again on

7 the 19th, called at 10:00 p.m., and again at -- I'm

8 sorry -- 8:00 initially; the second time at 10 p.m. and

9 then again at 1 a.m., which would have been on the 20th

10 that morning.

11    Q   And she didn't get an answer?

12    A   Correct.  She said the phone just rang.

13    Q   You have another paragraph.  What does that

14 say?

15    A   Ms. Williams could offer nothing additional and

16 the interview concluded.

17    Q   You also talked to Johanna Johnson?

18    A   Yes.

19    Q   And that was on the same day as well?

20    A   Yes.

21    Q   Ms. Johnson told you about a phone call she had

22 with the victim?

23    A   That's correct.

24    Q   Earlier that day or that morning?

25    A   That's correct.

1  Q In fact, in the very early hours?

2  A In fact about 1:00 a.m.

3  Q She told you they talked to approximately when?

4  A They talked about 45 minutes when Ms. Johnson

5 had to hang up the telephone. She called Iris back

6 within ten minutes and they talked for -- until at

7 least approximately 0230 hours, about 2:30 a.m.

8  Q And why did she tell you the phone call

9 concluded?

10  A Because Iris heard a knock on her window.

11  MR. McCORMACK: I object to this. This is

12 inconsistent with what Johanna Johnson stated.

13  MR. MULLER: That's why it's been offered.

14  THE COURT: Are you withdrawing the question?

15  MR. MULLER: I'm move on.

16 BY MR. MULLER:

17  Q You have a note at the bottom. Do you see

18 that?

19  A Yes.

20  Q It states that she indicated that Iris said the

21 name of the male she was allowing into her home?

22  A That's correct.

23  Q She couldn't remember it. Why?

24  A Well, she said she couldn't remember the name.

25 As Iris told her she saw a mouse run across the kitchen

floor and that had her attention; however, Iris did
sound alarmed when she heard the knock at the window.

Q    And she heard a male voice?

A    Yes.

Q    On the other end?

A    Yes.

Q    She didn't recognize it?

A    She said she couldn't tell who it was.

Q    Iris had told her that she was cooking chicken?

A    Yes.

Q    To go back a little; previously you talked to
two other people, a Vetta Maynard and a Wendy Harris.

A    Yes, I did.

Q    When did you talk to them?

A    I talked to Wendy Harris on December 21st at
about 5:05 p.m.

Q    Did you talk to her before that?  I'm looking
at your report.

A    What page are you looking at?

Q    The printout says page 19 on mine.  It's right
before you talked to Ms. Johnson.  Do you see where I'm
referring to?

A    That's the day of the incident when I spoke to
Vetta Maynard.

        MR. McCORMACK:  I object.

```
 1          THE COURT:  Wait a minute.

 2          MR. McCORMACK:  I object to anything concerning

 3   Vetta Maynard.

 4          MR. MULLER:  I'm not asking about that.

 5          MR. McCORMACK:  You did ask about speaking with

 6   Vetta Maynard.

 7          MR. MULLER:  Did you speak with her is not

 8   hearsay.

 9          THE COURT:  Officer, I want you to refer to the

10   portions concerning Wendy Harris.

11          MR. MULLER:  You spoke to them at 1314 hours.

12          MR. McCORMACK:  You say them.

13          MR. MULLER:  I'm setting the stage of the

14   foundation.  I'm not asking what Maynard said.  It's

15   hearsay if I ask.

16          MR. McCORMACK:  May we approach?  It's a

17   summary of two people talking to him at the same time.

18          THE COURT:  All right.

19          (A discussion is held at sidebar off the

20   record.)

21          MR. MULLER:  The Court's indulgence.

22   BY MR. MULLER:

23      Q   You spoke to a Wendy Harris the next day?

24      A   Yes.

25      Q   And she told you that she had gone to this
```

1  address that morning, correct?

2      A    That's correct.

3      Q    When did she say she went to Iris's home that

4  morning, what time?

5      A    She said at about 11:00 a.m.

6      Q    How long were you involved in this

7  investigation?

8      A    I believe until the 21st, maybe about the 28th

9  of December of '96.

10     Q    That was the end of your involvement?

11     A    Yes.

12          MR. MULLER:  The Court's indulgence.

13  BY MR. MULLER:

14     Q    These rags you found, you indicated that they

15  were wet?

16     A    Yes.

17     Q    Did they smell like anything?

18     A    It was like bleach or some kind of cleaning

19  solution.

20     Q    And after did you actually open the bag or did

21  you keep everything in the bag?

22     A    I kept everything in the bag.

23          MR. MULLER:  That's all I have.

24          THE COURT:  Redirect?

25          MR. McCORMACK:  Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. McCORMACK:

Q    On your report when you were talking to
Mr. Muller on cross examination, he directed you to
your interview with Johanna Johnson that you had a note
at the bottom of the page?

A    Yes.

Q    And you started reading from that but yet you
stopped at one point.  You read that Ms. Johnson
mentioned Iris sounded alarmed when she heard the
knock.  However, you didn't read the rest of that
sentence.  What did you write for the rest of that
note?  Do you see where I'm referring to?

