1      agree with that?

2   A   Yes.

3   Q   Did you testify truthfully at this

4      hearing?

5   A   No.

6   Q   You lied at this hearing; is that correct?

7   A   Yes.

8   Q   Now, so even though you lied then, are you

9      lying today?

10   A   No.

11   Q   What was your reasoning for lying back in

12      1997?

13   A   I didn't want no part of it.

14   Q   I'm sorry?

15   A   I didn't want no part of it.

16   Q   When you leave the house where did you go?

17

18

19     MR. MULLER:  I'm sorry.  The Court's

20 indulgence.

21

22

23     BY MR. BATSON:

24   Q   How is it you came to tell the police

25      about your involvement or what you

1        witnessed?

2    A   Because I just kept seeing it over and

3        over and over.

4    Q   So you went to the police to say, hey, I

5        was a witness to this incident?

6    A   No, I didn't go to the police.  I talked

7        to my uncle about it and he advised me to

8        go to the police, and I went to the

9        police.

10   Q   And you talked to Heffner or somebody else

11       in the police department?

12   A   Yes.

13   Q   You tell them what you saw?

14   A   I talked to Heffner.

15   Q   You didn't do it because you were coerced

16       by the Commonwealth or anybody like that

17       to go?

18   A   No.

19   Q   Now, at this time though you had pending

20       criminal charges; is that right?

21   A   No.

22   Q   You didn't have pending criminal charges?

23   A   No.

24   Q   You weren't charged with hindering the

25       apprehension of an individual?

1    A    No.

2    Q    You didn't have juvenile charges?

3    A    Yes.

4    Q    So you're saying you came forward today to

5         testify because you saw stuff on the news.

6         Is that what your testimony is?

7    A    I said because I kept seeing it over in my

8         head.

9    Q    So it took you until 2002 to come forward?

10   A    (No response.)

11

12

13   MR. McCORMACK:  In the transcript it's --

14

15

16   THE COURT:  You have to answer the question.

17              Did you answer that question?

18   THE WITNESS:  Actually it was 2001.

19   BY MR. BATSON:

20   Q    You came forward in 2001.

21   A    Yeah.

22   Q    So you didn't come forward because you

23        were subpoenaed by the grand jury?  You're

24        saying you didn't come forward voluntarily

25        because of being forced by the grand

```
 1          jury?
 2     A    Say that again.
 3     Q    Were you compelled to come forward because
 4          the grand jury was convened in this case?
 5     A    No.
 6     Q    You weren't?
 7     A    No.
 8          MR. BATSON:  Judge, that's all the
 9                       questions I have.
10
11
12     MR. MULLER:  Your Honor, another witness was
13 called and then Ms. Cruz was recalled by Defense
14 counsel.
15
16
17     BY MR. BATSON:
18     Q    Miss Cruz, I just have one follow-up
19          question.  Earlier you testified about
20          seeing my client discharging a weapon when
21          you went upstairs.  What I need to know
22          is, in what position did you see my client
23          in when you saw him discharging that
24          weapon?
25     A    He was, like, in the doorway almost, like
```

1              a couple of steps away from the doorway.

2       Q    Was he standing up?  Was he sitting down?

3       A    Standing up.

4       Q    Straight up.

5       A    Yes.

6              MR. BATSON:  Thank you.  That's all I

7                             have.

8

9

10             THE COURT:  That's the extent of the

11  transcript.

12             MR. McCORMACK:  Yes.

13             THE COURT:  Do I understand, Mr. McCormack, we

14  don't have a witness you could fit in here in 20

15  minutes.

16             MR. McCORMACK:  No, Your Honor, that's correct.

17             THE COURT:  All right.  Well, ladies and

18  gentlemen, we'll start our weekend break early.  You

19  should leave your notebooks in the envelopes, and the

20  pens, leave them on your chairs.  We'll collect them.

21  We're going -- is there anything we'll need to address

22  Monday morning before we bring the jury in the

23  courtroom that anyone can think of now?

24             MR. MULLER:  Briefly, not prolonged.

25             THE COURT:  I have one pretrial conference for

1 civil trials that start the week after. That's at

2 nine. I'd like you back here Monday morning to

3 commence testimony at 9:30, which means be back in the

4 courthouse around 9:15 or 9:20 so we can be ready to

5 go.

6       You are not permitted to discuss this case or

7 any of the evidence you heard amongst yourselves or

8 with any other persons over the weekend. Please be

9 very careful now. Stay away from any kind of

10 newspapers or media that may contain any commentary of

11 the trial, avoid all such outside influence whatsoever.

12       But enjoy your weekend. I hear it's supposed

13 to be nice weather, and we'll see you Monday morning.

14       (The jury exited the courtroom at 4:04 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1       Monday, September 19, 2005
2                Morning Session
3
4          (The jury entered the courtroom at
5    10:10 a.m.)
6          THE COURT:  Good morning, ladies and gentlemen.
7    Welcome back.  I hope you had an enjoyable weekend.
8    Are we ready to proceed?
9          MR. McCORMACK:  Yes, we are, Your Honor.
10         THE COURT:  Call your next witness.
11         MR. McCORMACK:  At this time I call Detective
12   Donald Heffner.
13
14                 DONALD HEFFNER,
15   having been sworn, was examined and testified as
16   follows:
17
18                 DIRECT EXAMINATION
19
20   BY MR. McCORMACK:
21       Q    Could you tell me your name?
22       A    My name is Detective Donald Heffner,
23   H-E-F-F-N-E-R.
24       Q    And by whom are you employed?
25       A    Harrisburg Bureau of Police, Criminal

1  Investigation Division, Shield 15.

2      Q     How long have you been with the Harrisburg
3  police?

4      A     Since 1992.

5      Q     And you said Criminal Investigation Division.
6  What specifically do you do?

7      A     We investigate reports of criminal activity as
8  they come up from uniform patrol.  You can pick up the
9  phone and call 911 and report a crime, theft, drugs,
10 shootings, what have you.  Uniformed patrol arrives
11 first.  Depending on the seriousness of the event a
12 detective may arrive on scene or the report may be
13 written and it is sent upstairs to the Criminal
14 Investigation Division where we launch an investigation
15 on the incident.

16     Q     And in this particular case, did you start out
17 with this case from the beginning in 1996?

18     A     No.

19     Q     What were you doing in 1996?

20     A     I was working narcotics.

21     Q     Now, how did you wind up involved in this
22 particular case and now the lead investigator?

23     A     On May -- I think it was May 18, 2000 I
24 received information on this case.  My supervisor at
25 the time was Sergeant Teel.  Sergeant Teel asked me to

1 look into the case and later in 2001 he actually

2 assigned this case to me as a case assignment.

3     Q    What was the status of the case?  What date did

4 you say you had this conversation with Sergeant Teel?

5     A    Actually received it was May 18, when I

6 received information, 2000.  It would have been right

7 after that.  It would have been about that week.

8     Q    With the Harrisburg police in May of 2000, what

9 was the status of this case?

10     A    It was a cold open homicide.

11     Q    When you say cold, what do you mean by that?

12     A    Nothing had been done on it for quite some

13 time.  I believe the last thing that had been done had

14 been done in '98 by one of our detectives.

15     Q    So you get some information from someone.

16 Somehow you get some information related to this case

17 and then you follow up.  What do you do?

18     A    I take down the information, and I was not that

19 familiar with the case.  I had not read it before.

20 What I did, I collected all the documents I could and

21 just began reviewing the case updating myself on

22 everything that had been done up to that point.

23         After that what I decided to do since I knew

24 nothing about the people involved in this incident, I

25 decided it was best for me to go into it with an open

1  mind and begin at the beginning and interview
2  everybody.

3      Q    When you say everybody, what do you mean
4  everybody?

5      A    I mean everybody.  Everybody that -- whose name
6  was mentioned throughout the investigation; whoever was
7  attached to this case and in any way I tried to follow
8  up and interview them.

9      Q    Once you get up to speed with the case and
10 became familiar with it, did you do anything with any
11 of the evidence or anything like that?

12     A    Yeah.  In fact, that was one of the first
13 things we did.  I went over the evidence from 1996 to
14 2000.  Technology had changed.  It had become better.
15 Our DNA system had become better.

16          So what we did was, I met with my supervisor,
17 with the supervisor of the case, Sergeant Drobenak and
18 Coroner Graham Hetrick.  What we did was, we sat down
19 and went over all the evidence.  It was decided that it
20 was best to meet with the DNA lab technician, LeeAnn
21 Singley.  We met with her on a couple of different
22 occasions, and from this what I ended up doing with all
23 of these things, we checked the fingerprints on the --
24 on Iris.  I checked out the forensic unit.  Nothing
25 could be done with that.  We explored the possibility

1 of the soot on her to see if we could sequence the
2 shots. That was not possible.
3 We had a weak DNA kit on LaQuan with a blood
4 smear on the boot that you heard about. We had better
5 science. I wanted to send that back in. We had a bite
6 on the wrist of Iris Fennel. I wanted to see what we
7 could do with that. We sent the pictures to the
8 odontologist. We found out it was just a human bite
9 mark.
10 MR. MULLER: Objection to any results that
11 aren't in evidence.
12 THE COURT: Sustained.
13 THE WITNESS: We sent up the socks from Iris
14 back out to the lab. We sent the T-shirt she was
15 wearing back to the lab. We sent, I believe, Tyshaunt
16 Love's coat back to the lab, his pants, the boot of
17 LaQuan Williams and all of the clothing LaQuan Williams
18 was wearing at the time. We sent all that back out to
19 the lab. We also went over all the blood evidence on
20 the clothing from the photographs.
21 BY MR. McCORMACK:
22 Q As you begin this process, had you by this
23 point in time met with these people, had you eliminated
24 Kazar or LaQuan Williams in this case?
25 A Nobody was eliminated.

1    Q    How about Guillermina Cruz?

2    A    No, she was not eliminated.

3    Q    So you start kind of from scratch, start moving

4 along.  Were their witnesses that you saw that needed

5 followed up with in greater detail?

6    A    Yes.

7    Q    What are some of the witnesses that you felt

8 needed to be followed up with?

9    A    Socorro Roman, Jeanette McCurdy, Stacy Harris,

10 and there were a lot of Iris's friends such as Daelene,

11 Tawana Poteat, that hadn't been spoken to at all.  I

12 wanted to talk to all of them.

13    Q    You mentioned Stacy Harris and we heard from

14 Stacy and I had asked Stacy something about her being

15 in the bar.  Tell us about that.

16    A    It was on the 25th of January.  I think it was

17 2002.  I think it was 2002.  I was in Roebuck's bar on

18 Sixth Street on an unrelated issue with numerous parole

19 officers and detectives and she approached me.  She

20 said she needed to speak to me about this case, and

21 what I did I took out a card, I wrote a date and time

22 on it for the 3rd of February and I gave it to her and

23 said I hope I see you at the police station on that

24 day.

25    Q    Did she show up on that day?

1   A   No.

2   Q   Did you contact her?

3   A   I contacted her on the 4th and again on the
4   11th of 2003 -- I think it was August 2003 -- she was
5   at the police station to pick up a family member and I
6   saw her there and I spoke to her and I convinced her to
7   talk to me about this incident and she did.

8   Q   Now, so the other attempts to get her to come
9   between when she happened to be at the station and the
10  time you saw her in the bar, she didn't come in?

11  A   No.  She wasn't cooperating with me at all.

12  Q   The case moves forward and at some point in
13  time charges were filed against this Defendant; is that
14  correct?

15  A   Yes, on the 4th of September 2001.

16  Q   And when does the Defendant wind up being
17  arrested?

18  A   On the 14th of February 2002.

19  Q   Did you have an opportunity to speak with the
20  Defendant back in February of 2002?

21  A   Yes.

22  Q   Describe it.  Tell us about that.

23  A   We were at the police station.  It's about
24  7:00.  He was in custody for this warrant.  I read him
25  his rights, and after I Mirandized him we began talking

1  about his relationship with Iris and the details of

2  what he could remember from 1996, about the night that

3  Iris was killed.

4      Q    Now, have you also during the time period

5  leading up to that had an opportunity to speak with

6  Guillermina Cruz?

7      A    Yes.

8      Q    Do you know where she was to start with?

9      A    You mean from the beginning?

10     Q    Yes.  When you started with the case.

11     A    No.  I reached out to family and Guillermina

12 actually contacted me.

13     Q    At some point did you take a statement from

14 Guillermina?

15     A    Yes.  That was -- yes, I did.  I don't remember

16 the exact date but I took two.

17         MR. MULLER:  I'm sorry?

18         THE WITNESS:  I took two.

19 BY MR. McCORMACK:

20     Q    Has she -- obviously she wasn't here during the

21 course of this trial.  Have you had difficulties with

22 her over time that you've been investigating this case?

