1  what I'm talking about.  Things were moved in that

2  bedroom after she decided -- when you get an

3  opportunity this isn't probably the best photograph to

4  look at -- but Iris was here.  Iris was right here at

5  some point in time because there's a pool of blood

6  there and looks like two drag marks as if her body was

7  on there and somebody tried to pull it off at some

8  point in time perhaps.

9          When you're searching one part of the room and

10 she's in the way there perhaps in that closet, you move

11 her over to the bed to get her out of the way or is she

12 over by the bed and you want to get back into here so

13 you move her out of the way.

14         That's what I'm talking about changing the

15 crime scene.  He's emphasizing the first statement, how

16 important it was to find Iris.  He's telling people

17 it's very, very important.  She wouldn't disappear like

18 this on me.  She wouldn't not tell me where she's

19 going.   And then he comes to the realization according

20 to his statement that she's probably out cheating on

21 him.  Do you think that made him happy?  Well, he seems

22 to kind of insinuate when he talks to Heffner -- didn't

23 you get jealous about her having sex with other guys?

24 That wasn't an issue, wasn't a happy thought, but it

25 wasn't an issue.  Yeah.  It wasn't an issue.

1    He goes from that initial statement that people

2 were so tired of me asking them where Iris was to that

3 it wasn't an issue.  Of course it was an issue.  He

4 always wanted to know where she was, always wanted to

5 know where she was.  He was consistently snatching her

6 up.  You heard a number of witnesses that talked about

7 that.  If she was somewhere he didn't want her to be,

8 he would grab her, pull her out of there.  He would

9 grab her and pull her out of there.  He was also a very

10 jealous person and the fighting -- they tended to be

11 fighting over the fact he was jealous.  He broke the

12 car window because she was talking to another guy.

13 They are fighting.  He's arguing with her.  It's

14 getting him upset and he punches the window out.

15 That's how mad she gets him.  That's how much she gets

16 under his skin.  She brings that out of him.

17    Now, if it's just talking to a guy that's one

18 thing.  Now if you add talking to a guy I didn't know

19 where she was all night, she has all this money, she's

20 kicking me out, who is she to kick me out.  You start

21 to add all those things together.  You can imagine the

22 rage that begins to build, and he said during that

23 incident if I can't have you no one can.

24    Now the Defendant claimed in his opening that

25 Detective Heffner somehow orchestrated this.  He's

somehow behind witnesses changing their stories and
those sorts of things. I ask you to take a good, close
look at what Detective Heffner did in this case. He's
reinvestigated this case from the beginning. It was a
cold case. It was essentially done and closed. He
gets some information. He goes to his sergeant, talks
to his sergeant about it, and his sergeant says, okay,
if you want to look into it, it's your case now, and he
starts investigating this case. He doesn't shy away
from that. He starts reinvestigating this case. If
you have somebody that is reinvestigating a case, do
you want them to say, okay, these are all the reports I
have, I'm going to base everything on what I did years
ago? Do you want police officers to go out and talk to
everybody? Somebody talked to Daelene Saez back in
1996 and she was less than cooperative or whatever.
She said she didn't have much information. Did anyone
bring her to the Harrisburg Police Department and sit
her down and get a full statement from her? Let's go
to that.

Socorro Roman, some people talked to her at the
scene. You heard Investigator Bailey. Detective
Bailey testified she was really kind of preoccupied.
As you can imagine that, ladies and gentlemen, she just
found Iris's body, just shown Iris's dead body. She's

1    there, wasn't sure exactly what she was going to find

2    when she initially went in the house. She had her

3    grandson in her arms. She gets upstairs, oh, my God,

4    puts her grandson in the living room. You stay here.

5    She goes back, gets down to check to see if Iris -- it

6    was pretty obvious that Iris is dead.

7          And now police, after time and time and time is

8    passing, now police want to get details from her.

9    She's preoccupied about her grandson and other things.

10   Did anyone take her down and follow up with another

11   formal statement? If he didn't, Detective Heffner

12   makes sure that somebody does go talk to her. That's

13   the steps that he's taken in this case. He's not

14   behind a conspiracy trying to tell witnesses what to

15   say. He's going back to them. Did you notice some of

16   those witnesses? They are not the same people they

17   were back in 1996. Some of them have jobs now. They

18   are cleaned up. They are out of that lifestyle. They

19   have grown up. They've actually grown up from the way

20   they were living back in 1996.

21          Detective Heffner had blinders on. That was

22   the Defense opening; had blinders on. Did he? He's

23   the man who sent LaQuan Williams' clothing out to the

24   lab. He's the one making those decisions. He didn't

25   have blinders on. LaQuan was a suspect. Guillermina

1 Cruz was a suspect. Everybody was a suspect when he
2 began this case. He followed up on the leads that he
3 was presented with in this case, and he followed them
4 to where they took him. If they took him in the
5 direction of LaQuan Williams, if he followed them in
6 the direction of LaQuan Williams, if he took them in
7 the direction of Tyshaunt Love, he followed them to
8 Tyshaunt Love.
9 Now, Mr. Muller just in his closing said a
10 number of different things. I would suggest to you
11 some of the things he said to you were completely
12 flawed. As you look at the evidence in this case I ask
13 you to ask yourself, did you hear some of the things
14 that he was telling you? Certainly some of the things
15 he would say are inferences. But some of the things
16 just didn't come into evidence. Maybe the person
17 arriving at 2:30 was Anthony Knight. Where did you
18 hear any testimony that Iris even knew a man by the
19 name of Anthony Knight? You didn't hear that
20 testimony. We don't know whether Iris knew Anthony
21 Knight or not. There was no testimony about that, and
22 he's telling you that maybe that's the guy arriving and
23 it's her friend. We don't know whether they liked one
24 another or not, don't know whether they know one
25 another.

1    Wounds on Kazar.  I asked the detective whether
2 there were wounds on Kazar.  He objected.  We didn't
3 get the answer.  Now he argues in his closing that
4 there may be wounds on Kazar.  You didn't hear any
5 testimony that Kazar the very next day that he got
6 arrested had wounds on him.  You can't speculate maybe
7 he has wounds on him, maybe he doesn't.  It didn't come
8 into evidence.

9    Like I said, I asked the question.  He didn't
10 want the answer.  But now he's in front of you arguing
11 that he had wounds on him.  I submit to you that he
12 didn't have any wounds on him.  Kazar knows she's doing
13 well, that she's making all this money.  When did you
14 hear any testimony that Kazar knew she was doing well
15 and making all this money?  You didn't hear any
16 testimony like that.

17    Now, you did hear that other than the blood on
18 the boot, there was absolutely no other blood from Iris
19 on his clothing, absolutely no other evidence on him.
20 If he's saying his client didn't have blood on him,
21 therefore, he couldn't do it, didn't have all this
22 blood all over him from head to toe, the same thing
23 would go for Kazar.  Although I suggest that the
24 Defendant had more than enough time to change his
25 clothing.  No one ever went to speak to pop-pop.  How

1  do we know no one ever went to speak to pop-pop?  That
2  question wasn't asked.  Again it's speculating, asking
3  you to speculate whether someone ever went to speak to
4  pop-pop.  We don't know.  Pop-pop is perhaps even dead.
5          MR. MULLER:  Your Honor, I'm going to object.
6          THE COURT:  I tend to agree.  Move on.
7          MR. McCORMACK:  The Defense attorney tells you
8  that Tawana Poteat is suggesting some time -- I'm
9  basing my time line on this -- about him being there at
10  9:00, and it's Tawana Poteat now with her recovered
11  memory syndrome must be wrong about that, perhaps
12  saying that because we want her to say, well, what did
13  she tell Detective Heffner?  I got up the next morning
14  around 9 something.  I know the Kentucky Fried Chicken
15  just opened.  The manager was outside.  I went in,
16  ordered some biscuits and something to eat.  Tawana
17  Poteat isn't the only one with recovered memory
18  syndrome telling you that the Defendant was perhaps
19  down on the street at 9:00.  The Defendant tells you
20  that himself.  Keep all those things in mind when
21  evaluating the things that Mr. Muller told you about
22  the evidence.  Did you really hear it? because if you
23  didn't hear something you can't be speculating.  You
24  have got to base your verdict on the evidence and
25  reasonable inferences that come from there.

He called my opening smokes and mirrors.  Who
is the person that doesn't want you to pay attention to
the evidence?  Who is trying to shift your attention
away from the crime scene?  Who is talking about other
parts and over here and over there but not talking
about the actual crime scene?  Don't let the Defendant
shift your focus, ladies and gentlemen, because the
truth I suggest to you is at the crime scene.

I suggest to you Detective Heffner followed the
leads.  He let the evidence lead the way and I ask you
to do the same.  Let the evidence be your guide.

LaQuan Williams, yes, he had blood on his shoe.
I already talked about whether he had injuries.  He
choked Candace, therefore, he must be the person that
committed this crime because there was some choking in
this case.  I didn't hear any evidence of Candace being
shot twice in the face.  I didn't hear any evidence of
Candace getting her larynx crushed.  I didn't hear any
evidence of her fingers being broken, of her nose being
broken.  There's nothing similar about the fact that he
choked his girlfriend.  There's nothing similar at all
between the two crimes.  Is he now a suspect of every
choking in the city of Harrisburg?  So is choking
sometimes between two intimate people, one of them
really upset, a common occurrence if there's domestic

violence involved in that relationship?  Iris had a gun
because of Kazar, because she was afraid.  In the
Defendant's own words they were looking for a gun.  He
made no mention about her wanting a gun for protection.
He says they were looking for a gun together and to
tell you the truth we are trying to get a gun right
after they got robbed, right after that she got robbed.
Candace Mills, one of the reasons she wanted the gun
was because they got robbed.

This great fear of Kazar really doesn't
materialize when you look at all the evidence.  Is
Kazar a nice guy?  No, he's not a nice guy.  Is he
someone people want in their house?  No, he's not
someone people want in their house.  Does the evidence
lead to him?  I suggest to you it doesn't.

Now the Judge is going to go over the elements
of the crime with you.  He's going to tell you in
detail what everything means.  You're going to have
three choices.  One choice, is it voluntary
manslaughter.  With voluntary manslaughter, first of
all was Iris dead.  I submit to you we proved that Iris
is dead.  Did the Defendant kill her.  That's what
we're here for.  That's why we're here.  That's the
decision you're ultimately going to have to make.  Did
the Defendant have the intent to kill.

1    Voluntary manslaughter is different from murder
2  because there's no malice, and the Judge will go into
3  great detail as to what malice is.  But there's some
4  type of sudden or intense passion then a reasonable
5  person would agree with that.  It's more than he's
6  upset with her; she says something that gets him really
7  mad and that he does this.

