1  COMMONWEALTH OF PENNSYLVANIA: IN THE COURT OF COMMON PLEAS

2                               : OF DAUPHIN COUNTY, PENNSYLVANIA

3        VS            :

4  TYSHAUNT LOVE          : No. 937 CR 2002

5

6

7

8              TRANSCRIPT OF PROCEEDINGS

9               STATE SENTENCE

10

11

12    BEFORE:   HONORABLE BRUCE F. BRATTON

13    DATE:    Friday, October 28, 2005

14    PLACE:   Courtroom No. 3
             Dauphin County Courthouse
15             Harrisburg, Pennsylvania

16

17  APPEARANCES:

18    SEAN M. McCORMACK, Esquire
      Chief Deputy District Attorney
19

20        For - Commonwealth

21

22    PAUL W. MULLER, Esquire
      Chief Deputy Public Defender
23

      NATHAN C. GIUNTA, Esquire
24    Assistant Public Defender

25        For - Defendant

DAUPHIN COUNTY COURT REPORTERS

INDEX TO WITNESSES

| FOR COMMONWEALTH | DIRECT |
|---|---|
| Angela Robinson | 20 |
| Charlena Belcher | 23 |
| Johanna Iftikhar-Khan | 29 |
| Daelene Saez | 33 |

| FOR DEFENDANT | DIRECT |
|---|---|
| Willy Love | 6 |
| Isaac Pelt | 7 |
| Anita Love | 10 |

P R O C E E D I N G S

MR. McCORMACK:  I would call the case of Commonwealth of Pennsylvania versus Tyshaunt Love, Docket 937 CR 2002.

On September 20, 2005, before Your Honor, the Defendant during the dates of September 12 through September 20th was tried and was found guilty on September 20th of murder in the third degree.

The Defendant is present in court being represented by his attorneys, Mr. Muller and Mr. Giunta.  A Pre-Sentence Investigation was ordered by Your Honor in this case and the Pre-Sentence Investigation is complete.  The Defendant is present before the Court today for sentencing.

THE COURT:  I assume, Mr. McCormack, you had fair opportunity to review the Pre-Sentence Investigation?

MR. McCORMACK:  Yes, I did.

THE COURT:  Is there anything you wish to bring to my attention in terms of errors or modifications or --

MR. McCORMACK:  I don't have any

1  modifications or errors that I noted.  I did note
2  no sentencing guidelines.  I have prepared
3  sentencing guidelines.  It was a little difficult
4  being the case was so old.  In fact, they don't
5  make the forms anymore.  I had to photocopy blank
6  ones out of the book.  I'll pass those up to the
7  Court, and I have some argument then later.
8          THE COURT:  Now, Mr. Muller, I understand
9  from my staff that you too had an opportunity to
10 review the Pre-Sentence Investigation report.
11         MR. MULLER:  That's correct.
12         THE COURT:  I think we provided a copy so
13 you and Mr. Love could review it together this
14 morning.
15         MR. MULLER:  Down in the holding cell he
16 was provided a copy to review and he has reviewed
17 it as well.
18         THE COURT:  Are there any errors or
19 anything you would like to bring to my attention?
20         MR. MULLER:  I'm sorry, Your Honor; just
21 a moment.  Your Honor, there were some minor
22 discrepancies of significance maybe.  Mr. Love
23 disputes the assertion that he absconded from
24 parole back in 1998 and any assertion that he
25 tested positive for drugs while on parole.  He

1  says that's incorrect as well.

2      His parole officer apparently did not --

3  he was in New York after he was initially

4  released in this case in 1998 and informed him to

5  keep in phone contact and make payments on fines

6  and costs.  He didn't make payments on the fines

7  and costs.  There probably would have been a

8  violation there.

9      THE COURT:  Is the sentence imposed by

10 Judge Clark now a closed docket?

11     MR. MULLER:  It is as far as I know.

12     MR. McCORMACK:  The last time I had

13 contact from the probation office, they were

14 still holding off on the revocation on that

15 charge pending this case.

16     As for the absconding, the probation

17 office prepared the Pre-Sentence Investigation.

18 A warrant was issued for his arrest in 1998.  I

19 would tell the Court that had nothing to do with

20 our investigation into this case.  Our grand jury

21 investigation didn't begin until another year or

22 two later.

23     THE COURT:  I don't know that again is a

24 terribly material factor in my determination of

25 the sentence here, Mr. Muller.  Tell me what I

1 need to know.

2     MR. MULLER: Your Honor, Mr. Love is

3 going to want to address the Court. He has

4 family members here who would like to address the

5 Court on his behalf, and I think I would like to

6 start by calling them up if that's all right.

7     THE COURT: All right, and I know,

8 Mr. McCormack, you said you had argument you

9 would like to add, and I'll provide you the same

10 opportunity.

11     MR. MULLER: Willy Love.

12

13             WILLY LOVE,

14 having been sworn, was examined and testified as

15 follows:

16

17 BY MR. MULLER:

18    Q   Would you state your name for the record?

19    A   Willy Love.

20    Q   And how are you related to Tyshaunt Love?

21    A   I'm his father.

22    Q   And what can you tell the Court about

23 Tyshaunt?

24    A   Well, I had an opportunity to be with my

25 son back in '81. I lived in the Virgin Islands.

1  He came down for a year.  He seems to care about
2  others.  He had a streak like all young people to
3  see what's going on in the world and what have
4  you, wants to learn about a lot of things, but
5  one of the main reasons I want to speak to the
6  Court today, I just want to give my deepest
7  sympathy to the family.  I don't know them and
8  what have you.  I know how I would feel in a
9  situation like this.  That was the main thing I
10  wanted to give them my deepest sorrow, and that's
11  about all I have to say.
12          THE COURT:  All right.  Anything else?
13          MR. McCORMACK:  No questions, Your Honor.
14          MR. MULLER:  Isaac Pelt.
15
16                  ISAAC PELT,
17  having been sworn, was examined and testified as
18  follows:
19
20  BY MR. MULLER:
21      Q    Could you state your name for the record?
22      A    Isaac Pelt.
23      Q    Spell your last name.
24      A    P-e-l-t.
25      Q    And how are you related to Tyshaunt Love?

