1  COMMONWEALTH OF PENNSYLVANIA: IN THE COURT OF COMMON PLEAS

2                                : OF DAUPHIN COUNTY, PENNSYLVANIA

3          VS                    :

4  TYSHAUNT LOVE                 : No. 937 CR 2002

5

6

7

8                   TRANSCRIPT OF PROCEEDINGS

9

10

11

12       BEFORE:   HONORABLE BRUCE F. BRATTON

13       DATE:     Tuesday, April 27, 2010

14       PLACE:    Courtroom No. 5
                   Dauphin County Courthouse
15                 Harrisburg, Pennsylvania

16

17

18

19  APPEARANCES:

20     JASON E. McMURRY, Esquire
       Deputy District Attorney
21

22        For - Commonwealth

23

24     JUSTIN J. McSHANE, Esquire

25        For - Defendant

DAUPHIN COUNTY COURT REPORTERS

INDEX TO WITNESSES

| FOR DEFENDANT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| James Rowland | 8 | 19 | -- | -- |
| Jerry Russo | 21 | -- | -- | -- |
| Monty Batson | 25 | 79 | 82 | -- |
| Monica Cliatt | 83 | 149 | 153 | -- |
| Nathan Giunta | 158 | 204 | 222 | -- |
| James Stamos | 238 | 243 | 244 | -- |
| Chuck Sheaffer | 245 | 252 | -- | -- |

P R O C E E D I N G S

1

2

3    MR. McMURRY:  Good morning, Judge.  Your
4    Honor, Commonwealth calls its case against
5    Tyshaunt Love, Docket 937 CR 2002.  This is the
6    date and time set for an evidentiary hearing on
7    the PCRA filed by Mr. Love pro se, along with
8    appointed counsel, Mr. McShane, on these matters.
9         Mr. McShane had a request for an
10   evidentiary hearing.  That's what we're here for
11   today dealing with ineffective assistance of
12   claims.
13        MR. McSHANE:  May it please the Court,
14   there was also a supplemental PCRA that was filed
15   in addition to the amended PCRA where he had
16   sought leave for the Court to include additional
17   information and matters under the PCRA, and the
18   Court had signed that order several weeks ago.
19        We're prepared to proceed today as we
20   have a half day budgeted basically by trying to
21   make things chronological and these's are for the
22   Court with respect to the development of this
23   case with the eye towards the focus of the issues
24   that are presented to the Court for its review.
25        By way of the information and just to

1 note on the record that we have James Rowland

2 present; Jerry Russo present; Monty Batson

3 present; Monica Cliatt present; Nate Giunta

4 present; Paul Muller present.

5     In addition, Your Honor, we intended to

6 call Chuck Sheaffer who at the time was an

7 investigator with the Public Defender's office;

8 because of his various duties with the county and

9 sheriff's department, I excused him to return in

10 an hour and the same is true with Mr. Stamos

11 also.  He's still an investigator with the Public

12 Defender's office.

13     My thought pattern was for the Court to

14 kind of budget where we're going.  Both Attorney

15 Rowland and Attorney Russo are very short

16 witnesses, and I anticipate them being very, very

17 brief.

18     Mr. Batson would be the Petitioner's

19 first main witness followed by Attorney Cliatt.

20 Those would take a good portion of time.  With

21 that in mind, understanding that we would be

22 asking for sequestration of our own witnesses,

23 because this is a contested matter, and I

24 anticipate calling some of these people under the

25 provisions of Rules of Evidence 611-C as hostile

witnesses.  We would be asking to sequester the
witnesses also.

     Out of respect to these professionals who
are here today, particularly Attorney Muller and
Attorney Giunta, it looks like we will not get to
them for at least an hour, I will anticipate.  So
I would like to seek leave of the Court to have
them come back at approximately 10:00 because
Mr. Batson and Ms. Cliatt's testimony is going to
take a little bit.

     THE COURT:  All right.  Any objection?

     MR. McMURRY:  Your Honor, not
necessarily; I don't see the need for
sequestration.  They are all attorneys of the bar
here.  I don't know.  I'll leave it to the
Court's discretion.  I don't see the need for
that.  They can come in freely if they want.

     THE COURT:  Mr. McShane, I understand
sequestration requests are not unusual,
particularly the testimony being presented to a
jury.  On the other hand, it isn't automatic.
Tell me why.

     MR. McSHANE:  Sure.  Well, I anticipate
that there's going to be conflicting testimony
and not only because of -- these events happened

in advance of five years ago, but also because,
to be quite blunt, some of the attorneys were
cooperative with us when we sought to interview
them.

Other people were not, and, therefore,
it's going to be our argument there's
demonstrable bias because of that, and I think
it's better to be safe than sorry type of
situation where at this particular moment in
time, why create the possibility of taint, why
not just have straight fact testimony.  Although
they are attorneys, they are still human beings.

THE COURT:  I understand.  What's the
prejudice to the Commonwealth?

MR. McMURRY:  There is not.  I'm just
making that statement to the Court, Judge.

THE COURT:  My only -- biggest concern
with a lengthy list of witnesses, it slows the
process down somewhat, but as long as you're
willing to undertake the obligation to make sure
that witnesses are in and out quickly and
promptly, I'll grant the request.

MR. McSHANE:  That's why I brought four
people with me.

THE COURT:  We'll grant the request and

```
 1   sequester all witnesses.  Who will be testifying
 2   first?
 3         MR. McSHANE:  Attorney Rowland.
 4         THE COURT:  Who has the hour off?
 5         MR. McSHANE:  Mr. Muller and Mr. Giunta.
 6   Your Honor, the first act I ask the Court to do
 7   is to ask the Court to take judicial notice of
 8   register the actions in this matter, the various
 9   filings that were made in court.  The briefs and
10   the other materials that are in the Clerk of
11   Court's file that significantly reduced the
12   additional paper that has already been
13   anticipated being generated in this matter.
14         I ask the Court to take judicial notice
15   as they are matters beyond dispute.
16         MR. McMURRY:  We have no objection to
17   that, Your Honor.
18         THE COURT:  Not the truth of contents of
19   any such documents, just the fact of filing.
20         MR. McSHANE:  Filing and the various
21   documents that were produced in this matter
22   including the transcripts.
23         THE COURT:  All right.
24         MR. McSHANE:  At this time the first
25   witness for the Petitioner would be Attorney
```

1  James Rowland.

2

3              JAMES ROWLAND,

4  having been sworn, was examined and testified as

5  follows:

6

7          MR. McSHANE:  Your Honor, may I ask leave

8  of the Court to approach witnesses as exhibits

9  need to be identified?

10         THE COURT:  Yes, it's granted and you

11  need not seek that approval each time, neither

12  counsel.

13         MR. McMURRY:  Thank you, Judge.

14

15              DIRECT EXAMINATION

16

17  BY MR. McSHANE:

18    Q    Sir, could you please state your name,

19  spelling your last name for the benefit of the

20  court reporter and the record?

21    A    James H. Rowland, Jr., R-o-w-l-a-n-d.

22    Q    Sir, as you sit here today, would you

23  please identify your profession?

24    A    Attorney.

25    Q    And I'm going to draw your attention back

1   to January 17, 1997.  As you'll recall that was
2   the date of the preliminary hearing in the
3   originally filed action of Commonwealth of
4   Pennsylvania versus Tyshaunt Love.  Do you recall
5   that date?
6       A   Yes.
7       Q   And at that point in time, what was your
8   occupation as well?
9       A   Attorney.
10      Q   How long have you been an attorney, sir?
11      A   Forty-six plus years.
12      Q   So this wasn't your first rodeo by any
13  stretch of the imagination?
14      A   No way.
15      Q   I want to draw your attention and focus a
16  lot of our attention to the relevant point in
17  time for purposes of your particular testimony,
18  which is January 17, 1997.  If we could use the
19  benchmark to help the Court pin down your
20  relevant skill level and the information you'll
21  be able to provide.  I think that will be
22  helpful.  Can we agree to do that?
23      A   Yes.
24      Q   Now, there's an individual by the name of
25  Tyshaunt Love.  Do you see him here today?

1    A    Yes, I do.

2    Q    Would you please identify him for the

3  Court by pointing to him?

4    A    Seated at counsel table, has the

5  beautiful orange uniform on.

6         MR. McSHANE:  I ask the Court to note the

7  identification of the Petitioner, Tyshaunt Love.

8         THE COURT:  So noted.

9  BY MR. McSHANE:

10   Q    Back on January 17, 1997, how did you

11 come to know Tyshaunt Love?  What was the

12 interaction that you folks had?

13   A    I think I was appointed counsel to

14 represent him.

15   Q    Okay, and by way of appointed counsel,

16 what you mean, of course, that Mr. Love was

17 deemed to be indigent by the Public Defender's

18 office or by the Court and that you were

19 appointed counsel to represent him.  Is that

20 fair?

21   A    Either that or there was a conflict of

22 interest involved.  I think it was probably a

23 conflict of interest involved, potential second

24 or third Defendant.  I was brought in as conflict

25 counsel.

1     Q    So it was in that capacity that you took

2   on this case and that you knew, of course, it to

3   be an allegation of homicide?

4     A    Yes.

5     Q    And you conducted a preliminary hearing

6   on January 17, 1997 at approximately 1:30 p.m.;

7   is that correct?

8     A    Yes.

9     Q    And --

10     A    If you say so, I don't remember the time.

11     Q    Would it refresh your recollection to

12   take a look at the time on the title page?

13     A    Only as to the date; I'll accept your

14   statement that was the date of the preliminary

15   hearing.

16     Q    Let's take a look at it together.

17         THE COURT:  Is this contested?

18         MR. McMURRY:  It is not.

19         THE COURT:  We'll accept the fact that

20   was the date of the preliminary hearing.

21   BY MR. McSHANE:

22     Q    I want to draw your attention to the

23   regular course of business as an attorney and how

24   you went about developing cases.  You maintained

25   a case file; is that correct, sir?

```
 1      A    Yes.
 2      Q    And that would be for every case, and you
 3 did so in this particular case, the Tyshaunt Love
 4 matter?
 5      A    That's correct.
 6      Q    And inside the case file was various
 7 correspondence and all of the relevant material
 8 that had been given to you or that you developed
 9 on your own including the preliminary hearing
10 transcript.
11      A    Yes.
12      Q    And at some point in time -- strike that.
13           Typically for this jurisdiction one does
14 not receive full discovery, meaning, all the
15 police reports, all the investigation, at the
16 time of the preliminary hearing; is that fair?
17      A    That's correct.
18      Q    So more or less there is perhaps an
19 Affidavit of Probable Cause, whatever information
20 you can glean from your client and other than
21 that you're kind of a little bit in the dark as
22 far as what the full scope of the investigation
23 by the Commonwealth is; is that fair?
24      A    Yes.
25      Q    You request all that information and all
```

1 that.  At that point in time a preliminary

2 hearing was held on that date, correct?

3     A   Yes.

4     Q   I'm placing in front of you what has been

5 premarked as Defense Exhibit No. 1 with the blue

6 sticker in the lower left-hand corner.  I'll ask

7 that you take a moment and flip through it, and

8 I'll ask you to identify it in a moment.

9     A   This is 30 or 40 pages long.  You say

10 flip through it.

