1    Q   At this meeting in which yourself and

2   presumably Paul met with Tyshaunt, you provided

3   to Tyshaunt all of the discovery that you had

4   been provided so far?

5    A   Yes.

6    Q   And that was based upon all of the

7   information that you had gathered up to this

8   point in time and everything that was in your

9   possession as you were the steward of the case

10  file; is that correct?

11   A   Yes.

12   Q   You also provided Tyshaunt Love with

13  copies of various hearing transcripts that had

14  occurred including all of the preliminary

15  hearings transcripts; the Anthony Knight,

16  otherwise known as Black, preliminary hearing

17  transcript; LaQuan Williams' trial transcript as

18  well?

19   A   Yes.

20   Q   All of those things were necessarily in

21  your possession in order to turn it over to

22  Mr. Love at that point in time?

23   A   Right.

24   Q   And subsequent to that, when you, in

25  fact, gave up the stewardship of the case, you

1  gave all of those materials and everything you

2  had to Attorney Muller for his eventual

3  stewardship?

4      A    Yes.

5      Q    Now, you also had spoken at this

6  particular point in time -- strike that.

7           You had spoken to him and taken the

8  opportunity on this date to discuss with Tyshaunt

9  his recollection of the events of December 19th

10 and 20th, 1996, correct?

11     A    Yes.

12     Q    And placed that in the memo?

13     A    Yes.

14     Q    This memo was placed in the file?

15     A    Yes.

16     Q    This memo that was placed in the file was

17 later surrendered to Attorney Muller, correct?

18     A    That's correct.

19     Q    Now, I'm going to be placing in front of

20 you what has previously been premarked as Defense

21 Exhibit No. 20.  Do you see it so marked?

22     A    Yes.

23     Q    Now, having taken a look at that, that's

24 another document that you had prepared in this

25 particular case, correct?

1     A    Yes.

2     Q    And you'll recognize it as being titled

3 as timeline of events made by you?

4     A    Yes.

5     Q    And this was generated in your strategy

6 to try and build an impossibility related defense

7 or at least narrow the time of death and show how

8 for a portion of it, if not all of it, that

9 Tyshaunt would not be available in order to

10 commit the homicide?

11    A    That's right.

12    Q    And the reason behind that is because we

13 had a decedent, a dead person, no doubt about

14 that.

15    A    Right.

16    Q    The question was who did it?

17    A    Right.

18    Q    And whether or not the Commonwealth can

19 prove this particular gentleman, in fact, did it,

20 correct?

21    A    Correct.

22    Q    You were using all your training,

23 knowledge and skill and ultimately came about in

24 this timeline of events to confront the known

25 physical reality of the situation versus the

1  eyewitness accounts; is that fair?

2      A    That's fair.

3      Q    Part of that not only including a

4  timeline of events but also intended had this

5  case gone to trial, to interview as many of the

6  witnesses on that list.  Also on Mr. Batson's

7  earlier list of 15 people, that is marked Defense

8  Exhibit No. 8, includes a list of 15 witnesses.

9  It had been your intent and plan if you carried

10  this case to trial not only to interview all of

11  those people but also to try to build a timeline

12  of events but a disagreement between known

13  realities, forensic, empirical results versus the

14  potential bias, recollections or honest mistaken

15  recollections of eyewitnesses or witnesses?

16      A    Right.

17      Q    That much was clear during your entire

18  stewardship of this case?

19      A    Yes.

20      Q    You compiled this timeline of events by

21  yourself, correct?

22      A    Yes.

23      Q    This was based upon the comprehensive

24  review of the case file itself?

25      A    Yes.

1    Q    Speaking of the case file itself, you
2  read through all of the -- all of the case file
3  and all the documents at least once; is that
4  fair?
5    A    Yes.
6    Q    I'm placing in front of you now what is
7  Exhibit No. 21.  Do you see it so marked?
8    A    I do.
9    Q    This is another document that was
10 prepared by you, correct?
11   A    I believe so, yes.
12   Q    And at that point in time when these
13 things are being generated, you were working on
14 this case perhaps somewhat in conjunction with
15 Jessica Bush basically doing the heavy lifting?
16   A    That's fair.
17   Q    This document now marked as Defense
18 Exhibit No. 20, labeled potential witnesses?
19   A    That's correct.
20   Q    There's two pages of potential witnesses,
21 over 60 names you identified as potential
22 witnesses in this case, correct?
23   A    Correct.
24   Q    And, again, just as with you discussed
25 before with the prior exhibit information, your

1  intent was to look through and again employ those

2  things we talked about before looking for

3  discrepancies and things that didn't make their

4  way into the police report and do a full and

5  complete investigation; is that fair?

6      A    That's right.

7      Q    I'm placing in front of you what has been

8  marked as Defense Exhibit No. 22.  That's another

9  document that you generated during your

10 stewardship of this case, correct?

11     A    Yes.

12     Q    And it also appears to be a list of

13 witnesses of over or potentially about 30

14 witnesses as well as specific notation of three

15 witnesses who needed to be located, correct?

16     A    That's correct.

17     Q    And those names included Vanessa Ames,

18 correct?

19     A    Yes.

20     Q    It also explains within that document

21 itself the potential relevance or the importance

22 of those several witnesses, correct?

23     A    Yes.

24     Q    For lack of a better way of putting it, a

25 witness cheat sheet; is that correct?

1    A    Yes.

2    Q    These are all things generated that you

3  placed in the file, Exhibits 20, 21 and 22, that

4  remained with the file after you left the Public

5  Defender's office, correct?

6    A    Correct.

7    Q    And, again, all of these things were

8  given over to Attorney Paul Muller as the new

9  trial counsel, correct?

10    A    Yes.

11    Q    Additionally, you weren't satisfied with

12  those level of memos.  You made subsequent memos

13  after that?

14    A    I made a lot of memos.

15    Q    One of those memos included what has been

16  identified as Defense Exhibit No. 23.  Do you see

17  it so marked?

18    A    I do.

19    Q    Defense Exhibit No. 23 is your index

20  discovery regarding all the discovery in

21  Tyshaunt's case, what appears to have a bate

22  number stamp to the right; is that correct?

23    A    That's correct.

24    Q    This is the way you organized this case

25  file so we could reference things included within

1    it, correct?

2        A    That's right.

3        Q    This would be a fair and accurate

4    representation of all documents and material in

5    your position and formulation in this case but

6    for attorney work product, correct?

7        A    Right.

8        Q    Everything you've seen that would be

9    inside of the case file and remained there,

10   correct?

11       A    Yes.

12       Q    And, in fact, you were at my office

13   earlier last week, I believe, and you were able

14   to see some of these documents, correct?

15       A    Yes.

16       Q    Now, I want to draw your attention and

17   move on to trial strategy that you had developed

18   in this particular case.

19           You were involved in the development of

20   the trial strategy involving Attorney Batson,

21   correct?

22       A    Yes.

23       Q    And there was a great deal of interaction

24   between the two of you settling upon an ultimate

25   type of defense, correct?

```
 1    A    Yes.
 2    Q    As we discussed before with Attorney
 3  Batson, there seems to be two strategies in a
 4  homicide case when there's an actual decedent.
 5  One being the SODDI defense, some other dude did
 6  it, or this particular person did it?
 7    A    Right.
 8    Q    What theories of the case did you
 9  formulate with Attorney Batson?
10    A    That LaQuan did it.
11    Q    After Monty Batson left the employ of the
12  public defender's and primary counsel involved in
13  the case, did your impression change of the trial
14  strategy?
15    A    No.
16    Q    Now, I'm going to draw your attention
17  toward Exhibit 19.
18    A    Okay.
19    Q    Directing your attention to Exhibit 19
20  previously identified as a memorandum of March
21  14, 2005.  Yourself, Attorney Muller and LaQuan
22  (sic) had sat down and discussed this change of
23  representation as documented in there.  I want to
24  draw your attention to a particular portion of
25  that wherein you explained to Tyshaunt that your
```

1 trial strategy was to follow a theory that LaQuan
2 Williams, aka, Kazar, killed Iris. That's
3 indicative within that memo.

4     A    Yes.

5     Q    And this was because of various matters
6 that had to do with LaQuan Williams that were in
7 terms of the ultimate fruition of your idea of
8 theories of the case, correct?

9     A    Yes.

10     Q    One of those things that you had in your
11 possession at that point in time was LaQuan
12 Williams' transcript involving LaQuan Williams,
13 showed similarity between the murder of Iris, the
14 victim in this unfortunate case, and an attempted
15 homicide of an individual by the name of Vanessa
16 Ames; is that correct?

17     A    Yes.

18     Q    That transcript at that point in time
19 which bolstered your potential argument that
20 there was a similarity there, striking similarity
21 that was there, correct?

22     A    Yes, that was part of it. I think,
23 although I didn't include this in the memo, the
24 main thrust was this gave LaQuan motive to kill
25 Iris. She was going to turn him in for this

1 murder or attempted murder.

2     Q   Now, that wasn't the only reason you

3 formulated that -- I'm sorry -- that trial

4 strategy.  This was also to include that Iris's

5 blood was found on LaQuan Williams' boot,

6 correct?

7     A   That's right.  There was a shoe print,

8 very bloody scene.  There was no blood on

9 Tyshaunt but there was blood on LaQuan.

10     Q   There was no explicable reason for that

11 fact.  Initially -- LaQuan initially denied

12 having blood on his shoe but later backtracked

13 his story?

14     A   Yeah, that's correct.

15     Q   Now, additionally to that also, this

16 motive that you described was because of this

17 snitching based upon his prior crime that he had

18 committed, correct?

19     A   Yes.

20     Q   And had alleged to have committed at that

21 point in time, correct?

22     A   Correct.

23     Q   There had been a particular series of

24 events that I want to draw your attention to

25 involving the jewelry of the victim, meaning,

1  jewelry of Iris.  Do you recall -- do you recall

2  on September 1, 2005 having a meeting with

3  Attorney Paul Muller?

4      A    I don't recall the meeting.

5      Q    Would it refresh your recollection to

6  take a look at notes from that meeting?

7      A    It may, yes.

8      Q    I'm placing in front of you what has been

9  previously marked and identified as Exhibit

10 No. 30.  Do you see it?

11     A    Yes.

12     Q    Would you take a moment -- there's a

13 particular notation I want to draw your attention

14 to that describes the missing jewelry.  There had

15 been a, to your knowledge, prior to your leaving

16 the Public Defender's office, there was some

17 information that you had with respect to the

18 decedent's jewelry, correct?

19     A    Yes.

20     Q    What was that information?

21     A    It was my understanding, I believe, from

22 a relative of Iris that her jewelry was missing.

23 She noticed, I believe, when she viewed the body

24 and that Iris was known for wearing quite a bit

25 of jewelry.  When LaQuan Williams was arrested --

1  I don't recall whether the day after or days

2  later -- he happened to have women's jewelry in

3  his possession.

4      Q    In fact, it was later returned to the

5  decedent's family to your knowledge.  Do you

6  recall that?

7      A    I don't remember.

8      Q    So not only do we have the blood that he

9  denies and then gives a story to account for it

10 being, in fact, the victim's, now we have missing

11 jewelry that's consistent with missing jewelry of

12 the alleged victim but there was also evidence

13 with respect to a Cory Alston and a borrowed gun

14 that you had received at that point in time,

15 correct?

16     A    I don't remember the name.  I vaguely

17 remember there was an issue with LaQuan having a

18 gun.

