1    Q    Same exact one you just looked at before.
2    A    No.
3    Q    Was there ever a discussion between you
4    and your superior counsel about obtaining the use
5    of an expert or experts in this particular matter
6    such as a forensic odontologist or a blood
7    spatter expert, fluid dynamics or fingerprint
8    expert or any sort of expert whatsoever?
9    A    No.
10   Q    Okay.  Given your level of information
11   that you now possess as a practicing attorney
12   having handled several homicides including, I
13   believe, receiving a not guilty on one; is that
14   correct?
15   A    Wrong person.
16   Q    Nevertheless having handled several
17   homicides that are -- being involved in forensics
18   and knowing forensics as you do right now, take a
19   look back over how the information developed and
20   also the forensics that could have been done or
21   maybe had been explored, will you concede that
22   there was more information that could have been
23   gleaned or perhaps an expert would have been
24   useful?
25   A    Looking back now, yes; at the time

1  looking at that DNA was uncontested.  Her blood
2  was on Kazar's boot.  I don't think we needed a
3  forensic expert to say what was already proven by
4  the Commonwealth saying that that blood was hers
5  on his shoes.
6      Q    Importing the knowledge that you have now
7  and benefit of extreme hindsight, you'll concede
8  that having a forensic odontologist trying to
9  exclude the bite mark evidence with Tyshaunt Love
10 or maybe potentially matching the bite mark
11 evidence with Kazar, that would have been
12 something that would be preferred?
13     A    Yes, yes, in hindsight, yes.
14     Q    Also the blood that was reported to be
15 all over Kazar -- there was a report that was
16 given by a forensic scientist, that expert -- was
17 on the boot and eyelet, that was not consistent
18 with her being a contributor, meaning the DNA
19 didn't, quote/unquote, match?
20     A    Right.
21     Q    Neither yourself nor Paul Muller, to your
22 knowledge, went and got the raw data to see how
23 they came about that ultimate conclusion,
24 correct?
25     A    Correct.

1    Q    Now, now knowing what you do know, you
2  concede the possibility of what's called random
3  error or random sampling error, meaning a small
4  partition is tested of a big pool of something,
5  it's not necessarily representative of the
6  colloidal mix of the blood?
7    A    Correct.
8    Q    Also the lifting of the print off the
9  body, are you aware that there's technology that
10 is available and was available back then that
11 would have been able to potentially develop the
12 fingerprint more or better than the lifting that
13 occurred with the tape?
14   A    Yes.
15   Q    If you were the attorney of record in the
16 matter now, you would have explored those
17 possibilities because you have that greater level
18 of knowledge now?
19   A    Correct.
20   Q    And the point of that is to conflict
21 potentially the known physical irrefutable
22 evidence, meaning the physical evidence, versus,
23 that is, the witness evidence, correct?
24   A    Correct.
25   Q    In this case the way that it was tried

1 fell or rose not upon the forensics but based

2 upon the witnesses. Is that fair to say based

3 upon your estimation?

4     A   Yes.

5     Q   If one were able to impeach the witnesses

6 with the greater body of science that's empirical

7 in nature not potentially by -- honestly

8 mistaken, that was reasonable trial strategy to

9 employ, correct?

10     A   Yes.

11        MR. McSHANE:  Nothing further for this

12 witness.

13        THE COURT:  Mr. McMurry.

14        MR. McMURRY:  Thank you, Judge.

15

16               CROSS EXAMINATION

17

18 BY MR. McMURRY:

19     Q   Mr. Giunta, I want to go through

20 basically with you the filed documents

21 Mr. McShane has filed regarding each of the

22 errors, alleged errors in Mr. Love's complaint,

23 both the amended and the supplement to the

24 amended. We'll just start, basically he's

25 alleging that these following witnesses should

1  have been interviewed and possibly called as
2  defense witnesses:
3        Starting with LaQuan Williams, we touched
4  on about, what was, in your estimation regarding
5  this case, what was LaQuan Williams' availability
6  for trial?
7        A    Unavailable.
8        Q    How did you decide he was unavailable?
9        A    Based on, I believe -- and Mr. Muller
10 might be able to speak to this better -- we tried
11 to get him.  He was facing another set of either
12 rape or attempted murder charges in New York and
13 I believe that they would not release him from
14 New York.
15       Q    Did you have reason to believe based on
16 your investigation of the case and strategy that
17 you were attempting to employ, that Mr. Williams,
18 LaQuan Williams would be cooperative for the
19 Defense?
20       A    Not at all.
21       Q    You're not aware of any statement
22 Mr. Williams gave implicating himself in this
23 case?
24       A    No.
25       Q    Let's talk about Ms. Smith.  Mr. McShane

1  introduced a statement that you saw from her.

2  What was your knowledge of Ms. Smith's

3  availability at trial?

4     A   I don't remember if we had found her or

5  knew where she was at the time or were able to

6  locate her at that time.

7     Q   You don't recall?

8     A   I don't recall if we had located her at

9  that point or not.

10     Q   Did you personally talk to Ms. Smith

11  about her testimony?

12     A   I don't believe I did.

13     Q   Are you aware of anyone from your office

14  interviewing Ms. Smith in regards to her

15  testimony?

16     A   I don't know if Mr. Muller did or not.

17     Q   Ms. Smith didn't appear for trial?

18     A   No.

19     Q   In regards to Ms. Smith's testimony,

20  albeit, what she said Cory Alston had told her

21  could be favorable to the Defense.  Do you have

22  any reason to believe that would be admissible in

23  court?

24     A   No.

25     Q   Let's talk about Keith Herndon.  What do

1  you recall about Mr. Herndon's availability?

2      A    I believe we sent a writ out to have him

3  brought in to DCP.  I believe he was in state

4  prison at the time.  I, myself, did not speak to

5  him.  I don't know if Mr. Muller did or not.

6      Q    You don't know what his testimony would

7  have been?

8      A    No, other than the statement.

9      Q    Let's talk about Larry Fennel.  Did you

10  interview Mr. Fennel?

11      A    I did not, no.

12      Q    Do you know if your office did?

13      A    I don't know if anyone from -- anyone

14  else from my office did.  I know I did not.

15          THE COURT:  Is he related to the victim?

16          MR. McMURRY:  I think it's spelled

17  differently, Your Honor.

18          THE COURT:  I was just asking if

19  Mr. Giunta knew that or remembered that.

20          THE WITNESS:  I don't recall.

21          MR. McSHANE:  I think he's the baby's

22  daddy.

23  BY MR. McMURRY:

24      Q    Your knowledge of Mr. Fennel, you

25  testified about whether he was available at the

1  time of trial.

2      A    I don't know if he was.  I don't recall.

3      Q    Was Mr. Fennel beating at your door

4  saying you got the wrong guy?

5      A    No, he did not, at least to my knowledge.

6      Q    In reference to Carlos Hill, were you

7  aware of Mr. Hill's whereabouts at the time of

8  trial?

