1   COMMONWEALTH OF PENNSYLVANIA: IN THE COURT OF COMMON PLEAS

2                          : OF DAUPHIN COUNTY, PENNSYLVANIA

3       VS              :

4   TYSHAUNT LOVE         : No. 937 CR 2002

5

6

7

8                TRANSCRIPT OF PROCEEDINGS

9

10

11

12          BEFORE:   HONORABLE BRUCE F. BRATTON

13           DATE:   Thursday, November 4, 2010

14          PLACE:   Courtroom No. 5
                        Dauphin County Courthouse
15                        Harrisburg, Pennsylvania

16

17

18

19   APPEARANCES:

20      JASON E. McMURRY, Esquire
         Office of the District Attorney
21

22        For - Commonwealth

23

24      JUSTIN J. McSHANE, Esquire

25        For - Defendant



1                    INDEX TO WITNESSES

2   FOR DEFENDANT          DIRECT    CROSS   REDIRECT   RECROSS

3   Paul Muller      (cont'd, 4)      62       --         --

4   Carlos Hill              81       99       --         --

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    INDEX TO EXHIBITS
 2   FOR COMMONWEALTH            MARKED   ADMITTED
 3   Nos. 1 - 2                    --        79
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15   FOR DEFENDANT
16   Nos. 1 - 45                   --        80
17   No. 46                         7        80
18
19
20
21
22
23
24
25
</pre>

PROCEEDINGS

1

2

3     THE COURT: My recollection is Mr. Muller
4  was on the stand the last we broke or are we
5  completed with his testimony?
6     MR. McSHANE: No, Your Honor.  May we
7  approach on a witness related issue?
8     THE COURT: Sure.
9     (A discussion is held at sidebar off the
10  record.)
11     THE COURT: Mr. Muller, I don't think we
12  need to swear you in again.  You know you're
13  still under oath.
14     THE WITNESS: I do, Your Honor.
15     MR. McSHANE: May I continue, Your Honor?
16     THE COURT: Absolutely.
17
18     DIRECT EXAMINATION (cont'd)
19
20  BY MR. McSHANE:
21     Q  We had talked about your role in the
22  Tyshaunt Love case before and just because we had
23  an appreciable delay here, you were lead counsel
24  of course.
25     **A  Correct.**

---

1     Q  In terms of the strategy that was
2  involved in the arguing of this case and the
3  presentation of this case, the investigation of
4  this case, for lack of a better way of putting
5  it, the buck stops with you; is that fair?
6     **A  More or less.  It was little more**
7  **collaborative than that but ultimately, yes.**
8     Q  You had cocounsel in this particular
9  case, correct?
10     **A  Yes.**
11     Q  And was that cocounsel of record,
12  meaning, entry of appearance?  Do you recall?
13     **A  I don't recall.  I mean, it would have**
14  **been procedure to do that at least when it came**
15  **to trial so cocounsel wasn't put somewhere else**
16  **because he wasn't listed on this.**
17     Q  In terms of your best recollection based
18  on your habit and routine, the other attorney was
19  Attorney Giunta, correct?
20     **A  Yes.**
21     Q  So in terms of the preparation of this
22  case, you said it was a collaborative effort
23  between the two you of, fair?
24     **A  Pretty fair.**
25     Q  And in terms of ultimate decisions if

---

1  there were any disputes between either trial
2  strategy, witness preparation, investigation,
3  presentation or argument, you being the lead
4  counsel, you would -- you would trump his
5  concerns; is that fair?
6     **A  I don't know if I would say trump.  I**
7  **mean --**
8     Q  What would you say?
9     **A  I don't recall disagreements, you know,**
10  **in this case between either Mr. Giunta and myself**
11  **as to how the case was going.  We were both**
12  **reviewing it.  We both talked about it.  I don't**
13  **recall any single incident where Mr. Giunta said,**
14  **oh, I think we should do this and I said, no, I**
15  **don't think we should do this.**
16     **I guess ultimately if there had been an**
17  **issue where he felt strongly one way and I felt**
18  **strongly the other way, as a senior attorney my**
19  **decision would probably hold out.  I just don't**
20  **recall that being the situation in this case.**
21     Q  In terms of the preparation and the
22  investigation and even the presentation, is it
23  fair to say and to characterize that you had more
24  experience in this type of case than your
25  cocounsel did at this point in time?

---

1     **A  At that point, yeah.**
2     Q  I would like to talk to you about
3  decisions that you had to make in this particular
4  case involving trial strategy and get your
5  interpretation of what occurred, and I have a
6  power point presentation that I would like to use
7  as demonstrative evidence.  Are you in a position
8  where you can see the screen?
9     **A  Mr. Love may have to move.**
10     Q  How about now?
11     **A  Depends what you put up there.**
12     Q  If you can't see it, then let me know.
13     (Whereupon, a Power Point presentation is
14  produced and marked for identification as
15  Defendant Exhibit No. 46.)
16  BY MR. McSHANE:
17     Q  The first decision you had involved
18  around possibly of calling a witness by the name
19  of LaQuan Williams.  You're aware who he was?
20     **A  I believe we discussed that the last**
21  **time.**
22     Q  Placing in front of you what has been
23  marked as Defendant Exhibit No. 46 and the lower
24  right-hand corner, do you see that so marked?
25     **A  Okay.**

---

1  Q  And it is marked that way for
2  identification purposes.  Do you see that?
3  **A  Yes.**
4  Q  And it is pretty much a true and faithful
5  copy we see in front of you and in front of the
6  Court here in terms of the power point; is that
7  fair?
8  **A  I'll take your word on that.  I can't see**
9  **the fine print.**
10  Q  You can't see the fine print that's
11  involved in there?
12  **A  But if you say it's the same.**
13  Q  Would you care to step down so you can
14  see?
15  MR. McSHANE:  With permission, I would
16  like the witness to use this microphone so he
17  doesn't intrude the Court's vision.
18  THE COURT:  Frankly, I'm not sure what
19  purpose the screen has.  We're all looking at a
20  legible copy provided to me and the witness and
21  you're holding in your hand.
22  MR. McSHANE:  Okay.  I mean -- we can do
23  it that way.
24  THE COURT:  I appreciate it if the jury
25  was present.

1  MR. McSHANE:  That's a fair point.
2  BY MR. McSHANE:
3  Q  Taking a look at Exhibit No. 46 in front
4  of you, this person LaQuan Williams was
5  ostensibly who you identified as an alternative
6  suspect.
7  **A  Yes.**
8  Q  Your first decision was whether or not to
9  call him as a witness.  That was one of your
10  decisions that you made at the trial, correct?
11  **A  Yes.**
12  Q  You did not call him as a witness in this
13  trial?
14  **A  No.**
15  Q  In doing so the jury heard no information
16  with respect to his point of view or any of his
17  statements; is that a fair consequence?
18  **A  Yes.**
19  Q  All right.  Now, the alternative
20  decision was that you could have called him as a
21  witness, correct?
22  **A  Yes.**
23  Q  And, in fact, you knew where he was at
24  that point in time.  He was in prison, was he
25  not?

1  **A  He was in prison somewhere in New York.**
2  Q  And that somewhere, you had been provided
3  information because you had a hearing before the
4  Court on the motion in limina where that
5  information was revealed, correct?
6  **A  I recall the hearing.  I mean, what**
7  **information was revealed, I don't remember.**
8  Q  But you know that he was in the New York
9  state system at some point in time.  Where
10  exactly he was, in your recollection today, you
11  don't recall.
12  **A  I don't recall whether it was a New York**
13  **local detention or whether he was in the state**
14  **facility.  I don't recall today.**
15  Q  At the time you had information as far as
16  where he was?
17  **A  I believe so.  I can't attest to that 100**
18  **percent.  I don't believe so.**
19  Q  To secure his appearance you're aware of
20  what's called the Uniform Act that was applicable
21  in New York as a party, correct?
22  **A  Yes.**
23  Q  Do you know if securing him as a witness
24  was an option to you on the date of trial, true?
25  **A  It was a possibility.**

1  Q  Now, if we could go through some of the
2  decisions -- points.  Had you called him as a
3  witness to -- examine your trial strategy, let's
4  do that together.  If you had called him as a
5  witness, one of three things could have happened
6  in terms of your questioning.  The first being,
7  he could have asserted his Fifth Amendment,
8  correct?
9  **A  Of course.**
10  Q  And if he had asserted his Fifth
11  Amendment, you're aware based on your training,
12  knowledge and experience and years of trial work,
13  he could be declared unavailable, correct?
14  **A  Under most conditions, yes.**
15  Q  Specifically if he came in front of the
16  Court with or without the presence of the jury
17  and refused to say anything or otherwise asserted
18  his Fifth Amendment, you could have asked the
19  Court to grant him immunity, true?
20  **A  I don't know if I can ask the Court to**
21  **grant him immunity.  I mean --**
22  Q  You never heard the practice of
23  petitioning the Court for it to do a special
24  transaction on immunity for the purposes of a
25  trial?

1   **A** I suppose it's possible.

2   **Q** And you could have asked the District

3 Attorney to grant him immunity?

4   **A Yeah, more logically, yes.**

5   **Q** And neither one of those two you pursued

6 because obviously you had not called him as a

7 witness, true?

8   **A Accurate.**

9   **Q** In terms of the Fifth Amendment, if all

10 of those efforts had failed, you could have

11 declared him unavailable by the Court much like

12 the one other key Commonwealth witness who was

13 declared unavailable in this case, correct?

14   **A Are you talking about Ms. Cruz?**

15   **Q** Yes.

16   **A I don't know. That's apples and oranges.**

17 **There was a prior statement taken under oath,**

18 **full and fair cross examination, and I think that**

19 **had more bearing on that statement coming in than**

20 **any generalized statement to another third party**

21 **coming in.**

22   **The Rules of Evidence -- there are**

23 **different Rules of Evidence and the statute**

24 **treats it differently as to why Guillermina**

25 **Cruz's statement came in versus any other**

1 **statement coming in.**

2   **Q** I want to focus on being declared

3 unavailable. Any question of unavailability to

4 you was based upon your knowledge, training and

5 experience at the time or even now that question

6 of unavailability by invoking one's Fifth

7 Amendment rights pursuant to the Rules of

8 Evidence is a classical scale of being declared

9 unavailable, true?

10   **A Yes.**

11   **Q** And Ms. Cruz was also, over your

12 objection, declared unavailable?

13   **A Yes.**

14   **Q** So you were aware of the concept of

15 unavailability, correct?

16   **A In that circumstance, yes.**

17   **Q** You had mentioned there's a difference

18 between being declared unavailable and

19 admissibility, of course, correct?

20   **A Yes.**

21   **Q** And in terms of your familiarity with the

22 Rules of Evidence as a practicing attorney for

23 many years with a very good reputation, you're,

24 of course, aware of the Rules of Evidence?

25   **A Yes.**

1   **Q** And you have written briefs before. In

2 fact, you're the chief of the appellate division

3 in the Dauphin County Public Defender's office.

4   **A It's not a formal title. I'm a chief**

5 **deputy who happens to supervise the appeals.**

6   **Q** So by way of kind of a de facto without a

7 proper title, you're, for lack of a better way of

8 putting it, the appeals person or appeal guru in

9 that office or thought --

10   **A I'm the person who oversees the appeals.**

11   **Q** On appeals you argue admissibility of

12 evidence as an appellate issue?

13   **A I'm sure I have.**

14   **Q** And you reviewed specifically the Rules

15 on hearsay, specifically going from Pennsylvania

16 Rules of Evidence 801 through 809; is that fair?

17   **A I'm sure I have.**

18   **Q** And that was all within your skill set.

19 At the time of this trial you had that knowledge

20 level, correct?

21   **A I mean, I had a knowledge level of the**

22 **Rules of Evidence.**

23   **Q** Right.

24   **A Every attorney does to a certain extent.**

25   **Q** You don't mean to say you're unfamiliar

1 with the Rules of Evidence in particular hearsay?

