IN THE SUPERIOR COURT OF PENNSYLVANIA

FOR THE MIDDLE DISTRICT

RECEIVED
JUL 2006
DISTRICT ATTORNEY
OF
DAUPHIN

NO. 198 MDA 2006

COMMONWEALTH OF PENNSYLVANIA,
Appellee

VS.

TYSHAUNT LOVE,
Appellant

## BRIEF FOR APPELLANT

Appeal of Tyshaunt Love, from the judgment
of sentence, entered in this matter on the
28th day of December, 2005, by
The Honorable Bruce F. Bratton, Judge,
Twelfth Judicial District of Pennsylvania,
Docketed at No 0937 Criminal Division 2002,
Dauphin County Court of Common Pleas.

Paul W. Muller
Chief Deputy Public Defender
ID#: 73799

Joshua J. Vecchio
Assistant Public Defender
ID#: 93354

Dauphin County Public
Defender's Office
Dauphin County Administration Building
Two South Second Street
Harrisburg, PA 17101
(717) 780-6370

# INDEX TO BRIEF

                                                                    Page

I.    STATEMENT OF JURISDICTION.................................................    1

II.   ORDER OR OTHER DETERMINATION IN QUESTION.............    2

III.  STATEMENT OF THE SCOPE AND
         STANDARD OF REVIEW......................................................    5

IV.   STATEMENT OF QUESTIONS PRESENTED.............................    7

V.    STATEMENT OF THE CASE.....................................................    8

VI.   SUMMARY OF THE ARGUMENT.............................................    36

VII.  ARGUMENT.............................................................................    37

VIII. CONCLUSION..........................................................................    70

APPENDIX

Opinion, the Honorable Bruce F. Bratton,
dated March 14, 2006……………………...............................................    Exhibit A

Statement pursuant to Pa.R.A.P. 1925(b)………………………………..    Exhibit B

# TABLE OF CITATIONS

**CASES:** **PAGE**

Commonwealth v. Africa, 524 Pa. 118, 569 A.2d 920 (1990)...................... 39

Commonwealth v. Bailey, 469 A.2d 604, 611 (1983)................................. 60

Commonwealth v. Bazemore, 531 Pa. 582, 614 A.2d 684 (1992)................. 59

Commonwealth v. Blair, 460 Pa. 31, 34, 331 A.2d 213, 214 (1975).............. 58

Commonwealth v. Chesson, 509 A.2d 875, 877 (Pa. Super. 1986)................ 68

Commonwealth v. Cosnek, 836 A.2d 871 (Pa. 2003)................................ 48

Commonwealth v. Fleming, 794 A.2d 385 (Pa. Super. 2002)........................ 55

Commonwealth v. Frank, 395 Pa. Super. 412, 421, 577 A.2d 609, 614 (1990). 65

Commonwealth v. Gause, 659 A.2d 1014, 1016 (Pa. Super. 1995)................ 69

Commonwealth v. Hunt, 858 A.2d 1234, 1238-39 (Pa.Super. 2004)............. 39

Commonwealth v. Jarema, 590 a.2d 310 (1991)..................................... 51

Commonwealth v. Kimbrough, 872 A.2d 1244, 1258 (2005)....................... 40

Commonwealth v. McNear, 852 A.2d 401, 404 (Pa.Super. 2004)................ 38

Commonwealth v. Phillips, 601 A.2d 816, 823 (Pa.Super. 1992),
*affirmed*, 534 Pa. 423 (1993)..................................................... 68

Commonwealth v. Pounds, 490 Pa. 621, 417 A.2d 597, 600 (1980)............. 39

Commonwealth v. Royer, 476 A.2d 453, 458 (Pa.Super. 1984)................... 68

Commonwealth v. Sandutch, 498 Pa. 536, 540, 449 A.2d 566, 567 (1982).... 57

Commonwealth v. Schwartz, 419 Pa. Super. 251, 263, 615 A.2d 350,
356 (1992)........................................................................... 65

Commonwealth v. Smith, 436 Pa.Super. 277, 287-294, 647 A.2d 907,
911-915 (1994)...................................................................... 59

Commonwealth v. Stinson, 427 Pa.Super. 289, 297-301, 628 A.2d 1165,
1169-1171 (1993)................................................................... 59

Commonwealth v. Stock, 679 A.2d 760 (1996)...................................... 52

Commonwealth v. Thompson, 538 Pa. 297, 311, 648 A.2d 315, 322 (1994)...　59

Commonwealth v. Walloe, 472 Pa. 473, 476, 372 A.2d 788, 790 (1977).......　58

Commonwealth v. Williams, 893 A.2d 147 (2006).....................................　51, 52

Casani v. Lincoln Bank, 436 A.2d 1019, 1020.  (Pa.Super. 1981)..................　54

Crawford v. Washington, 541 U.S. 36 (2004)...........................................　57

OTHER SOURCES:

Pa.R.C.P. 600 (C)(3)(b)..................................................................　37

Pa.R.A.P. 311(d)...........................................................................　56

Pa.R.A.P. 1311(a)..........................................................................　49, 53

Pa.R.A.P. 1701(a)..........................................................................　55, 56,

Pa.R.E. 404(b)(1)...........................................................................　65

Pa.R.E. 404(b)(2)...........................................................................　65

42 Pa.C.S. §702(b).........................................................................　54

42 Pa.C.S.A. §9721(b).....................................................................　68, 69

I.

## STATEMENT OF JURISDICTION

Jurisdiction over this matter is conferred upon This Honorable Court by §742 of

the Judicial Code, Act of July 9, 1976, P.L. 586, No. 142, §2, (42 Pa.C.S.A. §742),

providing that the Superior Court shall have exclusive appellate jurisdiction of all appeals

from finals orders of Courts of Common Pleas, regardless of the nature of the

controversy or the amount involved, except such classes of appeals as are within the

exclusive jurisdiction of the Supreme Court or the Commonwealth Court.

## ORDER OR OTHER DETERMINATION IN QUESTION

THE CLERK:                    In the case of Commonwealth of Pennsylvania

versus Tyshaunt Love, Docket No. 937 CR 2002, on the charge of murder in the first

degree, how did you find?

THE FOREPERSON:          Not guilty.

THE CLERK:                    On the charge of murder in the third degree, how

did you find?

THE FOREPERSON:          Guilty.

THE COURT:                    That's all, Mr. Hargis. Does either counsel have

anything they would like to bring to my attention why the verdict should not be recorded

as the verdict of this jury?

MR. McCORMICK:          Not from the Commonwealth, Your Honor.

MR. MULLER:                  Just request a polling of the jury.

THE COURT:                    Let me explain, polling of a jury is a right of either

side in any action including this one. What you'll be asked is if you agree individually

that this is the verdict of each of you. As I told you the verdict is required to be

announced. Now please proceed.

THE CLERK:                    In the case of Commonwealth versus Tyshaunt

Love, Docket 937 CR 2002, on the charge of murder in the first degree you voted not

guilty. On the charge of murder in the third degree you voted guilty, did you sir?

JUROR NO. 1:              Yes.

THE CLERK:                    No. 2, do you agree with the verdict rendered by

No. 1?

JUROR NO. 2:              Yes.

2

THE CLERK: No. 3, do you agree with the verdict rendered from Juror No. 1?

JUROR NO. 3: Yes.

THE CLERK: No. 4.

JUROR NO. 4: Yes.

THE CLERK: No. 5.

JUROR NO. 5: Yes.

THE CLERK: No. 6.

JUROR NO. 6: Yes.

THE CLERK: No. 7.

JUROR NO. 7: Yes.

THE CLERK: No. 8.

JUROR NO. 8: Yes.

THE CLERK: No. 9.

JUROR NO. 9: Yes.

THE CLERK: No.10.

JUROR NO.10: Yes.

THE CLERK: No. 11.

JUROR NO. 11: Yes.

THE CLERK: No. 12.

JUROR NO. 12: Yes.

THE COURT: Anything further, counsel?

MR. MULLER: No, Your Honor.

MR. McCormack: No, Your Honor.

THE COURT: The verdict will be recorded.

(The verdict is recorded.)

(Notes of Transcript of Proceedings of Jury Trial, September 16-20, 2005, pp. 372-374.)

III.

## STATEMENT OF SCOPE AND STANDARD OF REVIEW

The standard of review in evaluating Rule 600 issues is whether the trial court abused its discretion. The proper scope of review in determining the propriety of the trial court's ruling is limited to the evidence on the record of the Rule 600 evidentiary hearing and the findings of the lower court. In reviewing the determination of the hearing court, an appellate court must view the facts in the light most favorable to the prevailing party. Commonwealth v. McNear, 852 A.2d 401, 404 (Pa.Super. 2004).

When considering the trial court's ruling, the Superior Court is not permitted to ignore the dual purpose behind Rule 600. Rule 600 serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. However, the administrative mandate of Rule 600 was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth. Commonwealth v. Hunt, 858 A.2d 1234, 1238-39 (Pa.Super. 2004) (*en banc*).

An abuse of discretion standard governs the review of the propriety of a grant or denial of an appeal *nunc pro tunc*. Commonwealth v. Jarema, 590 a.2d 310 (1991).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"In order for prior testimony to be admissible in a subsequent proceeding as substantive evidence against the accused, there must have been a full and fair opportunity to cross-examine." Commonwealth v. Thompson, 538 Pa. 297, 311, 648 A.2d 315, 322 (1994). "The Commonwealth may not be deprived of its ability to present inculpatory evidence at trial merely because the defendant, despite having the opportunity to do so, did not cross-examine the witness at the preliminary hearing stage as extensively as he might have done at trial." 648 A.2d 315.

However, where the defense, at the time of the preliminary hearing, was denied access to vital impeachment evidence, such as prior inconsistent statements of the witness or the witness's criminal record, a full and fair opportunity to cross-examine the unavailable witness may be deemed to have been lacking at the preliminary hearing. Commonwealth v. Bazemore, 531 Pa. 582, 614 A.2d 684 (1992); Commonwealth v. Smith, 436 Pa.Super. 277, 287-294, 647 A.2d 907, 911-915 (1994); Commonwealth v. Stinson, 427 Pa.Super. 289, 297-301, 628 A.2d 1165, 1169-1171 (1993).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

A trial court has broad discretion in admitting or excluding evidence and such a decision will only be overturned if there is an abuse of such discretion. Commonwealth v. Schwartz, 419 Pa. Super. 251, 263, 615 A.2d 350, 356 (1992).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Sentencing is a matter within the sound discretion of the trial court and will not be disturbed unless it is outside the statutory limits or manifestly excessive so as to inflict too severe a punishment." Commonwealth v. Phillips, 601 A.2d 816, 823 (Pa.Super. 1992), *affirmed*, 534 Pa. 423 (1993).

IV.

## STATEMENT OF QUESTIONS PRESENTED

     1.  WHETHER THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO DISMISS THE CHARGE PURSUANT TO PA.R.CRIM.P. 600, WHERE THE COMMONWEALTH TOOK MORE THAN 365 DAYS TO BRING APPELLANT'S CASE TO TRIAL.

     Suggested answer in the affirmative.

     2.  WHETHER THE TRIAL COURT ERRED WHEN IT ALLOWED THE COMMONWEALTH TO INTRODUCE THE PRELIMINARY HEARING TESTIMONY OF A MATERIAL WITNESS, GUILLEMENA CRUZ, WHEN THE WITNESS FAILED TO APPEAR FOR TRIAL.

     Suggested answer in the affirmative.

     3.  WHETHER THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO INTRODUCE PRIOR RECORDED TESTIMONY REGARDING A PRIOR BAD ACT OF LAQUANN WILLIAMS A/K/A KAZAR, WHO THE APPELLANT ALLEGED WAS THE REAL PERPETRATOR OF THE CRIME.

     Suggested answer in the affirmative.

     4.  WHETHER THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO MODIFY SENTENCE, WHERE SAID SENTENCE WAS BEYOND THE AGGRAVATED RANGE OF SENTENCING GUIDELINES APPLICABLE AT THE TIME OF THE CRIME.

     Suggested answer in the affirmative.

V.

## STATEMENT OF THE CASE

### A.   FACTUAL HISTORY

On February 14, 2002, the police charged Tyshaunt Love (hereinafter "Appellant") with the December 20, 1996 murder[1] of Iris Fennel.  On September 20, 2005, a jury found appellant guilty on all counts.  Sentencing was held on October 28, 2005, at which time appellant was sentenced to serve fifteen to thirty years in a state correctional institution.  On November 7, 2005 appellant filed a Motion for Modification of Sentence, which was denied on December 28, 2005.  On January 27, 2006, appellant filed a Notice of Appeal.  On February 15, 2006, appellant filed a Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b).  The trial court issued an Opinion Pursuant to P.R.A.P. 1925(a) on March 14, 2006.

In 1996 Mr. Love and Iris Fennell, aka "Blondie", were dating. (Notes of Transcript of Jury Trial, Hereinafter "N.T.", September 12, 2005, Volume II, p. 358)  It was common knowledge that Mr. Love and Ms. Fennell sold drugs. (N.T., Volume II, p. 389)  Originally, Iris sold drugs with a group of female drugs dealers in the Market Street area of Harrisburg near Fav's Bar.  (N.T., Volume II, p. 358)  According to one of her female associates, Tawana Poteat, Iris was one of the best drug dealers on the street, better than the appellant was.  (N.T., Volume II, pp. 361-362)  Iris eventually left her group of female drug dealers and started associating more with appellant and the two of them became a team.

---

[1] 18 Pa.C.S.A. §2502.

(N.T., Volume II, p. 362) The drug dealers would sell drugs in the 14th Street Playground and behind the Kentucky Fried Chicken on Market Street. (N.T., Volume II, p. 361)

Mr. Love was from New York and went by the nicknames "Cuzzo" and sometimes "Schoolboy". (N.T., Volume II, p. 357) The description of his relationship with Iris traversed a broad range of adjectives, from "good" and "tight" to "possessive" and "jealous".