A    I'm trying to find the location.  Yes, I'm
here.  Ms. Johnson mentioned Iris sounded alarmed when
she heard a knock at the door.  However, when she saw
who it was she was okay.

MR. McCORMACK:  Nothing further.

MR. MULLER:  Nothing.

THE COURT:  Thank you.  Detective Massey, you
may step down.

MR. McCORMACK:  Your Honor, I would move at
this time for the admission of Commonwealth Exhibit
No. 53, a photograph which we just saw, and I would

1 also move for the admission of Commonwealth 60, which

2 was on the previous witness, the receipt of the payroll

3 check that was cashed and the pen.  So I can keep up.

4 　　　　　MR. MULLER:  No objection.

5 　　　　　THE COURT:  Both are admitted.

6 　　　　　(Whereupon, Commonwealth Exhibit Nos. 53 and 60

7 are admitted into the record.)

8 　　　　　MR. McCORMACK:  At this time I call Officer

9 Joseph Zimmerman.

10

11 　　　　　　　　　JOSEPH ZIMMERMAN,

12 having been sworn, was examined and testified as

13 follows:)

14

15 　　　　　　　　　DIRECT EXAMINATION

16

17 BY MR. McCORMACK:

18 　　　Q　　Could you please state your name for us?

19 　　　A　　Joseph A. Zimmerman.

20 　　　Q　　By whom are you employed?

21 　　　A　　Harrisburg Bureau of Police.

22 　　　Q　　How long have you worked for the Harrisburg

23 police?

24 　　　A　　Thirteen years.

25 　　　Q　　Were you involved in the investigation of the

1   death of Iris Fennel on December 20, 1996?

2      A   Yes, I was.

3      Q   And what was your role?

4      A   I transported Mr. Love to the police station.

5      Q   And when you transported Mr. Love to the police

6   station, did you also participate in an interview of

7   Mr. Love?

8      A   Yes, I did.

9      Q   How are interviews conducted at the Harrisburg

10   Police Department, a formal interview?

11      A   He was taken into the conference room, CID

12   conference room -- CID being the Criminal Investigation

13   Division -- and in the conference room we sat down and

14   talked to him about what had happened.

15      Q   Is there any attempt at any point in time to

16   then put that on either tape or down on paper?

17      A   Yes. First we interview them; then we take a

18   formal statement from them.

19      Q   So the formal statement takes place?

20      A   The formal statement is usually typed, can be

21   recorded, but it was typed here.

22      Q   Who typically types it?

23      A   We have a secretary that types our statements.

24   If she's not available then we do it ourselves.

25      Q   When the secretary takes the statement how is

1  that done?  Is she sitting there with you writing down

2  everything that's being said?

3      A    From the interview room we would go to her

4  office and in her office she has a typewriter and a

5  computer.

6      Q    After that is done, that interview is done, do

7  you then show it to the person who gave you the

8  statement?

9      A    Yes.  The person typically reviews the

10 statement and then signs it after they are done

11 reviewing it.

12     Q    In this particular case, did you participate in

13 that process with this Defendant?

14     A    Yes, I did.

15     Q    When the statement was completed, did you

16 review the statement with the Defendant?

17     A    Yes, I did.

18     Q    And tell me how that happens?

19     A    After we took a statement, he was reviewing it.

20 Apparently at some point he got tired of reading it so

21 I offered to read it to him.  I read it out loud as he

22 followed along and he initialed each page as I read it

23 and then he signed it at the end of the statement.

24     Q    Now, did you also have an opportunity to go to

25 the residence of 1941 McCleaster Street?

1    A    Yes, I did.

2    Q    When did you go to 1941 McCleaster Street?

3    A    Initially I responded there.  I didn't go to

4    the house.  I initially responded I believe the next

5    day.  I went with Investigator Taylor to the house.

6    Q    Now, the next day you said you went to the

7    house?

8    A    I believe it was actually -- if I could refer

9    to my report I could tell you exactly what time.

10    Q    If you could do that for us.

11    A    Yes.  That would have been the 21st at 4:59

12    p.m.

13    Q    Did you find anything when you went back to the

14    scene on December 21st?

15    A    Yes.  We found suspected crack cocaine on the

16    bedroom windowsill and a marijuana blunt in the ashtray

17    in the bedroom.

18    Q    What's a marijuana blunt?

19    A    A blunt would be what's left of a marijuana

20    cigarette.  A blunt is -- without looking at it in this

21    case I'm not sure whether it was wrapped in a cigar.

22    It's used to smoke marijuana.

23    Q    I'm going to show you what has been previously

24    marked and moved into evidence as Defense Exhibit

25    No. 1.  Do you recognize what that is a photograph of?

1   A   Yes, the bedroom of 1941 McCleaster Street.

2   Q   The window where you found the crack cocaine --

3   A   Yes.

4   Q   -- is that depicted in that photograph?

5   A   Yes.  The windowsill is behind the blinds here,

6   the black blinds.