23     A    Yes, numerous.

24     Q    Have there been times when --

25         MR. MULLER:  Objection.  Leading, Your Honor.

```
 1        THE COURT:  Sounds like it was about to be but
 2   that might be a little premature.
 3   BY MR. McCORMACK:
 4    Q    What difficulties did you have with her?
 5        THE COURT:  Thank you.
 6        THE WITNESS:  She was always telling me, first
 7   she would say she would be cooperative and then she
 8   would leave me messages and tell me she was not going
 9   to be cooperative or call.  The other detectives that I
10   was working with, Detective Baez, she would leave him a
11   message saying she was done with the case, saying she
12   wasn't going to cooperate.
13        In fact, just so there was some kind of record
14   that was going on, I took the message that Detective
15   Baez received, two cell phone messages, that I had
16   those transcribed and just recently I received right
17   before this trial.  I received the phone call from
18   Ms. Cruz.
19    Q    Now, you also had the opportunity to interview
20   people such as LaQuan Williams?
21    A    Yes.
22    Q    Getting back to the statement from the
23   Defendant, where did that statement take place at
24   the --
25    A    At the police station, at my desk.
```

DAUPHIN COUNTY COURT REPORTERS

1    Q    How did it take place at your desk?  Tell me
2 about that.

3    A    Do you want me to start from where we first
4 met?

5    Q    Where did you first meet?

6    A    We met in eastern Pennsylvania, Northampton
7 County, and that's where I picked him up and I drove
8 him back to the police station.  I met him around 4:20
9 p.m. that day and drove him back.

10    Q    When you get back, what time do you start the
11 statement?

12    A    It was 7:00.  7:00 when I Mirandized him;
13 that's when I start the interview.  The statement -- I
14 think the formal actual recording of the statement
15 maybe it was 7:45 or 7:55 p.m.

16    Q    When you say the formal recorded statement,
17 what do you mean by recorded?

18    A    I mean, putting it in some kind of form that he
19 could actually adopt as his own whether it be voice
20 recorded where it's his voice or where it's
21 transcription where I type what he says, type what he
22 says and he adopts that after he reviews it, in this
23 case corrects it, or he can write it himself.

24    Q    And how did you do it this time?

25    A    I transcribed it.  As he answered my questions

1  I typed in his responses.

2     Q    When you were finished, did you have an
3  opportunity to review with him what you went over with
4  him?

5     A    Yes.  He reviewed the statement, made the
6  corrections and signed it.

7     Q    Did you speak with him concerning what occurred
8  on December 20 -- actually December 19 into December
9  20, 1996?

10    A    Yes, I did.

11    Q    And do you have a copy of the statement that
12 you took from him with you?

13    A    Yes.

14    Q    I'm going to direct your attention to really
15 the bottom of your first page.  What questions did you
16 ask him at the bottom of the first page?

17    A    What happened the last night that you saw her?

18    Q    What was the answer to that?

19         THE COURT:  Slowly, please.

20         THE WITNESS:  Yes, Your Honor.  We left the
21 house.  I don't recall what time.  I don't think it was
22 early.  We went to the block on Market Street.  We were
23 hanging out at the bar having drinks.  We were hustling
24 that day.  I don't think I had any work.  She had
25 worked but not a lot.

1    I was thinking she should be done.  Everything
2  was normal.  People was having drinks.  Her and I were
3  chilling, not arguing or anything.  She said she was
4  going out to handle business, to serve somebody and she
5  would be right back.  Before she went out, she gave me
6  a kiss by the juke box, by the bar.  Somebody said
7  something.  I don't remember if it was Tawana or the
8  barmaid, Neecy.  She bounced.  I don't know if Wendy
9  left out first or I was going out first.  When I saw
10  Wendy later I asked if she had seen her.  Wendy was
11  like that she could be around here somewhere or
12  something to that effect.
13    I chilled around the bar and I didn't see --
14  and I didn't see her and I went to the house to check
15  and she wasn't there.  I went to the house three times,
16  not to mention the calls I made from 14th and Market
17  and 13th and Derry.  I don't remember if it was the
18  first time or second time that dude gave me a ride,
19  earlier in the day, not even getting dark, almost dark,
20  I made him take me two blocks over.  I got out, went to
21  the house and she wasn't there.  This was the first
22  time.
23    I don't remember how I got there the second
24  time.  I was on the block hanging out waiting for her
25  to pop up.  I called a lot of times, probably like two

1   hours from when she left.  I seen Guillermina on the
2   block walking by.  I spoke to her.  It was like casual
3   normal conversation.  I got her phone number.  I called
4   her later while I was waiting earlier in the day.  I
5   talked to her briefly then.  I couldn't find her.  I
6   wanted to get like out of there.  I didn't have no
7   work.  It was hot and I wanted out of there.  The last
8   time I went to my house it was light.  She wasn't
9   there, but I noticed the light on when I was there
10  before.

11          That is how I knew she had to have been there.
12  In the bedroom cabinet I saw loose money I picked it
13  up.  I know no one had keys to my house and no one was
14  coming back.  It was a lot of money sitting there.  I
15  had like $20 left.  I only had $30 in my pocket.  I
16  left the money right there.

17          Then I left out and bounced.  I went out on the
18  block.  I chilled.  It had to have been after midnight
19  by then.  After the last call to the house I chilled
20  for a minute.  I called Tootie or went to her house and
21  asked if she was coming out.  I said, don't worry I got
22  a spot so we can chill out and watch TV and be
23  comfortable.  We watched two movies like a karate
24  movie.  I don't remember what.  I got up the next
25  morning around 9 something.  I went to the Kentucky

1  Fried Chicken and the manager was outside. I went in

2  and ordered some biscuits and something to eat. I sat

3  in there for a minute and ate that.

4        I went to the Five and Dime and bought gum.

5  From out there I called a cab by the KFC. But no cab

6  could come. I was sitting at the KFC. I seen the

7  Spanish kid from the south and asked her for a ride.

8  She couldn't give me a ride. She gave me a ride

9  though. D told her to give me a ride and she gave me a

10  ride and dropped me off a block from the house, like up

11  at the gas station and she left.

12       I went up the hill and went down to the main

13  block and turned and it was the house right there. I

14  kept walking to the front of the house. I knocked on

15  the door. I noticing the smell like now but there's a

16  lot going on. There's some people working in the yard.

17  I knocked on the door louder and called her by name.

18  I left out -- that when I came from the car I had my

19  keys.

20       I put my keys right next to a pole across from

21  my house, a telephone pole. I was going to tell her I

22  lost my keys that is why I spent the night out. I

23  called her name. I started to smell smoke. I walked

24  around to the front of the house. I knocked on the

25  door two times and it came open. I walk in and I see a

hell of a fire, smoke shooting out.  I'm calling Iris,
you fell asleep and left the oven on.  I walk to the
stove; turned the stove off.  I went up the stairs and
was calling her name.

I seen the bedroom was split toss.  The first
thing that came to my mind was she was pissed.  I
walked in and she got pissed flipped out and left.  I
turned around to walk back and said to myself she is
pissed.

I walked to my room.  There's a stereo, weight
bench.  I turned around and I see what looked like a
leg.  Then I look and say, Iris.  I move quick over to
her and she's like laying there.  She was in the corner
laying there with her legs open and naked.  I shook her
leg and called her name.  I couldn't see her face.
Then I looked and saw her face, like it was black on
one side.

I immediately turn and run down the steps.  I
went to yell help but couldn't say it.  I don't
remember if I was in the house or bumped into him or
was outside.  He said is there a fire.  We got to call
an ambulance.  She needs help.  She is not moving.  I
was going to knock on a neighbor's house.  He ran over
to his house and a lady came over and I said she is not
moving.

1    We went back upstairs and she was like doing a
2 pulse. Then the ambulance was there real fast. What
3 do you mean -- I'm sorry -- the only person -- she
4 didn't feel a pulse and I said, what do you mean? From
5 there her mother got there fast. From Iris's sister --
6    MR. MULLER: You missed one.
7    THE WITNESS: Did I?
8    I'm in a state like this can't be happening.
9 Iris's sister asked, Cuzzo, what happened? I was like
10 I don't know, and was just in a state. I can't really
11 describe it. I said I don't know.
12 BY MR. McCORMACK:
13    Q   Did you ask him any questions about there ever
14 being a gun in the house?
15    A   Yes.
16    Q   What did he tell you about that?
17    A   He said, no, there was no gun.
18    Q   In fact, at the bottom of that page that you
19 were just reading from, what was the question you asked
20 specifically?
21    A   Question: Was there a gun in the house?
22       Answer: No.
23    Q   What was the next question?
24    A   Question: Did you ever carry a gun while in
25 Harrisburg?

DAUPHIN COUNTY COURT REPORTERS

1     Answer:  No.

2   Q   Did you ask him about Iris also?

3   A   Yes.

4   Q   What did he say about Iris?

5   A   I asked him if Iris carried a gun and he said

6 no.

7   Q   Now, later on in the statement does he tell you

8 that at least at some point in time he did have a gun?

9   A   Yes.  He said he had a gun several months prior

10 to the murder.

11   Q   And he had it for like a month.  Okay.  And if

12 you go to the -- in fact, the bottom of the page 4 of

13 your statement.

14   A   Yes.

15   Q   Could you -- what did you ask him?  What's the

16 question there?

17   A   Which question, the last question?

18   Q   The very last question.

19   A   Where did you get the gun?

20   Q   And what was the answer?

21   A   'I don't know.  I had the gun for a hot minute,

22 like a month.

23      THE COURT:  A hot minute?

24      THE WITNESS:  A hot minute.  I don't know if I

25 got it from my cousin.  That was months and months

1 before that happened to Iris. We didn't have any more

2 guns. To tell you the truth we were trying to get a

3 gun.

4 BY MR. McCORMACK:

5     Q    Just finish that off.

6     A    Right after that she got robbed.

7     Q    Now, he mentioned before about coming to the

8 house and in the bedroom cabinet saw loose money. Did

9 you ask him how much money she had in the house?

10     A    Yes.

11     Q    What did he tell you?

12     A    I believe he told me $3,000.

13     Q    What did he say? What specifically was his

14 answer? It's on page 5. How much money did Iris have

15 in the house when she was killed?

16     A    It says answer: At least 3,000. There was at

17 least 1500 sitting in the open. When I left it was

18 right wherever or under the bed or behind the couch

19 rolled up in the carpet, under the sink, in the

20 bathroom. She had a lot of stash boxes.

21     Q    How about the next question.

22     A    Question: Was this both your money or only

23 hers?

24     Q    What was the answer?

25     A    Answer: Both our money.

1    Q    Now, up to this point as you reviewed the case

2  there was never any mention from him about money being

3  in the house or anything?

4    A    No.

5    Q    Did you have a discussion with him about his

6  relationship with Iris, the state of his relationship

7  with Iris?

8    A    Yes.

9    Q    Did you ever ask him if he believed that she

10  was cheating on him?

11    A    Yes.

12    Q    And if you go to the top of page 8 what was his

13  answer to that question?

14    A    It says answer:  I didn't think our

15  relationship -- I thought she might -- I thought that

16  she might be but I was never -- it was never like a

17  serious --

18    Q    What was the question you followed that up

19  with?

20    A    Question:  Did you get jealous about her having

21  sex with other guys?

22    Q    What was the answer?

23    A    Nah.  It wasn't a happy thought but it wasn't

24  an issue.

25    Q    In the statement to Investigator Taylor, he

1  made some reference to the key being dropped by a
2  telephone pole on Swatara Street.
3      A    Yes.
4      Q    What did he tell you about where he put the
5  keys in your statement?
6      A    He said the key, he dropped the key by a
7  telephone pole across from his house, across the street
8  from his house.
9      Q    Is that Swatara Street?
10     A    No, that's McCleaster Street.
11     Q    Where is Swatara Street?
12     A    Swatara would be another street north.
13     Q    Another block.  You mentioned something about
14 the time, something about that he was going over to the
15 house.  Do you recall the first time he said he was
16 going over to the house?
17     A    Yes.  He said it was not even getting dark yet.
18 That was the first time and the second time he couldn't
19 remember how he got there.
20     Q    Then when he talked to Investigator Taylor he
21 made some comments concerning Iris having been sleeping
22 in the house and him looking for her, making phone
23 calls and she didn't show up at the bar until eleven.
24 How does Iris get to the bar when he talks to you?
25     A    He indicated that they went together to the

1  bar.

2     Q    Now, in reviewing this case you had an

3  opportunity to go through all the evidence; is that

4  correct?

5     A    Yes.

6     Q    And all the pictures?

7     A    Yes.

8     Q    Was there ever a picture of a footprint from

9  the living room of the residence?

10    A    Yes.

11    Q    I'm going to show you what has been marked as

12 Commonwealth Exhibit 63.  Do you recognize that

13 photograph?