8    It has to be something that a reasonable person
9  would agree that might be something that will get you
10 pass the point where you're being held responsible.
11 You're not being held as responsible as you would be
12 for murder.

13    Third degree murder, another choice, this
14 sometimes is called murder with malice.  We have to
15 prove that Iris is dead.  Again, I submit to you Iris
16 is dead; that the Defendant killed her and it was a
17 killing with malice; that there was a hardness of
18 heart, that there was a complete disregard of the value
19 of human life.  Those are the types of things we talk
20 about with malice.  I submit to you that we proved that
21 Iris is dead.  I also submit to you that we have proved
22 that whoever killed Iris did so with malice in a way in
23 which she was killed, the manner in which she was
24 killed, the fact of a gunshot wound to her head can be
25 used to infer whether there was malice.  In fact, all

1 the wounds or majority of the wounds on her face go

2 towards malice. So the ultimate question you're going

3 to have to decide is, did this Defendant do it. We are

4 seeking a conviction of murder in the first degree, and

5 again we have to prove that Iris is dead. We have to

6 prove that the Defendant killed her and that he had the

7 specific intent to kill with malice.

8 The difference is in third degree murder he

9 doesn't have to have the specific intent to kill.

10 There's malice, hardness of heart that the law talks

11 about; there's just extreme indifference to the

12 value -- actual value of life. Where here you have

13 that plus you have the intent to kill.

14 Did he have the intent to kill here? Let's say

15 there's a struggle going on in that bedroom and the gun

16 goes off in your cheek, into her jaw, let's say it goes

17 off accidentally, she's on the ground, somebody puts a

18 second bullet in her. I submit to you that's evidence

19 of a specific intent to kill. The first shot could be

20 an accident but the second one sure isn't. Is there

21 evidence that the person wanted her dead? Yeah. The

22 choking, there's plenty of evidence of specific intent

23 to kill with malice in this case.

24 I submit to you that we proved that Iris is

25 dead and there's a specific intent to kill, and you

have to decide, did the Defendant do it. The Judge
will talk about reasonable doubt. Sometimes people
talk about reasonable doubt being a jigsaw puzzle.

Now, the Judge will tell you we don't have to
prove this case beyond all doubt. It's reasonable
doubt. We don't have to prove to you 100 percent
certainty in your minds. Sometimes that's a hard
concept to agree to, but you've sworn as jurors you'll
uphold the law.

Sometimes when you evaluate a case you may
still have questions. There's no videotape here of
what happened in that bedroom. We're relying on
people's memories and we're relying on testimony and
we're relying on evidence. Not every question is going
to be answered. Not every question is going to be
answered and the law recognized that. If you look at
the puzzle you may not know what that is as you look at
that puzzle. But as the pieces get put in you'll start
to have some understanding of what the picture is.
You'll start to have a hint of what the picture is, and
the same thing with the evidence. During the course of
this trial you got a lot of evidence, and the evidence
came in and you had pieces of it coming in in a little
bit at a time. You may start to have an idea of what
the painting is of, but I've seen some caricatures of

this particular painting.  Maybe this isn't the actual
genuine article, and you might say I can't see the
smile.  Until I see the smile that's when I'll know
what this is.  And you see it now.  You know what it is
and you can say that's the Mona Lisa.   You're missing
this piece here.  You're missing this piece here.
You're missing these pieces here.  But you still know
it's the Mona Lisa.  You may still have a question
about those pieces.  But this picture shows you beyond
a reasonable doubt that that is a picture of the Mona
Lisa.

　　　　　You may still have a few questions.  A lot of
times I liken it to buying a car.  Someone goes to buy
a car, try to pick out the color they want and can I
afford the car.  Can I afford the insurance?  When you
leave that lot you may have some questions.  I hope,
really hope I can afford this.  I hope we can make the
payments, but you made your decision and you drove off
that lot.  You bought the car.  You may still have a
few questions in your mind as you drive away.  But you
don't know everything for 100 percent certainty but
you've made the decision.  That's what we're asking you
to do in this case, and I'm not going to try to say
that this decision in this case is easy in any way,
shape or means.  You have a lot to look at.  But if you

1  get to the point where you believe that this Defendant

2  committed this crime and you don't have serious doubts

3  you may have a question if Kazar played a bigger role,

4  was Guillermina actually in that bedroom not on the

5  steps like she testified, was he still hitting Iris

6  when Iris got shot.  They might be some questions that

7  you have.  But after you look at everything and the

8  evidence leads you to believe that, one, she was there

9  and, two, that Tyshaunt Love pulled that trigger, you

10 may not know what everybody did in that bedroom, you

11 may not know if other people were in that house, but

12 you're beyond a reasonable doubt as to whether this

13 Defendant is guilty.

14         Here again is the kitchen.  All right.

15 Remember Guillermina said they came, came in the door

16 and Iris was over by the stove.  When you look at this

17 case and you listen to the things that you heard

18 yesterday about her testimony from 2002, match it to

19 the evidence.  That's what you need to do.  That's

20 what's going to lead you to the conclusion in this case

21 that this Defendant is guilty.

22         Only the person that saw these things would be

23 able to testify to them.  Only the person that saw what

24 happened would be able to give the details that she

25 gave in this case.  She tells you through her

1 transcript that there was an argument, that the two of
2 them were talking and there was screaming. He was
3 hitting her. What's he hitting her with? His fist.
4 What part of her body was being hit? Her face. Where
5 are 80 to 90 percent of her injuries? Her face. They
6 go to the stove and in the drawer in the bottom gets a
7 gun out. You heard a couple of witnesses talk about
8 she kept the gun in the stove area.

9 She admits that she even took part in some of
10 this; maybe that's why she's not here. She came
11 towards me when they first walked in and I smacked her.
12 Maybe that's why Guillermina isn't here. I smacked
13 her. She was standing there by herself. Were the two
14 of them touching? That was my question. Were the two
15 of them touching? By her hair. She's talking about
16 all this stuff happening downstairs in the kitchen.
17 Does any of that match up with the evidence? I just
18 talked about the gun being over by the stove. The
19 stove burning. The Defendant said he turned it off.
20 Socorro said she turned it off. Another inconsistency.
21 Iris was over by the stove and she was cooking.
22 There's the stove. There's the food. Pretty good
23 evidence that she saw Iris cooking. Pretty good
24 evidence that she saw Iris cooking.

25 Now again if she was cooking earlier there's

nothing wrong, nothing unusual about her reheating it
later.  There's nothing that says she couldn't reheat
it later.  In fact, listen to some of the witnesses,
Stacy Harris or one of the group of women that went
over to the house.  I think they said they were over
there about 9:00.  When they were at the house they
smelled food cooking, didn't smell smoke at the time.
They smelled food cooking some time around 9:00 and
then they were teasing the Defendant later, we thought
that you were having a Thanksgiving breakfast.  It
probably would have been really smoking, burning if it
was cooking from 2:30 to 9.  They didn't smell smoke at
that time.  They smelled food cooking.  If it was 6 or
7 when the murder happened perhaps it might still smell
like food cooking at that time.

But the point is Guillermina said there was
food on the stove.  There's food on the stove.
Remember also she was asked at the preliminary hearing
to draw the kitchen.  Mr. Muller doesn't seem to know
what the kitchen -- she was also asked to draw it and
he said where is the steps at in relation to the stove,
steps next to the stove.  Steps right there next to the
stove just like Guillermina says because she was in the
house, ladies and gentlemen.  Cruz said there was a
struggle in the kitchen.  Is there evidence of a

1 struggle in the evidence? Yes, there's evidence, lots
2 of evidence of a struggle in the kitchen, lots of blood
3 evidence, ladies and gentlemen, of a struggle in the
4 kitchen. Cruz said -- how are they connected? He had
5 her by the hair. He had control of her by the hair,
6 and is there evidence of that here, ladies and
7 gentlemen? Yes. Right there. Little scrunchie. I
8 don't know what my wife calls it -- a scrunchie or type
9 of hair thing right there in the kitchen. Did this
10 happen in the kitchen like Guillermina Cruz said it
11 did? Yes, ladies and gentlemen. That's proof of it
12 right there along with the blood evidence. I'm just
13 showing a portion of the kitchen. By the stove, she
14 said, over by the stove, got the gun, Commonwealth
15 Exhibit No. 4. Zoom in on it. Looks like probably
16 some blood evidence there.

17     He forced her up the stairs. Is there evidence
18 that he took her up the stairs at some point in time?
19 Yes. Evidence that backs up everything Guillermina
20 Cruz is saying. There's blood at the bottom of the
21 stairs. There's blood on the stairs just like
22 Guillermina was talking about. Does he hit her a few
23 times downstairs? What I suggest to you, ladies and
24 gentlemen, yes. Iris was a fighter. But how much
25 fight do you have left in you if someone takes a gun or

their fist and they break your nose?  How much pain are
you in?  How stunned are you that now you're not
fighting but you're just struggling to hold on?  You'll
see pictures.  You'll see the pictures.  Her hands are
like -- the blood ran through them.  Broken nose.
She's being pulled up those stairs half walking, half
being pulled by her hair.

Is Guillermina Cruz telling you the truth?
Here's the bedroom.  Guillermina said she was pulled up
by her hair.  There's hair evidence found in the
bedroom.  Guillermina says there was somebody upstairs.
She tells us that it was Kazar, and when she first came
in she heard somebody upstairs.  Could that person have
been watching that television that was on?  It was
right here.  Is that what the person was doing
upstairs?  Is that what Kazar was doing in the bedroom
because he was watching it when Iris got pulled
upstairs?

I talked before that there's evidence of blood
on the mattress; there's blood in the closet; here's
the hair.  Here are the stairs.  There's the hair right
between the top of the stairs and the living room.
Guillermina says she was pulled up by the hair, ladies
and gentlemen, and sure enough there's evidence backing
that up.  There is hair, and you heard the testimony.

1   It is consistent with Iris's hair.

2        There's a lot of confusion in this case, ladies

3   and gentlemen, until you start looking at the evidence

4   and match the evidence up with the words.  When you

5   start doing that this case starts to become clear.

6   Guillermina Cruz was in that house and she witnessed

7   what was going on.  There's some blood.  Some things

8   actually moved into the living room, perhaps some blood

9   on the vase, some blood on the couch.  Is Iris trying

10  to get in the living room at some point in time after

11  getting to the top of the stairs?  Was she trying to

12  get over to perhaps a phone?  You'll have to take a

13  look at it?  This phone that -- look how far away from

14  the door.  It's not that far from the door.  The

15  Defendant claimed he had no clue where the phone is.

16  That's why he didn't call 911 because he doesn't know

17  where the phone is.  There it is.