1    A    I'm his uncle.

2    Q    On the father's side or mother's side?

3    A    On the mother's side.

4    Q    Have you had much contact with Tyshaunt

5  over the years?

6    A    I pretty much -- as a young child, I was

7  there raising him.  So I had a hand in raising

8  him.  I've been in the Marine Corps for the last

9  26 years.  But before that time when I lived at

10 home, you know, I had pretty much a hand in

11 raising him.

12        One of the reasons why I wanted to at

13 least have an opportunity to address the Court

14 for, No. 1, let me first say, you know, this

15 situation that brings us here is an extremely sad

16 one, and I do want to extend my deepest regrets

17 to the family in this matter.  I did want to say

18 that the type of young man that I saw in TJ over

19 the years, I would never thought we would end up

20 in this place.  He has had struggles that he had

21 to overcome just like a lot of us that grew up in

22 the New York area, grew up in Harlem, pretty

23 adverse situations probably much like some of the

24 situations that are here in this state.

25        I saw him overcome a lot of things.  I

mean, and just to overcome the things,

academically, those things really show me there's

a real person here with some character.  Things

that have happened, you know, these last couple

of years.

When he called me and I came and I had

the opportunity to see him, he really expressed

to me that -- he really expressed his innocence

to me, and I was really concerned about that

because the loss of human life is against

everything we've been taught from my parents and

the way we were brought up and the way we raised

him definitely is not in keeping.  I know that

things happen out in life and people take turns.

But I think one of the most important

things, you know, I can just say from my years of

knowing him, I just -- I don't know how this

could have happened that he would have created

this type of situation.

However, again, I say my deep, deepest

sympathy.  I also ask you to consider the fact

that this young man is a person that has some

character.  He's been striving to make something

of himself.

MR. MULLER:  Thank you.

1    THE COURT:  Thank you.  Any questions?

2    MR. McCORMACK:  No, Your Honor.

3    MR. MULLER:  Anita Love.

4

5                   ANITA LOVE,

6  having been sworn, was examined and testified as

7  follows:

8

9  BY MR. MULLER:

10    Q    Could you state your name for the record?

11    A    Anita Love.  I'm TJ's aunt from his

12  father's side of the family, and, first of all,

13  I'd like to express to the family of the victim

14  that I'm sorry for their loss from my heart.  I'm

15  here today on TJ's behalf.  I would like to say I

16  have four children of my own.

17         At the age when TJ -- from a child, he

18  spent time during the summer, during the year

19  with my children.  He was like one of mine when

20  he came to spend time with us in New Jersey as a

21  teenager.  You go through things.  We lost

22  contact.  I went through a divorce.

23         I'm here today to express my sorrow for

24  the things that he's gone through, for the family

25  of the victim, and had I known that his life

would have taken a turn for the worse, I would have raised TJ, and I just want to express to everyone here today that I'm sorry for this situation that has brought us here today.

THE COURT: Thank you. Questions?

MR. McCORMACK: No, Your Honor. Thank you.

MR. MULLER: Your Honor, Mr. Love would like to address the Court, as is his right.

THE COURT: All right. Mr. Love.

THE DEFENDANT: Good morning, everybody. First, I would like to start off, there's something -- there's a lot of things actually. This has been like nine years. It's been a very long painful nine years that I had to endure and go through this. It's pretty hard trying to think where to start.

I'm thinking like two main people in my life, things that they have told me. Right now at the start, one of them being this lady. She's Sister Mary Anna. She's my social studies -- actually my English teacher, homeroom, and she would -- I would like to read poems and things. There's one that, like she said, remember this is something that will apply to you through life and

DAUPHIN COUNTY COURT REPORTERS

1  it was a poem, and it went something like, when a

2  word is said, that some people say that the word

3  after it's said that that word is just gone, that

4  the word is no more; went on to say, but I say

5  once the word is said that the word just begins,

6  like, to live and, like, nourishing, grows in

7  people's head.  Once the word is spoken the word

8  takes life.

9         She told me, like I said, in 10th grade.

10 She stressed that I really -- I didn't get a

11 grasp of what she meant until a lot of this

12 situation I'm going through here today, that lead

13 up to today.  There's been a lot of words spoken

14 and words are like seeds, like taking seeds and

15 grow in people's heads.

16        They are untrue words.  They are not

17 true.  I pray every day for Iris's family, just

18 the general public, for people to know I looked

19 so forward for this trial and held my head high

20 and kept my faith for people to see for themself.

21 They say court is a form of justice, that facts

22 come out and, you know, people come -- there are

23 people that speak untruths and they get their

24 chance to get crossed and to be heard, you know,

25 and so forth.

1        Through the nine years of contacting a
2   lot of people, like pillars of this community,
3   I've spoken with people through correspondence
4   and expressed my feelings on just the whole
5   situation overall and, you know, everybody
6   referred -- not everyone.  Mayor Reed, he
7   referred me to the courtroom.  Everything should
8   be brought out, and points I made to him that
9   these points, you know, should be made here and
10  like other people -- other people that I met that
11  lived in Harrisburg from when I graduated school.
12        In 1993 I came out here.  My cousin had
13  come out here.  I liked it out here in '93.  When
14  I graduated in 1993, I came out here.  It was a
15  beautiful town.  A lot of things that I got into,
16  I didn't really have any business getting into
17  it, but I was, you know, I was young, and I was
18  like basically having fun or having a good time.
19  There's people -- what I feel about individuals
20  of people, I'm not going to point fingers or what
21  have you.
22        I had some sort of like owning up to do
23  especially with this particular -- with Lynne.  I
24  don't know if she's here, like, now.  When I was
25  in a relationship with Iris, I met her in the