11     Q   I'm not asking you to verify the

12 contents.  It's a certified record.  That appears

13 to be the preliminary hearing transcript in the

14 first preliminary hearing in this matter; is that

15 fair?

16     A   Yes, it does.

17     Q   You were counsel appearing on behalf of

18 Mr. Love?

19     A   Yes.

20     Q   It appears to be a true and accurate

21 representation; is that fair?

22     A   Such as I see.  I haven't had an

23 opportunity to read it.

24     Q   You don't dispute its contents.  It

25 appears to be a well formatted matter, correct?

1     A   I was at the hearing which I won't

2  disagree.  I attended on January 17, 1997 on

3  behalf of Mr. Love.

4     Q   You asked questions that typically

5  results in a preliminary hearing transcript in

6  the same form and notion as that, correct?

7     A   Yes.

8     Q   Now, I'm placing in front of you a letter

9  that's been premarked as Defendant Exhibit No. 2.

10  I want you to take a moment and just take a look

11  at it because I'm going to ask you to identify it

12  here in a moment.

13     A   Okay.

14     Q   And, sir, do you recognize that?

15     A   Yes.

16     Q   And it is something that is written under

17  your own signature?

18     A   Yes.

19     Q   And it's a true and accurate

20  representation of the letter that you -- that you

21  generated?

22     A   Yes.

23     Q   Now, have you had the opportunity to read

24  that letter to refresh your recollection?

25     A   Yes.

1    Q    Can you indicate to the Court the date of

2    that letter?

3    A    October 16, 1997.

4    Q    For lack of a better way of summarizing

5    it, it was a letter to Tyshaunt Love dated on

6    that date indicating that you were able to speak

7    to a Doretha, D-o-r-e-t-h-a, Campbell, to verify

8    that Tyshaunt was at KFC on the morning of the

9    date he was arrested.  Is that a good summary of

10   that document?

11   A    Yes.

12   Q    And that was a true and accurate

13   depiction of what you did, meaning, that you did,

14   in fact, talk to the Doretha Campbell individual

15   back on that date verifying that Tyshaunt Love

16   was, in fact, at the KFC on the morning of the

17   incident?

18   A    I pronounce that Doretha.

19   Q    I'm -- that is a true and accurate

20   representation of what you did, memorialized and

21   sent to your client?

22   A    Yes.

23   Q    There came a point in time you no longer

24   became associated with the case.  Is that a fair

25   representation?

1     A    Yes.

2     Q    I'm placing in front of you another

3  letter, Defense Exhibit No. 3, and ask you to

4  take a look at Defense Exhibit No. 3, and when

5  you had the opportunity to take a look at it,

6  please let me know.  We'll identify it for

7  purposes of the record.

8     A    Okay.

9     Q    It appears to be blatant, at the top, a

10 logo of the Dauphin County Public Defender's

11 office.

12    A    Yes.

13    Q    It appears to be signed by an individual,

14 Jessica Bush, who you know to be employed in the

15 Public Defender's office, correct?

16    A    Yes.

17    Q    And, in fact, she is an attorney.  Do you

18 know that?

19    A    No, I don't know that.

20    Q    Nevertheless, the contents of the letter

21 is a letter from Jessica Bush requesting any and

22 all information basically asking you to turn over

23 all the information that you had with respect to

24 Ms. Campbell; is that fair?

25    A    Yes.

1      Q    In response to that letter you did, in
2   fact, turn over all the information you received
3   to the Office of the Public Defender in this
4   particular case; is that accurate?
5      A    Yes, I believe so.
6      Q    In fact, you sent correspondence
7   consistent with that.  I'm going to ask you to
8   take a look at what has been premarked as
9   Petitioner's Exhibit No 4 and ask you whether or
10  not you recognize that.
11  ·  A    Yes, that's my letter.
12     Q    And that would be consistent with what we
13  were just testifying about, what you were just
14  discussing with the Court that you turned over
15  any and all information not only with respect to
16  Ms. Campbell but also what's available for
17  further questions that they may have in terms of
18  the entirety of the case; is that fair?
19     A    Yes.
20     Q    It's within this letter that you provide
21  your information, your last known information
22  about Ms. Campbell's whereabouts and method of
23  contact; is that fair?
24     A    Um-hum, that's correct.
25     Q    And also her place of employment and

1 phone number.

2    A    Yes.

3    Q    You also informed Ms. Bush to contact you

4 if there was anything else needed and necessary

5 for the proper representation of Mr. Love.

6    A    Yes.

7    Q    Subsequent to that, you were not further

8 contacted by any of the other attorneys that were

9 involved in this case; is that fair?

10    A    To the best of my recollection, that's

11 correct.

12    Q    And in terms of -- okay -- to the best of

13 your recollection certainly back in 2005 when

14 this case went to trial, do you have an

15 independent recollection of being called in to

16 interview or speak with Attorney Muller or

17 Attorney Giunta about matters having to do with

18 Ms. Campbell or having anything to do with this

19 case?

20    A    I have no recollection of that.

21        MR. McSHANE:  The Court's indulgence.

22 That's all the questions I have of this witness.

23 I tender the witness.

24        THE COURT:  Cross.

25        MR. McMURRY:  Thank you, Judge.

CROSS EXAMINATION

BY MR. McMURRY:

Q    Mr. Rowland, back at the preliminary
hearing on January 17, '97, do you recall what
happened at the end of that preliminary hearing?

A    No, I don't recall.  I imagine that it
was --

Q    I believe if you look at the transcript
you'll find it was actually continued to another
date.  Do you recall that?

A    No.

Q    Do you recall making objections to the
magisterial judge why it shouldn't be continued?

A    No, I don't.

Q    Did you interview Ms. Campbell?

A    Yes.

Q    Do you recall your interview with
Ms. Campbell?

A    It was a phone conversation, and I just
asked her whether or not she remembered Tyshaunt
being there on the date in question.

Q    Do you recall -- strike that.
       When was the last time you talked to
Ms. Campbell?

1    A    I don't know.  It would have been after.
2 It would have been prior to the letter that I
3 wrote that's dated March 29, 2005.
4    Q   And do you recall talking to her after
5 that?
6    A    No, I don't recall.  I think I probably
7 didn't talk to her after that.
8    Q    You have no personal knowledge of what
9 the Public Defender's office did or did not do in
10 relation to this witness?
11    A    No.
12        MR. McMURRY:   No further questions.
13        THE COURT:  Anything else?
14        MR. McSHANE:  No.  May the witness be
15 released from the subpoena?
16        THE COURT:  No objection?
17        MR. McMURRY:   No objection.
18        THE COURT:  You're excused, Mr. Rowland.
19 Thank you very much.
20        MR. McSHANE:  Defense calls Jerry Russo.
21
22              JERRY RUSSO,
23 having been sworn, was examined and testified as
24 follows:
25

DIRECT EXAMINATION

BY MR. McSHANE:

Q    Sir, would you please state your name, spell your last name for the benefit of the court reporter?

A    Jerry Russo, R-u-s-s-o.

Q    As we sit here in the year 2010, how are you employed?

A    A lawyer at the law firm of Goldberg Katzman.

Q    How long have you been a practicing attorney?

A    1989.

Q    Criminal defense?

A    Exclusively.

Q    Okay.  I want to draw your attention back to the relevant time frame of March 18, 19, 1997. Do you recall being the attorney involved in the case of Commonwealth of Pennsylvania versus Tyshaunt Love, preliminary hearing before Senior District Justice Mary Cross?

A    I do know that I represented Mr. Love at that proceeding.

Q    Would it refresh your recollection to

1  take a look at the title page of the preliminary

2  hearing transcript?

3      A    Sure.

4      Q    Take your time in order to refresh your

5  recollection.  When you are done, please let me

6  know.

7      A    I am and it does.

8      Q    So there was a point in time when you

9  became involved in this particular case, correct?

10     A    Yes, sir.

11     Q    And that was in a privately retained

12 counsel capacity; is that fair?

13     A    Yes.  I was retained to represent

14 Mr. Love at the preliminary hearing that you

15 mentioned in 1997.

16     Q    And you maintained a case file.

17     A    Certainly.

18     Q    With all of your cases?

19     A    Yes, sir.

20     Q    And it contains information such as, you

21 know, everything that you can gather in terms of

22 personal notes that come from interviews with

23 witnesses, with clients, as well as preliminary

24 hearings and basically everything gets funneled

25 into this one document?

1    A    Yes.

2    Q    I'm sorry.  This one folder.

3    A    Yes, sir.

4    Q    And you conducted the preliminary hearing

5 on March 18, 1997, correct?

6    A    Yes, sir.

7    Q    And you had at that point in time

8 generated contents for that case file?

9    A    I presume so, yes.

10    Q    And at the point in time you discontinued

11 your representation of whereby the Public

12 Defender's office continued on in the

13 representation of Mr. Love, correct?

14    A    I believe that's accurate, yes.

15    Q    And with respect to that general time

16 frame it came somewhat after the preliminary

17 hearing certainly before the year 2005?

18    A    Well, I see at the end of the transcript

19 that the charges were held for court.  I don't

20 believe I entered an appearance to represent the

21 Defendant before the formal arraignment.  So some

22 time between March 18th of 1997, I presume, and

23 the date that he was formally arraigned, our

24 representation would have terminated.

25    Q    With that level of understanding, you

1  were contacted by the Public Defender's office to
2  turn over the entirety of your case file
3  including all of your attorney work product,
4  correct?
5      A    I believe that I was, yes.
6      Q    And you did so?
7      A    Yes, sir.
8          MR. McSHANE:  No further questions of the
9  witness.  I tender the witness for cross
10 examination.  I'm sorry.  I forgot.
11 BY MR. McSHANE:
12     Q    Defense Exhibit No. 5, if you could
13 identify what that is.
14     A    It's a copy of the transcript of the
15 preliminary hearing before Senior District Judge
16 Mary Cross, dated March 18, 1997, in the case of
17 Commonwealth versus Tyshaunt Jermain Love and the
18 appearances at that proceeding were Diane
19 Woodside of the District Attorney's office,
20 myself as counsel for the Defendant and the court
21 reporter from Archive Reporting Service, Terry J.
22 O'Connor, a notary public.
23         MR. McSHANE:  Thank you.  No further
24 questions.
25             THE COURT:  Cross.

```
 1        MR. McMURRY:  I have no questions of the
 2   witness.
 3        MR. McSHANE:  May Attorney Russo be
 4   excused?
 5        THE COURT:  Any objection?
 6        MR. McMURRY:  No objection.
 7        THE COURT:  You're excused.
 8
 9                 MONTY BATSON,
10   having been sworn, was examined and testified as
11   follows:
12
13        MR. McSHANE:  Your Honor, may I inquire
14   of the witness?
15        THE COURT:  Certainly.  As soon as he's
16   under oath and seated, you may proceed.
17
18                 DIRECT EXAMINATION
19
20   BY MR. McSHANE:
21     Q   Sir, would you please state your name,
22   spell your first and last name for the benefit of
23   the court reporter?
24     A   Monty Batson, M-o-n-t-y, B-a-t-s-o-n.
25     Q   How are you employed, sir?
```

1     A     I'm currently employed as a prosecuting

2 attorney at the Department of State, Bureau of

3 Professional and Occupational Affairs.

4     Q     I draw your attention to the time frame

5 of 2002 and 2005, particularly in that early

6 period of time, the 2002 period of time, how were

7 you employed?