19     Q    Okay, and without -- the main gist is

20 that Kazar, which is LaQuan, returned a bloody

21 gun to another individual?

22     A    Yes.

23     Q    That also bolstered your theory of the

24 case?

25     A    Yes.

1    Q    There was no blood found on Tyshaunt that
2 was also of significance?

3    A    Yes, it was huge.

4    Q    And no defense injuries were found on
5 him?

6    A    None.

7    Q    Now, there had been bleach found at the
8 scene, correct?

9    A    Yes.  I remember the police report
10 stating that someone smelled bleach like someone
11 tried to clean.  It was a female officer.

12    Q    Based upon your prior examination of the
13 Vanessa Ames' matter, you were aware, were you
14 not, that LaQuan Williams was known to bleach his
15 crime scenes to take away evidence?

16    A    I don't remember that.

17    Q    You don't recall that?

18    A    No.

19    Q    Okay.  I want to draw your attention
20 towards the witnesses again if we could, and in
21 terms of your training, knowledge and experience,
22 would you categorize these people as must
23 interview people and specifically LaQuan Williams
24 being a must interview type of person?

25    A    Absolutely.

1    Q    Vanessa Ames?

2    A    Possibly, yes.

3    Q    Cory Alston or an individual who provided

4    information with respect to the bloody gun?

5    A    Definitely.

6    Q    Jewelry people, the decedent's relatives

7    as well as the police officers who perhaps

8    returned the jewelry?

9    A    Yes.

10   Q    And also the forensic examiners who

11   developed the DNA, the blood conclusion on the

12   boot as well as pathologists perhaps?

13   A    Definitely.

14   Q    That was what you would have done if you

15   carried through with the case?

16   A    Right.

17   Q    And that's because it was consistent with

18   your theory of the case that Kazar, in fact, did

19   this as opposed to some other dude or an

20   unexplained death, right?

21   A    Yes.

22   Q    In fact, during your stewardship of this

23   case, you did exactly that.  At least you tried

24   to do exactly that by tracking down people,

25   assigning investigators to go and try to track

1 them down or exercise your maximum due diligence
2 there doing so, correct?
3     A    Yes, we tried.
4     Q    You had made memos or handwritten notes
5 that were consistent with your efforts and your
6 assigning of various people to do various things,
7 correct?
8     A    Yes.
9     Q    One of those would be a memo with respect
10 to potential investigation matters involving an
11 individual by the name of Chuck Sheaffer,
12 correct?
13     A    Yes.
14     Q    I'm placing in front of you what has been
15 premarked as Defense Exhibit No. 24.  Those are
16 the notes that we are describing, that are
17 consistent with your efforts to try and find
18 these folks and where they may be and your level
19 of communication with Chuck Sheaffer, correct?
20     A    That's right.
21     Q    This began all the way back on March 30,
22 2004 because you had identified certain people to
23 be of significance, correct?
24     A    Correct.
25     Q    Among those people involved Keith

1  Herndon?

2      A    Yes, he's on the memo.

3      Q    Larry Fennel?

4      A    Yes.

5      Q    Carlos Hill?

6      A    Yes, he's on the memo.

7      Q    And Kendra Smith?

8      A    She is too on the memo.

9      Q    I want to draw your attention to Keith

10  Herndon and your identification of him as being a

11  significant witness to interview, if we could for

12  a moment.

13      A    Okay.

14      Q    There was a voluntary statement that you

15  were in possession of that was given to you

16  through the course of discovery that involved

17  Donald Heffner and Keith Herndon, which is now

18  marked as Exhibit No. 25.  That was in your

19  possession, correct?

20      A    Yes.

21      Q    Based upon that information that you

22  received there, that you thought of him as a

23  person who would be not only worthy of

24  questioning but indeed perhaps necessary to

25  question, correct?

1      A    Yes.

2      Q    And you knew at that point in time that

3 Keith indicated that he met LaQuan Williams at

4 SCI Greene in 1998.  LaQuan admitted to beating

5 and killing Iris, the decedent, in this

6 particular matter?

7      A    Yes.

8      Q    And that's based upon the information

9 that you received on Defense Exhibit No. 25?

10     A    That's correct.

11     Q    That is of major significance in your

12 words as a criminal defense attorney, correct?

13     A    Yes.

14     Q    It's a statement against personal

15 interest, correct?

16     A    That's correct.

17     Q    Even if someone were to be declared

18 unavailable by taking the Fifth, it can be argued

19 perhaps successfully that it should be admitted

20 into evidence as substantive evidence as opposed

21 to impeach related evidence; is that correct?

22     A    Potential argument, yes.

23     Q    I want to draw your attention to another

24 individual and that's Larry Fennel.  Larry Fennel

25 had a significance in this particular case, did

1 he not?

2     A   I remember the name.  I don't exactly

3 remember.

4     Q   Would it refresh your recollection to

5 take a look at his, quote/unquote, voluntary

6 statement previously marked as Defense Exhibit

7 No. 10?

8     A   Yes.

9     Q   Yeah, in the significance of Larry

10 Fennel's voluntary statement given to the police

11 on December 16, 2000, that's when Larry stated

12 that LaQuan Williams, Kazar, alternative suspect,

13 told him that he knew Iris had snitched on him;

14 LaQuan Williams told Larry he was coming back to

15 Harrisburg to, quote, kill that bitch, meaning

16 Iris.

17     A   I remember those words.

18     Q   And, again, much like the statement

19 against personal interest, that if one were to be

20 declared unavailable, meaning Kazar, that could

21 be separately viewed not as hearsay but as a

22 present sense impression, meaning, an indication

23 of what he intended to do in the future, correct?

24     A   Yes, or state of mind.

25     Q   Correct.  I want to draw your attention

1 towards another character that was developed

2 during the course of the investigation by the

3 name of Carlos Hill. In a moment I'll show you

4 Defense Exhibit No. 26. Do you see that so

5 marked?

6     A    Yes.

7     Q    Defense Exhibit No. 26 is again another,

8 quote, voluntary statement from the police from

9 Carlos Hill, correct?

10     A    Yes.

11     Q    And it's dated September 29, 2000?

12     A    Yes, it is.

13     Q    Just like with Exhibit No. 10 and Exhibit

14 No. 25, that was in your possession prior to you

15 leaving the case, correct?

16     A    It was.

17     Q    Now, Carlos Hill, as you'll recall, was

18 an individual who was interviewed by the police,

19 stated again that LaQuan Williams, Kazar, was his

20 cellie, meaning he shared a cell in Dauphin

21 County Prison, and that LaQuan Williams admitted

22 to Carlos Hill by direct admission to killing

23 Iris and then gave pertinent details about the

24 murder itself.

25     A    Yes, he did do that. I also recall what

1  I read in Carlos Hill's statement.  I remember a

2  statement, something in the police report,

3  Heffner, where Kazar is worried Heffner is going

4  to question him about the blood -- or Detective

5  Heffner.

6      Q    This has significance apparently to you,

7  jeez, you know what these people that are

8  giving -- that were involved in this particular

9  case, meaning Keith Herndon, Larry Fennel, Carlos

10 Hill, we got to talk to them?

11     A    Right.

12     Q    Not only talk to them but potentially --

13 it's not wise not to bring them in?

14     A    Yes.

15     Q    Because even if Kazar had taken the Fifth

16 like with the other exhibits, also potentially

17 for the Court ruling statements against personal

18 interest that can be introduced to the case?

19     A    That's correct.

20          THE COURT:  Are we at a good break point?

21          MR. McSHANE:  Sure.

22          THE COURT:  Let's take a 10-minute

23 recess.

24          (A brief recess is taken from 11:13 a.m.

25 to 11:31 a.m.)

1    MR. McSHANE:  Prior to resuming the
2 testimony, there's a lay witness by the name of
3 Kendra Smith Alston, subpoenaed by the Defense,
4 as we have no subsequent date, she has pressing
5 matters in her personal life.  We would like to
6 seek to have her released to come back on that
7 second day.  I just ask the Court to admonish her
8 that she's still under the personal service.
9 That it's a subpoena as it said on here to remain
10 as otherwise directed.
11    THE COURT:  Do you have, obviously at
12 least to this point, do you have good contact
13 information?
14    MR. McSHANE:  We have excellent contact
15 information.
16    THE COURT:  Without objection, we'll
17 release Ms. Alston.
18    MR. McMURRY:  No objection.
19    THE COURT:  With that admonition you're
20 still under subpoena.  You'll be advised about
21 the next scheduled date.
22    MR. McSHANE:  Moving right along, Your
23 Honor.
24 BY MR. McSHANE:
25    Q   We were talking about other witnesses.

1  That knowledge was known to you as far as their

2  statements and information that they could

3  provide and we had talked about Keith Herndon,

4  Larry Fennel, Carlos Hill and now the last one,

5  if we could, Kendra Smith.

6      Now, you had been provided in the past

7  what has been previously marked and previously

8  identified as Defense Exhibit No. 11, again,

9  quote, voluntary statement from the police

10  department from Kendra Smith?

11      A   Yes.

12      Q   You'll recall within that that Kendra

13  indicated that Cory Alston told her that LaQuan

14  Williams borrowed Cory's gun around the time Iris

15  was killed and returned it with blood on it.

16      THE COURT:  Can you say that again?  I

17  got lost who said what to whom.

18  BY MR. McSHANE:

19      Q   Kendra, her statement to the police, 2001

20  statement, indicated within that Cory Alston told

21  her, meaning again Kendra, that LaQuan Williams

22  borrowed Cory's gun around the time that Iris was

23  killed and returned it with blood on it.

24      A   That's right.

25      Q   Understanding that it's hearsay within

1  hearsay, you based upon that information you knew
2  that Cory Alston was a person of significance?
3      A   Right.
4      Q   The significance becoming the decedent
5  was shot by a gun, correct?
6      A   Correct.
7      Q   Your alternative suspect who had this
8  prior violent history and other attendant related
9  matters returned a bloody gun within the narrow
10 scope of time of these relevant events?
11     A   Yes, after threatening to kill her.
12         MR. McSHANE:  At this point in time, Your
13 Honor, I would like to have the Court take
14 judicial notice during the trial of the case in
15 chief of the prosecution as well as the case in
16 chief by the Defense, that Keith Herndon, Larry
17 Fennel, Carlos Hill and Kendra Smith were to be
18 called as witnesses by either side.  There's no
19 dispute about that.
20         MR. McMURRY:  That's correct, Your Honor.
21         THE COURT:  All right.
22 BY MR. McSHANE:
23     Q   Moving right along, you had received
24 correspondence throughout the entire period of
25 time, both yourself and Mr. Batson, from the

DAUPHIN COUNTY COURT REPORTERS

 1  Petitioner in this case, correct?

 2     A   Yes.

 3     Q   I'm placing in front of you what's --

 4  Exhibit No. 12 previously marked and identified.

 5  Can you flip through and see if it was

 6  information in your possession prior to leaving

 7  the Public Defender's office?

 8     A   I don't recall this but I don't doubt he

 9  sent things to Monty.  We even went to the prison

10  to speak to him.

11     Q   It appears to be consistent with what you

12  knew to be his handwriting, those documents,

13  correct?

14     A   From what I remember, this seems like

15  Tyshaunt's handwriting.

16     Q   In it includes information that is

17  germane to all those people that had not

18  testified and also providing information with

19  respect to his belief as well as his information

20  level that connects all of these folks together;

21  that was consistent with your defense theory of

22  the case, correct?