9      A    I don't recall.

10     Q    Were you aware of any testimony he could

11 have offered that would be favorable to you, to

12 your case?

13     A    Like other than --

14     Q    Other than what you read in discovery

15 personally.

16     A    Personally, no.

17     Q    You don't know if he would have

18 cooperated?

19     A    No, I don't.

20     Q    Let's talk forensics for a minute.  It's

21 alleged that trial counsel errs in failing to

22 request an independent test of DNA and blood

23 evidence in order to conduct a full and

24 comprehensive test of the blood spatter on LaQuan

25 Williams' clothing.  In reference to that, what

1  evidence did you have or what reason would you
2  have had to have another test of the DNA when you
3  already had a positive result for the victim?
4      A    We didn't think there was another reason.
5  Two reasons I can think of offhand is, one, we
6  already had the DNA match to LaQuan Williams that
7  was on his item.  LaQuan wasn't covered in blood,
8  and there wasn't a drop of blood on Tyshaunt;
9  that I never would have thought --
10     Q    Would it be fair to say that while -- a
11 possible reason -- strategy to take what you got
12 and don't interfere with the rest of it?
13     A    Yeah.
14     Q    What you had was favorable to the
15 Defense?
16     A    Correct.
17     Q    Since we are speaking of hypotheticals
18 earlier this morning, blood could have been
19 tested on Mr. Williams and come back to a
20 different person?
21     A    Exactly.
22     Q    So your reasonable trial strategy was why
23 rock the boat?
24     A    Certainly and the fact there was no blood
25 on Mr. Love.

1   Q   Let's talk about the hand impressions
2 found on the victim's thighs.  What do you recall
3 about that?
4   A   I don't recall that much about the
5 decisions made on that at all.
6   Q   We'll move on then.  What about -- I
7 think this coincides probably the same thing --
8 the clothing of LaQuan.  Did you request an
9 independent laboratory test for luminol for
10 evidence, for additional blood located on LaQuan
11 Williams' clothing for blood?
12   A   Again, all the blood was found on him.
13 None on our client.
14   Q   And, again, for the same reason, that
15 part that was tested was favorable to you?
16   A   Correct.
17   Q   Why rock the boat?
18   A   Exactly.
19   Q   In reference to the bite marks that
20 Mr. McShane brought up, I believe you testified
21 you didn't have much knowledge about that as
22 well?
23   A   That's correct.
24   Q   What were your and Mr. Muller's
25 discussions regarding trial strategy?  What was

1  your plan?

2      A    Basically to point the finger at LaQuan

3  Williams.

4      Q    Tell the Court how you thought you were

5  going to be able to do that.

6      A    Originally we figured that LaQuan -- I

7  believe Guillermina Cruz, were all witnesses

8  potentially going to come in and be benefitted,

9  which we didn't see.  Guillermina was not

10  favorable to us.

11          On Monday she came to court and then

12  disappeared the rest of the week.  At that point

13  we -- the Commonwealth sought to introduce her

14  preliminary hearing, and we had a whole -- half

15  day hearing on whether or not -- whether we had

16  full and fair opportunity to cross examination.

17          For our sake it was best that nothing

18  comes in from her testimony.  She had been here

19  Monday, disappeared, and the Court ruled her

20  unavailable and based on after hearing let that

21  read in.

22          But her not being here was actually --

23  was something -- we figured they had called her.

24  She had been subpoenaed.  They went out searching

25  for her.  Her disappearing was favorable for us.

1  Incidentally the way we didn't get a ruling in
2  our favor; lead to her transcript hearing in.

3         We next went -- we focused on the fact a
4  big part of it was that LaQuan, I believe his --
5  LaQuan's girlfriend, Candace Mills, I believe her
6  name was, in cross examination of her said all
7  the things that she was -- Iris was afraid of
8  Kazar and the whole snitching part and that came
9  out and I believe Daelene Saez made similar
10 references during cross examination of Iris's
11 fear, and then the blood, the fact that all of it
12 was found, like, on Kazar.

13        None was on Tyshaunt Love; that that was
14 our plan; just to take all those things there
15 even though, for example, LaQuan Williams
16 wouldn't have been favorable for us to put on,
17 because on the flip side he said it was Tyshaunt
18 that did this in going through his statements.

19        But had they put him on, we had avenues
20 to counteract his testimony, but I think the
21 evidence and focus that we had was the blood was
22 on Kazar.  The DNA matched Iris on his shoes.  I
23 believe they found a shoeprint in there, and the
24 Commonwealth didn't have anything to say to the
25 contrary of that and basically our whole focus

1  was to point it at Kazar.

2      Q    Was that the same basic trial strategy

3  that you had discussed with Ms. Cliatt?

4      A    Yes.  I think everyone thought that had

5  this case always said it was going to be Kazar.

6  I don't think there's a doubt that it's Kazar.

7      Q    Again, explain to us and explain what

8  lengths you went through to try to get in this

9  other evidence regarding Kazar and his actions.

10     A    To the best of my recollection we had

11 filed the motion.  We had the transcript from the

12 Vanessa Ames incident, and I believe we had a

13 hearing and Mr. McCormack called someone -- I

14 can't remember his name -- as a witness to say --

15 to take both of these events and say that they

16 weren't similar and what the differences were.

17          So it wasn't attached in the motion.

18 Those facts came out during that hearing because

19 Mr. McCormack called someone to take both of

20 these situations, compare them and then the judge

21 ultimately ruled on whether or not the Vanessa

22 Ames' incident came in, but we had filed the

23 motion and made the argument and basically laid

24 out the fact that Vanessa Ames was raped.  Iris

25 was laying in her underwear.  I don't remember if

1   she had a shirt on or not, legs spread.

2          Vanessa Ames was duct taped and he slit

3   her throat.   Iris got a bullet point blank to

4   the head to the point there was blackening around

5   there.

6          So we kind of paralleled there was, I

7   believe, the bleach that was used in Vanessa Ames

8   when Kazar tried to clean everything up.   The

9   bleach that was found at the scene in the house

10  kind of just paralleled it that way.

11     Q    So all this information was brought to

12  the trial court's attention and for the court to

13  make the ruling?

14     A    I believe so, yes.

15     Q    And that was done at the hearing?

16     A    Correct.

17     Q    Prior to the trial?

18     A    Yes.

19     Q    When was that hearing in relation to the

20  trial?  Do you remember?

21     A    I believe we had it a day, day and a half

22  prior to the trial; because I know we had that

23  and then there was the Rule 600 issue that we

24  argued prior to trial.

25     Q    Did the trial court's ruling on those

1 matters affect the trial strategy?

2     A    On which one?

3     Q    On, well, for the Rule 600 but the

4 404-B --

5     A    Yes.

6     Q    How did it affect --

7     A    Not in-house; we presented -- we were

8 still going to argue that it was LaQuan. We were

9 just hoping that we were able to show this is

10 what happened. I mean, we still went forward

11 showing it was LaQuan and arguing it was LaQuan.