2   **A I'm not going to hold myself out as**

3 **Edward Ohlbaum. As most general practicing**

4 **attorneys, I have familiarity with the Rules of**

5 **Evidence in certain situations and it's something**

6 **that has to be referred to often to address each**

7 **situation.**

8   **Q** Good point. But you have books including

9 Ohlbaum on evidence, correct?

10   **A Yes.**

11   **Q** Packle and Poulin on evidence, a black

12 book.

13   **A Yeah. I mean, we did at one point, but,**

14 **I mean, still do now. I don't know.**

15   **Q** And you've gone to updates and CLE

16 training where hearsay has been discussed before?

17   **A A couple of times.**

18   **Q** PACDL, the Pennsylvania Association of

19 Criminal Defense Lawyers, you're a member?

20   **A Am I a member?**

21   **Q** Um-hum.

22   **A Yes, every member of our office is a**

23 **member.**

24   **Q** You're on their list, sir?

25   **A I am now.**

1 Q But not at the time of trial?

2 A Back in 2005?

3 Q Yes.

4 A No, I seriously doubt it.

5 Q One of the rules of hearsay is Rule 804.

6 You're aware of that rule, its existence?

7 A Yes.

8 Q There's a definitional component in there

9 that states the definition of unavailability as a

10 witness, and it has specific and enumerated

11 consequences or circumstances rather where one

12 can be declared unavailable?

13 A Okay.

14 Q Is that true? Would it refresh your

15 recollection to take a look?

16 A Yes.

17 Q Drawing your attention to 804-A and its

18 sequential parts. Let me know when you have

19 finished reviewing it, sir.

20 A Okay.

21 Q So 804, as you just took a look at, has a

22 definitional component including in A with its

23 subsection.

24 A Delineating what kind of hearsay

25 statements are admissible if the declarant is

1 declared unavailable and, of course, it gives an

2 itemized list of what kind of statements are

3 admissible.

4 Q One of the specific ones is under --

5 MR. McSHANE: The Court's indulgence.

6 BY MR. McSHANE:

7 Q In your possession as we established the

8 last time was the statements attributed to Kazar

9 by other individuals, correct, meaning

10 confessions?

11 A Or was a confession or statement against

12 interest?

13 Q Yes.

14 A Okay.

15 Q Because you have used that phrase, you're

16 aware of hearsay Section 804 Sub 3, which is a

17 statement against interest, correct?

18 A There's a statement against interest

19 that's also qualified as to how and when but

20 yeah.

21 Q You're aware of the concept of that at

22 least at the time of trial?

23 A Yeah.

24 Q And you didn't petition the Court or ask

25 the Court to at any point in time to have those

1 statements that we've been talking about admitted

2 into evidence because you didn't have Kazar?

3 A Not without Kazar being here, no.

4 Q You'll agree -- strike that. If you

5 don't ask the Court, then the Court is generally

6 not sua sponte going to allow it into evidence;

7 is that fair to say?

8 A I don't know if that's a question.

9 Q Here's a question, if you don't ask, you

10 won't get. Is that a fair statement?

11 A That's a fair statement in life.

12 Q And so the next decision that you had in

13 this decision making tree is if you had called

14 him as a witness, the second option is that he

15 could have denied, I imagine, because your

16 previous announced trial strategy was to blame

17 Kazar, LaQuan Williams. You'll confirm that

18 again.

19 A Yes.

20 Q Part of that would have been some sort of

21 confrontation. Had he been here, you killed the

22 decedent not Mr. Love, right?

23 A Ideally, yeah.

24 Q He could have, like we had established,

25 taken the Fifth Amendment over that type of

1 question. We just went through the exercise,

2 went along with that, and the second option he

3 could have flat out denied killing her. Is that

4 true?

5 A Possibility.

6 Q And, in fact, implicated Mr. Love as the

7 sole and exclusive person in becoming all of a

8 sudden a new eyewitness to the event. That's a

9 possibility as well, correct?

10 A That was one of the possibilities. I

11 think I mentioned the last time the other

12 possibility. He had given a statement where he

13 was going to explain under those circumstances

14 how the victim's blood ended up on him from a

15 previous altercation between Mr. Love and the

16 victim.

17 Q Which already came into evidence at the

18 trial in any regard.

19 A No, it didn't.

20 Q The blood on the shoe did.

21 A But not the alternative that he was there

22 because Tyshaunt had struck the victim earlier in

23 the presence of Kazar, only by separating them

24 that the blood got on his boot. That would have

25 been his explanation because of the DNA and blood

1  on his boot.

2   Q   You feel based upon your experience that

3  you had, you were utterly incapable of

4  cross-examining the gentleman under those

5  circumstances in that context to develop his

6  bias, his motive and the incredibility of that

7  explanation?

8   A   I don't think I would have been incapable

9  of cross-examining him. I'm not sure. It's a

10  credible statement. I think a pretty plausible

11  statement in front of a jury to hear that after

12  hearing everything else.

13      So, you know, you can sit here all this

14  time later and say because how things turned out

15  it would have, you know, just been an incredible

16  statement on his behalf. At the time that's not

17  how we viewed it would have been. We viewed it

18  would have been bad for us to have him explain

19  how the blood got on him.

20   Q   But the prosecution's theory of this case

21  was that Mr. Love was a jilted lover who was

22  angry and upset to the point where he became

23  homicidal. That was their basic general theory

24  of the case. Is that fair?

25   A   In the theory of that and the drug

1  dealing that was going on.

2   Q   But there was that component of the

3  jilted lover scenario, come to play out during

4  openings and closings and had been brought up

5  throughout periods of time in the trial by

6  various witnesses, fair?

7   A   I guess.

8   Q   Now, if he had denied -- I'm going back

9  to LaQuan Williams -- denied killing her, then

10  the statement that he had given to others could

11  have been statements that could have been used in

12  terms of impeachment or statement against

13  personal interest at least argued that way by

14  you, correct?

15   A   Under the rules?

16   Q   Yes.

17   A   Certainly one could have been.

18   Q   But those certain ones that could have

19  been were not advanced to the jury in this case

20  because LaQuan Williams wasn't present.

21   A   Right. As I mentioned before, there were

22  certain ones where those witnesses who gave

23  incriminating statements then retracted them

24  which also would come out as well.

25   Q   The circumstances of the retractions were

1  always in response to questioning, later

2  questioning by the detectives involved in the

3  investigation of this matter, true? They just

4  didn't voluntarily show up and say, hey, I want

5  to take back my statement I gave to you guys

6  months ago. It was always in response to

7  Detective Heffner showing up and reinterviewing

8  the witnesses, fair?

9   A   Probably.

10   Q   And in terms of cross examination and

11  skills, you could have developed a line of

12  questioning to reveal that arguable convenience

13  that occurred.

14   A   What convenience? I don't understand.

15   Q   That they changed their statements after

16  an identified suspect, after questioning by

17  Detective Heffner.

18   A   Tyshaunt was an identified suspect also

19  from the get-go.

20   Q   I'm sorry. Charged suspect.

21   A   He had been a charged suspect over the

22  period of time as well. There was no mystery to

23  those people that gave the statements that

24  Tyshaunt was the suspect and Tyshaunt had been

25  charged several times over the course of the

1  previous at that time five years, six years,

2  seven years, whatever.

3   Q   But it was always in response to

4  Detective Heffner going back to these witnesses

5  that these people recanted and said that their

6  previous story had not been the truth.

7   A   Some of them, yes.

8   Q   And in terms of the theme of cross

9  examination that you could have developed and, in

10  fact, you probably have developed in the past is

11  along the lines of something akin to precisely

12  that the timing of the recantation and the

13  authority of the police officer, that's something

14  you could have developed in terms of cross

15  examination.

16   A   Anything is possible.

17   Q   Okay. It's within your skill set at the

18  time?

19   A   Sure.

20   Q   And then the third alternative that could

21  have happened, if you called him as a witness he

22  could have admitted it?

23   A   We're talking about Kazar?

24   Q   Yes. It's possible.

25   A   Anything is possible.

1    Q   But you didn't know because you never or
2 your staff or no one from the Public Defender's
3 office ever interviewed the man at any point in
4 time, correct?
5    **A**   **No, we didn't.**
6    Q   You relied upon the police officers'
7 reports, correct?
8    **A**   **And our attempts to get in contact with**
9 **him. We weren't able to at the time.**
10    Q   But in terms of the attempts that were
11 made, who made those attempts?
12    **A**   **It would have been -- probably started**
13 **with Monica Cliatt in locating him, and after she**
14 **left it would have gone to Mr. Giunta and one of**
15 **the investigators who made the efforts to find**
16 **out what prison he was at and whether phone calls**
17 **could have been made at that point and who his**
18 **attorney was, I believe.**
19    Q   But in terms of all that, you didn't
20 directly try and contact Kazar, did you?
21    **A**   **We were not successful in contacting him,**
22 **no.**
23    Q   I understand we. But you, you
24 specifically weren't able to contact him?
25    **A**   **No, I did not have contact with Kazar.**

1    Q   How did you personally try to contact
2 him?
3    **A**   **I didn't. The others were doing that.**
4    Q   In terms of the likely -- had Kazar
5 admitted to being either part of the homicide or
6 the actual perpetrator of the homicide, you would
7 agree that would have fundamentally been great
8 evidence on behalf of the accused in this case,
9 true?
10    **A**   **Yes.**
11    Q   The second decision that you had to make
12 had to do with some of the forensic evidence that
13 was possibly available in this case. You'll
14 recognize that there was a series of decisions
15 that you made with respect to whether or not you
16 would attempt to do any sort of forensic related
17 testimony, correct?
18    **A**   **You'll have to repeat that.**
19    Q   Sure. There was a second series of
20 decisions that you made that had to do with the
21 investigation of this case in preparation of
22 trial.
23    **A**   **Okay.**
24    Q   That included taking a look at forensic
25 evidence or examining forensic evidence. There

1 was a series of decisions as far as what you
2 could have done with respect to the forensic
3 evidence. You'll concede that.
4    **A**   **Okay.**
5    Q   One of the decisions that you had in
6 front of you was with respect to DNA testing
7 specifically of the blood that was found on
8 Kazar.
9    **A**   **Yes.**
10    Q   The blood in terms of the examination of
11 where the DNA was sampled from, did you ever take
12 a look at the surfaces of the items or anything
13 that had to do with where that sampling of the
14 DNA could have been provided?
15    **A**   **I'm not sure. If you can be more**
16 **specific.**
17    Q   Kazar had blood on him.
18    **A**   **Yes.**
19    Q   Your recollection is that the blood was
20 on his boot and, otherwise, about his person,
21 correct?
22    **A**   **Yes.**
23    Q   The sampling that you got back from the
24 Pennsylvania State Police lab was a conclusion
25 that the decedent's blood was on his shoe,

1 correct?
2    **A**   **Yes.**
3    Q   But not on his person. The blood that
4 was on his person was not due to the decedent.
5 Do you recall --
6    **A**   **I recall it wasn't the decedent's. I**
7 **don't recall if they said it was his own blood or**
8 **it was blood at all. I don't recall.**
9    Q   In terms of DNA sampling that occurs, you
10 recognize that when you go to sample DNA, you
11 don't sample the entire possible contributing
12 source. Instead you do sample selection. You
13 look at one specific area of the contribution.
14 Do you realize that?
15    **A**   **I don't know if I would realize that back**
16 **when this occurred.**
17    Q   Now, with your experience, you do realize
18 that, correct?
19    **A**   **A little more. I'm still -- I'm not**
20 **going to claim to be an expert.**
21    Q   Did you take a look at Kazar's clothes or
22 any of the seized items that had to do with
23 Kazar?
24    **A**   **You mean in person?**
25    Q   Yes.