Tamara Williams, Iris' younger sister, knew Iris acquired her money by selling drugs and Iris normally had a lot of money. (N.T., Volume II, p. 326) Tamara knew appellant as "Cuzzo" and described his relationship with Iris as "tight", meaning they were always together. (N.T., Volume II, p. 328) Tamara heard them argue, but only what she described as minor arguments. (N.T., Volume II, p. 328)

Kwajalyn Jackson, Iris' older sister, testified Iris lived with her in the Hall Manor public housing project in Harrisburg for three or four days a week in February and March of 1996. In addition to staying with her sister, Iris had other places to stay. (N.T., Volume II, p. 321) Ms. Jackson knew appellant as "Cuzzo" and described him as being very possessive of Iris. (N.T., Volume II, p. 314) On one occasion, according to Ms. Jackson, appellant and Iris were arguing in Ms. Jackson's house and she told appellant to get out of the house. As he was leaving, Iris called him to the doorway where they spoke, and then Iris called a taxi for both of them to leave. Iris returned an hour later with a slap mark on her face. (N.T., Volume II, p. 314) Ms. Jackson did not know that her sister was in

the drug trade. (N.T., Volume II, p. 315) Ms. Jackson was aware that Iris had a gun that she kept beside the stove in her apartment in a hole in the wall. (N.T., Volume II, p. 316)

Barbara Brown knew appellant and Iris Fennel in 1995. Ms. Brown would speak to both when she saw them. She also knew appellant as "Cuzzo". (N.T., Volume II, p. 265) Ms. Brown saw appellant with handguns and saw Iris with a gun as well. One gun was black, which she thinks belonged to the appellant, and one gun was small and silver, which she thinks belonged to Iris. (N.T., Volume II, pp. 266-273) Ms. Brown testified Iris was dominant towards appellant and described her as being more like a thug. (N.T., Volume II, p. 282) According to Ms. Brown, if someone was threatening Iris, she would stand up to him or her. In fact, Ms. Brown testified Iris would fight to her last breath. (N.T., Volume II, pp. 284-285) Ms. Brown described Iris as feisty and always telling appellant he was too jealous. She would often get physical with appellant and shove her finger into his forehead, an action known as "mugging". (N.T., Volume II, p. 278) The last time that Ms. Brown saw Iris was in the summer or fall of 1996. (N.T., Volume II, p. 281)

On one occasion Ms. Brown related there was an incident at Kentucky Fried Chicken in either October or November of 1996. Ms. Brown testified she saw Iris talking to another guy, appellant got angry, and punched out a window. According to her, appellant stated, "if he couldn't have her, then no one else could either." (N.T., Volume II, p. 268) Appellant and Iris often fought about jealousy. (N.T., Volume II, p. 289) Ms. Brown testified she believed appellant

thought Iris may have cheated on him, but it was never a serious issue. (N.T., Volume III, p. 225)  Ms. Brown gave a statement to the police on January 6, 2001, but she never mentioned the incident at Kentucky Fried Chicken.  Nor did she tell the police about appellant punching the window out. (N.T., Volume II, p. 271)  The last time that Ms. Brown saw Iris was in the summer or fall of 1996. (N.T., Volume II, p. 281)

Stacy Harris was sixteen or seventeen years old back in 1996.  In 1996, she was living at 20th and Kensington Street, which is very near to McCleaster Street. (N.T., Volume II, p. 243)  Ms. Harris was familiar with Iris Fennel from seeing her around the neighborhood but she wasn't close friends with her.  She was also familiar with appellant.  Ms. Harris knew both appellant and Iris for about six months.  Ms. Harris knew appellant better than she knew Iris. (N.T., Volume II, p. 244)  Ms. Harris saw appellant and Iris fight one time across the street from her house.  Appellant grabbed Iris and hit her and Iris fought back. (N.T., Volume II, p. 244)  Ms. Williams last talked to Iris a week before her murder. (N.T., Volume II, p. 330)

Darlene Saez, who met Iris Fennel through a mutual friend, testified she and Iris were sort of best friends and they trusted each other. (N.T., Volume II, p. 347)  Ms. Saez met appellant before she knew Iris. (N.T., Volume II, p. 342)  Ms. Saez stated appellant and Iris did have some problems in their relationship, mostly being jealous and possessive of one another. (N.T., Volume II, p. 344)  Ms. Saez knew Iris was dealing drugs.  Iris actually entrusted Ms. Saez with a safe to keep at her house.  Iris went to the safe in the week before her death to

11

get money out to buy her child some Christmas presents. (N.T., Volume II, p. 346) Iris went to the safe while Ms. Saez was at work. (N.T., Volume II, p. 346) Ms. Saez recalls Iris saying she was afraid of LaQuann "Kazar" Williams and stressed out Kazar was staying in her house. (N.T., Volume II, p. 352)

Candace Mills also described herself as being good friends with Iris Fennel. Ms. Mills described Iris as feisty. (N.T., Volume II, p. 306) She met Iris through LaQuann Williams, a/k/a Kazar, with whom Ms. Mills had been romantically involved. (N.T., Volume II, p. 292) Ms. Mills stayed with Iris in December of 1996 for about a week when her mother's house burned down. At one point, Iris, Ms. Mills and appellant lived at Iris' apartment. LaQuann Williams would stay with Ms. Mills if he came to visit. Ms. Mills and Kazar stayed on a pullout mattress in the living room. At one point, Iris called Ms. Mills and told her she was kicking appellant out of the house. (N.T., Volume II, pp. 296-297) This was after Ms. Mills had moved out of Iris' apartment. (N.T., Volume II, p. 297) Ms. Mills did not have keys to Iris' apartment. (N.T., Volume II, p. 297)

Ms. Mills testified before a grand jury that Iris was afraid of Kazar but Iris let him into her apartment because she was friends with Ms. Mills, who was dating Kazar. (N.T., Volume II, p. 305) If Kazar wanted in Iris' apartment, he would just knock and someone would let him in. (N.T., Volume II, p. 297) Trial testimony revealed that at one point, Kazar had strangled and beaten Ms. Mills. (N.T., Volume II, p. 308) At the time of her death, Iris and Ms. Mills were not on the best of terms. (N.T., Volume II, p. 294)

Johanna Johnson Iftikhar-Khan had known Iris Fennel since Iris was five or seven years old. (N.T., Volume I,. p. 105) Ms. Iftikhar-Khan is raising Iris' daughter, Brittany, whose father is Johanna's son. (N.T., Volume I, p. 169) Iris acquired the nom de plume "Blondie" because she dyed her hair blonde. (N.T., Volume II, p. 358) Back in 1996, Ms. Iftikhar-Khan would see Iris almost every day and would communicate with her every day either by phone or in person. (N.T., Volume I, p. 169)

Several months prior to December 1996 Iris moved into an apartment at 1941 McCleaster Street in Harrisburg, and shortly thereafter appellant moved in with her. (N.T., Volume II, p. 59) At trial, a divergent set of views emerged as to what transpired on December 19th and 20th, 1996. Earlier on the 19th, Ms. Poteat saw Iris here and there but they did not hang out. (N.T., Volume II, p. 386) Ms. Poteat saw Iris at Fav's bar between 11:30 and 11:45 the night before her death. (N.T., Volume II, p. 364) Ms. Poteat saw Iris putting coins into the juke box to play music. She told Ms. Poteat that she was getting ready to leave because appellant was getting on her nerves. Appellant and Iris left together. (N.T., Volume II, p. 190) Iris was wearing a feather down coat and appellant owned a matching coat. (N.T., Volume II, p. 369)

The last time Wendy Harris saw Iris was at Fav's bar. Iris was leaving and said she was on her way home. (N.T., Volume II, p. 389) After Iris left, Ms. Harris ran into appellant who asked Wendy if she had seen Iris. When Wendy told appellant Iris was on her way home, appellant went to the pay phone to see if she had made it home yet. (N.T., Volume II, p. 390) When Wendy saw Iris at

Fav's, it was around 11:00 p.m. or midnight. (N.T., Volume II, p. 393) Wendy Harris testified appellant did not leave with Iris. Appellant left Fav's bar about 30-45 minutes after Iris. (N.T., Volume II, p. 393)

Tamara Williams tried to contact Iris on December 19 around 11:00 p.m. and midnight, but was unable to get a hold of her. (N.T., Volume II, p. 330)

On the evening of December 19, 1996, Ms. Iftikhar-Khan attempted to call Iris on several occasions just to check in and to let Brittany talk to her mother. She did not get in touch with Iris during any of these attempts. (N.T., Volume I, p. 170) On December 20, 1996, Ms. Iftikhar-Khan called Iris at 1:00 a.m. in a last attempt to get in touch with Iris for the evening. She did get in touch with Iris this time. (N.T., Volume I, p. 170) Brittany was in bed when Ms. Iftikhar-Khan finally got in touch with Iris. (N.T., Volume I, p. 169)

Ms. Iftikhar-Khan talked to Iris on the phone for about forty-five (45) minutes. Ms. Iftikhar-Khan had to tend to some cooking so she terminated the call. (N.T., Volume I, p. 173) Ms. Iftikhar-Khan called Iris back ten minutes later and spoke to her until about 2:40 or 2:45 in the morning. (N.T., Volume I, p. 173) During their second conversation, Iris stated she had a chicken in the oven and asked how long it would be until the chicken was done cooking. Ms. Iftikhar-Khan replied the chicken would be done cooking shortly. (N.T., Volume I, p. 184) During the second phone call, there was an interruption at about 2:30 during which Iris said there was someone in front of her house who was tapping on her window. Iris stated to Ms. Iftikhar-Khan that she was alarmed because she was home alone. (N.T., Volume I, p. 184)

Iris asked who was there, and then she opened the door for him to come in. That person said, "What's up, Iris" and she greeted him. (N.T., Volume I, p. 174) Iris told Ms. Iftikhar-Khan who came to the house, but Ms. Iftikhar-Khan didn't recognize the name, nor could she remember the name. (N.T., Volume I, p. 174) Ms. Iftikhar-Khan told the police that after Iris let the person in the door, her tone changed. (N.T., Volume I, p. 187) After the interruption, they stayed on the phone for another ten or fifteen minutes. After her company arrived, Iris tried to get off the phone, but Ms. Iftikhar-Khan wanted to continue talking. She and Iris talked for a couple more minutes before hanging up. (N.T., Volume I, p. 176)

Ms. Iftikhar-Khan was aware that Iris was involved in the drug trade. Ms. Iftikhar-Khan did not approve of Iris' friends. (N.T., Volume I, p. 181) Ms. Iftikhar-Khan knew appellant as "Cuzzo" and that he was romantically involved with Iris. (N.T., Volume I, p. 182) Iris stated the person she let in the door was not a romantic friend. (N.T., Volume I, p. 185)

Appellant gave several statements to the police over the years regarding the events of December 19th and 20th of 1996. In an unrecorded interview with Detective Michael Maloney of the Dauphin County Criminal Investigation Division, a division of the District Attorney's Office, appellant allegedly stated he and LaQuann Williams went to Iris' house around 4:00 p.m. on December 19, 1996, bought an ounce of cocaine, and also smoked marijuana. (N.T., Volume III, p. 149) Appellant indicated he wanted to buy more cocaine but he already owed Iris money so he could not buy any more. (N.T., Volume III, p. 149) He also said he and LaQuann left the apartment around 6:00 p.m. (N.T., Volume III,

p. 150) Appellant indicated to Officer Maloney that he was getting ready to move out of Iris' house and live in the house of an acquaintance named Pop-Pop but that he was not leaving Iris. (N.T., Volume III, p. 10) Officer Maloney did not have appellant review anything that he wrote in his report.

Appellant told Detective Heffner Iris and he did not leave the bar together and he spent many hours looking for her in person and by phone. (N.T., Volume III, p. 218) On one trip to the house, appellant went inside and saw a lot of money (approximately $3,000) in the bedroom cabinet but he left it there. (N.T., Volume III, p. 219) Appellant claimed he called Iris' apartment a few times but there was no answer. One person told appellant that Iris got in a car with someone and went home. Appellant called a girl he knew, Guillermina Cruz, a/k/a "Tootie", around midnight and went to her grandmother's house, where she was residing. At the house, Ms. Cruz and appellant spoke for 15 or 20 minutes. Appellant left but told Ms. Cruz that he would probably be back. Appellant returned to Fav's bar. At one point, appellant saw a pizza delivery guy he knew and he had the driver take him to Iris' apartment to see if she was there. Appellant went inside the apartment but nobody was there and everything seemed in order so appellant returned to the bar. Appellant believed this was around midnight or 12:30 because the pizza guy had just got off work. Ms. Cruz paged appellant later to hang out. (N.T., Volume III, p. 175)

Upon questioning by police at the scene on December 20th appellant advised them he was with Ms. Cruz the previous night. Ms. Cruz was interviewed by the police later that day, confirmed she was with appellant the

previous night, and stated she had not been to Iris' apartment. (N.T., Volume III, p. 260) Detective Elijah Massey of the Harrisburg Bureau of Police re-interviewed Ms. Cruz on December 21st at 11:05 p.m. (N.T., Volume III, p. 260) Ms. Cruz told the police that she had lied the previous day. (N.T., Volume III, p. 261) Ms. Cruz gave subsequent statements to the police on December 28, 1996, March 24, 2001 and February 19, 2002.