7   Q   The blinds are black in that photograph?

8   A   Yes.

9   Q   Did you estimate how much crack cocaine you

10  found?

11  A   I don't have it listed here in my report.  I'm

12  sure it would be on a property record.

13  Q   Did you put that item into evidence?

14  A   Both were accounted for on a property record.

15  I'm not sure if I did that or Investigator Taylor did

16  that.

17  Q   I'm going to show you a copy of an item.  Can

18  you tell me what that is?

19  A   It's a property record indicating that I

20  actually collected and accounted for the property via

21  the property record.

22  Q   My question prior to looking for this item was,

23  did you estimate the amount of crack cocaine we were

24  talking about?

25  A   Yes, I did.  I have here approximately an eight

ball found on the bedroom windowsill.

Q    What is an eight ball?

A    A quantity of crack cocaine; it's actually a larger chunk of crack cocaine.  I'm not sure how much that weighs.

Q    As part of your role in this investigation, did you have contact with a woman by the name of Stacy Harris?

A    Yes, I did.

Q    When did you have contact with Stacy Harris?

A    That was prior to taking Mr. Love to base.

Q    Was that at the scene?

A    Yes.

Q    And I want to ask what -- I'm not asking what she told you, but do you recall -- well, was she ever transported to base?

A    Yes, she was.

Q    Do you recall what her demeanor was concerning coming down and talking to the police?

A    She was reluctant to come.  She didn't want to be involved.

Q    Do you recall how old Stacy Harris was at the time?

A    I believe she was --

Q    Would you have noted that in your report?

1  A    Yes, she was 17.

2       MR. McCORMACK:  I have nothing further at this

3  time.

4       THE COURT:  Cross.

5

6                 CROSS EXAMINATION

7

8  BY MR. MULLER:

9  Q    Just so I'm clear, you were at the crime scene

10 on December 20th?

11 A    Yes, I was.

12 Q    The date?

13 A    Actually it was the front of the crime scene.

14 I did not go to the house.

15 Q    That's when you met up with Mr. Love and at the

16 same time you made contact with Stacy Harris?

17 A    That's correct.

18 Q    In your report does it indicate when you made

19 contact with Stacy Harris?

20 A    Yes.

21 Q    What time was it?

22 A    It says 12:41.

23 Q    Was she at the scene or did you go to her

24 place?

25 A    I don't have that indicated here whether I went

1   to her place.  Actually we were on a neighborhood

2   canvass.  I don't believe we were at her place or she

3   was just in the neighborhood and we talked to her.

4        Q    What was her address?

5        A    1954 Kensington Street.

6        Q    You determined she was living at that address?

7        A    Yes.

8        Q    Did you determine whether she was living alone

9   or not?

10       A    No, I didn't.

11       Q    When you talked to her she told you that at 2

12  a.m. that morning she heard what sounded like a shot

13  fired and someone screaming, correct?

14       A    That's correct.

15       Q    I'm sorry.  Who was with you when you went back

16  to the scene the next day?

17       A    Investigator or Detective Taylor.

18            MR. MULLER:  That's all I have.

19            THE COURT:  Any redirect?

20            MR. McCORMACK:  No redirect, Your Honor.

21            THE COURT:  All right.  Thank you.

22            MR. McCORMACK:  May we approach, Your Honor?

23            THE COURT:  Sure.

24            (A discussion is held at sidebar off the

25  record.)

1    THE COURT: All right. Ladies and gentlemen,

2  because the next witness I'm told is anticipated to be

3  somewhat lengthier than these that we have just heard

4  this morning, we couldn't get done before the lunch

5  hour and rather than break up the testimony we'll break

6  early for lunch. We have things already scheduled.

7  That means I can't really get started with the jury

8  back in the seats before 1:30. Plan on being back at

9  that time. If I hadn't made those arrangements, we

10  would try to get back early. Enjoy your lunch break.

11  Don't talk about the case. We stand in recess.

12    (The jury exited the courtroom at 11:45 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1       <u>Friday, September 16, 2005</u>
2              <u>Afternoon Session</u>
3
4       THE COURT:  Mr. Muller, are you going to call
5    a witness?
6       MR. MULLER:  No, I'm not, Your Honor.
7       THE COURT:  Over the lunch break, my staff had
8    an opportunity to review the exhibits that are marked I
9    believe Commonwealth Exhibits 54 through 59.  We
10   already determined that the proposed witness,
11   Guillermina Cruz, is not available.  Then the question
12   is whether or not the Defense was afforded fair
13   opportunity to cross examination and added opportunity
14   to cross-examine Ms. Cruz at the preliminary hearing
15   conducted on March 5, 2002.  Her testimony from which
16   is being offered in lieu of her presence here.
17          Reading all of these statements and
18   transcripts, and so the record is also clear,
19   Mr. Barker had provided and wished to put into the
20   record I guess Exhibits 61 and 62.
21      MR. BARKER:  Yes, Your Honor.  Just so the
22   record is clear, I checked with Mr. Muller before I did
23   that.  I didn't provide anybody with anything he didn't
24   know about.
25      THE COURT:  Which are two prior preliminary