14    A    Yes.  It looks like an impression of a

15 footprint, dark gray on this tile floor.

16    Q    And from looking over the photographs of this

17 case that tile floor appears to be in which room of the

18 house?

19    A    I think it's the bedroom.

20    Q    Well, let me see if I can...

21    A    Either the bedroom or the kitchen -- I mean,

22 not the bedroom, the living room.

23    Q    So we're not confused here, which one are you

24 saying it is?

25    A    I think it's the living room.

1     Q    Just so we're clear on these things, I'm

2  showing you Commonwealth Exhibit No. 64.  Do you

3  recognize what that is a photograph of?

4     A   Yes.

5     Q    What is that a photograph of?

6     A   The living room of her apartment.

7     Q    Now, you noticed the television set there?

8     A   Yes.

9     Q    And I believe there's like a little kid

10  shopping cart?

11     A   Yes.

12     Q    I'm going to show you Commonwealth Exhibit

13  No. 65.  Do you see the television and the shopping

14  cart there?

15     A   Yes.

16     Q    And the footprint is the footprint from --

17     A   Yes, it is.

18     Q    Where is the footprint?

19     A   In the middle of the photograph above my

20  finger.

21     Q   And then Commonwealth 63, which is where we

22  started, that's a close up of the footprint you were

23  just pointing to on Commonwealth Exhibit 65 in the

24  living room; is that correct?

25     A   Yes.

```
 1      Q    Were you able to determine during the
 2 investigation whose footprint that was?
 3      A    Yes.
 4      Q    Whose?
 5           MR. MULLER:  Objection.
 6           THE COURT:  Based on...
 7           MR. MULLER:  May we approach?
 8           THE COURT:  Sure.
 9           (A discussion is held at sidebar off the
10 record.)
11           MR. MULLER:  Withdrawn, Your Honor.
12 BY MR. McCORMACK:
13      Q    Was it determined whose print that was?
14      A    Yes.
15      Q    Whose was it?
16      A    It belonged to one of the medics that was at
17 the house.
18           MR. McCORMACK:  If I could have just one
19 moment.
20 BY MR. McCORMACK:
21      Q    Now, there were times that Guillermina Cruz,
22 Toothie, wasn't cooperative, and you mentioned you made
23 some notes in your report of the times that she didn't
24 -- she actually left you phone messages saying she
25 didn't want any part of the case?
```

1    A    Yes.

2    Q    Were there other times that she was cooperative

3 with you?

4    A    Yes.

5    Q    You heard her transcript read on Friday where

6 she indicated that LaQuan Williams was present in the

7 home when this Defendant killed Iris Fennel.  Do you

8 recall that?

9    A    Yes.

10   Q    Had she told you that at any time prior to the

11 preliminary hearing?

12        MR. MULLER:  Your Honor, objection.

13        THE COURT:  Hearsay?

14        MR. MULLER:  Yes.

15        MR. McCORMACK:  I'm not admitting it for the

16 fact of the matter asserted if we can approach.

17        THE COURT:  All right.

18        (The following discussion is held at sidebar:)

19        MR. McCORMACK:  I'm seeking to admit that's a

20 reference point and give him a follow-up question as to

21 her demeanor during that conversation, how she was

22 acting during the conversation.

23        MR. MULLER:  How she was what?

24        MR. McCORMACK:  Her demeanor during the

25 conversation.

1    MR. MULLER:  Which conversation?

2    MR. McCORMACK:  With Heffner.

3    THE COURT:  How is it still not hearsay?

4    MR. McCORMACK:  I'm not admitting it to say

5  that she says -- I said are you familiar with the

6  statement and now --

7    THE COURT:  You asked did she tell you that

8  when she was talking with you.

9    MR. McCORMACK:  Well, I'm trying to focus in on

10  maybe it's easier to give a date as to when he met with

11  her.

12    MR. MULLER:  What are you trying to show when

13  she first mentioned Kazar?

14    MR. McCORMACK:  There's a point of time when

15  she spoke to the police, in talking about this homicide

16  that she was very emotional, crying and those were the

17  thing I'm trying to elicit.

18    MR. MULLER:  What does that have to do with

19  anything about her telling him about Kazar?

20    MR. McCORMACK:  It was during the conversation

21  that she was emotional.

22    THE COURT:  Use this an excuse to getting in

23  prior inconsistent statements.

24    MR. McCORMACK:  What I'm trying to do is show

25  the demeanor that she had at certain points in time.  I

1  think it becomes important as to whether the jury winds

2  up ultimately believing her because obviously, you

3  know, she has times she wants to cooperate and then

4  other times that she doesn't want to cooperate during

5  the time period and at the preliminary hearing

6  transcript.

7          THE COURT:  Well, go ahead.

8          MR. McCORMACK:  During the preliminary hearing

9  transcript there were references to her emotional state

10  concerning the fact that, you know, she -- I don't

11  remember the exact words -- but she -- why she came

12  forward.  She came forward and was cooperating at the

13  time because, you know, she would see Iris or, you

14  know, whether it was --

15          MR. MULLER:  That wasn't in the prelim that we

16  were talking about.

17          MR. McCORMACK:  Yes, there was.

18          THE COURT:  She said she saw the crime in her

19  mind.

20          MR. McCORMACK:  Yes.

21          MR. MULLER:  How is her demeanor coming through

22  Heffner?  I mean, just bolstering a witness that isn't

23  here.

24          MR. McCORMACK:  Someone's demeanor has an

25  impression.  The fact that she was crying and stuff is

```
 1  not an opinion.  It's an actual -- I saw it.
 2        MR. MULLER:  This is to bolster their
 3  nonavailable witness.
 4        THE COURT:  That's my concern, Mr. McCormack.
 5  It sounds like that's what you're doing, substituting
 6  his observations that she didn't get to make.  She's
 7  not here.  I don't know if this is proper.
 8        MR. McCORMACK:  Well --
 9        MR. MULLER:  I mean, you're not trying to admit
10  it under excited utterance maybe goes into the
11  demeanor.  That's not the case here.
12        MR. McCORMACK:  Why isn't it the case?  She
13  comes in to him.  She's emotional and fearful and
14  provides him with additional information during that
15  conversation.
16        MR. MULLER:  You're getting into the
17  information provided which is hearsay.
18        THE COURT:  Unless she says why she's crying or
19  emotional, which gets into hearsay and it's bolstering.
20  I'm not going to permit it.  Objection sustained.
21        (The discussion is concluded.)
22        MR. McCORMACK:  Just one moment, Your Honor.
23  BY MR. McCORMACK:
24     Q   You indicated to the jury that you met with and
25  spoke with Tyshaunt Love concerning this case and you
```

DAUPHIN COUNTY COURT REPORTERS

1    read portions of his statement. The person that you

2    were speaking with, is he present in the courtroom?

3        A    Yes.

4        Q    And can you tell me where he is and perhaps an

5    item of clothing he's wearing?

6        A    Sitting there beside counsel at the defense

7    table wearing a black shirt and glasses.

8            MR. McCORMACK:  May the record reflect he

9    identified the Defendant.

10           THE COURT:  Yes.

11           MR. McCORMACK:  They are all the questions I

12   have at this time.

13           THE COURT:  Cross-examine.

14

15                    CROSS EXAMINATION

16

17   BY MR. MULLER:

18       Q    You first became involved in this case some

19   time in 2000?

20       A    May 18, 2000.

21       Q    Nothing really took place until 2001 as far as

22   interviews?

23       A    Yes.

24       Q    During your investigation you were able to

25   confirm that it was indeed Iris who had turned Kazar in

1 for a prior offense?

2     A    Yes.

3     Q    And you talked to among other people Kwajalyn

4 Jackson?

5     A    Kwajalyn.

6     Q    And she told you Iris had told her that Kazar

7 had come over the day before, knew about her snitching

8 and wanted money from her, correct?

9     A    Is that in the statement? I know that he had

10 stopped by her house and wanted money and a place to

11 stay. If that's what's in his statement.

12     Q    What you wrote, Jackson also told me during the

13 same conversation that Fennel told Jackson that

14 Williams stopped by her house and asked for money. He

15 also told her that she knew he told her on and told her

16 to give him some money. That's from your report.

17     A    Yes, that would be correct.

18     Q    Mr. McCormack referenced this in your

19 conversation with Stacy Harris?

20     A    Yes.

21     Q    And you said she came up to you in a bar

22 originally in 2002?

23     A    Yes, January 25th.

24     Q    And all you did at that point was make

25 arrangements to meet her, correct?

```
 1    A    Yes.

 2    Q    She didn't show up for your meeting?

 3    A    Correct.

 4    Q    But you did speak to her, looked like about a

 5  week later?

 6    A    I spoke to her on the 4th and on the 11th of

 7  February.

 8    Q    When you spoke to her on the 4th, she told you

 9  it was a long time ago and she doesn't remember as

10  clearly as she did?

11    A    Yes.

12    Q    On the night or the morning Fennel was killed

13  she heard gunshots, correct?

14    A    Yes.

15    Q    Can't remember when she heard the shots, and

16  then you spoke to her about a week later.  You said the

17  11th of February of 2002.  She told you she couldn't

18  remember anything else, right?

19    A    That's correct.

20    Q    And you didn't take a statement from her until

21  the following year?

22    A    Yes, 8/27 2003 -- 04.  I'm sorry.

23    Q    August of 2004?

24    A    August 27, 2004, yes.

25    Q    That was the first time she provided you with
```

1 details, correct?

2     A    Yes.

3     Q    When among the things you reviewed in your

4 case, was a receipt from Giant found in the apartment

5 for food items, correct?

6     A    Yes.

7     Q    And you were able to determine where that Giant

8 was, correct?

9     A    It was the -- I believe we're talking about the

10 Giant up at Kline Village.

11     Q    You determined the time of the transaction,

12 correct?

13     A    From memory around 11:20 p.m.

14     Q    Of...

15     A    Of the 19th of December.

16     Q    And just for foundation purposes this had been

17 collected at the scene at the time of the incident?

18     A    Yes.

19     Q    And obviously it was kept as part of evidence

20 up to and including the time you took the case in 2000

21 and 2001?

22     A    Yes.

23     Q    Just to show you Commonwealth Exhibit 47.  Is

24 that the receipt we're talking about?

25     A    Yes.  It's a receipt from the 19th of December

1 1996, time stamp 12:12, Store No. 9, Harrisburg, which

2 would have been the old Kline Village store before they

3 tore it down.

4     Q    And that's Kline Village.  Just from a

5 relationship perspective in the city, that's uptown,

6 correct?

7     A    That's the Uptown Plaza.

8     Q    Now, to say uptown, what's that near?

9     A    The high school, John Harris, across the

10 street, 25th Street.

11     Q    When --

12     MR. MULLER:  The Court's indulgence.

13 BY MR. MULLER:

14     Q   You mentioned -- you talk about this statement

15 from Mr. Love.  You met him in Easton, correct?

16     A    Yes.

17     Q    You picked him up because he turned himself in?

18     A    Correct.

19     Q    You brought him back to Harrisburg, brought him

20 into the police station and at some point that evening

21 you took this statement from him, correct?

22     A    Yes.

23     Q    Was it just you?

24     A    Yes.  I was the only one left in CID at the

25 time.

1     Q    And when taking the statement essentially your

2  first question -- second question, what happened the

3  last night you saw her, and that's the section you read

4  from.

5     A    Yes.

6     Q    Did you ever ask him about any discrepancies?

7  Were you just taking the statement and leaving it as

8  that?

9     A    What discrepancies are you referring to, sir?

10     Q    Mr. McCormack asked about some of the things he

11  told Investigator Taylor versus some of the things that

12  he told you didn't exactly match up.  I'm assuming you

13  were familiar with Investigator Taylor's interview.

14     A    Yes.

15     Q    We left the house.  I don't recall what time.

16  I don't think it was early.  They were hanging out in

17  the bar.  Did you ask him what bar, where exactly they

18  went at that point?

19     A    No.  From speaking to him prior it was already

20  inferred I knew what he was talking about.  He already

21  told me Fav's, and I was just tying to -- what he had

22  said so those were his words.

23     Q    So you -- there was a preinterview so to speak?

24     A    Well, before formalizing we will talk.  We just

25  don't go right to the recorder, on a computer to type

something. It's uncomfortable. I have to get a person's permission to do it first. I want to have an idea of what we're going to be talking about.

Q   After --

MR. MULLER:  The Court's indulgence.

BY MR. MULLER:

Q   Mr. McCormack asked you about the relationship with Iris and whether he thought she was seeing someone else. Did you talk to him and ask him about seeing other people too?

A   We had talked about Guillermina Cruz. He had said --

Q   And after at one point probably on page 8 I believe you had asked if you physically hit Iris or did she ever hit you?