18        Was Iris trying to get out the door, trying to

19  get out the front door?  These are some of the things.

20  There's blood in the living room.  We don't know how

21  that corresponds with things.  It may never get

22  answered but it's not a doubt.  It's not a reasonable

23  doubt.

24        Toothie says she comes upstairs after she hears

25  the gunshots, sees Cuzzo fire the gun.  She sees Kazar

1  leave the room, and then she goes running out.

2         Now, she was asked at the preliminary hearing

3  to describe the upstairs.  She was able to draw the

4  downstairs.  She knew where the stairs were and those

5  sorts of things but she couldn't describe the upstairs

6  because she says she came only part way up the stairs,

7  and she didn't see anything else.  She never saw Iris.

8  If she's lying, ladies and gentlemen, in trying to just

9  say this for whatever reason for us because certainly

10 there's no evidence that -- well, don't you think she

11 would, say, give you more details rather than less

12 details?  I saw him with the gun right up to her mouth

13 and pull the trigger.  She doesn't say that.  I saw him

14 do this.  I saw -- she doesn't do that, ladies and

15 gentlemen, and that's why I suggest as you look at the

16 things she's telling you that she's being honest about

17 it.

18         Same thing goes for Jeanette McCurdy.  Was

19 Guillermina in that house?  There are other witnesses

20 that say yes.  Jeanette McCurdy seems to say so.  Now I

21 asked her straight out, was that Guillermina Cruz?  She

22 said I saw the back of her head, but it was a young

23 girl.  I don't know.  I don't recall whether she said

24 young, Hispanic girl or not.  But it was a young girl.

25 Jeanette McCurdy puts them together in the house,

coming out of the house. When she testified confusing
what the time frame was in relationship to the smoke,
you're going to have to use your recollection on that
as to the time frame, but Jeanette McCurdy says she saw
them come out.

Now is that another example of repressed memory
he was referring to? You got to see this woman. She
was 71 years old nine years ago. She's 80 years old.
She didn't really want to be here. Did she appear that
she was coming in here to lie on somebody's behalf, to
make this up on somebody's behalf? When the police are
at the house -- and this is what I ask you to consider
when you're considering all of the Commonwealth's
witnesses, the one that doesn't have information back
then -- when the police come to the house they have the
Defendant. They take him out, and they take him down
to the police station, and things seem to have wrapped
up pretty quick.

Is their information really important? The
police never came and followed up with them. Did they
know how important their information was? Did they
want to get involved? Did Jeanette McCurdy want to get
involved? You saw her. You saw her on that witness
stand, and she is convinced that what she saw is that
Defendant come out of that house with a young girl.

1  You saw her with your own eyes.  Do you think she was
2  lying to you?  If she was lying to help us out wouldn't
3  she be saying, yes, I saw Guillermina Cruz come out of
4  that house?  But that's not what she's saying.  She
5  wants to be sure what she's saying.  I can't say that,
6  Mr. McCormack.  I can't say I saw him come out with the
7  young girl.  I saw the back of her head.  But I submit
8  to you that's proof that those two were in the house
9  together.

10         Stacy Harris sees the Defendant going down the
11 alley.  Again I submit to you, this is another witness
12 who over the years has grown up.  When she's drunk in
13 the bar a few years ago she approaches Detective
14 Heffner, hey, I have some information for you.  When
15 she sobers up later on she doesn't have information
16 anymore, doesn't want to talk about it anymore.  It
17 isn't until last year that she's finally willing to
18 come forth and give all the information that she has.
19 She sees this Defendant.  She hears two gunshots.  She
20 goes downstairs and she sees this Defendant running
21 down the alleyway.

22         Finally, Guillermina Cruz says Iris was killed
23 in the bedroom.  Iris was killed in the bedroom, ladies
24 and gentlemen.  Guillermina Cruz says there were two
25 gunshots.  One, she heard a thud on the floor.  She

1  comes upstairs to the second one. She sees the
2  Defendant firing towards the floor. Iris had two
3  wounds, on her jaw and one through her mouth, and the
4  one on the jaw is probably extremely painful, but it
5  didn't kill her. But the one in the mouth had killed
6  her.

7          Everything Guillermina Cruz says is present in
8  the evidence. We talked about the body being moved and
9  the blood going uphill. There's this whole spot here
10 where Iris was in that spot at one point in time.
11 Back over here is that mattress, and you'll have some
12 of those pictures of the mattress with blood on it over
13 there.

14          Her legs -- it's cut off here -- her legs are
15 spread wide open. You heard the coroner testify about
16 a void in this area of her body where there's no blood
17 evidence. You heard about her sock. She had one sock
18 on and she was probably wearing it during the assault
19 because there's blood on the bottom of it. Her own
20 blood. Where was her other sock? Her other sock was
21 down there next to her leg. Was that sock pulled off
22 as her body was being moved around or was that sock
23 pulled off when her underwear was being taken off?
24 Getting rid of that that's something that caused that
25 void.

1    Her underwear is taken off. Did that happen
2  when the sock was pulled off with it? And you might
3  say, well, okay, I might buy that. It's all moved
4  around looking for money. Why else are we talking
5  about the body being moved? To throw suspicion off of
6  the most likely suspect, throw suspicion off the most
7  likely suspect. If this is a rape, is it this
8  Defendant or is it probably somebody else breaking into
9  the house trying to rape her? Let's make it look like
10  a rape instead of what it really was, which was a
11  domestic, very violent domestic argument.

12    The Defendant sets up his alibi. You heard all
13  this making phone calls to the house supposedly trying
14  to find her. He doesn't go to the house according to
15  him until some time after 11:30. Yet he's trying to
16  find her all morning. What is he doing all that time
17  frame? Yes, I'm going to ask what was he doing during
18  that time frame. Was he in the house setting up that?
19  Was he retrieving items from the house? Was he
20  changing his clothing during that time frame? He could
21  have easily done it because his clothes are there.
22  Could have easily changed his clothes, and I get back
23  to what I talked about in my opening.

24    The Defendant's alibi is Guillermina Cruz. We
25  didn't talk to her because she came to us. We talked

to her because he told us -- he told us to talk to her.
Yet it's his alibi, his alibi, the person he is relying
on that he didn't commit this crime says he murdered
her. And why would she be doing that, ladies and
gentlemen? Two things, I hope you didn't miss it
yesterday, and just in case I'm going to cover it now.
How is it you came to tell the police your involvement,
what you witnessed? because I just kept seeing it over
and over and over. So you went to the police to say,
hey, I was a witness to this incident? No. I didn't
go to the police. I talked to my uncle and he advised
me to go to the police and I went to the police. You
talked to Heffner or somebody else at the police
department? Yes. You told them what you saw. I
talked to Heffner, and later on again she was asked, so
you're saying you came forward to testify because you
saw stuff on the news. Is that what your testimony is?
I said because I kept seeing it over in my head.
That's why she came forward. That's why she's
testifying. She witnessed this and she keeps seeing
it over and over again in her head.

      As I said, when you follow the evidence, ladies
and gentlemen, the evidence leads to the conclusion
that the Defendant killed Iris Fennel. When you reach
that point after you looked at all the evidence, ladies

and gentlemen, that will prove murder in the third
degree.

But as I said, we are seeking a conviction of
murder in the first degree. Iris is dead. There's no
disputing that. I would submit to you there's no
disputing that there was specific intent to kill. You
follow the evidence. The Defendant killed her. He has
shown in the past that this is the way he's willing to
act. He was angry. Even when he was with Guillermina
he was talking about Iris. And he takes her over there
that morning not to be a witness or anything like that.
He wanted to get the bag. Did he plan when he went
over there to kill her? I submit to you probably not,
probably not. He brings Guillermina in that house, is
disrespecting Iris. Iris doesn't like it. Iris goes
to Guillermina; Guillermina slaps her, and it goes from
there and all of those feelings that were inside the
Defendant at that point in time explode.

That's what we're suggesting that happened in
this case. The Defendant said if I can't have her, if
I can't have you no one can. This is the way he left
her, ladies and gentlemen. He couldn't have her so no
one can. I know it's been a long case. I know I've
been standing up here for a long time, and I appreciate
your patience for that because it's a lot of evidence

1    to go over, and if there's one thing I can leave you

2    with it's the evidence.  Take a very close look at the

3    things that you heard, and I know it's not the same

4    thing when somebody actually physically is in this

5    chair telling you things, but the things you heard that

6    Guillermina said, compare it to all the other

7    witnesses, compare it to what the Defendant has said.

8    If the Defendant is not telling the truth in the things

9    that he has said, why is he not telling the truth?  Is

10    he trying to hide something?  Is he trying to protect

11    something?  And then finally follow the evidence.  The

12    evidence leads you right back to this.  I couldn't have

13    her so no one could, and on December 20, 1996 he shot

14    her, choked her, beat her; that's an up close and

15    personal crime from somebody that was upset at her,

16    somebody that got right underneath his skin.

17            When you do all those things, ladies and

18    gentlemen, I submit to you you only have one choice and

19    that choice is find this Defendant guilty of murder in

20    the first degree.  Thank you.

21            THE COURT:  Thank you, Mr. McCormack.

22            Ladies and gentlemen, with the conclusion of

23    the closing statements of counsel.  The next step in

24    the process is for me to give you instructions on the

25    applicable law which is -- some of which have been

1  discussed already by counsel, and also on how you do
2  your task in arriving at a verdict in this case. Those
3  instructions tend to be somewhat lengthy.
4          You already sat here and been talked at for
5  quite some time this afternoon. If, I believe, to
6  begin those instructions right now we would be -- I
7  would probably be concluding just about the time you
8  might be thinking it's time to go home again for the
9  evening. Rather than do that since I would like to
10 have the instructions fresh in your mind when you begin
11 your deliberations, I'm going to take a break for the
12 evening right now and ask you to return tomorrow
13 morning so we can start up at 8:30. You are still not
14 permitted to discuss the case amongst yourselves or
15 with anyone else. I suggest that until -- as I said,
16 keep an open mind until all the testimony is in. I
17 think it's a good idea to keep an open mind until you
18 go to the deliberation room and start talking to each
19 other. I'll ask you to do that as well. Of course,
20 avoid any outside influences whatsoever. Don't read
21 the newspaper. Don't watch the news. Don't look for
22 anything about the case. We're going to stand in
23 recess until 8:30 tomorrow morning. Have a good
24 evening.
25          (The jury exited the courtroom at 3:35 p.m.)