1 beginning of '94. We were very close friends
2 before we became -- were friends for years, and
3 along like the last days when she was around, she
4 was here, we would speak to Wazzi on the phone.
5 She lived in Milwaukee. Wazzi used to tell me to
6 take care of myself. She would always say, you
7 take care of my sister, and I would say you
8 already know, Wazzi, you already know, and I
9 probably heard when we were out there in the
10 streets, whatever.
11       After a while I didn't know where she was
12 at, asking people where is she, where is she?
13 Because I was -- that was my responsibility, that
14 was something that I agreed and that I said that
15 I would do, look out for her and make sure, you
16 know -- certain things in the relationship that
17 you just do automatically, that just comes
18 natural and in a situation that things that we
19 were doing basically was cutting corners, we
20 would call it.
21       Iris used to say, she was like, we're
22 heathens right now. We got to get right. That
23 was my best friend. We've been through, me and
24 her, a lot people don't know about. They were in
25 their own little world, and basically pretty much

1   we were.  We are like around, like, people didn't

2   know about us.  We done illegal things.  Our

3   families are similar.  We had much in common that

4   way.  She has a big family.  I have a big family

5   too.  We would just be talking about, like, the

6   things that happened when we were young.  We went

7   through some of the same things, and, like, we

8   both are Christians.  We actually went to church

9   together.  We would have conversations outside

10  just talking about God.  She would say something.

11      I would say something, like, be upset

12  about a dude and I'm talking, like, man, this

13  dude and like -- like when I see him because he

14  had something wrong.  Like I would say actually

15  I'm going to kill this dude not meaning, like,

16  I'm going to kill the dude, you know, like you

17  would be upset with somebody.  Like, I'm going

18  to, like, you're mad at them, like, you're

19  frustrated.

20      Just the word that came out and she would

21  say, that's not worth it.  I would actually, I'd

22  say, I don't mean it, like, because she would say

23  I'm going to heaven.  Don't you want to go to

24  heaven?  Yeah, I'm going to heaven.  Yeah, me

25  too.  She's, like, the way it sounded.  What

makes you think that?  Like, I was, like, what
makes you take it like that?  That's because
that's what you said.  Then it goes back to like
when a word is spoken.  It, like, goes to say,
like, my mom say, maybe half kill you.  I would
know this is my mother.  She's not talking about
killing me or whatever.

Just this person, this thing that was on
my mind was my grandmother used to say -- this
was my grandmother on my mother's side -- Nellie
Love.  Every summer I would go out there.  She
would make me do yard work around the house.  My
grandfather used to do yard work.  I used to feel
some kind of way.  She kept the house up.  It
wasn't like the house was a disaster.

It was yard work that needed to be done,
and I would be there and I would say, why do I do
all this work?  I'm coming up, like, for a school
vacation or summer vacation in my big head.
Danny Love is sitting in the front seat.  Danny
was there all day long.  He didn't help granddad
clean the garage or the basement or whatever.  I
know my grandfather was teaching me, like,
structure and, like, I would go ahead and do it.

I would be, like, a little upset, but my

grandmother, she always was like the weeds need
pulled around the house, like around the gate,
like weeds that grew.  She would say, TJ, you did
good.  You helped granddad.  The only thing I
need to do is pull up the weeds around the gate.
She would say pull up the weeds and trim the
hedges around the house, and I would, like, be
all right, get the stuff and cutters out of the
garage.

        To make a long story short, I would try
to take the shortcut.  Instead of me pulling up
the weeds, like she said, I would get the hedge
clippers and I would cut the hedges and bushes
and trim them nice.  I would sweep away -- I got
the hedge right here.  I would cut down the weeds
like they are gone.  You can't see the weeds.
Like she would kind of actually be specific, pull
the weeds up.

        Now, two days would go by, three days
would go by.  It looks, like, nice.  She would
call me.  I want to show you something.  I was,
like, what happened?  I thought I told you to do
the hedges and do the weeds, and I said, I did do
the weeds and I did the hedges.  No, you didn't
do what I told you to do.  She said look out

1  there.  I looked out there, and I said, well,
2  yeah, they grow back.  They grew back.  She said
3  why did they grow back?  I don't know.  They grew
4  back because you didn't do what I told you to do.
5  I told you to pull those weeds.  If you would
6  have pulled them up by the root, then the weeds
7  wouldn't have came back.

8        So when I think of that, I think, like,
9  of her instructions and pulling the weeds up by
10 the root and everything and like my prayer has
11 been for this whole time is like this situation
12 with these guys.  They need to be pulled up by
13 the root, and unfortunately that didn't occur
14 here in this courtroom.

15       The person told me I don't know what
16 happened, where they are, whatever.  I just say a
17 prayer for the family constantly for their pain.
18 The pain every day, I feel that pain.  The pain,
19 I know what it is.

20       Then another thing that I have to address
21 that I would like to address is, like, we had
22 some type of friendship that turned into us
23 becoming intimate and becoming -- we had some
24 type of understanding and I against that -- I
25 didn't have a relationship, but I cheated.  I

1  wasn't there where I should have been, and that's

2  something that I have to live with forever, and I

3  told Wazzi that I would be there.  I wasn't

4  there.  She told me to take care of my sister,

5  and I said, yeah, and I wasn't there, and for

6  that, I apologize, and I know that I probably

7  will never be forgiven.  I just pray.  I pray.  I

8  pray every day that the truth comes to light,

9  that the person that's responsible for this, not

10  only that they be brought to justice through your

11  court, Judge Bratton, but also I already know

12  they are going to pay.  I pray that the day they

13  come in this court, the truth comes out and God

14  gives them the strength and the courage to come

15  and speak the truth.

16        One last thing -- this is the last

17  thing -- I read over the presentence report

18  thing, and it was like -- there was nothing like

19  I said.  I told myself if I don't have anything

20  nice to say, don't say anything about anyone.