8     A     2002 I was employed at the Dauphin County

9 Public Defender's office.

10     Q     What was your title?

11     A     I was an assistant public defender.

12     Q     Okay, and so you represented people who

13 were indigent and in criminal affairs and

14 criminal matters?

15     A     Correct.

16     Q     Now, are you familiar with an individual

17 by the name of Tyshaunt Love?

18     A     I am.

19     Q     Do you see him here in the courtroom

20 today?

21     A     I do.

22     Q     Would you please point him out?

23     A     Sitting in the orange jumpsuit at defense

24 table.

25          MR. McSHANE:  The record will reflect the

1  identification of Mr. Love.

2       THE COURT:  So noted.

3  BY MR. McSHANE:

4       Q    You're familiar with Mr. Love.  At one

5  time you were his counsel in this particular

6  case?

7       A    Correct.

8       Q    You weren't the first attorney to

9  represent Mr. Love in this case, were you?

10      A    No, I was not.

11      Q    In fact, James Rowland and Jerry Russo

12  were prior counsel, prior to you becoming

13  involved in the case?

14      A    Correct.

15      Q    You represented Tyshaunt at his second --

16  well, I guess chronologically -- third

17  preliminary hearing but second full preliminary

18  hearing in this matter where the charges were

19  refiled against him in 2002?

20      A    Correct.

21      Q    In terms of date, would it refresh your

22  recollection to take a look at the preliminary

23  hearing transcript to hone in on the date?

24      A    It would.

25      Q    I'm placing in front of you what has been

1  premarked as Defendant Exhibit No. 6.

2      A    Okay.

3      Q    Having refreshed your recollection, would

4  you indicate to the Court the date, time and

5  location and the parties who represented the

6  various entities in this matter?

7      A    It was on March 5, 2002, and it was at

8  the Dauphin County Prison, and I was representing

9  Tyshaunt Love and I believe Sean McCormack was

10 representing the District Attorney's office.

11     Q    Does it indicate on the cover it was

12 indeed Sean McCormack?

13     A    Yes, it does.

14     Q    All right.  And at that particular moment

15 in time, you had taken on the responsibility of

16 representing Mr. Love in the accusations against

17 him?

18     A    Correct.

19     Q    Ultimately it resulted in a preliminary

20 hearing transcript, which has been marked as

21 Defense Exhibit No. 6, correct?

22     A    Correct.

23     Q    At that time of the meeting in 2002, you

24 had been a lawyer for several years?

25     A    Correct.

1    Q    And you had been employed exclusively by

2  the office of the Dauphin County Public

3  Defender's office for several years?

4    A    Yes, correct.

5    Q    You began in 1999?

6    A    Correct.

7    Q    And during that entire period of time you

8  were what we call a litigating attorney, correct?

9    A    Correct.

10    Q    You weren't in the appellate division?

11    A    No.

12    Q    All you did was trial work?

13    A    Correct.

14    Q    In fact, back in those days there was

15  plenty of trial work to go around; is that fair

16  to say?

17    A    That's fair to say.

18    Q    With the one week sessions that were

19  subsequently throughout the year in Dauphin

20  County but for July, you were constantly in

21  trial; is that fair?

22    A    That's correct.  That is correct.

23    Q    At the point of 2002 when you took on the

24  matter of representing Mr. Love, you had

25  approximately a great -- well, certainly greater

1 than two years not quite three years worth of
2 experience in this particular system, in this
3 particular courthouse having tried a great many
4 cases through to burdens?
5     A    That's correct.
6     Q    Through to verdict, meaning, just
7 different types of cases, not just misdemeanors
8 but also felonies, correct?
9     A    Correct.
10     Q    And this is certainly not your first
11 criminal case?
12     A    That is correct.  It was not.
13     Q    And is it fair to say that by sheer
14 volume of the way that the Public Defender's
15 office was run at that point in time, you had
16 represented certainly hundreds of individuals?
17     A    I would say at that time that's accurate.
18     Q    This was not your first homicide case
19 that you had been assigned to; is that fair?
20     A    That is correct.
21     Q    And how many homicide cases had you been
22 assigned to and/or litigated at this point in
23 time in 2002?
24     A    I'm not really sure of the exact number
25 of cases.  I know I had a few at that point up

1  until the time that I started representing

2  Tyshaunt.

3      Q    It certainly wasn't your first homicide?

4      A    Correct.

5      Q    And it wasn't your first case that

6  involved not only just lay witnesses, correct?

7      A    Correct.

8      Q    And it certainly wasn't your first case

9  that involved forensic evidence?

10      A    Correct.

11      Q    And would it be fair -- would you

12  describe yourself as a seasoned trial attorney at

13  that point in time?

14      A    I would.

15      Q    You prepared for your trials?

16      A    I did.

17      Q    And in particular this trial, you had

18  prepared quite a bit?

19      A    A lot of time consumed, yes.

20      Q    And in your cases but also in particular

21  to this case, you conducted an investigation of

22  your cases?

23      A    Yes.

24      Q    You did all things that are necessary and

25  professional to mount a successful defense on

1  behalf of your clients?

2      A    Yes.

3      Q    In fact, at that time as Tyshaunt's

4  counsel, the Commonwealth attempted to disqualify

5  you from the case?

6      A    That is correct, true.

7      Q    This was based upon conflict of --

8  between the Public Defender's office and a

9  potential witness in the case?

10     A    Correct.

11     Q    But it was also because you had been a

12  very successful attorney litigating matters to

13  not guilty frequently?

14     A    That's correct.  I had successful juries.

15     Q    Ultimately the Commonwealth failed in the

16  request to have you removed from the case?

17     A    Correct.

18     Q    Currently you're no longer employed by

19  the Dauphin County Public Defender as you shared

20  with us initially.

21     A    Correct.

22     Q    You left the position in the Public

23  Defender's office in 2004?

24     A    Correct.

25     Q    That was while this case had not come to

1  trial but was beginning down that litigation path

2  that lead to trial in 2005?

3      A   Correct.

4      Q   At that point in time the various

5  interlocutory appeals had been returned and this

6  matter did not appear to be resolved between the

7  parties and was on a fairly eminent domain path

8  towards trial?

9      A   That is correct.

10     Q   In total between 2002 and when you left

11 in 2004, you had continuously represented

12 Tyshaunt Love in this matter for about two years?

13     A   I would say that's correct.

14     Q   Would it be fair to say in the two years

15 when you were assigned this case, it consumed a

16 lot of time as a public defender?

17     A   Yes.

18     Q   In fact, there was a bone of contention

19 among your superiors about how much time had been

20 involved in this particular case?

21     A   Yes.

22     Q   You spent many hours reviewing the case

23 file and its contents?

24     A   Correct.

25     Q   You had investigated all the discovery

1  material provided to you at this point in time in
2  the case?
3      A    Correct.
4      Q    In fact, you called in a supplemental
5  attorney to help you out because this case had
6  become rather complex?
7      A    Correct.
8      Q    And that attorney's name?
9      A    Monica Cliatt.
10      Q    Also employed at the Public Defender's
11  office?
12      A    At that time, correct.
13      Q    Between the two of you, you spent many
14  hours speaking with Tyshaunt either by person or
15  written correspondence?
16      A    Correct.
17      Q    In fact -- strike that -- because of the
18  level of complexity that was involved in this
19  case, it wasn't a -- for lack of a better way of
20  putting it -- a ho-hum case.  This was something
21  that you still remember to this day?
22      A    Certain aspects of it I still remember.
23      Q    As a predicate, you had maintained a case
24  file that contained all of the relevant
25  documentation and attorney work product with

1 respect to this particular case?

2     A    Yes, that's correct.

3     Q    You took notes at various points in time,

4 correct?

5     A    Correct.

6     Q    And in addition to that, you received

7 contents of files from prior counsel, correct?

8     A    Correct.

9     Q    Including memorandums and also various

10 other work products as well as anything that was

11 disclosed to you?

12     A    Correct.

13     Q    I'm going to be placing in front of you

14 what has been marked as Defendant Exhibit No. 7

15 and ask you to take a moment to take a look at

16 that and when you are done, please let me know.

17 I'm going to ask you to identify it.

18     A    Okay.

19     Q    Certify, first of all, the handwriting.

20 Whose handwriting is that?

21     A    It's my handwriting.

22     Q    Do you recognize it?

23     A    I do.

24     Q    What is it?

25     A    These are notes that I had written in the

1  file reminding me of items still yet to be
2  received in discovery.
3      Q    Meaning precisely, you had taken a look
4  through the discovery, all of the various
5  material that was relevant to this case and
6  basically everything that had come before you
7  became involved with the case, everything that
8  you had at that point in time you summarized
9  those things, included things not yet received
10 but wished to receive from the Commonwealth of
11 Pennsylvania?
12     A    Correct.
13     Q    Now, these items included a Giant receipt
14 indicating a purchase on December 19, 1996 around
15 11:15 p.m.
16     A    Correct.
17     Q    A copy of the police dispatch log
18 indicating when the police officers were
19 dispatched.
20     A    Correct.
21     Q    A copy of the 911 tapes or the transcript
22 indicating when police were called to 941
23 McClerster, M-c-C-l-e-r-s-t-e-r.
24     A    Correct.
25     Q    A copy of the receipt recovered from

1  Tyshaunt?

2      A    Correct.

3      Q    A copy of gunshot primer residue analysis

4  done on the clothing of Tyshaunt and LaQuan

5  Williams' clothes?

6      A    Correct.

7      Q    I want to pause there for a moment.  The

8  significance of the gunshot primer residue

9  analysis in this particular case based upon your

10 training, knowledge and experience in your trial

11 skills in the past, you know that gunshot primer

12 residue would be indicative of either having

13 handled a firearm or being in the vicinity of a

14 firearm being discharged?

15     A    Correct.

16     Q    The particular reason why you wanted to

17 receive that information was to possibly exclude

18 Tyshaunt Love in being either one of those,

19 either one of those two events; is that fair?

20     A    Correct.

21     Q    And the reason why you wanted it --

22 LaQuan Williams, LaQuan, he's known as Kazar?

23     A    Correct.

24     Q    You wanted to see if he could be included

25 in either one of those two scenarios?

1      A    Correct.

2      Q    There was a significance behind that

3    forensically?

4      A    Yes.

5      Q    It was not lost on you?

6      A    No.

7      Q    Now, you had also requested within that

8    letter the name and address of all Capitol region

9    ambulance attendants on the scene?

10      A    Correct.

11      Q    And that was because of the potential

12    contamination related issues of the crime scene?

13      A    Correct.

14      Q    The crime scene log indicating who

15    arrived on the scene and when each individual

16    arrived?