23     A   I believe so.  Again, I don't recall this

24  document, but I do remember speaking with him

25  about all of these people.

1    Q    You recall last week being in my office
2  reviewing documents, correct?
3    A    I do.
4    Q    Do you recall even glancing at that
5  document?  If you don't, that's fine.
6    A    I don't.
7    Q    Fair enough.  Moving right along.  Now, I
8  want to talk about the forensics involved in this
9  particular case or the lack thereof.
10        Drawing your attention to the relevant
11 point in time 2002, 2004, you had enough basis of
12 knowledge of forensics, as we discussed before,
13 the importance of contrasting knowledge, related
14 knowledge of the witness either to include or
15 exclude persons as possible perpetrators of the
16 crime?
17   A    Yes.
18   Q    I want to draw your attention to Exhibit
19 14.  Do you have that handy?  You Probably don't
20 because it's right here.  Exhibit No. 14, do you
21 see Exhibit No. 14?
22   A    I do.
23   Q    And those appear to be copies of the
24 sticky notes, correct?
25   A    Yes.

1    Q    When you did your review of the case
2 file, you came across a document that included
3 those stickies on top of another document,
4 correct?
5    A    Yes.
6    Q    Although it hasn't been placed into
7 evidence, that document, with Joseph Citron,
8 M.D., forensic pathologist, included those sticky
9 notes directly on top, correct?
10    A    Yes.
11    Q    And that's the way that it appeared in
12 the file.  You maintained the file, correct, the
13 sticky notes?
14    A    I believe so.  I don't remember -- that's
15 my handwriting.
16    Q    You certainly didn't go back after the
17 fact and place sticky notes on --
18    A    I can't account on what Paul or Nate
19 would have done.
20    Q    Nevertheless, it's your handwriting and
21 attached to something that is relevant to the
22 subject matter of sticky notes; is that correct?
23    A    Correct.
24    Q    In particular, as you can see on Exhibit
25 14, it includes that handwritten note by you that

1  reads, we probably need a blood spatter expert

2  and a pathologist, correct?

3      A    Yes.

4      Q    And you identified that as a potential

5  need because there were some forensic aspects

6  that needed to be developed or refuted; is that

7  fair?

8      A    That's fair.

9      Q    By pathologist, you meant someone is

10  going to testify with respect to the cause and

11  manner of death, correct?

12      A    Yes.

13      Q    And so it wasn't just strictly someone

14  who would take a look at the autopsy but it would

15  be someone to take a look at all the information

16  from the crime scene itself, the development of

17  the forensic evidence and ultimately opine to the

18  Court relevant matters having to do with that, if

19  you had your druthers.

20      A    And the time of death.

21      Q    I want to draw your attention towards

22  some of the particular matters involved in this.

23  There had been DNA that had been developed two

24  separate occasions with respect to Kazar and the

25  same thing from his boot, correct?

1    A    Inside, yes.

2    Q    And specifically it was matched not once

3 but twice with respect to the DNA, meaning, that

4 it was purportedly what had -- you used the

5 terminology at that time a match for the victim?

6    A    Yes.

7    Q    Now, there was also a tremendous amount

8 of blood that was on an alternative suspect by

9 the name of Kazar, correct?

10    A    Yes.

11    Q    Now, you had received some sort of

12 cursory reports during your stewardship of this

13 case of the conclusion by the forensic scientist,

14 the examiner, at that point in time that the

15 blood did not -- was not consistent with the

16 decedent, correct?

17    A    That's correct.

18    Q    But you didn't go and visually inspect

19 the samples -- I'm sorry -- the evidence from

20 which the samples were derived, meaning the

21 clothing?

22    A    No.

23    Q    If this had moved forward to trial, you

24 would have done that, correct?

25    A    Yes.

1    Q   And the reason being there's a concept

2  called random sampling error where if one were to

3  take a small amount of a gross subject matter,

4  meaning a large pool of blood, for example, one

5  can get an inaccurate result based upon only

6  taking a look at a smidgen?

7    A   That was my understanding.

8    Q   Further, not only unknown to you but you

9  would have known if you developed the case

10  further and stayed with it, where the sampling

11  occurred of the blood that lead to the conclusion

12  but you would have also asked for the underlying

13  data that supported this person's opinion; is

14  that fair?

15    A   Yes.

16    Q   And that is a potential development, that

17  argument of random sampling error, even being to

18  have alternative testing done either to confirm

19  or refute that forensic scientist's conclusion?

20    A   Yes.

21    Q   If one were to only sample a smidgen that

22  ignores the potential rest of the population of

23  blood could very well be the victim's blood?

24    A   It could very well be.

25    Q   There was also remarks having to do with

1 bite marks that were involved in this case, if
2 you recall. Do you recall that?
3    A    No.
4    Q    Okay. Would it refresh your recollection
5 to take a look at a document that may discuss the
6 forensic odontology?
7    A    Yes.
8        MR. McSHANE:    A moment of the Court's
9 indulgence.
10 BY MR. McSHANE:
11    Q    Specifically the autopsy as performed by
12 Wayne Ross -- move on to the next concept -- I'll
13 move on to the next concept. We'll come back to
14 the forensic odontology. You may recall that
15 there was a patent as opposed to a latent print
16 or something consistent with that that had been
17 noted on the autopsy that was consistent with
18 perhaps a human palm print or some sort of
19 finger?
20    A    That sounds vaguely familiar.
21    Q    We'll get to that as well. Let's talk
22 about your level of knowledge in those two areas.
23 We'll come back around and connect the dots.
24 You're aware at least at that point in time,
25 2000, 2004, the forensic field of what's called

1  forensic odontology, correct?

2    A    Yes.

3    Q    You weren't aware of bite mark

4  examination?

5    A    Yes.  I'm sorry.

6    Q    We'll call it bite mark examination.

7    A    Yes.

8    Q    Is it, in essence, a pattern location one

9  compares known to unknown either to include or

10 exclude the donor in question?

11   A    Yes.

12   Q    The significance of a potential bite mark

13 on a person's body, especially in this context

14 involved in this particular case, would show

15 things that are consistent with a struggle or at

16 least proximity to the decedent at or around the

17 time because of the concept such as lividity or

18 bruising; is that fair?

19   A    Yes.

20   Q    And you had identified that as maybe a

21 potential exclusionary device to exclude Tyshaunt

22 Love as a potential donor of that?

23   A    I may have.

24   Q    If you don't recall, you don't recall.

25 But nevertheless you saw the significance of it

1  and you weren't just going to let the bite mark

2  go and say this is an unexplained phenomenon?

3      A     There was no physical evidence that I was

4  going to ignore.

5      Q     And the same would be true as a possible

6  way to include Kazar as the donor of that bite

7  mark.   That would potentially have significance

8  as well?

9      A     Potentially.

10     Q     One doesn't go around biting people

11  typically; is that fair to say?

12     A     Typically.

13     Q     Now, moving on to -- there was a decedent

14  and your level of knowledge at that particular

15  point in time with respect to pattern recognition

16  in the form of fingerprinting or developing

17  fingerprints, you're aware there's that forensic

18  field, correct?

19     A     Yes.

20     Q     And although you may not be aware of the

21  entirety of the details, you're aware of a

22  possibility even at that point in time that one

23  can develop or transfer, for further sampling,

24  fingerprints from a decedent; is that correct --

25  on a decedent?

1    A    Yes.

2    Q    Again, there was an ultimate conclusion

3  that -- you were in possession of being the

4  steward of the file -- that the conclusion was

5  that although something was developed, that had

6  no sufficient ridge characteristics to allow for

7  comparison; is that correct?

8    A    I don't recall.

9    Q    Okay.

10        MR. McSHANE:  A moment of the Court's

11  indulgence again.

12  BY MR. McSHANE:

13    Q    We were talking about the developing of

14  it.  That again is the same conclusion that you

15  had with respect to the -- that no physical

16  evidence would be ignored by you?

17    A    That's correct.  I was asking for, as I

18  recall, I didn't have a level of knowledge I

19  would have liked to have all of the scientific

20  examinations that we needed.  I was going to Paul

21  Muller at the time for help because he did, and I

22  was -- I needed him to help figure out what I

23  wanted.  I know I wanted a pathologist, blood

24  spatter expert.  I wanted someone to examine the

25  gun.  That's what I recall.

1    Q    Moving right along to that specific

2  point.  While you're doing this investigating,

3  there's this other physical evidence out there

4  that may include your client as a potential

5  suspect in the case and potentially even help

6  bolster your argument that it was Kazar who

7  perpetrated this crime.  You took actions such as

8  e-mailing -- such as doing the Defense Exhibit 14

9  where you asked your co-counsel at the time,

10  Monty, do we need a private investigator?  And

11  also with respect to 14 specifically, where you

12  note we probably need a blood spatter expert and

13  a pathologist.

14    A    That's correct.

15    Q    Now, talking about the blood spatter

16  expert, you thought there was significance at

17  that point in time because you had enough

18  experience where you knew that shooting a high

19  powered pistol at an individual in near close

20  contact range is typically a messy event.

21    A    That was my theory.  Supposedly it was

22  close contact as I recall from the preliminary

23  transcript, and I expect there should have been

24  some sort of blow back on Tyshaunt had he been

25  the gunman.

1    Q    In fact, we have evidence of blood on
2  Kazar's foot would be significant of your
3  understanding of the case?
4    A    That's where we were going with Kazar.
5    Q    Going from the angle of not what was
6  physically present that could confirm Kazar being
7  potentially at least present in the near term if
8  not the actual shooter that was involved in this
9  but also to exclude your client?
10    A    Yes.
11    Q    Now, you took further actions in that
12  including -- I think you have in front of you
13  Defense Exhibit No. 27.  Do you have that in
14  front of you?
15    A    I do.
16    Q    That is an e-mail conversation between
17  you, yourself, and you described your superior,
18  Paul Muller, who has more experience.  That is
19  dated January 24, 2005.
20    A    Yes.
21    Q    Taking a look at Defense Exhibit 27, in
22  this e-mail conversation at the very bottom of
23  the page you wrote down, I need your guidance on
24  experts.  I'm exploring whether we need a
25  forensic pathologist, blood spatter expert and/or

1 gun expert, period. Help. That's how it reads?

2     A    That is.

3     Q    What was the response, if any, that

4 Attorney Muller gave you?

5     A    I don't believe I got a response.

6     Q    Well, maybe I'll make it this way. You

7 did not retain or receive authority to retain

8 experts despite your identification of

9 demonstrable need?

10     A    When Monty was on the case, he asked for

11 an expert as well and that was with George Shultz

12 at the time and we didn't get anything.

13       THE COURT: Date of the e-mail?

14       MR. McSHANE: The date is January 24,

15 2005.

16       THE COURT: Is that right?

17       THE WITNESS: Yes, that's what it says.

18       THE COURT: That's marked as what

19 exhibit?

20       MR. McSHANE: Twenty-seven.

21       THE COURT: Thank you.

22 BY MR. McSHANE:

23     Q    Going back, now that we found it, to the

24 question of the bite mark, whether or not it was

25 present, would it refresh your recollection to

1  take a look at Wayne K. Ross, M. D., post-mortem

2  report?

3      A    It would.

4      Q    I want to draw your attention to page 4.

5  Although not marked as evidence, I want you to

6  take a look at the second bullet at the top.

7      A    Okay.

8      Q    Having refreshed your recollection, now

9  would you confirm that there was at least a

10  notation on here that there was some sort of bite

11  mark evidence?