12 We just weren't able to say, hey, look, even all

13 the evidence where we said, everybody said she

14 was scared to death of Kazar. We were hoping to

15 supplement that by saying and here's why and look

16 what the similarities are. We just weren't

17 allowed to do that.

18     Q    In preparing for trial and discussing

19 things with Mr. Love -- there was an allegation

20 regarding whether or not you or Mr. Muller

21 consulted with Mr. Love regarding whether he

22 should or should not testify. Do you recall

23 anything about that?

24     A    I remember --

25         MR. McSHANE: Judge, to speed things

1 along, we'll concede we no longer want to go
2 along with that claim. We have more than enough
3 in our belief.
4       THE COURT: Which paragraph?
5       MR. McMURRY: No. 22, Your Honor, on the
6 April 1st amended -- no. It's the supplemental
7 filed after the --
8       THE COURT: You're withdrawing that
9 paragraph 22.
10       MR. McSHANE: With the consent of
11 Mr. Love. Correct?
12       THE DEFENDANT: Yes.
13       THE COURT: All right.
14 BY MR. McMURRY:
15   Q  Again, in regards to paragraph 21 of that
16 same motion, it's alleged that counsel was
17 ineffective for not making an oral motion to
18 reconsider the trial court's ruling barring
19 LaQuan's relevant bad acts. Regarding that
20 hearing, what's your opinion of that?
21   A  Once Judge Bratton said no, that I wasn't
22 going to stand up and say I object again or
23 reiterate. He already ruled. It was preserved
24 and raised in the appeal. We had preserved that.
25 I don't know what objecting again would have

1  done.
2      Q    And you did appeal that issue to the
3  Superior Court?
4      A    Correct.
5      Q    And Superior Court's decision was?
6      A    They denied it.
7      Q    There's some other witnesses that were
8  listed in the original amended PCRA motion under
9  paragraph 42 that we haven't discussed today.
10 Anthony Knight.
11     A    Yes.
12     Q    Did you call Mr. Knight?
13     A    Yes.
14     Q    Mr. Knight testified at trial?
15     A    No.
16     Q    Can you tell me what the strategy,
17 process with regard to Mr. Knight's testimony?
18     A    I don't recall if we were able to locate
19 him, and I don't recall at the moment what his
20 statement was.
21     Q    It's your recall Mr. Knight was
22 unavailable for court?
23     A    To my knowledge, yes.
24     Q    What about Daelene Saez?
25     A    Yes.

```
1    Q   Did she testify?

2    A   She testified.

3    Q   Did you talk to her before she testified?

4    A   I did not.

5    Q   Did anyone from your office talk to her?

6    A   Not that I remember.

7    Q   Do you recall her testimony?

8    A   Yes.

9    Q   What was it?

10   A   I believe --

11       MR. McSHANE:  Objection.  It speaks for

12   itself, the testimony of the witness.

13       THE COURT:  Well, it would be --

14       MR. McSHANE:  I'll withdraw it.

15       THE COURT:  It's helpful for me to have a

16   summary of it rather than having to search

17   through the transcript to find it again.

18       THE WITNESS:  I believe she made the

19   indication on cross examination that when Iris

20   would mention or she would mention Kazar's name,

21   something like the hair on the back of her neck

22   would stand up and she was scared to death of

23   him.

24   BY MR. McMURRY:

25   Q   So in your opinion you got useful
```

1 information from the Commonwealth's witness?

2     A    Correct, and the rest of her testimony

3 was not favorable to the Defense or defense

4 friendly.

5     Q    I'm sorry?

6     A    She was not generally a defense friendly

7 witness except that point which boasted towards

8 our defense of Kazar, but the other parts of her

9 testimony were to be favorable towards Mr. Love.

10     Q    I understand.  What about Linda

11 Gianquitto?

12     A    We did not call her.  I remember speaking

13 to her on the phone and she flat out said that

14 she was not going to be favorable for Tyshaunt.

15     Q    It's safe to say it's not reasonable to

16 call a nonfavorable witness for your case?

17     A    Yes.

18     Q    What about Mr. Lloyd Banks?

19     A    I don't recall I spoke with him.  I'm not

20 sure if we were aware where he was at the time.

21     Q    And the last person on the list of that

22 paragraph is a person by the name of pop-pop.

23     A    I believe there was an address.  When one

24 of our investigators -- whether it was at the

25 time when we had it or right when Ms. Cliatt was

1 leaving, the address they had, the building had

2 been demolished or abandoned and other than that

3 address where that abandoned building was we had

4 no official name of someone other than that,

5 pop-pop.

6    Q    Basically you weren't able to contact

7 him?

8    A    Correct.

9    Q    Having discussions with Mr. Love evolved

10 in the formulation of trial strategy?

11    A    I remember speaking -- I don't

12 remember -- I can't recall the exact

13 conversations. I don't believe he would say no

14 let's not blame Kazar and that was what our

15 strategy was. So I would say he was with that.

16 I don't recall exact conversations because a lot

17 of them he was living in New York at the time and

18 I believe one time prior he drove down.

19    MR. McSHANE: I'm sorry. Who was living

20 in New York at the time?

21    THE WITNESS: Tyshaunt, I believe; he

22 drove down for a face-to-face prior to trial. We

23 arranged for Thursday or Friday afternoon, and we

24 would set up a specific time having a phone

25 conversation in the conference room via speaker

1  phone, and then I believe one time he did come
2  down and went back to New York. Most times they
3  were all via phone conversations.
4  BY MR. McMURRY:
5      Q    Did you have conversations -- did he have
6  to say I got witnesses to help me out that you
7  guys need to find this person or that person?
8      A    Again, I don't recall the specifics.
9  Most anybody -- I believe there was. No one -- I
10 would say if it was said additional from the
11 people we were already aware of via statements,
12 police reports, and wouldn't have already
13 independently, I guess, tried to track down.
14          Again, I don't recall specifically those
15 conversations.
16     Q    Did you and Mr. Muller and Mr. Love get
17 along during the preparation of trial?
18     A    I thought we did.
19     Q    Do you recall anything that Mr. Love
20 asked for or asked you guys to do that you didn't
21 do or couldn't do?
22     A    I mean, I can't recall.
23          MR. McMURRY: I believe that's all I
24 have, Judge.
25          THE COURT: Anything else, Mr. McShane?

1    MR. McSHANE:  Yes.

2

3              REDIRECT EXAMINATION

4

5  BY MR. McSHANE:

6    Q    Seems to be the theme of part of the

7  cross examination is that Mr. Love should have

8  purported to have knowledge of a lawyer.  I'm

9  wondering if you knew or that you testified that

10 Mr. Love was or was not a lawyer?

11   A    He was not.

12   Q    And also did he possess any sort of

13 independent legal knowledge akin to a paralegal?