1   **A   Like I mentioned the last time we were at**
2   **this hearing, we generally at some point go over**
3   **the evidence in the evidence room and look**
4   **through the things.  I have a vague recollection**
5   **of doing that in this case.  I remember seeing**
6   **the blood before they were brought to evidence,**
7   **and there was a jacket of some sort that was**
8   **pulled out and marked at some point.  I'm not a**
9   **hundred percent sure but we looked at --**
10   Q   You didn't seek to examine the source of
11   the sample selection that yielded the
12   Pennsylvania State Police conclusions?
13   **A   Which sample selections?  All of them?**
14   Q   All of them.
15   **A   No.**
16   Q   You don't know how many sample selections
17   were done in the contributing areas.
18   **A   I don't recall.**
19   Q   You're aware of the concept which is
20   called random sampling error where if you have a
21   pool of evidence, in our case blood, and you only
22   take a sample from one specific place, it may not
23   necessarily mean that it is that throughout the
24   entire sample.
25   **A   I'm aware of that concept.  Whether --**

1   **once again if you're asking me did I have that**
2   **knowledge, was I aware of that five or six years**
3   **ago, I can't honestly tell you.**
4   Q   You were aware at the time that there was
5   some blood, correct?
6   **A   Um-hum.**
7   Q   And you knew that there was some on his
8   shoe that had to do with the decedent.
9   **A   Yes.**
10   Q   You recognize that as being an important
11   part of the theory of your case, correct?
12   **A   Yes.**
13   Q   You have another contributing area where
14   there was blood, but a single piece of paper from
15   the Pennsylvania State Police saying that at the
16   very least that blood that was sampled in some
17   unknown way was not dutifully sent.  That was
18   what you had at the time.
19   **A   If that was in the report, yes.**
20   Q   You could have sought to have that, all
21   of those potential sampling areas to have tested
22   by either the Pennsylvania State Police or an
23   independent lab.  That was an option, wasn't it?
24   **A   Yes.**
25   Q   It was an option that you did not pursue?

1   **A   Correct.**
2   Q   And because you didn't do it in terms of
3   the overall examination of the total blood
4   sources, it is unknown to us whether or not there
5   is that random sampling error at this point,
6   fair?
7   **A   I can't answer that.  I don't know.**
8   Q   You don't know.  Okay.  But you could
9   have asked to have more expansive testing done.
10   That was a decision you could have made, correct?
11   **A   Sure.**
12   Q   And if you had done that, there's
13   basically three outcomes that could have come:
14   That the Pennsylvania State Police conclusion
15   that the other area of blood was not hers.  That
16   was one outcome that could have came, in other
17   words, confirming the Pennsylvania State Police
18   conclusion.
19   **A   Okay.**
20   Q   And the second outcome could have been
21   that the other blood, because of random sampling
22   error, could have been hers.  You perceive that's
23   a possibility?
24   **A   I guess.**
25   Q   The third one is that the blood could

1   have came from another source or another person
2   yet unidentified.  That's a third possibility,
3   correct?
4   **A   I guess with blood anything is a**
5   **possibility.**
6   Q   Right.  So if it comes back in terms of
7   trial strategy in expansive DNA testing that that
8   other blood that occurred was not hers, meaning,
9   the decedent's, that would have confirmed the
10   Pennsylvania State Police conclusion and you
11   would have been no worse off in terms of your
12   trial strategy.
13   **A   Probably.**
14   Q   If it had come back that the Pennsylvania
15   State Police due to their sample selection or
16   their methodology had missed a part of that
17   contributing blood source of being hers, in fact
18   hers, meaning, the decedent's, that would have
19   helped your case, would it not?
20   **A   Which blood source?**
21   Q   I'm sorry.  The one that they said --
22   there's two blood sources on the shoe and
23   everything else that wasn't on the shoe.  I want
24   to concentrate on that part that wasn't on the
25   shoe with this line of questioning.

1     **A**   Where was that?

2     Q   On the pants I believe.

3     **A**   Whose pants?

4     Q   Kazar's.

5     **A**   Okay.

6     Q   That exclusion that occurred with the

7 Pennsylvania State Police due to random sampling

8 or improper procedure being followed or whatever,

9 independent testing possibly could have came back

10 with the fact that it was, in fact, her blood,

11 meaning, the decedent's blood or a portion of

12 that blood was the decedent's blood. That's a

13 possibility, wasn't it?

14     **A**   Anything is a possibility.

15     Q   And in terms of the -- if it had came

16 back from independent testing or reanalysis or

17 further expansive DNA testing that, in fact,

18 there had been blood on his pants, Kazar's pants,

19 that would have helped your theory of the case,

20 true?

21     **A**   If it had been her blood?

22     Q   Her blood.

23     **A**   Yes.

24     Q   The other option, that there was an

25 unidentified third person that was on this

---

1 non-blood source that was there that he had been

2 talking about. If there was a third person that

3 wouldn't have hurt your case by any stretch of

4 the imagination.

5     **A**   Information it wasn't Tyshaunt.

6     Q   That's why I say third unidentified

7 person, right?

8     **A**   I don't know if it would have helped or

9 hurt. I don't know.

10     Q   Okay. But certainly it wouldn't have

11 hurt if it was a third person's not Tyshaunt's,

12 not the decedent's and not Kazar's blood, I

13 guess, a fourth person's blood couldn't have hurt

14 your case.

15     **A**   I don't know. Without reviewing

16 everything again, looking at the possibility and

17 trial strategies, I don't know if a fourth

18 person, what possibilities would have opened up

19 to either side in that case. I really can't

20 answer that.

21     Q   There was a bite mark on the decedent.

22 Do you remember the bite mark?

23     **A**   Vaguely.

24     Q   There was this source of evidence from

25 Wayne Ross, the pathologist, the person who

---

1 performed the autopsy, had seen something that he

2 believed was a bite mark. Do you recollect that?

3     **A**   I don't recall that today, but if it was

4 there, it was there.

5     Q   If there had been evidence of that in his

6 autopsy report, you could have called in a

7 specialist, an expert known as a forensic

8 odontologist, correct?

9     **A**   We could have. It is not much of a

10 developed field especially back then.

11     Q   The NAS report, National Academy of

12 Science report that exposed that particular --

13 the deficiencies, pattern recognition and

14 forensic odontologist had not been pushed until

15 February of 2009, correct?

16     **A**   That's not what I'm referring to. I'm

17 referring to the fact that in a previous homicide

18 also involving a bite mark, I had an extensive

19 consultation with a forensic odontologist in New

20 Jersey and the samplings and what was needed and

21 what I learned from that --

22     Q   Let's talk --

23     **A**   -- it was not considered a reliable

24 science.

25     Q   Well, the prosecution in that case sought

---

1 to bring in bite mark evidence that had -- that

2 is why you consulted with this other evidence,

3 correct?

4     **A**   In the other case?

5     Q   Yes.

6     **A**   Yes.

7     Q   And, in fact, in that other case the

8 prosecution was allowed to bring in forensic

9 odontology results, true?

10     **A**   No.

11     Q   They were excluded from doing so?

12     **A**   They never did it.

13     Q   We don't have a court related Frye motion

14 that you filed?

15     **A**   No.

16     Q   And you're aware that even today forensic

17 odontology, even though it's under attack, is

18 allowed to be presented in court even in

19 Pennsylvania?

20     **A**   I'll take your word for it. I don't

21 know. I have not had to deal with it since then.

22     Q   You could have researched that, right?

23     **A**   Back then?

24     Q   Yes.

25     **A**   Sure.

1    Q  And your decision in this case was not to
2  consult a forensic odontologist, correct?
3    **A  We did not consult.**
4    Q  Like you did with that New Jersey
5  individual in the other case.
6    **A  Because in that case the District**
7  **Attorney had already sent his off to his expert**
8  **and we needed to counter.**
9    Q  The criticism, as you learned from
10  talking to that New Jersey consultant, was in the
11  fact of forensic odontology used as a method of
12  identification, meaning this bite mark came from
13  this individual, that's the criticism that you're
14  aware of?
15    **A  I'm not aware if it was identification or**
16  **of elimination.  I'm not sure where it fell at**
17  **that point as to whether there was reliability to**
18  **one or the other or neither.**
19    Q  You'll conceive it is potentially
20  exclusionary evidence.  For example, if a person
21  only has four teeth and you have a developed bite
22  mark, that has certainly, you know, more than
23  four teeth, it can be used as an exclusionary
24  device?
25    **A  In extreme circumstances possibly.**

1    Q  In this case did you seek to have any
2  sort of documentation as to the bite mark itself?
3    **A  I think we had the autopsy photo as their**
4  **evidence of a bite mark, but I don't recall**
5  **specifically.**
6    Q  Are you familiar with a style of defense
7  that's called the negative corpus argument you
8  argue, which is what the police could have done
9  in order to answer the question?
10    **A  Sure.  We do it with fingerprints all the**
11  **time.**
12    Q  In this particular case based upon your
13  recollection, you'll recall that the -- but for
14  the picture there was nothing that was developed
15  in terms of the bite mark.  There's no casting
16  that was done, no imprinting that was done.
17    **A  I'll take your word for it.  I have not**
18  **looked back at the file, that portion of the**
19  **file.  So I don't know if that's what's in the**
20  **evidence.  I'll take your word for it.**
21    Q  As you have done in the past with
22  fingerprint analysis, you could have advanced a
23  negative corpus argument with respect to the
24  odontology evidence, could you not have?
25    **A  Yes.**

1    Q  And in this case you did not?
2    **A  I'll take your word for it.  I don't**
3  **recall what, if anything, we did.**
4    Q  If you had consulted with a forensic
5  odontologist, they could have developed and you
6  could have developed this negative corpus style
7  argument, correct?
8    **A  Maybe, maybe not.  I don't know, depends**
9  **on the evidence, I guess what they would say.**
10    Q  They could tell the proper way of
11  advancing evidence, preserving the evidence and
12  analyzing the evidence, correct?
13    **A  I mean, conceivable any expert could do**
14  **that.**
15    Q  And if you had asked -- because you
16  didn't consult a forensic odontologist and
17  because it wasn't developed in a negative corpus
18  sense, the jury didn't hear the significance or
19  lack of significance of the bite mark in this
20  particular case from a negative corpus point of
21  view.
22    **A  I don't recall.**
23    Q  In terms of consulting with the
24  odontologist, besides the negative corpus style
25  argument, the person looking at the photograph

1  potentially could have used it much like the four
2  tooth versus the multiple tooth to exclude?
3    **A  Anything is possible.**
4    Q  If it had excluded Tyshaunt Love as a
5  contributing source of that, that could have been
6  something that you argued to the jury?
7    **A  Yes.**
8    Q  If the expert was out there that could
9  have used that information plus an exemplar,
10  Kazar, LaQuan Williams, identify a match between
11  the two, that could have helped your case?
12    **A  Probably.  I don't know.**
13    Q  Because you didn't seek to have an
14  exemplar or consult with the odontologist, that's
15  unknown to us at this point in time.  We're
16  speculating.
17    **A  Yes.**
18    Q  So it could have brought about
19  potentially exculpatory information if that was
20  possible, fair?
21    **A  Anything is possible.**
22    Q  The other possibility, you could have
23  identified Mr. Love as the contributing source of
24  that bite mark, true?
25    **A  Yes.**

1     Q   In which case you could have simply not
2 called him as a witness, true?
3     **A   Well, yeah, one would not have called him**
4 **as a witness.**
5     Q   Even if that person gave negative
6 information, you're in control of calling that
7 witness and you just simply would not have called
8 him certainly under those circumstances, true?
9     **A   No.**
10     Q   The next decision that you had to do with
11 respect to forensic evidence had to do with
12 gunshot residue. In this particular case, of
13 course, there were allegations that a handgun was
14 used to kill the decedent, true?
15     **A   Yes.**
16     Q   Developing that negative corpus style of
17 argument in this particular case, there was no
18 gunshot residue testing that was done on either
19 Kazar or Mr. Love. You recollect that.
20     **A   I'll take your word for it. I don't**
21 **recall because I also don't recall if either one**
22 **was, you know, apprehended or taken in within the**
23 **applicable period of time. I don't recall.**
24 **Gunshot residue tends to be limited to -- for a**
25 **period of hours. I don't recall if they did it**