On January 17, 1997 a preliminary hearing was held in which Ms. Cruz testified she was with appellant on the evening of December 19th, 1996 and the morning of December 20th, 1996, but after leaving Pop-Pop's house, they split up and she returned home. (N.T., Volume III, pp. 261-262)

Because the murder charge was ultimately Nol Prossed by the Commonwealth in 1996, a second preliminary hearing was held on March 15, 2002, after appellant's re-arrest. Ms. Cruz testified she knew appellant but not too well. She knew him as "Cuzzo." (N.T., Volume III, p. 159) Ms. Cruz testified that On December 19, 1996 she saw appellant at the Chinese restaurant on Market Street. They walked to her grandmother's house and talked there. (N.T., Volume III, p. 160) Ms. Cruz knew appellant's girlfriend was Iris. (N.T., Volume III, p. 160) As they talked, appellant allegedly told Ms. Cruz Iris was getting on his nerves and he needed to get out of the house because they were always arguing. (N.T., Volume III, p. 161) After she ate with her grandmother, Ms. Cruz paged appellant and he came and picked her up around 10:30. (N.T., Volume III, p. 162) Appellant and Ms. Cruz went to Pop-Pop's house, where they talked and watched movies. (N.T., Volume III, p. 163) They stayed there all night and

kissed a little but they did not have sex. (N.T., Volume III, p. 163) Ms. Cruz and appellant spent the night on the couch watching movies. Ms. Cruz thinks she fell asleep around 10:30 or 11:00. (N.T., Volume III, p. 180)

Ms. Cruz was not sure where appellant went after she fell asleep. (N.T., Volume III, p. 10) Although Ms. Cruz was only 16 at the time, she did not go to school the next day. (N.T., Volume III, p. 180) Ms. Cruz knew she woke up early the next day (because she saw kids walking to school) and appellant asked her to help him move some of his stuff out of Iris' house. (N.T., Volume III, p. 164)

When they arrived at Iris' house, Ms. Cruz saw Iris in the kitchen. Iris was standing by the stove cooking something when they came in. (N.T., Volume III, p. 184) Ms. Cruz had heard rumors that her boyfriend was sleeping with Iris. (N.T., Volume III, p. 187) Ms. Cruz told the police that Iris asked her if she was Black's girlfriend and she said yes, then Iris said that she was with him for awhile. (N.T., Volume III, p. 191) Ms. Cruz stated that Iris was wearing pajamas when they arrived. (N.T., Volume III, p. 195)

Ms. Cruz stated that appellant and Iris started fighting and appellant started hitting Iris' face with his fists. (N.T., Volume III, p. 166) Iris tried to fight off appellant by hitting back. (N.T., Volume III, p. 191) Appellant then went to the stove and got a gun out. (N.T., Volume III, p. 166) Although appellant and Iris were in a physical altercation, Ms. Cruz just stood there and didn't leave. (N.T., Volume III, p. 187)

At one point, Iris came after Ms. Cruz and Ms. Cruz smacked her. (N.T., Volume III, p. 167) Appellant took Iris by the hair and dragged her upstairs.

(N.T., Volume III, p. 167) Ms. Cruz could no longer see them but heard arguing and Iris telling appellant to leave her alone. (N.T., Volume III, p. 168) Ms. Cruz then heard a gunshot and a thump on the ceiling. She went up the steps to see what happened and saw appellant standing up firing the gun toward the floor. (N.T., Volume III, p. 169)

Ms. Cruz could not see Iris at this point. (N.T., Volume III, p. 170) Ms. Cruz saw Kazar leave the room where appellant and Iris were. (N.T., Volume III, p. 170) When Ms. Cruz saw the second gunshot, she ran out of the house. (N.T., Volume III, p. 170)

Kazar did not say anything to Ms. Cruz when he ran out of the room. (N.T., Volume III, p. 198) Ms. Cruz ran out of the house and did not see if anyone else ran out of the house. (N.T., Volume III, p. 198) Ms. Cruz went home.

Appellant told the police he stayed at Pop-Pop's house until around 10:00 a.m. on December 20. That morning he went to Kentucky Fried Chicken for breakfast, and then caught a ride to Iris' house. (N.T., Volume III, p. 220) Upon arrival, appellant noticed a burning smell. Appellant went inside and turned the stove off. (N.T., Volume III, p. 220)

Appellant initially thought Iris was upset and that is why things were thrown everywhere. Appellant then started to leave but turned around and saw Iris lying in the room. (N.T., Volume III, p. 221) Appellant shook her leg but she did not move. He told her to get up and there was no response, nor was there

any breathing. Realizing she was dead, he ran down the steps to find help. He ran into Zachary Belcher, Iris' brother, downstairs and told him Iris needed help.

Socorro Roman lived at 1942 Kensington Street on December 20, 1996. McCleaster Street was the back alley to her house. Ms. Roman was Iris' neighbor. (N.T., Volume II, p. 32) On December 20, 1996, Ms. Roman got up early and went to do some yard work. Ms. Roman believes she came outside around 9:00 a.m. that morning. (N.T., Volume II, p. 45) She asked Zach to help her. Once outside, Zach smelled smoke, so Ms. Roman took a sniff and saw that the smoke was coming from Iris' house. (N.T., Volume II, p. 32)

On December 19-20, 1996, Mr. Belcher was staying at 1942 Kensington Street with Socorro Roman. (N.T., Volume II, p. 6) Mr. Belcher woke up around 10:30 on the morning of December 20, 1996. (N.T., Volume II, p. 17) On the morning of December 20, Mr. Belcher and Ms. Roman got up to do yard work. While out in the yard, Mr. Belcher did not hear gunshots, screaming, banging on the door or anyone yelling Iris' name. (N.T., Volume II, p. 14)

Ms. Socorro and Zachary went over to the yard. Mr. Belcher testified he saw a little bit of smoke and smelled food burning. (N.T., Volume II, p. 7) Ms. Roman's yard is adjacent to Iris' apartment, so it took Mr. Belcher only ten seconds or so to reach Iris' apartment. (N.T., Volume II, p. 7) Mr. Belcher made his way into Iris' apartment thinking she left something on the stove. He entered the unlocked back door that went into the kitchen. (N.T., Volume II, p. 67)

Upon entering the apartment, Zachary testified he saw appellant coming down the stairs at which point the appellant stopped and made his way back up the steps for four or five seconds. Appellant then came back down the steps and told Mr. Belcher that Iris wasn't moving and that he needed help. (N.T., Volume II, p. 7) Mr. Belcher saw appellant inside the apartment within two or three seconds. (N.T., Volume II, p. 10) At no point did Mr. Belcher go upstairs in Iris' apartment. (N.T., Volume II, p. 21) After hearing that his sister wasn't moving, Zachary Belcher immediately went to Socorro's house and called 911. (N.T., Volume II, p. 11) Appellant followed Mr. Belcher to Socorro's house and, according to Zachary, told him that if Kazar did anything to Iris that he was going to kill him. (N.T., Volume II, p. 12)   After he went to Ms. Roman's house to call 911, Ms. Roman went over to Iris' house. (N.T., Volume II, p. 33) Ms. Roman had her two year old grandson with her at the time. Appellant followed Ms. Roman into Iris' house. At some point, Mr. Belcher saw Ms. Roman and appellant go back into Iris' apartment. (N.T., Volume II, p. 22) Appellant told Ms. Roman that he spent all night looking for Iris but couldn't find her. (N.T., Volume II, p. 34)

Mr. Belcher testified he did not see any blood in the kitchen. (N.T., Volume II, p. 23) Although they were very close, at no point did Iris ever tell Mr. Belcher that she was having problems with the appellant. (N.T., Volume II, p. 24) Mr. Belcher was aware that in addition to appellant, Kazar and Candi Mills would sometimes stay at Iris' apartment. (N.T., Volume II, p. 25) Mr. Belcher

knew that his sister Iris was saving money to buy a truck. (N.T., Volume II, pp. 29-30)

Ms. Roman testified that upon entering the house she turned the stove off (which she claimed was still on), then went upstairs. (N.T., Volume II, p. 34) Ms. Roman assumed Iris was sleeping. (N.T., Volume II, p. 32) Once upstairs, Ms. Roman looked in the bedroom and saw Iris on the floor. She sat her grandson down on the couch in the living room. (N.T., Volume II, p. 35)

Ms. Roman went back to Iris, bent over, and checked Iris' neck and wrist for a pulse. (N.T., Volume II, p. 35) Ms. Roman felt no pulse, Iris felt cold, and rigor mortis had set in. (N.T., Volume II, p. 36) Iris was only wearing a little pajama top when Ms. Roman discovered her. (N.T., Volume II, p. 36) Ms. Roman found Iris lying at the end of the bed and her body was partially lying on the mattress that was coming off of the box spring. (N.T., Volume II, pp. 36-37)

Ms. Roman left the room, walked passed appellant, got her grandson, and went outside. But she also testified that when Zach came back to Ms. Roman's house, appellant was right behind him. (N.T., Volume II, p. 52) Upon leaving the apartment she told a neighbor, Jeanette McCurdy, to call the police. (N.T., Volume II, p. 43)

Ms. Roman spoke to a few police officers that day. (N.T., Volume II, p. 46) Later that day, Ms. Roman was taken to the police station where she gave a statement. (N.T., Volume II, p. 46) Ms. Roman testified she did not sleep at all that night. Ms. Roman, her husband and Zach stayed up playing cards. Ms.

Roman did not hear anything from Iris' apartment that night. (N.T., Volume II, p. 46)

Ms. Roman told the police in 2003 that she ran into appellant when she entered Iris' apartment. However, she testified that is not how it happened. (N.T., Volume II, p. 53) Ms. Roman went back into Iris' apartment when the police and paramedics arrived. (N.T., Volume II, p. 58) When Ms. Roman went back to Iris' house, appellant was in the living room with the police. (N.T., Volume II, p. 63) Ms. Roman admitted that her memory was better in 1996 than in 2003 as to what happened. (N.T., Volume II, p. 68)

Jeanette McCurdy lived at 1940 Kensington Street on December 20, 1996. She had lived there since 1979. (N.T., Volume II, p. 117) Iris' apartment (which belonged to Jeanette's next door neighbor) was attached to Ms. McCurdy's garage. (N.T., Volume II, p. 117) Jeanette McCurdy testified she was outside in her back yard on December 20, 1996 and saw appellant and another girl coming out the back door of Iris' apartment. Ms. McCurdy claims she said hello to the girl and the girl said hello back. (N.T., Volume II, p. 119) Ms. McCurdy is not sure who the young girl was who was with appellant. (N.T., Volume II, p. 120) But Ms. McCurdy told the police in 1996 that she did not see anyone coming out of Iris' apartment. (N.T., Volume II, p. 126) Ms. McCurdy then noticed smoke coming out of Iris' apartment and yelled for Zack, who was working next door, and he immediately came over. (N.T., Volume II, p. 121) Upon Ms. Roman's request, Ms. McCurdy called 911. (N.T., Volume II, p. 122)

On cross examination at trial, Ms. McCurdy could not recall whether she was outside her house during the morning or early afternoon hours. (N.T., Volume II, p. 77) Ms. McCurdy remembered seeing appellant at a preliminary hearing in 1997, but she never saw appellant when he lived with Iris. (N.T., Volume II, p. 126) After seeing appellant at the hearing, Ms. McCurdy did not go to the police to tell them that she saw him coming out of Iris' apartment on December 20, 1996. She says this is because the police never asked her if she saw the appellant. (N.T., Volume II, pp. 128-130)

Lydell Muldrow, a Harrisburg Police Officer, responded to 1941 McCleaster Street on December 20, 1996. (N.T., Volume III, p. 61) The call came into Officer Muldrow as a female not breathing. (N.T., Volume III, p. 67) Officer Muldrow arrived at approximately 12:13 p.m. Officer Muldrow arrived at the same time as the paramedics. (N.T., Volume III, p. 61) Officer Muldrow knocked on the door and heard movement and crying inside. When Officer Muldrow asked appellant what was wrong, he said that something was wrong with his girlfriend and directed him into the bedroom. (N.T., Volume III, p. 61)

As Officer Muldrow approached the bedroom, he was greeted by a Hispanic female approximately in her forties (Socorro Roman) who was very upset and said she tried CPR on Iris. (N.T., Volume III, p. 61) Officer Muldrow saw Iris' body and directed the ambulance crew to go to work and then he cleared the scene. (N.T., Volume III, p. 62)

Office Muldrow testified that while trying to gather information, appellant stated to him that he was trying to get into the apartment all night and he couldn't

get a hold of Iris. He also mentioned Iris' brother. (N.T., Volume III, p. 63)

Officer Muldrow claimed at trial that appellant was also changing his story as to who actually found Iris (N.T., Volume III, p. 64); however, appellant's alleged flip-flopping was not contained in Officer Muldrow's report. (N.T., Volume III, p. 171)

Detective Elijah Massey of the Harrisburg Bureau of Police responded to 1941 McCleaster Street on December 20, 1996 and arrived at 1:25 p.m. (N.T., Volume III, p. 79) Detective Massey's role was to assist the lead investigator, Matthew Taylor, and assist other officers at the scene. (N.T., Volume III, p. 79) Detective Massey also assisted by talking to several neighbors who were family members of Iris Fennel. (N.T., Volume III, p. 81)

Officer Muldrow and Officer Michelle Bailey were already at the scene when Detective Massey arrived. The coroner had not yet arrived. (N.T., Volume III, p. 82) Detective Massey spoke to Jeanette McCurdy who told him that around 12:15 or 12:30, she was confronted by Zachary Belcher and Socorro Roman who requested she dial 911 because something was wrong with Iris. She also said she heard nothing out of the ordinary. (N.T., Volume III, p. 84) Detective Massey also spoke to Ms. Roman who said that Zach spotted smoke coming out of the apartment and they went to the apartment and saw appellant coming down the steps. (N.T., Volume III, p. 84)

Detective Massey also spoke to Joanna Johnson who said that she was talking to Iris until 2:30 a.m. on December 20, 1996 but that the phone call ended when Iris heard a knock on the window. (N.T., Volume III, p. 86)

Officer Bailey responded to Iris' apartment on December 20, 1996. (N.T., Volume III, pp. 245-246) Officer Bailey spoke to Zachary Belcher, Jeanette McCurdy and Socorro Roman. (N.T., Volume III, p. 247) Ms. Roman told Officer Bailey that before Zach entered Iris' apartment, he saw appellant exit the rear door yelling for help. (N.T., Volume III, p. 249) Detective Bailey testified appellant appeared to be upset and it took him a while to answer her questions. (N.T., Volume III, p. 250)

The police interviewed appellant for several hours. (N.T., Volume III, p. 141) Although the victim was beaten, Investigator Taylor admitted he cannot remember whether the police checked appellant's hands for blood, bruises or scrapes. (N.T., Volume III, p. 144) The police did not see any blood on appellant or his clothes even though he was wearing the same clothes since that morning. (N.T., Volume III, p. 144)

Officer Leroy Paul Lucas, who works for the Harrisburg Police Department Criminal Investigation Division forensic unit, processed the crime scene. (N.T., Volume II, p. 131) This involved taking photographs, searching for latent fingerprints and the collection and preservation of all evidence relating to that particular crime. (N.T., Volume II, p. 131) Proceeding downstairs, Officer Lucas noticed blood going down to the kitchen. (N.T., Volume II, p. 135) There was a bottle of Clorox sitting beside the stove on the floor and blood on the floor in the kitchen. (N.T., Volume II, p. 135) Officer Lucas testified there were some blood on the refrigerator as well as blood scattered on the kitchen floor. (N.T., Volume II, p. 140) There were blood droplets as well as a clump of hair present on the

landing area of the stairs. (N.T., Volume II, p. 141) There was a clump of hair found in the bedroom. (N.T., Volume II, p. 147) The bedroom was carpeted while the living room was not. (N.T., Volume II, p. 148) The clumps of hair, as well as hair taken from the autopsy, were sent for examination. (N.T., Volume II, p. 149)