A   Yes.

Q   What was the response?

A   Do you want me to read it verbatim? Do you want me to summarize it?

Q   It's three or four lines.

A   He said they play, tussle, and that there was one time where Iris slapped his glasses off his head and kept them and he walked around blind for like two days before he got them back.

Q   When you were involved in this investigation --

1  there was Guillermina Cruz who testified and left us

2  some messages that you had transcribed?

3      A    Yes.

4      Q    One of those in 2001, did that refer to Anthony

5  Knight threatening her?

6      A    I don't recall.  I didn't review the messages.

7  If you have a copy there I'll review it, and I'll

8  better be able to answer that, Mr. Muller, if I may.

9      Q    Do you have it up there?

10     A    No, I don't.  I'm not sure if that was a

11  message or just calling me to inform me of that.

12  There was a phone call regarding that.  But I don't

13  believe it was -- it was just to let me know she was

14  having problems from that person.

15     Q    After --

16         MR. MULLER:  The Court's indulgence.  That's

17  all I have.

18         THE COURT:  Any redirect?

19

20             REDIRECT EXAMINATION

21

22  BY MR. McCORMACK:

23     Q    When you said he indicated about having a

24  sexual relationship with Toothie, when did he say he

25  had a relationship with Toothie?

1    A    He had sex with her the one night between the

2  19th and the 20th and that was on the couch.

3            MR. McCORMACK:  No further questions.

4            THE COURT:  Anything else, Mr. Muller?

5            MR. MULLER:  No.

6            THE COURT:  Thank you.

7            MR. McCORMACK:  Your Honor, at this time there

8  has been an agreement between Mr. Muller and myself.

9  Your Honor, because of distances and some time problems

10  one of our witnesses was unable to attend this trial --

11  other than Guillermina Cruz -- and he was the medic

12  that arrived.  His name was John Ratchford Bruzinsik,

13  R-A-T-C-H-F-O-R-D, B-R-U-Z-I-N-S-I-K.  There's been an

14  agreement between us if he had appeared at trial he

15  would testify that he was the first medic on the scene;

16  that he made entry into the residence; he did not bring

17  any equipment.  He recalls being greeted by a female

18  upon entry.  She was Hispanic but she was speaking

19  English.

20            Once inside the location he went upstairs,

21  observed the room, observed the body on the floor.  He

22  recalled the body was uncovered, body was clothed with

23  a shirt, no bottom.  The legs were spread and the body

24  was face up.  Arm was draped across the torso.  He

25  grabbed the right arm, pulled; he observed rigor had

1  set in. The torso moved when I pulled the arm. Body
2  was cold. He did not attempt any resuscitation because
3  it was obvious to him that the victim was deceased and
4  did not further touch the body.
5          MR. MULLER: Just for clarification.
6          MR. McCORMACK: When he was there there was no
7  other officials or police officers there prior to his
8  arrival. He was the first person there. In fact, he
9  would testify that they drove to a different street.
10 He ran up in behind and came through the kitchen I
11 believe while his partner drove the ambulance around to
12 the front.
13         THE COURT: All right.
14         MR. McCORMACK: That would be the stipulation.
15         THE COURT: Is that acceptable to you?
16         MR. MULLER: Yes. We both talked to the
17 gentleman on Monday and arrived at the stipulation.
18         MR. McCORMACK: At this time I would move for
19 the admission of Commonwealth Exhibit Nos. 63, 64, 65,
20 the pictures Detective Heffner looked at this morning
21 during his testimony and the footprint and the pictures
22 of the living room. I move for them to be admitted
23 into evidence.
24         MR. MULLER: No objection.
25         THE COURT: They are admitted.

1    (Whereupon, Commonwealth Exhibit Nos. 63, 64
2  and 65 are admitted into the record.)

3    MR. McCORMACK:  I would move for the admission
4  of Commonwealth Exhibit No. 1, the picture of Iris.

5    MR. MULLER:  No objection.

6    THE COURT:  Admitted.

7    (Whereupon, Commonwealth Exhibit No. 1 is
8  admitted into the record.)

9    MR. McCORMACK:  I believe other than No. 32,
10 which I did not use and will not move, I believe all
11 the other items have been moved into evidence at this
12 time.

13    52 was from the Naval Observatory, times as to
14 when twilight was and 51 was LaQuan Williams' shoes, if
15 I did not I so move them at this time.

16    THE COURT:  I just have no record of that being
17 done.  Do you have any objection?

18    MR. MULLER:  No, Your Honor.

19    THE COURT:  They are admitted.

20    (Whereupon, Commonwealth Exhibit Nos. 51 and 52
21 are admitted into the record.)

22    MR. McCORMACK:  At this time the Commonwealth
23 rests its case.

24    THE COURT:  Mr. Muller.

25    MR. MULLER:  Defense would call Officer

1  Michelle Bailey.

2

3                    MICHELLE BAILEY,

4  having been sworn, was examined and testified as

5  follows:

6

7                  DIRECT EXAMINATION

8

9  BY MR. MULLER:

10     Q    Would you state your name and occupation for

11 the record?

12     A    Michelle Bailey, detective with the Harrisburg

13 bureau of police.

14     Q    How long have you been with the Harrisburg

15 police?

16     A    For 19 years.

17     Q    How long have you been a detective?

18     A    For six years.

19     Q    Back on December 20, 1996, what was your

20 position?

21     A    I was a patrol officer.

22     Q    And do you recall responding to the scene in

23 question in this case?

24     A    Yes, sir.

25     Q    On McCleaster?

246

1   A   Yes.

2   Q   Were you first responder?

3   A   Yes, Corporal Muldrow and I.

4   Q   And you had a chance to review your report or
5   reports, correct?

6   A   Yes, I did.

7   Q   And approximately what time did you arrive at
8   the scene?

9   A   I don't remember the times on the report.

10   Q   If it indicates that we were dispatched 1208
11   hours, would that sound about approximate?

12   A   Yes.

13   Q   And you talked to several people at the scene,
14   correct?

15   A   Yes.

16   Q   Among the people you talked to were Zachary
17   Belcher, correct?

18   A   Yes.

19   Q   Jeanette McCurdy?

20   A   Yes.

21   Q   Socorro Roman?

22   A   Yes.

23   Q   When you talked to Mr. Belcher, where did that
24   place? Was that at the scene?

25   A   Yes, it was.

DAUPHIN COUNTY COURT REPORTERS

1    Q    Do you recall what Mr. Belcher told you?

2    A    That he saw smoke coming from the area, I

3    believe it was 1941 McCleaster Street.

4    Q    Did you take any more information from

5    Mr. Belcher?

6    A    I might have, but I don't remember offhand

7    exactly what his statement was.

8    Q    Did he ever indicate to you that he wasn't in

9    the residence after smelling the smoke?

10    A    I believe he did say he was in the residence.

11    Q    Jeanette McCurdy, an older white woman who was

12    a neighbor, do you recall her?

13    A    I recall speaking to a neighbor, but I don't

14    remember who she was specifically.

15    Q    When you were speaking to these people, was

16    Corporal Muldrow with you?

17    A    I believe when I spoke to the neighbors, that

18    he was inside the residence.

19    Q    So you were outside?

20    A    Yes.

21    Q    After some other officers and your superiors

22    arrived on the scene, you had a chance to interview

23    Socorro Roman, correct?

24    A    Correct.  I didn't actually interview her.

25    From what I remember I took basic information from her

1  so that she could be interviewed at a later time.

2     Q    And she was with her grandson at that point?

3     A    Yes.

4     Q    Just for clarification, was the ambulance there

5  already when you got there?

6     A    They came after I arrived.

7     Q    When you arrived, there was smoke or something

8  burning, right?

9     A    Correct.

10    Q    From the apartment itself?

11    A    Yes.

12    Q    In your report you do indicate that you

13 interviewed Ms. Roman.

14         MR.MULLER:  If I may approach.

15 BY MR. MULLER:

16    Q    Detective, can you identify what that is?

17    A    This is my police report.

18    Q    From that day?

19    A    Yes, sir.

20    Q    And does it indicate you interviewed Ms. Roman?

21    A    Yes, I believe I did speak to her.

22    Q    What did she tell you regarding where she was

23 and what time things happened?

24    A    Out cleaning the dog cages at the rear of her

25 residence at approximately 1155 hours.  They observed

1  smoke coming from the rear of 1941 McCleaster Street.

2  That as Zachary Belcher attempted to enter the

3  residence to check on the smoke situation and prior to

4  entering Zachary observed Tyshaunt exit the rear door

5  yelling for help.

6      Q    Was -- and she indicated to you at some point

7  that she went in to the apartment?

8      A    If that's what it says, um-hum.

9      Q    To check on the victim?

10     A    Yes.

11     Q    That was your only involvement in the case,

12  correct, as far as writing the reports and doing thing?

13     A    Yes, sir.  I didn't conduct any follow-up

14  investigation.

15     Q    Do you recall how you said Mr. Love appeared at

16  that time?

17     A    Yes.

18     Q    How did he appear?

19         MR. McCORMACK:  Objection, Your Honor.

20         THE COURT:  I'm not sure I understand.  How did

21  he appear there or what did he look like?

22  BY MR. MULLER:

23     Q    What was his demeanor?

24         MR. McCORMACK:  I object.  It's asking for an

25  opinion.

1      THE COURT:  She can express her observations
2  without expressing opinions I presume.  Overruled to
3  that extent.
4      THE WITNESS:  What was his demeanor?  He
5  appeared to be upset.  I remember that it took him
6  quite a while to answer my questions.
7      MR. MULLER:  That's all I have.
8      THE COURT:  Any cross examination?
9      MR. McCORMACK:  Yes.  Thank you.
10
11              CROSS EXAMINATION
12
13  BY MR. McCORMACK:
14     Q    Detective Bailey, what's your current role with
15  the Harrisburg Police Department?
16     A    I'm a detective assigned to the internal
17  affairs unit.
18     Q    And the role that you played on December 20,
19  1996 you were a patrol officer, correct?
20     A    Yes, sir.
21     Q    Having been in both positions, both as a
22  detective and as a patrol officer, the patrol officer's
23  role is essentially you were securing the scene and
24  getting initial information; is that correct?
25     A    That's correct, sir.

1     Q    A detective would later follow up with more

2  detailed interviews, actually having people do

3  statements and those sorts of things; is that correct?

4     A    Yes, sir.

5     Q    Now, do you recall how, when you were speaking

6  to Socorro Roman, how she was, what her demeanor was?

7     A    Honestly I don't really.  I think from what I

8  remember she was rushed because she had some

9  responsibilities or something to do with her grandson

10  at that time.

11     Q    And, in fact, what you went over with

12  Mr. Muller about what she had said, she said she

13  discovered Iris on the first floor rear room; is that

14  correct?

15     A    If that's what's in the report, yes.

16     Q    I'll show you a copy of your report.

17     A    Yes.

18     Q    The rear room is actually above the kitchen?

19     A    From what I remember about that residence, you

20  go downstairs into -- I wouldn't call it the basement

21  area but you walk downstairs into the kitchen, which is

22  on the lower level and the bedroom is on the first

23  level like when you walk to the front door and going to

24  the rear that's where the bedroom is.  You can go to

25  the lower level and that's where the kitchen was

1 located.

2     Q    Being one of the first officers to arrive, the

3 scene was a little chaotic?

4     A    Yes, sir.

5     Q    Took a little time to sort through things, sort

6 things out?

7     A    Yes.

8     Q    Do you recall family members of Iris's coming

9 to the house seeing what was going on?

10     A    Yes.

11     MR. McCORMACK:  Thank you, Detective Bailey.  I

12 don't have any further questions.

13     MR. MULLER:  Just briefly.

14

15                 REDIRECT EXAMINATION

16

17 BY MR. MULLER:

18     Q    My calculations back in 1996 you would have

19 been a police officer for approximately ten years?

20     A    Ten years.

21     Q    You had certainly done a number of reports by

22 that point, right?

23     A    Yes.

24     Q    And the purpose of a report was to take down

25 accurate information?

1    A    At that time I would note the date on my
2  report, what someone told me or if it was my
3  observations.  It would be accurate as to what I saw.
4  If it was an interview it would be what someone told me
5  that I would document in my report.
6    Q    In regards, Mr. McCormack asked, Ms. Roman told
7  you that she went in through the rear door?
8    A    That's what's indicated in my report.  That's
9  what she told me.
10          MR. MULLER:  Thank you.
11          THE COURT:  Anything else?
12          MR. McCORMACK:  No further questions, Your
13  Honor.
14          THE COURT:  Thank you, detective.
15          MR. MULLER:  May she be excused?
16          MR. McCORMACK:  I have no objection.
17          THE COURT:  Detective, you may be excused.
18          MR. MULLER:  Defense would recall Officer
19  Joseph Zimmerman.
20          THE COURT:  Officer, just to make sure you
21  understand, you're still under oath from when you were
22  already sworn.
23          THE WITNESS:  Yes, Judge.
24
25

DIRECT EXAMINATION

BY MR. MULLER:

Q    Officer Zimmerman, you were initially involved in the case, correct?