1    THE COURT:  Let's discuss this real quick.  Do
2  you have a copy of proposed points for charge?  The
3  stipulation of fact instruction you still request that,
4  Mr. Muller?

5    MR. MULLER:  Yep.

6    THE COURT:  All right.

7    MR. MULLER:  There were a couple of things that
8  were stipulated to.

9    THE COURT:  Any objection you would like to put
10  on the record?

11    MR. McCORMACK:  That's the standard, no
12  deviation.

13    MR. MULLER:  No.

14    MR. McCORMACK:  No objection.

15    THE COURT:  I was completely confused by your
16  second one, which of the alternatives do you believe
17  applies to inconsistent prior statements?

18    MR. MULLER:  I think the first alternative
19  applies.

20    THE COURT:  The copy saying Mr. McCormack had
21  some scratchings on, he scratched out the blanketed
22  first alternative -- the second alternative but left
23  the language there.

24    MR. MULLER:  That wasn't intentional.

25    THE COURT:  I think the first alternative is

1  more appropriate.

2       MR. MULLER:  Simpler.

3       THE COURT:  I don't know that I'm going to try

4  to substitute my recollection of which witnesses had

5  prior inconsistent statements.  I may not include all

6  these names.

7       MR. MULLER:  Actually that should have been

8  crossed out because I crossed out -- you have heard

9  evidence that a witness, one or more witnesses, made a

10 statement on an earlier occasion.

11      MR. McCORMACK:  On that we're going to read

12 paragraph 1, first alternative 2 and paragraph 3.

13      THE COURT:  I may not repeat paragraph 3

14 because I intend to fit this under credibility to

15 determine how much you believe, false in one --

16      MR. MULLER:  Standard.

17      THE COURT:  Any objection?

18      MR. McCORMACK:  No.

19      MR. MULLER:  The third one really applies to

20 Stacy Harris and Ms. McCurdy.

21      THE COURT:  I'm sorry.  Which one?

22      MR. MULLER:  The identification testimony.

23      MR. McCORMACK:  Was there a question of her

24 identification?

25      THE COURT:  That's right.  There was a question

1 why she didn't say anything about that at the time. Is
2 recollection correct?

3      MR. McCORMACK: We're not talking about bad
4 position, poor lighting, just a lot of different
5 choices here. There was no line up.

6      MR. MULLER: Crossed that out.

7      THE COURT: We're not doing the first one.
8 The reason -- frankly, I have a problem figuring out
9 what it is I'm going to be saying here. Is that, at
10 least as to Ms. McCurdy's testimony, your question
11 really was did she see him at all?

12      MR. MULLER: That's true.

13      THE COURT: Not did she see a person.

14      MR. MULLER: Yes.

15      THE COURT: The question is did she see
16 anybody? And it is Ms. Harris.

17      MR. McCORMACK: Yes, Your Honor.

18      THE COURT: The question is, could she really
19 see. That applies to her, might be bad position, poor
20 lighting or other lack of opportunity to observe the
21 individual.

22      MR. MULLER: If there's a way to fashion it
23 more general.

24      THE COURT: Well, I'm going to do my best to
25 try to segregate out -- so while I may include the

1 first paragraph concerning identification generally and

2 that there's a question separately to discuss the

3 issues as to the identification testimony of

4 Mr. McCurdy versus separately addressing Ms. Harris.

5 Ms. McCurdy, the question is going to have to do with

6 whether identification, if she saw anybody, she didn't

7 say anything at the time she talked to the police.  The

8 other witness, Stacy Harris, it is a question of

9 perhaps mistaken identity.  The first statement she

10 gave to the police then goes to if you find she did in

11 fact do that, then you still should receive the

12 testimony with caution.  There may have been, because

13 of position, lighting, etc., she may not have had a

14 full opportunity to make the identification she

15 testified about with certainty, or words to that

16 effect.

17 　　　　MR. McCORMACK:  With the words it must be

18 received with caution because of bad position, poor

19 lighting.  I want to make sure it's received with

20 caution.

21 　　　　THE COURT:  Yes.  Three is not required if I

22 give two as to for the first alternative.

23 　　　　MR. MULLER:  I think two takes care of --

24 　　　　MR. McCORMACK:  You're not ruling as a matter

25 of law that caution is required.

1    THE COURT:  I don't frankly know what that
2    means right off the top of my head.  But --
3            MR. MULLER:  Received with caution if --
4            THE COURT:  Read it just as I said as to
5    Ms. Harris.  It must be received with caution if the
6    witness because of position, poor lighting or other
7    reasons as you find them didn't have a good enough
8    opportunity to make an identification with any
9    certainty, words to that effect.  Therefore, I don't
10   think 3 in either case -- well, I guess the second
11   alternative to 3, and 4 looks okay, I think it is more
12   or less standard.  Four.  And the rest, first degree
13   murder, I'm going to be including.
14           I agree, if I recall correctly, general
15   instructions for homicide probably then go to the
16   2502-A, C; 2053-A and just go back and rehash them with
17   the instruction 2501-C, summary at the end, and that's
18   about it for substantive instruction.  Anything the
19   Commonwealth would prefer or want in addition?
20           MR. McCORMACK:  No, Your Honor.
21           THE COURT:  Very good.
22
23
24
25

1    <u>Tuesday, September 20, 2005</u>

2              <u>Morning Session</u>

3

4      (The jury entered the courtroom at 8:34 a.m.)

5      THE COURT:   Good morning, everyone.

6           Counsel, ladies and gentlemen, we're now at the

7    conclusion of the case.  Before I remove the gags I

8    placed on you early in this case, it is up to me to

9    give you final instructions before you begin your

10   deliberations.

11           Before I do that I want to make a couple of

12   comments.  First of all, your job throughout this

13   proceeding is to watch the evidence as it's presented.

14   Part of my job is to watch you to make sure you're

15   doing your job adequately and fair to all concerned.

16   My observation is that you paid close attention to all

17   the testimony.

18           I want to make sure you understand the system

19   wouldn't work if you didn't do your job right.  I thank

20   you for your service on this jury and for the way in

21   which you have been paying attention to the testimony

22   throughout.  I want to also make mention that during

23   the course of the instruction, which can be somewhat

24   lengthy, I may from time to time make comments upon or

25   mention one or another of the witnesses or one or

another part of the testimony or some piece of
evidence. If I do that, it is not my intention by
doing that to be drawing special attention to that
particular piece of evidence or that particular part of
the testimony. It may only be I'm using it as an
example or that some particular instruction applies to
that evidence. In any case, it's never my intention to
try to replace my recollection of what the testimony
may have been for yours. Ultimately that's your
decision and your decision must be based upon what you
recall the evidence was in this case.

Finally, I'm cautioning you that the
instructions are, as I said, lengthy, lengthier than
you might expect and that I will be reading great
portions of them. I say that for two reasons. One, to
admit openly I don't have the ability the lawyers have
in front of me to speak extemporaneously on all points
to make sure that I have covered everything they want.
It is to make sure I cover everything. So we don't
instruct you more than one time I have to cover
everything; secondly, a way of forewarning you a bit.
I don't know what your experience has been but I know
that sometimes when people are read to it can be a
little anesthetizing a bit. My mother read to me from
the time I was small with the sole purpose of putting

1  me to sleep.  That's not my purpose here.  I'm hoping
2  being forewarned, pay attention, I'll do my best to try
3  to keep my voice as conversational as I can.

4       Now, you as the jury in this case are the
5  judges of the facts.  You decide what the facts are.
6  I told you yesterday, the speeches you hear from
7  counsel both in the opening statements and closing
8  arguments are not evidence.  You should not deem those
9  speeches to be evidence.  You can certainly be guided
10 by the arguments that have been presented by counsel
11 but only if what counsel has said to you they believe
12 they heard as evidence is the same as what you recall.
13 If there's anything different from what the evidence
14 was in your recollection from what either of the
15 lawyers said, it is your recollection which must govern
16 and control your deliberations and your decision
17 making.  You're not required to accept the arguments of
18 either of counsel.

19      If the inferences that you deem to be drawable
20 or to be drawn from the evidence you heard as you
21 recall is different than what either of the lawyers
22 have suggested that's your purview and you should be
23 guided by your view of the evidence.  It's for you and
24 for you alone to decide this case based upon the
25 evidence that was presented from this witness stand and

1 during these proceedings and following the instructions
2 that I'm giving you right now.
3      As judges of the facts, sometimes jurors have
4 asked what does that mean? Essentially one of your
5 main jobs is to judge the credibility of the witnesses.
6 Credibility, as I think I mentioned, only means
7 deciding how accurate and how truthful you believe each
8 witness's testimony was. The factors that go into that
9 credibility decision are probably numberless. This is
10 where we expect you to use your common sense. Some of
11 the factors that you should consider, however, are
12 whether the witness was, in fact, able to see, to hear,
13 to know the things about which he or she testified
14 before you. Was that witness's ability to see, hear,
15 know and remember or describe those things effected by
16 circumstances at the time of the alleged incident, by
17 the person's age or anything or interest or bias? How
18 well did the witness appear to remember and describe
19 the things that he or she testified about? What was
20 the witness's demeanor when testifying? Did the
21 witness appear to be convincing? How did he or she
22 look or speak or act during the act of testifying? Was
23 the witness's testimony uncertain, confused,
24 contradictory, evasive or was it direct and coherent?
25 Does the witness have an interest of any type in the

outcome of these proceedings or any other reason or
motive that might effect his or her testimony and the
credibility of that testimony?  How well does the
testimony of one witness square with the other evidence
that's been presented in this case including the
testimony of other witnesses?  Was it contradicted or
supported?  Ultimately the question is, does it make
sense to you?

If you believe that a particular part of any
witness's testimony is inaccurate, then you should
consider whether or not that inaccuracy casts doubt
upon the rest of his or her testimony.  That may depend
whether the witness was inaccurate on some important
matter or on some minor detail or possible explanation.
Did the witness simply make an honest mistake?  On the
other hand, did the witness deliberately falsify his or
her testimony?  If you decide that any witness that's
deliberately testified falsely about a material point,
by that I mean a matter which would effect the outcome
of this trial, then you may for that reason alone
choose to disbelieve the rest of this witness's
testimony but you are not required to do so.

You should consider not only the deliberate
falsehood but also all other factors bearing on a
witness's credibility in deciding whether to believe

1 other parts of that witness's testimony.

2       When you're judging the credibility of each
3 witness, as I mentioned, you're probably going to be
4 judging the credibility of all or some of the other
5 witnesses who testified as well.  You may find
6 inconsistencies in the evidence.  In fact, in this case
7 I think it's clear there have been many inconsistencies
8 pointed out whether the testimony that was presented or
9 by the statements that were made by various witnesses
10 to investigating officers and others.