21  I'm not just going to say it at all.  My grandmom

22  had told me.  But this is just to Officer Smiley

23  Heffner.  I don't walk around with my head up

24  because I feel I'm invincible.  I walk around

25  with my head up because I'm innocent.  That's

```
1   why.  That's all I have to say.
2           THE COURT:  Thank you, Mr. Love.
3   Anything else?
4           MR. MULLER:  No, Your Honor.  Just
5   briefly, as you know --
6           MR. McCORMACK:  If you were going to
7   argument, I have some victim impact.
8           THE COURT:  Let's hear from third persons
9   first.  Then I'll allow each side an opportunity
10  to give me their position.
11          MR. McCORMACK:  Angela Robinson.
12
13                ANGELA ROBINSON,
14  having been sworn, was examined and testified as
15  follows:
16
17  BY MR. McCORMACK:
18     Q   Ma'am, state your name for us.
19     A   Angela Robinson.
20     Q   And before you say anything, I want to
21  just remind you, your comments should be directed
22  to the Court, okay, as to how -- I guess my
23  question for you is, what relevant information do
24  you have as to how this has affected both
25  yourself and Iris's family?
```

1    A   Okay.  Well, first of all, I just want to

2 say I wasn't there so I don't know what happened

3 and only God does, but you sit here and profess

4 your innocence.

5        THE COURT:  Your comments should be

6 directed to me not to any other individual.

7 BY MR. McCORMACK:

8    Q   Before you begin, are you related in any

9 way?

10    A   No; just a good friend, very good friend.

11 You know, I did -- when this all happened, I did

12 give my information, you know.  Whether or not

13 they wanted to hear it at the time was another

14 thing.  I was called later on.  I gave everything

15 I know about what I thought had happened, and,

16 like I said, I don't know what happened there.  I

17 wasn't there, but I know for a fact that he

18 definitely knows what happened, and he needs to

19 just stop professing his innocence and, you know,

20 stop living by the street code or whatever you're

21 going by and just tell the truth, you know, cause

22 he knows, you know what I mean, and I know he

23 knows.

24        If he did do it, tell the truth, because

25 it's too late now.  I mean, you know he didn't

1  tell what happened because you don't -- you know,
2  everyone since I've been up here in Harrisburg, I
3  know it's a lot of people. They live by the
4  streets, and that's not the right way. You end
5  up dead or in jail or just have a miserable life.
6  You got to live by God. That's just his
7  downfall, you know. I mean, you sit there and
8  you say you have faith now. Where was your faith
9  then when this all happened? And I know you're
10  feeling pity for yourself now. You should have
11  been having faith then. You would never be here.
12  Iris would be with us. She has a daughter. If
13  somebody could have took your mom away from you,
14  that would have hurt, right?
15          THE COURT: To me.
16          THE WITNESS: I just think that he does
17  belong here because he should have opened his
18  mouth when he had the chance and told the truth
19  because he knows. You know what happened. So I
20  just -- I hope one day if you don't say nothing
21  now today to the family and tell everything, you
22  just breakdown and tell them what happened. I
23  hope one day if you haven't already, you open up
24  and let somebody know, you know what I mean. He
25  already knows but you need to tell him.

1       MR. McCORMACK:  Thank you.

2       THE COURT:  Anything else?

3       MR. MULLER:  No.

4       MR. McCORMACK:  Charlena Belcher.

5

6                 CHARLENA BELCHER,

7   having been sworn, was examined and testified as

8   follows:

9

10  BY MR. McCORMACK:

11      Q    Could you please state your name for us?

12      A    Charlena Rebecca Belcher.

13      Q    Are you related in any way to Iris

14  Belcher?

15      A    Iris Fennel Belcher, born January 26,

16  1977, is my third-born child.

17      Q    And, again, I would remind you when we

18  talked outside about this as part of a

19  victim/impact statement, you should address the

20  Court with your words.  I ask, how has Iris's

21  death affected both you and your family?

22      A    On December 20th and 21st, my memory for

23  some reason won't let me remember the exact day.

24  I'm a registered nurse, and I worked so many

25  overtime hours that they called me at home and

told me to stay home and sleep in the morning.  I
got a phone call.  I was downstairs on the couch
and Cookie said to me, Charlena, Iris is here,
and I can't get a pulse.  I said, what do you
mean you can't get a pulse?  She's probably got a
cold because the bus driver here had passed out
while he was driving the bus.  It was a bad flu
season.  Cookie, what's she doing?  She couldn't
answer me.  I said, Cookie, try to give her CPR,
and I ran out the house in my bare feet, and I
drove from Susquehanna Township all the way to
Iris's.  I don't remember getting there.  I just
remember that I was there, and I saw the
ambulance, and I'm a nurse and I couldn't figure
out why the crew was outside when she was in
there.  They were just standing there not doing
anything.

        Then I saw him.  I didn't really know
him, but he just walked out of that door by
hisself.  They wouldn't let me in.  He just
walked out, and then I remember Mr. Hetrick
coming to me and he bent down because I was on
the ground somehow, and he said to me she's dead.
You can come down and see her in a few hours.

        You know, that doesn't register.  I've

seen lots of people die. I've helped people die.
I've held their hand. I prayed. But somehow it
just didn't register that -- they were so unreal,
so just not real. Nine years I can't sleep. My
dreams are so real.

I have seven other children and I can't
really be there for them like I'm supposed to be.
I love them all the same. I tried to raise them
all to be honest, to believe in God and do the
right thing, but me telling them to do the right
thing and have her murdered and nobody seems to
care.

She was a loving human being, and she
absolutely was doing the wrong thing. But she
was not raised in a house of hate. She was
raised with love, and even though she didn't have
her father, I was her mother and her father, and
I did the best for all of my kids. I was there
with them. I tried to be a role model for them.
They know right from wrong. It doesn't matter.
I always told them if you do the wrong thing,
there's consequences. If you go out and get in
trouble and go to jail, do not look for me to get
you out because you already know.