17      A    Correct.

18      Q    And, again, that was to make sure there

19    was no spoilation of the evidence or to argue

20    that there was?

21      A    Correct.

22      Q    And then you also asked for a copy of

23    x-rays taken of the victim?

24      A    Correct.

25      Q    And that was also because of the

1  Commonwealth's -- at that point in time you had
2  gleaned their theory of the case, which was this
3  was an advanced domestic dispute that escalated
4  from blunt force trauma to an ultimate execution?
5      A    Correct.
6      Q    And the reason you wanted the x-rays
7  taken of the victim was to either rule in or rule
8  out that theory of the case as promulgated by the
9  Commonwealth?
10     A    Correct.
11     Q    You needed all items to do a thorough
12 review of the case file at that point in time?
13     A    Correct.
14     Q    You requested certain specific
15 evidentiary items not yet provided hence your
16 handwritten note?
17     A    Correct.
18     Q    This was something that you had generated
19 relatively early on in your stewardship of the
20 case as discovery was coming in?
21     A    Correct.
22     Q    I want to bookmark that and move on to
23 another subject and talk about trial experience
24 and witness interviews if we could for a moment.
25     A    Okay.

1    Q    Based upon your level of experience that

2 you obtained through the years leading up through

3 and including the time you left the Public

4 Defender's office in 2004, you knew from your

5 personal experience as well as your professional

6 knowledge that interviewing witnesses was

7 important?

8    A    Correct.

9    Q    And the reason why it was important was

10 because not only can they give inconsistent

11 statements that's one potential outcome --

12    A    Correct.

13    Q    -- but also give you information that,

14 for lack of a better way of putting it, didn't

15 make its way into the police report; is that

16 fair?

17    A    Correct.

18    Q    That maybe not the whole story had been

19 recorded by the police officer in the police

20 report?

21    A    Correct.

22    Q    Hence the need to fully exercise one's

23 due diligence as trial counsel in either having

24 an investigator or yourself with the witness

25 present and interviewing of potential witnesses

1  that the Commonwealth may call to trial?

2    A    Correct.

3    Q    That way you wouldn't be, for lack of a

4  better way of putting it, ambushed by something

5  you weren't prepared for?

6    A    That's fair to say, yes.

7    Q    Ultimately another thing that could

8  happen, a person could verbally tell you to go

9  pound sand?

10   A    Correct.

11   Q    Meaning, they want to you -- could have

12 potential bias, show they are not open to

13 information; is that fair?

14   A    That's fair.

15   Q    I want to place in front of you another

16 document -- I'm sorry -- place in front of you

17 another document, Defense Exhibit No. 8,

18 premarked in the lower right-hand corner.  Take a

19 moment to look at that and let me know when

20 you're ready.  I'm going to ask you to identify

21 it.

22   A    Okay.

23   Q    Sir, do you recognize that document?

24   A    I do.

25   Q    And whose handwriting is it?

1    A   It's my handwriting.

2    Q   Much like the prior exhibit, Defense

3 Exhibit No. 7.  It was in preparation of the

4 case?

5    A   Correct.

6    Q   Ultimately resulted in Defense Exhibit

7 No. 8 which you ultimately placed into the file?

8    A   Correct.

9    Q   You also placed Exhibit No. 7 in the file

10 and that's where it was maintained?

11    A   Correct.

12    Q   Now, directing your attention to Defense

13 Exhibit No. 8.  It bears a date of October 21,

14 2002 on that document.

15    A   Correct.

16    Q   And does that mean that according to your

17 habit, routine, custom that you record the date

18 of the document as it's being generated?

19    A   Correct.

20    Q   I want to draw your attention

21 particularly with respect to that document.

22 Overall it is entitled things to do.

23    A   Correct.

24    Q   Meaning, these are things that you

25 thought were important that needed to be

1  developed prior to the case being brought to
2  trial; is that fair?
3      A    Correct.
4      Q    Under No. 5, I draw your attention
5  specifically to that.  It states, quote, get
6  correct/current address for the following
7  witnesses.  Does it say that?
8      A    Correct.
9      Q    And then you list approximately 15
10 witnesses, correct?
11     A    Correct.
12     Q    And those 15 witnesses are people that
13 you judge, based upon the discovery you had at
14 that time, that point in time, people of interest
15 that you need or needed to have someone interview
16 to develop some of those things that we had just
17 discussed previously?
18     A    Correct.
19     Q    Indeed with respect to this case because
20 ultimately there was no time of death that could
21 be opined with any degree of scientific certainty
22 by any of the experts to various matters that you
23 knew that it was going to be a witness intensive
24 case?
25     A    Correct.

1    Q   Because the forensics had not been

2 totally developed in this matter hence the need

3 to rely upon eyewitnesses, correct?

4    A   Correct.

5    Q   So locating these individuals, these

6 potential witnesses for purposes of interview was

7 one of your priorities that you had established

8 very early on on October 21, 2002?

9    A   Correct.

10    Q   Throughout your stewardship of this case

11 you spoke with some of those witnesses?

12    A   Yes.  I can't tell you everybody that I

13 spoke to at this point but I did speak to some of

14 the witnesses.

15    Q   But at the time that you left the Public

16 Defender's office in 2004, you, although it was

17 moving down the path of trial had not yet come to

18 a firm date certain in terms of a trial date; is

19 that fair?

20    A   Correct.

21    Q   So there had been plenty of time had you

22 remained at the Public Defender's office to

23 complete your intent of interviewing all of those

24 witnesses?

25    A   I believe so, yes.

 1    Q    And based upon your prior testimony that
 2  there had been friction in the Public Defender's
 3  office in terms of the amount of time you spent
 4  on this case, you were doing the investigation or
 5  Attorney Cliatt or the investigators in the
 6  office as time would permit?
 7    A    Correct.
 8    Q    Okay, and you wanted to conduct the
 9  interviews of at least these 15 witnesses because
10  you thought that they were potentially either
11  Commonwealth witnesses or defense witnesses with
12  germane information?
13    A    Correct.
14    Q    Would it be fair to say that this was in
15  your opinion the exertion of your minimum amount
16  of due diligence in this case to talk to those
17  folks?
18    A    Yes.
19    Q    I want to get some low hanging fruit here
20  and talk about the Public Defender's office as it
21  was constituted in the years 2002 to 2004.  Is
22  that okay?
23    A    Okay.
24    Q    You were an assistant public defender?
25    A    Correct.

1    Q    And there were senior public defenders in
2  the office?
3    A    Senior, yes.
4    Q    And the next hierarchy was the chief
5  deputy?
6    A    Correct.
7    Q    And there was ultimately the appointed
8  Public Defender, meaning George Shultz?
9    A    Correct.
10    Q    Also within that office there were
11  investigators at least their title was, correct?
12    A    Correct.
13    Q    At that point in time there were three
14  full-time investigators, correct?
15    A    Correct.
16    Q    And that would be Chuck Sheaffer, Jim
17  Stamos as well as -- I can't remember the third
18  one.
19    A    I don't remember.
20    Q    Ron Shambaugh?
21    A    Yes.
22    Q    And they were available to all of the
23  folks in the office to perform investigations; is
24  that fair?
25    A    Yes.

```
 1      Q    But they weren't licensed private
 2  detectives?
 3      A    No.
 4      Q    Nevertheless they were available to
 5  either try and find or develop witnesses, knock
 6  on doors and try and interview them, correct?
 7      A    Correct.
 8      Q    Also the office had access to the
 9  internet?
10      A    Yes, correct.
11      Q    And at that point in time there was no
12  restriction on using the internet by any of the
13  attorneys or by the investigators in doing
14  searches for people, individuals, places or
15  things?
16      A    No.
17      Q    Now, in this particular case both
18  yourself and Attorney Cliatt at various points in
19  time task the private investigators of the office
20  to do certain things?
21      A    Correct.
22      Q    In addition to the investigators, there
23  was also an individual on the staff by the name
24  of Sherri Summerford, correct?
25      A    Correct.
```

1      Q    I believe her job title at that point in
2  time was prison coordinator?
3      A    Correct.
4      Q    That means she was the person who would
5  have the duty -- task assigned to go to the
6  prison for client intakes as well as a method of
7  communication back and forth with individuals in
8  the prison because there's only one of you and
9  you can't run out to the prison every day; is
10 that fair?
11     A    Yes, that's fair.
12     Q    One of the particular layers of the
13 Public Defender's office as well as the system
14 that had been developed during that period of
15 time was to use of a sheet of paper that was an
16 inmate request form; is that fair?
17     A    Correct.
18     Q    That was a method whereby individuals
19 could communicate to and from the Public
20 Defender's office by way of written
21 correspondence that would be taken by Sherri
22 Summerford to and from the prison on a daily
23 basis as she would come in and out of prison on a
24 daily basis?
25     A    Correct.

1     Q    I'm going to place in front of you

2  Defense Exhibit No. 9, and if you could please

3  let me know when you're completed.

4     A    Okay.

5     Q    And that appears to be a true and

6  accurate representation of an inmate request form

7  dated July 9, 2003 from an individual by the name

8  of Wendy Harris?

9     A    Correct.

10    Q    And that would go through the channels as

11  we described, from Sherri Summerford to you?

12    A    Correct.

13    Q    Ultimately because it involved Tyshaunt

14  Love's case, that would get directed to you?

15    A    Correct.

16    Q    In fact it did?

17    A    I believe so, yes.

18    Q    It got into the case file in one way or

19  another?

20    A    It was in the case file and I would have

21  reviewed it and the answer is yes.

22    Q    And you had taken the opportunity to

23  interview and speak to Wendy Harris about her

24  potential level of information?

25    A    Yes.

1    Q    I want to continue on in your

2 investigation in this case, what you did during

3 your stewardship of this case and draw your

4 attention to some particulars. You eventually

5 formed what we call a theory of the case based

6 upon your knowledge of the case?

7    A    Correct.

8    Q    If you would please let the Court know

9 that if you had been trial counsel and based upon

10 your due diligence and all the investigation that

11 you had done, what was that theory of the case

12 that you had developed?

13    A    Sure. My theory of the case would have

14 been that LaQuan Williams, aka, Kazar, that my

15 theory was that he was the one who was

16 responsible for killing Iris Fennel. We based

17 that on the fact that he had been charged with

18 rape in a homicide and he was on the run at the

19 time and based upon the discovery that we

20 received, Iris had agreed to speak to the police

21 to turn him in. As a result of her turning him

22 in, he found out about that and then he wanted

23 to -- and he, in fact, threatened her through

24 other witnesses that he was going to kill her.