12      A    Yes, there was bite mark evidence.

13      Q    Would you adopt by way of simple

14  affirmation all the prior testimony that you had

15  with respect now that we connected the dots?

16      A    Yes.

17          MR. McSHANE:  A moment of the Court's

18  indulgence.

19  BY MR. McSHANE:

20      Q    I want to draw your attention towards

21  subpoenas issued in Mr. Love's case.  There was a

22  point in time where the case came close enough to

23  trial that you thought it was wise to issue

24  subpoenas to various individuals, correct?

25      A    Yes.

1    Q    And then it was at or around the period
2  of time that you left that they later became
3  superfluous, that the trial did not occur?
4    A    That's correct.
5    Q    You took not only the mechanism of action
6  of drafting those subpoenas of people that you
7  thought were important but indeed trying to have
8  them served?
9    A    Yes.
10    Q    I want to draw your attention to Defense
11  Exhibit No. 28.  I believe you have that in front
12  of you; is that correct?
13    A    I do.
14    Q    And taking a look at it, you'll confirm
15  that's an e-mail sent by you first to James
16  Stamos, who is a private detective or private
17  investigator with the Public Defender's office.
18  Then it was subsequently forwarded to you -- by
19  you to Rosemary Deibler, D-e-i-b-l-e-r, who is an
20  administrative assistant with the office of the
21  Public Defender; is that true?
22    A    I do see the subpoenas.
23    Q    There's no e-mail there?
24    A    I don't see any.
25    Q    Hold on one second.  Nevertheless, the

1 subpoenas were created in this particular case,

2 correct?

3     A   They were created by -- my name is at the

4 bottom.

5     Q   And that is Defense Exhibit No. 28,

6 correct?

7     A   That's correct.

8     Q   And these are the ones that we discussed

9 that you tried to have served, correct?

10     A   That's correct.

11     Q   And those are the people that you had

12 identified that were out on the street, as we

13 call it, meaning not incarcerated, that you

14 believe were necessary in order to present a good

15 defense in this particular case?

16     A   That's right.

17     Q   And you followed the concept that it's

18 better to have a cross subpoena than no subpoena

19 at all, meaning, that you weren't just going to

20 rely upon the Commonwealth subpoenaing various

21 people, correct?

22     A   Right.

23     Q   Because you wanted to be able to control

24 where, when and how of the witnesses in order to

25 make sure they appeared upon demand, not simple

1  courtesy from the government?

2     A   I never depend on the District Attorneys.

3     Q   Among these individuals included Larry

4  Fennel, correct?

5     A   That's correct.

6     Q   Kendra Smith?

7     A   Yes.

8     Q   Carlos Hill?

9     A   Right.

10    Q   In front of you you should also have

11 Defense Exhibit -- well, I don't know if it's a

12 separate one.  It's the habeas corpus.

13    A   Yes, Exhibit 29.

14    Q   Twenty-nine, very good.  That's for one

15 Keith Herndon, correct?

16    A   That's correct.

17    Q   So Keith Herndon we had talked about

18 before was the person who admitted to -- LaQuan

19 admitted to beating and killing Iris as you'll

20 recall?

21    A   Yes.

22    Q   That means if you did a writ of habeas

23 corpus at that point in time his whereabouts were

24 known?

25    A   Yes.

```
1      Q    And that he was available?

2      A    Yes.

3      Q    And that he was incarcerated?

4      A    Yes.

5      Q    And he basically had no choice but to

6   show up in court if that writ of habeas corpus

7   had been issued?

8      A    Correct.

9           MR. McSHANE:  A moment of the Court's

10  indulgence.

11  BY MR. McSHANE:

12     Q    Ma'am, would it help you to refresh your

13  recollection going back to the fingerprint

14  information and how it was something was

15  recovered from the body, would it refresh your

16  recollection to take a look at the Harrisburg

17  Police bureau fingerprint data sheet by a Leroy

18  Lucas?

19     A    It may.

20     Q    As well as a witness statement by -- no.

21     A    Okay.

22     Q    Having refreshed your recollection now

23  with that document, there had been developed some

24  sort of potential fingerprint or palm print or

25  some sort of hoped for forensic evidence with
```

1  respect -- what they suspected to be ridge print

2  identification such as a hand?

3      A    It appears to be.

4      Q    Just going way simple, adopt your prior

5  testimony in conjunction with this lifting of the

6  fingerprint off of the body and the development,

7  you'll agree that all these things now connect?

8      A    Yes.

9      Q    This was all information that was within

10  your power, your knowledge and your control and

11  you identified as potential issues that needed

12  further development?

13     A    Yes.

14     Q    All right.  Now, I want to move right

15  along to a meeting that you had after you left

16  the Public Defender's office.  Do you recall a

17  meeting with Attorney Paul Muller and Nate Giunta

18  of the Public Defender's office on or about

19  September 1, 2005?

20     A    I don't.

21     Q    Would it refresh your recollection to

22  take a look at the notes from Attorney Muller and

23  Attorney Giunta to refresh your recollection?

24     A    It may.

25     Q    I'm placing in front of you what has been

1    previously marked and identified as Defense

2    Exhibit No. 30.  Do you see it?

3        A    Yes.

4        Q    Please take a moment -- and it would

5    probably help if I gave a context where I'm going

6    with it.   Where I'm going with it, the meeting

7    itself and some level of detail with respect to

8    the upcoming trial that was within a couple of

9    days --

10       A    I apologize, Justin.  I don't recall the

11   meeting.  This would be information that I told

12   Paul.

13       Q    With that in place, do you see what the

14   handwritten note says up top, meeting with Monica

15   9/1 2005?

16       A    Yes.

17       Q    You have no reason to dispute that.  You

18   had some sort of meeting.  Maybe you don't

19   remember the date or exact contents of it,

20   correct?

21       A    I have no reason to dispute it.

22       Q    And you knew that the trial occurred some

23   eleven days later beginning on September 12th,

24   correct?

25       A    Yes.

1    Q   You spoke to Paul about the case whether

2  it's on this occasion or another occasion,

3  correct?

4    A   Yes, I'm sure of it.

5    Q   What prompted you to contact him?

6    A   I would have wanted to make sure that he

7  was following up on things that I had identified

8  as important or if I can answer any questions,

9  but I don't want to step on his toes, of course.

10    Q   I think we're going to have to a little

11  bit because we're here with Mr. Love's liberty

12  and the truth here.

13    A   I mean, at that time when I contacted

14  him.

15    Q   So this wasn't a case where Mr. Muller

16  contacted you.  You contacted him?

17    A   Apparently.

18    Q   So you had concerns about whether or not

19  -- is it fair to say -- I don't want to put words

20  in your mouth -- fair to say you're concerned

21  whether or not Paul had been able to fully read,

22  digest and understand the entirety of the case

23  and significance that prompted you towards that

24  action?

25    A   I recall feeling that way, being

1 concerned, wanted to make sure he and Nate had

2 everything they needed and understood the case in

3 its entirety.

4     Q   This was at this meeting or some meeting

5 before trial you reiterated to them prior trial

6 strategy, the SODDI defense, about the Kazar did

7 it defense?

8     A   Yes.

9     Q   And included within that meeting you'll

10 see on the second page the 7th line down you

11 folks also involved Tyshaunt Love, correct?

12     A   It does say that.

13     Q   And your trial strategy had not shifted

14 even through and including the trial which was

15 that Kazar did it, correct?

16     A   No.

17     Q   Meaning, that it was consistent that

18 Kazar did it?

19     A   Right.  It never wavered.  We were going

20 with LaQuan Williams was the murderer.

21     Q   You came to the trial?

22     A   I did the first day.

23     Q   And then you learned the verdict,

24 correct?

25     A   I did some time later.  Monty Batson

1  called and told me. I came the first day to make

2  sure Tyshaunt knew that he hadn't been abandoned.

3      Q    Last series of questions, if we could.

4  I had asked you to meet with us, meaning Tyshaunt

5  and his defense team and you agreed?

6      A    Yes.

7      Q    You came down to my office?

8      A    I did.

9      Q    You reviewed documents?

10     A    Yes.

11     Q    And we discussed various matters

12  including your testimony here today in terms of

13  the general framework of it?

14     A    We discussed our theory of the case.

15     Q    And that was with Mr. Batson?

16     A    He was present.

17     Q    It was an open conversation of free give

18  and take, correct?

19     A    Yes.

20     Q    You know what, let's do this a hundred

21  percent. Again, although you're taking a look at

22  the Harrisburg Police, also request forensic

23  analysis because the Harrisburg Police could not

24  develop a usable print of what was sent out to

25  the Pennsylvania State Police with respect to the

1 tape lift impression, that was attempted on the

2 body. Do you recall that?

3     A    That seems vaguely familiar but --

4     Q    Would it refresh your recollection to

5 take a look at that report?

6     A    Yes.

7     Q    I draw your attention towards page 2.

8 Having received that and taking a look at it, it

9 wasn't just the Harrisburg Police attempt. It

10 appears to be the Pennsylvania State Police

11 request?

12     A    Correct.

13     Q    And to your recollection there was no

14 follow up in terms of eventual report that was

15 generated by the Pennsylvania State Police,

16 correct?

17     A    Correct.

18     Q    That's something that you would have

19 tracked down and tried to figure out, hey, why

20 not?

21     A    I would have.

22     MR. McSHANE: Nothing further.

23     THE COURT: Mr. McMurry.

24     MR. McMURRY: Thank you.

25

CROSS EXAMINATION

BY MR. McMURRY:

Q    Okay.  Ms. Cliatt, obviously you didn't try this case; is that correct?

A    That's correct.

Q    In regards to the witnesses you testified, you made a statement we couldn't find some of the witnesses.  Do you remember which ones?

A    No.  I just remember there was some witnesses that we couldn't locate, for instance, Guillermina Cruz, and there was a few others and some that I think are actually, I think, noted on some of the subpoenas where my investigators put down that the house was vacant or cell phone wasn't working.

Q    In regards to the witnesses, did you have any interview bringing them down to the office?

A    I don't recall exactly how we spoke to which ones and where.  I know that there were, I think, I believe, I spoke to some.  Monty was speaking to others.  That's how we know about the jewelry and that there was discrepancy with regards to when the gunshot was heard at the time

1  Iris was supposedly killed.

2      Q      More specifically did you ever interview

3  LaQuan Williams?

4      A      No.

5      Q      The victim in LaQuan's case, Ms. Ames?

6      A      I don't believe we could find her.

7      Q      What about Cory Alston?

8      A      No.

9      Q      Keith Herndon?

10     A      No.  If I may correct, actually, I

11 believe I asked for someone to find her.  I don't

12 know whether she was found or not.

13     Q      You didn't interview her?

14     A      No, I didn't.

15     Q      Larry Fennel?

16     A      No.

17     Q      Carlos Hill?

18     A      No.

19     Q      Or Kendra Smith?

20     A      No.

21     Q      Are you aware of any reason why you

22 didn't interview these people?

23     A      At the time I believe we were still

24 getting the case going, and we had gone down to

25 the crime scene, tried to talk to the neighbors

1  behind the home.  There was quite a few.  I was

2  having my investigator locate certain people.

3      Q  Would it be possible these people were

4  not forthcoming or willing to participate for the

5  defense?

6      A  I don't know because we hadn't found them

7  and hadn't heard from them whether they were

8  going to be difficult or not.