14   A    Not that I'm aware of.

15   Q    In fact, explain -- was he incompetent in

16 terms of the intricacies of the Rules of

17 Evidence?

18   A    I don't remember discussing the Rules of

19 Evidence.

20   Q    So we're implying his formulating a trial

21 strategy would be malpractice; is that fair?

22   A    Yes.

23   Q    Would you agree with the sentiment, upon

24 review the Superior Court can only make a ruling

25 to overturn a trial court's determination based

1 upon the four corners of the record?

2     A    Correct.

3     Q    Absent incompetency, the Superior Court,

4 they're stuck with the record that's developed by

5 trial counsel, correct?

6     A    Yes.

7     Q    And in this particular case the

8 Commonwealth called the investigating detective

9 from the New York -- I'm sorry -- from the Ames'

10 matter to testify about this dissimilarity of

11 events between the Iris event and the Ames'

12 event?

13     A    If that's what -- I know they called

14 someone. I don't know what the exact title was.

15 I believe that's what it was in reference to

16 today. Sitting here today I don't remember.

17     Q    Did you folks anticipate that the hearing

18 would come about with the testimony from an

19 individual making such correlations or lack of

20 correlations between the two events?

21     A    I don't recall.

22     Q    You folks didn't speak to any of the

23 witnesses involved in the -- with respect to the

24 Ames' incident, did you?

25     A    We did subpoena -- I think we spoke with

1  Vanessa Ames.  I don't recall her being
2  subpoenaed to testify, but I remember I think we
3  spoke with her.
4      Q   But if you had gotten your wish and if
5  you had been able to bring in the Ames' incident,
6  you'll agree that you had no enforceable
7  subpoenas in order to bring that event into the
8  court.  You had no live witnesses, correct?
9      A   Correct.
10     Q   You had testified here that based on your
11 recollection that there was testimony from
12 Candace Mills, correct?
13     A   Correct.
14     Q   And, in fact, you had done the cross
15 examination of -- I'm sorry -- you had done the
16 cross examination of Ms. Mills?
17     A   I believe so, yes.
18     Q   And it is your testimony here that your
19 recollection was more or less that Kazar did make
20 a big deal about Iris snitching on him, correct?
21     A   Did?
22     Q   Yes, did.
23     A   Yes.  Is that his girlfriend?  I may have
24 messed the name up, but I knew it was his
25 girlfriend.

1     Q   Taking a look at page 301 of the trial

2   transcript, Volume No. 2, September 14 and 15

3   before this Honorable Court, I'm going to ask you

4   to take a look at page 301 and if you want to go

5   ahead and take a look.  Actually it was

6   Mr. Muller who had conducted the examination.

7   Take a look at the context over those two pages.

8   I'm going to look over your shoulder and I'm

9   going to confirm --

10        THE COURT:  That's the examination of...

11        MR. McSHANE:  Candace Mills.

12        THE COURT:  Cross examination.

13        MR. McSHANE:  The redirect.

14        THE WITNESS:  This is actually from the

15   grant jury testimony.

16   BY MR. McSHANE:

17     Q   From the grand jury testimony.

18     A   I did the cross examination.  Mr. Muller

19   crossed her on because we were just getting the

20   grand jury testimony live in our hands.  As I was

21   doing the cross examination, he was preparing the

22   cross based off of the grand jury.  It was a two

23   part --

24     Q   Bifurcated.

25     A   Yes.

1    Q    Drawing your attention to page 301.

2  There was a question placed before the witness

3  and the question was at this point, he, being

4  Kazar, Mr. Williams, told that he thought Iris

5  had turned him in or set him up, correct?

6    A    Yes.

7    Q    And the answer was no?

8    A    Correct.

9    Q    Now, when that's in conflict to the

10  recollection that you just had here with respect

11  to whether or not favorable bit of evidence was

12  first presented before the jury; is that fair?

13    A    Yes, but I think the second part of that

14  right after that she did say that, did come --

15    Q    Okay.  We'll bookmark that.  If it's

16  there we'll come back and clean it up.

17         As it stands on page 301 that conflicts

18  with your recollection?

19    A    Yes.

20    Q    One of the themes in the opening that

21  Mr. Muller had made is that there's a reason why

22  they have 30 people coming in and testifying in

23  this case because they are hoping that just by

24  the sheer number of folks making accusations,

25  that it's going to be good enough to excuse an

1 insufficient amount of evidence. That's in
2 summation of part of this theme, correct?
3     A   I don't recall. Like I said, I don't
4 recall.
5     Q   Let me ask you a generalized question.
6 Based upon your training, knowledge and
7 experience, drawing upon all of it, is it more
8 powerful or impactful to a jury or for
9 presentation of the case to have a single
10 person's say so or multiple people's say so
11 backed up with forensic evidence that confirms --
12     A   In relation to this case or in general?
13     Q   General as a defense attorney.
14     A   Multiple and forensic evidence.
15     Q   That general sentiment we extrapolate to
16 this case was not unique in that regard. If you
17 have forensic evidence that backs up your theory
18 of the case and contrasted what the
19 Commonwealth's theory of the case, well, that's
20 right, that's what you want?
21     A   Yes.
22     Q   But you would rather have not just a
23 little bit of forensic evidence but a whole bunch
24 of forensic evidence that would confirm your
25 theory of the case?

1    A    Yes.

2    Q    Drawing your attention in particular

3  towards the blood and the DNA, you -- basically

4  the answer was why rock the boat in terms of why

5  have those things tested.  So I can understand

6  the mixture that we're clear here.  The testing

7  that was done by the Commonwealth's entity,

8  meaning, it wasn't an independent lab that did

9  the testing.  It was done on the behest and

10  guidance of the government?

11    A    Correct.

12    Q    Not by the Defense?

13    A    Correct.

14    Q    You're aware that the government was

15  contending that it was not Kazar who did it,

16  correct?

17    A    Correct.

18    Q    You had a small bit of DNA evidence that

19  was confirmed in the eyelet and on the shoe

20  string of the alternative suspect, meaning Kazar,

21  coming from the victim herself, correct?

22    A    Correct.

23    Q    And that was through two different

24  methods of amplification to arrive at the

25  rematch; is that fair?

1    A    Yes.

2    Q    Why rock the boat is curious in regards

3  to this.  You had some sort of statements from

4  some forensic scientists based on an unknown

5  population size that the remaining balance of the

6  blood that was found on Kazar at or near the time

7  of his arrest was exclusive of the victim.  Is

8  that true?

9    A    I don't recall if that's what the

10 statement was but yes.

11   Q    Well, if it comes back that it was

12 consistent with or even a match or even

13 mitochondrial DNA certainly insisted that

14 Mr. Muller bring that forth to the jury, correct?

15   A    Yes.

16   Q    So without knowing the population of the

17 ultimate conclusion made by the government's

18 scientist at the behest of the government, the

19 remaining portion of the blood was not the

20 victim's, you feel comfortable that why rocking

21 the boat would be a sufficient trial strategy

22 answer when you have already an individual who

23 sits there and says it's not the victim's?