1 or not.
2     Q   Okay. But we'll let the record speak for
3 itself with respect to that. You certainly
4 didn't develop a negative corpus style argument
5 in terms of the availability of gunshot residue
6 testing on either one of those two, true?
7     **A   I don't recall if it was addressed.**
8     Q   In terms of the possibility of developing
9 that negative corpus style of argument, one of
10 two things could have occurred either the --
11 strike that.
12       With respect to the negative corpus
13 argument under those conditions that you believed
14 at the time to be applicable, there's no downside
15 to arguing to a jury why wasn't gunshot residue
16 testing done, correct?
17     **A   I guess.**
18     Q   Certainly if one is to shoot a gun
19 according to the proponents of gunshot residue,
20 that would leave trace particles behind that were
21 capable of being identified consistent with
22 firing a handgun.
23     **A   Under certain circumstances, yes.**
24     Q   You had no information here that would
25 exclude these circumstances being -- being inside

1 a house and it being a close contact wound
2 involving an automatic weapon would exclude
3 gunshot residue being on the perpetrator's body
4 or hand.
5     **A   I don't recall if there was evidence of**
6 **wearing gloves or anything by that -- by anyone**
7 **during this period of time. I don't know. I**
8 **don't recall.**
9     Q   None of the witnesses, is that right,
10 involved, in particular Ms. Cruz, had said there
11 was any sort of gloves that were used, true?
12     **A   I don't recall. The record would have to**
13 **reflect that.**
14     Q   In terms of the gunshot residue, had it
15 been developed and tested, one of two
16 possibilities would have came about with respect
17 to these two people, meaning Kazar and Tyshaunt.
18 One being that it would have negative results
19 towards Mr. Love. That's one possibility,
20 correct?
21     **A   Um-hum.**
22     Q   And that would be a powerful potential
23 piece of evidence to exclude him as the shooter
24 under these circumstances if one were to believe
25 Ms. Cruz, true?

1     **A   It would have been a piece of evidence.**
2 **Once again, gunshot residue depends if someone**
3 **washes their hands, how long after they are**
4 **tested for the evidence. it would be a piece of**
5 **evidence. I don't know how powerful depending on**
6 **the other circumstances.**
7     Q   Let's explore that. You don't mean to
8 tell us that the lack of gunshot residue would be
9 irrelevant?
10     **A   No.**
11     Q   It would have relevance?
12     **A   Yes.**
13     Q   If gunshot residue were present, then
14 that would note the possibility that the person
15 fired a handgun?
16     **A   Yes.**
17     Q   And if testing had been done on Kazar and
18 had it been available, one of two possibilities
19 could have come up. It could be negative,
20 correct?
21     **A   Yes.**
22     Q   In which case you could have used those
23 arguments that you just did with respect to this
24 case to apply to him, meaning, he could have
25 washed his hands, used bleach, and time gone by?

1 **A Correct.**

2 Q Or, No. 2, it could have came back

3 positive for gunshot residue with respect to

4 Kazar, which would have bolstered your argument

5 and theory of the case that he had been the

6 shooter as opposed to Mr. Love?

7 **A Yes.**

8 Q There was a piece of information that was

9 developed by the police that I would like to draw

10 your attention to next that had to do with Iris's

11 ring. Do you recollect information with respect

12 to Kazar when he was arrested being caught in his

13 possession was Iris's, the decedent, ring?

14 **A I don't recall at this point. I mean,**

15 **was this in your supplemental petition?**

16 Q Yes.

17 **A I don't recall.**

18 Q Let's talk about the ring.

19 **A Okay.**

20 Q This ring was identified -- was

21 identified as being Iris's ring. Do you

22 recollect that?

23 **A Vaguely.**

24 Q Iris, obviously being the decedent.

25 **A Yes.**

1 Q Kazar, your alternative suspect, having

2 possession of a dead person's ring, after they

3 are dead with no history of extensive access to

4 the decedent, meaning, a long standing history,

5 you see the relevance of that today?

6 **A Obviously there's relevance.**

7 Q And the relevance would be that your

8 alternative suspect had the ring of the decedent

9 at or around the time after she had been killed,

10 that's relevant evidence.

11 **A Okay.**

12 Q Is that true?

13 **A Yes.**

14 Q And the evidence that had been developed

15 was that this was a ring that she had the habit

16 and custom of wearing on a daily basis. Do you

17 remember that?

18 **A I don't remember that part offhand.**

19 Q If it had been the case that's something

20 that was on her 24 hours or nearly 24 hours a

21 day, you would agree that would be relevant

22 evidence that would bolster your argument that

23 Kazar did it, true?

24 **A Yes.**

25 Q That wasn't developed in front of the

1 jury at all.

2 **A I'll take your word for it. I don't**

3 **recall.**

4 Q In order to develop that evidence, had

5 you done so, it would have required nothing other

6 than calling a police officer who was the person

7 who had arrested Kazar and inventoried his

8 person.

9 **A Calling that person and someone to**

10 **identify the ring that knew Iris.**

11 Q Such as mom.

12 **A Stepmom or whatever, yes.**

13 Q Those things could have been done?

14 **A Yes.**

15 Q They weren't done in this case?

16 **A I'll take your word for it. I don't**

17 **remember. If that's what the record reflects,**

18 **then, no, we didn't develop it.**

19 Q If you don't call the police officer, you

20 don't call the stepmom or the mom of Iris, then

21 the jury never hears that evidence obviously.

22 **A No.**

23 Q If you do call them, then the police

24 officer based upon business records exception

25 would have had an inventory control sheet that

1 would have verified his or her say so in addition

2 to their oral testimony, correct?

3 **A Yes.**

4 Q The records were available because it was

5 the Harrisburg Police Department who had arrested

6 Kazar if you'll recollect.

7 **A I don't recollect who arrested him, which**

8 **department.**

9 Q If that's the case based upon your past

10 experience inventory documents are available.

11 **A Yes.**

12 Q If you had presented those two witnesses,

13 the jury would have heard that, correct?

14 **A Yes.**

15 Q You would have included that in your

16 closing statement as a point of significance.

17 **A Probably.**

18 Q Your recollection now is you don't recall

19 whether or not you did.

20 **A I don't recall.**

21 Q There's another decision that you made

22 with respect to calling Carlos Hill, and Carlos

23 Hill, you'll recollect, gave a statement to

24 Officer Heffner on September 29, 2000 where he

25 had stated that Kazar had confessed to him during

1 booking. Do you recollect that general evidence?
2 **A Generally, yeah.**
3 Q Now, you could have called Carlos Hill to
4 the stand, correct?
5 **A Yes.**
6 Q But you didn't call Carlos Hill to the
7 stand.
8 **A No, we didn't.**
9 Q And in terms of the decision making that
10 went along with that, there's no -- rather than
11 getting into all the details that we did with the
12 original witness, meaning Kazar, you could have
13 used the Uniform Act to secure his presence,
14 correct?
15 **A Whose presence?**
16 Q Carlos Hill.
17 **A Yes.**
18 Q You could have utilized the Uniform Act,
19 correct, or writ of habeas corpus because he was
20 in a Pennsylvania prison?
21 **A I was going to say he was in a**
22 **Pennsylvania prison.**
23 Q You could have used the habeas corpus to
24 secure his presence.
25 **A Yes.**

1 Q You didn't in this case.
2 **A No, I thought we did.**
3 Q He testified at trial?
4 **A No, he didn't. I'm saying I think we did**
5 **do a writ to make him available. Whether he was**
6 **brought in, I don't recall. There was certainly**
7 **a writ done for Carlos Hill.**
8 Q But regardless of that, you didn't call
9 him to trial?
10 **A No.**
11 Q The other decisions that we talked about
12 with respect to his options are similar to those
13 that we already went over in detail with respect
14 to Kazar. He could have taken the Fifth
15 Amendment. That was one of his options.
16 **A Yes.**
17 Q He could have contradicted himself and
18 stuck to the second statement where he repeated
19 his original confession that Kazar made. That
20 was another option, correct?
21 **A Going back a step. Carlos's initial**
22 **statement -- I'm getting him confused. Carlos's**
23 **initial statement was to Detective Heffner.**
24 Q Correct. On September 29, 2000 that
25 while he was in booking with Kazar, that Kazar

1 had made a statement against personal interest
2 along the effects of the bitch got what she
3 deserved.
4 **A Okay.**
5 Q Now you recall that?
6 **A I recall them being in booking and**
7 **statements being made but then there was**
8 **another --**
9 Q The second statement that occurred was
10 when Heffner went back after Mr. Love had been
11 charged and he recanted that original statement
12 implicating Kazar.
13 **A Yes.**
14 Q In the scenario, we talked about the
15 Fifth Amendment. He could have been declared
16 unavailable. Arguably presented an argument to
17 the Court that it was a statement against
18 personal interest in conjunction with having
19 Kazar there having developed -- that's the same
20 option that could have been available at that
21 time?
22 **A Regarding Carlos?**
23 Q Yes.
24 **A Being unavailable?**
25 Q Yes.

1 **A Yes.**
2 Q If he had taken the Fifth.
3 **A Yes.**
4 Q The other option could have been that you
5 put him on the stand and he doesn't want to talk.
6 He doesn't want to talk in favor of the accused,
7 Mr. Love. He could have said along the lines, I
8 lied to the police in my first statement and,
9 therefore, stuck with his second statement that
10 he gave to Detective Heffner. That's a
11 possibility, correct?
12 **A Yes.**
13 Q You could have impeached him with his
14 original statement showing the circumstances
15 involving the second statement at that time to
16 make an argument much along the lines we explored
17 with respect to Kazar, correct?
18 **A Possible.**
19 Q Then the third option could have been
20 that he basically tells you that what he had
21 originally told Detective Heffner in terms of the
22 statement against interest was the truth and that
23 he was pressured by Detective Heffner to change
24 his opinion. That's a possibility, correct?
25 **A Sure.**

1  Q  All these possibilities were not known as
2  far as which way this particular case was going
3  to go because neither you or your staff
4  personally interviewed Carlos Hill, true?
5  **A  I don't think we did.  I don't know.**
6  Q  I want to talk to you about a group of
7  witnesses in terms of your decision making that
8  was here.  Corey Alston, as you'll recall,
9  possibly was the individual to whom Kazar
10  supposedly got access to a weapon; that he
11  returned it with blood on it.  Do you remember
12  that type of evidence?
13  **A  Yes.**
14  Q  And then do you recall Kendra Smith, who
15  was the paramour of Corey Alston, who fit into
16  developing that story.  Do you recall that
17  individual?
18  **A  Do I recall that from her testifying the**
19  **last time or originally back in '05?**
20  Q  Let's do both.
21  **A  Okay.**
22  Q  Do you recall that in the original trial
23  development of that story how Kazar could have
24  gotten a weapon and returned it with blood?
25  **A  No.**

1  Q  You don't dispute that it exists based
2  upon your hearing the prior testimony --
3  **A  Of...**
4  Q  -- of Kendra Smith and Corey Alston the
5  last time we were in court.
6  **A  The last time, no.**
7  Q  In terms of your investigation and your
8  office investigation of this matter, you'll
9  confirm that neither yourself nor anyone at your
10  behest personally interviewed or sought to
11  interview Corey Alston or Kendra Smith, true?
12  **A  I mean, I don't recall.  I don't have all**
13  **those files, but if there's no notes indicating**
14  **they were interviewed, that's a fair assumption.**
15  Q  But you called neither of them to trial.
16  **A  No, we didn't.**
17  Q  Having access to a gun by Kazar and
18  returning a gun in the immediate temporal
19  proximity to the death of Iris with blood on it,
20  you see the relevance to that, to your theory of
21  the case that Kazar killed Iris and not -- and
22  not Mr. Love?
23  **A  I see the relevance except what I recall**
24  **back then, Corey -- Kendra was the one saying**
25  **that Corey was denying and the dates didn't match**