Also found at the crime scene was a voter registration card for appellant, but Officer Lucas could not remember in which room it was found. (N.T., Volume II, p. 167) A receipt from Giant Food Store was found at the scene. The receipt was dated December 19, 1996 and the time of the receipt was 11:12 p.m. (N.T., Volume II, p. 167)

Dr. Wayne Ross, a forensic pathologist, testified for the Commonwealth. (N.T., Volume II, pp. 69-74) Dr. Ross performed the autopsy on Iris Belcher on December 21, 1996. In conducting the autopsy of Iris Fennel, Dr. Ross found blood patterns. He did a tape lift. He tried to raise fingerprints and blood found on the thighs. He also found a bite mark, twenty seven (27) areas of trauma to the body and two gunshot wounds. (N.T., Volume II, p. 77) After conducting an external review, Dr. Ross conducted an internal examination. (N.T., Volume II, p. 77) In Dr. Ross' opinion, Iris was badly beaten. (N.T., Volume II, p. 80)

Dr. Ross stated that Iris' nose was broken, specifically her septum, and it was twisted from right to left. (N.T., Volume II, p. 80) One gunshot wound was to Iris' lower left lip. (N.T., Volume II, p. 81) Iris also had bruises to the right side of her neck and a broken thyroid bone, which shows the possibility of strangulation. (N.T., Volume II, p. 81)

Dr. Ross found a bullet in the back of Iris' head. That bullet had been fired through Iris' left lip, traveled through the mouth, went through the skull, sliced the brain stem in half then went through the right cerebellum. (N.T., Volume II, pp. 93-94) This bullet was fired front to back and at an upward angle. (N.T., Volume II, p. 96)

Dr. Ross testified the shot fired to the lip was immediately fatal. As soon as a bullet goes through the brain stem, it would cause immediate death. (N.T., Volume II, p. 96) Dr. Ross admitted that he could not tell which shot was fired first. (N.T., Volume II, p. 96) Dr. Ross did not find any evidence of sexual assault or any signs of trauma or sperm near the vaginal or rectal regions. (N.T., Volume II, pp. 105-106) Within a reasonable degree of medical certainty, Dr. Ross attributed the cause of Iris' death to multiple gunshot wounds to the head. Other significant conditions would be blunt trauma and strangulation. (N.T., Volume II, p. 107)

LeeAnn Singley, a forensic scientist with the Pennsylvania State Police Laboratory, was presented with blood samples from Iris Fennel, appellant and Rasheed (La-Quann) Williams for testing. (N.T., Volume II, p. 217) Ms. Singley collected a ski cap, hiking boots, jacket, T-shirt and sock. (N.T., Volume II, p. 218) After Ms. Singley determined that there was blood on those items, she sent the items off for DNA testing.

Michael John Kurtz, an expert on DNA analysis, works at the Pennsylvania State Police DNA Laboratory in Greensburg. (N.T., Volume II, pp. 183-184) Mr. Kurtz worked on the case *sub judice*. (N.T., Volume II, p. 190)

The State Police lab received three known samples. Item K1, or Known 1, was from Iris Fennel. Item K2 was from appellant. Item K3 was taken from Rasheed (La-Quann) Williams. (N.T., Volume II, p. 190) Additionally, the lab received a stain from a black knit ski hat, which was Q1. Q2 was a stain from the metal hook from a Timberland hiking shoe belonging to La-Quann Williams, and a stain sample cut off a white T-shirt was Q3. (N.T., Volume II, p. 190)

Back in 1997, under the old type of DNA testing, there were a few matches. The specimen from K1 (Iris Fennel) matched the DNA from specimen Item Q2 (the metal hook from the hiking shoe) (N.T., Volume II, p. 191) The rarity of the sample was 1 in 23,800 in the Caucasian population, approximately 1 in 600 from the African American population; and approximately 1 in 8,200 from the Hispanic population. (N.T., Volume II, pp. 1901-192)

The samples were again tested in 2000 under the new, more accurate DNA tests. The samples tested were from Iris' T-shirt, and Iris' sock. (N.T., Volume II, p. 194) The new testing showed that Iris' blood matched the blood found on the metal hook and shoelace from the hiking shoes of Le-Quann Williams. Further, the new results showed that the rarity of this blood was 1 in 6.3 quintillion from the Caucasian population, 1 in 1.2 quintillion from the African American population and 1 in 1.1 quintillion from the Hispanic population. It is worth noting that a quintillion is a bigger number than the number of people that currently exists on the Earth. (N.T., Volume II, pp. 194-195)

Detective Donald Heffner of the Harrisburg Bureau of Police started working on the Iris Fennel case in May of 2000. (N.T., Volume III, p. 208)

Detective Heffner interviewed Kwajalyn Jackson and was told that LaQuann Williams stopped by Iris' house earlier in December and demanded money because he knew she had turned him in to the police. (N.T., Volume III, p. 236) Detective Heffner testified that Iris had indeed turned LaQuann Williams in for a prior offense. (N.T., Volume III, p. 235)

## B.  PROCEDURAL HISTORY FOR PURPOSES OF RULE 600 ISSUES

The procedural history for the Rule 600 issue is quite complex and spans a number of years, two separate prosecution attempts and a number of defense counsel changes. It is therefore best to go through the procedural history in a chronological order.

Appellant was originally arrested on December 20, 1996. The appellant was arraigned and remanded to Dauphin County Prison without bail. The Criminal Complaint was filed on December 28, 1996. By order of the court dated January 13, 1997, James Rowland, Esq. was appointed counsel. A Preliminary Hearing in this matter was scheduled for January 17, 1997, but was continued by the district magistrate. There was a judicial continuance on January 30, 1997.

Between January 30, 1997 and March 18, 1997, the appellant hired Jerry Russo, Esq. as his attorney. On March 18, 1997, there was a Preliminary Hearing and the case was held for court. Appellant was formally arraigned on April 24, 1997 and the first trial date was set for May 12, 1997. The next day, May 13, the case was continued to June 2, 1997 and Rule 1100 (now Rule 600)

was waived. On May 19, 1997, the Court again appointed James Rowland as defense counsel via a Reappointment Order.

On June 5, 1997, the case was continued to August 4, 1997 and Rule 1100 was again waived. On March 5, 1998, the Commonwealth filed for Nolle Prosequi. The order granting the Commonwealth's request for Nolle Prosequi was filed on March 6, 1998. From the date when the complaint was filed to the date of Nolle Prosequi was 432 days. However, there were 80 days of delay attributable to the appellant via continuances. Therefore, the total number of days between when the Complaint was filed and Nolle Prosequi was 352 days. This marks the end of the initial prosecution attempt.

On February 14, 2002, appellant surrendered himself into the custody of Detective Heffner by way of the United States Marshal's Task Force. On March 15, 2002, a preliminary hearing was held before Senior District Justice William Rathfon and the case was held for court.

The appellant was arraigned on April 4, 2002 and a trial date was set for May 6, 2002. On April 22, 2002, the appellant filed a Motion for Continuance from the May 6, 2002 trial date until the September 9, 2002 Term of Criminal Court. The continuance motion was granted on April 22, 2002.

On or about April 23, 2002, the Dauphin County District Attorney's Office, through Chief Deputy District Attorney Sean McCormack, filed a Motion to Disqualify the Dauphin County Public Defender's Office from the above-captioned case. On June 21, 2002, the appellant filed a written request for discovery with the District Attorney's Office. On June 28, 2002, Chief Deputy

District Attorney Sean McCormack forwarded a letter to defense counsel, Monty Batson, indicating that discovery would be forthcoming.

On or about July 22, 2002, the trial court issued an Order scheduling a hearing on the issue of disqualification for July 30, 2002. On July 30, 2002, defense counsel, public defender Monty Batson, filed a Motion to Compel Discovery. On August 12, 2002, subsequent to a hearing on the matter, The Honorable Judge Bruce F. Bratton issued an Order denying the Motion to Disqualifying the Public Defender's Office from representing the appellant. On August 12, 2002, District Attorney McCormack provided 546 pages of discovery.

On or about August 19, 2002, the District Attorney's Office filed a Motion for Reconsideration regarding the Issue of Disqualifying the Public Defender's Office. A hearing on the issue of reconsideration was scheduled for September 18, 2002. Defense counsel Batson, averring that the discovery was still incomplete, filed a request for continuance in an Omnibus Pre-Trial Motion on September 8, 2002, in order to obtain the remaining discovery material so that he could prepare for the case. Defense counsel argued that the continuance should count against the Commonwealth because of their failure to provide discovery in a timely fashion upon request. On September 12, 2002, Attorney McCormack provided 210 photographs relevant to the case.

On October 1, 2002, Judge Bratton granted the motion for continuance until the December 9, 2002 Term of Criminal Court and counted the time against the appellant. On October 30, 2002, subsequent to the hearing, Judge Bratton denied the Commonwealth's Motion for Reconsideration on the Issue of

32

Disqualifying the Public Defender's Office. At this point, Attorney McCormack advised the Court that the Commonwealth would appeal this decision to the Superior Court. Further, Attorney McCormack asked Judge Bratton not to move forward with the case pending the appeal. [N.T. October 30, 2002 Pre-Trial Hearing, page 15] Judge Bratton did not issue an order to stay the proceedings on the charge against the appellant.

On November 1, 2002, the Commonwealth filed a Notice of Appeal with the Superior Court. On January 12, 2004, the Superior Court, in a Memorandum Opinion, quashed the Commonwealth appeal.

The Court quashed the appeal because on November 24, 2003 the Pennsylvania Supreme Court, in Commonwealth v. Cosnek, limited the application of Pennsylvania Rule of Appellate Procedure 311(d) to those circumstances provided by law in which a pre-trial ruling results in the suppression, preclusion or exclusion of Commonwealth evidence. The issue in the case *sub judice* did not fall into those categories so therefore the Superior Court lacked jurisdiction to review the pre-trial order. In addition, the Superior Court Memorandum Opinion noted in a footnote that the Commonwealth failed to file a timely Notice of Appeal in that it appealed from the date its Motion for Reconsideration was denied rather than the date of the trial court's Order denying the Commonwealth's initial disqualification motion.

On February 12, 2004, the Commonwealth and the defense entered into a court-approved agreement whereby the Commonwealth withdrew its Petition for Allowance of Appeal to the Supreme Court of Pennsylvania from the Superior

Court's decision on January 12, 2004. The agreement also stipulated the appellant would be released on bail. (N.T. Volume I, p. 5).

Per the agreement, the court granted the Commonwealth leave to appeal *nunc pro tunc* to the Superior Court the denial of the Commonwealth's motions to remove the Public Defender's Office from representation of the appellant. In addition, the Court would also certify the appellant's appeal of the Order denying his Motion to Dismiss pursuant to Rule 600 *nunc pro tunc.* No further stipulations regarding appeals were contained within the agreement.

On March 15, 2004, the Commonwealth filed a Motion for Leave to File Pre-Trial Appeal *nunc pro tunc.* On April 7, 2004, Judge Bratton granted the Commonwealth leave to appeal from the Orders denying the Commonwealth's Motion to Disqualify the Public Defender's Office entered on August 8, 2002 and October 30, 2002.

The trial court then ruled that Rule 600 time did not run while the issue was on appeal because the Commonwealth's second appeal was done in good faith. (N.T. Volume I, p.16). On April 14, 2004, the Commonwealth filed its Notice of Appeal to the Superior Court. On or about June 4, 2004, Judge Bratton granted the appellant leave to appeal from the Orders denying the Petition for Allowance of Appeal pursuant to 42 Pa.C.S.A. 702(b) of the trial court's denial of the appellant's Motion to Dismiss pursuant to Pa.R.C.P. 600 entered on January 2, 2004.[3]

---

[3] Ultimately, the appellant chose not to pursue this course and did not file an appeal *nunc pro tunc.* Mr. Batson filed an appeal from the trial court's Rule 600 decision, but withdrew it a week later. (N.T. Volume I, p. 15).

On November 23, 2004, the Superior Court filed a Memorandum Opinion regarding the Commonwealth's *nunc pro tunc* appeal, quashing the Commonwealth's appeal. The Superior Court concluded that the Commonwealth failed to meet the requirements for an interlocutory appeal by permission under Pa.R.A.P. 1311. The Superior Court's Opinion also stated that the trial court's October 30, 2002 Order denying reconsideration of its decision not to disqualify the Public Defender's Office did not contain the statement of certification from the trial court, and therefore the trial court no longer had jurisdiction to certify the Order after the Superior Court had taken the issue on appeal.

On or about February 9, 2005, the Superior Court remanded the case to the Clerk of Court of Dauphin County. The appellant requested and was granted a continuance from March 14, 2005 until the June 20, 2005 Term of Criminal Court. The appellant requested and was granted another continuance from the June 20, 2005 Term of Criminal Court until the August 1, 2005 Term of Criminal Court. The appellant requested and was granted a third continuance from the August 1, 2005 Term of Criminal Court until the September 12, 2005 Term of Criminal Court. Appellant was convicted of third degree murder after a trial by jury, which took place from September 12-20, 2005.

## SUMMARY OF THE ARGUMENT

The Trial Court erred when: (1) it failed to dismiss the case when the Commonwealth failed to bring the Appellant to trial within 365 days, thus violating Rule 600; (2) when it admitted the preliminary hearing testimony of an unavailable witness, Guillermina Cruz, when the Appellant did not have an opportunity to fairly or fully cross-examine her at a prior hearing; (3) when it refused to admit the prior bad acts of LaQuann "Kazar" Williams, who Appellant alleged was the true perpetrator of this crime, and (4) when it sentenced Appellant to a prison term outside the standard guidelines in place at the time this crime occurred.

## **ARGUMENT**

### 1. THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO DISMISS THE CHARGE PURSUANT TO PA.R.CRIM.P. 600, WHERE THE COMMONWEALTH TOOK MORE THAN 365 DAYS TO BRING APPELLANT'S CASE TO TRIAL.