A    Correct.

Q    Back on December 20th?

A    Correct.

Q    On December 20th, was contact made with Guillermina Cruz, aka Toothie?

A    Yes.

Q    And you were one of the officers present when this contact was made?

A    I can't remember where the contact was made.  I just remember I interviewed her.

Q    Do you recall who else was there?

A    During the interview?

Q    The contact interview, whatever.

A    No, I don't.

Q    After she then went home that day?

A    I believe she did.  I can't remember.

Q    Let me rephrase it.  Did you have contact with her the next day?

A    I did not.  Another -- Detective Massey did.

Q    Did you have contact with her the following

1  week?

2      A    I'd have to refer to my report, but I don't

3  recall.

4      Q    Was your -- your involvement in this case, how

5  long did it last?

6      A    My involvement lasted approximately four days.

7      Q    After that someone else was taking the

8  information, doing whatever, correct?

9      A    Correct.

10         MR. MULLER:  That's all I have.

11         THE COURT:  Cross.

12         MR. McCORMACK:  No cross examination.

13         MR. MULLER:  We need to check to see if our

14  next witness is here.  May we approach?

15         THE COURT:  Yes.

16         MR. MULLER:  We hit a bit of a snag, Your

17  Honor, in terms of availability of the witness.

18         THE COURT:  We'll try to start up about ten

19  after one.  Please put your notebooks back in the

20  envelopes and we'll take our lunch break.  Again no

21  talking about the case, no talking about the evidence,

22  avoid all outside influences and, of course, keep an

23  open mind until the case is complete.  We stand in

24  recess until 1:10 p.m.

25         (The jury exited the courtroom at 11:41 a.m.)

1          <u>Monday, September 19, 2005</u>

2              <u>Afternoon Session</u>

3

4          THE COURT:  Mr. Muller.

5          MR. MULLER:  Good afternoon, Your Honor.

6          THE COURT:  Good afternoon, Mr. Love.

7          THE DEFENDANT:  Good afternoon, Your Honor.

8          MR. MULLER:  Pursuant to a pre-lunch

9  conversation, we have chosen now is the time to ask

10  Mr. Love, to colloquy him about testifying or not

11  testifying.

12          THE COURT:  Do you want to do that or do you

13  want me to?

14          MR. MULLER:  I can start it.

15          Mr. Love, you understand that you have the

16  right to testify in your defense or not to testify.

17          THE DEFENDANT:  Yes.

18          MR. MULLER:  You and I have had discussions

19  about this matter.

20          THE DEFENDANT:  Yes.

21          MR. MULLER:  And since we are approaching the

22  conclusion of the case, what is your decision as far as

23  testifying?

24          THE DEFENDANT:  Based on the advice of my

25  attorney, I feel that there's no need for me to testify

1  because of my numerous statements for which I told the
2  truth anyway.

3          MR. MULLER:  You're making a decision not to
4  testify.  Is that what you're telling the Court?

5          THE DEFENDANT:  Correct, based on your advice.

6          MR. MULLER:  I understand.

7          THE COURT:  And you said you've had an
8  opportunity, Mr. Love, to talk this over with
9  Mr. Muller and you said based on his advice, I trust if
10 you have any questions about your decision you've had a
11 chance then to ask those of Mr. Muller and he has
12 answered them to your satisfaction; is that right?

13         THE DEFENDANT:  I understand.  I think I
14 understand.

15         THE COURT:  I can't hear you.

16         THE DEFENDANT:  I believe I do understand.  I
17 believe he was pretty clear.  I told him I don't have
18 any questions about testifying or not testifying.  I'm
19 going by his advice based on what's going on for what
20 he explained to me.

21         THE COURT:  I assume -- do I take from what you
22 just said you and he did talk about both the pros and
23 cons, the goods and bads of choosing to take the stand
24 or not to testify.

25         THE DEFENDANT:  Pros and cons?

1          MR. MULLER:  The Court's indulgence.

2          THE COURT:  Sure.  Yes.  All right.  Is there

3  anything further?

4          MR. MULLER:  No, Your Honor.

5          THE COURT:  Thank you, Mr. Love.  Are we ready

6  for the jury?  The record should reflect, Mr. Muller,

7  although he had I guess not signed or filed a motion at

8  the time earlier this morning, we did address the

9  motion in limina that you submitted with respect to

10  certain testimony that was offered or might have been

11  offered by the Commonwealth and with the agreement that

12  Mr. McCormack, I believe, all of the issues that you

13  raised were in fact agreeable to the Commonwealth and

14  therefore by stipulation the motion was granted.

15          MR. MULLER:  That's correct, Your Honor.

16          MR. McCORMACK:  Can we approach briefly, Your

17  Honor?

18          THE COURT:  Sure.

19          (A discussion is held at sidebar off the

20  record.)

21          (The jury entered the courtroom at 1:19 p.m.)

22          THE COURT:  Be seated.  Welcome back again,

23  ladies and gentlemen.  Mr. Muller.

24          MR. MULLER:  Thank you, Your Honor.  Defense

25  would call Investigator Massey.

ELIJAH QUINN MASSEY,

having been sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MULLER:

Q   Investigator, I realize you've already testified.  Give us your name and occupation again.

A   Elijah Quinn Massey, M-A-S-S-E-Y, I'm a detective with the Harrisburg Bureau of Police assigned to the Criminal Investigation Division.

Q   And as I think was established with the Commonwealth you were involved in this case at its inception, correct?

A   Yes.

Q   Now, on December 20th, did you have an opportunity to be present for or take a statement from Guillermina Cruz?

A   According to my report on December 21st, which was a Saturday, I took a statement from her which is 2305 hours.  Your time would be 11:05 p.m.

Q   Okay.  And this was a reinterview or something to that effect.  She had already given one statement, correct?

1    A    Yes.

2    Q    In that first statement she had said she was

3 with Tyshaunt but she wasn't at the house?

4    A    That's correct.

5    Q    The victim's house, and on the 21st when you

6 had her in, she told you that she had lied the day

7 before, correct?

8    A    Yes.

9    Q    Was she to come in and give a written statement

10 after the 21st?

11    A    I don't know about after the 21st with another

12 detective.  I think she did come in to provide a formal

13 statement which may have been taken on the same

14 evening.  On the 28th of December she came in and gave

15 a formal statement.

16    Q    She didn't come back until the 28th?

17    A    That's correct.

18    Q    Were you present then?

19    A    I don't think I took that statement from her.

20 Two of my colleagues might have taken the statement

21 from her.

22    Q    Were you present?

23    A    Not during the statement.  I was present during

24 the 21st.  I conducted that interview.

25    Q    Do you know where she had been between the 21st

1  and the 28th? Has that ever been determined?

2      A    No. I did have contact with her on the 28th.

3  That was --

4      Q    I'm sorry on the...

5      A    On the 28th of December.

6      Q    Let me ask you this, when you were at the scene

7  in the kitchen -- you've seen pictures and things -- do

8  you recall if there was any furniture in the kitchen?

9      A    I don't recall much furniture being there. It

10 was too long ago. It was a very small kitchen. There

11 was a refrigerator, stove, oven in the kitchen and a

12 cupboard in addition to the bag of clothes or with wet

13 rags found between the refrigerator and the cupboard.

14 Anything other than that I really don't remember.

15          MR. MULLER: That's all I have.

16          MR. McCORMACK: No questions, Your Honor.

17          THE COURT: Thank you, detective.

18          MR. MULLER: Your Honor, the only thing left is

19 a stipulation I discussed with Mr. McCormack; that on

20 January 17, 1997 there was a preliminary hearing in

21 front of a district justice where Miss Cruz,

22 Guillermina Cruz was called to testify under oath and

23 at which time she testified that she had been with

24 Mr. Love the evening of the 19th and the morning of the

25 20th. But she had not gone to the victim's house, Iris

1     Fennel's house.  In fact, they split after she left

2     this Balm Street address.  She went home and he went

3     his way.

4             MR. McCORMACK:  That's correct.

5             THE COURT:  That was on January 27th.

6             MR. MULLER:  January 17, 1997.

7             THE COURT:  All right.  Is there anything else?

8             MR. MULLER:  No.  We rest.

9             THE COURT:  Any rebuttal testimony,

10    Mr. McCormack?

11            MR. McCORMACK:  No rebuttal testimony from the

12    Commonwealth, Your Honor.

13            THE COURT:  All right.  Are we ready to proceed

14    then with closing arguments.

15            MR. MULLER:  Yes, Your Honor.

16            THE COURT:  Ladies and gentlemen, we're

17    approaching the time when I can take the gags off but

18    we're not there yet.  The evidentiary phase of these

19    proceedings are now concluded.  We're going to be

20    moving into arguments of counsel.

21            At this point as I told you at the beginning of

22    this case the order of presentation is reversed.  Now

23    the Defendant's counsel has an opportunity to speak to

24    you first followed by the prosecution counsel.  You

25    should listen carefully to what these lawyers have to

1  say. You've heard from numerous witnesses. You heard

2  references to numerous exhibits.

3  　　　　The lawyers have an obligation and right to

4  discuss with you the evidence now applying logical

5  means in their arguments how they believe the evidence

6  should lead you to a conclusion most favorable to the

7  side that one or the other represents.

8  　　　　What the lawyers tell you during their closing

9  arguments is not testimony. It's not evidence, and you

10  should not accept it as such. You can -- you should

11  listen carefully. It may help you to understand the

12  evidence that you have heard, may help put it all

13  together. You should be guided by what one or the

14  other lawyers may tell you in their closing argument

15  but you are not obligated to follow and agree with what

16  either of the attorneys tells you. They are simply

17  presenting their view of the evidence as they heard it

18  and it is what you heard collectively that must guide

19  your decision making in this case.

20  　　　　Mr. Muller, are you ready to proceed?

21  　　　　MR. MULLER: May we approach just briefly?

22  　　　　(A discussion is held at sidebar off the

23  record.)

24  　　　　THE COURT: You are also, by the way, not

25  permitted to take notes during this segment of the

trial. In fact, you're not able to take notes during
the closing arguments nor my instructions to you on the
law of this case, which will come either later this
afternoon or tomorrow morning.

For now just put your notebooks in the
envelopes along with the pens and we'll collect them
right now and return them to you as you begin your
deliberations. Before you begin, everyone in the
courtroom now knows I assume once we begin this stage
of the proceeding, there's no going in and out.

MR. MULLER: Thank you, Your Honor.

Where to begin? I don't want to belabor a lot
of things. Obviously there were a lot of witnesses and
a lot of evidence introduced. Where does it all lead?
Start with the day before. Iris is fine. You haven't
heard any testimony about there being any problems that
day anywhere. The first confirmation we have of
anything is that Iris is with Tyshaunt at Fav's bar
around 11. You've heard that from any number of
witnesses regarding them both being there at that time,
and certainly you didn't hear anything about there
being problems with Iris at that point or anything
happening.

Who is more accurate? Who is to be believed?
Use your common sense. Do you think what these people

told the police and others back in 1996 may have been a
little more accurate than what they tell them in 1999,
2001, 2003, 2004, are just some of the dates these
other statements were given.

Do you think someone was more accurate when he
said we saw them there at the bar at around the same
time and we saw them leave -- I'm sorry -- we saw Iris
leave but Tyshaunt was still in the bar for a while?
They didn't leave together. That was the testimony --
okay -- from a witness who talked to the police the day
after the incident.

If you go by the testimony of Tawana Poteat or
any of the others that gave statements later, she's the
only one who says they left the bar together, and when
did she give that statement? I don't have it written
down but it was approximately 2001. This is so
important to her and she has this vital information for
five years. Later she remembers it and she tells the
police.

That night before where did Tyshaunt end up?
His own statements, through the testimony of
Guillermina Cruz they end up together at this house on
Balm Street some time. It really was some time after
midnight if you go by all the statements. Some time
after midnight they are over at Balm Street. As to

exact times there are no exact times. The closest we
got out of the testimony or out of the statements was
from Investigator Taylor and his taking the statement
from Mr. Love about getting a ride from the pizza guy
at 12:30 to check on the house. That makes sense. He
gets there before one and Iris isn't there. We know
that's true. How do we know it's true? Johanna
Johnson, the first witness here who testified, she was
on the phone or -- I'm sorry -- actually she tried to
call Iris on the 19th. She tried to call her at 10:00.
She tried to call her at 11:00. No answer. The phone
was never picked up. She finally reached her at 1 a.m.
on the 20th. About Iris not hearing the phone and
Johanna saying she knows she wasn't there and we know
she wasn't there at least part of that time because of
the Giant food receipt showing she had been at Giant
some time between 11:15 and 11:30 that night buying
items.