11       But even factual contradictions in testimony of
12 witnesses does not necessarily mean that any witness
13 has been willfully false.  Poor memory is not uncommon.
14 Sometimes people just do simply forget.  Sometimes
15 people remember things incorrectly, and we all observed
16 that two persons observing the same incident may not
17 hear it or see it exactly the same way and may not
18 report it the same way.  I simply point back to my
19 childhood again.  We used to play a game called
20 telephone.  Someone whispers a sentence and by the time
21 it came out the other end it may not be recognizable.
22 If different parts of the testimony of any witness or
23 witnesses appears to be inconsistent then it is your
24 job as the jury to try to reconcile in your own minds
25 the conflicting statements whether they came from the

1 same witness or from different witnesses, try to fit

2 them together, explain in your own minds how those

3 conflicts or contradictions can exist.

4     But if you ultimately decide that there is a

5 genuine irreconcilable conflict in the testimony it's

6 your function as jurors to determine which, if any, of

7 that conflicting or contradictory testimony or evidence

8 you choose to believe. As the sole judge of

9 credibility and of the facts, you the jury are

10 responsible to give the testimony of every witness and

11 all other evidence whatever credibility and whatever

12 weight you think it deserves, if any.

13     The number of witnesses offered by one side or

14 the other side does not of itself determine the weight

15 of the evidence for that side -- for that side of the

16 case. It's a factor but only one of many factors that

17 you should consider. Whether or not the witness who

18 testified appeared to be biased or unbiased, interested

19 or uninterested persons, whether or not their testimony

20 was credible as you heard it, are the important factors

21 which go to the reliability of that testimony. The

22 important thing is the quality of the testimony from

23 each of the witnesses presented. It's not which side

24 brings the greater number of witnesses. Even the

25 testimony of one witness that you find or believe to be

1 very reliable and credible can outweigh the testimony
2 of many others or one piece of evidence may outweigh
3 the testimony of other witnesses. Obviously if you
4 find that the -- after hearing all of this, that the
5 testimony is essentially the equality on one side than
6 number of witnesses may begin to take a role. But it
7 is quality not quantity that is at most important here.
8 Just a word about experts; we heard from a
9 couple of witnesses who testified -- Dr. Ross coming
10 first to mind -- who because of their qualifications,
11 education and training testified as an expert. I told
12 you during the trial experts are allowed to express
13 opinions. But you still have the job in evaluating all
14 the testimony, to judge the credibility of experts as
15 you would any other witness who comes before you in
16 judging the weight to be given to any opinions that are
17 rendered. You should consider and reconsider the
18 experts' qualifications, and anything that goes into
19 your determination of the reliability of the experts'
20 testimony. The opinion of an expert only has value
21 when the facts upon which that opinion is rendered you
22 find it true or reliable; whether it comes from the
23 experts' own testimony about hypothetical facts or from
24 facts that were testified to by other witnesses or from
25 some other source.

1    You are not, however, bound to accept the

2 opinion of an expert simply because I, as the court,

3 accepted him or her as an expert. Based upon their

4 qualifications you may accept it or reject the

5 testimony as to any other witness and you are to give

6 whatever weight to those opinions you believe those

7 opinions deserve, if any.

8    Now, I just told you today and I told you

9 before that the statements that were made by counsel

10 are not evidence in this case, and they are not binding

11 upon you. But there is one exception to that, and that

12 is, that during the course of these proceedings there

13 were one or two stipulations that were reached between

14 counsel for the Commonwealth and counsel for the

15 Defense, and when they did that and presented to us a

16 stipulation -- again my recollection most recent, I

17 guess, is as to the testimony of the EMS individual, I

18 want to say Brudzinski, what his testimony would have

19 been. When they agree or stipulate as to certain

20 facts, then that stipulation becomes evidence of those

21 facts and you should regard the stipulated or agreed

22 facts as proven.

23    Now, moving on a bit. One of the fundamentals

24 I told you at the beginning of this case of our

25 criminal justice system is that the Defendant here and

1  in every criminal case is presumed to be innocent.
2  The mere fact Mr. Love has been arrested, that he is
3  accused of this crime is not evidence against him and
4  the fact that he was arrested and the fact that he is
5  accused, it is not to be taken by you as evidence
6  against him.

7          He is presumed to be innocent and he's entitled
8  to that presumption of innocence throughout the trial
9  of this case.  He remains innocent unless and until
10 you, the jury, conclude after a careful and impartial
11 consideration of all of the evidence that was presented
12 over this last week and a day, that the Commonwealth
13 has proven him guilty beyond a reasonable doubt.  The
14 burden does not lie on the Defendant to prove that he
15 is not guilty.  The Defendant has no burden whatsoever.
16 Instead it is the Commonwealth which always has the
17 burden of proving each and every element or legal
18 subpart of the crimes that are charged and that the
19 Defendant is guilty of those crimes beyond a reasonable
20 doubt.

21         In this case the Defendant chose not to take
22 the witness stand.  I told you at the beginning, I want
23 to repeat, it's a part of our criminal justice system
24 that it is entirely the Defendant's choice in every
25 criminal trial to determine whether or not to testify.

1 I've already told you he has no obligation to present
2 any testimony. He has no obligation to present any
3 evidence in his own defense. He has an absolute right
4 founded on the Constitution of the United States and
5 the Constitution of this Commonwealth to remain silent.
6 You must not draw any inference of guilt or any other
7 inference adverse to the Defendant from the fact that
8 he chose not to testify in this case.

9 I will only observe that I have learned that
10 some folks and I think we even heard it during voir
11 dire something about if a Defendant doesn't take the
12 stand there must be something wrong. If that's in your
13 mind then you are violating your oath as jurors. You
14 must put that thought out of your mind. You may draw
15 no adverse inference whatsoever against the Defendant
16 from his choice not to testify.

17 The Commonwealth, as I said, has the burden to
18 prove guilt beyond a reasonable doubt. That standard
19 that we apply in criminal cases is one of the highest
20 standards of proof anywhere in our justice system, in
21 fact, it is the highest.

22 During the closing statements I know that the
23 District Attorney did not intend to imply this -- I
24 want to make sure you understand -- the mere fact there
25 are difficulties encountered in the investigation of

1  the case, that there's a difficulty in getting people
2  to talk, to testify, difficulty putting it together,
3  I'm sure that Mr. McCormack did not intend to imply
4  that this somehow lowers the bar.  The burden remains
5  the same in every case, and, that is, that the
6  Commonwealth bears the burden to prove guilt beyond a
7  reasonable doubt.
8       If the Commonwealth's evidence has failed to
9  prove the Defendant's guilt beyond a reasonable doubt,
10 then your verdict must be not guilty.  On the other
11 hand, if the Commonwealth's evidence does prove to you
12 beyond a reasonable doubt that the Defendant is guilty
13 then your verdict should be guilty.
14      I'll be going through a verdict slip with you
15 shortly and I'll explain how you reach those
16 conclusions.
17      Although the Commonwealth has the burden of
18 proving that the Defendant is guilty beyond a
19 reasonable doubt, it does not mean that the
20 Commonwealth must prove its case beyond all doubt or to
21 a some scientific or mathematical certainty.  This is
22 not required to demonstrate a complete impossibility of
23 innocence of the Defendant.  Reasonable doubt is simply
24 defined in Pennsylvania law as that doubt which would
25 cause a reasonable, careful and sensible and prudent

person to hesitate before acting upon a matter of
importance in his or her own affairs. I heard lots of
examples to try to explain that. I don't know that any
of them are absolutely correct and accurate but the one
that I think comes closest is one that Judge Quigley up
in Perry County used to use. I'm going to admit I'm
stealing this from him. He used to say that he kept
his checkbook as I do, and that is, I have a running
register that allows me to record transactions. When
I'm required to turn the page and the possibility is
called upon in your own life to write a check and it's
the first check you're going to be doing on the next
page of the register and you've come to the bottom and
you look and you see that you have a number written in
there as the balance that you're now going to carry
forward you might even -- say it's a check you're going
to write to someone important, family member, Internal
Revenue Service, and it's going to be for the exact
amount of that balance, you don't want it to bounce.
It's a matter of importance in your own life.
Reasonable doubt isn't that you might go back and see
that you have recorded all your transactions. It's
after having done that, having reviewed your check
register, would you still write that check for the full
balance? Would you still hesitate and say I better go

1  back and run an adding machine tape or double check all
2  my math? There's a certain amount that we expect, I'm
3  saying we expect, when you first begin to deliberate
4  over the evidence, that you're going to have some
5  questions. I'd be surprised if you didn't. It's
6  really after all the discussing this case do you still
7  hesitate, would you check, write the check based upon
8  the knowledge you've come to to decide what evidence
9  you believe.

10        Reasonable doubt, however, in Pennsylvania must
11  also arrive fairly from the evidence that was presented
12  here during this case or the absence of the evidence as
13  to one or more of the elements that are being presented
14  to you.

15        Your doubt must be a real one. You cannot just
16  make something up, come up with a fanciful, imaginary
17  reason just to avoid performing an unpleasant task.
18  Some might say passing judgement on a member of the
19  community can be an unpleasant task.

20        To summarize this portion of the instructions,
21  you may not find the Defendant in this case guilty
22  based upon a mere suspicion of guilt or on a hunch or
23  on a guess or on speculation. The Commonwealth has the
24  burden of proving the Defendant is guilty beyond a
25  reasonable doubt. If the Commonwealth meets that

burden then the Defendant is no longer entitled to the presumption of innocence I talked to you about, then you should find him guilty. On the other hand, if the Commonwealth has not met its burden then you must find the Defendant not guilty.

Before moving into the actual instructions on the crimes that are charged, I want to mention one thing and that is that certainly witnesses, as I recall, testified during these proceedings identifying the Defendant as being at or around the crime scene. There is a question as to how accurate that identification is and how you should accept it. If I remember correctly I believe Ms. McCurdy, a neighbor, said that she saw the Defendant leaving the home. Ms. Harris, I believe it was, also testified something about seeing a person running in an alley and identified that person as the Defendant. A victim or a witness can sometimes make mistakes trying to identify someone, allegedly a criminal. If certain factors are present in the testimony of those identification witnesses, then the accuracy of identification testimony can be so doubtful that you, as the jury, should receive it with caution. In the case of Ms. McCurdy, my recollection is that she gave statements to the police, for example, immediately

1 after or on the date of the incident that we're dealing

2 with here and made no mention, for example, of having

3 seen the Defendant. So in her case the question is,

4 did she see him at all? because it did not come up

5 until years later in a much later statement and her

6 testimony here.