I thought they were lying to me. I

thought because she did what I told her to do, to
help catch other guys that tried to murder my
next-door neighbor, that she was already all
right.  I never imagined one year later on the
exact same day the same thing would happen to
her, the same thing on the same day.

When your kids get older, you know, they
think they know everything.  Even when they are
in their 20's and 30's they don't really know.
They think they do.  Outside influences, the way
our country is with the drugs and the abuse of
women and children, they have no idea how
horrible it really is.

I told Iris the last conversation I had
with her, I said, Iris, I heard you're doing
stuff out there and you already know it's wrong.
I said you're dealing with people that are not
like you.  You grew up with love and a belief in
God, and although you're strained, I do believe
when you raise a child like that and they
eventually come back if they have a foundation
even if they mess up.

I said to my child, you don't know these
people.  They will hurt you.  They will do
anything to you because they are not like you.

It has been so bad.  I do not even wish this on
him nor his family.  It is such a horrible,
unbelievable nightmare, and it will never end for
us.  I don't seek revenge because when I close my
eyes for the last time, I don't want to have
another person's death on my hands.

Anger, of course; I'm a human being, but
that's so long gone because it was eating me up.
It was killing me.  It was making me not able to
take care of the rest of my children and my
grandchildren.

I'm not a perfect human being, and it's
real tough when you try to lay down after work
and I get these pictures in my head because for
nine years we didn't know what happened to Iris.
I thought she was still alive.  I thought they
put her in a program and somehow she was going to
contact me because she never let me see her.  I
never saw her again.

My cousin buried her.  He wouldn't let me
see her either.  So my imagination took over and
through all this time I would catch myself
looking for her and then I would remember, oh,
no, she's gone.  But is she gone?

We had to go into that apartment and look

at her Christmas tree with blood on it and the
presents she had for her daughter with blood on
them. Nobody cleans up places when somebody has
a death like that. Nobody comes and cleans up
the blood. I saw right where she died, right
where the big pool of blood was.

Me and my child -- the landlord didn't
come to let us in. We crawled in the window.
It's just been one thing after the other. My
child meant everything to me. Iris was the light
for the family. She loved her little sisters and
brothers. They were so little then, but I could
tell if they even saw her out the window of the
house -- it would be quiet, believe it or not,
and then I hear all this noise and flipping and
giggling and carrying on. I would look over at
my mother and say, must be Iris coming.

She loved her family. She loved God.
She would have never harmed anyone. God chose to
allow this to happen and it didn't just happen
for one reason. We all make mistakes. We have
to learn to forgive, and I pray for his soul, and
I pray for my daughter's soul. I hope that you
understand that for the rest of our lives things
will never be the same for our family. Thank

1  you.

2        THE COURT:  Thank you, Ms. Belcher.

3        MR. McCORMACK:  My last witness will be

4  Johanna Iftikhar-Khan.

5

6              JOHANNA IFTIKHAR-KHAN,

7  having been sworn, was examined and testified as

8  follows:

9

10  BY MR. McCORMACK:

11     Q    Could you please state your name and

12  spell your last name for us again?

13     A    Johanna Iftikhar-Khan, I-f-t-i-k-h-a-r,

14  K-h-a-n.

15     Q    And how are you related to Iris?

16     A    I am -- Iris is my daughter, Brittany's

17  grandmother, and I was Iris's surrogate mother.

18     Q    Could you express to the Court what

19  Iris's murder has meant to you?  In particular

20  you have been the person raising Brittany; is

21  that correct?

22     A    Yes, yes.  You know, Iris's death has had

23  a tremendous impact on our family, her biological

24  family, her adoptive family that adopted her

25  through love, and her friends, and more

1 importantly it has changed the course of her

2 daughter's life starting with the day that Iris

3 was murdered five days before Christmas.

4     I believe besides the person that

5 murdered Iris, I was the last one that spoke to

6 her, and we had plans to go Christmas shopping on

7 December 20th to finish getting things for

8 Brittany's Christmas and for her birthday, which

9 was shortly after Christmas.

10     Those are supposed to be happy times.

11 Christmas is supposed to be a happy time for

12 kids, for families. Birthdays are supposed to be

13 happy times. When holidays come around now, all

14 we have is sorrow. We're trying to get back to

15 that point where we can be happy, but it's hard

16 to do.

17     When Iris was murdered, you try to

18 explain it to a four year old. We didn't know

19 how to explain to her that her mommy was gone.

20 She asked us what happened. We finally, through

21 a child psychologist, we had to tell her. We

22 couldn't wait until Christmas or after her

23 birthday.

24     To have a four year old ask what happened

25 to her mom, you do not expect. Her mommy went to

heaven to be with God.  For a four year old to come to you and say, no, you tell me what happened to my mom.  You tell me what happened to my mom, a four year old, and we had to explain to her that her mom was murdered and she wouldn't even accept that.  She wanted to know what happened.  Her words were tell me now.  You tell me what happened to my mommy, and we had to tell her her mother was shot, that she was murdered.  Every day we live without Iris; my granddaughter lives without her mother every single day now.

Your Honor, I don't know what the sentence guidelines are, but I know what Iris's sentence was.  Her sentence was death and her sentence was death at the early age of 20 years old, before she had a chance to even turn 21, before she had an opportunity to get her driver's license.

She didn't have the opportunity to see her child graduate from high school or when her daughter gets married or when she just goes through the normal things that little girls go through.  I'm there for her.  I've always been there for her but as much as I love her, I can never replace her mommy for her.