25 Then the evidence also indicated that when LaQuan

1  Williams was captured, there was blood from Iris
2  that was on his shoelace or eyelet of his shoes,
3  and so based upon those things we believed that
4  it was most probable that he was the one.  That
5  was going to be our theory of the case.
6      Q    Okay.  Let's unpack that a little bit
7  here and get into more specifics, but this theory
8  of the case that you had developed, in defense
9  parlance there's two different basic ways to
10 handle a homicide case.  There's what's called
11 the SODDI, s-o-d-d-i, some other dude did it.
12     A    Correct.
13     Q    And the alternative suspect is unknown.
14     A    Correct.
15     Q    And there's a specific finger pointing
16 style saying it wasn't me it was him.
17     A    Correct.
18     Q    Your theory of the case based upon
19 everything that you had developed through 2002
20 through 2004 was not the SODDI defense but rather
21 this guy did it, meaning LaQuan Williams?
22     A    Correct.
23     Q    Now, I want to draw your attention
24 towards specific recollections as to your theory
25 of the case, meaning, what evidence lead you to

1  believe, to develop this theory of the case
2  rather than the SODDI defense.  You're aware that
3  Iris's blood was found on LaQuan Williams' boot
4  as you just described, correct?
5      A    Correct.
6      Q    There was a significance behind that
7  because he basically more or less had no
8  legitimate reason to have the blood on the boot?
9      A    Right.
10      Q    At least to your knowledge and based upon
11  your investigation, correct?
12      A    Correct.
13      Q    Also in your review of the discovery --
14  I'm going to place in front of you Defense
15  Exhibit No. 10, and ask you to take -- take a
16  look at that and I'm going to unpack a little bit
17  of that.
18      A    Do you want me to read the whole --
19      Q    I'm going to ask generally, that's a
20  statement, a voluntary police statement with an
21  individual identified within those contents as
22  Larry Fennel, F-e-n-n-e-l.
23      A    Correct.
24      Q    That's where you draw upon this motive,
25  aware of LaQuan Williams' potential motive to

1 kill Iris because she snitched on LaQuan

2 Williams, informed the police of his location

3 while he was on the run for an unrelated

4 attempted rape and homicide?

5     A    Correct.

6     Q    Now, directing your attention to more

7 specifics of Exhibit No. 11 that I'm placing in

8 front of you, on the face of it, this is what's

9 termed a voluntary police statement of a Kendra

10 Smith?

11     A    Correct.

12     Q    You're aware of the evidence indicating

13 that LaQuan Williams had returned literally a

14 bloody gun to an individual by the name of Cory

15 Alston around the time that Iris was killed based

16 upon that report?

17     A    Correct.

18     Q    This was based upon letters that Tyshaunt

19 received and also based upon Kendra Smith's

20 voluntary statement?

21     A    Definitely based upon her statement, and

22 I don't remember what Tyshaunt and I spoke about

23 in reference to this specific witness.

24     Q    Okay, and I'm going to be placing in

25 front of -- the Court's indulgence.  When you say

1 that you received, you received various
2 correspondence to and from Tyshaunt Love
3 throughout the pendency of this case?

4     A    Correct.

5     Q    And I'm directing your attention to a
6 series of letters that's been marked as Defense
7 Exhibit No. 12.  Those are letters to and from
8 the Petitioner and also includes letters that
9 were sent to him that he subsequently forwarded
10 to you?

11     A    Okay.  I mean, if you say so.

12     Q    Let's just take a moment and see.  You
13 can take a look at the signatures on the bottom.

14     A    Okay.  I looked at the letters and the
15 signatures.

16     Q    You have no reason to dispute that those
17 were letters that were sent to you from the
18 Petitioner and they were in your possession
19 during the relevant period of time where you're
20 formulating your defense theory of the case?

21     A    Yes.

22     Q    Again, this Cory Alston individual who
23 was purported both from Exhibit No. 11 and
24 Exhibit 12 to have had a bloody gun returned to
25 him by LaQuan Williams, that was relevant to the

1 establishment of your case?

2    A   Yes.

3    Q   Because if one returns a gun with blood

4 on it, has blood on their boot, that is of

5 significance to you as a trial attorney?

6    A   Well, especially the fact that Iris

7 Fennel, the victim in this case, had been shot,

8 so, yes.

9    Q   And also -- there was a particular point

10 in time where you had become aware that Iris, the

11 decedent, had been missing jewelry, personal

12 jewelry that she was known to wear frequently?

13    A   I don't know when I became aware of that.

14    Q   Prior to you leaving the Public

15 Defender's office?

16    A   Right, but I can't tell you when that

17 would have been.

18    Q   You had been made aware that she had been

19 missing jewelry some time before you departed the

20 Public Defender's office in 2004?

21    A   Correct.

22    Q   Now, I want to draw your attention to

23 Defense Exhibit No. 30, and you had previously

24 came to my office to review documents in

25 preparation for this case due to its advanced

1  age, correct?

2      A    Correct.

3      Q    At that point in time Monica Cliatt was

4  also present as well, correct?

5      A    Correct.

6      Q    And you folks discussed some of these

7  issues openly with myself and my staff, correct?

8      A    Correct.

9      Q    One of the things that you had noted,

10  continue to note that the missing woman's

11  jewelry, that was found in LaQuan Williams'

12  pocket at the time of his arrest.  That had

13  significance for you as well?

14      A    I do not remember what was found on

15  LaQuan.  At this point I don't remember whether

16  or not I knew that at the time that he had

17  jewelry found on him.

18      Q    Had you known that that would have had

19  major significance?

20      A    Correct, correct.

21      Q    So you're also made aware that there was

22  no gunshot residue found on Tyshaunt Love on

23  December 20, 1996 the date of the incident?

24      A    Correct.

25      Q    Did that bolster your idea of your theory

1  of the case?

2     A    It did.

3     Q    You're also aware on December 20, 1996

4  that Tyshaunt did not have injuries on or about

5  his person.  Is that your level of understanding

6  that if he had no -- your defense theory of the

7  case?

8     A    It did.

9     Q    That was because of the Commonwealth's --

10 the handwriting on the wall, the Commonwealth's

11 theory of the case, there was blunt force trauma

12 that occurred leading up to an ultimate

13 execution; is that fair?

14    A    Correct.  My understanding was, at least

15 what I remember, according to the witness Cruz,

16 that after Cruz and Iris were fighting, Tyshaunt

17 allegedly grabbed her, strikes her with an object

18 and then takes her upstairs and the witness said

19 she heard two shots.

20    Q    And it was also, you're aware, that the

21 Commonwealth's theory of the case was that she

22 did some fighting back.  There are defense

23 wounds?

24    A    Correct.

25    Q    Based upon your training, knowledge and

1 experience at that point in time, one who is free
2 of any sort of physical damage to their person --
3 strike that; too convoluted a question.

4       If the assailant, meaning person doing
5 the striking, is free of any sort of demonstrable
6 evidence, that is consistent with a struggle or
7 with a fight that could embrace your theory of
8 the case?

9     A    Yes, and the fact that it's my
10 recollection that Iris was known to be a fighter.
11 So -- so, yes, the fact that Tyshaunt did not
12 have any injuries on him was significant.

13    Q    You're also aware that Tyshaunt's
14 clothing he wore from the night of December 19,
15 1996 into December 20, 1996, that clothing was
16 collected by the police?

17    A    Correct.

18    Q    And you're also aware that there was no
19 blood evidence observed on Tyshaunt's clothing?

20    A    Correct.

21    Q    You're also aware based upon your
22 training, knowledge and experience having dealt
23 with other gunshot related cases, that as one
24 fires a gun, that it's not like in the movies
25 where there's very little mess.  It typically has

1 forward spatter and back spatter, contaminates an
2 individual in close proximity?
3     A    Correct.
4     Q    Hence the significance of having no blood
5 being accused of being the shooter in close
6 contact such as this case.
7     A    Correct.
8     Q    There was also bleach found in Iris's
9 home?
10     A    Correct.
11     Q    Drawing your attention to your prior
12 testimony before the other fact evidence, you're
13 aware with respect to allegations against the
14 alternative suspect you had developed, Kazar,
15 that had significance, correct?
16     A    Well, I don't -- the significance that
17 Kazar was, because of the threats, because of him
18 believing that Iris had ratted him out, the fact
19 that Cruz, their main witness, places him in the
20 house at the time this alleged killing occurs,
21 you know, but I don't recall whether or not
22 bleach or anything had anything to do with his
23 other case but bleach was important because the
24 Commonwealth at least alleged or tried to alleged
25 that somehow Tyshaunt tried to use bleach to

1 clean up the scene.

2     Q   You don't recall whether or not LaQuan

3 Williams' MO in his other case was the use of

4 bleach to clean the scene of the crime to try and

5 erase prints?

6     A   I don't recall that.  If it had been in

7 the file, I would have known that at the time.

8 As I sit here today, I can't say that I remember

9 that fact.

10     Q   Directing your attention to another piece

11 of the puzzle that helped form your theory of the

12 case, you were also aware that the police did not

13 recover any sort of latent or patent prints,

14 fingerprints in their investigation of this case?

15     A   Correct.

16     Q   You're also aware that several witnesses

17 such as Keith Herndon, Carlos Hill and others had

18 indicated that LaQuan Williams had admitted on

19 several occasions, rather separate occasions to

20 having killed Iris and providing details of the

21 killing?

22     A   Yes.  That was in the statements that

23 they had given to the police.

24     Q   All of this information but for the two

25 things that you don't have an independent

1    recollection of right now, lead you to form that
2    reasonable trial strategy of this guy did it?
3        A    Correct.
4        Q    Because of the blood on the boot?
5        A    Correct.
6        Q    The motive with respect to the snitching?
7        A    Correct.
8        Q    The evidence with respect to -- sorry --
9    the allegation with respect to the returning of a
10   bloody gun to Cory Alston?
11       A    Correct.
12       Q    The jewelry -- you may not recall if you
13   had that information -- that would have factored
14   into it?
15       A    Correct.
16       Q    No gunshot residue?
17       A    Correct.
18       Q    The lack of any sort of demonstrable
19   injuries to the Petitioner?
20       A    Correct.
21       Q    The clothing didn't have any blood on it
22   whatsoever?
23       A    Correct.
24       Q    Knowing that in your past experience
25   would indicate that a close contact wound would

1    potentially have blood if one were nearby?

2        A    Right.

3        Q    And Kazar had blood on his shoe?

4        A    Correct.

5        Q    The significance of the bleach you're not

6    quite clear of but that would have significance

7    if you had that information at that point in

8    time?

9        A    Correct.

10       Q    The lack of fingerprints or other

11   developed matters of the crime scene?

12       A    Correct.

13       Q    And the several witnesses who have

14   overheard at various times and separate times

15   that he had no ability to interact to conclude

16   against the alternative suspect that is what lead

17   you to a pretty easy determination, jeez, this is

18   this other guy?

19       A    Correct.

20       Q    And the fact that their ultimate material

21   witness said that he was at the scene which there

22   was no explanation why he would have been there.

23   If you take their theory that their witness, you

24   know, knew the guy and knew that he was at the

25   house, you know, if you add all those together --

1    A   Yes, I believe he was the one and that

2 their witness was lying about who ultimately shot

3 Iris.

4    Q   I wonder, you had reviewed various

5 statements from Kazar?

6    A   Correct.

7    Q   And those various statements, would it be

8 fair to summarize them as what's called

9 minimization, admitting as little as possible in

10 order to try and get out of a situation?