9      Q  Referring you to Defense Exhibit No. 22,

10  this is a memo that you created, correct --

11      A  Yes.

12      Q  -- with regards to witnesses?  On the

13  last page when you have these here, I was curious

14  as to your categorization here.  You have

15  witnesses favorable, which is Mr. Hill, and then

16  you have unfavorable witnesses here and included

17  in there are LaQuan and obviously Ms. Cruz.  Do

18  you recall why those people were unfavorable?

19  Did you interview them?

20      A  I'm trying to remember.  LaQuan Williams,

21  I never interviewed.  Guillermina, I'm not

22  certain if I did or Monty or one of our staff

23  would have spoke with her or not; preliminary

24  transcripts and her statements seem to indicate

25  that she was going to make statements that were

1 adverse to the Defendant.

2     Q   If you never spoke to LaQuan, why do you

3 feel that he was unfavorable?

4     A   Well, I don't think he was going to

5 implicate himself because he told Detective

6 Heffner different stories about the blood.

7     Q   You're not a forensic expert?

8     A   Not at all.

9     Q   So these theories then and tests that you

10 had with regards to spatter and those were your

11 own personal theories not based on any scientific

12 test?

13     A   My idea of people that I thought I should

14 contact in order to educate myself with what went

15 on with Tyshaunt Love's case.

16     Q   Not any personal knowledge that you had?

17     A   No.

18     Q   Regarding the witnesses that you have

19 listed in front of you, there are over 60 plus.

20 You were not -- again, you were not the attorney

21 at the time of trial?

22     A   No, I was not.

23     Q   You can't sit here and testify as to the

24 availability or unavailability of the witnesses

25 at the time of trial?

1    A    Not at the time of trial.

2         MR. McMURRY:  That's all the questions I

3  have.

4

5                  REDIRECT EXAMINATION

6

7  BY MR. McSHANE:

8    Q    What I want to do is talk about your

9  habit and routine in preparing cases with an eye

10  towards the witnesses and trying to subpoena

11  folks.  Based upon your habit and routine of 2002

12  to 2005 when you left the Public Defender's

13  office, if you had someone to subpoena, you would

14  either subpoena them yourself or have an

15  investigator attempt personal service, correct?

16    A    I typically always had the investigator

17  attempt service.

18    Q    Because you wanted to be able to call

19  someone to court to testify as to the personal

20  service; is that fair?

21    A    That's right.

22    Q    Now, suppose for a second, drawing your

23  attention to your habit or routine, that the

24  investigator went one time to a house, knocked on

25  the door and then came back as moved or not there

1 or there was no one home, you wouldn't throw your
2 hands up and say, gee whiz, we're done, correct?
3    A    That's correct.
4    Q    You are due diligent in doing internet
5 related searches?
6    A    Perhaps.
7    Q    Including contacting even potentially the
8 Commonwealth in helping to enlist its vast amount
9 of resources in tracking down an individual?
10   A    If I had to.
11   Q    But that would be a last-case scenario?
12   A    Yes.
13   Q    You don't want to telegraph who your
14 potential witnesses are?
15   A    Never.
16   Q    Nevertheless, that's an availability that
17 you're aware of at that point in time that you
18 could have employed if this case had finished
19 out?
20   A    Correct.
21   Q    And based upon your habit or routine,
22 that is something that you would have potentially
23 done along with applying for material witness
24 bail if that's what the circumstances were?
25   A    If it required it.

1    Q    But all of those things didn't happen not

2  because you kind of gave up but because the case

3  got continued, correct?

4    A    Right.

5    Q    And so although we have this notation on

6  the subpoenas -- I believe it's Exhibit No. 28 --

7  those aren't conclusive of the maximum amount of

8  due diligence you personally, as trial attorney,

9  would have asserted in this matter, correct?

10    A    Correct.

11    Q    Last line of questioning has to do with

12  the forensics and the idea that you're not a

13  forensic expert, no, you're a lawyer?

14    A    That's correct.

15    Q    You draw upon not only your personal

16  knowledge and experience in being a lawyer and

17  being involved in other cases but upon your

18  knowledge of talking to other people inside the

19  office and outside the office and also your

20  general knowledge, correct?

21    A    Of course.

22    Q    So using all of that knowledge that you

23  had there, these aren't just pie in the sky let's

24  try it out type of things, correct?

25    A    No.  I was picking experts I felt

1 pertained to that particular case given the

2 evidence given to light.  I wasn't picking any

3 expert.

4     Q    You weren't chasing after rainbows

5 looking for the answers to be empirical in

6 nature?

7     A    Right.

8     Q    All of these theories that we had just

9 discussed, you employed all of the alleged

10 theories that we just --

11     A    That's correct.

12         THE COURT:  What are the dates those

13 subpoenas were telling witnesses to appear, which

14 was Exhibit 28?

15         THE WITNESS:  February 14th through the

16 18th of 2005.

17         THE COURT:  Anything else?

18         MR. McMURRY:  No, Your Honor.

19         THE COURT:  Thank you, Ms. Cliatt.

20         MR. McSHANE:  May she be excused?

21         THE COURT:  Without objection?

22         MR. McMURRY:  No objection.

23         THE COURT:  You're excused.

24         MR. McSHANE:  The next witness is going

25 to be Nate Giunta from the Public Defender's

1 office.

2       THE COURT: Well, before you do that,

3 you're now at 12:10.

4       MR. McSHANE: I lost track of time.

5       THE COURT: There is a possibility that I

6 have time this afternoon.

7       MR. McSHANE: Love to take it.

8       THE COURT: But I won't know until I

9 check with my staff and see if this afternoon's

10 hearing is resolved.

11       MR. McSHANE: That would be most gracious

12 if the Court would allow us to continue.

13       THE COURT: Are you available?

14       MR. McMURRY: Unfortunately, yes.

15       THE COURT: Let me check. Please just

16 recess in place here for a few minutes until I

17 double check.

18       We'll reconvene at 1:30.

19       (Lunch is taken from 12:17 p.m. to

20 1:36 p.m.)

21       MR. McSHANE: Your Honor, may it please

22 the Court, just for an overview of what time we

23 have, I thought we would take a look at the

24 examination of Attorney Nate Giunta. Then I

25 think Paul Muller will be an appreciable period

1  of time, and do things of that general nature.

2  Then I thought Chuck Sheaffer and Stamos, the

3  investigators, that should take the balance of

4  time plus I wanted to talk a little bit about the

5  JNET motion and the due diligence of the

6  Commonwealth for purposes of the record and

7  trying to obtain information on those witnesses.

8  Is that acceptable to the Court?

9         THE COURT:  It's your case.

10        MR. McSHANE:  I just wanted to make sure.

11        THE COURT:  We have until about 4:30.

12  I'm not suggesting that you must fill it.

13        MR. McSHANE:  In that case, we'll do

14  Mr. Muller after Mr. Giunta.  At this time we

15  call Nate Giunta from the Public Defender's

16  office to the stand.

17

18              NATHAN GIUNTA,

19  having been sworn, was examined and testified as

20  follows:

21

22              DIRECT EXAMINATION

23

24  BY MR. McSHANE:

25     Q    Sir, would you please state your full

1  name, spell your last name for the benefit of the

2  Court?

3      A    Nathan Giunta, G-i-u-n-t-a.

4      Q    And how are you currently employed, sir?

5      A    I'm a chief deputy public defender of the

6  Dauphin County Public Defender's office.

7      Q    Your occupation is that of an attorney?

8      A    That's correct.

9      Q    I want to draw your attention to the

10  relevant period of time that involves the

11  particular matter you're subpoenaed here to

12  testify about and that is the case of

13  Commonwealth versus Tyshaunt Love in the relevant

14  period of time that I would like you to examine

15  one yourself while through these questions from

16  2002 until let's just say 2006 just to be

17  inclusive even though that's past trial date,

18  directing your attention to moments of periods in

19  time -- do you see Tyshaunt Love in the courtroom

20  here?

21      A    Yes, I do.

22      Q    Indicate to the Court using your finger

23  where he is.

24      A    He's sitting at the table in the orange

25  jumpsuit -- (indicating.)

1      MR. McSHANE:  Let the record reflect the
2  identification of the Petitioner as indicated by
3  this witness.
4      THE COURT:  It so reflects.
5  BY MR. McSHANE:
6      Q    I want to draw your attention to the
7  relevant skill set that you had in place in 2005
8  when you became involved in this particular case.
9  Now, you became licensed to practice law in the
10  Commonwealth of Pennsylvania when?
11     A    2004.
12     Q    Do you know the month?
13     A    I believe it was September, October.
14     Q    So now you've been involved in a homicide
15  case in 2005 involving Tyshaunt Love?
16     A    Correct.
17     Q    Do you recall the approximate period of
18  time when you became involved in the case?
19     THE COURT:  You mean the date when he
20  started working on this case?
21     MR. McSHANE:  Yes.
22     THE WITNESS:  I don't remember.
23  BY MR. McSHANE:
24     Q    Would it be after or before Attorney
25  Cliatt left the office?

1    A    After.

2    Q    If it was revealed to you that she left

3    the office in May 2005, would that give you a

4    relevant time frame?

5    A    Yeah.

6    Q    You weren't working with Ms. Cliatt in

7    preparation of the case in any sort of

8    substantive way prior to her departure?

9    A    No.

10    Q    Your level of understanding is that you

11    weren't particularly assigned the case, meaning,

12    that you weren't the primary attorney of record

13    in this matter, correct?

14    A    No, no.

15    Q    So much in the way that the custom habit

16    of the Public Defender's office at that time was

17    that there was a particular assigned lead counsel

18    and then that lead counsel basically asked a

19    colleague in order to help out in the preparation

20    of the case because homicide cases take typically

21    a tremendous amount of due diligence and hard

22    work; is that fair?

23    A    Yes.

24    Q    That was the case in this particular

25    matter, correct?

1    A   Correct.

2    Q   So we have a period of time from 2004

3 until you become involved in this case some time

4 after May 2005 where you could draw upon your

5 experience being an assistant public defender at

6 that time?

7    A   Correct.

8    Q   There was a period of time before you

9 were an assistant public defender you were

10 exposed to the Public Defender's office in trial

11 work, correct?

12    A   That's correct.

13    Q   In fact, you were what we call a

14 certified legal intern as approved by the

15 Pennsylvania Supreme Court in the two years prior

16 to your joining the office?

17    A   January of 2002.

18    Q   And so from January 2002 until you passed

19 and became a member of the bar, you were in a

20 voluntary capacity, supervised intern who was

21 permitted to present matters before the court?

22    A   Correct.

23    Q   But mostly exclusively of a misdemeanor

24 type nature or revocation related matter,

25 correct?

1    A   Correct.

2    Q   Not of a felonious nature?

3    A   No.

4    Q   So during that period of time you were

5 also a full-time student at the Widener School of

6 Law, correct?

7    A   Yes.

8    Q   It wasn't as if it was a 40-hour plus

9 week dedication that you have during that time

10 leading to your full-time employment; is that

11 fair?

12    A   That's fair.

13    Q   Did you try any jury trials as a

14 certified legal intern?

15    A   Yes.

16    Q   How many?

17    A   One.

18    Q   What type of case was that?

19    A   It was a criminal mischief.

20    Q   Okay.  That particular type of case

21 didn't involve any sort of crime of violence?

22    A   No.

23    Q   And it also didn't involve any sort of

24 forensic work?

25    A   No.

1    Q    And it was maybe a one or two witness

2  affair; is that fair?