24   A    At this point I would say probably not.

25 Five years ago that was fair.

1    Q   Talk to me about the subpoenas.  Did you

2   prepare personally any of the subpoenas in this

3   matter?

4    A   I believe so.

5    Q   Of all the people -- the axiom, do you

6   agree if you don't look for someone you'll never

7   find them?

8    A   Oh, yes, if you don't look for somebody,

9   yes.

10    Q   It wasn't as if you had people coming out

11   of the woodwork and want to be involved in it?

12    A   Correct.

13    Q   The entirety of the case, Commonwealth

14   and Defense, had appreciable problems with people

15   showing up, nominal bail being granted and other

16   such matters?

17    A   Correct.

18    Q   Do you recollect even preparing a

19   subpoena for Kendra Smith?

20    A   I don't recall if one was done or not.

21    Q   Do you recall similarly making a subpoena

22   for Larry Fennel?

23    A   I don't recall.

24    Q   Do you recall preparing a subpoena for

25   Cory Alston?

1    A    I don't recall, but I believe there was a

2    writ done so we must have -- I mean, I think we

3    had him brought here.

4    Q    And then in terms of the subpoena for

5    Carlos Hill, you don't recall that either?

6    A    I don't recall.

7    Q    You're positive of Keith Herndon being

8    prepared, correct?  And he was present in prison

9    as you previously testified?

10   A    Yes.

11   Q    Now, here's a question that I have with

12   respect to Kendra Smith.  You didn't seek to talk

13   to her.

14   A    I don't remember.

15   Q    If drawing upon your training, knowledge

16   and experience, if she had said that she was --

17   strike that.  One second.

18        If Kendra Smith had that made a statement

19   to you the morning following the homicide, she

20   woke to find Kazar laying there in bed with the

21   flatmate or a friend of hers who she was staying

22   with and that when Kendra woke up her boyfriend,

23   Cory Alston, at the time advised him of such.

24   She verified it with her own two eyes; that she

25   spoke with Kazar.

1        He left the residence and that when he
2   left the residence to smoke outside, the police
3   came by.  He ran back through the residence
4   advising that Iris had been dead, talking to
5   Smith directly, went inside the residence.

6        The detectives coming through the house,
7   a jacket that he had on that he had discarded in
8   the chase contained bullets that were consistent
9   with the firearm that was alleged to have been
10  used in this particular matter.  Would you find
11  that to be a significant occurrence?

12      A    Sure.

13      Q    Again, you didn't ask Kendra Smith any
14  questions to your knowledge or to your
15  recollection?

16      A    I do not.

17      Q    You would have documented that if she had
18  said anything close to that, correct?

19      A    I think so, yes.

20      Q    You would have put that to Attorney
21  Muller's attention to be brought before the jury?

22      A    Yes.

23      Q    I want to talk about Kendra Smith's
24  statement that you and I went over before about
25  the whole Cory Alston and the gun being returned

1 with the blood on it. If one were to secure Cory
2 Alston through the writ and have him brought into
3 court, if he had denied making that statement,
4 one could use Kendra Smith's statement as
5 potential impeachment evidence, not substantive
6 evidence, but as potential impeachment evidence
7 potentially?

8     A   Yes.

9     Q   That was not done?

10     A   Not that I'm aware of, no.

11     Q   Drawing your attention to LaQuan
12 Williams, you never spoke with him?

13     A   No.

14     Q   Your summation that these people would be
15 favorable or disfavorable, in particular, LaQuan
16 Williams, Kendra Smith, Keith Herndon, Larry
17 Fennel, Cory Alston and Carlos Hill is not based
18 upon firsthand conversations that you had with
19 them but just because of a gut feeling; is that
20 fair?

21     A   Their statements are -- at least LaQuan
22 would have pointed the finger, I believe, at
23 Tyshaunt, in fact, went to the point if it was
24 me, I would have killed him too.

25     Q   He would have killed him too, meaning

1 that he would have?

2    A   If he was the one who killed Iris, I

3 would have killed Tyshaunt too at the same time,

4 implying Tyshaunt was there at the house too.

5    Q   You never spoke with the man?

6    A   No.

7    Q   You are basing this simply upon a police

8 report?

9    A   Correct.

10    Q   And it's generated by the police not

11 based upon --

12    A   That was from his statement from SCI.

13    Q   But that was, again, generated not based

14 upon a tape recording, audio recording, but some

15 police officer's summary of what he was told by a

16 person, correct?

17    A   Correct.

18    Q   And you'll concede of the possibility

19 that not everything that a police officer records

20 in a statement can be accurate or precise and

21 true every single time, correct?

22    A   Correct, but I wasn't willing to gamble

23 that.  I don't think Mr. Muller was willing to

24 gamble that when someone was looking at life in

25 prison.

1      Q    I respect that gambling that by putting

2   them on the stand without having any idea what

3   they will say versus having a conversation with

4   them or attempting to have a conversation with

5   them, correct?

6      A    Correct.

7      Q    In which case he could do one of many

8   things, which would include, I don't want to talk

9   to you, right?

10     A    Yes.

11     Q    Or I want to talk to you.  Let me tell

12  you about my perspective, point of view so you

13  can evaluate the witness, correct?

14     A    Correct.

15     Q    In this particular case neither was done,

16  correct?

17     A    That's correct.

18     Q    And even if he had been cooperative, you

19  gave his perspective, his point of view even if

20  you gave the exact summary of what he gave to the

21  police, he could have been -- if he arrived here

22  in court and invoked his Fifth amendment right,

23  you could have then later attempted to have him

24  declared unavailable and have those beneficial

25  statements against personal interest where he

1 made various confessions to separate people on
2 separate dates who have no reason to interfere,
3 present that to the jury as statements against
4 personal interest, correct?

5    A    I guess even without the ability to cross
6 examination on those things prior.

7    Q    Sure.

8    A    I mean, if you want to put it that way.

9    Q    Also question him about the I'm going to
10 go back down and kill that bitch statement, that
11 if he was declared unavailable, either it could
12 be considerably arguable present sense impression
13 or declaration of intent; fair?

14    A    Fair.

15    Q    But you didn't seek to try to have him
16 declared unavailable, correct?

17    A    Correct.

18    Q    And based upon your experience level, it
19 was likely that if he was called to the stand
20 even though you never discussed anything with the
21 man, that he would have asserted his Fifth
22 amendment right, correct?

23    A    I think he would have blamed Tyshaunt.  I
24 don't think he would have --

25    Q    You don't think he would have asserted

1  his Fifth amendment right?

2     A   He may have.  He would have tried to

3  implicate Tyshaunt.