1  up as to whether it happened.
2  Q  But you heard her testimony here?
3  **A  I heard what she said this year, yes.**
4  Q  But in terms of your investigation,
5  you're again relying upon solely the police
6  officer's written recording of oral statements
7  that were given by these two people as opposed to
8  an independent investigation by you.
9  **A  It's possible with those two that's the**
10  **case.**
11  Q  You could have called them as witnesses
12  to try to develop that, correct?
13  **A  Yeah, I could have called anyone as a**
14  **witness, yeah.**
15  Q  Much like the other witnesses, they could
16  have taken the Fifth Amendment, true?
17  **A  Yes.**
18  Q  They could have been declared
19  unavailable, arguments that had to do with it,
20  like, we talked about before, could have been
21  developed but not in this case.
22  **A  Yes.**
23  Q  The second thing, Corey could have denied
24  that the entire incident happened instead of
25  invoking his Fifth Amendment in which case you

1  could have impeached him with the statements of
2  Ms. Smith, true?
3  **A  Possibly, depending on how the other**
4  **side --**
5  Q  You can impeach --
6  **A  -- reacted to Rules of Evidence.  I don't**
7  **know.**
8  Q  You can impeach anyone with anything,
9  correct?
10  **A  Yes.**
11  Q  So you could have called Kendra Smith and
12  had her impeach Corey Alston with his previous
13  statements, correct?
14  **A  Yes.**
15  Q  And we didn't in this case.
16  **A  No.**
17  Q  Then the other possibility is that Corey
18  Alston could have -- could have admitted and
19  Kendra Smith backed it up in which case that
20  would certainly help out your theory of the case
21  that Kazar was the perpetrator of this crime.
22  **A  Yes.**
23  Q  Finally I would like to talk about Keith
24  Herndon who was another witness, and you'll
25  recall him as being the individual who had a

1  conversation with Kazar at SCI Greene where it
2  was attributed to Kazar something to the effect
3  of -- that he did Candi like he did Iris.  This
4  was a September 19, 2000 statement that was made
5  to Mr. Herndon alleged by Kazar.  You'll recall
6  that as being the context, correct?
7      **A   I mean, I know there was some sort of**
8  **mention of that.**
9      Q   Based upon your recollection, Candi is
10  the victim of his other acts that you had sought
11  to bring in but was denied by this Court.
12      **A   Yes.**
13      Q   So the significance of that statement, I
14  do Candi like I do Iris, you see the significance
15  of that statement, correct?
16      **A   Yes.**
17      Q   Now, you didn't call him as a witness in
18  this case, correct?
19      **A   No.**
20      Q   You could have called him.
21      THE COURT:  Excuse me a second.  I'm a
22  little confused.  Your exhibit refers to and my
23  recollection is triggered by the exhibit which
24  says that the statement Keith Herndon or the
25  statement regarding that Mr. Herndon either said

1  or heard and my recollection that it was
2  represented that he had said during the trial
3  that -- maybe I'm confused -- he had said to
4  Kazar or someone else that Kazar should do Iris
5  or do Candi like he did Iris or whatever and I'm
6  confused what the statement actually was.  I
7  guess I don't recall.
8      MR. McSHANE:  Sure.  A moment of the
9  Court's indulgence.
10      THE COURT:  Unless you remember.
11      THE WITNESS:  I don't remember.
12      MR. McSHANE:  Exhibit 25, Your Honor.  A
13  moment of the Court's indulgence.
14  BY MR. McSHANE:
15      Q   If I may, Your Honor, Exhibit 25 you'll
16  see a voluntary statement taken by Donald Heffner
17  of one Keith Herndon, and in there, there was a
18  question that was asked by the detective, what
19  did Kazar say in reference to Iris Fennel?  Do
20  you see that question?
21      **A   Not with your hand there.**
22      Q   What did Kazar say in reference to Iris
23  Fennel?
24      **A   Okay.**
25      Q   The response was:  He said, his exact

1  words was that he did that and that he should
2  have done this girl, Candi, like he did that
3  bitch Iris.  Is that how it reads?
4      **A   Are you asking me?**
5      Q   Yes.
6      **A   Yes.  That was part of it.**
7      Q   The significance of that statement as we
8  now read it into the record was obvious to you at
9  the time you read it.
10      **A   Yes.**
11      Q   In terms of Keith Herndon he wasn't
12  called to trial?
13      **A   No.**
14      Q   And it was because you couldn't locate
15  him or did you try to locate him?
16      **A   Tried to locate him.  I assumed he -- I**
17  **mean, Keith Herndon has a record as long as my**
18  **arm.  So I don't know if he was in jail at the**
19  **time or on the run or whatever.**
20      **My problem with Keith, he's -- I dealt**
21  **with Keith before this case and he's a**
22  **pathological liar.  He has crimen falsi longer**
23  **than anyone I met.   Presenting him as a witness**
24  **even for something that would seem to be good**
25  **seemed a risk.**

1      **As far as locating him, I don't recall if**
2  **he was in jail or we did a writ or not.**
3      Q   Let's talk about his location.  If he had
4  been in jail much like other witnesses, you could
5  have secured his appearance?
6      **A   If he was in jail there would have been a**
7  **writ of habeas.**
8      Q   If he had been out on the street, you
9  could have applied for material witness bail to
10  try and get him to come into court?
11      **A   If we knew where he was, yes.**
12      Q   Or put out an application to the Court
13  for material witness bail even if you didn't know
14  where he was asking for a warrant to be issued.
15  You're aware of that.
16      **A   Yes.**
17      Q   And your recollection is you don't recall
18  which way if any of those two that you took,
19  true?
20      **A   I thought Keith was in jail, but I don't**
21  **recall.  The record will reflect that.**
22      Q   In terms of his crimen falsi, crimen
23  falsi has to do with -- has to do with the
24  witness's credibility and believability.
25      **A   Yes.**

1     Q   And your concern was that the witness
2 would be easily impeached because of his long
3 prior crimen falsi.
4     **A   My concern was, having represented Keith**
5 **before and dealt with Keith before, that I knew**
6 **exactly what kind of witness Keith would have**
7 **been and the crimen falsi added on top of that I**
8 **think would have been devastating presenting him**
9 **as a witness. I think he would have been torn to**
10 **shreds. He would have come off terrible and**
11 **whatever we gained, we would have lost.**
12     Q   In terms of preparing him as a witness,
13 it is your testimony that there's no possible way
14 that you could have prepared him for trial so as
15 to alleviate some of those fears?
16     **A   That's hypothetical. I don't know.**
17     Q   But you didn't try, true?
18     **A   I don't recall if we located him or not.**
19 **So I don't know.**
20     Q   He comes into court. He testifies
21 consistent with the statement we just went over,
22 his recorded statement to the police officer.
23 Commonwealth argues you can't believe him because
24 he got a prior record. That was part of your
25 fear in addition to his personality; is that

1 fair?
2     **A   Yes.**
3     Q   Let's focus on the argument by the
4 Commonwealth that he can't be trusted because of
5 his crimen falsi. You have nothing that you
6 could personally have offered him that would have
7 gained him any sort of favorable treatment in
8 prison or treatment in life, true?
9     **A   No.**
10     Q   The argument that the Commonwealth would
11 have made with respect to implicating -- I'm
12 sorry. The argument that the Commonwealth would
13 have made in advance that you shouldn't trust him
14 because he's not trustworthy is a tactic that you
15 used as a defense attorney; is that true?
16     **A   Yes.**
17     Q   But in the case when you're the defense
18 attorney, it's in conjunction with the argument
19 that the Commonwealth can provide either a
20 quality of life change or some sort of benefit
21 for the person, correct?
22     **A   Sometimes.**
23     Q   In terms of developing a bias, true?
24     **A   Yes.**
25     Q   In this particular case, Commonwealth

1 couldn't develop that area of bias because you
2 had nothing to offer this witness.
3     **A   Under those circumstances, yes.**
4     MR. McSHANE: A moment of the Court's
5 indulgence. Thank you, Judge. No further
6 questions.
7     THE COURT: Mr. McMurry.
8     MR. McMURRY: Does Mr. Muller need a
9 break?
10     THE COURT: Good question.
11     THE WITNESS: I'm fine.
12     THE COURT: Good answer.
13
14            CROSS EXAMINATION
15
16 BY MR. McMURRY:
17     Q   Mr. Muller, I'm going to go through the
18 files prepared by Mr. McShane. The allegations
19 alleged against you and Mr. Giunta, a discussion
20 in regards to -- some of these we already
21 covered. I want to move quickly over those.
22     Let's start with the original
23 supplemental petition. I believe we covered this
24 in fairly great detail, but to summarize, I
25 believe -- what was your theory of the case?

1 Let's get to that.
2     **A   The theory of the case based on what**
3 **Mr. Love had told us and what he had told the**
4 **police in several different statements and then**
5 **what Iris -- I'm sorry -- Guillermina had**
6 **presented in her statement was essentially that**
7 **obviously Kazar was the shooter in this case**
8 **based on, you know, those various statements.**
9 **In Guillermina's initial statement**
10 **talking about seeing Kazar in the apartment or**
11 **something to that effect, if I recall correctly,**
12 **and the fact that the blood found on Tyshaunt and**
13 **on Kazar, LaQuan Williams, whatever was on**
14 **Tyshaunt did not match. It was his own blood and**
15 **what was on Kazar was the victim's blood. The**
16 **fact the only connection to blood was to the**
17 **victim was what was on Kazar's boot.**
18 **So I mean, the theory was that obviously**
19 **Kazar is the one who killed Iris and, you know,**
20 **we thought we backed that up pretty well with the**
21 **time line of when things happened, getting the**
22 **phone call, putting something in the oven, not**
23 **mentioning who was outside. If it had been**
24 **someone she knew, she would have told her mother**
25 **or stepmother it was Tyshaunt.**

1        **Those kind of things, that was the**
2  **essence of the theory of the case. Whatever**
3  **happened between Tyshaunt and Iris as far as**
4  **their relationship wasn't -- the end result was**
5  **not him killing her. It was Kazar being involved**
6  **and Kazar being the shooter in this case.**
7     Q  So basically it was, Mr. Love had nothing
8  to do with it, someone else did it, and it's most
9  likely Kazar to wrap it up.
10    **A  Essentially, yes.**
11     Q  And facts pointed to Kazar obviously
12  forensic, the victim's blood on his shoes and the
13  fact there was no blood on Mr. Love or the fact
14  there was none of the victim's blood on him.
15    **A  Yes.**
16     Q  So in regards to that, it's alleged that
17  you were ineffective for not calling LaQuan
18  Williams. We've gone through this several times
19  over the course of the hearing. I believe you
20  basically said regardless of whether he was
21  available or unavailable or not, you were not
22  calling Kazar as a witness; is that correct?
23    **A  That's correct.**
24     Q  And, again, what's the main purpose for
25  not calling him as a witness regardless of

1  whether he's available or not?
2    **A  I guess it was two-fold, not wanting to**
3  **create his unavailability one way or the other**
4  **but also not wanting him to actually show up --**
5  **okay -- and tell the jury that the reason her**
6  **blood was on his boot was because Tyshaunt had**
7  **gotten into a physical fight with the victim**
8  **earlier. I don't recall if it was that day or**
9  **the day before, whatever the case may be, and in**
10  **breaking them up, that Tyshaunt had punched her**
11  **in the face and she was bleeding and the blood**
12  **from her got on him at that point.**
13       **At least back then that was our theory we**
14  **didn't want Kazar as a witness. I mean,**
15  **we made the efforts to find out where he was, his**
16  **availability and whether he could be brought in**
17  **or not.**
18       **It became a concern during the pretrial**
19  **hearing on getting Kazar's prior bad acts in**
20  **where this Candi who he had also strangled and**
21  **beaten and done very similar things in fact on**
22  **the exact same date a year before, whatever,**
23  **December 20th, or whatever the date was, under**
24  **similar circumstances and there was a lengthy**
25  **pretrial hearing in front of Judge Bratton**