Pennsylvania Rule of Criminal Procedure 600 states in pertinent part that "[t]rial in a court case in which a written complaint is filed against the defendant, when the defendant is at liberty on bail, shall commence no later than 365 days from the date on which the complaint is filed.[4] For the purposes of Rule 600, trial shall be deemed to commence on the date the trial judge calls the case to trial.[5]

For purposes of determining the commencement of trial, certain periods of time shall be excluded for Rule 600 purposes. Specifically, any period of time for which the defendant expressly waives Rule 600[6] and any period of delay resulting from any continuance granted at the request of the defendant or defendant's attorney.[7]

The standard of review in evaluating Rule 600 issues is whether the trial court abused its discretion. The proper scope of review in determining the propriety of the trial court's ruling is limited to the evidence on the record of the Rule 600 evidentiary hearing and the findings of the lower court. In reviewing the

---

[4] Pa.R.C.P. 600 (A)(3).
[5] Pa.R.C.P. 600 (B).
[6] Pa.R.C.P. 600 (C)(2).
[7] Pa.R.C.P. 600 (C)(3)(b). It is worth noting that Rule 600 time does not run for periods of time when the defendant could not be apprehended because his or her whereabouts were unknown. However, at no point was Appellant's whereabouts unknown in this case. Rather, he turned himself in to the police.

determination of the hearing court, an appellate court must view the facts in the light most favorable to the prevailing party. <u>Commonwealth v. McNear</u>, 852 A.2d 401, 404 (Pa.Super. 2004).

### A. <u>THE DELAY IN STARTING THE TRIAL IN THE INSTANT MATTER VIOLATED THE SPIRIT OF THE LAW OF PENNSYLVANIA'S SPEEDY TRIAL RULE</u>

When considering the trial court's ruling, the Superior Court is not permitted to ignore the dual purpose behind Rule 600. Rule 600 serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. However, the administrative mandate of Rule 600 was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth. <u>Commonwealth v. Hunt</u>, 858 A.2d 1234, 1238-39 (Pa.Super. 2004) (*en banc*).

The Pennsylvania Supreme Court articulated a two-step process to analyze alleged violations of Pennsylvania's speedy trial rule. The first step is to determine whether the delay itself was sufficiently long to be presumptively prejudicial. <u>Commonwealth v. Africa</u>, 569 A.2d 920 (Pa. 1990). If it is determined that the delay is presumptively prejudicial, the court then applies a balancing test wherein four factors are considered: the length of the delay, reason for the delay, the defendant's assertion of the right to a speedy trial, and any prejudice to the defendant arising from the delay. <u>Id.</u> at 923.

In <u>Africa</u>, the Court held that a delay of twenty seven months is sufficient to trigger the four prong inquiry. <u>Id.</u> In <u>Commonwealth v. Pounds</u>, the

Pennsylvania Supreme Court found that a delay of almost two years precipitated further inquiry. <u>Pounds</u>, 417 A.2d 597, 600 (Pa. 1980) More recently, the Superior Court held that a delay of three years was sufficient to trigger the inquiry under Pennsylvania law. <u>Commonwealth v. Kimbrough</u>, 872 A.2d 1244, 1258 (Pa.Super. 2005)

Appellant avers that he satisfies each of the four prongs in proving a violation of the speedy trial rule. The first prong is the length of the delay. Rule 600(A)(3) provides that a defendant must be brought to trial within 365 days of when the criminal complaint is filed. In the case *sub judice*, the Commonwealth charged Appellant with murder on February 14, 2002. Appellant's trial did not start until September 12, 2005, 1,306 days (3 years and 7 months) after the filing of the second criminal complaint. That is 941 days more than is allowed under Rule 600. Appellant believes the first prong is clearly satisfied because 1,306 days is well beyond any time limit set forth by Rule 600 and, as previously stated, several courts have found less time to be presumptively prejudicial. Appellant avers that the amount of time in the instant case is clearly sufficient to trigger the four prong inquiry.

The second prong is the reason for the delay. While Appellant concedes his requests for continuances caused some of the delays, and therefore tolled the applicable time, the bulk of the delay of this trial was caused because the Commonwealth attempted numerous appeals in this matter. Appellant further opines that the appeals were not done in good faith and were frivolous. As will

be discussed later on a date by date basis, the reason for the delay should fall on the Commonwealth's shoulders, thus meeting the second prong.

The third prong is the defendant's assertion of the right to a speedy trial. Kimbrough, Id. In Kimbrough, the defense attorney raised the Rule 600 issue on numerous occasions during the proceedings. The court held this satisfied the third prong.

In the instant matter, defense counsel Monty Batson argued on numerous occasions that Rule 600 should apply and the case dismissed. On December 8, 2003, defense counsel filed a Motion to Dismiss pursuant to Rule 600. Second, defense counsel was very vociferous in asserting there were Rule 600 implications to all the appeals by the Commonwealth. On several occasions, Mr. Batson brought up issues concerning the computation of time for Rule 600 purposes.

Mr. Batson was very clear that he thought there were Rule 600 implications inherent in the Commonwealth appealing the first time and that the Commonwealth had to bear the risk the appeal delay could have Rule 600 implications. For an appeal to stay time for Rule 600 purposes, it must be a non-frivolous, good-faith appeal. Because defense counsel on numerous occasions raised Rule 600 implications, appellant certainly satisfies the third prong by asserting his right to a speedy trial.

The fourth prong is whether there was any prejudice to the defendant arising from the delay. Prejudice should be assessed in the light of the interests of defendants that the speedy trial right was designed to protect. The Court has

identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last because witnesses may die, disappear and their memory may be affected. <u>Kimbrough</u>, supra, at 1259.

The first two interests require only a brief discussion. First, Appellant was incarcerated for over two years after voluntarily turning himself in. Second, Appellant had to be concerned and worried about the outcome of this matter and his future for almost three and a half years.

The third interest merits more analysis. The length of the delay prejudiced appellant in numerous ways. The most apparent prejudice was the fact that a material Commonwealth witness, Guillermina Cruz, was not available to testify at trial. As such, she was not available for cross-examination. Because she was unavailable, the Court allowed her preliminary hearing testimony be read to the jury. Ms. Cruz was the only alleged eyewitness to the shooting. She stated she saw Appellant actually fire the gun. This was obviously the most damaging testimony to the Appellant.

Had this trial started in a timely manner, Ms. Cruz would more likely have been available to testify and subject to cross-examination about inconsistencies between the statements she gave to the police, the grand jury and her preliminary hearing testimony.

Appellant was further prejudiced because several witnesses admitted their memories were not as good by the time this case went to trial as when it

happened almost ten years earlier. First, Johanna Johnson Iftikhar-Khan did not recall giving certain statements to the police in which she said that Iris was the person who wanted to hang up when they spoke the night she was killed. This is to be expected after almost a ten year delay from the time of the crime to the start of the trial.

Second, Socorro Roman admitted that her memory was fresher in 1996 when the incident happened than in 2003 when she gave a statement to the police. Accordingly, her memory was certainly better in 1996 than in 2005 when the case went to trial.

Third, Jeanette McCurdy admitted that she could not remember telling the police in 1996 that she did not see anyone coming out of Iris' apartment. Fourth, Officer Lucas cannot recall whether he collected for testing certain samples of blood at the apartment. .

Fourth, Stacy Harris admitted she did not remember when she spoke to police officers and there were parts of what she saw that night she just could not remember at trial. Sixth, Tamara Williams admitted that her memory was a lot fresher in 1996 than at the time of the trial.

Four different witnesses each stated during trial their memories were obviously better in 1996 when this incident occurred than at the time of the trial in 2005. It is worth noting that each of the six witnesses were for the Commonwealth. Where the key witness in this case failed to show up to testify and where at least six Commonwealth witnesses admitted worse memory at the

trial, Appellant has shown that he has been prejudiced due to the long period of time it took to bring this case to trial.

Because Appellant has met each prong of the four prong test and shown that the three year and seven month period between when the complaint was filed and when the trial began, Appellant has shown that under <u>Africa</u> this case failed to adhere to Pennsylvania's speedy trial rule.

### B. THE DELAY IN STARTING THE TRIAL IN THE INSTANT MATTER VIOLATED THE LETTER OF THE LAW OF RULE 600.

The aforementioned discussion describes how the case *sub judice* did not adhere to the spirit of Pennsylvania's speedy trial rule. The following discussion explains how this case did not adhere to the letter of the law under Rule 600 and the trial did not happen within 365 days of when the criminal complaint was filed.

In the case *sub judice*, the Commonwealth charged Appellant with murder on February 14, 2002. However, Appellant's trial did not begin until September 12, 2005. While Appellant concedes that some of this time is tolled for purposes of Rule 600, Appellant believes and therefore avers that more than 365 days should have counted for Rule 600 purposes, thus rendering Appellant's trial untimely.

Appellant surrendered himself into the custody of Detective Heffner on February 14, 2002. On March 15, 2002, a preliminary hearing was held before Senior District Justice William Rathfon and the case was held for court.

The Appellant was arraigned on April 4, 2002 and the trial date was set for May 6, 2002. On April 22, 2002, the Honorable Judge Hoover granted Appellant's Motion for Continuance to September 9, 2002. Appellant concedes that the period between May 6, when trial was originally scheduled, until September 9, 2002 should not count for Rule 600 purposes by way of Pa.R.C.P. 600 (C)(3)(b). However, the time between February 14, 2002 (the date the criminal complaint was filed) and May 6, 2002 (the date on which Appellant's trial was originally rescheduled) should count for Rule 600 purposes. Therefore, eighty-one (81) days should count for Rule 600 purposes.[8]

While the case was being continued at Appellant's request, the Commonwealth filed a motion to disqualify the Dauphin County Public Defender's Office. On June 21, 2002, the Appellant filed a written request for discovery with the District Attorney's Office. On or about July 22, 2002, Judge Bratton scheduled a hearing for July 30, 2002 on the issue of disqualification. Following said hearing, Judge Bratton issued an order denying the Motion to Disqualify the Public Defender's Officer from representing the Appellant.

On July 30, 2002, the Appellant filed a Motion to Compel Discovery. On or about August 12, 2002, Chief Deputy District Attorney Sean McCormack provided 546 pages of discovery. On or about August 19, 2002, the District Attorney's Office filed a Motion for Reconsideration regarding the issue of disqualifying the Public Defender's Office. On September 9, 2002, Judge Bratton

---

[8] 81 days subtracted from 365 days equals 284 days that remained for the Commonwealth to bring the case to trail.

issued an Order that a hearing would be held on the issue of disqualification on September 18, 2002.

On September 12, 2002, Attorney McCormack provided 210 photographs relevant to the case. However, defense counsel had not received all of the discoverable evidence. As a result, on September 18, 2002 the defense was forced to file a request for a continuance in an Omnibus Pre-Trial Motion in order to obtain the remaining discovery material in an effort to adequately prepare for the case.

Defense counsel argued that the continuance should count against the Commonwealth because of their failure to provide discovery in a timely fashion upon request. On October 1, 2002, Judge Bratton granted the motion for a continuance until December 9, 2002 and counted the time against the Appellant. Pursuant to the Judge's order, the time from October 14, 2002 to December 9, 2002 is tolled for Rule 600 purposes. However, the days from September 9, 2002 (the date to which the trial was continued) until October 14, 2002 (the next available trial court date) should count for Rule 600 purposes.[9] The delay of trial from the September 9th trial date was due to the Commonwealth's motion.

After a hearing on October 30, 2002, Judge Bratton denied the Motion for Reconsideration on the issue of disqualifying the Public Defender's Office. Attorney McCormack advised the court at the hearing that the Commonwealth would appeal the court's decision to the Pennsylvania Superior Court. Further,

---

[9] September 9, 2002 until October 14, 2002 is 36 days. Therefore, 36 days subtracted from 284 days (the previous calculation) means that at this point, the Commonwealth had 248 days. If the time from September 9 until December 9, 2002 were counted, the calculation would be 91 days and the Commonwealth was left with 188 days.

Mr. McCormack asked Judge Bratton not to move forward with the case pending this appeal. (Notes of Transcript of Pretrial Hearing, Hereinafter "N.T.P.T." 10/30/02, p. 15).

Judge Bratton questioned Mr. McCormack about the Appellant's speedy trial rights. Judge Bratton advised Mr. McCormack that if the Commonwealth was asking the Court not move forward with the Omnibus Pretrial Matters, then the Commonwealth must be willing to bear the risk that the delay would have Rule 600 implications. [N.T.P.T.] Mr. McCormack iterated that the Commonwealth need not concern itself with the Defendant's speedy trial rights because Rule 600 would not start to run until the December term of court because the continuance until December 9, 2002. On November 1, 2002, the Commonwealth filed a Notice of Appeal with the Superior Court.

The trial court erred in two ways when it counted the time against appellant. First, the period of time from September 9 to October 14, 2002 should have counted against the Commonwealth because it was responsible for this delay. The Commonwealth filed the Motion for Reconsideration, which necessitated the holding of a hearing, by court order, at the end of the September trial term. The appellant did not file a continuance motion until September 18, after the September court term expired.

Second, the omnibus motion filed by appellant on September 18 was necessitated by the Commonwealth's failure to turn over applicable Discovery material in a timely fashion pursuant to Pa.R.C.P. 573. The remaining applicable

time, October 14 to December 9, 2002, is attributable to the Commonwealth's neglect of the Rule's requirements and should not be held against the appellant.

The days after December 9, 2002 should count against the Commonwealth for Rule 600 purposes. After December 9, 2002 Appellant and his counsel were available and ready to proceed to trial. Further, the Commonwealth took an interlocutory appeal in defiance of the Appellant's constitutionally mandated speedy trial rights.

Any day after December 9, 2002 should count against the Commonwealth for purposes of Rule 600 because it was the Commonwealth who appealed. While there is no authority on point, Appellant asserts that a Commonwealth appeal, *even if done in good faith*, should count against the Commonwealth for Rule 600 purposes. Certainly if a defendant appeals, time stops for Rule 600 purposes. It logically follows that if the Commonwealth appeals before a trial, it bears the risk of having the time that the case is up on appeal count for Rule 600 purposes. The appeal time should count for Rule 600 purposes because a defendant could be incarcerated and if the Commonwealth appeals before a trail is over, that defendant is still in prison. This result is exactly what Rule 600 was designed to avoid.