          1 a.m. to 2:30 are the times that are exact in
this case, and we know that because Johanna Johnson
gave that statement that day, the day after when she
talked to the police. She was very specific about what
had happened, what she knew. She's the one who places
Iris back in her apartment after one; talking for 45
minutes then hanging up and then calling back in ten

minutes and then talking until 2:30, and what happened
in that period of time? One, Iris was alone. Two, at
2:30 someone comes to the apartment. Iris is worried
at first because someone is tapping on the window. She
tells Johanna that. She let's whoever it is in and she
tells Johanna it's okay. It's a male friend, but she
indicated to Johanna it wasn't a romantic friend and
she said the name and Johanna couldn't remember what
the name was but she knows Tyshaunt, she knew his
nickname was Cuzzo, and she was sure it wasn't Cuzzo,
and it couldn't have been. If Iris would have said
that Johanna would have known. This was some other guy
coming to her house at 2:30.

What's going on at 2:30? Well, there's a
chicken in the oven. We know that. Johanna tells you
that. We know that from the receipt.

The items purchased were a roaster for $5.38,
along with stuffing and muffins or rolls. The things
you saw up there being cooked. She is cooking the
chicken. She asks Johanna, I got the chicken in the
oven. How much longer is it going to be? Johanna
tells her it's only going to be a little while. We
know the chicken is cooking at 2:30. We know it's
close to getting done at 2:30. If Iris were killed
later, go by this testimony from Guillermina Cruz from

the preliminary hearing three years ago, if you go by
that, they didn't get there until the next morning.
Some time sounds like between 9 and 11. It's hard to
tell what the exact time that Guillermina thinks they
went there.

Iris is still cooking according to Guillermina
at the stove, and this whole thing takes place. Do you
really think that Iris was alive after 2:30, that she
wouldn't have taken that chicken out of the oven? Do
you think that chicken was sitting there for eight
hours without Iris doing anything with it? The only
thing that makes sense is, yes, there was a chicken in
the oven. It was cooking. She's killed. She can't
take it out of the oven. And she's killed at 2:30 in
the morning the last contact anyone has with her.

In regard to witness testimony, Guillermina
Cruz, the Commonwealth's main witness in their case,
she's gone. She's left. She wouldn't show up, you
know. Put whatever face you want on it. She wouldn't
come in.

What do we get? We get her testimony in front
of a district justice three years ago about this. Her
sitting there, a couple of other people in the district
judge's office and her giving this version of the
events which she had the opportunity to come in here in

front of 12 people to sit up there under oath and under
cross examination and tell what had happened.  She
refused.  It's easy to go and say something to the
police or it's easy to go and say something in a small
room to just a couple of people.  When she had the
chance to come here she refused to.  Why do you think
she refused to come here and face you?  It had nothing
to do with Tyshaunt.  You know that.  He had nothing to
do with it.

The only thing we heard out of all the
testimony as to threats to her were from Anthony,
Black, her boyfriend; Socorro Roman gives four
different statements.  Which is the only plausible one?
How about the first one she gives.  She got up around
8:00.  They went out at 11:45 to clean the cages, the
dog cages out back.  She went out with Zach.  Zach puts
the time at 11:55 when they go out to do that, and
right away Zach sees smoke, smells smoke and he runs
over.

Well, he smells it and he sees it because
Mr. Love has already gone into that kitchen in the back
door.  Him opening the door the smoke has come out,
burnt smell has come out, because it was cooped up in
that apartment.  After going over there the only thing
that makes sense from Ms. Roman's testimony and

1  Zachary's testimony is there initial stories.

2       Zachary runs over there.  He goes into the

3  place.  Tyshaunt is in there coming out.  The

4  Commonwealth tries to make a big issue of Zachary

5  saying he saw him go up and then came back down.

6  According to Zachary, depending on which version you

7  want to believe, he did go over there after telling --

8  he did see Mr. Love in the apartment, which is

9  consistent with what Mr. Love told the police.  He was

10 coming out to get help.

11      Why the back door?  Well, the front door is

12 just an alley.  You saw that picture.  The back door

13 where everyone is it's out back.  Indeed that's where

14 he found people, and what happens according to the

15 testimony?  Zach runs back to Socorro's house and right

16 behind Zach is Tyshaunt following him there.  So the

17 911 call can be made according to Zach, and at one

18 point Socorro, and then Tyshaunt goes back with Socorro

19 because she's going to check on things.  Socorro has

20 her grandson at this point, she goes in there,

21 remember, and she puts her grandson in the living room.

22      They go in there to check on Iris.  Socorro

23 determines that Iris is dead at that point.  After

24 Socorro sees, you know, she left at some point and then

25 came back and I guess that's supposed to be the

plausible story because that's when Tyshaunt had a
chance to change the scene. The scene wasn't changed.
Socorro never left Tyshaunt. Okay. And essentially
not for long enough for anything to happen.

 She said she had already left before an
ambulance and police get there. You heard the
stipulated testimony from the EMS technician. He got
there, knocked on the door, Socorro opened and he went
in and Socorro was there. He referred to a Hispanic
female, you know. From the testimony there was one
Hispanic female and that was Socorro and Tyshaunt was
in there as well. The EMS technician went in there.
The first thing he does is lift the arm up to see if
there's rigor. He lifts the arm up of the victim.

 Now, Investigator Taylor testified there was a
sheet covering her from the waist down. The EMS guy is
not real clear on if there was or wasn't a sheet. This
whole issue of the body being moved and it must have
been Tyshaunt doesn't make sense with the evidence.
Whoever was there early that morning and killed Iris,
you don't know how long they were there. You don't
know how long they were there looking for something and
you don't know what they decided to do with that body
before they left or when they left.

 Dr. Ross made no determination of time of death

1  or, you know, when rigor mortis set in. You don't have

2  that on the record as to when that happened. Could it

3  have set in before whoever did this left? Yes. But

4  it's a person that was there at 2:30 that morning. The

5  big question is who would have been there and how did

6  Guillermina know anything? Or why did she say anything

7  about being there? Well, the first question is was

8  Guillermina really there. In her statements that came

9  in or her testimony she said she sat at the kitchen

10  table while all this happened. One statement she said

11  she just sat there and waited for Tyshaunt to come

12  down. Another statement she said she went up part way

13  to watch what happened and all those things. You seen

14  the pictures though, and you'll have them available to

15  you in deliberations.

16  　　　　Investigator Massey just told you that's a

17  small kitchen, 7 by 9 feet, whatever the dimensions

18  are. There was no table in that kitchen, and she was

19  never in the kitchen. Who would Iris let in the

20  kitchen -- apartment at 2:30? It wasn't someone she

21  wasn't afraid of. How about someone like Anthony

22  Knight, someone she's friendly with? And then when

23  she's worried before she hangs up with Johanna Johnson,

24  is she worried she sees Kazar coming in with Anthony?

25  That's maybe a few minutes later. I don't know. You

1   don't know.  They don't know.

2           Kazar, I mean, it's a heck of a coincidence he

3   gets back into town that week, a week before.  He knows

4   Iris is the one that snitched on him before when he was

5   on the run.  She is the one who called the police.

6   She's the one that told him where he was.  He knows

7   that, you know that through Candace.  You know that

8   through Investigator Heffner confirming who narked on

9   him.  When he gets back into town Candace ends up

10  staying with her friend, soon to be ex-friend Iris.

11  Who does she let come over?  Kazar.  What have you

12  heard everyone testify to about how Iris felt about

13  Kazar.  She's scared of him.  The mere mention of his

14  name made hair on her arm stand up.  She didn't want to

15  go around him.  Why did she let him come there?  Well,

16  because Candace was there.  Candace was her friend.

17  She was letting him stay there a couple of nights

18  because Candace was there.

19          Now, Kazar apparently like everyone else knows

20  who's doing what, who's dealing drugs and what's going

21  on with that; because according to Kwajalyn Jackson her

22  conversation with Iris the morning of the incident or

23  before, Iris tells her Kazar was here this morning.  He

24  was saying I know you're the one that snitched on me

25  and he wanted money from me.

What's missing from the apartment later?
Money, lots of monies.  She's gotten it out from
Daelene Saez's place apparently.  She spent some of it
because there are Christmas gifts.  Gifts for her
daughter that were being talked about but nothing else
is found.

Who has blood on them?  Kazar.  There's no
other explanation as to how Kazar got Iris's blood on
his boot.  There's no other explanation.  He's picked
up a day, day and a half later and he still got blood
on his boot.  He's got blood, his own blood on his own
clothing.  I don't know.  Where do you think that came
from?  Maybe because someone was fighting him getting
defensive wounds, hitting him, cutting him, getting his
own blood on himself.  Her blood is on him.  His own
blood is on him.

Tyshaunt is taken in that day when this all
happened.  According to the testimony that was brought
out he was wearing the same thing when they picked him
up as he was wearing the night before at Fav's.
There's no blood on him anywhere.  Mr. McCormack
described this I think in his opening as a bloody
scene.  Blood in the kitchen, blood on the stairs,
blood in the bedroom, blood in the living room, and
this woman was viciously beaten, how much blood she

1 lost.

2       But do you think if that happened maybe if

3 Tyshaunt was the one who did it there would have been

4 some trace on his clothing of her blood? What about

5 some marks on Tyshaunt? You saw the pictures of the

6 victim. I mean, other things if you notice she had a

7 lot of rings on and things. Okay. You heard her

8 described as feisty. She wouldn't put up with anything

9 from anyone. She would fight for her life.

10       According to Dr. Ross there were 28 defensive

11 wounds showing that's what happened. They are saying

12 the person that does it, Tyshaunt, has no visible

13 injuries. They took all his clothes, tested and

14 retested tested them in '96, tested them again in 2001

15 when there was better technology.

16       Iris's blood is not on him, and yet he's

17 supposed to be the one who has done this. Dr. Ross,

18 the forensic pathologist, testified to the condition of

19 the body and those things, and among other things what

20 he told you is she was strangled. Remember the broken

21 bone in the neck area, the hand imprints on the right

22 side, linear contusions on the neck, etc., etc., she

23 may have died from the gunshot wound but obviously

24 before that someone tried to choke her too.

25       Who do we know that's strangled someone before?

1  Kazar, LaQuan Williams. You heard it through Candace
2  Mills. He tried to strangle her before, Kazar, who is
3  in town that week; Kazar, who knows where Iris lives
4  now; Kazar, who knows Iris is dealing drugs and
5  apparently doing very well at it.

6        After -- let me go back. Look at another of
7  those witness statements again. Jeanette McCurdy, the
8  older woman who testified on Tuesday, the neighbor who
9  says Zach and/or Socorro came out and told her to call
10 911. What did she tell the police that day? That they
11 came over. She was out with her dog. They came over
12 and asked her to call 91. She shared nothing out of
13 the ordinary and nothing additional at that time.

14       Seven years later she gives a statement where
15 she said not only did that happen, a young Hispanic
16 male come out and this gentleman had come out with her
17 and this was ten minutes before all this happened with
18 the fire. Do you think maybe back in 1996 when this
19 actually happened if that had been the indication they
20 would have mentioned that. Oh, yeah, ten minutes
21 before this fire these two people ran out and you found
22 a dead body and did I tell you ten minutes before this
23 two people ran out. She only comes up with it seven
24 years later after she had been at one of those
25 preliminary hearings and seen and heard from

1 Guillermina Cruz and seen Mr. Love. I mean, use your
2 common sense. It's not plausible. The same with Stacy
3 Harris; Stacy Harris, who said the night of the
4 incident she heard a scream and gunshot around 2:00 in
5 the morning. Well, that matches some of the other
6 evidence especially Johanna's statement of what was
7 going on when.

8 December 20, 1996, Stacy Harris says she hears
9 a gunshot and a scream at around 2 in the morning. I
10 didn't go check on it. I didn't want to go check on
11 it. Years later, 2002, she goes up to Investigator
12 Heffner, oh, I have more information; talks to him.
13 The next day, you know, my memory is not good about
14 that time. I don't really know anymore. A year or two
15 years after that, 2004, Investigator Heffner interviews
16 her, and we have another example of a case of being
17 incredible recovery memory syndrome. The tainted
18 memory; two years before people said my memory isn't so
19 good at the time. Later I heard a gunshot and scream
20 at 2:00. I actually heard something and it was after
21 5:00 or 7:00, whatever the case may be, and by the way,
22 I then went out and looked around the corner and I
23 looked down the street and someone was running away
24 from me in a hoodie. They turned briefly and I know it
25 was Tyshaunt. I don't know why she would go that way?