7 As to Ms. Harris, you should receive her

8 identification testimony with caution not only because

9 I believe her statement was different given to the

10 police, as I recall, shortly after the incident than it

11 was much later when they said she actually went outside

12 and saw someone in an alley but also because at the

13 time the Defense has raised the issue as to whether or

14 not there was proper lighting from her observation

15 standpoint where she was. Was there other reasons why,

16 if I recall, she said the gentleman was running away

17 from her, had, I think, hooded clothing on. She said

18 she saw him. You should -- you should receive it with

19 caution. If you find that any of those factors about

20 bad position, bad lighting, bad observation, etc., if

21 you find those are present, then you should consider

22 Ms. Harris's testimony with caution in identifying the

23 Defendant as the person allegedly running from the

24 scene.

25 However, if you do not believe that those

1 factors were present or one of them is present, then
2 you need not receive the testimony with caution but
3 treat it the same way as you would in any other
4 testimony. You should consider all evidence relevant
5 to the question and I think in this case I can say it
6 is the primary question. Who committed this crime?
7 Including the testimony of those who testified about
8 identification.

9 You cannot find the Defendant guilty unless you
10 are satisfied beyond a reasonable doubt that the
11 evidence, direct and circumstantial, is proven not only
12 by the crime committed but that it was the Defendant
13 who committed it.

14 Since I mentioned the phrase direct and
15 circumstantial, you are -- you have been presented with
16 a lot of testimony and a lot of evidence much of which,
17 all of which falls into two categories. One is direct
18 evidence. Direct evidence is the testimony of a
19 witness or evidence presented as to what the witness
20 saw, heard, felt, touched, smelled, etc., first person
21 observation.

22 There is also, however, circumstantial evidence
23 and I believe in this case circumstantial evidence is a
24 large portion. Circumstantial evidence is nothing more
25 than proof of Fact A, which tends to prove by

1  inference; Fact B, without referring specifically to
2  the evidence in this case since I have to limit my
3  comments on evidence -- I can give the example we use,
4  almost everyone uses from law school on.  If we were
5  sitting here today until noontime and we closed the
6  blinds and we were having testimony and other noise
7  going on in here and when we take a break you walk
8  outside and you see that the street is wet.  Cars are
9  wet, a couple still have their windshield wipers on,
10 you hold your hand out and feel nothing.  You see folks
11 running around with umbrellas, all of those
12 observations are direct evidence.  They are also
13 circumstantial evidence to prove that it has recently
14 rained.  If that is a fact at issue, just by way of
15 example, circumstantial evidence is valid evidence to
16 be presented in a case.  If you believe that the
17 circumstantial evidence is strong enough, if the
18 inference to be drawn is strong enough from evidence of
19 one fact to prove another which is an element of this
20 case, your verdict can be based on circumstantial
21 evidence alone but only if you believe the
22 circumstantial evidence is strong enough to convince
23 you beyond a reasonable doubt that the Defendant is
24 guilty of the crime charged.
25         Now let's talk about the crimes charged.   The

1  crime is charged generally as homicide.  The Defendant
2  is charged with taking the life of Iris Belcher, also
3  known as Iris Fennel, by criminal homicide.  There are
4  actually three possible verdicts you can reach in this
5  case, guilty or not guilty of one of the three of these
6  three charges.  The first is and in order of severity
7  or seriousness is murder of the first degree followed
8  by murder of the third degree and then followed by
9  voluntary manslaughter.  Those other two are sometimes
10  known as lesser included offenses.

11       Before I define each of these crimes for you, I
12  want to tell you about the term malice.  It's an
13  element of murder, both murder charges but not of
14  manslaughter.  A person who kills must act with malice
15  to be guilty of any degree of murder.  The word malice,
16  as I'm using it, has special legal meaning.  It does
17  not mean simply hatred or spite or ill will.  Malice is
18  a shorthand way of referring to any of the different
19  mental states which the law requires as being bad
20  enough to make a killing of a human being a murder.
21  The type of malice varies with the different degrees of
22  murder.

23       Thus for murder of the first degree a killing
24  is with malice if a perpetrator acts with a specific
25  intent to kill or, as I will explain it later, as I

1 defined further first degree murder, that the killing
2 is willful, deliberate and premeditated.

3　　　For murder of the third degree, a killing is
4 with malice if the perpetrator acts with a reckless
5 disposition, hardness of heart, cruelty, a recklessness
6 of consequences and a mind disregarded of social duty
7 indicating an unjustifiable disregard of the
8 possibility of death or great bodily injury and an
9 extreme indifference of the value of human life.

10　　　On the other hand, a killing is without malice
11 if the perpetrator is acting under circumstances which
12 would reduce the killing to voluntary manslaughter
13 about which I'll tell you when I describe for you what
14 voluntary manslaughter is.

15　　　Let's go through each of them.  The Defendant
16 is charged first with first degree murder.  First
17 degree murder is a murder in which the perpetrator has
18 a specific intent to kill.  To find the Defendant
19 guilty of this offense as charged, you must find that
20 the following three elements have been proven beyond a
21 reasonable doubt:

22　　　First, that Iris Fennel or Iris Belcher is
23 dead.  I think that is not in dispute.  Second, the
24 issue most disputed, that the Defendant killed her, and
25 third, that the Defendant did so with the specific

intent to kill and with malice. A person has the
specific intent to kill if he has a fully formed intent
to kill and is conscious of his or her own intention.
As my earlier definition of malice indicates, a killing
by a person who has a specific intent to kill is a
killing with malice so long as the killing also is
undertaken without the circumstances which would reduce
the killing to voluntary manslaughter -- I'll get to
that in a second -- a killing with specific intent to
kill, therefore, it is willful, deliberate and
premeditated. A specific intent to kill including the
premeditation needed for first degree need not require
planning or previous thought or any particular length
of time. It can occur quickly. All that is necessary
is time enough so that the Defendant charged with the
crime could and did fully form an intent to kill and
was conscious of that intention. When deciding whether
the Defendant had the specific intent to kill you
should consider all of the evidence that was presented
including his words. Although he did not testify he
talked to others and his statements were brought before
you and his conduct and the attending circumstances
which may show his state of mind.

   If you find the Defendant intentionally used a
deadly weapon on a vital part of the victim's body, you

may regard that as an item of circumstantial evidence
from which you may, if you choose, infer that the
Defendant had the specific intent to kill.

Third degree murder; third degree murder is
simply any killing with malice and for our purposes any
killing with malice that is not first degree murder.
The Defendant is charged, as I said, with first degree
but also a lesser included third degree murder. To
find the Defendant guilty of this offense, you must
find that the following three elements have been proven
beyond a reasonable doubt:

First, that Iris Belcher or Iris Fennel is
dead. Secondly, that the Defendant killed her, and
third, that the Defendant did so with malice.
The word malice has the same meaning as I said before,
not simply hatred or spite or ill will. It's the
mental state of the perpetrator of the crime.

For purposes of murder of the third degree a
killing is with malice if the perpetrator acts with
that wickedness of disposition, that hardness of heart
or cruelty and with recklessness for the consequences
of his act operating of a mind completely disregarding
social duty such as indicates an unjustified disregard
to the probability of death or great bodily harm and
extreme indifference to human life.

1      As I said, before a killing is without malice,

2  however, if circumstances, which I'm about to tell you

3  about, that will make the crime voluntary manslaughter.

4  When deciding again whether the Defendant acted with

5  malice necessary for third degree, third degree murder

6  conviction, you should consider all the evidence the

7  same as you would for first degree as to his words, his

8  conduct, circumstances attending to the -- to the crime

9  that might bear upon or show his state of mind at the

10  time.

11      If you believe, again, that he intentionally

12  used a deadly weapon on a vital part of the victim's

13  body, then you must regard that again as an item of

14  circumstantial evidence from which you may, if you

15  choose, infer that the Defendant acted with malice.

16      As I mentioned during defining malice, there

17  can be no malice where there are certain reducing

18  circumstances present.  When those circumstances are

19  present a killing may be voluntary manslaughter but

20  never murder.  This is true when a Defendant kills in

21  the heat of passion following serious provocation.

22  Accordingly, you can find malice and murder only if

23  you're satisfied beyond a reasonable doubt that the

24  Defendant was not acting under a sudden and intense

25  passion resulting from a serious provocation by the

victim.  A Defendant acts under an intense passion if
he acts under an emotion such as anger, rage, sudden
resentment or terror that is so strong that it rendered
him incapable of cool reflection.  A Defendant acts
under sudden passion if the time between the
provocation and the killing is not long enough for the
passion of a reasonable person to cool.  A Defendant's
passion results from a serious provocation, if it
results from conduct or events that are sufficient to
excite an intense passion in a reasonable person.
Thus the existence of the intense passion turns on the
actual mental and emotional state of the Defendant
while the existence of a sudden passion and the serious
provocation turns on how a reasonable person confronted
by the provocation would react.

Remember that you can find malice and murder
only if you are satisfied beyond a reasonable doubt
that the Defendant was not acting under a sudden and
intense passion resulting from serious provocation by
the victim.  The law recognizes too, however, that the
cumulative impact of a series of related events can
lead to sudden passion and amount to a serious
provocation.  The test of whether a reasonable person
confronted with the same series of events would become
impassioned that he or she would be incapable of cool

1 reflection.

2      If you do not find that the Defendant had

3 malice and thus committed murder, then you may find him

4 guilty of voluntary manslaughter but only so long as

5 you are satisfied that the following three elements

6 have been proven beyond a reasonable doubt:

7      First, that the victim, Iris Belcher, is dead;

8 second, that the Defendant killed her; and third, that

9 the Defendant had the intent to kill.

10      Now, having defined the elements of the three

11 types of criminal homicide you might possibly find in

12 this case, I'd like to review them in summary fashion

13 of the order of seriousness:  First degree murder,

14 third degree murder and voluntary manslaughter.  You

15 have the right to bring in a verdict finding the

16 Defendant not guilty of each of those or finding him

17 guilty of one of those types of criminal homicides.

18 It may help you to remember that murder requires malice

19 manslaughter does not.

20      First degree murder requires specific intent to

21 kill, and third degree murder is any other murder.  It

22 means killing with malice.  Voluntary manslaughter is

23 basically an intentional killing for which malice has

24 not been proven because of the sudden passion and

25 serious provocation.