1    Iris wasn't doing the things that we all
2 wanted her to do, and she made some wrong choices
3 in life.  But she didn't have the opportunity to
4 change her life, the changes that we were talking
5 about the night or the morning of her murder.
6    We were on the phone until maybe 1:30 or
7 later in the morning, but she said she wanted to
8 go to HACC to become a nurse, like her mom, that
9 she was changing her life.  She didn't have an
10 opportunity to do those things, Your Honor.  Her
11 life was taken away, was snuffed out.  No one, no
12 matter what, had the right to take her life.  No
13 one had the right to do that.  No one had the
14 right to rob Brittany of her mother.
15    I'm asking that you give this convicted
16 murderer the maximum sentence allowable by law.
17 I ask that for Iris and I ask that for her
18 daughter.  I ask that for her mother and for all
19 the rest of us.  There's no real justice.
20 There's two families that have been affected.
21 There's no real justice in this at all.  But I
22 ask for you to give him the sentence -- the
23 maximum allowable sentence that you can give him
24 by law.  That's my request.
25    THE COURT:  All right.  Thank you.

1 Anything further?

2     MR. McCORMACK:  No further testimony,

3 Your Honor.  Wait.  I apologize, Your Honor.

4

5           DAELENE SAEZ,

6 having been sworn, was examined and testified as

7 follows:

8

9 BY MR. McCORMACK:

10    Q    Could you please state your name for the

11 record?

12    A    Daelene Saez.

13    Q    And we heard during the course of the

14 trial, you were a friend of Iris's.

15    A    Yes.

16    Q    You have an opportunity now to speak to

17 the Court concerning sentencing in this matter.

18    A    I just want to say that I was friends

19 with both Tyshaunt and Iris.  So I'm kind of,

20 like, stuck in the middle.  I feel bad for you

21 and your family.  I feel bad for Iris's family.

22 I know that when I come around the block and that

23 cab pulls up around the corner, I'm not going to

24 see her standing there or waiting, coming to my

25 house to meet me.  We lived together for a while.

We talked a lot.

She had a daughter.  I had a child.  We talked about what we wanted for our kids, and I sit back and think about polishing her fingernails, doing her hair.  I think of those things you do for them every day.  You take them for granted.

My daughter is going through puberty. Brittany has no one to talk to.  She can go to her grandmother.  Not that her grandmother isn't right.  It's just the fact that your mother, you know -- she never going to have a mom.  Iris was only 20 years old.  I remember when I used to go party, go to New York all the time.  She would say I want to come to the club.  You can't get in.  The ID's are really strict.  As soon as you turn 21, the first place girlfriends go is to the Olympic bar.

I took two bottles and walked all the way to her gravesite, sat with two champagne glasses and celebrated my girlfriend's 21st birthday. That's not what I intended to do.

Brittany, I want you to know even though your mom is not here, she would have been proud. Your mom is proud, and you are going to be a

1  beautiful, beautiful young lady, and she will be

2  very proud.  She is proud, and that's it, and I

3  know that I believe in my heart of hearts that,

4  you know, what went on in that house --

5          THE DEFENDANT:  I told these people --

6          THE WITNESS:  I would just hope that at

7  some time -- I went to visit him when he got

8  incarcerated the first time and I said to him

9  before you hear from anybody else, I want you to

10  know and I want to hear from you, I asked him if

11  he did it, and he said he didn't.  I said, well,

12  I believe you.  Do you know who did it or what

13  went on there?  You need to say something.  I

14  still stand by that.  I do believe he knows what

15  went on there.  If you can find in your heart of

16  hearts some day --

17          MR. MULLER:  I think we've gone beyond

18  victim impact here.

19          THE WITNESS:  That's pretty much all I

20  have to say.  Thank you.

21          THE COURT:  Now, do you want to address

22  me first?

23          MR. McCORMACK:  I have nothing further

24  other than just argument.

25          THE COURT:  Who wants to go first?

1          MR. McCORMACK:  I suggest it is the
2   Defense.
3          MR. MULLER:  Judge, obviously here
4   because of the third degree verdict last month in
5   court and obviously while we may not agree with
6   it, that is what we're here for and we understand
7   that.  The guidelines give you a broad discretion
8   in sentencing someone for third degree murder.  I
9   don't think there's any other crime that someone
10  can be convicted of that has such a broad range
11  of minimum penalties as this does.
12          We would ask that you consider what you
13  heard from Mr. Love and his family today and that
14  you consider what's in the Pre-Sentence
15  Investigation, including the fact that he has two
16  children back in New York and a third one on the
17  way.  We just ask that you take those things into
18  consideration, into serious consideration when
19  fashioning a sentence in this case.
20          MR. McCORMACK:  Your Honor, just a couple
21  of things.  First of all, concerning the
22  guidelines, as I indicated, it was a little
23  difficult putting the guidelines together in that
24  we were dealing with a crime that occurred on
25  December 20, 1996.  The law had changed in 1995.

Previous to 1995, May of 1995, if someone was convicted of murder in the third degree, they faced a maximum penalty of 20 years in jail. In May of 1995 the law changed. The legislature increased it to a maximum penalty of 40 years in jail, what it still stands at today.

However, unfortunately the way things work is the sentencing guidelines did not catch up with the actual crime itself until June of 1997, hence, the reason why the guidelines topped out at 10 years in the standard range, and I would note that according to the old guidelines, there wasn't even an aggravated range because the original guidelines included the max.

Now, six months later the legislature expressed its desire and made the max what it is today being -- the max being the standard range of the sentencing guidelines.