11    A   Right. I believe, yes. He was asked

12 about why there was blood on his boot, something

13 to the effect, and he made a statement to the

14 effect that --

15    Q   He initially denied it?

16    A   Yes, correct, he denied it, and then he

17 made a statement, something, oh, there was a

18 fight between Tyshaunt and Iris and I was

19 breaking it up and maybe that's how the blood got

20 on my shoe and then I decided to leave.

21    Q   And so all of those things, your plan of

22 action was to develop all those things further?

23    A   Correct.

24    Q   Including potential forensics?

25    A   Correct.

1    Q    And physical evidence?

2    A    Correct.

3    Q    And ultimately argue to the jury not only

4 did he do it, it was inconsistent and having

5 characteristics that are consistent with an

6 individual who had been caught and now had been

7 minimizing his acts?

8    A    Correct.

9    Q    Now, I want to turn our attention towards

10 expert witnesses and what steps you took towards

11 obtaining some.  Is that okay?

12    A    Sure.

13    Q    I don't know whether or not you have

14 Defense Exhibit No. 7 in front of you.

15    A    I do.

16    Q    I want you to take a look at that in

17 conjunction with what I'm placing in front of you

18 as Defense Exhibit No. 13.  Would you take a

19 moment to take a look at Defense Exhibit No. 13?

20    A    Okay.

21    Q    Taking a look at Defense Exhibit No. 13

22 and in the context of Defense Exhibit No. 7, it

23 appears to be a forensics article from a website

24 that was around at that point in time, maybe

25 today, www.ForensicOnline.com, wherein yourself

1 or perhaps Attorney Cliatt indicated the need for
2 an expert with respect to this specific case; is
3 that fair?
4     A    Correct.
5     Q    And to further bolster what I'm placing
6 in front of you, what is Defense Exhibit No. 14,
7 do you see that?
8     A    Yes.
9     Q    Defense Exhibit No. 14, had you posted
10 over sticky notes that were placed on top of
11 Exhibit No. 14.
12     A    Okay.
13     Q    And the handwriting, do you recognize it?
14 Is it yours?
15     A    It's not my handwriting.
16     Q    Nevertheless you do recognize that
17 document.  You can identify it as being pertinent
18 to this case, correct?
19     A    Correct.
20     Q    Now, the Post-it notes on the left side
21 of the paper reads we probably need a blood
22 spatter expert plus pathologist.  That's how it
23 reads.
24     A    Correct.
25     Q    This is based on your due diligence, as

1 well as Attorney Cliatt, that you identified a

2 demonstrable need, for lack of a better way of

3 putting it, another source of forensic

4 information other than Wayne Ross and other usual

5 suspects that the Commonwealth had brought forth.

6     A    Correct.

7     Q    That was to develop these theories of the

8 case that you had been discussing this entire

9 period of time?

10     A    Correct.

11     Q    And specifics were to take the eyewitness

12 statements in the minimization that was involved

13 in it and contrast all of those, all that level

14 of information that potentially could be biased,

15 with unbiased information that would be the

16 forensic evidence that is empirical in nature?

17     A    Correct.

18     Q    That was your intent had you been

19 involved in the case was to at least consult with

20 if not retain and present a blood spatter expert

21 pathologist if you were allowed to do so by the

22 Public Defender's office?

23     A    Correct.

24     Q    I think we had identified Exhibit No. 14.

25 Moving right along.

1    A   Yes.

2    Q   Based upon your training, knowledge and

3 experience, you knew this to be of significance

4 for the reasons that we just indicated?

5    A   Correct.

6    Q   Also, the significance, because one could

7 do the opposite of that, not only take the known

8 physical realities as they exist with the

9 evidence, that is there is also, take a look at

10 the demonstrable lack of evidence that had been

11 developed, correct?

12    A   Correct.

13    Q   One of those key things being a close

14 contact wound with a high powered pistol with a

15 complete lack of blood evidence being on an

16 individual?

17    A   Correct.

18    Q   You knew that to be significant?

19    A   Correct.

20    Q   Hence not only just looking to confront

21 the Commonwealth's theory of the case but for

22 lack of a better way of stating, the

23 impossibility of the Petitioner's involvement in

24 this homicide?

25    A   Correct.

1    Q    There comes a point in time not only had

2 this become important to you based upon your

3 training, knowledge and experience, hence your

4 post on-line seeking individuals who may be able

5 to explain these things but also became apparent

6 to Mr. Love that such further investigation would

7 be necessary in order to try and do these things

8 that we've been talking about?

9    A    Correct.

10    Q    This was based upon your chats with him,

11 telling him how you're developing this case?

12    A    Correct.

13    Q    I'm placing in front of you what has been

14 premarked as Defense Exhibit No. 15.

15    A    Okay.

16    Q    And also No. 16, and we'll go over these

17 individually after you had a moment to take a

18 look at them.

19        MR. McSHANE:    Judge, as he's reviewing

20 that, I'll ask the Court to take judicial notice

21 that part of the transcript wherein the offer of

22 proof was made with respect to the 404 A or B,

23 evidence where there had been testimony with

24 respect to the bleach and the prior bad act that

25 was -- it is on September 12, 2005 and September

1  13, 2005 proceeding before this Court and

2  specifically drawing your attention, the Court's

3  attention to page 43 wherein the witness had

4  testified as follows:

5       This is the answer to the question, then

6  he made me get out of the tub and laid me back on

7  the bed, and he had at first put his clothes on.

8  After he put me in the tub of water, he puts his

9  clothes on.  When he put me in the tub of water,

10  took me back out, put me on the bed, strapped me

11  down and put his clothes on.

12       What did he do after that?

13       Then he started wiping down his

14  fingerprints, and then he decided to take his

15  clothes off again and rape me.

16       So further testimony that continues on

17  page 44 wherein there's a discussion that

18  occurred about the wiping down the headboard, the

19  refrigerator and the kitchen, things he had

20  touched in the living room, meaning, LaQuan

21  Williams wiped down the refrigerator as well and

22  he continues on page 45, includes information

23  with respect to the use of bleach in that

24  particular case and finally on page 46, the

25  Court -- I would ask the Court at its

1 opportunity -- I can provide a copy of those

2 relevant pages -- I ask for judicial notice of

3 those matters at this point in time.

4        THE COURT:  Of the fact that the matter

5 was discussed on those dates at the time of

6 trial?

7        MR. McSHANE:  Correct, not for the truth

8 of the matter but rather that testimony had been

9 developed and was at least at that point in time

10 aware to the Court as well.

11 BY MR. McSHANE:

12    Q    I'm sorry.  Sir, we were on Defense

13 Exhibit 15 which had been placed in front of you

14 and together with 16.  Let's take a look at 15

15 together first.

16    A    Okay.

17    Q    That was a memorandum from this Court to

18 you as the attorney of record based upon -- and

19 that memorandum was dated April 7, 2003; is that

20 correct?

21    A    Correct.

22    Q    And in the regular course of events for

23 the purpose of the record as we all know them but

24 we need to develop, is that -- if a represented

25 individual sends correspondence to one of the

1 members of the judiciary in Dauphin County, that

2 judiciary forwards that matter not only to the

3 attorney of record but also to the Commonwealth

4 of Pennsylvania with a cover letter such as one

5 generated in this particular case?

6      A     Correct.

7      Q     Within that attachment was the

8 information that was sent by the Petitioner in

9 this matter, that was entitled motion to appoint

10 a private investigator; is that correct?

11     A     Correct.

12     Q     And this is -- you read this motion at

13 that point in time.  Now you had benefit of

14 reading it again?

15     A     Correct.

16     Q     Within that there was indications it was

17 written by the hand of the Petitioner of his ID,

18 of the need for further forensics and also lay

19 witness investigation in this matter, correct?

20     A     Correct.

21     Q     Now, in this particular matter having had

22 the opportunity to review prior to today's

23 proceedings, there was a Post-it note that had

24 been attached to that, is the next exhibit, I

25 believe to be, Exhibit No. 16.  Do you see it so

1  marked?

2      A    Yes.

3      Q    This Post-it note says, Mont, what do you

4  think about Tyshaunt's idea for private

5  investigator?  Signed by Monica.  Is that how

6  this reads?

7      A    Correct.

8      Q    That was correspondence intended between

9  the two of you, meaning, you are Mont or Monty,

10 and Monica Cliatt being the co-counsel that you

11 had developed in this particular case?

12     A    Correct.

13     Q    And so this had been not only apparent to

14 you but also to Monica Cliatt and also to the

15 Petitioner, this need for further investigation

16 particularly in the forensic matters and the need

17 to continue to develop witnesses, correct?

18     A    Correct.

19     Q    And you and Attorney Cliatt discussed the

20 need for expert witnesses that were to be

21 obtained in this particular case?

22     A    Yes.

23     Q    And it wasn't just limited to blood

24 spatter experts and also pathologists but also

25 taking a look at DNA; is that fair?

1    A    Yes.

2    Q    And also other matters having to do with

3  the crime scene as it was, at least some argument

4  of spoilation because of the amount of people

5  that were in and out of the scene; is that

6  correct?

7    A    Correct.

8    Q    All these things were well known prior to

9  your departure in 2004 from the Public Defender's

10  office?

11    A    Correct.

12    Q    You left the Public Defender's office as

13  this matter was continuing to be litigated as we

14  discussed before, correct?

15    A    Correct.

16    Q    Now, when you left the Public Defender's

17  office, it was under good terms.  You had

18  found -- secured other employment in -- it's, in

19  fact, the employment you're at right now?

20    A    Correct.

21    Q    When you left the Public Defender's

22  office, all of these materials remained behind,

23  correct?

24    A    Correct.

25    Q    And Attorney Cliatt had remained in place

1 at least until 2005; is that correct?

2     A    Correct.

3     Q    All of this information that we have been

4 discussing and all of this information that has

5 been identified remained in the case file and in

6 the exclusive possession not of you anymore but

7 rather the office and in particular Monica

8 Cliatt; is that true?

9     A    Correct.

10     Q    And that's why we have it today?

11     A    Correct.

12     Q    None of these materials came from your

13 own private stash of Love materials, correct?

14     A    No, they did not.

15     Q    Now, when you left the Public Defender's

16 office, like we said, it was under great terms?

17     A    Correct.

18     Q    There was a going-away party.  Everyone

19 was happy for your good future?

20     A    Correct.

21     Q    Included among those was Paul Muller and

22 Nate Giunta?

23     A    Correct.

24     Q    And also Monica Cliatt?

25     A    Correct.

1    Q   You folks maintained -- Monica
2  maintained, you know, contact through these years
3  leading up to today?
4    A   Correct.
5    Q   You are also well known because you're in
6  the same position that you could be easily
7  contacted if someone would simply pick up the
8  phone?
9    A   Correct.
10   Q   And as lead counsel you were the person
11 who was in the possession of the most amount of
12 information leading up to your eventually leaving
13 the Public Defender's office?
14   A   Correct.
15   Q   Now, I want to draw your attention to
16 approximately a year later.  That was when
17 Attorney Cliatt had left the office for her
18 current employment at Widener Law School,
19 correct?
20   A   Correct.
21   Q   During that period of time for one year
22 you and Monica continued to discuss the case and
23 how it was developing?
24   A   Correct.
25   Q   I want to contrast when Paul and Nate

1 Giunta became involved in the case.

2     A    Okay.

3     Q    Those types of communications where

4 you're discussing with counsel who was involved

5 in the case and the lead counsel cease after

6 Monica left?

7     A    Correct.  I don't recall being asked for

8 my advice on the case from Paul Muller or Giunta.