3    A    I think there were more like five.

4    Q    Not to the gravity in terms of the level

5  of sophistication that was on this particular

6  case, meaning, the Tyshaunt Love matter?

7    A    No.

8    Q    And you were supervised in that period of

9  time by whom?

10   A    Mr. Ari Weitzman.

11   Q    Now, drawing the importance of that

12 experience and now translating it over to the

13 period of crossover where you were in the Public

14 Defender's office and you were just hired as a

15 full-time assistant Public Defender in 2002, up

16 to when this case came to trial, which was in

17 September of 2005, you were a full-time litigate

18 attorney in the Public Defender's office,

19 correct?

20   A    From 2004?

21   Q    I'm sorry.  2004 -- no -- from 2005.

22   A    Yes.

23   Q    And during that period of time did you

24 start out in the typical rotation where you were

25 a juvenile attorney and you had to do juvenile

1  court duties primarily while you were just a

2  straight adult litigating attorney in the Public

3  Defender's office?

4      A    Yes.

5      Q    From that 2004 to that 2005 period when

6  this case went to trial in September, can you

7  give us an approximate number of cases that you

8  tried through to verdict in front of a jury?

9      A    Three possibly four.

10     Q    And the nature of those types of cases,

11 if you recall?

12     A    I believe that was PWI.

13     Q    Possession with intent to deliver a

14 controlled substance?

15     A    Correct.

16     Q    Okay.

17     A    A stalking.

18     Q    Okay.

19     A    Another possession with intent to

20 deliver.  I'm not sure where it fell.  There was

21 an attempted aggravated assault somewhere in

22 there.  I'm not sure if it was right before or

23 right after.

24     Q    You know the first three.  Attempted

25 murder or homicide might have been subsequent to

1  this homicide case?

2      A    Either before or right after, I can't

3  remember.

4      Q    At this point in time, meaning September

5  of 2005 when this case went to trial, you would

6  not feel comfortable being assigned this level of

7  a case with the complexities that were involved

8  in this standing alone?

9      A    By myself, correct.

10     Q    But nevertheless, you were trying to

11  use -- learn over tutelage of Attorney Muller who

12  had been more experienced in these regards as

13  well as contributing with him?

14     A    Correct.

15     Q    And when you did so it was an open door

16  type of policy, back and forth exchanging

17  information and allowing each other points of

18  view to be heard?

19     A    Correct.

20     Q    And it was true teamwork; is that fair?

21     A    Yes.

22     Q    But nevertheless, you acknowledged and

23  you acknowledge at this point in time that you

24  were the junior member of the team because you

25  didn't have a tremendous amount of trial

1    experience at least at that the point in time?

2        A    I would have deferred if he said --

3        Q    If there was a conflict between the two

4    of you in terms of trial strategy or in terms of

5    even in the instance questioning of witnesses, he

6    would rule at the end of the day due to his

7    superior experience; is that fair?

8        A    Yes.

9        Q    Now, at this point in time when you

10   joined in the defense of Mr. Love, you had the

11   opportunity to review the case files; is that

12   true?

13       A    Correct.

14       Q    And you reviewed all of the contents of

15   the case file, correct?

16       A    Yes.

17       Q    And all the correspondence?

18       A    Yes.

19       Q    And the memos that were left by

20   Ms. Cliatt?

21       A    Yes.

22       Q    And the information that was obtained

23   from Attorney Rowland, the first counsel?

24       A    The preliminary hearing, yes.

25       Q    As well as that of Jerry Russo?

1    A    Correct.

2    Q    And also Monty Batson who was in the

3 Public Defender's office, correct?

4    A    Correct.

5    Q    You had the benefit of background level

6 of information because there were customary staff

7 members whereby bigger cases were discussed at

8 least at the preliminary matter, if not

9 substantial matter, more or less on a monthly

10 basis within that office?

11    A    Correct.

12    Q    Also there was a collegial atmosphere;

13 people would talk about bigger cases among one

14 another?

15    A    Correct.

16    Q    While Attorney Batson and Attorney Cliatt

17 were in the office, this was one of the bigger,

18 higher profile cases in complexity and appeals so

19 everyone was fairly aware of the case and what

20 was going on; is that fair?

21    A    That's correct.

22    Q    When you became involved in the case you

23 weren't starting from zero.  You might have had

24 some level of detail of information of at least

25 the basic allegations based upon the synergy that

1  was developed in the office; is that fair?

2  A  Yes.

3  Q  I want to bookmark -- I'm sorry.  This

4  was your first homicide that you had ever been

5  involved with?

6  A  That's true.

7  Q  And you also read and reviewed the

8  relevant material having to do with the witness

9  statements, correct?

10  A  Yes.

11  Q  And also that of Kazar's trial transcript

12  and LaQuan Williams' trial?

13  A  At rape and attempted murder?

14  Q  Yes.

15  A  Yes.

16  Q  You read, reviewed and participated in

17  some of the correspondence from and to Tyshaunt

18  in your office, correct?

19  A  I believe so, yes.

20  Q  You had various meetings with Tyshaunt at

21  various points in time either yourself or in

22  combination with others?

23  A  Yes.

24  Q  In fact, there was a meeting on September

25  1, 2005 between -- this was approximately eleven

1  days before trial with Attorney Monica Cliatt,

2  who had left the office, yourself, Paul Muller

3  and also Tyshaunt by way of telephone; is that

4  correct?

5      A   Yes.  I think it was close to Fridays we

6  have phone conversations.

7      Q   And this resulted in Mr. Muller taking

8  down contemporaneous notes about the

9  conversations that were occurring and what was

10 discussed.  Did you see him take down notes?

11     A   I believe so, yes.

12     Q   Would it refresh your recollection to see

13 some of these notes to see whether or not you can

14 confirm this was at least not your handwriting

15 and more likely Paul's.  Take a look at Defense

16 Exhibit No. 30, multipage document.  Let me know

17 when you're done.

18     A   I'm done.

19     Q   And taking a look at that, that would be

20 the contemporaneous notes taken by Attorney

21 Muller at the time noted up top, the September 1,

22 2005 meeting that we just previously discussed,

23 correct?

24     A   I would say yes.  I don't know if

25 Tyshaunt was on the phone.  I know that -- I

1  mean, we met with Monica.  I don't recall the

2  exact date.

3      Q    Let's take it segmented.  September 1,

4  2005, you're not sure -- you don't dispute the

5  notation on that?

6      A    That's correct.

7      Q    That involved yourself being present?

8      A    Correct.

9      Q    And Attorney Muller?

10      A    Yes.

11      Q    And Monica Cliatt?

12      A    Yes.

13      Q    And uncertain as to whether or not there

14  was telephone conversation with Tyshaunt Love?

15      A    Correct.  I do recall the conversation.

16  I don't know if those notes were made from that

17  phone call or just in meeting with Monica.

18      Q    Drawing your attention to page 2, the

19  second notation there.  I ask you to read and see

20  whether it refreshes your recollection as to --

21          THE COURT:  To himself?

22          MR. McSHANE:  To himself, correct.

23  BY MR. McSHANE:

24      Q    Having refreshed your recollection in

25  reading it to yourself, does that help to resolve

DAUPHIN COUNTY COURT REPORTERS

1  the ambiguity in your testimony?

2      A    Yes.

3      Q    In fact, all parties were present,

4  meaning, at least they were participatory,

5  meaning the Petitioner, Tyshaunt Love, yourself,

6  Paul Muller and Monica Cliatt; is that fair?

7      A    Yes.

8      Q    Various things were discussed including

9  what we call the defense theory of the case,

10  correct?

11      A    Yes.

12      Q    And during that conversation that

13  occurred and memorialized in Defense Exhibit 30,

14  Monica made it clear that her proposed theory of

15  the case was that Kazar did it and informed you

16  folks of basically why she thought that was a

17  viable trial strategy; is that fair?

18      A    Yes.

19      Q    Now, I want to draw your attention to the

20  actual trial itself.  During the actual trial

21  itself, you were at counsel table, correct?

22      A    Correct.

23      Q    And Attorney Muller was at counsel table,

24  correct?

25      A    Correct.

1    Q    And, of course, obviously the Petitioner

2 was at that counsel table, correct?

3    A    Correct.

4    Q    Okay.  I would -- like the set up

5 currently before the Court of the counsel set up.

6 It was set up differently whereby Attorney Muller

7 was at the far extreme towards the jury, then

8 came you in the middle and then ultimately came

9 the Petitioner at the end?

10    A    Correct.

11    Q    Inhibiting potentially the communication

12 between lead counsel and Defendant, correct?

13    A    We had -- Tyshaunt had pen and paper, was

14 writing stuff down and I was passing it over to

15 Mr. Muller if there was a question.

16    Q    But at no time, it's your testimony, at

17 no time did you not allow paperwork to move

18 freely between -- you didn't act as a roadblock

19 for a way of doing a screening device?

20    A    Not screening; more so if Mr. Muller was

21 in the midst of cross examination or a witness

22 was being directed and Tyshaunt was passing

23 something over, I would wait until he was done

24 and hand it to Mr. Muller and Mr. Muller would

25 review it and ask any appropriate questions from

1  that point on.

2    Q    And in terms of the -- in terms of every

3  single time, every single written correspondence

4  or in terms of even oral comment was directed

5  over to Attorney Muller without any infidelity,

6  meaning, everything got through?

7    A    I believe so, yes.

8    Q    I want to draw your attention towards a

9  couple of other things that have to do with your

10  independent trial strategy that you developed.

11  Rather you didn't have an independent trial

12  strategy, meaning yourself as an attorney sitting

13  down and going, gee, if I tried this by myself

14  and I had my druthers, if I were trying this

15  case, it wasn't that type of situation.  It was a

16  collegial effort between the two of you to

17  develop the theory of the case, correct?  I want

18  to talk to you about the general theory of the

19  case, and you were present, of course, through

20  the entire period of trial?

21    A    Correct.

22    Q    You participated in some of the cross

23  examination, meaning, you yourself asked

24  questions, correct?

25    A    Correct.

1    Q    But the questions that you asked and the
2   witnesses that you asked were not -- were not the
3   most inculpatory or exculpatory.  They weren't
4   primary movers of the case; is that fair to say?
5    A    When it was planned, yes, but I believe
6   those were the ones the Commonwealth ended up
7   calling.  I mean, those were the first ones right
8   off the bat.
9    Q    So the intention prior to trial was for
10  you to have the less significant based upon your
11  ascertation, meaning, both Attorney Muller and
12  yourself, you had not yet developed full trial
13  experience that you now enjoy; is that fair?
14   A    I wouldn't say it was lack of ability on
15  my part.
16   Q    I'm saying that at that point in time
17  that you had not developed the trial credentials,
18  knowledge and experience that you currently have,
19  and based upon your own candid admission that
20  this was your first homicide and also on top of
21  it that this was maybe your fourth or fifth jury
22  trial that you were involved with, that the
23  assignment of duties of cross examination of
24  various witnesses were that Paul would take the
25  more significant ones -- I'm not saying the

1 insignificant ones were left to you -- but more

2 significant ones were left for Attorney Muller

3 based upon his advanced experience.

4     A    Yes.

5     Q    When this came to the actual trial

6 itself, you had alluded to the fact that who you

7 folks had guessed would be the more significant

8 witnesses, they turned out to be not the ones

9 that were yours, meaning -- let me strike that

10 and reask that.