4     Q   Don't you think that's beneficial to have

5  another individual blame your client in front of

6  a jury in order to get him out of a jam when he

7  has blood on his sneaker and has motive that you

8  can open up the door?

9     A   Yes.

10     Q   The ruling by the Court was that there

11  was insufficient similarities between the two

12  events that would justify it being presented,

13  either motive or modus operandi in terms of this

14  matter, correct?

15     A   Correct.

16     Q   If he were to testify, as you say was a

17  possibility, then potentially one could open the

18  door to revisit that ruling, correct, if he were

19  to open the door.

20     A   If he were to open the door, yes.

21     Q   And we don't know that because obviously

22  it didn't occur?

23     A   Correct.

24     Q   Did you interview anyone in this case

25  that you haven't told us about?

1    A    I don't recall.

2    Q    Okay.

3         MR. McSHANE:  Nothing further.

4         MR. McMURRY:  No further questions.

5         THE COURT:  All right.  Mr. Giunta, thank

6    you.  You may step down.

7         MR. McSHANE:  Judge, Mr. Muller is going

8    to take an appreciable amount of time based upon

9    this witness.  I have two very short witnesses

10   that I can do.  Would that be acceptable to the

11   Court?

12        THE COURT:  Sure.

13

14                    JAMES STAMOS,

15   having been sworn, was examined and testified as

16   follows:

17

18                 DIRECT EXAMINATION

19

20   BY MR. McSHANE:

21     Q    Sir, would you please state your name and

22   spell your last name for the benefit of the court

23   reporter and the record?

24     A    James Stamos, S-t-a-m-o-s.

25     Q    How are you currently employed, sir?

1      A    I'm an investigator for the Dauphin

2   County Public Defender's office.

3      Q    Drawing your attention to the relevant

4   point in time in this particular case from 2002

5   to 2005, were you similarly employed with the

6   Dauphin County Public Defender's office?

7      A    Yes, I was.

8      Q    When you're in that position as an

9   investigator with the Public Defender's office,

10  it is a unique position within that office,

11  meaning, that you assist the attorneys in their

12  preparation of trial?

13     A    Correct.

14     Q    And that includes such things as

15  potentially subpoenaing witnesses?

16     A    Well, serving.

17     Q    Serving the witnesses --

18     A    Correct.

19     Q    -- with subpoenas?

20     A    Right.

21     Q    Also attempting to try to track down

22  individuals?

23     A    Correct.

24     Q    And also on top of it, trying to locate

25  witnesses or even employing your professional

1  level of skill, training and knowledge to make
2  and formulating the defense and theory of the
3  case, correct?
4      A    Right.
5      Q    Now, the general course of duty as one
6  uses as an investigator in the Public Defender's
7  office is that you are on call to aid in the
8  defense as time permits with various different
9  cases that are involved, correct?
10     A    Yes.
11     Q    You don't have the luxury of having one
12 case and run down that case?
13     A    No.
14     Q    Directing your attention to this
15 particular case of Tyshaunt Love, Commonwealth
16 versus Tyshaunt Love, which went to trial in 2005
17 when you were employed in the Public Defender's
18 office, correct?
19     A    Yes.
20     Q    During various moments in time you were
21 attached with assignments to help fraught in the
22 defense in this particular matter, correct?
23     A    Yes, sir.
24     Q    Now, I want to draw your attention -- I'm
25 going to call it -- I'll make it somewhat easy

1  for reference purposes as the before and after

2  Monica Cliatt periods of this particular case so

3  we can use that nomenclature, helpful to make

4  sure that all of us are able to do that. You

5  realize there was a period of time when Monica

6  and Monty were involved with the case.

7     A   Right.

8     Q   Afterwards it was Paul and Nate.

9     A   Correct.

10    Q   I'm placing in front of you what has

11 previously been marked and identified as Defense

12 Exhibit No. 17. If you could take a moment and

13 take a look at that and I'll ask you to identify

14 it, if you don't mind. Let me know when you're

15 ready.

16    A   Okay.

17    Q   Having taken a look at Exhibit No. 17,

18 this is a memorandum between Monica Cliatt, who

19 was the attorney in charge of the case on January

20 24, 2005, which is the date of the letter to you,

21 correct?

22    A   Correct.

23    Q   And included within it an indication that

24 there was several witnesses who needed to be

25 subpoenaed and located, correct?

1    A    Correct.

2    Q    There's handwritten notes that are there

3  that are consistent with your handwriting,

4  correct?

5    A    That's not my handwriting.

6    Q    That's not yours?

7    A    No.

8    Q    Do you know whose handwriting it is?

9    A    I'm not sure.

10    Q    Okay.  There had been a period of time

11  that you had been asked to serve several of the

12  subpoenas at the behest of Monica in this

13  particular case, correct?

14    A    Yes, sir.

15    Q    When it came to trial in 2005 with Paul

16  Muller and Nate Giunta providing for the defense,

17  no subpoenas were served by you in this

18  particular matter?

19    A    Not that I recall.

20         MR. McSHANE:  Nothing further.

21         THE COURT:  Maybe I missed it.

22  Mr. Stamos, I want to make sure I understood.

23  You did serve subpoenas for Monica and Monty when

24  they were representing --

25         THE WITNESS:  I believe I did.  I don't

1 have my records if they had. I have to take a
2 look at them. I saw some yesterday from another
3 attorney from our office I recall my signature
4 on.

5 THE COURT: But you know that you were
6 not asked to serve any by Mr. Muller and
7 Mr. Giunta.

8 THE WITNESS: I'm not a hundred percent
9 sure. We -- I don't recall. I have to look at
10 the copy.

11 THE COURT: Any questions, Mr. McMurry?

12

13 CROSS EXAMINATION

14

15 BY MR. McMURRY:

16 Q In reference to the -- I want to ask you,
17 some witnesses -- see if you recall looking for
18 these individuals, Kendra Smith. Does that ring
19 a bell?

20 A Not really; this is five years ago.

21 Q Keith Herndon?

22 A Keith Herndon, can't recall.

23 Q Larry Fennel?

24 A No.

25 Q Anthony Knight?

1    A    No, sir.

2    Q    LaQuan Williams?

3    A    Can't recall that; I have to look if

4  there's paperwork.

5    Q    Carlos Hill?

6    A    No, sir.

7    Q    Linda Gianquitto?

8    A    That sounds familiar, but I'm not sure.

9    Q    Lloyd Banks?

10   A    No.

11   Q    Do you recall trying to find an

12  individual by the name of pop-pop?

13       MR. McMURRY:  No further questions.

14

15              REDIRECT EXAMINATION

16

17  BY MR. McSHANE:

18   Q    Take a look at Defendant Exhibit 28, and

19  have you flip through them.  They appear to be

20  subpoenas and they are previously marked and

21  identified by Monica Cliatt.