1  regarding whether we would be able to get that in
2  with or without Kazar being here.
3     Q  The Candi incident, just to clarify,
4  occurred before Iris's death?
5    **A  Yes. That was a year before.**
6     Q  And this is where it's alleged that
7  Kazar, your knowledge of it, raped a young lady,
8  slit her throat and tried to shoot her?
9    **A  I believe so, yes, and ultimately it came**
10  **out through the other witnesses that, I mean,**
11  **that incident didn't necessarily come out. It**
12  **came out that Kazar had a propensity for trying**
13  **to strangle women and various other things.**
14     Q  Through the trial through other witnesses
15  even through cross examination or direct, you
16  were able to dirty up Kazar even more?
17    **A  Yes.**
18     Q  Let's talk about Kendra Smith. You heard
19  Ms. Smith testify here at the hearing?
20    **A  Yes.**
21     Q  It's alleged that you were ineffective
22  for not calling Ms. Smith to the stand in support
23  of your case. Can you again tell us what that
24  reason is for not having her participate?
25    **A  I mean, our belief back then in preparing**

1  **the case, I believe was that between her and**
2  **Corey Alston and their statements not matching up**
3  **as to the gun and where it was and when it was,**
4  **that it would be a bigger negative than a**
5  **positive.**
6     Q  I believe the last testimony with all of
7  these witnesses we're talking about here today
8  and it's been alleged in the petition there were
9  good points and bad points with each of them, I
10  think you said each witness cut both ways.
11    **A  All double edge sword.**
12     Q  For every good thing you got, you got
13  something bad.
14    **A  Yes.**
15     Q  It was more a strategic decision on yours
16  and Mr. Giunta's part as to figure out which was
17  the best path of pinning this case on Kazar?
18    **A  The focus was pinned on Kazar, the blood**
19  **on Kazar's boot was -- I mean, it certainly**
20  **wasn't a slam dunk but it was a really good**
21  **issue.**
22     Q  And in reference to that, it would be
23  fair to say you didn't want to create too much
24  distraction from that or muddy the waters too
25  much to get the jury off that focus on your

1 behalf.

2 **A   More or less.  I think part of the**
3 **problem was everyone being an ex-con and**
4 **presenting ex-cons to support our theory was a**
5 **concern back then if we thought we could advance**
6 **the theory without going through that.**

7 Q   Let's talk about Keith Herndon.  You
8 covered that pretty well.  The fact that he had a
9 long extensive history, you didn't think he would
10 do well on the stand based on your prior
11 representation of him.

12 There's a couple of other people alleged
13 here, Larry Fennel.

14 **A   Larry Fennel, we could not find him.  We**
15 **tracked him finally down to South Carolina.  He**
16 **moved during the pendency of this case.  He had**
17 **moved several times starting off when Mr. Batson**
18 **had the case originally and Ms. Cliatt had the**
19 **case, and then when we got the case our subpoenas**
20 **went out and we were told he didn't live at the**
21 **locations anymore.  The last thing our**
22 **investigator was able to find out was he had**
23 **possibly moved to South Carolina.**

24 Q   Basically Mr. Fennel you couldn't find.

25 **A   We couldn't find.**

1 Q   What about Anthony Knight or Maurice
2 Apkin?

3 **A   From what I recall, he was under subpoena**
4 **at the various times the trial was pending.  When**
5 **we finally went to trial, it turned out it was**
6 **one of the few times he was not incarcerated**
7 **somewhere.  He had been released that month or**
8 **the month before, I believe, and was not**
9 **reincarcerated until several months after the**
10 **trial took place, and we were unable to find him.**
11 **He had always been under subpoena.**

12 Q   There's another individual, Daelene Saez.

13 **A   I think she testified.**

14 Q   Carlos Hill we talked about already.

15 **A   Yes.**

16 Q   In that regard, again, whether he would
17 have been available or unavailable, why would you
18 not present Mr. Hill?

19 **A   I mean, pretty much what I already told**
20 **Mr. McShane as to why we considered or didn't**
21 **consider him to be a good witness or potential**
22 **witness.  The Rules of Evidence would get under**
23 **him as far as statements of interest against**
24 **Kazar and his backtracking, you know, yet again**
25 **someone -- a convict.**

1 Q   It's your recollection Mr. Hill gave two
2 statements.  One originally would be good for you
3 and second one not so good.

4 **A   I believe so.  I'm getting some of the**
5 **witnesses confused.  I believe that was an issue.**

6 Q   I believe the last time when Detective
7 Heffner testified -- I show you Commonwealth
8 Exhibit No. 1.  I believe Carlos Hill's second
9 statement -- take a second to read through that.

10 **A   Okay.  I guess he's the one who gave the**
11 **other statement about Tyshaunt, called Cuzzo,**
12 **about being there and being somewhat involved in**
13 **the incident.**

14 Q   Basically incriminating the statement
15 made by Mr. Love while they were in prison and
16 while Kazar was there as well, correct?

17 THE COURT:  The witness would like a
18 break and so would I.  We'll take a ten-minute
19 recess.

20 (A recess is taken from 10:25 a.m. to
21 10:41 a.m.)

22 BY MR. McMURRY:

23 Q   Mr. Muller, you had a chance to read
24 Commonwealth Exhibit 1.

25 **A   I did.**

1 Q   After reading that, that's one of the
2 reasons why you would not have called Mr. Hill to
3 the stand; is that correct?

4 **A   Yes.  It references in it his statement**
5 **to things Tyshaunt said to him or notes he gave**
6 **to give to Kazar.**

7 Q   I'm showing you what is marked as Defense
8 Exhibit 26, which I believe is Mr. Hill's
9 original statement to the police.

10 **A   If I could have a moment.**

11 Q   Sure.

12 **A   Okay.**

13 Q   In reading that first statement,
14 obviously there's differences between the two.

15 **A   Yes.**

16 Q   In particular on page 2 of that statement
17 back to the question:  Did Kazar give you any
18 details of the murder?  And he went through that
19 long paragraph here.  There's no mention there
20 of any kind of gunshot, right?

21 **A   No, no, hitting her on the head.**

22 Q   Correct.

23 **A   Yes.**

24 Q   Is that something that would make a
25 difference whether or not you bring Mr. Hill in

1  to testify?

2  **A** It didn't match up with the evidence. I

3  mean, that would have been an issue whatever

4  story he's telling or he told doesn't match the

5  evidence that's presented or that is there.

6  **Q** Let's talk about Linda Gianquitto. What

7  about her as a witness?

8  **A** That was Mr. Giunta's part of his when we

9  split up various aspects of the case. He had the

10  Gianquittos. He had contact with them on a

11  number of occasions, I believe, and it became

12  very clear they were going to be terrible,

13  terrible witnesses if we called them.

14  **Q** Based on your review of their statements

15  and review of their -- your interview with them,

16  you decided not to call the Gianquittos?

17  **A** For those, yes.

18  **Q** Floyd Banks?

19  **A** I believe he died.

20  **Q** He was an individual that was in the cell

21  with Mr. Hill at the time. Do you recall?

22  **A** I think Floyd -- I may be getting these

23  people mixed up. I thought he died by the time

24  we got the case. There were several people

25  involved as potential witnesses who had died.

1  One was a cab driver and I don't remember if that

2  was Mr. Banks. I'm pretty sure Mr. Banks was

3  dead.

4  **Q** What about an individual by the name of

5  pop-pop?

6  **A** No. No one could tell us who it was.

7  Tyshaunt couldn't tell us who it was. The home,

8  two different possible addresses Tyshaunt said it

9  was. One had been torn down, and the other one

10  there was no -- there was no pop-pop. We could

11  never figure out who pop-pop was.

12  **Q** It's your testimony that you looked at

13  all these witnesses and for various reasons that

14  you stated -- you're aware of all these

15  witnesses?

16  **A** Yes.

17  **Q** But through your analysis of their

18  testimony and their baggage they brought to the

19  table, you elected to not call them?

20  **A** For various reasons, yes.

21  **Q** What about the allegations alleged in the

22  initial supplemental petition filed that we dealt

23  with here, and the first part of the supplemental

24  petition dealt with ineffectiveness or not

25  requesting for DNA and blood evidence. I think

1  we've gone through that a lot of this morning.

2  First one being the clothing on LaQuan Williams.

3  I believe your testimony earlier was you had

4  blood on LaQuan Williams?

5  **A** Yes.

6  **Q** You didn't feel there was any other need

7  for that independent test. Hand impressions on

8  the victim, I don't know if we got into that.

9  Do you recall anything about hand impressions on

10  the victim, whether or not you would have got

11  forensic analysis done for that?

12  **A** I don't remember.

13  **Q** As far as independent laboratory evidence

14  for additional blood on LaQuan Williams' boots

15  and clothing.

16  **A** It was not something that was considered.

17  **Q** Why was that?

18  **A** I don't know if we even considered it

19  back then. I don't know if it was within the

20  realm of our understanding as to whether to have

21  independent testing for luminol under the

22  circumstances.

23  **Q** Did you find it necessary?

24  **A** Well, no, not with our theory of the

25  case.

1  **Q** We went over the bite mark in reference

2  to that. You said you already had previous

3  experience with that type of science.

4  **A** Yes.

5  **Q** You didn't feel comfortable with it.

6  **A** No.

7  **Q** After that it's also alleged that trial

8  counsel failed to make an oral motion to

9  reconsider the trial courts ruling on LaQuan's

10  prior bad acts, post-sentence motion or direct

11  appeal on that same issue. Do you recall that?

12  **A** We argued the issue before the Judge

13  under what we thought was the relevant standard

14  and issue. We preserved what we thought should

15  be preserved and we argued that. I mean --

16  **Q** Did you appeal on that issue? Do you

17  recall?

18  **A** I believe we appealed on the issue of the

19  denial of our motion to introduce that evidence.

20  In regards to what standard we used, I don't

21  recall. Someone else was involved in writing the

22  appeal.

23  **Q** That record will speak for itself.

24  **A** Yes.

25  **Q** In regards to that allegation of

1 ineffectiveness, you felt you argued that
2 correctly?
3 **A   Yes, and we did not after being denied,**
4 **our motion being denied, we did not re-raise an**
5 **oral objection.  It was already preserved.**
6 Q   For that purpose that you already
7 preserved it.
8 **A   Yes.**
9 Q   The last issue, at least I see in the
10 supplemental petition was, it was alleged -- that
11 was withdrawn way back -- about not talking to
12 Mr. Love about testifying.
13 MR. McSHANE:  We withdrew that the first
14 day.
15 MR. McMURRY:  I had it marked here
16 wanting to clarify.  We won't -- that's not an
17 allegation here.
18 BY MR. McMURRY:
19 Q   Those are the only allegations
20 specifically that have been alleged against you
21 in that regard, Mr. Muller.  We went through all
22 these scenarios what could have happened, what
23 could not have happened.
24 MR. McMURRY:  A moment, Judge.
25

1 BY MR. McMURRY:
2 Q   Going back to your original theory of the
3 case and trial strategy -- going back to the
4 original theory of the case, the strategy you
5 employed during the trial, did you feel that
6 everything you did supported that theory?
7 **A   Yes.**
8 Q   And for reasons of not doing certain
9 things was also in support of that theory?
10 **A   At the time, yeah, yeah.  I think you can**
11 **always look back after the fact and, you know,**
12 **someone is convicted, what should have been done**
13 **or shouldn't have been done at the time going to**
14 **trial.  Yeah, we felt that was the appropriate**
15 **theory.**
16 **MR. McMURRY:  That is -- that's all the**
17 **questions I have.**
18 **THE COURT:  Anything else, Mr. McShane?**
19 MR. McSHANE:  One moment.  Nothing
20 further, Your Honor.
21 THE COURT:  I want to ask one question,
22 Mr. Muller.  Tell me again, you knew where -- if
23 you knew where Mr. Williams was and he was the
24 guy that you were alleging was, under your
25 theory, the shooter --