Assuming arguendo that this Court finds that a good faith appeal by the Commonwealth should not count against the Commonwealth for Rule 600 purposes, Appellant contends the Commonwealth's appeals in this case were not done in good faith. As stated, the Commonwealth's first appeal was quashed on January 12, 2004. The appeal was quashed because of a recent Pennsylvania

Supreme Court decision. The Commonwealth appealed under Pa.R.A.P.
311(d). However, the Supreme Court of Pennsylvania held in <u>Cosnek</u> that Rule
311(d) was limited to those circumstances provided by law in which a pretrial
ruling results in the suppression, preclusion or exclusion of Commonwealth
evidence." <u>Commonwealth v. Cosnek</u>, 836 A.2d 871 (Pa. 2003). <u>Cosnek</u> was
filed on November 24, 2003.

The Superior Court quashed the Commonwealth's first appeal because
the disqualification of defense counsel does not result in the suppression,
preclusion, or exclusion of any Commonwealth evidence. Accordingly, the
Superior Court held that it did not have jurisdiction to review the pretrial order of
the trial court.

Further, the Superior Court mentioned in a footnote that the
Commonwealth had failed to file a timely Notice of Appeal in that it appealed
from the date its Motion for Reconsideration was denied rather than the date of
the trial court's order denying the Commonwealth's initial disqualification motion.

The initial appeal was quashed on January 12, 2004. On February 12,
2004, the Commonwealth and defense entered into a court-approved agreement
whereby: The Commonwealth would withdraw its Petition for Allowance of
Appeal to the Supreme Court of Pennsylvania; the court would grant the
Commonwealth leave to appeal the denial of the Commonwealth's motions to
remove the Public Defender's Office *nunc pro tunc* to the Superior Court of
Pennsylvania; and finally, the trial court, pursuant to Rule 1311, would certify the
defendant's appeal of the order denying his Motion to Dismiss Pursuant to Rule

600 *nunc pro tunc*. No further stipulations regarding appeals were contained within the agreements. At no point did Appellant or his counsel agree to toll Rule 600.

Although Cosnek was decided on November 24, 2003, the court-approved agreement did not take place until February 12, 2004, the Commonwealth did not file their Motion for Leave to File Pre-trial Appeal Nunc Pro Tunc until March 15, 2004. The trial court did not certify the appeal until April 6, 2004.

Even in the face of Cosnek, the Commonwealth chose through the agreement on February 12, 2004 to try and appeal this issue again. It is this second appeal that the Appellant believes was not done in good faith because it was clearly untimely.

The Superior Court again quashed the Commonwealth's second appeal on November 23, 2004. The Superior Court noted that there was nothing in the record to suggest that the Commonwealth ever made a timely application to the trial court for an Amendment of the Order as required under Chapter 13 of the Rules of Appellate Procedure. As stated earlier, Cosnek was decided on November 24, 2003, but the court-approved agreement did not take place until February 12, 2004, and the Commonwealth did not file their Notice of Appeal until April 14, 2004.

Appellant contends the Commonwealth had thirty (30) days from Superior Court's January 12, 2004 decision quashing their appeal to correct their erroneous first appeal. Because the Commonwealth did not act within that thirty day window and waited over three months to correct their error, they did not act

in good faith. Therefore, if this court chooses to rule that a good faith appeal stops time running for Rule 600 purposes, which was not the case here because the Commonwealth did not act in good faith. At the very least the Commonwealth was willfully negligent.

Given the earlier calculations, and erring in the Commonwealth's favor, Appellant's trial should have started 284 days after January 12, 2004. This means that Appellant's trial should have started on or about October 22, 2004. It did not. In fact, Appellant's trial did not start until almost one year after this date. Therefore, whether this Court determines that the Commonwealth's appeals were in good faith or not, Appellant has shown that Rule 600 time expired well before Appellant's trial actually began.

### C. THE TRIAL COURT ABUSED ITS DISCRETION IN REINSTATING THE COMMONWEALTH'S RIGHT *NUNC PRO TUNC* TO APPEAL FROM THE ORDER DENYING THE MOTION TO DISQUALIFY THE PUBLIC DEFENDER'S OFFICE FROM REPRESENTING APPELLANT

An abuse of discretion standard governs the review of the propriety of a grant or denial of an appeal *nunc pro tunc*. Commonwealth v. Jarema, 590 A.2d 310 (Pa.Super 1991).

On March 15, 2004, the Commonwealth filed a Motion for Leave to File a Pre-Trial Appeal *nunc pro* tunc. On April 7, 2004, the Trial Court granted the Commonwealth leave to appeal. The trial court should not have reinstated the Commonwealth's appellate rights *nunc pro tunc*.

In <u>Commonwealth v. Williams</u>, This Court held that the trial court abused its discretion when it reinstated the Commonwealth's appeal rights *nunc pro tunc*. In <u>Williams</u>, the trial court granted the defendant's motion *in limine* on July 15, 2004. However, the Commonwealth did not appeal that decision until September 15, 2004 and sought leave to do so *nunc pro tunc*. The trial court reinstated the Commonwealth's appellate rights *nunc pro tunc*, and on January 4, 2005, the Commonwealth filed its notice of appeal. The defendant averred that the Commonwealth's appeal was untimely as it was not filed within 30 days of the July 15, 2004 order (see Pa.R.A.P. 903(a)). <u>Commonwealth v. Williams</u>, 893 A.2d 147 (Pa.Super. 2006).

The Commonwealth in <u>Williams</u> argued that the 30 days to appeal rule did not apply to an interlocutory appeal and that the rule only applied to final orders. However, This Court in <u>Williams</u> noted that the order in question (which was a suppression order) was a final order. The court then noted that Pa.R.A.P. 311(d) allows the Commonwealth to file an interlocutory appeal where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution.

In the case at bar, Appellant does not believe that the Commonwealth can show the order disqualifying the Public Defender's Office from representing Appellant would severely handicap the prosecution. If the prosecution has a strong case, it should not matter who is representing the Appellant. Further, Appellant believes the order that denied the disqualification of the Public

Defender's Office was a final order and thus the Commonwealth had to appeal within thirty (30) days. However, the Commonwealth did not do so.

The trial court in the instant matter erred when it allowed the Commonwealth to proceed *nunc pro tunc*. In Commonwealth v. Stock, the Supreme Court held that *nunc pro tunc* is intended as a remedy to vindicate the right to an appeal where the right has been lost due to extraordinary circumstances. Stock, 679 A.2d 760 (Pa. 1996). In the case *sub judice*, there are no extraordinary circumstances. The only circumstance is that the Commonwealth did not correct its own mistake by amending its appeal in a timely manner. Because there were no extraordinary circumstances, the Appellant believes that the trial court erred when it allowed the Commonwealth to proceed *nun pro tunc*.

These facts bolster Appellant's argument that Rule 600 time should have been running the entire time since January 12, 2004 because not only should the Commonwealth have filed their appeal within 30 days of that date, but the Commonwealth did not properly proceed *nunc pro tunc* in the first place. By the Commonwealth being allowed to appeal *nunc pro tunc*, almost 4 months of Rule 600 time elapsed.

D. THE TRIAL COURT ERRED WHEN IT DID NOT CERTIFY THE INITIAL COMMONWEALTH APPEAL IN A TIMELY MANNER.

In the previous section of this brief, Appellant argued that the first Commonwealth appeal in this matter was not an interlocutory appeal. Assuming

arguendo that this court rules that the Commonwealth's appeal was in fact an interlocutory appeal, the trail court erred because it did not certify the appeal in a timely manner.

Pa.R.A.P. 1311 provides that "an appeal may be taken by permission under 42 Pa.C.S. §702(b) (interlocutory appeals by permission) from any interlocutory order of a lower court or other governmental unit." Pa.R.A.P. 1311(a).

Section 702(b) states:

> When a court or other governmental unit, in making an interlocutory order in a matter in which its final order would be within the jurisdiction of an appellate court, shall be of the opinion that such order involves a controlling question of law as which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the matter, *it shall so state in such order.* The appellate court may thereupon, in its discretion, permit an appeal to be taken from such interlocutory order.

42 Pa.C.S. §702(b) (emphasis added).

Contrary to the requirements set forth in Section 702(b), the trial court's October 30, 2002 order denying reconsideration of its decision not to disqualify the Public Defender's Office did not contain the statement of certification from the trial court. This Court has held that "[i]t is clear that an appeal by permission must meet the requirements of Section 702(b) of the Judicial Code." Casani v. Lincoln Bank, 436 A.2d 1019, 1020 (Pa.Super. 1981).

Because the trial court failed to properly certify the October 30, 2002 appeal, the Pennsylvania Superior Court never properly obtained jurisdiction to

decide the Commonwealth appeal.  Because the Superior Court never acquired

jurisdiction, the trial court retained the jurisdiction and thus, Rule 600 time should

have been running from October 30, 2002.[10]

Assuming arguendo that the Superior Court did originally acquire

jurisdiction on the Commonwealth's first appeal, said jurisdiction was

extinguished on November 24, 2003 when Cosnek was decided, and/or January

12, 2004 when the appeal was quashed.   Therefore, such certification must

have been made, at the latest, within 30 days of January 12, 2004.  There is

nothing in the record to suggest that the Commonwealth ever made a timely

application to the trial court for an amendment of the order as required under

Chapter 13 of the Rules of Appellate Procedure.  Additionally, no petition for

review of an interlocutory order as prescribed by Pa.R.A.P. 1311 was made to

the Superior Court.  This Court has held in similar cases that even if the order

was properly certified, the Court would nonetheless lack jurisdiction due to the

Commonwealth's failure to file a petition for permission to appeal.

Commonwealth v. Fleming, 794 A.2d 385, 387 (Pa.Super. 2002) (concluding that

"discretionary review may only be sought by the filing of a petition for an

interlocutory appeal by permission.")

Such certification must be made within thirty (30) days of the entry of an

order.  The agreement between the Commonwealth and defense counsel was

drafted on February 12, 2004 the trial judge did not purport to certify the Order

---

[10] Based on previous calculations, Rule 600 time would have run out on August 15, 2003.
However, Appellant's trial did not begin until September 12, 2005.

until April 6, 2004. Therefore, the certification was made outside the thirty (30) day time limit allowed under Pa.R.A.P. 1311.

The trial court did not certify the October 30, 2002 Commonwealth appeal until April 6, 2004. However, under Pa.R.A.P. 1701, "after an appeal is taken or a review of a quasijudical order is sought, the trial court or other governmental unit may no longer proceed in the matter." Pa.R.A.P. 1701(a). As none of the exceptions enumerated in Rule 1701 apply to this situation, the trial court no longer had jurisdiction to certify the order after the Superior Court had taken the issue on appeal.

The Superior Court noted in its second memorandum quashing the Commonwealth's appeal, that "[w]hile the Commonwealth relied solely on Pa.R.A.P. 311(d) to assert its right of appeal in this matter, it is important to note that Rule 1311 was available as a viable option to request review of the trial court's denial from the moment the order was issued." The Superior Court further noted that, "[i]t is clear that the Commonwealth has failed to fulfill the requirements necessary to invoke the Superior Court's jurisdiction as prescribed under Pa.R.A.P. 1311."

Because the Commonwealth never requested the trial court properly certify its appeal within 30 days of January 12, 2004, Rule 600 time should have started to run on February 12, 2004.[11]

While there was a court approved agreement on February 12, 2004 where the Appellant agreed that the Trial Court would certify the Commonwealth's

---

[11] Based on previous calculations, Rule 600 time would have expired on October 8, 2004. However, Appellant's trial did not begin until September 12, 2005. This is outside the time limit prescribed in Rule 600 and thus violates the Pennsylvania Speedy Trial Rule.

appeal, the appellant never agreed to waive Rule 600 time. Appellant was merely giving the Commonwealth the opportunity to properly perfect their appeal under the assumption that all the while, the clock would be running for Rule 600 purposes. Appellant certainly did not waive the necessity for the Commonwealth to properly perfect its appeal *nunc pro tunc*.

Appellant has shown that because the Commonwealth never asked the trial court to properly certify its appeal and because the trial court did not certify said appeal for some 18 months after the appeal, the Superior Court never properly acquired jurisdiction to hear the Commonwealth's appeal. As such, the clock should have never stopped running for Rule 600 purposes. Consequently, Appellant's case should be dismissed for lack of having a speedy trial, which violated his Constitutional Rights.

2. <u>WHETHER THE TRIAL COURT ERRED WHEN IT ALLOWED THE COMMONWEALTH TO INTRODUCE THE PRELIMINARY HEARING TESTIMONY OF A MATERIAL WITNESS, GUILLERMENA CRUZ, WHEN THE WITNESS FAILED TO APPEAR FOR TRIAL.</u>

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witness against him." The United States Supreme Court has construed this language to mean that where testimonial evidence is at issue and a witness is unavailable, a prior opportunity for cross examination is required. <u>Crawford v. Washington</u>, 541 U.S. 36 (2004). *See also* <u>Commonwealth v. Sandutch</u>, 449 A.2d 566, 567 (Pa. 1982).

On the Commonwealth level, under Pennsylvania Rule of Evidence 804, a declarant is unavailable if they are absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process or other reasonable means.[12]

If a declarant is unavailable, their former testimony is not automatically excluded by the hearsay rule.  However, for the testimony to not be excluded by the hearsay rule, the party against whom the testimony is now offered must have had an adequate opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.[13]

A witness who cannot be found at the time of trial will be deemed unavailable "only if a good-faith effort to locate the witness and compel his attendance at trial has failed."  Commonwealth v. Blair, 331 A.2d 213, 214 (Pa. 1975).  "The burden of demonstrating such a 'good-faith effort' is on the party seeking to introduce the prior testimony."  Commonwealth v. Walloe, 372 A.2d 788, 790 (Pa. 1977).

In the instant matter, numerous attempts were taken to find Guillermina Cruz.  First, Detective John Goshert conducted an online search as well as placing an advertisement in the Patriot News.  Additionally, Detective Goshert entered her in the National Crime Information Center (NCIC) and put out a be on the lookout (BOLO) to all the chiefs of police in Dauphin County.  Further, Detective Goshert searched all the local motels for Ms. Cruz.  Detective Donald

---

[12] Pa.R.E. 804(a)(5).
[13] Pa.R.E. 804(b)(1).  It is worth noting that Pa.R.E. 804(b)(1) is identical to F.R.E. 804(b)(1), except that it adds the word "adequate" in front of opportunity.  It is consistent with Pennsylvania caselaw.