But once again use your common sense. Do you think she knew what was going on in 1996 and it was fresh in her memory? Do you think this recovered memory in 2003 is the accurate one?

Tamara Williams, Iris's sister, I don't honestly know what her testimony was because it wasn't consistent from one statement to the next or one answer to the next when she was up there. She tells us that she had seen her sister some time in the month or two before and that her sister had a black eye and told her that Tyshaunt had hit her. Apparently this was around the same time that Daelene Saez says Iris had a red puffy eye and didn't say that Tyshaunt had hit her, which brings us right back to where we were.

Incredibly feisty woman hung around Tyshaunt for -- at that time for a year, all fighting, breaking up and getting back together. I know one of the witnesses said he was always around her and my question to her after that, by the same token, she was always around him.

Commonwealth brings us an incident two months before from Barbara Brown. She's in the KFC parking lot. There's an incident where Tyshaunt punches a car window saying if I can't have you no one can. In fact, in their opening that's the case. This is him that

1   made the remark back then. He must be the one that

2   killed her. It doesn't connect. Barbara Brown

3   remembers one incident and all of a sudden that's the

4   Commonwealth's case.

5          Candace Mills testified she talked me out and I

6   talked to her and she already kicked Tyshaunt out and

7   she had packed his stuff. And according to Candace it

8   was three days before this happened and nothing

9   confirms. What did the police do and what didn't the

10  police do?

11         Well, how about trying to check up on what

12  Tyshaunt was telling them? How about going to Balm

13  Street and checking with this pop-pop, who,

14  Guillermina, according to her testimony, verifies that

15  they were there together. How about going there and

16  saying, were these two here? When were they here?

17  When did they leave? You don't know that because the

18  police didn't do anything with that. They are suspects

19  and their main witnesses are saying the same thing.

20  Hey, we were here, and Guillermina never takes that

21  back, changes her story about where she was the next

22  day. She never changes that. No one ever goes there.

23  1996 no one goes there to say, were they here? And

24  maybe if they were here when did they leave? What

25  happened?

1    You don't know.  I don't know.  They don't
2 know.  I don't remember if it was her preliminary
3 hearing testimony or what, Guillermina Cruz had stated
4 she, Tyshaunt and the other went upstairs for the
5 night.  She stayed on the couch downstairs.  So she
6 can't account for Tyshaunt but the reverse is true too.
7 No one can account for her whether she left the
8 apartment that night and came back.  No one knows.  No
9 one talked to pop-pop.  No one went over there and
10 asked.

11    Shavetta Maynard and Ms. Poteat, Tawana Poteat
12 is silent by pinning their time line on some of this
13 the next day saying about when they got up.  They
14 always get up around 5:00, drug trade.  That day they
15 didn't get up until 8 or 9.  They went looking for
16 Iris.  They ended up in Fav's, and that's when they saw
17 Tyshaunt, and it had to be 9:00 that they were there.

18    Mr. McCormack made a big deal in his opening
19 about what he was doing between 9 and 11:30 if he was
20 so concerned about her, go look for her if he wasn't
21 there at 9:00.

22    Bear with me, their other witness, I think,
23 Wendy Harris who sees Tyshaunt by the Five and Ten the
24 next morning on Market Street, and when does she see
25 him there?  Sometime Around 11 or after 11.  Who else

does she see down there at Fav's? Shavetta and Tawana.
They are there too. She told the police that on the
20th or 21st in 1996. Tawana gives her statement four
or five years later about her times and what she saw.
In fact, the day they talked to her then she didn't
offer any of that information or anything like that.

Mr. Love in his statements gives various times
where he was and when he was. Maybe he's not going to
but I would suspect that Mr. McCormack's comments on
when that was read is going to read it trying to create
an alibi. Look at what he's saying.

You also heard Investigator Taylor. He just
talked and talked. You're a talker. Maybe he did the
only thing to confirm out of that, at 12:30 he went
over and saw the clock in the car of the pizza delivery
guy. That's the one time he went over to check on
Iris, the one time.

When she sees -- I'm sorry -- back to Wendy
Harris. She went to check on Iris around 11:00 that
morning. Went there, smelled smoke, didn't think
anything of it. And then left, went to Market Street.
That's when they saw Tyshaunt, which makes perfect
sense.

Whenever Tyshaunt left pop-pop's on Balm
Street, Guillermina's testimony was read in, something

1  about I saw school buses and kids at the bus stop.  It
2  must have been when school buses were running.  I mean,
3  that's 7:30 or 8:30.  That can be 11:30 or 12 for
4  kindergarten classes.  Yes.  We don't know.  She wasn't
5  here to explain it.

6        And the recovered memory continues because then
7  we had Officer Muldrow, who had a one-page report that
8  we read to him where he said Mr. Love told him the
9  victim was in the other room or something to that
10  effect.  But he said that and then he said, no, Zachary
11  found her.  No, I found her.  In all of this no one in
12  the report -- the report was concise.  Mr. Love told me
13  this, and on and on with his testimony.

14        Nine years later Officer Muldrow is the
15  brainiac.  He's got everyone up there now.  He's got
16  the incredible memory not to put in the report at the
17  time maybe those are important facts.  But to get up
18  here nine years later knowing Mr. Love is on trial and
19  to testify to that.

20        Guillermina gives a statement and initially
21  saying I was with Tyshaunt at the Balm Street address.
22  I didn't go to Iris's.  But she says, no, I wasn't with
23  him that morning, and it was the first chance to
24  testify about it.  So I lied again.  He was with me.  I
25  wasn't there.  I never went over there.  I didn't see

1 any of it and on and on throughout the years, whether
2 testifying to a grand jury, telling another story at
3 the preliminary hearing later and telling another
4 story.

5       She's not here to explain it.  She didn't show
6 up for you to see what kind of person Guillermina is.
7 The facts don't fit the Commonwealth's evidence.  They
8 are trying to tell you that this guy who is described
9 by one of the witnesses, Candace, something to the
10 effect he's a nerd; he's a wimp, something like that.
11 Everyone described her as, Iris, feisty, would fight
12 back, wouldn't put up with anything.

13       We're to believe that Tyshaunt Love is the one
14 who went over there, who beat her to death or shot her
15 to death, who left and for some reason taking
16 Guillermina with him to see all this yet didn't get any
17 blood on him and nothing happened to him because he
18 wasn't there.  He was never there that morning.  He's
19 not the one that's there when Iris is talking to
20 Johanna.  He's not the one that comes in or does
21 whatever.  Someone comes in.  He's not the one that's
22 there.  Even their main witness, Guillermina, her own
23 story, things that happened at 9:00 the next day, which
24 is inconsistent with the physical evidence.  All the
25 physical evidence in this case indicates whatever

1 happened happened that morning around 2:30, some time

2 right after 2:30, something happened, someone was there

3 to do it and it wasn't Tyshaunt.

4      When Guillermina gives her statements she gives

5 a first one to Massey.  It takes in the next day and it

6 was Tyshaunt and she disappears for five or six days,

7 and I think we heard from someone at some point she's

8 with Black, her boyfriend, Anthony Knight.

9      Then on the 21th of December -- 28th she comes

10 back.  She's got the details.  She's got all the

11 details of what happened.  How does it happen?  How

12 does she have the details down and not earlier.  All we

13 know was Guillermina was there.  Guillermina doesn't

14 tell you that.

15      In 2001 they resubmit everything for testing.

16 January of 2001 the DNA comes back and it's not the

17 merely probably whether it was one in 600 chance.  Now

18 the chance that it wasn't Iris's blood on Kazar is

19 2.86.  Mr. McCormack said in his opening said

20 probably, probably is her blood; now one in two

21 quintillion it's her blood.  It's on his boot.

22      Just briefly Tyshaunt is the only person in

23 this case who gave statements that doesn't get better

24 over time.  He's the only one who gave statements

25 between the years, wasn't as detailed, didn't get more

1  details which is ordinary.  Something happened in 1996
2  and then you talk about in 2002.  You're not going to
3  be consistent with all the details.  You're not going
4  to remember all the details.
5      The only statement we have from Mr. Love is
6  different as the one in 1998, that wasn't recorded,
7  that wasn't written down, that wasn't given to Mr. Love
8  to review for accuracy.  The only one that's
9  inconsistent.  It's at least reliable for what is said
10  and for what is in it.
11      You were able to take notes.  You can look at
12  your notes to see what you remember or what happened if
13  it's not addressed here.  I can't possibly go over
14  everything.  I can only tell you where the evidence
15  leads that had been presented.
16      The Commonwealth has the burden of proving
17  beyond a reasonable doubt.  You have come to the
18  conclusion that Tyshaunt Love killed Iris Fennel.
19  That's what they are saying.  He's the one who killed
20  her.  You have to believe that beyond a reasonable
21  doubt.  They haven't proven that in 2000.  If you
22  suspect someone has done something, if you think
23  somebody has done something that's not a reasonable
24  doubt.  The Judge will explain those issues to you.
25  I'm not going to belabor it.  Ultimately that's what

1  this comes down to. Did they prove to you beyond a
2  reasonable doubt that Tyshaunt Love was there and that
3  he killed Iris Fennel? Now, they couldn't because he
4  wasn't there.
5          THE COURT: Thank you, Mr. Muller.
6  Mr. McCormack.
7          MR. McCORMACK: It will take me a few minutes
8  to set up, Your Honor.
9          It took nine years to get here, ladies and
10 gentlemen, nine long years. This is what Iris looked
11 like nine years ago before she had two bullets put in
12 her face. A twenty-year-old young woman who was doing
13 the wrong things, hanging around with the wrong people.
14 But before you say, well, okay, hanging around with the
15 wrong people you get what you get. Nobody deserves
16 what happened to Iris Fennel on December 20, 1996.
17 Nobody deserves to be found naked from the waist down,
18 laying on the floor, legs spread wide open, gunshot
19 wounds to the face. Nobody deserved to have those
20 wounds to the face that she had; broken nose, broken --
21 for lack of a better term -- broken throat. Nobody
22 deserves that.
23         Now, Mr. Muller is right. I did say in my
24 opening and I continue to say to this day and
25 throughout this entire closing, that the Defendant's

1 own words tell you a lot about him and that's what this
2 case is about. This case is about that Defendant.
3 The things that he said, the things that he did on the
4 19th into the 20th of 1996, December 1996 -- if I can't
5 have you no one can. That statement was made in anger
6 and in rage so much so he was punching out a car window
7 at the time.

8    I told you this case has been marked during
9 this nine year journey by many different things that
10 made it difficult to get into this courtroom. You
11 witnessed firsthand one of the most difficult parts in
12 this whole case, the eyewitness to the murder. She
13 runs hot and cold. She either cooperates with us and
14 she doesn't cooperate and it's an empty chair in the
15 courtroom and you don't get an opportunity to see her.

16    She was subpoenaed. She was supposed to be
17 here and she didn't stay around. She left. But we
18 can't walk away from this case so easily. We can't say
19 oh, well, our main witness isn't here. Let's just
20 forget about it and go home. That's just the way it
21 is. We can't turn our heads away from the things that
22 happened to Iris Fennel on December 20, 1996. If I was
23 to do that I would not be doing my job. I would submit
24 to you, ladies and gentlemen, if you simply dismissed
25 the whole thing about Guillermina Cruz and her

testimony she doesn't show up, I don't believe you just
do that out of hand. I suggest, ladies and gentlemen,
you're not doing your job. Certainly it's a factor you
have to consider, the fact she wasn't here. But I hope
to show you during this closing all of the things that
match with her testimony to show you that the story
that she told the police, what she has been saying for
years, it wasn't just out at the preliminary hearing
two or three years ago, that she suddenly said that
this happened. It is a story she's been telling for
years, since 1996, about this Defendant committing this
crime.

As I said in my opening, she's not the only one
who changed their story. The Defendant, as you heard
yourself -- I'll go through it with you here -- has
changed his story drastically. You have to take a look
at her and her testimony and the testimony of our
witnesses. Some of them in the courtroom here today.
If you have to take a critical eye of the things that
they have said you have to take a critical eye at the
changes in the Defendant's story.

Recovered memory syndrome I think Mr. Muller
referred to it as. What's the Defendant's excuse for
changing his story?

Mr. Muller tries to say, well, he's forgotten

details. Come on, ladies and gentlemen. The day that
your girlfriend or your ex-girlfriend's body is found
murdered, he forgets those details. He was the prime
suspect in police custody that day in 1996, and now
today he can't recall very important details. Details
that come close to matching. How could he forget those
things?

I submit to you that Guillermina Cruz hasn't
forgotten details. It's a matter of whether she wants
to tell details or not and the same thing goes for many
of our other witnesses. What were our witnesses doing
back in 1996? They were all roughly around Iris's age,
19, 20, a couple a little bit older. They are all drug
dealers, all drug dealers. Is it in their nature to be
cooperative with the police? Was it in their nature to
be cooperative back at that time? And the other
question I ask you to ask yourselves as we go through
this, did the police really follow up? I hate to say
this. Did the police really follow up the way they
should have back in 1996? I suggest that, no, they
didn't, and finally, LaQuan Williams was the other part
of this case. He has Iris's blood on his shoe.