1    Now, before you retire -- I'm sorry.  One other
2  point I'd like to talk about evidence.  You heard
3  evidence throughout this case from witnesses who took
4  this stand, that they gave statements to investigators,
5  that they testified in other proceedings and that that
6  other statement or other testimony was inconsistent
7  with something about which they testified here from the
8  witness stand.  You may if you choose regard the
9  evidence of the prior statements that were inconsistent
10 as proof of the truth of what the witness may have said
11 in the earlier statement, but you may also consider the
12 evidence as an aid to help you judge the credibility
13 and weight of the testimony that was given by each of
14 the witnesses who testified and who, as you recall, the
15 evidence made inconsistent prior statements so you can
16 use that evidence for two purposes.

17    Now, that's essentially most of the substance.
18 Before you retire though I want to give you final
19 guidelines about how you should go about your
20 deliberations and how you may properly arrive at a
21 verdict.

22    First of all, it's been my responsibility
23 throughout to decide all questions of law.  To the
24 extent that you disagree with some of my rulings on
25 objections you must abide by those anyway.  You must

DAUPHIN COUNTY COURT REPORTERS

1  follow all of my rulings. You must follow the
2  instructions that I've given throughout the proceedings
3  and most particularly the instructions I'm giving you
4  right now on matters of law. But I'm not the judge of
5  the facts. You are.

6      It's not for me to decide what the true facts
7  are considering the charge that has been brought
8  against Mr. Love. You are the sole judges of the
9  facts. It's your responsibility now when we get to the
10 deliberation room to consider all of the evidence, to
11 find and decide what the facts are that have been
12 proven, if you can do so, and then apply the law to the
13 facts as you find them in deciding whether or not the
14 Defendant has been proven guilty beyond a reasonable
15 doubt.

16     I don't need to tell you that in this case, in
17 this case particular, but in every case that a jury
18 hears in this courtroom, that this is a matter of
19 considerable importance. It is your responsibility as
20 jurors to perform your duties in accordance with your
21 oath and to reach your verdict based on the evidence or
22 lack of evidence, if that's what you determine, as it
23 was presented during the trial.

24     All of the persons here involved in this
25 proceeding have a right to expect that you will do so.

1 However, as you decide what the facts are, we expect

2 you and you may properly apply your own common sense

3 and your understanding of life as you experienced it.

4 You should -- we don't want you to forget what your

5 common sense is. We expect you to use it. You should

6 keep your deliberations free from any personal

7 predispositions, biases, prejudices whatsoever. The

8 Commonwealth and the Defendant, as I said, expect you

9 and I do expect you to consider all the evidence

10 conscientiously and to apply the law as I've outlined

11 it to you.

12         One thing you should not consider during your

13 deliberations is possible future consequences of your

14 verdict including what the penalty might be if you were

15 to find the Defendant guilty of one of these charges.

16 The question of guilt and the question of penalty in

17 our system of justice here are decided separately.

18         When you retire to the jury room your

19 deliberations should begin and proceed in as orderly a

20 fashion as possible. The first thing the jury must do

21 is choose one from amongst you to act as the foreperson

22 of the jury. The foreperson has two essential roles.

23 One is to preside over your deliberations, and

24 secondly, to announce the verdict when it has been

25 reached here in open court in this courtroom after you

finished your deliberation.   The foreperson's vote and
opinion is entitled to no greater weight during your
deliberations, however, than any other member of the
jury.

None of you should attempt to communicate with
the Court or with anyone outside the deliberation room
except in accordance with these instructions.  We will
be providing, for purposes of communicating with me, we
will be providing a piece of paper that the foreperson,
once selected, will take into his or her possession.
If the jury becomes confused as to some element of the
instructions that I've given, the foreperson may write
out what that question is on that piece of paper being
as specific as possible so I understand what the
question is.  The foreperson should sign that question,
put down their juror number, put the note into the
envelope and seal it and simply advise the tip staff
waiting outside the jury deliberation room that there
is a question that needs my attention.  They will see
that the envelope is brought back to me.  I'll consider
it and determine whether or not I can respond, if so
and in what fashion.  Sometimes we bring you back into
the courtroom and reread or reinstruct you on some of
what I've talked to you about this morning.

If at the time you do that, you talk to the tip

1  staff outside the jury deliberation room, don't ever

2  discuss with them what the question is.  Don't ever

3  reveal that and if you have taken votes along the way

4  as to your verdict, do not reveal to the tip staff or

5  to anyone else what those votes may be.  The only time

6  we're going -- anyone is going to hear your verdict is

7  here in this courtroom when it is announced in open

8  court.

9          Your verdict in this case to be valid must be

10 unanimous.  That simply means in order to reach a valid

11 verdict you must all agree with that verdict.  You have

12 a duty as jurors to consult with each other, to hear

13 each other out, to listen to each other's opinions and

14 to consider all of the evidence together and to do so

15 with a goal toward reaching an agreement as to what the

16 verdict in this case should be that you can all accept

17 if you can do so without violating your individual

18 judgments and your individual consciences.  Each of you

19 must decide this case ultimately for himself or herself

20 but only after you have given fair and impartial

21 consideration of the evidence with your fellow jurors

22 and understood and listened to their differing

23 opinions.

24          None of you should hesitate to change your mind

25 if you become convinced your initial belief or initial

1  opinion in this case was wrong after you have discussed
2  it with your fellows jurors.  But you should never
3  surrender an honest belief what the weight and effect
4  of the evidence has been solely because the opinion of
5  your fellow jurors may differ from yours and not solely
6  for the purpose of reaching a unanimous verdict.

7         We will be sending out with you a verdict slip,
8  a copy of which I'm holding up, which you can't
9  possibly read from where you are.  But essentially the
10 foreperson again should take charge of the original of
11 this form when it is sent to the jury room.
12 It simply says at the top place and now and a space for
13 inserting the date; we, the jury, in the above
14 captioned case find as follows; then there are three
15 insertions that say on the charge of first degree
16 murder there is a place to the right as you see the
17 form for inserting an X or check mark for either guilty
18 or not guilty.

19        There are instructions that say because they
20 are lesser included offenses that if you find the
21 Defendant not guilty then you move to the next and
22 consider on the charge of murder of the third degree,
23 again inserting guilty or not guilty.  If you find not
24 guilty then you go to the third.  If you find guilty to
25 any of them, you stop at that point and need not

consider then the lesser included charges below.

Ultimately I believe you should review all of the evidence but the first question I think in everyone's mind during the arguments, the first question and first issue, did Tyshaunt Love kill Iris Belcher? If you find that he did not then, of course, you simply indicate not guilty on all three and that would be your verdict.

If you do find that the evidence proves beyond a reasonable doubt that he killed Iris Belcher, then you must go through and consider each of them separately on the elements of the crime having to do with first degree, third degree or voluntary manslaughter.

One last time, bear with me. Counsel, is there anything else you think I should bring to the jury's attention or anything you would like to bring to my attention about my charge before I excuse the jury for their deliberation purposes?

MR. MULLER: No, Your Honor.

MR. McCORMACK: No, Your Honor.

THE COURT: Thank you. Now, before I do so, I turn my attention to our jurors at the end of the row, Mr. Spotts and Ms. Hess. Alternates under Pennsylvania jury system -- alternates play an important role but

1 they do not have an opportunity to participate in the
2 deliberation process nor to vote in the rendering of a
3 verdict.

4      I've told most of the alternates that I can
5 only compare the frustration of having sat through a
6 trial and not being able to participate to not getting
7 that kiss good night at the end of the prom date.  But
8 I want you to understand that in trials that I have had
9 in my four years on the bench, I've had trials that
10 have taken less than a day and we had sickness or we
11 had a family emergency or had some other reason why a
12 juror who had been on the panel could not serve, and if
13 we didn't have an alternate or alternates here that we
14 would be much in the same position as being with a flat
15 tire on a dark road and no spare.  Your service as an
16 alternate is extraordinarily valuable and I appreciate
17 that you paid close attention.

18      I now excuse you from jury duty and you should
19 follow the tip staff's instructions and directions to
20 the jury assembly area.  I'm sure you'll be released
21 immediately.  Thank you very much.  As soon as they
22 have cleared the stairway, ladies and gentlemen, of the
23 jury, I now remove your gags.  You are free to discuss
24 all of the evidence that you have heard and we will
25 await word from you as to the reaching of a verdict.

1    By the way to do that the foreperson simply
2  advises the tiff staff that a verdict has been reached.
3  Don't reveal what it is, and then you'll be brought
4  back to the courtroom to announce it.  Thank you very
5  much.  Good luck.  We stand in recess pending recall of
6  the jury.
7        (The jury exited the courtroom at 9:29 a.m.)
8        THE COURT:  Counsel, I need to see you at
9  sidebar?
10        (A discussion is held at sidebar off the
11  record.)
12        THE COURT:  Talk to me about what exhibits you
13  believe should or should not go to the jury.
14        MR. McCORMACK:  I would ask that all the
15  photographs would go up to the jury, any of the lab
16  reports, I think Exhibit 50 is the lab report, I don't
17  think that should go up to the jury.
18        MR. MULLER:  I don't either.  As indicated at
19  sidebar really only one photograph I would have an
20  objection to.  It was cropped for purposes of
21  publishing it the jury.  It would be a full photo --
22        MR. McCORMACK:  My position is the case is what
23  it is.  The scene is what it is.  People see things
24  every day watching television much worse, many times
25  with the shows that are on.  I don't think people are

1    as shocked by things that they may be once were. I

2    really don't think we need to shield the jury from the

3    truth of this case as to how horrible the scene was.

4          THE COURT: I'm going to allow it to go up. It

5    is not without some sense that I was trying to preserve

6    whatever dignity would be preserved for the victim

7    since I don't think it adds -- the exposed genitalia

8    adds to this case. It is what it is and it is as she

9    was found.

10         MR. MULLER: Just for the record that's Exhibit

11   No. 14, I believe.

12         MR. McCORMACK: Yes, it is Exhibit 14.

13         THE COURT: Your position is noted, Mr. Muller.

14   Now you have no objection to any of the other photos.

15   What about if everyone agrees that is what is to go up

16   and nothing else; is that correct?

17         MR. McCORMACK: I'm always leery about sending

18   physical evidence with blood on it unless they ask to

19   see it.

20         THE COURT: Let's err on that side and wait to

21   see what else they may request. I don't know.

22   Frankly, I don't know that there is much more that they

23   would -- they are likely to want. Anything else from

24   the Defense side?

25         MR. MULLER: No, Your Honor.

1    THE COURT:  Does that include Defense Exhibit

2  No. 1?

3    MR. MULLER:  Yes.

4    MR. McCORMACK:  Yes.

5

6    THE COURT:  I have received a communication

7  from the jury.  The original of which I'm marking as

8  Court Exhibit No. 3.  I've made copies for each of

9  counsel involved providing it to you now.  Well, I'd

10 like to hear each your positions.