That certainly was a concern to me. As I started putting them together and I went and did some research looking at some cases where people were sentenced for crimes that occurred under the old guidelines but in this same time frame and there is case law that supports departing from those old sentencing guidelines and using the

1  sentencing guidelines that would have been --
2  that correctly expressed the desire of the
3  legislature and through them the desire of the
4  people of this Commonwealth to hold someone who
5  has been convicted of murder in the third degree
6  accountable, to give the Court the ability to
7  provide a sentence to the maximum, and, you know,
8  I would ask the Court to give that consideration.
9        The one case in particular I noted just
10 for the record is Commonwealth versus Darryl
11 Kimbrough, 872 Atlantic 2nd 1244, for that the
12 judge departed from the sentencing guidelines.
13 In fact, that murder happened a day before the
14 sentencing guidelines took effect and, therefore,
15 still would have been under the old guidelines.
16       Being in front of this Court, I know
17 you're aware of this but the judge must take into
18 account the protection of the public,
19 rehabilitative needs, the Defendant's gravity
20 score, the particular offense and how it relates
21 to the life of the victim and the community.
22       This crime, as the Court heard in extreme
23 detail over a week and a couple of days, was an
24 extremely brutal crime.  The Defendant that
25 stands before you today and who quotes, from his

high school English teacher, poetry, I would
suggest to the Court is that Schoolboy, that
nickname that he had when he was up in New York,
not the smooth schoolboy-ish, this bookish
gentleman as compared to who, I submit to you,
committed this crime.

This was a brutal crime. This was not
any shooting. This was a horrible crime, but
this was more than just a shooting. This was a
very personal brutal crime, and we saw it in all
the pictures that were introduced during the
course of this trial. We --

THE COURT: I remember them.

MR. McCORMACK: We saw it in her face
with the gunshot wounds in her face, her swollen
face, her broken nose, her broken finger, and,
finally, in fact, the hyoid bone in her neck was
broken probably from strangulation. This was
someone who wanted to kill someone and certainly
did it with malice, as the jury found in this
case.

Cuzzo, that is the man who was beating on
Iris, and, yes, Iris wouldn't always be a
wallflower and take it. This is the man who
wanted to control her life. This was the man, I

1  submit to you that the jury believes, that she

2  was kicking him out of the house and he came back

3  into that house and whether a spark was ignited

4  before he got to the house or after he got into

5  the house, whatever, some spark was lit within

6  this man that he committed this brutal crime and

7  when you have a crime this brutal, I think it

8  warrants you to departing from the old sentencing

9  guidelines and going into the aggravated range.

10        I would submit to the Court that indeed a

11  maximum penalty of 20 to 40 years is appropriate

12  considering the crime that was committed here

13  today, and that's what we're looking at.  We're

14  looking at what punishment is appropriate for the

15  crime that was committed, and this was a brutal

16  crime.  You have a man, I submit to the Court,

17  who not only after he committed the crime, the

18  Defendant attempted to stage the crime scene and

19  put the blame on someone else.

20        The Defendant doesn't have to come in

21  here and say suddenly, okay, I'm not innocent

22  anymore.  I admit to it and I plead to the

23  Court's mercy, and I'm sorry for everything.  He

24  chose not to do that.  That's a choice he made.

25  He made a lot of choices along the way.

1    You read about his background in the
2  Pre-Sentence Investigation.  You heard from his
3  family here today.  He had a good background.
4  He, unlike so many other people that come before
5  you, graduated from high school.  He had
6  opportunities.  He was trying to learn a trade.
7  At one point I noted he was going to some trade
8  school at some point.
9    Yet he made choices; even when he was in
10 New York City he made choices, according to him,
11 $500 a week being a look out for drug dealers.
12 Then he comes down to our city to start dealing
13 drugs here and making money and making sometimes
14 on a really good day according to him 1500 a day.
15 That's a choice he made.  They are choices, and
16 what happened on the date of December 20, 1996
17 was a choice he made.  He chose to commit this
18 crime, and at this time I ask the punishment that
19 you give this Defendant fit the crime that he
20 chose to commit.
21    MR. MULLER:  Judge, if I may address the
22 sentencing guideline issue.  I've been on the
23 opposite end of this sentencing guideline divide
24 with the '97 guideline versus pre-'97 guideline.
25 The '97 guidelines actually made the sentencing

1  guidelines for drug crimes what they had been

2  previously, and I had the occasion of arguing --

3  well, you know the new guidelines are going to

4  make this, even though the crime happened under

5  the old guidelines -- and, you know, I've been

6  told by more than one judge that doesn't matter.

7  It's the old guidelines that apply, and I think

8  that's what applies here too.

9       We talk about the minimum and maximums

10 under the law.  We talk about the guidelines, and

11 adherence to the guidelines, and I don't think

12 it's just as easy to pick and choose what set

13 guidelines you adhere to based on these dates.  I

14 think it's the pre-'97 guidelines that apply.

15 The maximum especially changes under the law, but

16 the guideline range did not change and --

17      MR. McCORMACK:  Under the old guidelines

18 would never be appropriate, would seem to go

19 beyond the 10 years up to the maximum, which is

20 what the legislature a year and a half previously

21 had enacted.

22      THE COURT:  I understand your point, both

23 sides.

24      MR. MULLER:  Your Honor, I know Mr. Love

25 disputes what Mr. McCormack has been telling the

1 | Court.  I'm advising him he had his say.

2 |     THE COURT:  And I read the Pre-Sentence

3 | Investigation report carefully.  I understand

4 | your position here.

5 |     THE DEFENDANT:  The chronological order.

6 |     THE COURT:  There are lots about this job

7 | that I really enjoy.  There are days like today

8 | that is not one of them.  I listened to this

9 | story as the jury did and watched a tragedy

10 | unfold certainly for Iris Fennel and Iris

11 | Belcher's family and today we watch that tragedy

12 | expand to include Mr. Love's family.  This robe

13 | comes with no crystal ball, no promise of

14 | perfection.  I'm no more perfect than anyone

15 | else.

16 |     The jury, however, has spoken, made their

17 | determination and now it's my obligation to

18 | impose an appropriate sentence.

19 |     And now this 28th day of October 2005, in

20 | the matter of Commonwealth versus Tyshaunt Love,

21 | Docket 937 CR 2002, the Defendant having been

22 | found guilty by a jury of his peers following the

23 | trial concluding on September 20, 2005, I

24 | sentence the Defendant to a term of incarceration

25 | of not less than 15 nor more than 30 years, pay a

1  fine of $2,000, plus the costs of prosecution in

2  these proceedings.