9     Q    Maybe not even just advice but, hey, tell

10 us about this case, right?

11     A    Yeah.  I don't recall being asked that.

12     Q    And because not everything makes its way

13 into the file, correct?

14     A    Correct.

15     Q    There can be things that are in trial

16 counsel's head in terms of formulation of

17 strategies and maybe even witness interviews that

18 occurred or level of information that is not

19 demonstrable if one were to read the quite

20 voluminous file at this point in time?

21     A    Correct.

22     Q    Your testimony is that you had never sat

23 down after, recall sitting down through any sort

24 of strategy or subsequent conversation with the

25 ultimate trial counsel in this case either Paul

1  Muller or Nate Giunta?

2      A    I know I never sat down with them.   I

3  mean, through the years I do know that after the

4  trial I guess Paul and I did talk about, you

5  know, what happened, but I don't recall prior to

6  that us ever discussing strategy or what my

7  theory of the case was or anything like that.

8      Q    Or your steps towards involving forensics

9  in this particular case?

10     A    No.

11     Q    Or your -- you had developed this

12 alternative suspect, none of those types of

13 things?

14     A    I do not recall ever having that

15 conversation with Paul or Nate.

16     Q    Curious, after the case you said that

17 there was communication?

18     A    Correct.

19     Q    And you said about what had happened?

20     A    Well, because I hadn't been there, but, I

21 mean, I spent a lot time with Tyshaunt.  I was

22 concerned.  I wanted to see what happened in the

23 case.  So I did call after the trial to see what

24 happened and we did speak at that time.

25     Q    And just one last thing, one last area to

1  develop, I, in my office, had asked to debrief --
2  talk to you about the case in your efforts that
3  were involved in this matter, correct?
4      A    Correct.
5      Q    And, in fact, we met?
6      A    Correct.
7      Q    You were open and you gave us all the
8  information that you had?
9      A    Correct.
10     Q    And you reviewed documents?
11     A    Correct.
12     Q    And in that you're prepared to come into
13 court today not only to tell the truth but also
14 to give us a full and complete picture?
15     A    Correct.
16         MR. McSHANE:  A moment of the Court's
17 indulgence.
18         THE COURT:  Granted.
19         MR. McSHANE:  No further questions of the
20 witness.  I tender the witness.
21         MR. McMURRY:  Thank you.
22         THE COURT:  Mr. McMurry.
23
24
25

CROSS EXAMINATION

BY MR. McMURRY:

Q    Mr. Batson, it's safe to say you didn't
try this case, correct?

A    Correct.

Q    And you don't have any personal knowledge
regarding the availability of the witnesses that
you had listed in your notes at the time of
trial?

A    I do not.

Q    I believe you testified that you didn't
have any involvement with this case after you
left in 2004?

A    Correct.

Q    You don't know what was done to prepare
the case for trial in September of 2005?

A    I do not.

Q    You don't have any personal knowledge of
whether or not the witnesses -- attorney who
ultimately tried this matter did an investigation
with regard to forensics or anything like that?

A    No, I have no knowledge.

Q    A lot of things you testified to here
today, although you testified you did not

1 communicate with the ultimate trial attorneys in
2 this matter but a lot of that information you
3 discussed here today was in the file, your notes
4 and stuff like that?
5    A   Correct.
6    MR. McMURRY:  No further questions.
7    MR. McSHANE:  Nothing.  May the witness
8 be excused?
9    THE COURT:  One thing.  On the exhibit,
10 I'm not sure if I heard that right.
11    MR. McSHANE:  Are Post-it notes, photo
12 copies thereof.
13    THE WITNESS:  Correct.
14    THE COURT:  Did I hear you correctly say
15 that's not your handwriting?
16    THE WITNESS:  That's not handwriting.
17    THE COURT:  Do you know whose it is?
18    THE WITNESS:  I believe it's Monica's
19 handwriting.
20    THE COURT:  Do you know where those came
21 from?  Are they in the file?
22    THE WITNESS:  They were in the file
23 attached to or stuck to the exhibit.
24    THE COURT:  Thirteen.
25    THE WITNESS:  Thirteen.

1          THE COURT:  And they were in that
2    position when you reviewed the file with
3    Mr. McShane.
4          THE WITNESS:  They were on an exhibit,
5    yes.
6          THE COURT:  Do you recall at the time
7    back in -- before you left in 2004 whether those
8    notes were attached to that article?
9          THE WITNESS:  In 2002 no or 2004.  I
10   don't recall.
11         THE COURT:  I just wanted to make sure I
12   understood what was being said.  What of your
13   trial strategy or theory of the case was not in
14   the file when you left, if anything?
15         THE WITNESS:  I don't think anything was
16   not in the file when I left the case.
17         THE COURT:  The list of witnesses that
18   you had included on your things to do, where did
19   those names come from?
20         THE WITNESS:  Well, those names came from
21   after reviewing all of the discovery that I had
22   received from the Commonwealth, those are things
23   that I knew or I believed from their statements
24   that these are people that would aid us in
25   defending Tyshaunt in this case.

1    THE COURT:  Did -- if I missed it I
2 apologize -- did you, in fact, contact each of
3 those witnesses?
4    THE WITNESS:  I don't remember everybody
5 I contacted.  The only person I remember speaking
6 to was Wendy Harris, and the reason I remember
7 speaking to her was because I actually
8 represented her on another matter and that's why
9 I remember speaking to her.  But I don't remember
10 independently as I sit here today who I actually
11 spoke to on this list of people.
12    THE COURT:  All right.  Or anyone else
13 from the PD's office.
14    THE WITNESS:  Right.
15    THE COURT:  Any questions as a result of
16 that?
17
18         REDIRECT EXAMINATION
19
20 BY MR. McSHANE:
21   Q   Just to make it a little easier.  I'm
22 placing -- before the Court admits it into
23 evidence, but nevertheless we can see the Post-it
24 notes attached to the original of the
25 documentation, correct?

1    A    Correct.

2    Q    You're talking about Exhibit 14.

3    A    Correct.

4         MR. McSHANE:  Nothing based upon that.

5         THE COURT:  Anything else?

6         MR. McMURRY:  No, Your Honor.

7         THE COURT:  Mr. Batson, you may step down

8    and you have no objection to his being excused?

9         MR. McMURRY:   No, Your Honor.

10        THE COURT:  Back to the Commonwealth's

11   business.

12        MR. McSHANE:  The next witness we'll be

13   calling is Monica Cliatt.

14

15                   MONICA CLIATT,

16   having been sworn, was examined and testified as

17   follows:

18

19                 DIRECT EXAMINATION

20

21   BY MR. McSHANE:

22   Q    Would you please state your name and

23   spell your last name for the benefit of the

24   record?

25   A    My name is Monica Cliatt, C-l-i-a-t-t.

1  Q   How are you employed?

2  A   I'm currently one of the supervising

3  attorneys at the Widener Civil Law Clinic at

4  Widener University.

5  MR. McSHANE:  A moment of the Court's

6  indulgence.

7  BY MR. McSHANE:

8  Q   I want to draw your attention to the

9  relevant time frame in this particular matter

10  which would be 2002 through 2005.  How were you

11  employed at that particular point in time?

12  A   I would have been at the Dauphin County

13  Public Defender's office.

14  MR. McSHANE:  A moment of the Court's

15  indulgence.

16  BY MR. McSHANE:

17  Q   As we were discussing, you were employed

18  in the Public Defender's office during that

19  relevant period of time.  How were you employed?

20  What was your designation?

21  A   Senior deputy public defender.

22  Q   Please describe for the Court very

23  briefly -- you're on what's called -- trial

24  attorney; is that correct?

25  A   That's correct.

1    Q   When did you first become involved in the

2 matter of Commonwealth versus Tyshaunt Love, if

3 you can recall, maybe just the year?

4    A   I don't recall.

5    Q   Did you become involved in the case at

6 the behest or request of Monty Batson?

7    A   Yes.

8    Q   You remained involved in Tyshaunt's case

9 until you left the employ of the Public

10 Defender's which was May 2005?

11    A   That's right.

12    Q   So that approximately three years more or

13 less that you were involved on a daily day-in

14 day-out basis with respect to this case?

15    A   I have to agree with you.

16    Q   At the time of your initial involvement,

17 were you a senior public defender at that point

18 in time?

19    A   I don't remember when I changed from

20 assistant public defender to senior deputy.

21    Q   I want to draw your attention towards

22 your level of experience.  You were first

23 employed as an assistant public defender in 2001;

24 is that correct?

25    A   I believe so.

1    Q    Up through and including when you became
2  involved in the case, you had at least a year's
3  experience; by the time that you left the case
4  you had more or less four years of experience?
5    A    With the Dauphin County Public Defender's
6  office, yes.
7    Q    That would be as a trial attorney, one
8  who litigates various matters in the Court of
9  Common Pleas including jury trials?
10   A    That's correct.
11   Q    As well as juvenile matters?
12   A    That was my specialty.
13   Q    In addition to that, you had been exposed
14 through this period of time to various forensic
15 related matters?
16   A    From time to time.
17   Q    And is it fair to say that up through and
18 including your departure of the case that you had
19 handled hundreds of criminal cases and
20 accusations?
21   A    Handled many cases; I don't know the
22 number.
23   Q    Was this the first homicide that you had
24 been asked to work on?
25   A    Yes.

1    Q    And was it the first -- the first
2  homicide that you had worked on in tandem with
3  Attorney Batson, correct?
4    A    That's correct.
5    Q    This was not the first case that you had
6  cooperated or helped out Monty Batson with?
7    A    I helped him, Monty Batson, with many of
8  his cases.  He was my mentor.
9    Q    And based on that, you were well suited
10 in a position to observe what he did or didn't do
11 in this particular case?
12   A    That's correct.
13   Q    You also brought to the table your own
14 knowledge, your skill and experience in this
15 matter, correct?
16   A    Yes.
17   Q    And is it fair to say that you had spent
18 a good amount of time or a tremendous amount of
19 time on this particular case?
20   A    That's fair.
21   Q    Going back to -- prior to your -- you had
22 worked at a point in time in the York County
23 Public Defender's office?
24   A    I did.
25   Q    Was that prior to or after your

```
 1  employment with the Dauphin County Public
 2  Defender's office?
 3      A   Prior.
 4      Q   You had a level of experience on case law
 5  and also research that you brought to the table
 6  to help in the defense of Tyshaunt Love?
 7      A   That's right.
 8      Q   How long were you in that position in the
 9  York County Public Defender's office?
10      A   I was an appellate attorney for about six
11  months or so.  Then I left and came to Dauphin
12  County.
13      Q   In those six months you did research,
14  quite a bit of writing; that was a full-time job?
15      A   That's right.
16      Q   And that involved not only just briefing
17  but also general research as well?
18      A   That's correct.
19      Q   Now, prior to that or where in the
20  chronology at Mid Penn Legal Services were you
21  employed by them?
22      A   That was my first job as an attorney.
23      Q   That also involved litigation as well?
24      A   That's right.
25      Q   And now you're currently employed at the
```

1 Widener Law School as a supervising staff
2 attorney for the civil law clinic?
3     A    That's right.
4     Q    In your experience you drew upon up
5 through and including your departure in May of
6 2005, you took the entirety of your experience as
7 a staff attorney at Mid Penn Legal Services, the
8 appellate specialist attorney for the York County
9 Public Defender's office as well as your many,
10 many cases and applied all of that training,
11 knowledge and experience to this particular
12 matter, correct?
13     A    I did.
14     Q    All right.  You spent a great deal of
15 time investigating and helped prepare this case
16 in the Tyshaunt Love case, correct?
17     A    Yes.
18     Q    Is it fair to say that your particular
19 division of the labor was not just to generally
20 consult with Attorney Batson and give him your
21 feedback but also to be the higher technical
22 detailed person in terms of the discovery?  Is it
23 fair to put it that way?
24     A    Probably.  I tried to bring to the table
25 that stuff Monty usually -- I do research, the

1 writing and drafting.