11         The trial strategy of the Commonwealth

12 had been amiss -- strike that.

13         Let me be direct.  What you had prepared

14 for, what you thought was going to happen with

15 the intent of the division of labor be or that

16 occurred, it came as a shock to you that the

17 Commonwealth went kind of in another direction;

18 is that fair?

19     A    Yes, but it was more based on rulings

20 that occurred as much as the Commonwealth.

21     Q    Okay.  So you were left cross-examining

22 several people that if you had your magic wand to

23 do all over again that perhaps in that division

24 of labor, that hierarchy that the two of you had

25 developed prior to trial, if you had more time

1   then you would have reassigned and not taken on
2   some of the witnesses that you cross-examined; is
3   that fair?
4       A    I can't say.
5       Q    Now, it seems to me that in a criminal
6   homicide case, to use a vernacular of the trade
7   profession, two different types of theories of
8   the case, the first one is called a SODDI or some
9   other dude did it and second one blaming a
10  particular person.  Okay.  You recognize that
11  distinction?
12      A    Correct.
13      Q    And so in this particular case it was
14  without a doubt there was a dead person?
15      A    Um-hum.
16      Q    Now we're down to either the SODDI or
17  this dude did it, correct?
18      A    Correct.
19      Q    And going into the trial prior to opening
20  statements, you folks had developed a plan of
21  action that was going to blame that other guy,
22  meaning in particular, Kazar; is that correct?
23      A    Yes.
24      Q    And you were present for the opening
25  statement given by Attorney Muller and, of

1  course, paid attention to that?

2     A   Yes.

3     Q   It speaks for itself, but it seems that

4  during the periods of the opening statement and

5  especially towards the closing arguments, that it

6  shifted its focus away from this guy did it,

7  meaning Kazar, to the SODDI defense, this other

8  dude did it.  Do you recognize that occurred

9  somewhat?

10     A   I don't remember what the opening and

11  closing was.

12     Q   In terms of the closing that occurred,

13  you don't recall one way or another Attorney

14  Muller saying that maybe Kazar did it, maybe he

15  didn't and we'll never know the answer, that type

16  of summation?  You don't recall?

17     A   It's been five years.

18     Q   Sure.  One of the -- as we sit here

19  today.  Attorney Muller is your supervisor, one

20  of your supervisors?

21     A   Yes.

22     Q   He's what, third in charge of the office?

23     A   He's a chief deputy also at the

24  administrative end.

25     Q   And more along the lines it's a seniority

1  type of thing in the office?

2      A    Yes.

3      Q    He's more senior than you?

4      A    Yes, he is.

5      Q    He's been there for an appreciable period

6  of time than you?

7      A    Yes.

8      Q    Now, when there was a point in time where

9  you received the subpoena from my office to

10 present testimony in this particular case --

11     A    Correct.

12     Q    Okay.  And then after that you had -- you

13 or Paul or someone had obtained specific

14 allegations of a Post Conviction Relief Act that

15 was originally filed, the amended one?

16     A    Yes.

17     Q    And after that there was a supplement

18 that was filed that you also received as well,

19 correct?

20     A    Correct.

21     Q    Are you aware that contact was made to

22 Paul Muller, by extension you as well, by way of

23 e-mail seeking to have an interview occur with

24 our office in order to determine the reasonable

25 trial strategy that you folks employed?

1    A    Yes.

2    Q    And are you aware that Attorney Muller

3  said that you folks would not be questioned,

4  deposed or otherwise asked?

5    A    Correct.

6    Q    Was that a decision that you also joined

7  in?

8    A    That was -- that e-mail was brought to

9  the attention of First Assistant Public Defender

10  Brad Winnick, a conversation with Mr. Muller

11  occurred.  I was there.  At that point they

12  decided not to do that, and I went with that.

13    Q    Okay.  So I'm going to ask you directly,

14  that's not your decision?

15    A    I went along with it.  I mean, I was

16  really indifferent on it.

17    Q    Your First Assistant Public Defender,

18  superior, along with the more senior individual

19  came to a decision, that's at least acquiesced?

20    A    Correct.

21    Q    Questions that have to do with the

22  reasonable trial strategy and investigating this

23  matter could not be done by Mr. Love's attorney,

24  meaning me; is that fair?

25    A    If that's what the interview was for,

1  yes.

2      Q    You were aware of the e-mail and that

3  specifically what it asked for in that e-mail?

4      A    Yes.

5      Q    All right.  At trial, several witnesses

6  were not called and I want to talk about a

7  Commonwealth Exhibit, those folks, if you don't

8  mind.

9          Based upon your recollection of that

10  time, Keith Herndon was not called at trial?

11      A .  Correct.

12      Q    He was incarcerated, was he not?

13      A    Yes.

14      Q    Larry Fennel, he was also not called to

15  trial?

16      A    Correct.

17      Q    Carlos Hill was not called at trial?

18      A    Correct.

19      Q    Kendra Smith was not called at trial?

20      A    Yes.

21      Q    Nevertheless, you'll recall that with

22  Keith Herndon, he gave a voluntary statement on

23  September -- quote/unquote, voluntary statement

24  on September 19, 2000 where he indicated that

25  while at SCI Greene in 1998 with LaQuan Williams,

1  who was the other suspect, that LaQuan Williams

2  directly admitted to him to beating and killing

3  Iris, the decedent, in this matter, correct?

4      A    Correct.   He was writted here, to have

5  him brought in.

6      Q    So you're aware of his existence?

7      A    Yes.

8      Q    You're aware of his statement?

9      A    Yes.

10     Q    You're aware that even if it was denied,

11  that it could be admitted by way of admission

12  against personal interest as an exception to

13  hearsay as a substantive matter, correct?   You're

14  aware of the Rules of Evidence?

15     A    Yes.

16     Q    No. 2, that you were aware of his

17  whereabouts and location?

18     A    Correct.

19     Q    And the -- in fact, your office -- or did

20  you draft the writ of habeas corpus?

21     A    I pulled it up.   I remember seeing the

22  orders.   I didn't actually go to the clerk's

23  office.   I was doing a lot of that stuff.

24  There's a good chance I did draw that up.

25     Q    As a matter of course, a writ of habeas

1   corpus having been granted, the person who is
2   incarcerated elsewhere within the Commonwealth
3   and if it's properly formatted would have no
4   choice but to appear at trial and at least become
5   in the same chair you're in now?
6       A   Correct.
7       Q   All right.  The reasonable trial strategy
8   for not including Keith Herndon within the trial,
9   whether there's a statement against personal
10  interest --
11      A   Is that a question?
12      Q   Yes.
13      A   I think -- well, at the time from our
14  point, we were pointing at Kazar or LaQuan
15  Williams.  Right before then we planned on
16  bringing in the similarities to the rape,
17  attempted murder and all the other points about
18  that case and how it was similar to this case.
19  We had a ruling where Judge Bratton indicated
20  that we could not get into any of that, and at
21  that point we knew, well, I guess, it's my
22  understanding to the best of my knowledge, that
23  to put LaQuan up -- we couldn't put him up
24  because they wouldn't release him from New York.
25  We tried getting him from the Department of

1 Corrections there.

2 So at the time or at least to the best of

3 my knowledge that just to put him up and ask him,

4 didn't LaQuan tell you A, B and C, that it was --

5 without having him here would not have been

6 admissible. I don't know why that ultimately was

7 made. That's to the best of my recollection, but

8 without LaQuan being here, we had planned on that

9 whole segment to get those people here.

10 I believe also Cory Alston was on that

11 list. We had this all planned out for LaQuan.

12 What the Judge ruled we could not get into any of

13 that -- that similarity, it kind of shut the door

14 on that approach at least.

15 Q Let's unpack that a little bit. We're

16 doing lot of pronouns and stuff like that. When

17 you're talking about all of that, you're talking

18 about the incident where the alleged victim, and

19 later he was convicted, involving a Vanessa Ames?

20 A Correct.

21 Q What you meant by that was that there was

22 this prior bad act involving Vanessa Ames and

23 that there was information that you folks had

24 received through discovery that LaQuan Williams,

25 Kazar, was ratted on, for lack of a better way of

1 putting it, on by Iris, the decedent?

2    A   Correct.

3    Q   So what you folks had developed was an

4 idea that, boy, that's a pretty good reason to

5 potentially get rid of someone, a motive?

6    A   Yes.

7    Q   So I can understand the reasonable trial

8 strategy when it comes -- we'll come back to the

9 other ones. Keith Herndon, Keith Herndon in a

10 voluntary statement on December 19, 2000 wasn't

11 talking about the Ames matter. He had been

12 talking about the decedent, correct?

13    A   Correct.

14    Q   Okay. So now I'm trying to understand --

15 I'll give you fair opportunity here to see how --

16 how the Ames' matter, precluded by the Court,

17 impacted the Herndon statement, that he directly

18 confessed to Kazar -- I mean, Kazar directly

19 confessed to him that he had killed the decedent

20 in this particular case, meaning Iris. How does

21 the Ames' matter being precluded totally

22 eviscerate the statement against -- that I killed

23 the woman that's dead in this case?

24    A   Again, it wouldn't. It wouldn't. It was

25 under that belief when the ruling -- ruling was

1   made, that was just the avenue that we took.

2       Q    We took, but this was an avenue that you

3   have writted him.  He was available.  He was in

4   Dauphin County Prison, correct?

5       A    Correct.

6       Q    There was no offer of proof made to the

7   Court or an attempt to argue the admissibility of

8   the Ames' matter to Mr. Herndon; is that correct?

9       A    Correct.

10      Q    Looking back at that, in fairness with

11  benefit of 20/20 hindsight we all enjoy, we can't

12  practice at the time, that was a mistake?

13      A    Yes.

14      Q    Moving right along to Larry Fennel.  As I

15  recall, Larry Fennel gave a voluntary statement

16  to the police on December 16, 2000.  If you

17  recall, his testimony was that LaQuan Williams,

18  again Kazar, told him that he knew Iris snitched

19  on him.  LaQuan Williams told Larry he was coming

20  back to Harrisburg to kill that bitch, meaning

21  Iris.  Do you recall that?

22      A    I recall that.

23      Q    Now, there was a point in time when you

24  folks were trying to get in -- you had filed a

25  notice of intent three days before trial, 404,

1 seeking to admit it type of thing, the Ames'

2 evidence under Pennsylvania Rules of Evidence

3 404; is that correct?

4     A   Yes.

5     Q   Was that something you drafted or

6 something Attorney Muller drafted?

7     A   I don't recall.

8     Q   Nevertheless, you had some level of input

9 into the written proffer that was made at that

10 particular point in time?

11     A   I believe so, yes.

12     Q   Have you had the ability to review that

13 subsequent -- prior to today's testimony, that

14 particular motion that was forwarded to the

15 Court?

16     A   Not in a while.

17     Q   All right. Nevertheless, do you

18 recollect that within that motion that you had

19 filed with the Court seeking to have the

20 admission of the Ames' matter, you, meaning the

21 defense team that you were part of, that you did

22 not include the transcript as an exhibit to that

23 proffer, that written proffer? Do you recall?

24     A   I don't recall.

25     Q   Would it refresh your recollection to

1  take a look at that particular file?

2      A    If it's not cited, I'll take your word.

3      Q    I appreciate that.  Let's be sure so the

4  record is replete.

5          We need a moment.  We'll come back to

6  that.  The argument that you folks had proffered

7  or attempted to proffer before the Court, both by

8  written and oral argument because the Court did

9  allow oral argument, was the similarity between

10 the Ames' event and the Iris event, correct?