22   A    Okay.

23   Q    Just flip through all of them and see if

24  it's consistent with either your handwriting or

25  does it refresh your recollection that the

1  subpoenas were served at the behest of Monica
2  Cliatt?
3    A    It seems like my initials are on eight of
4  these subpoenas.
5    Q    Okay.  Now, simply if Mr. Muller or if
6  Mr. Giunta had asked you to serve the subpoenas,
7  if they had prepared them, you would have done so
8  because that's your job?
9    A    Correct.
10      MR. McSHANE:  Nothing further.
11      MR. McMURRY:  Nothing further, Judge.
12      THE COURT:  All right, Mr. Stamos.
13  Thank you.  You may step down.
14
15              CHUCK SHEAFFER,
16  having been sworn, was examined and testified as
17  follows:
18
19            DIRECT EXAMINATION
20
21  BY MR. McSHANE:
22    Q    Sir, would you please state your name,
23  spell your last name for the benefit of the --
24    A    Charles E, as in Edward, Sheaffer,
25  S-h-e-a-f-f-e-r.

1    Q    Sir, if I could have you identify your

2 current employment.

3    A    Dauphin County Sheriff's office.

4    Q    Prior to that you had been employed by

5 the office of the Public Defender's of Dauphin

6 County?

7    A    Yes.

8    Q    In what capacity?

9    A    Investigator.

10    Q    For what years?

11    A    Perhaps 2000 to 2005.

12    Q    And you were so employed, involved in as

13 an investigator when the matter of Commonwealth

14 versus Tyshaunt Love was either being prepared

15 for trial and had, in fact, came to trial,

16 correct?

17    A    Yes.

18    Q    I want to draw your attention towards a

19 couple of things. Your colleague just testified.

20 We don't need to get into a great amount of

21 detail. The questions that I have, is it in your

22 capacity as an investigator with the Public

23 Defender's office -- you were a full-time

24 employee, correct?

25    A    Yes.

1    Q   Exclusively doing work on the behest of

2  the attorneys and the administrative staff at the

3  Public Defender's office, correct?

4    A   Yes.

5    Q   And it included such things as trying to

6  locate witnesses, correct?

7    A   Yes.

8    Q   And serve subpoenas on witnesses?

9    A   Yes.

10    Q   And otherwise be available in order to

11  impart your knowledge, your wisdom and your

12  experience upon the attorneys in helping

13  formulate trial strategy and whatnot, correct?

14    A   Yes.

15    Q   I want to draw your attention to a couple

16  of particular documents and drawing your

17  attention to the 2005 time frame.  We previously

18  marked an exhibit and identified it which was for

19  purposes of the record as Exhibit No. 24.  I'm

20  going to ask you to take a look at this and then

21  I'll shortly ask you to identify it in a moment.

22    A   Okay.

23    Q   It bears a date on there of March 30,

24  2005, and it is your understanding it's an e-mail

25  correspondence sent to you by Monica Cliatt in

1 terms of your professional capacity towards doing

2 things we already mentioned, correct?

3   A   Yes.

4   Q   And in there she had informed you there

5 were several witnesses that needed to be

6 subpoenaed and also provided you information to

7 the best of her knowledge at that point in time

8 in order to aid in the ultimate goal which was to

9 serve subpoenas upon various individuals,

10 correct?

11   A   I'm not sure of that.  I think her

12 position here as I read them is for me to

13 locate --

14   Q   To locate them and potentially interview

15 them or to at least that way setting up for the

16 service of the subpoenas subsequent, correct?

17   A   Okay.

18   Q   Is that fair?

19   A   Yes.

20   Q   You had noted it with your own

21 handwriting.  The only handwriting on there is

22 your own handwriting; is that correct?

23   A   No.

24   Q   Is that your handwriting?

25   A   This information here is not my

1  handwriting.  Some of it is; some of it is not.

2  Q   Do you know whose handwriting is also

3  with this information?

4  A   No.

5  Q   What about on the last two pages?  On the

6  last two pages is that your handwriting?

7  A   Yes.

8  Q   And that's consistent with your level of

9  attempts to find people, interview them and to do

10  things that were at the direction of Attorney

11  Cliatt, correct?

12  A   Yes.

13  Q   Now, drawing your attention towards

14  additional documentation, Defense Exhibit No. 17,

15  the handwriting that's within that document, that

16  information, is that your handwriting?

17  A   Yes, I think that's my handwriting.

18  Q   That's consistent with your level and

19  your attempts to continue to try to find various

20  witnesses in this particular matter, correct?

21  A   Let me just preface this by saying this

22  was right around the time that I was leaving the

23  Public Defender's office so I don't know if this

24  was being transferred to someone else for any

25  follow up.  But this was the scope of my

1 investigation into this, yes.

2     Q    But nevertheless we can glean from these

3 documents, as well as your testimony here, that

4 Monica Cliatt identified several individuals whom

5 she thought were persons of interest that needed

6 to be interviewed, identified, possibly come to

7 trial, correct?

8     A    Yes.

9     Q    Now, drawing your attention towards

10 another document, Defendant Exhibit No. 43, so

11 marked in the lower right-hand corner. You'll

12 recognize that as a memorandum from Monica Cliatt

13 to you, correct?

14     A    Yes.

15     Q    And similar to the other two previous

16 documents, in the nature of -- in terms of here

17 is some witnesses, here's what I need help with,

18 can you help me out; along with your handwritten

19 annotations, correct?

20     A    I think this was more the results of my

21 attempt to locate some of those witnesses, yes.

22     Q    Now, I want to drawn your attention to

23 when this case actually came to trial and where

24 you said that you had left the Public Defender's

25 office. Did you leave the Public Defender's

1 office before this matter came to trial?

2    A    Yes.

3    Q    After you had went to -- directly from

4 the Public Defender's office to the sheriff's

5 office, correct?

6    A    Yes.

7    Q    Nevertheless because you had now moved on

8 to ostensively at least a prosecuting potential,

9 prosecuting agency, you were available to both

10 subsequent counsel, meaning Paul and Nate, to

11 discuss your efforts leading up to this point in

12 time, correct?

13    A    Yes.

14    Q    You weren't under an edict of don't talk

15 to them or you're on the white hat side?

16    A    No.

17    Q    To your knowledge and information, you

18 did not -- you did not caucus with Attorney

19 Muller or with Attorney Giunta about their trial

20 strategy or what information you were able to

21 obtain from these witnesses, correct?

22    A    I did not.

23    Q    If they had asked, you would have been

24 agreeable and told them to the best level of your

25 knowledge what you had?

1    A    Yes.

2         MR. McSHANE:  Nothing further.

3         THE COURT:  Mr. McMurry.

4

5              CROSS EXAMINATION

6

7  BY MR. McMURRY:

8    Q    I'm sorry.  I didn't -- do you recall

9  Mr. Muller and them ever speaking to you about

10 this case?

11   A    No.

12   Q    When you were working with the PD's

13 office -- I'm sorry -- you were not working with

14 the PD'S office at the time this case went to

15 trial?