1 THE WITNESS:  Yes.
2 THE COURT:  -- why again was it that you
3 wouldn't have wanted to put him in front of the
4 jury to take a look at him and at least deny it
5 and then answer some difficult questions.
6 THE WITNESS:  Because I think our worse
7 case scenario, he would have been here and he
8 would not take the Fifth and he would tell the
9 jury what he told the police, that he had been
10 there earlier when Tyshaunt was in a physical
11 altercation with Iris, the victim, and he
12 assaulted her, and that's how her blood got on
13 him.
14 That explanation doesn't come in unless
15 he's here to testify and that would have done
16 away with our theory, you know, we know who the
17 shooter was, the person with the blood on their
18 boot, victim's blood on the boot.  That was
19 Kazar.
20 It was a judgment call at that time.  We
21 didn't want him here because he would have given
22 a plausible explanation as to how that blood
23 ended up on his boot and that came in anyhow.
24 The evidence, the DNA evidence of the
25 victim's blood being on his boot that was

1 confiscated days after this occurred, that was
2 part of the evidence that came in regardless of
3 whether he testified or not.
4 THE COURT:  All right.  Anything else?
5 MR. McMURRY:  Nothing from the
6 Commonwealth.
7 MR. McSHANE:  Nothing from the Defense.
8 THE COURT:  There's no reason why he
9 can't move on to other hearings.
10 MR. McSHANE:  No, Your Honor.
11 MR. McMURRY:  No, Your Honor.
12 MR. McSHANE:  We would like to call
13 Carlos Hill.  As we're doing that, as a matter of
14 course, I ask for the admission -- if they
15 haven't already been previously admitted -- all
16 Defendant identified exhibits up to this point in
17 time, 1 through 46.
18 MR. McMURRY:  I likewise make the same
19 motion at this time, Judge.
20 MR. McSHANE:  I have no objection.
21 MR. McMURRY:  No objection on
22 Mr. McShane's exhibits.
23 THE COURT:  They are all admitted.
24 (Whereupon, Commonwealth Exhibit Nos. 1
25 and 2 are admitted into the record.)

1      (Whereupon, Defendant Exhibit Nos. 1
2 through 46 are admitted into the record.)
3      THE COURT: Before you leave, make sure
4 the court reporter has marked versions so you
5 haven't intentionally walked off with them.
6      MR. McSHANE: Will do.
7      MR. McMURRY: Your Honor, in reference to
8 Mr. Hill, I spoke to Mr. McShane, this is the
9 same objection we made through these witnesses
10 that testified previously as a running objection.
11 I want to reiterate it here again in regard to
12 Mr. Hill, no substantial compliance with 42
13 Subsection 9545(d)(1) in regards to the proffer
14 of their testimony.
15      In regard to him being here today as
16 outlined by that statute, the Court over the
17 objections on the other basis under that regard,
18 I wanted our objection noted for this witness
19 specifically again.
20      THE COURT: Did you get the numbers of
21 the section?
22      THE COURT REPORTER: Yes.
23      THE COURT: Anything to add?
24      MR. McSHANE: Ask the Court to rule
25 consistent with its prior rulings.

1      THE COURT: I try to do that. Your
2 objection is noted and overruled.
3
4      CARLOS HILL,
5 having been sworn, was examined and testified as
6 follows:
7
8      DIRECT EXAMINATION
9
10 BY MR. McSHANE:
11      Q You are Carlos Hill?
12      **A Yes, sir.**
13      Q You're currently incarcerated in the
14 state of Virginia?
15      **A Yes, sir.**
16      Q You're just here on what we call a
17 Uniform Act extradition to testify here today.
18 Do you know that?
19      **A I know that's what I was called for.**
20      Q And I want to talk to you about the
21 events that happened back in around the year
22 2000, September 29th. Do you recall talking to
23 Detective Donald Heffner?
24      **A I plead the Fifth.**
25      Q Okay, and in terms of the statement that

1 you gave --
2      **A I object. I plead the Fifth.**
3      Q If you let me do the question.
4      **A Everything here on for the record, I**
5 **plead the Fifth.**
6      Q Did you give a statement to Detective
7 Heffner at any point in your life?
8      THE COURT: He's already said he's not
9 going to answer the questions on the basis of his
10 Fifth Amendment.
11      MR. McSHANE: Your Honor, I struggle to
12 see how whether or not he had a conversation with
13 Detective Heffner could possibly implicate him
14 from a statement that he gave back in the year
15 2000 when the statute of limitations even if he
16 gave a false report to the police would have been
17 only two years.
18      THE COURT: Well, that may well be. I'm
19 not his lawyer either. If he's exercising his
20 right without counsel here, can't make him
21 answer. I'm not going to hold him in contempt
22 and have him stay here in our prison when he's
23 already doing a sentence in Virginia.
24      MR. McSHANE: Okay. So I would like at
25 this point in time to ask the Court to make an

1 oral motion to instruct the witness to answer the
2 questions as applicable. The statute of
3 limitations according to the Pennsylvania law
4 that he would potentially be subject to is only
5 two years. The date of his statement was on
6 September 29, 2000.
7      THE COURT: Mr. McShane -- Mr. McMurry.
8      MR. McMURRY: Judge, that's your
9 discretion, Mr. Hill exercises his constitutional
10 right to remain silent.
11      THE WITNESS: Your Honor, if I may, may I
12 speak for the record?
13      THE COURT: I just want to caution you
14 that you should be very careful about what you
15 say.
16      THE WITNESS: Okay. But I'm pretty
17 confident in what I'm going to say.
18      For the record, Mr. McShane never
19 contacted me -- I've been in the State of
20 Virginia corrections for five years -- about
21 being a witness to anything first and foremost.
22 Mr. McShane had -- there was a conference call
23 set up yesterday with a PI out of his firm,
24 whatever. I specifically then did tell
25 Mr. McShane I wanted nothing to do with his case.

1 I didn't know nothing about the case. I wasn't
2 testifying about nothing about the case.
3     MR. McSHANE: Can I ask you questions
4 based upon that?
5     THE WITNESS: I plead the Fifth to any
6 question that you ask me.
7     MR. McSHANE: Clearly there's no
8 implication with respect to what you -- he just
9 gave us. I ask the Court again to instruct the
10 witness to answer questions.
11     THE COURT: To the extent you're
12 talking -- both the witness and private
13 investigator know all the facts about it. I do
14 not. I don't know what likely is to come up or
15 when there's a criminality implicated or
16 otherwise.
17     MR. McSHANE: I ask the Court to make
18 this ruling based upon what this witness alleges.
19     THE WITNESS: You can't make me answer
20 nothing. I never agreed that you putting me on
21 the stand about anything. How can you just force
22 me to take the stand.
23     THE COURT: That's what subpoenas are all
24 about, Mr. Hill. But hold on just a second.
25 Whether or not there was a conference with

1 Mr. Hill and your PI, how is that relevant to the
2 issues that are being litigated here in this
3 proceeding, which is whether or not Mr. Muller
4 and Mr. Giunta were effective counsel in their
5 representation of Mr. Love back at the time of
6 trial?
7     MR. McSHANE: Bias against Mr. Love and
8 also motive to not testify here. He's offering a
9 specific reason why he's not testifying, and I
10 think with all due respect, his misunderstanding
11 of the Fifth Amendment and that the statute of
12 any conceivable crime based upon this statement
13 of September 29, 2000, has well passed and he
14 didn't testify at trial.
15     So, therefore, even perjury would not be
16 available and in terms of --
17     THE COURT: The underlying crime is
18 homicide.
19     MR. McSHANE: Correct.
20     THE COURT: How am I to know whether or
21 not something that you may inquire about could
22 implicate him in the homicide itself?
23     MR. McSHANE: I wasn't planning --
24     THE COURT: I'm not even asking him if
25 that's what he's concerned about. I don't have

1 the right to do that.
2     MR. McSHANE: Right.
3     THE COURT: Either by implication I can't
4 do that.
5     MR. McSHANE: Maybe if I ask the
6 questions specifically and then the gentleman
7 either decides that he wants to take the Fifth
8 Amendment or not. That way we know what my
9 intended question would be, the scope of possible
10 responses that one would reasonably have to the
11 question and maybe that will give a broader
12 context rather than just this general question or
13 this general statement of the Fifth that he's
14 implicating the Fifth. May I proceed with that?
15     THE COURT: Let me have a chat here with
16 Mr. Hill briefly. Mr. Hill, I want you to
17 understand no one wants you to be inconvenienced
18 or held here longer than need be. You do have a
19 right to refuse to testify if the matter under
20 inquiry is or may implicate you in some criminal
21 fashion. That Fifth Amendment right does not
22 necessarily mean you just can say I don't want to
23 testify.
24     I think that the testimony that is going
25 to be elicited is whether or not you have some

1 reason why you don't want to testify unrelated to
2 potential prosecution because it does appear to
3 me, and I think Mr. McShane would even agree, it
4 is unlikely that anything that's going to be
5 asked about bad blood between you and Mr. Love or
6 you don't like each other or some other such
7 thing or your conversation with the PI would not
8 give rise to criminal prosecution.
9     Just so you know, you're correct. We're
10 not allowed to water board you or to otherwise
11 force you at the point of a knife or barrel of a
12 gun to say something. That's true.
13     But the Court does have the ability to
14 hold you in contempt if you fail to answer
15 questions that do not violate your Fifth
16 Amendment rights. That would mean that you would
17 end up spending a longer period of time at Warden
18 DeRose's hotel, which I don't think you want to
19 do, and I think I'm not asking you or saying you
20 must waive your Fifth Amendment right.
21     If you believe that a question
22 Mr. McShane may ask causes you to be concerned
23 your answer may or could be used against you to
24 implicate you in a crime for which is not already
25 barred by a statute of limitations, then you can

1    still do that.
2          But I think -- let's hear the questions,
3    and some of them I think will not -- will be
4    innocuous and not implicate you in any kind of
5    crime.
6          THE WITNESS:  Okay.  If I may please the
7    Court, I understand clearly what's going on.  I
8    don't think, with all due respect, Your Honor,
9    you understand what's going on.  Mr. McShane
10   never made an attempt to contact me about these
11   proceedings.  I have the right to plead the Fifth
12   going into these proceedings.  I talked to
13   Mr. McShane's PI yesterday, and I specifically
14   notified him and told him that I had no
15   intentions on testifying, taking the stand.  I
16   didn't want nothing to do with the case.
17         THE COURT:  That's why we have subpoenas
18   so that people can't select whether or not they
19   wish to testify.  Your right to raise that is
20   after the questions are asked not before.
21         THE WITNESS:  Do it not matter yesterday
22   morning my life was put in jeopardy?  Do that
23   matter?
24         THE COURT:  I don't know.  Why don't we
25   let him ask the questions.

1          THE WITNESS:  I'm pleading the Fifth all
2    the way out.
3          MR. McSHANE:  I think I'm entitled on the
4    record to ask the questions and have the
5    gentleman assert the Fifth and then see where it
6    goes.
7    BY MR. McSHANE:
8          Q    The first question that I have to you,
9    you gave a statement to Donald Heffner on
10   September 29, 2000, didn't you?
11         **A    I do not recall.**
12         Q    If I placed your statement, typed
13   statement in front of you with your signature and
14   your initials, that would refresh your
15   recollection, wouldn't it?
16         THE COURT:  Don't ask too many questions.
17   Just ask one.  Show it to him and ask if he would
18   read it.
19   BY MR. McSHANE:
20         Q    Would you be able to recognize your own
21   signature?
22         **A    I should, yeah.**
23         Q    I'm placing in front of you what's marked
24   down here as Defendant Exhibit 26.  Do you see
25   that mark?

1          **A    Um-hum.**
2          THE COURT:  I see it.  That's all that
3    matters.
4    BY MR. McSHANE:
5          Q    The last page here, this is your
6    signature that I'm pointing at where it says
7    signature of person giving statement.  Do you see
8    that?
9          **A    Um-hum.**
10         Q    Is that yes for the record?
11         **A    Yes.**
12         Q    Taking a look at these three pages, does
13   that refresh your recollection that you were
14   interviewed by Detective Heffner on September 29,
15   2000?
16         **A    I don't recall.**
17         Q    You did talk to an Investigator Heffner
18   about the murder of Iris, correct?
19         **A    I don't recall.**
20         Q    I'm placing in front of you what is
21   marked Defendant Exhibit No. 26.  Do you see the
22   CH that is there?
23         **A    Yes.**
24         Q    That's on the first page we're looking at
25   there.