Heffner also personally served her last known addresses and contacted her family members to determine Ms. Cruz's whereabouts.

Appellant concedes that Detective Goshert, Detective Heffner and Deputy District Attorney McCormack did make a good faith effort to look for Ms. Cruz. Appellant also concedes that Ms. Cruz was not available to testify at trial. Therefore, the only remaining issue is whether Appellant or his counsel had a fair and full opportunity to cross examine Ms. Cruz at the preliminary hearing.

"In order for prior testimony to be admissible in a subsequent proceeding as substantive evidence against the accused, there must have been a full and fair opportunity to cross-examine." Commonwealth v. Thompson, 648 A.2d 315, 322 (Pa. 1994). "The Commonwealth may not be deprived of its ability to present inculpatory evidence at trial merely because the defendant, despite having the opportunity to do so, did not cross-examine the witness at the preliminary hearing stage as extensively as he might have done at trial." 648 A.2d 315.

However, where the defense, at the time of the preliminary hearing, was denied access to vital impeachment evidence, such as prior inconsistent statements of the witness or the witness's criminal record, a full and fair opportunity to cross-examine the unavailable witness may be deemed to have been lacking at the preliminary hearing. Commonwealth v. Bazemore, 14 A.2d 684 (Pa. 1992); Commonwealth v. Smith, 647 A.2d 907, 911-915 (Pa.Super. 1994); Commonwealth v. Stinson, 628 A.2d 1165, 1169-1171 (Pa.Super. 1993).

In the instant matter, Appellant avers there were several pieces of vital impeachment evidence that were not available to him or his counsel when Guillermina Cruz testified at the preliminary hearing on March 5, 2002. Therefore, Appellant did not have a full and fair opportunity to cross examine Ms. Cruz and it was error for the trial court to allow her preliminary hearing testimony to be read to the jury at Appellant's trial.

Specifically, at the preliminary hearing, neither Appellant nor his counsel had access to Ms. Cruz's statements she gave to the police on February 19, 2002, and on March 24, 2001. Nor did they have access to her grand jury testimony of March 28, 2001.

"Mere dissimilarities or omissions in prior statements . . . do not suffice as impeaching evidence; the dissimilarities or omissions must be substantial enough to cast doubt on a witness's testimony to be admissible as prior inconsistent statements." Commonwealth v. Bailey, 469 A.2d 604, 611 (Pa.Super. 1983). The grand jury testimony is inconsistent because in it, Ms. Cruz denies seeing Kazar at Iris' apartment on the morning of the shooting. This is completely inconsistent with her testimony on March 5, 2002 where she said that she saw Kazar leave the room where Iris was shot and run down the stairs after the shooting. While it is agreed that the Commonwealth did not have a duty to turn over grand jury testimony at the preliminary hearing, Appellant avers that this "secret testimony" could have been used to cross examine Ms. Cruz at the preliminary hearing, and certainly would have been used at trial for cross-examination. The lack of access to Ms. Cruz's inconsistent statement at the

preliminary hearing prejudiced the appellant. It is emblematic of the problematic role grand jury testimony played in this case that appellant was not entitled to it at his preliminary hearing but only received it after Ms. Cruz's testimony was read into the record. The appellant was not privy to this information in 2003 and she was unavailable in 2005.

There is also evidence that Ms. Cruz herself gave varying statements. In its Memorandum quashing the Commonwealth's first Appeal, the Superior Court noted:

> While Ms. Cruz initially provided [Mr. Love] with an alibi, the Commonwealth alleges that Ms. Cruz thereafter informed the police that she saw [Mr. Love] murder the victim. At the first preliminary hearing, however, Ms. Cruz denied making a statement to the police and a continuance was granted. The Dauphin County Public Defender was then assigned to represent Ms. Cruz and the Commonwealth threatened to charge her with homicide because of her failure to cooperate. At a second preliminary hearing on March 18, 1997, Ms. Cruz invoked her Fifth Amendment privilege against self-incrimination. Thereafter, the Commonwealth withdrew the charges against [Mr. Love], and charged Ms. Cruz with hindering prosecution. The Commonwealth re-opened its investigation on September 4, 2001, with the cooperation of Ms. Cruz, and again charged [Mr. Love] on February 14, 2002 with the murder.

In her March 24, 2001 statement to the police, Ms. Cruz was asked why she gave two different versions of her story and in one essentially says that on prior occasions they told her to tell just what they wanted to hear so that she could leave town quicker. Having two different versions of what happened at Iris' apartment is certainly evidence that can be used to impeach. Because Appellant

did not have access to this statement, he was precluded from conducting a fair and full cross examination of Ms. Cruz.

Appellant also did not have access to phone calls Ms. Cruz had with Detective Heffner prior to the preliminary hearing wherein she stated a person named Anthony Knight had threatened her if she testified at the hearing. Additionally, Appellant did not have access to the statements of numerous other witnesses who contradicted Ms. Cruz's testimony. Without these key pieces of evidence and statements, it was impossible for Appellant to conduct a fair and full cross examination of Ms. Cruz at the preliminary hearing.

In addition to not having several items of evidence available with which to impeach Ms. Cruz at the preliminary hearing, Defense counsel could not ask Ms. Cruz about anything that happened after she left Iris Fennel's apartment that day. At the preliminary hearing, the Commonwealth objected and Defense counsel was unable to explore the issue as to what happened. This is significant because subsequent to the March 5, 2002 preliminary hearing, Appellant's counsel learned Ms. Cruz was claiming appellant met up with her later in the day and told her to make up this story. There was no information about this back at the preliminary hearing.

At the preliminary hearing, the Commonwealth also objected to defense counsel's cross-examination of Ms. Cruz regarding her adjudications as a juvenile. It was objected to because credibility is not an issue at preliminary hearings. However, because of the Commonwealth's objection, Appellant could

not create a full and fair record for when Ms. Cruz's testimony was read into evidence at trial. At trial, witness credibility is certainly an issue.

At Appellant's trial, Appellant's counsel could not cross examine Ms. Cruz as to the inconsistencies between her grand jury testimony and the testimony that she gave at the preliminary hearing on March 5, 2002. By being denied the chance to do this, the Appellant was not afforded a full and fair opportunity to cross examine Ms. Cruz. It is worth noting that at all stages of this proceeding, Ms. Cruz was reluctant to cooperate with police and did not want to testify in this matter.

After hearing the arguments, Judge Bratton ruled that the defense had available on March 5, 2002 access to anything that was materially inconsistent with the testimony that was given by the witness at the March 5, 2002 hearing. Judge Bratton further ruled that it may not have been defense counsel who had access to all the inconsistent statements, but certainly one of Appellant's prior attorneys had access to the statements.

In so ruling, Judge Bratton erred because he basically conceded that Appellant's attorney, Monty Batson, probably did not have access to all the statements with which to cross examine Ms. Cruz at the March 5, 2002 preliminary hearing. Without those key pieces of evidence, it was impossible for Defense counsel to cross-examine Ms. Cruz fairly and fully.

Simply stated, Ms. Cruz's testimony read to the jury at trial was the most damaging evidence against Appellant because Ms. Cruz is the only alleged eyewitness in this case. She is the only witness who placed Appellant at Iris'

apartment at the time of the shooting. However, there was absolutely no opportunity for Appellant to conduct a fair and full cross examination of Ms. Cruz and he could not question her about a number of inconsistent statements, both hers and from other witnesses. Importantly and seemingly unrecognized by the trial court, appellant had no access to other witness's statements that contradicted Ms. Cruz's version of events.

First, Ms. Cruz testified that it was early in the morning when she and Appellant went to Iris' house and that she knew it was early because she saw children walking to school However, Ms. McCurdy, Iris' neighbor, said that she saw Appellant and a girl leave Iris' apartment around 12:15 or 12:30 p.m. Ms. McCurdy also stated that she exchanged greeting with Ms. Cruz. At no point did Ms. Cruz mention that she spoke to any neighbors.

Further, Stacy Harris testified that it was barely dawn when she heard gunshots. Ms. Harris does not mention anything about seeing Ms. Cruz running from Iris' apartment after she heard the gunshots. This contradicts Ms. Cruz's testimony when she said that Appellant ran out of the apartment directly behind her.

Because Appellant did not have access not only to other witnesses' contradictory statements, but Ms. Cruz's own contradictory statements at the preliminary hearing, there was no way for Appellant's attorney to conduct a full and fair cross examination of Ms. Cruz. As such, it was error for the trial court to admit Ms. Cruz's preliminary hearing testimony when she was not available to testify at trial.

## 3. THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO INTRODUCE PRIOR RECORDED TESTIMONY REGARDING A PRIOR BAD ACT OF LAQUANN WILLIAMS, A/K/A KAZAR, WHO THE APPELLANT ALLEGED WAS THE REAL PERPETRATOR OF THE CRIME.

A trial court has broad discretion in admitting or excluding evidence, and such a decision will only be overturned if there is an abuse of such discretion. Commonwealth v. Schwartz, 615 A.2d 350, 356 (Pa.Super. 1992).

Under Pennsylvania Rule of Evidence 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. Pa.R.E. 404(b)(1). However, evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. Pa.R.E. 404(b)(2).[14] There must be a logical connection between the instant case and the facts of previous matters in order for the prior bad acts to be admitted.

Evidence of prior crimes is admissible "to prove other like crimes . . . so nearly identical in method as to earmark them as the handiwork of the accused. [M]uch more is demanded than the mere repeated commission of crimes of the same class . . . The device used must be so unusual and distinctive as to be like a signature." Commonwealth v.Snively, 424 A.2d 1257, 1259 (Pa. 1991), *quoting* McCormick on Evidence, §190 (1972 2d. ed).

---

[14] Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

When ruling on the common plan exception, the trial court must examine the details and surrounding circumstances of each criminal event to assure that the evidence reveals conduct that is distinctive and so nearly identical as to become the signature of the defendant. Commonwealth v. Frank, 577 A.2d 609, 614 (Pa.Super. 1990). The habits or patterns of action or conduct undertaken by the defendant, as well as the time, place, and types of victims typically chosen are all factors relevant to a finding that the criminal conduct is distinctive. Id.

In the instant matter, it was appellant's contention that Iris Fennel was actually murdered by LaQuann "Kazar" Williams. Appellant attempted to introduce other evidence in the form of threats that Kazar made to Iris Fennel because he believed her to be a snitch who turned him into the police. In an attempt to show that Kazar murdered Iris, Appellant also wanted to show similarities between Iris' murder and a rape that Kazar was previously convicted of committing. Appellant avers that the trial court erred when it did not permit evidence of Kazar's previous crimes, specifically the rape of Vanessa Ames.

Regarding Iris' murder and the rape of Vanessa Ames, there were several elements to both crimes that indicate that they were quite similar in nature.[15] First, both crimes occurred within a short period of one another, one year exactly to the day. Kazar raped Vanessa Ames on December 20, 1995 and Iris Fennel was murdered on December 20, 1996. [N.T. Vol. I, p. 32-75]

Second, the victims in both cases were single women who knew LaQuann "Kazar" Williams. Third, in both cases, there was no forced entry and the

---

[15] It is worth noting that no two crimes will be exactly the same. George Cronin, an expert in criminal investigation called by the commonwealth, noted that modus operandi can change over the course of a criminal's career as that criminal becomes successful and learns what works and what does not work.

perpetrator gained entrance to the victims' apartments in the early morning hours. In Vanessa Ames' case, LaQuann Williams used a ruse to gain entry to the apartment. In the Iris Fennel case, Iris let the person into her house because she knew him.

Fourth, in both cases guns were used to strike the victims in the head. In the Vanessa Ames case, LaQuann Williams struck her on the back of the head with his gun. In the Iris Fennel case, the violence was directed at Iris' face. Fifth, in both cases the victims were taken from other rooms into the bedroom. In Vanessa Ames' case, LaQuann moved her from the living room to the bedroom. In Iris Fennel's case, she was taken from the kitchen to the bedroom. Sixth, in both cases, the victims legs were spread and their genitals were exposed.[16]

Seventh, in both cases, the perpetrator tried to clean up the evidence. In the Vanessa Ames case, LaQuann Williams used Clorox and tried to clean up fingerprints, specifically the refrigerator. In the Iris Fennel case, there was some Clorox found near the refrigerator and it appeared as if someone tried to clean up evidence near the refrigerator.

Eighth, in both cases, the perpetrator shot or attempted to shoot the victims in the head. In the Vanessa Ames case, LaQuann Williams tried to shoot her three times at very close range, although he was unsuccessful. In the Iris Fennel case, she was shot twice in the head at close range because there were powder burns discovered on her face. Ninth, in both cases there were attacks to the victims' necks. In the Vanessa Ames case, LaQuann Williams attempted to

---

[16] The Commonwealth may argue that where Vanessa Ames was raped several times, there is no evidence of sexual assault in the Iris Fennel case. This could be because it was determined that Iris was menstruating at the time she was killed. [N.T. ??]

slit her neck with a knife. In the Iris Fennel case, there is evidence that she was strangled. Finally, evidence indicated that Iris Fennel was afraid of LaQuann "Kazar" Williams.

Based on all these similarities, Appellant contends that the trial court erred by ruling that the evidence of LaQuann Williams' previous crimes was not admissible. The trial court reasoned that such evidence would not be used against the defendant, so it was not going to be admissible against the person that the Appellant contends actually committed the crime. Appellant avers that in the face of all the similarities, the trial court erred when it did not allow evidence of LaQuann Williams' other crime to be admitted at Appellant's trial.

### 4. WHETHER THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO MODIFY SENTENCE, WHERE SAID SENTENCE WAS BEYOND THE AGGRAVATED RANGE OF SENTENCING GUIDELINES APPLICABLE AT THE TIME OF THE CRIME.

"Sentencing is a matter within the sound discretion of the trial court and will not be disturbed unless it is outside the statutory limits or manifestly excessive so as to inflict too severe a punishment." Commonwealth v. Phillips, 601 A.2d 816, 823 (Pa.Super. 1992), affirmed, 633 A.2d 604 (Pa. 1993).