Mr. Muller says that he also apparently has
defensive wounds or some type of wounds and some other
things. We'll talk about that in a few minutes. And

1   we have an altered crime scene.  No matter who changed
2   the scene, the scene has been changed and it makes it
3   that much more difficult to get to the bottom of
4   things.  We'll talk about that.
5          I'm going to start where I started with my
6   opening with the Defendant's own words.  If this
7   Defendant is not being truthful to the police, if he
8   was not being truthful you have to ask yourself why.
9   Why was he not being truthful?  What was he trying to
10  hide?  What image was he trying to project?  Even back
11  in 2002 when he gave his statement to Investigator
12  Heffner, his story continues to change.  Look at how
13  it's changed.  I go back to his 1996 statement, the
14  very first question, tell us in your own words what
15  happened.
16         Last night, um, last night I was just out.
17  When I left the house Iris was asleep.  This is
18  approximately five something because school was out
19  plus I had been in the house.  It was about 5:30, 6:00
20  and he goes on and on and on.  You hear him provide in
21  detail from 5 p.m. the previous evening every little
22  thing ad nauseam that he did, every little thing from
23  that simple little question, tell us in your own words
24  what happened.
25         Really, ladies and gentlemen, shouldn't he have

started with I went to McCleaster Street? I found
Iris's body in the bedroom and this is what I found.
Doesn't that seem more natural? I went to the house.
I had been looking for her. I went to the house and
there was smoke and I went inside. I couldn't find her
body and then I found her body and he saw that she was
dead. Okay.

Tell us what you were doing during the previous
-- he starts with his alibi. He starts setting this up
from the very first question. He starts providing lots
and lots of details.

Sometimes you should be very suspicious of too
many details, too many details. There are three basic
statements you heard during the course of this trial;
One to Investigator Taylor, one to Sergeant Maloney
from CID and the statement to Detective Heffner. Yes.
The statement to Maloney was completely different than
the other ones. But all three of his statements are
really completely different. He says to Sergeant
Maloney I was buying drugs from Iris. Never mentions
that at all in any of his other statements. He bought
an eight ball. He owed Iris money. He owed Iris money
so he couldn't buy the amount that he wanted, and the
Defendant says Kazar was there with him. Let's get
something straight here. Kazar isn't our friend. We

didn't bring Kazar into this house, into this case.
The Defendant does. It's his friend. It's Iris's
friends. These are the people that they hang around
with. These are the type of people that they hang
around with.

He is the one who brings Kazar's name up, that
he or Kazar are at the house. He doesn't say that
there's any problems with Iris and Kazar at that time.
Never in any of his statements does he mention any
problems with Iris and Kazar. He was the one that knew
her best. They were sleeping together. They loved
each other, boyfriend/girlfriend. He doesn't notice
that Iris gets worried when Kazar is around. He brings
Kazar around.

Now, there is one thing he's consistent in all
three statements and that is he leaves the house to go
to the bar. Now what time is another issue. In the
statement to Matt Taylor, which I was just reading,
5:30, 6:00 somewhere around there. When he talks to
Sergeant Maloney it's some time around 6 p.m.; pretty
close, and when he talks to Detective Heffner he really
doesn't give a time. But there the similarities end.
When he leaves in his statement in 1996 he leaves
alone. He makes a big deal of saying I left alone, and
in fact, Iris was sleeping. Remember that. Iris was

1  sleeping. He left alone to go to the bar.

2          Now, he tells Sergeant Maloney he left the

3  house but he left with somebody. He left with Kazar.

4  He really changes it when he talks to Detective

5  Heffner. He's with Iris. Now, yes, you might forget

6  some details here and there, but to go from I leave the

7  house alone to Iris and I all left together, that's a

8  big change, ladies and gentlemen. It's not one you can

9  ignore and you have to ask yourself what's he trying to

10  do. Back in 1996 he's trying to set up his alibi. I

11  suggest to you he's still trying to do the same thing

12  in 2002. However, he's doing it for a different

13  purpose in 2002. I would suggest to you in 2002 he's

14  trying to convince this detective how lovey-dovey the

15  two of them were and how much in love they were;

16  therefore, they had no problems; therefore, he had no

17  reason to commit this crime.

18          You'll see more of that as we go through this.

19  He says in 1996 I started calling her around 8 p.m. I

20  started calling Iris around 8 p.m., because he's at

21  Fav's. He called the house at 8 or 8 something. The

22  first time I called the phone was just ringing. I

23  wrote it off that she was just asleep, maybe she went

24  outside. So after that maybe I called around -- not

25  too far after that maybe -- he makes probably according

to his statement about 3 phone calls and he says Iris
arrives at 11 p.m. I seen her. It was around 11
something; around 11 something that's the first time I
seen her that night.

Now he doesn't say -- there's no discussion
with Sergeant Maloney about this but with Heffner she's
already in the bar. So there is no phone calls at
8:00, no frantic phone calls; everything is normal in
this house. Everything is normal at the bar. We're
all drinking, all having fun, everything normal, no
problems. Her and I were chilling. It continues.
When Iris arrives at 11:00 he starts jumping all over
her. Where were you? I just woke up. Well, I was
calling you. You didn't answer. Where were you? I
want to know where you are. His own words consistent
with the testimony that is suddenly refreshed memory
that Mr. Muller keeps returning to our witnesses said
this is the way he acted around her. He wanted to know
where she was at all times. He wanted to control her.

This is evidence of that through his own words.
Iris then was speaking with her friends because we only
talked about five minutes he said back then and then
Iris goes outside.

He doesn't really say anything to Sergeant
Maloney; to Detective Heffner Iris is already at the

1 bar. There was no fight whether she was sleeping or
2 outside or where she was. There was no fight that
3 night now. Iris is going out to serve someone. She's
4 going out to do a drug deal and all that, and
5 everything is still okay and, in fact, he wants to
6 paint the picture that everything was so rosy, that we
7 had a kiss by the junk box before she went out, and
8 that's the last time I saw her. That's what he's
9 trying to say in 2002.
10         Now, as I said, with Sergeant Maloney there's
11 no discussion about that. There's a witness who does
12 discuss what happened and that's Tawana Poteat. Tawana
13 Poteat says that Iris was annoyed.  Iris was annoyed
14 that night. This M-F'er is getting on my nerves as
15 Iris walked by her. He's getting on my nerves. I'm
16 going home. I'm out of here. Tawana is, hey, we're
17 going to be making money. See you tomorrow, and right
18 after that she sees the Defendant. Remember the
19 Defendant is pounding on his way out and the Defendant
20 either goes out with her or just after her but she
21 doesn't know essentially whether they actually leave or
22 go anywhere together. But Iris says she's going home.
23 This testimony here of Tawana Poteat is pretty close to
24 what the Defendant was saying back in 1996. So don't
25 just take Mr. Muller at his word and dismiss what she's

1  saying because she told the police this years later.

2  What she's saying pretty much tracks with what he was

3  saying except for he's minimizing and he says it the

4  way it was.  He minimizes because they just had a

5  conversation and she was sleeping.  I suggest to you

6  what really happened.  This M-F'er is getting on my

7  nerves.  He's annoying me.  I'm not sticking around

8  here tonight.

9       Then begins the quest how many times does he go

10 to find Iris.  He goes to find Iris over twice, went

11 and looked all around for her asking everybody, making

12 phone calls, more and more phone calls, and one time he

13 goes over to the house in this statement.  The second

14 time he's over to the house there's a light on in the

15 house.  Both times he goes over to the house he goes

16 inside the house.  When he talks to Detective Taylor

17 he's inside the house, but Iris isn't there.

18      Now, the first time is some time, 12:30 before

19 1:00, and, yes, I would agree with Mr. Muller, maybe

20 she wasn't back at the house by then.  Although the

21 receipt says it was 11:15 she was done at the store but

22 who knows how long it took her to get home.  Maybe she

23 wasn't there the first time.  But the second time and

24 it's hard to tell from his statement when exactly it

25 is.  It can be any time from 1:30 to 2:30 that he's

1  back in the house when he sees the light on and there's
2  nobody home.
3         The bedroom light was off.  He tells Heffner he
4  went to the house three times and the times have
5  changed.  I am going to hit all the times he's back.
6  The times are off are now.  By this time does he know
7  that Johanna Johnson from the beginning of this case
8  saying she was on the phone.  Is that perhaps why
9  there's a change in his time frame?  Does he have that
10 knowledge?  Now when he gives this statement to Heffner
11 in 2002 it's not even dark.  It's almost dark the time
12 he says when he's going over to the house the first
13 time.  In his statement to Investigator Taylor it was
14 about an hour, it was about an hour.  Iris came in
15 about 11.  Some time after midnight that he first
16 left.  When he talked to Investigator Taylor it was
17 some time after midnight.
18         And remember this whole conversation of Tawana
19 Poteat witnessed about her being annoyed and leaving
20 out of there some time not long after 11 she probably
21 left there.  In his own statement he says that he only
22 talked to her for about five minutes in his first
23 statement.
24         In his last statement now suddenly not only
25 does he arrive and there's a light on in the bedroom

but he arrives, light on in the bedroom and there's
$1500 sitting out. This is the first time he ever
mentioned $1500. It's sitting out. Does that give
somebody motive to come in and rob her suddenly? Is
that why that's in here? Remember what he said when he
first spoke to Muldrow? Muldrow said he was all over
the place, but Officer Muldrow wrote in his report and
put it in quotation marks, we're talking about most
accurate back in 1996 -- he put in his report, I don't
know what happened to her. I was trying to get in the
house all night but couldn't. I was trying to get in
the house all night but couldn't.

  Again look at the changes in his story. He is
changing his story. Is it that he can't remember his
original story? Is that what it is? Times of the
phone calls, times of visits to the house, they just
don't match. He says to Heffner the last time he
visited the house some time after midnight and the
first statement was much later. Again we talked about
Johanna Johnson was on the phone from 1 a.m. to 1:45,
got off the phone for about 10 minutes and then was on
from 1:55 to 2:40; about the cooking of chicken. Who
says you can't reheat chicken in the morning, ladies
and gentlemen. Maybe she was cooking chicken that
night. Johanna says she was when she was talking to

her on the phone.  Nothing says that Iris gets up at 5
or 6 in the morning she can't be cooking chicken in the
morning.  Nothing.  So a guest gets there around 2:30
in the morning, stops cooking the chicken or puts it
aside for something else, dealing drugs.  Now she's
busy doing that.  What's she doing?  I don't know.  I
don't know.

He says he bought an eight ball for $70, wanted
more but owed her 20 or $30.  That's what he tells
Sergeant Maloney.  Tells Heffner there's $3,000 in the
house.  He says to Heffner I had 20 or $30 in my
pocket.   How does he owe 20 or $30 and can't buy the
drugs.  He also has 20 or $30 in his pocket.  Again he
can't keep his stories straight.

Daelene says, as Mr. Muller pointed out, she
had the safe and she had gotten the money out for
Christmas and Tawana says she was a better hustler.
She was the one making the money, and he was the one
living off of her.  If they are breaking up, she's
through with him, they are done; she wants no part of
him anymore and she does indeed have $3,000 in that
house, he might want it.  Is there any evidence of
that?  $3,000 in the house, 1500 sitting out; it's
under the bed.  He knows where she keeps it.  He knows
her hiding spot under the bed, lots of stash spots,

1  lots.  Again the Defendant's own words it is both our
2  money.
3          He's annoying her.  He wants to control her.
4  He wants to know where she is at all times, and now she
5  has all this money in the house and it's his money too.
6  But is she giving it to him?  I mean, he owes her
7  money.  How is it his money too?  By his own words he
8  owes her money.  How is that $3,000 his too?  Defense
9  Exhibit 1, look at the state of the house, the state of
10 the mattresses.  Looking for money, is that what this
11 is?
12         Commonwealth Exhibit 34, again, the mattresses
13 all moved.  Is somebody looking under the bed?  Take a
14 closer look at the corner of Defense Exhibit No. 1.
15 If you look closely when you get an opportunity to look
16 at the photographs it would appear that perhaps these
17 two mattresses here are really twin size box springs,
18 and if you can picture these two twin size box springs
19 side by side on the floor because they don't have a
20 formal bed, and in this appears to be either a full or
21 queen size mattress perhaps sitting on top of that.
22 The Defendant knows she keeps her money under the bed.
23 Why isn't this one moved?  Why is this one here pulled
24 out of the corner?  Does he know exactly where to look?
25 When I talk about a crime scene being altered, this is