11    MR. McCORMACK:  My position is, Your Honor,

12 that the case law is very clear.  We cannot provide

13 them with written statements.

14    MR. MULLER:  I concur.  I know of no

15 exceptions.

16    THE COURT:  That is your position both with

17 respect to the statements and the testimony that was

18 read in.

19    MR. McCORMACK:  I think we would have to treat

20 it the same.  I'm thinking back to a number of years

21 ago, the Foster case, because the jury was allowed to

22 have partial portions of the case, homicide case here

23 in Dauphin County.

24    THE COURT:  Do either of you have a strenuous

25 objection simply advising them of that in a responsive

1  note?

2          MR. MULLER:  I have no problem with that, Your

3  Honor.

4          THE COURT:  I'll get you copy of it

5  simultaneously.

6          MR. McCORMACK:  No objection.

7          MR. MULLER:  Okay.

8          THE COURT:  I'll be doing that in the next few

9  minutes.  We probably will excuse the jury to take its

10 lunch break if they wish to do that.

11         MR. MULLER:  Would you consider they be

12 sequestered?

13         MR. McCORMACK:  I prefer they not be let out.

14 Just because of so many things, there are so many

15 family members.  I know the Defendant is present.  Sees

16 them in the hallway, any interaction might influence

17 their decision.

18         THE COURT:  All right.  Then let's take a lunch

19 order and see what we can get for them.

20         (Whereupon, the Reply to the Jury's Question is

21 Court Exhibit No. 4.)

22

23         THE COURT:  All right.  Good afternoon.  All in

24 attendance the jury has announced to the tip staff that

25 a verdict has been reached.  I do not know what that

1 verdict is.  I don't know which way this jury is going
2 to decide this case.  I can tell you and I want you to
3 understand that a court of law is a case where there is
4 in fact a bit of drama about what goes on here.  To all
5 of you who testified and had connections with the
6 victim's side of this case and the Commonwealth's side,
7 I understand that this is an emotional issue.  Same way
8 for the Defendant, we know this is an important
9 decision that's being rendered as to you Mr. Love and
10 to those who are here with you.
11         On the other hand, a court of law is not a
12 place of emotion.  It is a place where the jury -- and
13 I know they've done it -- that they have worked really
14 hard to try to get through all of the testimony and all
15 the evidence that's been presented.  I don't have any
16 doubt in my mind.  They deserve your respect.  That's
17 my way of saying when this verdict is announced, I will
18 not tolerate any outburst or any reaction whatsoever.
19 I'll clear the courtroom.  The jury deserves that kind
20 of respect as does this court.  If everyone understands
21 that then let's bring the jury into the courtroom and
22 we'll take this verdict.
23         (The jury entered the courtroom at 3:50 p.m.)
24         THE COURT:  Be seated.  Ladies and gentlemen,
25 I'm told a verdict has been reached.  Mr. Janeczek,

1   you're the foreperson, would you please rise and hand

2   the verdict slip to Mr. Hargis, our clerk. You may be

3   seated for a moment. Mr. Janeczek, rise again.

4         THE CLERK: In the case of Commonwealth of

5   Pennsylvania versus Tyshaunt Love, Docket No. 937 CR

6   2002, on the charge of murder in the first degree, how

7   did you find?

8         THE FOREPERSON: Not guilty.

9         THE CLERK: On the charge of murder in the

10   third degree, how did you find?

11         THE FOREPERSON: Guilty.

12         THE COURT: That's all, Mr. Hargis. Does

13   either counsel have anything they would like to bring

14   to my attention why the verdict should not be recorded

15   as the verdict of this jury?

16         MR. McCORMACK: Not from the Commonwealth, Your

17   Honor.

18         MR. MULLER: Just request a polling of the

19   jury.

20         THE COURT: Let me explain, polling of a jury

21   is a right of either side in any action including this

22   one. What you'll be asked is if you agree individually

23   that this is the verdict of each of you. As I told you

24   the verdict is required to be announced. Now please

25   proceed.

THE CLERK:  In the case of the Commonwealth versus Tyshaunt Love, Docket 937 CR 2002, on the charge of murder in the first degree you voted not guilty.

On the charge of murder of the third degree you voted guilty, did you, sir?

JUROR NO. 1:  Yes.

THE CLERK:  No. 2, do you agree with the verdict rendered by Juror No. 1?

JUROR NO. 2?  Yes.

THE COURT:  No. 3, do you agree with the verdict rendered from Juror No. 1?

JUROR NO. 3:  Yes.

THE CLERK:  No. 4.

JUROR NO. 4:  Yes.

THE CLERK:  No. 5.

JUROR NO. 5:  Yes.

THE CLERK:  No. 6.

JUROR NO. 6:  Yes.

THE CLERK:  No. 7.

JUROR NO. 7:  Yes.

THE CLERK:  No. 8.

JUROR NO. 8:  Yes.

THE CLERK:  No. 9.

JUROR NO. 9:  Yes.

THE CLERK:  No. 10.

1    JUROR NO. 10:  Yes.

2    THE CLERK:  No. 11.

3    JUROR NO. 11:  Yes.

4    THE CLERK:  No. 12.

5    JUROR NO. 12:  Yes.

6    THE COURT:  Anything further, counsel?

7    MR. MULLER:  No, Your Honor.

8    MR. McCORMACK:  No, Your Honor.

9    THE COURT:  The verdict will be recorded.

10    (The verdict is recorded.)

11    THE COURT:  Now counsel, are we proceeding

12    directly to sentencing or is there a request for a

13    Pre-Sentence Investigation, any post-verdict bail

14    issues you would like to bring to my attention?

15    MR. MULLER:  We're requesting a Pre-Sentence

16    Investigation, Your Honor.

17    THE COURT:  It's your right.

18    MR. McCORMACK:  We are requesting that bail be

19    set on the Defendant, high bail at this time.  The

20    Defendant is not a resident of Harrisburg.

21    THE COURT:  What do you suggest?

22    MR. McCORMACK:  I suggest $500,000.

23    THE COURT:  Do we know about Mr. Love's

24    financial condition to know if that's even remotely in

25    the ballpark?

1    MR. MULLER: It is not.

2    THE COURT: Tell me something about his

3 financial condition.

4    MR. MULLER: Poor.

5    THE COURT: What do you suggest the bail should

6 be?

7    MR. MULLER: I request something much lower

8 than that, Your Honor. He has come down on his own

9 repeatedly over the course of this. He has stayed here

10 throughout the trial. He's shown up for the verdict.

11    MR. McCORMACK: I would point out to the Court

12 the Defendant was initially informed by Candi Rader

13 back in September of 2001 that he was -- he was wanted

14 for these charges. It was not until February of 2002

15 the Defendant was finally captured by the police.

16    MR. MULLER: Your Honor, he wasn't captured.

17 He contacted the United States marshal service, made

18 arrangements with them to be taken to Easton to be

19 picked up by Officer Heffner.

20    THE COURT: Nevertheless with the rendering of

21 the verdict I do find that bail is appropriate and set

22 bail at $100,000. I'll order a Pre-Sentence

23 Investigation to be conducted by the Dauphin County

24 Adult Probation office. Sentencing will be set to

25 occur promptly on October 28th at 9 a.m. in this

1  courtroom.

2          Ladies and gentlemen, again I want to thank you

3  for your service on this jury.  I know that your job

4  was not an easy one.  Most jurors tell me it is not as

5  easy as it looks on television.  That's a good thing.

6  It's not supposed to be easy.

7          I excuse you from your service.  Take each of

8  your notebooks out of the individual envelopes and

9  because those notes are, as I told you, always

10  confidential, tear out the pages on which you took

11  notes and place them into the envelope, which our clerk

12  will be passing in front of you, to then be destroyed.

13  No one including me will look at those notes.  Then

14  place the notebooks, remaining notebooks back in the

15  envelopes and then we'll collect those.  If you'll just

16  pass them down then we can collect them.  While doing

17  that again thank you for your service.

18          Having rendered a verdict in this case and

19  knowing as we know from the beginning that this case

20  had garnered some media attention, I want to let you

21  know it is possible that some members of the press may

22  want to contact you individually to talk.  I'm not

23  going to tell you that you should refuse to talk to

24  reporters.  There is no law that forbids a reporter or

25  anyone else from asking you about your verdict in this

1  case. We have freedom of press in this country and you
2  have freedom of speech. But you're under no obligation
3  to answer the questions to anybody about your verdict.
4  You can decline to be interviewed. You can terminate
5  any kind of interview at any time. I assume that any
6  reporter that's involved in the case, any lawyers will
7  act professionally and responsibly. They will honor
8  what you say if you don't want to talk to someone and
9  they don't honor that request if someone is bothering
10 you and you don't want to be bothered.
11        There are some things though I think you should
12 not discuss with anyone, is exactly what happened
13 during your deliberations. The deliberation process of
14 a jury is confidential. You should not ever reveal to
15 anyone what any of your other jurors may have said, how
16 they may have voted or what their position may have
17 been during your deliberations. We do that for a
18 reason. Jury deliberations are intended to be
19 confidential so jurors who participate in that process
20 can speak freely in the deliberation room, go over the
21 evidence freely and not have to worry about someone
22 spilling the beans, so to speak.
23        With this one limitation, I'm simply saying,
24 you know it's up to you whether or not you want to talk
25 to anyone about your verdict you reached. Lawyers

1  sometimes talk to jurors because they want to know if
2  they did a good job or bad job on one or another area,
3  and I don't think that's wrong either if they want to
4  talk to you about what you thought about their
5  performance.  It's one of the few ways a lawyer can
6  sometimes learn how to improve his or her performance
7  and skills over the years.
8       But with that, again, with my thanks, I now
9  excuse you, the members of this jury, to return to the
10 jury assembly area.  You're excused from service.
11 Thank you very much.
12       (The jury exited the courtroom at 4:01 p.m.)
13       THE COURT:  Counsel, if there's nothing further
14 we'll stand adjourned.
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE

1
2
3
4          I hereby certify that the proceedings
5   and evidence are contained fully and accurately in the
6   notes taken by me on the hearing of the above cause,
7   and that this is a correct transcript of the same.
8
9
10                          _____
                            Joanne M. Kohn
11                          Official Court Reporter
12
13
14          The foregoing record of the proceedings
15  of the above cause is hereby approved and directed to
16  be filed.
17
18
19
20
21
22
23  _____      _____
Date                        Bruce F. Bratton, Judge
24
25

DAUPHIN COUNTY COURT REPORTERS