3       To the extent this sentence deviates from

4  the guidelines that may have been in effect at

5  the time, I do so because I believe the nature of

6  the offense, brutality of the crime, the

7  execution style of the murder itself warrants a

8  deviation.  I also do so on the basis that as by

9  the Commonwealth's guidelines, departure is

10  warranted when the legislature had clearly

11  expressed an indication that it would be there,

12  would be a much higher maximum sentence

13  applicable and the guidelines had not caught up.

14       MR. MULLER:  Your Honor, we have the

15  issue of time credit.  Three separate periods,

16  Your Honor, initially December 21st of 1996 until

17  March 6, 1998; second would be February 15, 2002

18  until February 12, 2004; and finally, September

19  20 of 2005 until today's date, October 28, 2005,

20  so approximately three years and three and a half

21  months time credit at this docket.

22       THE COURT:  Do those dates sound right?

23       MR. McCORMACK:  The only thing I

24  question, one thing with my research, is the

25  Defendant although it was for the murder was not

1  incarcerated under these charges at that time.

2       MR. MULLER: At which time?

3       MR. McCORMACK: During 1996. During

4  1996, the Defendant was arrested on a separate

5  complaint. That complaint was dismissed. That

6  complaint was withdrawn, and I simply ask at this

7  point --

8       THE COURT: It was a complaint for this

9  homicide?

10      MR. McCORMACK: For this homicide. What

11 I'll do, I'll research it. If I feel I have

12 issue with it, I would file a motion with the

13 Court.

14      THE COURT: I can't imagine just by

15 dismissing the charge and refiling that the

16 prosecution can erase time served from that date.

17      MR. MULLER: The courts have been clear

18 that --

19      THE COURT: I'm granting the credit as

20 requested.

21      MR. McCORMACK: It hasn't been cleared.

22 There's, in fact, a recent case that came down --

23      THE COURT: I'll take a look at it, but

24 I'm granting it for today's purposes.

25      MR. MULLER: Could you read his

1 post-sentencing rights?

2      MR. McCORMACK:  Mr. Love, at this time

3 the Court has sentenced you to 15 years to 30

4 years in the State Correctional Institution.  You

5 also have been fined $2,000.  You have certain

6 rights at this time.  You have a right within the

7 next 10 days to file a motion before this court,

8 post-sentencing motion.

9      You have 30 days from the disposition of

10 those motions to file an appeal to the Superior

11 Court.  You can take a direct appeal to the

12 Superior Court.  That must happen within the next

13 30 days; however, you need to discuss this with

14 your attorney because there are certain issues,

15 for example, sentencing, and there are other

16 issues that must be taken within the next 10 days

17 before this court.  Otherwise, you would lose

18 them if you went directly to the Superior Court.

19 Do you understand what I've said so far?

20      Basically I'll review them one more time.

21 You have 10 days to file a post-sentence motion

22 to Judge Bratton.

23      MR. MULLER:  Which includes a motion to

24 modify the sentence.

25      MR. McCORMACK:  You have 30 days from

today if you choose to skip filing that motion
with Judge Bratton, to go directly to Superior
Court within the next 30 days; however, if you
did that and you failed to raise things with
Judge Bratton, you would lose some of those
issues.  You need to discuss this with your
attorney as to what issues need to be filed
within the next 10 days.

If you file a post-sentence motion, you
have 30 days from the date that Judge Bratton
rules on those motions to file an appeal to the
Superior Court.  Do you understand that?

THE DEFENDANT:  Basically I have 10 days
to file a motion in front of Judge Bratton about
all of the things that didn't occur during the
trial.

MR. MULLER:  I'm going to have to discuss
that with you.  Certain things have to be raised
in the post-sentence motion.  Two relevant ones
come to mind, sentencing issues must be raised in
a post-sentence motion -- okay -- whether it's a
motion to modify or whatever, that has to be
raised.  The second is something called weight of
the evidence, and it's a legal term.

THE DEFENDANT:  Amendment rights are

1  something like --

2       MR. MULLER:  I'll have to explain them to

3  you.  Weight of the evidence is something that

4  also must be raised in a post-sentence motion or

5  it is considered waived.

6       Other issues such as sufficiency of the

7  evidence, trial court error, things like that do

8  not have to be raised in a post-sentence motion

9  and can be raised before the Superior Court in an

10  appellant process.

11       If you decide to take a post-sentence

12  motion, that 30 day period of appeal does not

13  begin to run until Judge Bratton has issued an

14  order in response to those post-sentence motions.

15  When he issues that order, the 30 days starts

16  ticking to file a notice of appeal to the

17  Superior Court.

18       MR. McCORMACK:  If you choose to do so

19  through your attorneys, you can file all your

20  motions all at one time in a post-sentence motion

21  within the next 10 days.  Do you understand that?

22       THE DEFENDANT:  Yes.

23       MR. McCORMACK:  You're currently

24  represented by the Public Defender's office free

25  of charge.  You have a right to be represented by

1 | an attorney in post-sentencing motions and
2 | appeals.  I would imagine the Public Defender's
3 | office would continue to represent you.  If you
4 | cannot afford an attorney, you have the right to
5 | be represented by the Public Defender's office or
6 | court-appointed counsel.  Do you understand that?
7 | THE DEFENDANT:  Yes.
8 | MR. McCORMACK:  I don't think I missed
9 | anything.  Thank you, Your Honor.
10 | THE COURT:  Thank you.
11 | * * * *
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |

CERTIFICATE


I hereby certify that the proceedings
and evidence are contained fully and accurately in the
notes taken by me on the hearing of the above cause,
and that this is a correct transcript of the same.


_____
Joanne M. Kohn
Official Court Reporter



The foregoing record of the proceedings
of the above cause is hereby approved and directed to
be filed.




_____        _____
Date                             Bruce F. Bratton, Judge