2     Q   And in this particular case you received

3 the discovery, the entirety of the documents

4 involved in this case; is that fair?

5     A   That's correct.

6     Q   You had an open file policy between the

7 two of you.  He didn't maintain a separate

8 independent file or anything like that?

9     A   I did make a copy of the entire file for

10 my use so that I wasn't taking it from Monty when

11 he needed it.

12     Q   You could go into his file.  He could go

13 into your file?

14     A   Oh, yeah.

15     Q   Vice versa; it was synergid.  It wasn't

16 competitive?

17     A   No.  I just kept everything organized.

18     Q   I want to draw your attention to some of

19 the things that you had identified in this as a

20 need during your stewardship of this case, and in

21 particular draw your attention towards witnesses

22 that the Commonwealth had interviewed.  There was

23 quite a few witnesses that the Commonwealth had

24 interviewed even more so than testified at trial,

25 correct?

1    A    I am not sure who testified at trial, but
2    there were a lot of witness statements that we
3    saw and a lot of witnesses that are listed in the
4    police reports that may have or may not have
5    given statements.
6    Q    Could you tell us why you felt it
7    necessary or why it's preferable to interview
8    these witnesses independently?
9    A    Because I don't advocate -- my
10   responsibilities were to find out what the
11   witnesses know or didn't know.  The police
12   report, I can't trust that they have everything,
13   and if they have already charged my client,
14   apparently they already have, I believe it comes
15   to the table, I need to look at other
16   alternatives.
17   Q    In other words, after exercise of due
18   diligence and based upon your experience level,
19   would require an attempt to contact the relevant
20   witnesses or those who were identified during the
21   case?
22   A    If we can find them, yes.
23   Q    And in your particular stewardship of
24   this case, you attempted to find a lot of these
25   witnesses, correct?

1    A    We tried to find many of them.  We

2  couldn't find -- some of them we did and some

3  avoided us.

4    Q    I'm placing in front of you a document

5  that's been marked as Defense Exhibit No. 17.

6  You documented this in the file.  You made

7  memorandums and you also made various lists using

8  a word process; is that fair?

9    A    That sounds like me.

10   Q    I'm placing in front of you what is

11  premarked as Defense Exhibit No. 17 in the lower

12  right-hand corner.  I ask you to review that

13  because I'm going to ask you to identify it

14  momentarily.  Ready, ma'am?

15   A    I'm ready.

16   Q    You'll recognize that as a memo created

17  by you that you had sent to a private

18  investigator in the office of the Public Defender

19  at the time by the name of Jim Stamos?

20   A    Yes, it says from me to Jim.

21   Q    And bears the date on January 24, 2005?

22   A    Yes.

23   Q    And is it in your custom and routine of

24  correctly placing the date that you generate the

25  memo on the memo itself?

1    A    Yes.

2    Q    At this point in time, Jim Stamos, his

3 given name is James Stamos as you know, correct?

4    A    That's correct.

5    Q    Jim Stamos was employed by the office of

6 the Public Defender as a private investigator,

7 correct?

8    A    Yes.

9    Q    And you were able to utilize Jim in

10 hoping to locate potential witnesses in various

11 cases?

12    A    Yes, if he had the time.

13    Q    In other words, you didn't necessarily

14 have to go out and search for these witnesses on

15 your own.  You could use the services of the

16 three in-house private detectives, rather private

17 investigators in helping to locate the

18 whereabouts of witnesses?

19    A    That was my practice because I didn't

20 always have the time with my case load.

21    Q    And they had been successful in the past

22 sometimes and sometimes not so much?

23    A    That's right.

24    Q    After reading through Defense Exhibit 17,

25 you indicate within that memo the need to locate

1  and interview certain witnesses.  Looking at

2  Defense Exhibit 17 you indicate within that

3  memorandum the need to locate and interview

4  certain witnesses, correct?

5      A   Yes.

6      Q   And that would be what we talked about

7  before, the amount of due diligence you believe

8  to be necessary in order to try and present the

9  best defense possible, correct?

10     A   That's right.

11     Q   That's based upon your training and

12 knowledge and experience that you had up to that

13 point in time?

14     A   Correct.

15     Q   Subsequent to that, based on all of your

16 training, knowledge and experience you have at

17 this point in time, that's a sound strategy to

18 employ?

19     A   Yes.

20     Q   You provide within that documentation the

21 latest or the best known potential addresses and

22 phone numbers for those various people, correct?

23     A   Right.

24     Q   Specifically in this memorandum to Jim,

25 you stated that there's a need to determine

1 whether Tyshaunt stayed overnight on December 19,
2 1996 at a house located on Balm Street?
3     A    That's right.
4     Q    The significance of that was because at
5 that point in time there had not been a pin down
6 or universal time of death, correct?
7     A    There was a range the coroner identified,
8 I believe, from two to eleven.
9     Q    This was based upon information that
10 Tyshaunt had given you at some point in time.
11 You're exploring the possibility of alibi
12 witnesses?
13     A    Yes.
14     Q    Obviously if he was in the house on Balm
15 Street the night of the incident, he couldn't be
16 in two places at once; is that fair?
17     A    That's right.
18     Q    Your office had the resources to conduct
19 this limited amount of -- wouldn't take that much
20 investigation based upon your experience level in
21 order to try to determine that salient fact; is
22 that fair?
23     A    Yes, that's fair.
24     Q    And there was an ability that was present
25 within the office to assign that through proper

1 channels in order to help out in your

2 investigation, correct?

3     A    Correct.

4     Q    And there was a hierarchy in the use of

5 the investigators in the Public Defender's office

6 in terms of the prioritization of their daily

7 tasks or there seems to be at least?

8     A    There seems to be.

9     Q    Now, with respect to the priorities, a

10 murder case got priority in the office in terms

11 of dedication of resources, maybe not all the

12 resources but certainly more than a misdemeanor

13 for example?

14     A    I would agree.

15     Q    Now, I'm placing in front of you what has

16 been premarked as Defense Exhibit No. 18, and I

17 ask you to take a look at that and when you're

18 done, we're going to identify it together.  Okay?

19     A    Okay.

20     Q    This is another one of your memos as

21 you'll recognize -- I'm sorry.  Strike that.

22         This is a memo where you instructed

23 Jessica Bush to send to James Rowland a letter

24 requesting any contact information that he may

25 have on a person by the name of Mrs. Campbell,

1  correct?

2      A    Yes.

3      Q    And Jessica Bush at that point in time

4  was involved with the Public Defender's office,

5  correct?

6      A    Yes.  She was a new employee at the time.

7      Q    Okay, and so you also had the benefit of

8  drawing upon one of the newer employees in order

9  to help spread the large division of the labor in

10 this case?

11     A    I was trying to.

12     Q    To your knowledge there was a letter that

13 was sent by Ms. Bush to Attorney Rowland based

14 upon your request for her to do so, correct?

15     A    I don't recall.

16     Q    Would it refresh your recollection to

17 take a look at such a document?

18     A    Yes.

19     Q    I'm placing in front of you what has been

20 previously marked and identified as Defense

21 Exhibit No. 3.

22     A    Okay.

23     Q    Does that refresh your recollection?

24     A    Yes.

25     Q    And so this letter was sent, correct?

1    A    I believe it was.

2    Q    And in your review of the case file,

3    there had been information that had been returned

4    to the Public Defender's office marked as

5    received March 30, 2005.  That is Defense Exhibit

6    No. 4 from Attorney Rowland, correct?

7    A    Yes.

8    Q    This was because you were exercising due

9    diligence in gathering all the information with

10   respect to the proper defense of this particular

11   individual based upon the allegations that were

12   there, correct?

13   A    Yes.

14   Q    Okay, and you'll recall the significance

15   of Mrs. Campbell in reference to Tyshaunt's case

16   was that she verified, according to the

17   information by Attorney Rowland and also

18   information provided to you by Tyshaunt, that he

19   was at the KFC on the morning of December 20,

20   1996, that she verified that Tyshaunt was

21   present?

22   A    That was my understanding.

23   Q    That was significant because, again, this

24   imprecise timing of death that occurred, this

25   would necessarily narrow the window provided that

1  if the jury would find Mrs. Campbell to be

2  credible?

3     A   Yes.

4     Q   This was framing it towards the

5  impossibility of time, of defense, meaning, that

6  Tyshaunt Love could not have done it?

7     A   That's right.

8     Q   I'm going to draw your attention to

9  another exhibit which has been premarked Defense

10 Exhibit No. 19.  Do you see it so marked?

11    A   Yes.

12    Q   Would you please take a moment -- we'll

13 identify it together and go through it.  Could

14 you identify it?

15    A   Yes.

16    Q   That's a memo that you had made to the

17 file, the date of March 14, 2005, correct?

18    A   Yes.

19    Q   It was on that date you generated this

20 memo wherein you indicate several things that I

21 would like to draw out.  One of them is that

22 Chief Deputy Paul Muller and Tyshaunt met to

23 discuss the case, correct?

24    A   Yes.

25    Q   That was in your presence?

1    A    I believe so.  I don't recall the meeting
2 independently, but that's what my memo says.
3    Q    Again, this was drafted on March 14,
4 2005, following this meeting that occurred on the
5 same day?
6    A    Correct.
7    Q    On this March 14, 2005 meeting you
8 explained to Tyshaunt his trial had been
9 continued until the June term of court, correct?
10    A    Yes.
11    Q    Tyshaunt's trial had been previously
12 scheduled for March 14, 2005, correct?
13    A    That's what this says.
14    Q    You explained to Tyshaunt this
15 continuance was requested because Chief Deputy
16 Public Defender Muller had recently entered his
17 appearance in the case and needed time to come up
18 to speed with all the facts and information
19 involved in the case?
20    A    Right.
21    Q    Chief Deputy Public Defender Muller
22 entered his appearance at this time because you
23 would soon be leaving the employ of the Dauphin
24 County Public Defender's office, correct?
25    A    That's correct.