11     A    Correct.

12     Q    With the hopes of including under 404,

13 specifically B of the rules of criminal evidence,

14 that prior conduct; is that fair?

15     A    Yes.

16     Q    And in particular, you knew that it would

17 be based upon the written proffer that was made

18 and also the oral argument that the Court would

19 make its decision, correct?

20     A    Could you repeat that?

21     Q    You knew that based upon what you put in

22 the motion and also as supplemented by what you

23 argued to the Court, that the Court would make

24 its decision, correct?

25     A    Yes, and I believe we had a hearing.  I

1  believe the Commonwealth called a witness to say
2  that they weren't similar.
3     Q    We'll get to that in a moment.  You knew
4  that the make or break of this particular style
5  of defense was what was written and then also
6  what was argued, correct?
7     A    Correct.
8     Q    That the Court wouldn't go outside of the
9  record that you produced, correct?
10     A    Correct.
11     Q    Meaning, that specifically whatever
12  information you gave to the Court, it was going
13  to make its decision, correct?
14     A    Yes.
15     Q    So if things are missing and lacking,
16  then one can't blame the Court for making a
17  potentially erroneous ruling, more specifically
18  pled or better argued?
19     A    Agree, yes.
20     Q    You had mentioned before that was -- it
21  would refresh your recollection to take a look at
22  the pleading that was proffered to the Court and
23  specifically the one that's entitled notice of
24  defense intent to introduce other crimes, wrongs
25  or bad acts pursuant to Pennsylvania Rules of

1  Evidence 404-B, that was time stamped with the
2  Clerk of Court on September 9, 2005; to refresh
3  your recollection with respect to the contents of
4  that filing; is that fair?
5      A   Yes.
6      Q   I'm placing in front of you what
7  document?  Please read it to yourself.
8      A   You're looking at the recited transcript
9  from the Vanessa Ames and LaQuan Williams --
10     Q   Let's take a look at it for some of the
11 substantive things and ask you about what was
12 included and what was not included in the written
13 argument.
14     A   Okay.
15     Q   Okay.  Have you refreshed your
16 recollection?  In taking a look at that document
17 you'll see that the transcript was not referenced
18 nor was it attached; is that accurate?
19     A   Correct.
20     Q   And it bears your name on -- as second
21 author of it.  I believe your signature is at the
22 end as well too?
23     A   That's correct.
24     Q   You read and you understood and proofread
25 it to make sure the entirety of the document was,

1  in fact, what you wanted it to --

2     A   Correct.

3     Q   Otherwise, you wouldn't have attached

4  your signature?

5     A   Yes.

6     Q   Now, it's about two pages in length,

7  maybe 20 averments in nature?

8     A   Yes.

9     Q   What was not included there is a --

10  besides the transcript of the prior bad act,

11  there's also no information in there about the

12  bleaching incident that was alleged to have

13  occurred in the Ames' matter with specificity?

14     A   Correct.

15     Q   And there's also no reference to bleach

16  being present at the crime scene and, therefore,

17  being a connecting agent, correct?

18     A   Correct.

19     Q   Also there's no mention of Mr. Cory

20  Alston and the bloody gun being returned,

21  correct?

22     A   Correct.

23     Q   Switching gears and coming back to Larry

24  Fennel if we could.  There's also no reference

25  there to Larry Fennel's statement that had to do

1  with he was going to come back to Harrisburg and
2  kill that bitch?

3      A    Correct.

4      Q    And to your recollection all of these
5  things that we just discussed were omitted and
6  not placed into the motion were also similarly
7  not argued before the Court, correct?

8      A    I don't recall.  I believe Mr. Muller did
9  that.  I don't recall.

10     Q    That will speak for itself in terms of
11 references there.

12     A    Yes.

13     Q    If, for instance, based on your training,
14 knowledge and experience that if you had to do
15 this all over again, meaning this proffer that
16 was going to more or less exclude a basic
17 component of your defense, would you have beefed
18 up that motion a little bit more?

19     A    I guess, yes.

20     Q    You would have?

21     A    Probably would have.

22     Q    Especially now knowing the consequences
23 that came about.  Again hindsight is 20/20.

24     A    Yes.

25     Q    Directing your attention to an individual

1 by the name of Carlos Hill.

2      THE COURT: Before you do, I have a call

3 that's coming in precisely at 2:15. If we could

4 take a three- to five-minute recess. It's an

5 important call. If you want to step down.

6      (A brief recess is taken.)

7      THE COURT: Go ahead. Thank you for your

8 patience.

9 BY MR. McSHANE:

10    Q  We were talking about Carlos Hill prior

11 to the break, and you'll recall that there was a

12 September 29, 2000 voluntary statement given to

13 the police by Carlos Hill that indicated that

14 LaQuan -- LaQuan's cellie, meaning cellmate at

15 the Dauphin County Prison -- do you recall that

16 voluntary statement?

17    A  I believe so, yes.

18    Q  Would you like to refresh your

19 recollection by taking a look at Defense Exhibit

20 26? Would that help?

21      Placing in front of you what has

22 previously been marked and identified as Defense

23 Exhibit 26. You'll see that that is that

24 voluntary statement from September 29, 2000 by

25 one Carlos Hill.

DAUPHIN COUNTY COURT REPORTERS

1     A    Correct.

2     Q    Would you read it to yourself in brevity

3 and then I'll ask you a couple of questions with

4 respect to that.  Did that refresh your

5 recollection, sir, that Carlos Hill indicated

6 that he was the cellmate of LaQuan Williams, the

7 alternative suspect?

8     A    Correct.

9     Q    Within that document and within that

10 purported statement given to the police was also

11 contained within there an admission to Carlos

12 Hill by LaQuan Williams where he, meaning LaQuan

13 Williams, admitted to killing Iris?

14    A    Correct.

15    Q    Then there was also detail given to the

16 murder not just generalities; is that fair?

17    A    Yes.

18    Q    And again much like Larry Fennel and much

19 like Keith Herndon, Carlos Hill was not called to

20 testify in this matter, correct?

21    A    Correct.

22    Q    Moving right along to Kendra Smith.  Now,

23 Kendra Smith you'll recall, if you recall, gave a

24 statement on September 7, 2001 to the police

25 wherein she indicated that Cory Alston told her

1 that LaQuan Williams borrowed Cory's gun at the

2 time Iris was killed and returned it with blood

3 on it?

4     A    Correct.

5     Q    Now, I want to go back to Carlos Hill for

6 a moment, the cellmate, with respect to what we

7 were just talking about. That had nothing to do

8 with the Ames' matter, did it?

9     A    No.

10     Q    That was speaking strictly of Iris,

11 correct?

12     A    Correct.

13     Q    Meaning the actual decedent in this case?

14     A    Yes.

15     Q    Now, with respect to the information of

16 Kendra Smith, we just went over, you'll recognize

17 that as being hearsay within hearsay?

18     A    Correct.

19     Q    Nevertheless, there was information

20 provided that Cory Alston may very well have, at

21 least according to Kendra Smith, have information

22 perhaps pertinent to the particular nexus and

23 time that this incident occurred involving Iris,

24 correct?

25     A    From Cory Alston?

Q   Not from Cory Alston, from Ms. Smith.
Ms. Smith said that Cory told her about a story?

A   Correct.

Q   So that's why it's hearsay within
hearsay?

A   Yes.

Q   But the name Cory Alston was known to you
good folks?

A   Correct.

Q   Did you make the effort yourself to
secure the story directly from Cory Alston?

A   I myself did not.  I don't recall what
occurred prior to me or in my time in the case.

Q   Nevertheless, neither Cory Alston or
Kendra Smith was called to trial?

A   Correct.

Q   Based upon the information that at least
Ms. Smith attributes to Cory Alston and by
implication of LaQuan Williams, your alternative
suspect, that would be relevant information if
you can connect all the dots that would show a
bloody gun, a dead girl, dead by gunshot, in
addition to blunt force trauma, that would be
consistent with Kazar being the killer, correct?

A   Correct.

1    Q   Much like the Carlos Hill, the Larry

2 Fennel and the Keith Herndon information that was

3 pertinent to Iris not to the Ames' matter,

4 correct?

5    A   Correct.

6    Q   To your knowledge and your recollection,

7 having refreshed your recollection with the

8 proffer that was made to the Court with respect

9 to the Ames' matter, none of this information

10 that we just went over with respect to Keith

11 Herndon, Larry Fennel, Carlos Hill or Kendra

12 Smith was brought to the Court's attention at

13 least in that file?

14    A   In the filing, no; I don't recall about

15 the hearing.

16    Q   The oral argument?

17    A   Yes.

18    Q   And you said that you didn't make the

19 oral argument.  It was instead chief counsel,

20 meaning, Attorney Muller, correct?

21    A   I believe so, yes.

22    Q   I want to draw your attention to Kazar,

23 the alternative suspect.  You'll admit that

24 looked pretty good for an alternative suspect

25 even without the ruling by the Court including

1 the Ames' matter, correct?

2     A     Correct.

3     Q     And now, you had made a statement that

4 Kazar would not be available because New York

5 would not release him.

6     A     I believe so, yes.

7     Q     Did you attempt to secure his appearance

8 by use of what's called the Uniform Act?

9     A     I don't recall we did.

10     Q     The Uniform Act being, of course, the 50

11 state plus District of Columbia, understanding

12 certain procedures are followed, that a subpoena

13 that would be issued by the Commonwealth of

14 Pennsylvania would be enforceable to other

15 entities within the United States.  Are you aware

16 of the Uniform Act?

17     A     No.

18     Q     At that point you weren't aware of the

19 Uniform Act?

20     A     At that time, no.

21     Q     Because you weren't aware of it you

22 couldn't use it?

23     A     Correct.

24     Q     So your testimony with respect to New

25 York wouldn't give him up, is that an indication

1    that he was incarcerated?

2        A    Yes.

3        Q    And is that an indication that you made a

4    call to secure his appearance?

5        A    I did not.

6        Q    Do you know who did?

7        A    I don't know.

8        Q    Do you know if there ever was one?

9        A    I don't know.

10       Q    Somehow or another this information got

11   to you that Kazar would not be available for

12   trial?

13       A    Yes.

14       Q    Did you attempt to have him declared

15   unavailable?

16       A    I don't remember what happened in that

17   oral argument.

18       Q    I want to bookmark that and now talk

19   about some of the forensic aspects of the case.

20   At no point in time in your career, in 2005 being

21   an attorney for approximately six months, eight

22   months maybe --

23       A    Yes.

24       Q    It would be more than that.

25       A    2004, eleven months.

1    Q   You weren't as intimately knowledgeable

2  with respect to the field of forensic science as

3  you are now certainly?

4    A   Correct.

5    Q   Nevertheless, it had been apparent to you

6  that there was some DNA?

7    A   Yes.

8    Q   That there was some blood?

9    A   Correct.

10    Q   That there was also a potential bite

11  mark?

12    A   Yes.

13    Q   And that there was also information with

14  respect to something that maybe was or wasn't a

15  hand mark or a handprint on the decedent?

16    A   Yes.

17    Q   Along with blood found on or about Kazar?

18    A   Correct.

19    Q   Was that information provided to the

20  Court in the filing with respect to try and

21  getting the Ames' matter into evidence?

22    A   I don't recall.

23    Q   Would it refresh your recollection to

24  take a look at that?

25    A   Yes.  Is that the one?