16   A    No.

17   Q    So stating the obvious, Mr. Muller or

18 Mr. Giunta didn't ask for your help in serving

19 any kind of subpoenas in that nature at that time

20 or looking for witnesses?

21   A    That's right.

22        MR. McMURRY:  No further questions.

23        THE COURT:  All right.  Thank you,

24 Mr. Sheaffer.

25        MR. McSHANE:  This will be a natural

place to conclude. I have questions with respect
to the fruits of what I call the JNET motion, the
motion to help obtain the whereabouts of various
witnesses we can address that.

THE COURT: Does this have to be on the
record rather than having a PCRA of a PCRA? We
can talk a little bit about the efforts that were
made.

MR. McSHANE: I would like to get
information here on the record in the efforts
that were undertaken by the Commonwealth in
response to the court order because my level of
knowledge is there's absolutely no information
whatsoever on any of these people as -- no
information whatsoever.

THE COURT: So the record is complete,
last week a motion was presented inquiring -- and
I'm summarizing -- inquiring the Commonwealth
attorneys to access records specifically in
reference being made to the JNET system or other
internet or other systems where information could
be had in order to assist the Petitioner's
counsel in locating -- I don't remember -- even
remember the exact number of names that were in
the original motion, but during the course of our

1 conference held in chambers, I know there was an
2 exchange of a couple of names that were specified
3 that were of particular interest.  I'm not sure
4 if that was exclusive or not.

5       MR. McSHANE:  It was a series of five
6 people.

7       THE COURT:  Hold on, and I did, in fact,
8 sign an order requiring the cooperation of the
9 District Attorney's office in, I guess, in
10 essence in reviewing all readily available and
11 reasonably available internet or other data bases
12 to see if any last known addresses could be
13 produced for those individuals.

14       I do not know the names because I refer
15 to them as only by reference to the petition that
16 had been written, that were that carved down to a
17 little bit at the time of the conference.  Now,
18 so what is it, what did you get?

19       MR. McSHANE:  To my knowledge the only
20 correspondence that we had was that some sort of
21 due diligence was exercised and no information
22 could be provided and that had to do with Larry
23 Fennel, Kendra Smith, who we now have contact
24 with -- that one becomes moot -- Keith Herndon,
25 Carlos Hill and Melinda Datil.

1          MR. McMURRY:  If I may respond briefly,
2     Judge, after our meeting I was given the names of
3     the following witnesses:  Larry Fennel, Kendra
4     Smith, Keith Herndon, Carlos Hill and Melinda
5     Datil, along with the information they have
6     provided in their motion filed with the court.  I
7     spoke to my supervisor, First Assistant District
8     Attorney Mr. Chardo and he authorized me to run
9     PennDOT checks through our JNET data basis on
10    these individuals to try to obtain last known
11    addresses.
12          The information that I had I provided to
13    Mr. McShane's law firm through his co-counsel
14    here, a list of the efforts that were made and
15    the information that I had found and specifically
16    e-mailed them what we could locate through
17    checking those.
18          We also ran them through our internal
19    criminal case management system to check and see,
20    to get more information other than just the name.
21    Some of them didn't have identifiers.  I ran the
22    names through our system to see if I could find
23    out additional dates of birth, those kinds of
24    things and subsequently ran those searches and
25    came up with the info that I provided through

1 e-mail through co-counsel, which I believe he has
2 there.

3 Carlos Hill had several addresses. He
4 had also been in state prison so I referred them
5 to state parole if they had any additional -- I
6 did not contact state parole. I thought
7 Mr. McShane should follow up through state parole
8 on that.

9 But he had one, two, three, four
10 addresses I provided, different places that
11 Mr. Hill was located. His last official address
12 in PennDOT was the one that was provided that
13 Mr. McShane had, the 1406 State Street address.

14 In reference to Mr. Fennel, through our
15 criminal internal data basis, the last address we
16 could provide was the Derry Street address. It
17 was a Derry Street address not the Liberty Street
18 address that he had originally.

19 MR. McSHANE: Your Honor, I'm going to
20 save a lot of time. I was not fully informed of
21 the efforts of the District Attorney's office. I
22 can see it in the e-mail here they did exercise
23 what appears to be due diligence in this. I
24 apologize. It was not intentional to say that
25 the Commonwealth had not exercised due diligence.

1       It was the best level of information that
2  I had at that point in time.  I don't wish to
3  entertain much more time of the Court.  Now I
4  have this in front of me.  I apologize.
5           THE COURT:  You're satisfied the
6  Commonwealth substantially complied.
7           MR. McSHANE:  Yes.
8           MR. McMURRY:  Thank you, Judge.
9           THE COURT:  Anything else for today?
10          MR. McMURRY:  I don't believe so.
11          MR. McSHANE:  No, Your Honor.
12          THE COURT:  My office will be in touch
13  with you regarding scheduling in probably late
14  May.  We do have the interruption there of a
15  criminal trial term.
16          MR. McMURRY:  May 24th.
17          THE COURT:  We'll see what can fit in.
18  Approximately how much more time?
19          MR. McSHANE:  I would judge Mr. Muller to
20  be a little bit more than Mr. Giunta, and then we
21  have potentially several of these witnesses if we
22  can track them down, but most of them, like I
23  indicated to the Court before, the ones that we
24  did track down will claim ignorance and,
25  therefore, it's a simple matter of refreshing

1  recollection where I'm stuck with a nothing type

2  of situation.  So I don't think more than half

3  day would be necessary.  I don't think.

4  THE COURT:  Given what I anticipate to be

5  the nature of the defense of Petitioner's entire

6  case, that Mr. McMurry you'll rely on what you

7  developed from cross examination with a few or no

8  witnesses.

9  MR. McMURRY:  Correct, Judge, from the

10  way Justin has subpoenaed the witnesses.

11  THE COURT:  Mr. McShane.

12  MR. McMURRY:  The way he subpoenaed the

13  witnesses in this matter, the issues may come

14  from Mr. Love himself raising the issue, then the

15  Commonwealth would in turn call the attorney to

16  defend himself in the nature of the way this case

17  has proceeded.

18  I don't foresee any witnesses at this

19  time having to present.

20  I would think we'll have probably based

21  on the lengthy annotate of this request for

22  transcript and a written type of argument at the

23  conclusion of the hearing.

24  THE COURT:  I'll try to set up half a day

25  as promptly as we can.

1          *   *   *   *
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

260

CERTIFICATE


I hereby certify that the proceedings
and evidence are contained fully and accurately in the
notes taken by me on the hearing of the above cause,
and that this is a correct transcript of the same.


_____
Joanne M. Kohn
Official Court Reporter



The foregoing record of the proceedings
of the above cause is hereby approved and directed to
be filed.


_____    _____
Date                        Bruce F. Bratton, Judge

DAUPHIN COUNTY COURT REPORTERS