1          **A    Yes.**
2          Q    CH stands for?
3          **A    I don't know.**
4          Q    You don't know your own initials?
5          **A    I just see a CH.  That could mean**
6    **anything.**
7          Q    CH happens to correspond with your
8    initials, Carlos Hill.
9          **A    Okay.**
10         Q    The CH that is here, that's your CH,
11   isn't it?
12         **A    I don't recall.  I don't know.**
13         Q    This CH here on the second page, that
14   corresponds to Carlos Hill, doesn't it?
15         **A    I don't know.**
16         Q    And on the last page where your signature
17   is, the CH is also there?
18         **A    I don't know.**
19         Q    You don't see a CH there?
20         **A    No.**
21         Q    That's right here in front of you.  Take
22   a look at this.  Do you see a CH there?
23         **A    I don't know.**
24         Q    You don't see a C?
25         **A    I see a C.**

1    Q  A period; do you see the period?

2    **A  Um-hum.**

3    Q  Do you see the H?

4    **A  Yeah.**

5    Q  So there's a CH present, correct?

6    **A  What is your point?  Why do you even have**

7  **me here today?  Why have me here today against my**

8  **will?  That's what the question is.**

9    Q  CH corresponds to?

10    **A  This is crazy.  This is crazy.**

11    **THE COURT:  Mr. Hill, I know we haven't**

12  **met.**

13    THE WITNESS:  I understand.  I'm trying

14  to figure out why he has me here today.

15    THE COURT:  Here's a rule, when my lips

16  are moving, talking, you don't.

17    THE WITNESS:  Okay.

18    THE COURT:  You're here because you've

19  been subpoenaed to answer questions.  He has a

20  right to represent his client, to ask you

21  questions.

22    THE WITNESS:  He's calling me as a

23  witness.

24    THE COURT:  He has the right to do that.

25  That's why we have subpoenas.

1    THE WITNESS:  Okay.

2  BY MR. McSHANE:

3    Q  We're talking about the CH.  The CH we

4  just saw on the third page of the document,

5  Defense Exhibit 26, corresponds to Carlos Hill,

6  doesn't it?

7    **A  I don't know.**

8    Q  Okay.  What you're saying to me is that

9  you don't initial things with a CH.

10    **A  I mean, right, naturally I would.  My**

11  **name is Carlos Hill.  If you're saying that's my**

12  **initials, that's what you saying?**

13    Q  I'm asking on these three pages.

14    **A  I don't recall.**

15    Q  Taking a look at -- do you know your own

16  initials?

17    **A  I don't recall.  I'm a poor witness.  I'm**

18  **a poor witness.**

19    **THE COURT:  Wait.**

20    THE WITNESS:  I'm a poor witness.

21    THE COURT:  Wait until he asks the

22  questions -- but before --

23    THE WITNESS:  I'm a poor witness.

24    THE COURT:  Get to the relevance.  That's

25  already part of this --

1    THE WITNESS:  I'm a poor witness.

2    THE COURT:  Mr. Hill, stop it.  Be quiet.

3    MR. McSHANE:  I'll move on.  He's being

4  obstructive.  We get the point.

5  BY MR. McSHANE:

6    Q  You gave a statement that you signed that

7  bears at least on the face of it 09-29-2000.  Do

8  you see that's how it reads?

9    **A  Yeah, I see it.**

10    Q  You did talk to a Detective Heffner.  You

11  were in the -- when you were in the adult

12  offenders section of the Harrisburg Police

13  Department.  Do you remember that?

14    **A  I don't recall.**

15    Q  Do you remember the year?

16    THE COURT:  Mr. McShane, maybe if you

17  could step back.  There's a little invasion of

18  space issue here.

19    MR. McSHANE:  I only have one copy.

20    THE COURT:  But the question ultimately

21  is, I believe the detective testified about this

22  statement.  It's already been authenticated and

23  admitted.  What is it more than you want?

24    MR. McSHANE:  All right.  I'll move on,

25  Judge.

1  BY MR. McSHANE:

2    Q  With respect to the trial that eventually

3  happened, had you ever been questioned by anyone

4  who represented Tyshaunt Love?

5    **A  I plead the Fifth.**

6    **MR. McSHANE:  I can't imagine how, Your**

7  **Honor, this could implicate him in the crime.**

8    THE WITNESS:  It's not about anything

9  implicating me in a crime.  I can't imagine why

10  you would put me on the stand.

11    THE COURT:  Mr. Hill, when I'm talking,

12  you don't.  That's one benefit that I have of

13  sitting up here.

14    THE WITNESS:  Okay.  I apologize.

15    THE COURT:  That's all right.

16  Mr. McShane simply asked whether or not you had

17  spoken to any of those who represented Mr. Love

18  prior to the trial.  Which occurred on what date?

19    MR. McSHANE:  2005, September of 2005.

20    THE COURT:  He's just asking whether

21  anyone representing Mr. Love had contacted you.

22    THE WITNESS:  No.

23  BY MR. McSHANE:

24    Q  Do you know where you were in September

25  of 2005?

1    **A  No.**

2    Q  Were you in prison in 2005?

3    **A  I don't recall.**

4    MR. McSHANE:  One moment of the Court's

5  indulgence.  One moment, Your Honor.

6  BY MR. McSHANE:

7    Q  Okay, Mr. Hill, you said your life was

8  threatened.  It was threatened by Kazar, LaQuan

9  Williams?

10    **A  I plead the Fifth.**

11    Q  You feel that your life is threatened by

12  testifying here today?

13    **A  I plead the Fifth.**

14    Q  I don't know how that possibly --

15    THE COURT:  If that's your feeling,

16  that's okay.

17    THE WITNESS:  I'm just saying yesterday

18  morning me and Williams got into an altercation.

19  Had I not been brought up here by you unannounced

20  out of the clear blue to testify, something that

21  I didn't want to get involved in or have

22  knowledge about, I wouldn't have went through

23  that.

24    So I feel like the altercation I went

25  through -- right now I'm in segregation because

1  of you, Justin McShane, because of you I'm in the

2  hole, had I not been brought up here, brought

3  into this situation.  I wasn't called as a

4  witness at the time of the first trial.  I

5  shouldn't be called as a witness now.

6  BY MR. McSHANE:

7    Q  By Mr. Williams, you mean LaQuan

8  Williams, correct?

9    **A  I can sit here all day, man.**

10    Q  And I can too.  This is the last question

11  I'm ever going to ask you, Mr. Williams.

12    THE COURT:  I'm going to tell you he's a

13  lawyer.

14    THE WITNESS:  He ain't going to lie to

15  me.  The clock keep ticking.  I only have a few

16  more months to do, you know.  Time is still

17  running in Virginia.

18    MR. McSHANE:  No one wants that.

19  BY MR. McSHANE:

20    Q  Just one question, the Williams you

21  referred to is LaQuan Williams?

22    **A  I don't know who he was.  I didn't look**

23  **at the writing.**

24    Q  Mr. Williams was in the prison?

25    **A  I didn't look.  They writing.  The dude**

1  **came at me.  For the record I beat his ass.**

2  **Excuse me, Your Honor, and that was it, blah,**

3  **blah.  But had I not been brought up here to the**

4  **state of Pennsylvania called by you on a**

5  **subpoena, I would never got into the altercation.**

6    **THE COURT:  And the dude is the guy you**

7  **said was Williams.**

8    THE WITNESS:  Whoever he was.

9    THE COURT:  You only heard that.

10    THE WITNESS:  I don't know for the

11  record.

12    MR. McSHANE:  I'm fine.  I'm done with

13  it.

14    THE WITNESS:  You don't need -- you're

15  not going to get anywhere with this matter.  I'm

16  not trying to hurt his appeal, whatever is going

17  on or hurt the family.  All I know is, you never

18  talked to me.  I never talked to you.  You

19  shouldn't want to call nobody to witness to

20  something without prior notification what they

21  wasn't involved in.  It doesn't take a rocket

22  scientist to know that.

23    MR. McSHANE:  I thank you for your

24  soliloquy and --

25    THE WITNESS:  I got a degree in

1  elementary education for the record.

2    THE COURT:  I have to do this.

3  Mr. McMurry, do you have any questions?

4    THE WITNESS:  This is crazy.

5    MR. McMURRY:  I do briefly, Judge.

6

7        CROSS EXAMINATION

8

9  BY MR. McMURRY:

10    Q  In reference to, Mr. Hill, Mr. McShane

11  asked did anyone contact you at the time of the

12  trial back in September of 2005 and you said no

13  to his question.  If they would have contacted

14  you, would you have come and testified for

15  Mr. Love in his defense?

16    **A  No, I wouldn't have gotten involved in**

17  **none of this.**

18    MR. McMURRY:  Thank you.  No further

19  questions.

20    MR. McSHANE:  I don't want to beat a dead

21  horse.

22    THE COURT:  Mr. Hill, thank you very

23  much.

24    THE WITNESS:  Is there any way to get me

25  back to Virginia corrections?  I got a doctor's

## 100

1 appointment on Tuesday morning.

2     THE SHERIFF: We'll try.

3     THE COURT: The short answer is, I'm

4 going to tell them you would like to go back as

5 soon as you can. The true answer is I do not

6 control the sheriff's vehicles and their

7 allocation. If they have no vehicles

8 available -- they do it as fast as they can.

9     We have no reason to keep you here.

10 There's no benefit to any of us or to you by you

11 being here. They will do the best they can.

12     THE WITNESS: I'll be filing a civil suit

13 against Mr. McShane for defamation of character.

14 I'll see you in a few months.

15     MR. McSHANE: Is that a threat, sir?

16     THE WITNESS: I just said I'll see you in

17 a few months in the courtroom.

18     THE COURT: Anything else?

19     MR. McSHANE: I think I provided enough

20 entertainment for today.

21     THE COURT: Anything?

22     MR. McMURRY: Judge, in light of the fact

23 the only witnesses the Commonwealth would have

24 called would have been Mr. Muller and Mr. Giunta.

25 Since we were able to examine their testimony

## 101

1 through Mr. McShane calling them as a witness, we

2 have no testimony to offer during the evidentiary

3 part of this hearing.

4     THE COURT: I want to make sure I

5 understand. You know when you are

6 cross-examining in response to the questioning by

7 Mr. McShane that limited you to the areas that he

8 had covered.

9     MR. McMURRY: I understand that.

10     THE COURT: Are you saying that you have

11 no reason to call them to cover any additional

12 areas of inquiry?

13     MR. McMURRY: That's correct. I believe

14 we covered everything we would have asked

15 directly on cross examination through

16 Mr. McShane's questions on the record.

17     THE COURT: Now, we spoke then at sidebar

18 at the beginning of these proceedings today. Is

19 everyone still on board with the -- what I

20 thought was the agreement that rather than making

21 closing arguments here, given that these

22 proceedings have now extended over a number of

23 months, that instead we'll get the transcript of

24 today's proceedings prepared promptly and that 30

25 days from today -- I gave you a date, December

## 102

1 3rd -- from today, I'll accept post-hearing memos

2 in the nature of closing arguments.

3     MR. McSHANE: That's fair.

4     THE COURT: Thank you very much.

5     * * * *

1                        CERTIFICATE
2
3
4              I hereby certify that the proceedings
5    and evidence are contained fully and accurately in the
6    notes taken by me on the hearing of the above cause,
7    and that this is a correct transcript of the same.
8
9
10                                    _____
                                     Joanne M. Kohn
11                                   Official Court Reporter
12
13
14             The foregoing record of the proceedings
15   of the above cause is hereby approved and directed to
16   be filed.
17
18
19
20
21
22
23   _____          _____
     Date                      Bruce F. Bratton, Judge
24
25