> The sentencing guidelines are complex, including as they do references to 'prior record score', 'offense gravity score', 'statutory classification', 'minimum range', 'aggravated minimum range', and 'mitigated minimum range.' 42 Pa.C.S.A. §9721. At the minimum, the court must indicate that it understands the sentencing guideline range, in those cases in which the court deviates from the guidelines." (Emphasis included)

<u>Commonwealth v. Royer</u>, 476 A.2d 453, 458 (Pa.Super. 1984). Further, the reasons for the deviation must be adequate. <u>Commonwealth v. Chesson</u>, 509 A.2d 875, 877 (Pa.Super. 1986). Failure to comply shall be grounds for vacating the sentence. 42 Pa.C.S.A. §9721(b).

> The court has expressed the purpose of the sentencing guidelines: The primary purpose behind the establishment of the sentencing guidelines was to create a system where not only would offenders be properly punished for their transgressions, but also where like offenders would be treated consistently.

<u>Commonwealth v. Gause</u>, 659 A.2d 1014, 1016 (Pa.Super. 1995), *citing* <u>Royer</u>, Supra. Therefore, the guidelines have been created to provide predesignated ranges of punishment for different offenses, considering the "inherent egregiousness of the conduct which is generally associated with the commission of that offense." <u>Gause</u> at 1016. Following this, "unless the particular facts of the case in question are distinguishable from the typical case of that same offense, a sentence in the standard range would be called for." <u>Id</u>. at 1016-1017.

Finally, the sentencing court shall call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and the community, and the rehabilitative needs of the defendant. 42 Pa.C.S.A. §9721(b).

On October 28, 2005, Appellant was sentenced on the Third Degree Murder charge to fifteen (15) to thirty (30) years at a State Correctional Institution. However, the sentencing guidelines applicable at the time this alleged offense was committed allowed the trial court to give a sentence only up to

twenty (20) years incarceration.[17]  Appellant believes and therefore avers that the trial court erred in giving Appellant an aggravated sentence of fifteen (15) to thirty (30) years.  This sentence departed from the top end of the minimum allowed by the sentencing guidelines that were applicable at the time this crime was committed.

Appellant is now asking the Superior Court to vacate the sentence of fifteen (15) to thirty (30) years, and replace it with the proper maximum of twenty (20) years.

---

[17] The applicable statute was changed the previous year to allow for a maximum sentence of forty (40) years.

VIII.

**CONCLUSION**

WHEREFORE, the Appellant, Tyshaunt Love, respectfully requests

This Honorable court to vacate the sentence imposed and remand this matter for

proceedings consistent with this order.

Respectfully submitted,

Paul W. Muller
Chief Deputy
Public defender
Attorney for the Appellant

Joshua J. Vecchio
Assistant Public Defender
Attorney for Appellant

**EXHIBIT "A"**

COMMONWEALTH OF PENNSYLVANIA

vs.

TYSHAUNT LOVE

: IN THE COURT OF COMMON PLEAS,
: DAUPHIN COUNTY, PENNSYLVANIA
:
:
: NO. 0937 CR 2002
:
: CHARGE: MURDER

## MEMORANDUM OPINION Pursuant to Pa.R.A.P. 1925(a)

Defendant, Tyshaunt Love, has appealed from his judgment of sentence entered on

December 28, 2005, following a jury trial at which he was convicted of third-degree murder of

Iris Fennel, a woman with whom he shared an intimate relationship. On December 20, 1996, Iris

Fennel was shot and killed in her home on McCleaster Street in the City of Harrisburg. Pursuant

to Pa.R.A.P. 1925(a), we file the within memorandum.

In his Statement of Matters Complained of on Appeal, Defendant has raised the following

issues on appeal:

1. The trial court erred when it denied [D]efendant's/[A]ppellant's motion to dismiss the charge pursuant to Pa.R.Crim.P. 600, where the Commonwealth took more than 365 days to bring [D]efendant's/[A]ppellant's case to trial.

2. The trial court erred when it allowed the Commonwealth to introduce the preliminary hearing testimony of a material witness, Guillermina Cruz, when the witness failed to appear for trial.

3. The trial court erred when it denied [D]efendant's/[A]ppellant's motion to introduce prior recorded testimony regarding a prior bad act of Lequann Williams, a/k/a Kazar, who the [D]efendant/[A]ppellant alleged was the real perpetrator of the crime.

4. The trial court erred when it denied [D]efendant's/[A]ppellant's motion to modify sentence, where said sentence was beyond the aggravated range of the Sentencing Guidelines applicable at the time of the crime.

2006 MAR 14 AM 9:47
DAUPHIN COUNTY PENNA
RECEIVED OFFICE OF CLERK OF COURTS

Defendant's Statement of Matters Complained of on Appeal at 1-2. Defendant's issues will be addressed in the order in which they were raised.

Defendant's first claim is that the Commonwealth failed to bring Defendant to trial within the time requirements of Pa.R.Crim.P. 600. The Commonwealth had initially charged Defendant with the murder of Iris Fennel on December 29, 1996, but had withdrawn the charges in March 1998. This case was re-opened on February 14, 2002, when the Commonwealth again charged Defendant with the murder. Thereafter, a dispute arose regarding Defendant's representation by the Dauphin County Public Defender's Office. The Commonwealth moved to disqualify Defendant's counsel which was denied by Order of October 30, 2002. The Commonwealth appealed that Order which appeal was subsequently quashed by the Superior Court on January 12, 2004. The Commonwealth then filed for an interlocutory appeal by permission as this Court's Order denying disqualification of counsel was certified for appeal upon agreement of the Commonwealth and Defendant's counsel on February 12, 2004; however, on November 23, 2004, the Superior Court again quashed the Commonwealth's appeal and remanded the case to this Court.

While these appeals were pending, of course, this court was without jurisdiction to proceed. Pa.R.A.P. 1701(a). This Court regained jurisdiction after the Superior Court's second remand of the case. When an appellate court remands a case to the trial court and the defendant has been released on bail (as was the case here), the trial shall commence within 365 days of the termination order. Pa.R.Crim.P. 600(D)(2). The case was called for trial on September 12, 2005, less than 365 days after the Superior Court's remand of the matter. Thus, we denied Defendant's Rule 600 Motion requesting dismissal of the charges against Defendant.

Next, Defendant argues that the Court erred in allowing the Commonwealth to read to the jury the March 5, 2002 preliminary hearing testimony of the Commonwealth's material witness Guillermina Cruz ("Cruz"), who did not appear for trial. Cruz's preliminary hearing testimony placed Defendant at the scene of the crime and she testified that she saw Defendant shooting a handgun in the direction of the victim.

An unavailable witness' prior recorded testimony from a preliminary hearing is admissible at trial if the defendant had counsel and a full and fair opportunity to cross-examine that witness at a prior proceeding. 42 Pa.C.S. § 5917; Commonwealth v. Bazemore, 614 A.2d 684 (Pa. 1992). A full and fair opportunity to cross-examine the witness may be lacking if the defense, at the time of the preliminary hearing, was denied access to vital impeachment evidence. Bazemore at 688. The opportunity to impeach a witness is most important where the Commonwealth's case rests almost entirely upon the testimony of the unavailable witness. Commonwealth v. Johnson, 758 A.2d 166, 169 (Pa. Super. 2000).

At a hearing on the admissibility of Cruz's testimony, the Commonwealth and Defendant's counsel agreed that Cruz was unavailable as a witness. Defendant then argued that he did not have a full and fair opportunity to cross-examine Cruz at the preliminary hearing because the Commonwealth did not produce certain prior statements made by Cruz to the public defender representing Defendant at that time. The only prior statement made by Cruz inconsistent to her preliminary hearing testimony of March 5, 2002, which the Commonwealth did not produce directly to the Public Defender's office, was a police statement Cruz made on December 20, 1996, although it was allegedly produced to Defendant's prior attorney of record during the original processing of the first-filed charges. All other statements not produced were

generally consistent with Cruz's testimony at the preliminary hearing, i.e. that Cruz was with Defendant at the time he shot the victim. Furthermore, there were prior inconsistent statements made by Cruz at other preliminary hearings, similar to the police report not produced by the Commonwealth, which could have been used to attack Cruz's credibility at the March 5, 2002 preliminary hearing and at trial. Although Cruz's testimony was an important part of the Commonwealth's case, the public defender representing Defendant at the time of Cruz's March 5, 2002 preliminary hearing had a full and fair opportunity to impeach her and the police report not produced by the Commonwealth was not vital impeachment evidence under all of the circumstances. Thus, we denied Defendant's request to preclude the Commonwealth from introducing Cruz's prior statement made on March 5, 2002.

Defendant's third issue raised on appeal is that defense counsel should have been allowed to introduce prior recorded testimony of a prior bad act of an individual, Lequann Williams ("Willams"), who defense counsel alleged was the true perpetrator of the crime for which Defendant was convicted. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without it. Pa.R.E. 401. Even if evidence is relevant, it may be excluded if its probative value outweighs the danger of unfair prejudice, confusion of the issues, or misleading the jury. Pa.R.E. 403. In the case *sub judice*, Williams did not testify at trial and, without more, evidence that he had committed a murder in some respect similar to the murder of Iris Fennel was not enough to make it relevant to the instant case. Williams' prior homicide was far from factually identical to the murder of Iris Fennel and the prejudice of placing testimony from the Williams' trial about the scene of that killing, and other details of that murder,

substantially outweighed its probative value of whether Defendant committed the murder of Iris Fennel. Thus, we found the testimony to be inadmissible and denied Defendant's request.

Defendant's final contention is that trial court erred in denying his request for modification of sentence. Defendant based that request on the fact the sentence of 15 to 30 years at a state correctional institution imposed by the Court was beyond the sentencing guidelines in effect at the time the crime was committed. The sentencing guidelines at the time Defendant committed the crime required the Court to give Defendant no more than 10 years as a minimum sentence and the maximum sentence was 20 years in prison. The legislature had adopted an amendment to the Crimes Code which increased the maximum penalty for the murder of the third degree from 20 years to 40 years at the time the crime occurred. The sentencing commission's guidelines, however, were not formally changed until after the crime occurred. The sentence imposed comports with current guidelines. The anomaly caused by the delay in revision of the guidelines following the adoption of the statute increasing penalties for this crime does not, we believe, create any protected "right" of the Defendant to be sentenced only under the obsolete guidelines. Thus, we denied Defendant's motion for modification.

14 March 06

Date

Bruce F. Bratton, J.

Distribution:
The Honorable Bruce F. Bratton
Karen Reid Bramblett, Esq., Prothonotary, Superior Court of Pennsylvania, 100 Pine Street, Suite 400, Harrisburg, PA 17101
Sean McCormack, Esq., District Attorney's Office
Paul Muller, Esq., Public Defender's Office
Nathan Giunta, Esq., Public Defender's Office

REC'D MAR 2 1 2006

**EXHIBIT "B"**

COMMONWEALTH OF PENNSYLVANIA   : IN THE COURT OF COMMON PLEAS
   : DAUPHIN COUNTY, PENNSYLVANIA
   :
   : NO.: 0937 CR 2002
          V.   :
   : CHARGE: MURDER
TYSHAUNT LOVE   :

*FILE COPY*

TO THE HONORABLE BRUCE F. BRATTON, JUDGE OF SAID COURT:

## STATEMENT OF MATTERS
## COMPLAINED OF UPON APPEAL,
## PURSUANT TO PA. RULE OF
## APPELLATE PROCEDURE 1925(b)

**AND NOW**, this 15th day of February, 2006, comes the above-named defendant/appellant, Tyshaunt Love, by and through his attorney, Paul W. Muller, Chief Deputy Public Defender, and respectfully files this Statement of Matters Complained of on Appeal, Pursuant to Pa. Rule of Appellate Procedure 1925(b) and, in support thereof, respectfully avers the following:

1. The trial court erred when it denied defendant's/appellant's motion to dismiss the charge pursuant to Pa.R.Crim.P. 600, where the Commonwealth took more than 365 days to bring defendant's/appellant's case to trial.

2. The trial court erred when it allowed the Commonwealth to introduce the preliminary hearing testimony of a material witness, Guillemena Cruz, when the witness failed to appear for trial.

3. The trial court erred when it denied defendant's/appellant's motion to introduce prior recorded testimony regarding a prior bad act of Lequann Williams, a/k/a Kazar, who the defendant/appellant alleged was the real perpetrator of the crime.

RECEIVED
OFFICE OF
CLERK OF COURTS
2006 FEB 15 PH 3: 05
DAUPHIN COUNTY
PENNA

4. The trial court erred when it denied defendant's/appellant's motion to modify sentence, where said sentence was beyond the aggravated range of the Sentencing Guidelines applicable at the time of the crime.

5. Defendant/appellant reserves the right to amend his Statement of Matters Complained of on Appeal after receipt of the trial transcripts.

**WHEREFORE**, pursuant to Pa. Rules of Appellate Procedure, Rule 1925(b), 42 Pa. C.S.A., the defendant/appellant submits the foregoing as his reasons relied upon for appeal.

Respectfully submitted,

Paul W. Muller
Chief Deputy Public Defender

**Distribution:**
Clerk of Courts (original)
Paul W. Muller, Chief Deputy Public Defender
Sean McCormack, Chief Deputy District Attorney

COMMONWEALTH OF PENNSYLVANIA   : IN THE SUPERIOR COURT OF
                                        : PENNSYLVANIA
                                        : FOR THE MIDDLE DISTRICT
                V.                    :
                                        :
                                        :
TYSHAUNT LOVE                        : NO.: 198 MDA 2006

## CERTIFICATE OF SERVICE

     I hereby certify that I am this day serving the foregoing document upon the person(s) and in the manner indicated below which service satisfies the requirements of Pa. R.A.P. 121:

<u>Via personal service as follows:</u>

Sean McCormack, Esquire (717) 780-6767
District Attorney's Office
**Dauphin County Courthouse**
Harrisburg, PA 17108

Dated: **7/3/** , 2006

Paul W. Muller, Esquire, <u>Attorney Registration No. 73799</u>
Public Defender's Office
Dauphin County Administration Building
Two South Second Street
Harrisburg, PA 17101
Counsel for Appellant

(717) 780-6370