IN THE SUPERIOR COURT OF PENNSYLVANIA

MIDDLE DISTRICT

---

NO.  198  MDA 2006

---

COMMONWEALTH OF PENNSYLVANIA,
Appellee

vs.

TYSHAUNT LOVE,
Appellant

---

BRIEF FOR APPELLEE

---

Appeal of Tyshaunt Love from the judgment of sentence of the Honorable Bruce F. Bratton, Judge, Court of Common Pleas, Dauphin County, dated October 28, 2005, and docketed to No. 937 CR 2002.

Edward M. Marsico, Jr.
District Attorney
I.D. No. 53915
James P. Barker
Deputy District Attorney
I.D. No. 67315
Attorneys for the Commonwealth

Dauphin County Court House
Harrisburg, Pennsylvania 17101
(717) 780-6767

# TABLE OF CONTENTS

Page

I.   COUNTER-STATEMENT OF QUESTIONS PRESENTED .................. 1

II.  COUNTER-STATEMENT OF THE CASE ............................ 2

III. SUMMARY OF ARGUMENT ................................. 25

IV.  ARGUMENT ................................................. 26

V.   CONCLUSION ................................................. 56

# TABLE OF CITATIONS

Cases

Commonwealth v. Africa,
   524 Pa. 118, 569 A.2d 920 (19900 ...................... 26

Commonwealth v. Bailey,
   469b A.2d 604, 611 (Pa. Super. 1983) ................ 48

Commonwealth v. Brown,
   875 A.2d 1128, 1135 (Pa. Super. 2005) ............... 34

Commonwealth v. Celestin,
   825 A.2d 670, 676 (Pa. Super. 2003) ................ 53, 54

Commonwealth v. Chmiel,
   558 Pa. 478, 499, 738 A.2d, 417 (1999) .............. 48

Commonwealth v. Cosnek,
   575 Pa. 411, 836 A.2d 871 (2003) .................... 11, 31

Commonwealth v. Devers,
   519 Pa. 88, 101-02, 546 A.2d 12, 18 (1988) ......... 54

Commonwealth v. Frank,
   577 A.2d 609, 614 (Pa. Super. 1990) ................ 51

Commonwealth v. Griffin,
    804 A.2d 1, 8 (Pa. Super. 2002)............................................................. 54

Commonwealth v. Guldin,
    502 Pa. 66, 71, 463 A.2d 1011, 1014 (1983)........................................ 34

Commonwealth v. Hunt,
    858 A.2d 1234, 1241 (Pa. Super. 2004)................................................ 34

Commonwealth v. Kimbrough,
    872 A.2d 1244 (Pa. Super. 2005)........................................................ 26
    ......................................................................................................... 35-36

Commonwealth v. Matis,
    551 Pa. 220, 230,. 710 A.2d 12, 17 (1998)........................................... 30

Commonwealth v. Murray,
    879 A.2d 309, 312-13 (Pa. Super. 2005)................................................ 30

Commonwealth v. Pounds,
    490 Pa. 621, 417 A.2d 597 (1980)........................................................ 26

Commonwealth v. Preston,
    904 A.2d 1, 10 (Pa. Super. 2006)........................................................ 27

Commonwealth v. Shearer,
    584 Pa. 134, 141 n.6, 882 A.2d 462, 466 n.6 (2005)............................ 32

Commonwealth v. Strong,
    825 A.2d 658, 662 (Pa. Super. 2003)................................................... 48

Commonwealth v. Tuladziecki,
    513 Pa. 508, 522 A.2d 17 (1987)......................................................... 53

Commonwealth v. White,
    818 A.2d 55, 558 (Pa. Super. 2003).................................................... 31-32

McManamon v. Washko,
    2006 PA Super 245, 11-12 (August 31, 2006)...................................... 47, 48

Statutes

18 Pa.C.S.A. §1908................................................................................ 30

18 Pa.C.S.A. §2501(a) ......................................................................... 2 n.1

18 Pa.C.S.A. §2502(a) ......................................................................... 2 n.2

18 Pa.C.S.A. §2502(c)........................................................................... 2 n.3

42 Pa.C.S.A. §702(b) ............................................................................ 12

42 Pa.C.S.A. §5917................................................................................ 48

Miscellaneous

Pa.R.A.P. 2119(f) .................................................................................. 53

Pa.R.Crim.P. 101(C)............................................................................... 30

Pa.R.Crim.P. 575(A)(2)(c) ..................................................................... 27

Pa.R.E. 804(a)(5), (b)(1)......................................................................... 48

I.

## COUNTER-STATEMENT OF QUESTIONS PRESENTED

A.    DID THE TRIAL COURT PROPERLY DENY APPELLANT'S
      MOTION TO DISMISS PURSUANT TO Pa.R.Crim.P. 600?

(Suggested answer in the affirmative)

B.    DID THE TRIAL COURT PROPERLY PERMIT INTRODUCTION
      OF THE PRELIMINARY HEARING TESTIMONY OF A
      COMMONWEALTH WITNESS WHO WAS UNAVAILABLE
      FOR TRIAL WHEN THE DEFENSE HAD A FULL AND FAIR
      OPPORTUNITY TO CROSS-EXAMINE THE WITNESS AT
      THE TIME OF THE PRELIMINARY HEARING?

(Suggested answer in the affirmative)

C.    DID THE TRIAL COURT PROPERLY EXCLUDE EVIDENCE
      OFFERED UNDER Pa.R.E. 404 RELATING TO A PRIOR
      RAPE AND ATTEMPTED MURDER BY A THEORETICAL
      ALTERNATIVE SUSPECT WHEN THE PRIOR "BAD ACT"
      DID NOT CONSTITUTE A SIGNATURE CRIME?

(Suggested answer in the affirmative)

D.    DID THE TRIAL COURT PROPERLY EXERCISE ITS
      DISCRETION AT THE TIME OF SENTENCING?

(Suggested answer in the affirmative)

II.

## COUNTER-STATEMENT OF THE CASE

This is an appeal from a judgment of sentence entered in the Dauphin County Court of Common Pleas for a charge of Murder of the Third Degree. The Appellant, Tyshaunt Love, challenges the trial court's denial of a motion to dismiss under the speedy trial rule, two evidentiary rulings, and the discretionary aspects of sentencing.

On February 14, 2002, Love was arrested and charged with Criminal Homicide[1] for the shooting of Iris Fennell on December 20, 1996; as discussed below, this was the second time that Love had been charged in Fennell's murder. On September 20, 2005, a Dauphin County jury returned a verdict of not guilty of Murder of the First Degree[2] and guilty of Murder of the Third Degree.[3] On October 28, 2005, the Honorable Bruce F. Bratton sentenced Love to imprisonment for 15 to 30 years, a fine of $2,000, and payment of the costs of prosecution.

---

[1]  18 Pa.C.S.A. §2501(a).

[2]  18 Pa.C.S.A. §2502(a).

[3]  18 Pa.C.S.A. §2502(c).

## A. STATEMENT OF FACTS

The evidence presented at trial, construed in favor of the Commonwealth as the prevailing party, established the following facts.

In 1996, Love was involved in a romantic relationship with Fennell. (Notes of Testimony of Jury Trial, Volume II,[4] dated September 14-15, 2005, at 357). Love was known as "Cuzzo" or "Schoolboy" and Fennell was known as "Blondie" because she dyed her hair blond. (N.T.II 356-58). Fennell was one of a group of women who sold drugs and gathered often at a bar called Fav's. (N.T.II 355-57). The women tended to associate with men who, like Love, had relocated from New York City to the Market Street area of Harrisburg. (N.T.II 356-57). Among the women, Fennell had a reputation as one of the best "hustlers" (N.T.II 361) and also was a better drug dealer than Love. (N.T.II 362).

The relationship between Love and Fennell was close but tended to be tumultuous. (N.T.II 267, 268-69, 278, 328-29, 344, 363). On one occasion, Love punched out a car window after Fennell spoke to another man. (N.T.II 268). At that time, Love said that if he could not have Fennell, no one else would, either. Id. However, shortly before her death, Fennell indicated that she was putting Love out of her home. (N.T.II 296-97, 316; see also N.T.III at 174 (Love describing problems in the relationship)).

---

[4]  Hereinafter cited as "N.T.II." Similarly, the Notes of Testimony of Jury Trial, Volume I, dated September 12-13, 2005, will be cited as "N.T.I," and the Notes of Testimony of Jury Trial, Volume III, dated September 16, 19-20, 2005, will be cited as "N.T.III."

At about 11:30 or 11:45 p.m. on December 19, 1996, Fennell was seen in Fav's. (N.T.II 363-64). She told Tawanna Poteat that Love was getting on her nerves and that she was going home. (N.T.II 364-65). Love approached as Fennell talked to Poteat, and then Fennell left. (N.T.II 365). Love asked Wendy Harris if she had seen Fennell. (N.T.II 390). When Harris told Love that Fennell had gone home, Love tried to call but Fennell apparently had not yet gotten home. Id. According to Love, he then made several attempts to contact Fennell but was unsuccessful. (N.T.III 112-114)

In 1996, Fennell had a close relationship with Johanna Johnson Iftikhar-Khan, a family friend and the mother of a man by whom Fennell had borne a child. (N.T.I 168-69). The two women spoke nearly every day. (N.T.I 169). On December 19, 1996, Iftikhar-Khan was preparing a dish called *pasteles*,[5] a holiday food made by Latinos and Puerto Ricans in particular. (N.T.I 170-71). Preparation of the dish is time-consuming, and Iftikhar-Khan usually involved the whole family in the process. (N.T.I 171). Iftikhar-Khan wanted to speak to Fennell because Fennell was expected to help with the *pasteles* and because Fennell's daughter wanted to speak to her. (N.T.I 170, 172-73). She called several times but was unable to reach Fennell. (N.T.I 170).

Finally, at about 1:00 a.m. on December 20, 1996, Iftikhar-Khan reached Fennell by telephone. (N.T.I 170, 72). They spoke for about 45 minutes before Iftikhar-Khan had to attend to her cooking. (N.T.I 173). About ten minutes later, Iftikhar-Khan called back and spoke to Fennell until about 2:30 or 2:45 a.m. Id. Among the topics

---

[5] Misspelled "postellies" in the transcript. The singular is *pastel* and the plural is *pasteles*. See http://members.tripod.com/~apadilla98_2/recipes/pasteles.htm.

discussed was the cooking of chicken, which Fennell indicated that she planned to do. (N.T.I 182). During the second phone call, Fennell answered a knock at her door and indicated to Iftikhar-Khan that it was a friend but not a "romantic friend." (N.T.I 174, 185). The conversation ended shortly thereafter. (N.T.I 175).

Iftikhar-Khan and Fennell planned to meet the next day to go Christmas shopping for Fennell's daughter. (N.T.I 176). They did not do so, as Iftikhar-Khan learned about noon on December 20, 1996, that Fennell was dead. (N.T.I 177).

Meanwhile, after his unsuccessful attempt to locate Fennell, Love contacted Guillermina Cruz, also called "Tootie" or "Toothie." (N.T.III 149, 161-62). They went to the home of a person that Love identified as his uncle. (N.T.III 162). There, Cruz fell asleep while watching movies. (N.T.III 163). When Cruz woke up the next morning, she went with Love to help him get his bags from Fennell's house. (N.T.III 164-65). Cruz was unsure of the time but remembered seeing children on their way to school. (N.T.III 164).

Cruz found herself in the kitchen of Fennell's house, where Fennell was cooking at the stove. (N.T.III 184-85). While arguing with Love, Fennell moved towards Cruz aggressively and Cruz smacked Fennell. (N.T.III 167, 185-86). Love then grabbed Fennell and started to punch her in the face. (N.T.III 166, 186). While holding Fennell by the hair, Love dragged her to the area of the stove and took out a gun. (N.T.III 166, 167, 190). Love then dragged Fennell up the stairs. (N.T.III 167-68, 191). Cruz stayed in the kitchen while Love and Fennell went up the stairs. (N.T.III 168, 191).

The couple continued to argue, and Cruz could hear Fennell tell Love to leave her alone. (N.T.III 168, 191-92). Cruz then heard a gunshot and a "big thump on the ceiling." (N.T.III 169). The thump came from the area of the bedroom. (N.T.III 197). Cruz then went to the stairs to see what had happened. (N.T.III 169) As she ascended the stairs, she saw Love holding the gun and shooting in the direction of the floor. Id. She then saw LaQun "Kazar" Williams leave the room. (N.T.III 170). Cruz then ran out of the house. (N.T.III 198).

On December 20, 1996, Jeannette McCurdy lived near Fennell. (N.T.II 117). Fennell's apartment was attached to McCurdy's garage. Id. McCurdy was working in her backyard, cleaning it up. (N.T.II 118). She heard the sound of Fennell's back door opening and saw Love and a young woman coming out of the apartment. (N.T.II 119). McCurdy recalled saying hello and the young woman responded by saying hello. Id.

Later, McCurdy saw smoke coming from the apartment, so she yelled to Socorro Roman and Zachary Belcher, Fennell's brother. (N.T.II 121). Belcher also saw the smoke as he went to the apartment. (N.T.II 7). As he went into the apartment, Belcher saw Love coming down the stairs. Id. Love stopped and went back up the stairs. Id. When he came down several seconds later, Love told Belcher that Fennell was not moving and that he (Love) needed help. Id.

The door that Belcher entered was the one that went into the kitchen area. (N.T.II 8). The first thing that he noticed was that there was food burning in a frying pan on the stove. Id. Love came down the stairs about two or three seconds later. (N.T.II

10).  He came about halfway down the stairs before going back upstairs.  Id.  After Love

told Belcher about his sister, Belcher left to call 911.  (N.T.II 11).  Once back at Roman's

house, he heard Love say that if Kazar did something to Fennell, he would kill Kazar.

Id.

After hearing from Belcher that something was wrong, Roman went into

the apartment and saw that the stove was on, so she turned it off.  (N.T.II 33-34).

Roman then went upstairs, where she saw Fennell lying in the bedroom.  (N.T.II 35).

She put her grandson on a couch in the adjoining living room and returned to the

bedroom to look at Fennell.  Id.  Roman checked for a pulse but found none.  (N.T.II 35-

36).  Fennell was cold and rigor mortis had set in.  (N.T.II 36).  The body was on the box

spring and mattress but tilted at an angle.  (N.T.II 36-37).  Fennell had a hole in the area

of her jaw bone.  (N.T.II 37-38).  Fennell had been wearing only a small top and her

lower body was exposed, so Roman covered her body with a sheet.  (N.T.II 38-39).

She told Love that he should have covered her.  (N.T.II 39).

Roman then left the apartment, told McCurdy to call the police, and went

back to her house with her grandson, husband, and Belcher.  (N.T.II 42-44).  They did

not see Love before the police arrived.  (N.T.II 44).  When the police arrived, Roman

went back into the apartment.  Id.

Officer Lydell Muldrow of the Harrisburg Bureau of Police responded to a

dispatch call and went to Fennell's apartment.  (N.T.III 60-61).  He received the dispatch

at 12:08 p.m. and arrived at the apartment at 12:13 p.m.  (N.T.III 61).  When Officer

Muldrow knocked on the door, Love answered the door.  Id.  Love was sweaty and

appeared to be very nervous.  Id.   When Officer Muldrow asked what happened, Love

said that something was wrong with his girlfriend and directed Officer Muldrow back to

the bedroom.  Id.

Once in the apartment, Officer Muldrow encountered Roman, who said

that she had tried CPR.  Id.  Officer Muldrow directed an ambulance crew into the

bedroom, where he could see Fennell's body laying on the floor.  (N.T.III 61-62).  Love

told him that he did not know what happened to Fennell and that he had been trying to

get into the house all night but could not.  (N.T.III 63).

Doctor Wayne Ross performed an autopsy on the body of Iris Fennell on

December 21, 1996.  (N.T.II 75, 78).  He found two gunshot wounds to her face, one in

the right jaw and one in the left lip.  (N.T.II 79).  Fennell's face had been badly beaten,

as evidence by bruising, swelling and abrasions all over her face.  Id.  The bruises were

so deep that they went into the fat beneath the face.  Id.  Additionally, her nose or

septum was broken and there was a broken hyoid bone, indicating strangling.  (N.T.II

80-81).  Her hands and arms had bruises and abrasions consistent with self-defense

and a bite mark on her left writs.  (N.T. 83).  Fennell's left hand had soot, indicating that

it was in close proximity to a gun as it was being fired.  Id.  Her right middle finger was

broken.  (N.T. 85).  Dr. Ross knew that the body had been moved because there was

blood flow that would have been going "uphill" based on the position in which the body

was found by the police.  (N.T.II 91).  The same was true of the fact that Fennell's body

was found with her arms in the air, which would happen only if her arms were in that

position when rigor mortis set in.  (N.T.II 102-03).  There was no evidence of any sort of

sexual trauma. (N.T.II 105-06). Dr. Ross concluded that the cause of death was multiple gunshot wounds to the head, with significant conditions of blunt trauma and strangulation. (N.T.II 107).

## B. PROCEDURAL HISTORY

Love initially was charged with Fennel's homicide on December 28, 1996, in a case docketed at No. 909 C.D. 1997. For reasons described below, the Commonwealth filed motion for a *nolle prosequi* on those charges that was granted in March of 1998.

The Commonwealth reinvestigated Fennell's murder and, in 2001, presented the case before an investigating grand jury. Charges were filed on September 4, 2001, and Love was arrested on February 14, 2002. A Preliminary Hearing was held on March 5, 2002. At the conclusion of the hearing, the charges were bound over to the Court of Common Pleas.

On April 23, 2002, the Commonwealth filed a Petition to Disqualify Public Defender's Office. Love filed an Answer and New Matter on May 13, 2002. The trial court scheduled a hearing for July 30, 2002. However, no evidence was presented, and the parties engaged in oral argument. At the conclusion of the proceeding, Love indicated on the record that he would waive any conflict of interest on the part of the Public Defender's Office. (Notes of Testimony of Proceeding dated July 30, 2002, at 22-24).

On August 2, 2002, the Commonwealth filed a Supplement to its Petition to Disqualify the Public Defender's Office that included an affidavit executed by Cruz that she would not waive any conflict of interest on the part of the Public Defender's Office. (Exhibit A appended to Commonwealth's Supplemental Petition).

On August 8, 2002, the trial court issued an Order denying the Commonwealth's Petition. In addition, the trial court placed limitations on communication within the Public Defender's Office and trial counsel's access to files and information relating to this case. Finally, the trial court placed limitations on trial counsel's cross-examination of Cruz.

On August 19, 2002, the Commonwealth filed a motion designated a "Motion for Reconsideration." The Motion for Reconsideration alleged that the Public Defender's Office also represented Rasheed LaQun Williams, also known as "Kazar," in proceedings relating to the brutal rape and attempted murder of a woman in Harrisburg in 1995.[6] Blood from Iris Fennel was found on Williams' shoe when he was arrested on the day after her murder. (Motion for Reconsideration at 2 ¶3 and Exhibit C; Defendant's Answer to Motion for Reconsideration at 1 ¶3). When questioned initially, Love blamed Williams for the murder of Fennel. (Motion for Reconsideration at 2 ¶3 and Exhibit D).

---

[6] See Commonwealth v. Williams, No. 596 Harrisburg 1997, J.A11013/98 (Pa. Super. May 21, 1998); Commonwealth v. Williams, No. 1511 MDA 1999, J.S42004/00 (Pa. Super. December 26, 2000). The case currently is before the Supreme Court of Pennsylvania, docketed at No. 34 MAP 2002.

The Commonwealth also indicated that the Public Defender's Office represents Anthony Knight, the boyfriend of Cruz at the time of the murder. While police were looking for Cruz as a witness to Fennel's murder, Knight was hiding her in a hotel on the West Shore region. (Motion for Reconsideration at 3 ¶6; Defendant's Answer to Motion for Reconsideration at 2 ¶6).[7]

On October 30, 2002, the trial court conducted an evidentiary hearing on the Commonwealth's Motion for Reconsideration. On October 31, 2002,[8] the trial court issued an Order denying the Commonwealth's Motion for Reconsideration and again directing that the Public Defender separate defense counsel from files and information, this time the files and information relating to Rasheed Williams and Anthony Knight.

On November 1, 2002, the Commonwealth filed a notice of appeal from the October 31, 2002, Order and certified that the Order would terminate or substantially handicap the prosecution. On January 12, 2004, this Honorable Court issued a Memorandum Opinion quashing the Commonwealth's appeal based on the Supreme Court's intervening decision in <u>Commonwealth v. Cosnek</u>, 575 Pa. 411, 836 A.2d 871 (2003). Simply stated, because the order appealed from did not suppress, preclude or exclude Commonwealth evidence, this Honorable Court did not have jurisdiction to hear the appeal. The Commonwealth filed a Petition for Allowance of Appeal to the Supreme

---

[7]   The West Shore refers to the area across the Susquehanna River from Harrisburg, which is on the "East Shore."

[8]   The Order is dated October 30, 2002, but the date-stamp of the Clerk's Office indicates that it was received on October 31, 2002.

Court of Pennsylvania but filed a Praecipe to Discontinue on March 8, 2004, based on an agreement between the parties, with trial court approval, under which, *inter alia*, the trial court would certify an interlocutory appeal for both parties.

On April 6, 2004, the trial court certified an interlocutory appeal pursuant to 42 Pa.C.S.A. §702(b). On November 23, 2004, this Honorable Court quashed the second appeal, finding that the Order certifying the appeal was untimely and therefore that the Commonwealth had not met the requirements of Pa.R.A.P. 1311.

On September 12, 2005, the case proceeded to trial. On September 20, 2005, the jury returned its verdict of guilty of Murder of the Third Degree. Love was sentenced on October 28, 2005. On November 7, 2005, Love filed a Motion for Modification of Sentence that was denied on December 29, 2005. Love filed a Notice of Appeal to this Honorable Court on January 27, 2006, and he complied with a February 1, 2006, Order by the trial court by filing a concise statement of matters complained of on appeal on February 15, 2006. On March 14, 2006, the trial court issued an Opinion pursuant to Pa.R.A.P. 1925(a). On July 31, 2006, Love filed his Brief for Appellant. This Brief for Appellee is submitted in response thereto.

### C. FACTS AND PROCEDURAL HISTORY
### RELATING TO COMMONWEALTH APPEALS

In his challenge to the trial court's denial of his motion to dismiss pursuant to Pa.R.Crim.P. 600, Love asserts that the Commonwealth's attempt to appeal the denial of its motion to disqualify members of the Dauphin County Public Defender's

Office was not in good faith. To understand the Commonwealth's position with respect to the motion to disqualify, it is necessary to review the facts and history relating to the motion.

Guillermina Cruz was adjudicated delinquent for hindering the apprehension or prosecution of Love in connection with the Iris Fennel murder. The Dauphin County Public Defender's Office represented Cruz in those proceedings. (Motion at 2 ¶4; Answer at 2 ¶4). Initially, Cruz told the Harrisburg Bureau of Police a story that essentially was an alibi for both herself and Love at the time of the homicide. Subsequently, Cruz told the police about Love's involvement in the homicide and described the killing. (Motion at 2 ¶5; Answer at 3-4 ¶¶ 18, 21).[9] At a preliminary hearing in this matter before District Justice George A. Zozos, Cruz began to recant a statement to the Harrisburg Police relating to Love's involvement in the Fennel murder. At that time, District Justice Zozos continued the hearing at the Commonwealth's request. (Motion at 2 ¶6; Answer at 2 ¶6). The Commonwealth called Cruz to testify at the rescheduled preliminary hearing. Based on the advice of her counsel, Cruz refused to testify and invoked her Fifth Amendment right to silence. (Motion at 2 ¶8; Answer at 2 ¶8).

---

[9]  Although the defendant responded, Answer at 2 ¶5, that he was "without sufficient evidence to sufficiently answer that question [sic]," the substance of the Commonwealth's allegation was recited as New Matter in ¶¶ 18 and 21. As to the necessity of "evidence," the defendant indicated in his New Matter that the statements were matters of public record. (Answer at 4 ¶¶ 20, 23).

At the time of the original case, the Public Defender's Office petitioned the Court of Common Pleas seeking appointed counsel because that Office had a conflict of interest. (Motion at 3 ¶9 and Exhibit A appended to Motion; Answer at 2 ¶9). On January 13, 1997, the Honorable Clarence C. Morrison granted the Public Defender's petition and James H. Rowland, Esquire, was appointed to represent Love. (Motion at 3 ¶10; Answer at 2 ¶10).

Based on the foregoing allegations, the Commonwealth filed its Petition to Disqualify Public Defender's Office on April 23, 2002. Love filed an Answer and New Matter on May 13, 2002. The trial court scheduled a hearing for July 30, 2002. However, no evidence was presented, and the parties engaged in oral argument. At the conclusion of the proceeding, Love indicated on the record that he would waive any conflict of interest on the part of the Public Defender's Office. (Notes of Testimony of Proceeding dated July 30, 2002, at 22-24).

On August 2, 2002, the Commonwealth filed a Supplement to its Petition to Disqualify the Public Defender's Office that included an affidavit executed by Cruz that she would not waive any conflict of interest on the part of the Public Defender's Office. (Exhibit A appended to Commonwealth's Supplemental Petition).

On August 8, 2002, the trial court issued an Order denying the Commonwealth's Petition. In addition, the trial court placed limitations on communication within the Public Defender's Office and trial counsel's access to files and information relating to this case. Finally, the trial court placed limitations on trial counsel's cross-examination of Cruz.

On August 19, 2002, the Commonwealth filed a motion that it designated a "Motion for Reconsideration." The Motion for Reconsideration alleged that the Public Defender's Office also represented Rasheed LaQun Williams, also known as "Kazar," in proceedings relating to the brutal rape and attempted murder of a woman in Harrisburg in 1995.[10] Blood from Iris Fennel was found on Williams' shoe when he was arrested on the day after her murder. (Motion for Reconsideration at 2 ¶3 and Exhibit C; Defendant's Answer to Motion for Reconsideration at 1 ¶3). When questioned initially, Love blamed Williams for the murder of Fennel. (Motion for Reconsideration at 2 ¶3 and Exhibit D).

The Commonwealth also indicated that the Public Defender's Office represents Anthony Knight, the boyfriend of Cruz at the time of the murder. While police were looking for Cruz as a witness to Fennel's murder, Knight was hiding her in a hotel on the West Shore region. (Motion for Reconsideration at 3 ¶6; Defendant's Answer to Motion for Reconsideration at 2 ¶6).

On October 30, 2002, the trial court conducted an evidentiary hearing on the Commonwealth's Motion for Reconsideration. On October 31, 2002, the trial court issued an Order denying the Commonwealth's Motion for Reconsideration and again directing that the Public Defender separate defense counsel from files and information, this time the files and information relating to Rasheed Williams and Anthony Knight.

---

[10]   See Commonwealth v. Williams, No. 596 Harrisburg 1997, J.A11013/98 (Pa. Super. May 21, 1998); Commonwealth v. Williams, No. 1511 MDA 1999, J.S42004/00 (Pa. Super. December 26, 2000). The case currently is before the Supreme Court of Pennsylvania, docketed at No. 34 MAP 2002.

In order to understand the full extent of the conflicts of interest of the Public Defender's Office in this case apart from that of Cruz, it is necessary to examine in more detail some of the circumstances of this case and the involvement of the various persons that have been represented by the Public Defender's Office.

Before trial, it was known that, on December 20, 1996, the body of Iris Fennell was discovered in 1946½ McCleaster Street, Harrisburg. (Notes of Testimony, Pretrial Hearing, October 29, 2002,[11] at 16). Fennell was found half clothed, her lower extremities being unclothed, and the house was in disarray. (N.T.P.T. 10/29/02 at 16). Fennell had been shot twice in the head. Id. During the ensuing investigation, Williams and Love were developed as suspects. Id.

The autopsy in this matter was conducted on December 21, 1996.[12] The autopsy revealed that there were two gunshot wounds described as close-range. One wound is described as located at the right lateral mandible with a prominent soot pattern measuring 1.5" by 1.5". The second wound was in the location of the left lower lip. It was the opinion of the pathologist that the cause of death was multiple gunshot wounds to the head. He also noted other significant conditions, including blunt trauma and strangulation.

---

[11]   Hereinafter cited as N.T.P.T. 10/29/02.

[12]   The autopsy report prepared by Wayne K. Ross, M.D., P.C., was referred to as Exhibit "B" in paragraph 3 of the Stipulation of Facts.

One year prior to Fennell's murder, Williams raped and attempted to kill a woman by the name of Vanessa Ames. The trial court in that case recited the facts as follows:

> On December 20, 1995 Appellant Williams entered the home of the victim Vanessa Ames. Ms. Ames testified at trial that she had known appellant for approximately eight months by the name "Kazar" and that she had seen appellant almost every day during that time as he was dating one of her friends. On the day in question, appellant told Ms. Ames that he came over to borrow duct tape. Ms. Ames explained that she had been using the duct tape to tape boxes during her move to a different apartment. When appellant indicated that he was leaving, he began to hit Ms. Ames over the head with a gun.
>
> Ms. Ames testified that the phone began to ring and, as appellant pulled the wires out of the phone, Ms. Ames attempted to grab the gun from appellant's hand. Appellant hit her on the head again, this time causing her to bleed, and then proceeded to drag Ms. Ames by the hair to her bedroom with the telephone cord in his hand. Appellant at this point, still threatening Ms. Ames with a gun, duct-taped her head and strapped her to the bed with the telephone wires and the cord of a curling iron. With a razor, appellant slashed off his victim's clothes. He then raped her twice. When appellant realized that Ms. Ames was having difficulty breathing due to the duct tape around her head, he slit a hole in the duct tape covering her mouth. Next, appellant sodomized her by placing his penis in the breathing opening.
>
> Soon thereafter, appellant went into the bathroom and ran some water. He later returned to the bedroom and raped Ms. Ames for a third time. He then proceeded to untie Ms. Ames and, again with a gun to her head, forced Ms. Ames into the bathroom and ordered her to sit in a tub of cold bath water while he put his clothes back on. Appellant then forced Ms. Ames back into the bedroom where he retied her to the bed and dried her off with a towel. He then used the towel to wipe down the headboard and various items he touched in other areas of the house. When appellant

returned, he smoked a cigarette, drank a juice and ultimately raped Ms. Ames for a fourth time.

After this last assault, appellant again put on his clothes. He then went into the bathroom to obtain another towel, this one to wrap around his victim's head. Ms. Ames recalled at trial that the towel was wet. The next thing the victim recounted was the feeling of appellant's gun on her toweled head. She heard the gun "click two or three times," but it did not go off. Ms. Ames related that she suddenly felt blood gushing down her shoulders and neck. Appellant eventually slashed his victim's neck three times. Ms. Ames feigned death by laying in a motionless position until she heard her attacker leave her apartment.

Ms. Ames managed to free herself from the tape binding her hands and feet, put clothes on and run outside into the snow. As she ran down the street, still bleeding from her wounds, a bystander took her into his house to call the police and the paramedics. The witness testified to Ms. Ames' injuries and to the tape and wires still attached to her body when he encountered her. Ms. Ames immediately identified appellant as the perpetrator of her attack to this witness and later to the authorities.

Commonwealth v. Williams, Nos. 338, 339 CR 1997, Memorandum Opinion issued July 21, 1999, at 1-2 (Com. P. Dauphin) (quoting prior Memorandum Opinion issued September 24, 1997).

On March 5, 2002, a Preliminary Hearing was held in this matter.[13] Cruz testified that in December of 1996 she knew Love by the nickname "Cuzzo." (Notes of Testimony of Preliminary Hearing dated March 5, 2002,[14] at 5). On December 19,

---

[13]  March 5, 2002, Preliminary Hearing Transcript referred to as Exhibit "B" in paragraph 2 of the Stipulation of Facts. This transcript is the same as that used at trial.

[14]  Hereinafter cited as "N.T.P.H. 3/5/02."

1996, the day before Iris Fennell was found dead in her home, Cruz met with and subsequently spent time with Cuzzo. (N.T.P.H. 3/5/02 AT 5-10). During the course of the time that Cruz and Cuzzo were together, Cuzzo was talking about his girlfriend, Iris, and saying that she was getting on his nerves, that he needed to get her out of the house, and that they were always arguing. (N.T.P.H. 3/5/02 at 6). After spending the night at a house on Baum Street, Harrisburg, which Cuzzo indicated was his uncle's house, Cruz and Cuzzo left the Baum Street residence some time in the early morning. (N.T.P.H. 3/5/02 at 8-10). Cruz noted as they walked the streets, she saw kids walking to school that morning. (N.T.P.H. 3/5/02 at 10). They proceeded from Baum Street to Iris Fennell's home. Id.

Upon arriving at Fennell's home, they went inside and encountered Fennell in the kitchen. (N.T.P.H. 3/5/02 at 10-11). An argument between Cuzzo and Fennell developed quickly and escalated into a physical altercation. (N.T.P.H. 3/5/02 at 11). Cuzzo was hitting her with his fists in the face, and at some point reached into the bottom drawer of the stove and took out a gun. Id. At some point early on in this confrontation, Cruz slapped Fennell as Fennell approached Cruz. (N.T.P.H. 3/5/02 at 12). Cuzzo had Fennell by the hair and dragged her upstairs. (N.T.P.H. 3/5/02 at 13). When Cuzzo took Fennell upstairs, Cruz could no longer see them, but she could hear them arguing upstairs. (N.T.P.H. 3/5/02 at 13-14). At some point in time, Cruz heard a gunshot upstairs and a big thump on the ceiling. (N.T.P.H. 3/5/02 at 14). After hearing the gunshot, Cruz went up the steps and observed Cuzzo holding the gun and shooting again towards the floor. (N.T.P.H. 3/5/02 at 15). As she was seeing that, she noticed

somebody else in the room with Cuzzo. (N.T.P.H. 3/5/02 at 15-16). The person that she saw was Kazar (Williams). (N.T.P.H. 3/5/02 at 16).

On the morning of Iris Fennell's murder, Zachary Belcher found Tyshaunt Love inside Fennell's home. (N.T.P.T. 10/29/02 at 16, 27-28[15]). In a statement to police, Belcher described statements made by Love that would tend to incriminate Williams in Fennell's murder. (N.T.P.T. 10/29/02 at 28). Likewise, when interviewed by the police, Williams gave statements that would tend to incriminate Love in Fennell's murder. (N.T.P.T. 10/29/02 at 22, 27[16]).

In May of 1997, Investigator Matthew Taylor of the Harrisburg Bureau of Police went to the Dauphin County Prison for the purpose of obtaining blood from Williams. (N.T.P.T. 10/29/02 at 58). Christopher Wilson, Esquire, of the Dauphin County Public Defender's Office represented Williams.[17] (N.T.P.T. 10/29/02 at 58-59). Investigator Taylor explained to Williams and Wilson that he was there for the purpose of obtaining blood to do DNA testing as it related to Fennell's murder. (N.T.P.T. 10/29/02 at 59). After it was explained why Investigator Taylor wanted the blood, Williams and his attorney consented to having the blood drawn. (N.T.P.T. 10/29/02 at 59-60).

---

[15] See also Commonwealth's October 29, 2002, Pretrial Exhibit No. 3 (Statement of Zachary Belcher).

[16] See also Commonwealth's October 29, 2002, Pretrial Exhibits No. 1, 2 (Statements of LaQun Williams).

[17] Attorney Wilson was the Assistant Public Defender assigned to defend Williams in the Vanessa Ames rape case, No. 339 CD 1997.

DNA testing conducted in 1997 on a blood sample found on a metal hook and shoelace from a Timberland hiking boot taken from Williams indicated a match with Fennell's blood. (N.T.P.T. 10/29/02 at 41-42). The probability of randomly selecting an unrelated individual exhibiting the same characteristics as Fennell's blood was deemed to be 1 in 600 in the African-American population in 1997. Id. The Harrisburg Police resubmitted the samples for a more sophisticated type of DNA testing in 2000. (N.T.P.T. 10/29/02 at 42). That DNA testing[18] revealed that the blood sample taken from Fennell matches the DNA from the metal hook and shoelace from the Timberland hiking boot now with a probability of 1 in 1.2 quintillion[19] of randomly selecting an unrelated individual exhibiting the same characteristics as Fennell's blood in the African-American population. Id.

As noted, Love originally was arrested for Fennell's murder on December 28, 1996.[20] He applied for Public Defender representation. George Shultz, Esquire, the Public Defender, filed a Petition for Appointment of Counsel outside of the Public Defender's Office due to a conflict of interest. (Notes of Testimony of Pretrial Hearing dated July 31, 2002,[21] at 2-3). This was done due to a conflict of interest relating to the

---

[18] See also Exhibit F in paragraph 7 of the Stipulation of Facts (November 30, 2000, DNA results).

[19] Referred to as a 1 in 6.3 quintillion chance during the pretrial hearing. That figure represented a random sampling of the Caucasian population.

[20] Dauphin County Criminal Docket 909 CD 1997.

[21] Hereinafter cited as "N.T.P.T. 7/31/02."

representation of both Love and Cruz.[22]  On January 13, 1997, the Honorable Clarence

C. Morrison, President Judge, signed an Order appointing James H. Rowland, Jr., as

Love's conflict counsel.

Cruz was called by the Commonwealth as a witness against Love at a

Preliminary Hearing on January 17, 1997.[23]  At that hearing, Cruz testified differently

than anticipated by the Commonwealth's attorneys.  (N.T.P.T. 10/29/02 at 64).  Bradley

Winnick, Cruz's assigned Assistant Public Defender, represented Cruz at this hearing.

(Notes of Testimony of Preliminary Hearing dated January 17, 1997,[24] at 24).  When her

testimony deviated from the anticipated testimony, the Commonwealth requested a brief

recess, during which Cruz consulted with Attorney Winnick.  (N.T.P.H. 1/17/97 at 17-

20).  Winnick spoke to Cruz a second time during this hearing, this time at the request

of the District Justice.  (N.T.P.H. 1/17/97 at 24-25).  During Winnick's conversation with

Cruz, Attorney Rowland accused Attorney Winnick of being "overbearing"[25] towards

---

[22]  That is, the Public Defender's Office represented Cruz on the charges resulting from her
hindering Love's apprehension by the police for Fennell's murder.

[23]  Referred to as Exhibit "D" in paragraph 5 of the Stipulation of Facts.

[24]  Hereinafter cited as "N.T.P.H. 1/17/97."

[25]  "Your Honor, my only question is what were we doing for the fifteen minute break.  Counsel
was with her for fifteen minutes.  I would assume that if he was doing his job that he was
advising her of that then and then we come back in the court and, for the record, he is three
inches from her face he is advising her that she may go to jail if she doesn't tell the truth.  That
is what I am talking about as being overbearing.  We have been here for a half an hour and
gotten nowhere except to pressure her into changing what she said three times."  (N.T.P.H.
1/17/97 at 25).

Cruz. (N.T.P.H. 1/17/97 at 25). As a result of Cruz's lack of cooperation, the January 17, 1997, Preliminary Hearing was continued. (N.T.P.H. 1/17/97 at 40-41).

After the Preliminary Hearing, there was a meeting at the District Attorney's Office. (N.T.P.T. 10/29/02 at 64). Present at this meeting were Cruz, Attorney Winnick, First Assistant Public Defender Diane Morgan, Chief Deputy District Attorney Seán McCormack, and Deputy District Attorney Diana Woodside. Id. During this meeting, the possibility that Cruz also could be charged for the homicide was discussed. Id. Ultimately, homicide charges were not filed against Cruz. (N.T.P.T. 10/29/02 at 64, 65).

At the next scheduled Preliminary Hearing, Cruz again was called to testify by the Commonwealth against Love. (Notes of Testimony of Preliminary Hearing dated March 18, 1997[26]). Upon Cruz being called as a witness, James Petrascu of the Public Defender's Office indicated that he was representing Cruz. (N.T.P.H. 3/18/97 at 20). Petrascu also indicated that the Public Defender's Office had filed a motion to quash the Commonwealth's subpoena for Cruz. Id. Prior to the March 18, 1997, Preliminary Hearing, the Honorable Lawrence F. Clark, Jr., held an in-chambers conference concerning the motion to quash the subpoena. (N.T.P.H. 3/18/97[27] at 21). Judge Clark refused to quash the subpoena but indicated that Cruz had a right to invoke

---

[26]   Hereinafter cited as "N.T.P.H. 3/18/97."

[27]   Present during the in-chambers conference were Guillermina Cruz, represented by Diane Morgan from the Public Defender's Office, along with Seán McCormack and Diana Woodside of the District Attorney's Office.

her Fifth Amendment privilege against self-incrimination. Id. Indeed, Cruz, on the advice of her attorney, did invoke her Fifth Amendment right to remain silent. (N.T.P.H. 3/18/97 at 20-25). While the charges against Love were bound over to court at that time, they later were the subject of a petition for *nolle prosequi*, primarily due to Cruz's refusal to cooperate. (N.T.P.H. 3/18/97 at 65).

The Commonwealth reinvestigated Fennell's murder and, in 2001, presented the case before an investigating grand jury. Charges were filed on September 4, 2001, and Love was arrested on February 14, 2002. A Preliminary Hearing was held on March 5, 2002. At the conclusion of the hearing, the charges were bound over to the Court of Common Pleas.

As noted, the trial court denied the Commonwealth's motion for reconsideration.

III.

## SUMMARY OF ARGUMENT

The trial court properly denied Love's motion to dismiss under Rule 600. Delays attributable to the defense constituted excludable time and delay cause by the Commonwealth's good faith appeal constituted excusable time. Those delays extended the adjusted run date beyond the date on which trial began. Love waived his constitutional challenge, but it fails on the merits because there were valid reasons for the delay and Love was not prejudiced.

The trial court properly permitted the Commonwealth to introduce the preliminary hearing testimony of an unavailable witness. The defense had all the materials necessary for a full and fair opportunity for cross-examination of the witness, and any information that was not available did not constitute substantial impeachment material. The trial court properly excluded evidence of the prior rape by Williams. There were substantial differences between the two crime scenes that reflected substantial differences in the offenses. The rape simply did not constitute a "signature" that was present in the murder of Iris Fennell.

Love waived his challenge to the discretionary aspects of sentencing by failing to include the requisite statement of reasons relied upon for allowance of appeal. Regardless, the trial court properly exercised its discretion by imposing a sentence consistent with the amendment to the maximum penalty for Murder of the Third Degree, which occurred prior to the offense at issue.

## IV.

## ARGUMENT

A.   THE TRIAL COURT PROPERLY DENIED APPELLANT'S
MOTION TO DISMISS PURSUANT TO Pa.R.Crim.P. 600.

Love first contends that the trial court erred when it denied his motion to dismiss the charges because trial did not commence within 365 days of the filing of the criminal complaint. Love relies on both the "spirit" and the "letter" of Rule 600.

With respect to the "spirit" of Rule 600, Love cites opinions decided under former Pa.R.Crim.P. 1100. See Commonwealth v. Africa, 524 Pa. 118, 569 A.2d 920 (1990); Commonwealth v. Pounds, 490 Pa. 621, 417 A.2d 597 (1980). Also, Love cites an opinion based on the constitutional guarantees of speedy trial and due process. Commonwealth v. Kimbrough, 872 A.2d 1244 (Pa. Super. 2005). See esp. id., at 1256 (noting specifically that appellant made no argument under Rule 600).

In his motion filed December 8, 2003, Love specified that the basis for dismissal was Rule 600. The same basis was recited in Love's Petition to Make Rule Absolute, filed December 23, 2003. In his Statement of Matters Complained of upon Appeal, Love recites the claim as:

> The trial court erred when it denied
> defendant's/appellant's motion to dismiss the charge
> pursuant to Pa.R.Crim.P. 600, where the Commonwealth
> took more than 365 days to bring defendant's/appellant's
> case to trial.

Id., at 1 ¶1.  The trial court addressed the claim only as it applied to Rule 600,

Memorandum Opinion Pursuant to Pa.R.A.P. 1925(a) at 2, as Love did not state that

the constitutional analysis applied.  As such, Love waived any argument under either

the Constitution of the United States or the Pennsylvania Constitution.  See

Pa.R.Crim.P. 575(A)(2)(c) (motion must state with particularity the grounds for the

motion, the facts supporting the motion, and the type of relief requested).  Further, Love

cites no authority for the proposition that the "spirit" of a Rule of Criminal Procedure may

serve as the basis for relief.  To the contrary, Rule 600 provides that a defendant may

move for "an order dismissing the charges with prejudice on the ground that this rule

has been violated."  Rule 600(G).  There is no provision for violations of the "spirit" of

Rule 600.  As such, the proper basis for any relief must be an actual violation of Rule

600.

      Recognizing that this Honorable Court may entertain Love's argument

based on the constitutional underpinnings of Rule 600, Commonwealth v. Preston, 904

A.2d 1, 10 (Pa. Super. 2006), the Commonwealth will address Love's argument in its

entirety.  This Honorable Court has restated at length the law regarding dismissal of

criminal charges pursuant to Rule 600:

> With regard to claims brought under Rule 600, we
> must determine whether the trial court committed an abuse
> of discretion.  Commonwealth v. Montgomery, 861 A.2d 304,
> 309 (Pa. Super. 2004).
>
> The term "discretion" imports the exercise of
> judgment, wisdom and skill so as to reach a
> dispassionate conclusion, within the framework of the
> law, and is not exercised for the purpose of giving

> effect to the will of the judge. Discretion must be
> exercised on the foundation of reason, as opposed to
> prejudice, personal motivations, caprice or arbitrary
> actions. Discretion is abused when the course
> pursued represents not merely an error of judgment,
> but where the judgment is manifestly unreasonable or
> where the law is not applied or where the record
> shows that the action is a result of partiality, prejudice,
> bias or ill will.

Commonwealth v. King, 576 Pa. 318, 323, 839 A.2d 237,
240 (2003) (emphasis omitted). The proper scope of review
is limited to the evidence on the record of the Rule 600
evidentiary hearing and the findings of the trial court.
Commonwealth v. Hunt, 858 A.2d 1234, 1238 (Pa. Super.
2004) (*en banc*). "An appellate court must view the facts in
the light most favorable to the prevailing party." Id. at 1239.

When considering the trial court's ruling, an appellate
court may not ignore the dual purpose behind Rule 600. Id.
The Rule serves two equally important functions: (1) the
protection of the accused's speedy trial rights, and (2) the
protection of society. Id.

> In determining whether an accused's right to a speedy
> trial has been violated, consideration must be given to
> society's right to effective prosecution of criminal
> cases, both to restrain those guilty of crime and to
> deter those contemplating it. However, the
> administrative mandate of Rule 600 was not designed
> to insulate the criminally accused from good faith
> prosecution delayed through no fault of the
> Commonwealth.

Id. (quoting Commonwealth v. Aaron, 804 A.2d 39, 42 (Pa.
Super. 2002) (*en banc*)). So long as there has been no
misconduct on the part of the Commonwealth in an effort to
evade the fundamental speedy trial rights of an accused,
Rule 600 must be construed in a manner consistent with
society's right to punish and deter crime. Id. In considering
these matters, courts must carefully factor into the ultimate
equation not only the prerogatives of the individual accused,
but the collective right of the community to vigorous law

enforcement as well.  Id.  "Strained and illogical judicial construction adds nothing to our search for justice, but only serves to expand the already bloated arsenal of the unscrupulous criminal determined to manipulate the system." Id.

Rule 1100, now 600, was designed to implement the speedy trial rights provided by the Sixth Amendment to the United States Constitution and by Article 1, Section 9 of the Pennsylvania Constitution.  Commonwealth v. DeBlase, 542 Pa. 22, 30, 665 A.2d 427, 431 (1995).  The constitutional provisions themselves continue to provide a separate basis for asserting a claim of undue delay in appropriate cases. Id.  The first step in determining whether a technical violation of Rule 600 has occurred is to calculate the "mechanical run date."  Aaron, 804 A.2d at 42.  The mechanical run date is the date by which the trial must commence under Rule 600. Id.  It is calculated by ascertaining the number of days in which the Commonwealth must commence trial under Rule 600 and counting from the date on which the criminal complaint was filed.  Id.  The mechanical run date can be modified or extended by adding any periods of time in which the defendant causes delay.  Id.  Once the mechanical run date is modified accordingly, it then becomes an "adjusted run date."  Id.

Rule 600 takes into account both "excludable time" and "excusable delay."  Hunt, 858 A.2d at 1241.  "Excludable time" is defined in Rule 600 (C) as the period of time between the filing of the written complaint and the defendant's arrest, provided that the defendant could not be apprehended because his whereabouts was unknown and could not be determined by due diligence; any period of time for which the defendant expressly waives Rule 600; and/or such period of delay at any stage of the proceedings as results from: (a) the unavailability of the defendant or the defendant's attorney; and/or (b) any continuance granted at the request of the defendant or the defendant's attorney. Hunt (citing Pa.R.Crim.P. 600(C)).  The "due diligence" required under Rule 600(C)(1) pertains to the Commonwealth's efforts to apprehend the defendant.  Id. at 1241 n.10.  The other aspects of Rule 600(C) defining "excludable time" do not require a showing of due diligence

> by the Commonwealth. Id. "Excusable delay" is not
> expressly defined in Rule 600, but the legal construct takes
> into account delays which occur as a result of circumstances
> beyond the Commonwealth's control and despite its due
> diligence. Id. See id., 858 A.2d at 1241-42 (explaining
> manner in which excludable time, excusable delay and due
> diligence are to be determined). See also DeBlase, 542 Pa.
> at 30-31, 665 A.2d at 431 (discussing excludable time and
> excusable delay).

Commonwealth v. Murray, 879 A.2d 309, 312-13 (Pa. Super. 2005). Additionally, the

Commonwealth fails in its duty to exercise due diligence if it "files a pre-trial appeal in

bad faith without the right to do so." Commonwealth v. Matis, 551 Pa. 220, 230, 710

A.2d 12, 17 (1998).

In this case, the criminal complaint was filed on September 4, 2001, and

Love was arrested on February 14, 2002. Love has never asserted that the

Commonwealth did not exercise due diligence, and so the mechanical run date of

September 4, 2002,[28] therefore is adjusted by 163 days to February 14, 2003. Love

requested the following continuances:

| | |
|---|---|
| May 6, 2002, to September 9, 2002 | 126 days |
| September 9, 2002, to December 9, 2002 | 91 days |
| March 14, 2005, to June 20, 2005 | 98 days |
| June 20, 2005, to August 1, 2005 | 42 days |
| August 1, 2005, to September 12, 2005 | 42 days |

The continuances requested by Love amounted to 399 days, and so the adjusted run

date became March 19, 2004.

---

[28] September 4, 2001, is excluded from this calculation. 18 Pa.C.S.A. §1908 (first day of statutory period is excluded when computing a time period); Pa.R.Crim.P. 101(C) (incorporating rules of statutory construction).

The Commonwealth filed its first notice of appeal on November 1, 2002, and this Honorable Court quashed the appeal based on Commonwealth v. Cosnek, 575 Pa. 411, 836 A.2d 871 (2003), on January 12, 2004. The Commonwealth thereafter filed a Petition for Allowance of Appeal, which it withdrew based on the agreement reached between the parties and with the approval of the trial court on February 12, 2004. Love concedes that the first appeal was taken in good faith. (See Brief for Appellant at 49 ("It is this *second* appeal that the Appellant believes was not done in good faith because it was clearly untimely"; emphasis added)). Nevertheless, it should be noted that the Commonwealth reasonably believed that it had the right to appeal:

> There exists a sizeable body of case law discussing the Commonwealth's right under 311(d) to file pretrial appeals. The most familiar cases are those addressing the admission or exclusion of evidence. Rule 311(d) has been held applicable to an order of suppression, Commonwealth v. Dugger, 506 Pa. 537, 486 A.2d 382 (1985); an order granting a defendant's motion in *limine* to exclude certain evidence, Commonwealth v. King, 456 Pa. Super. 72, 689 A.2d 918 (1997); and an order granting a defendant's motion in *limine* to admit certain evidence, Commonwealth v. Allburn, 721 A.2d 363 (Pa. Super. 1998), *appeal denied,* 559 Pa. 662, 739 A.2d 163 (1999).
>
> But in the past decade, we have deemed several non-evidentiary pretrial orders to be appealable as of right by the Commonwealth. For instance, the Commonwealth may appeal an order precluding it from seeking the death penalty, Commonwealth v. Buonopane, 410 Pa. Super. 215, 599 A.2d 681 (1991), *appeal denied,* 530 Pa. 651, 608 A.2d 27 (1992); an order transferring a case from criminal to juvenile court, Commonwealth v. Johnson, 542 Pa. 568, 669 A.2d 315 (1995); and an order denying a Commonwealth request for a continuance in order to secure a witness, Commonwealth v. Matis, 551 Pa. 220, 710 A.2d 12 (1998).

In each of these cases, the appellate court determined that the nature of the order made an appeal as of right proper.

Commonwealth v. White, 818 A.2d 555, 558 (Pa. Super. 2003).

Even after Cosnek, it is not the law that Rule 311(d) allows the Commonwealth to appeal *only* when its evidence is suppressed, precluded or excluded:

> There are, of course, other types of orders that *Cosnek* did not address, but which may also be appealable under Rule 311(d). *See, e.g.,* Commonwealth v. Boos, 533 Pa. 124, 620 A.2d 485 (1993) (order reinstating appellee into ARD program was immediately appealable as it had the effect of terminating DUI charge); Commonwealth v. Hughes, 468 Pa. 502, 364 A.2d 306, 308 n.2 (1976) (order quashing some, but not all, of charges against defendant was immediately appealable).

Commonwealth v. Shearer, 584 Pa. 134, 141 n.6, 882 A.2d 462, 466 n.6 (2005).

To all of this it may be added that an order denying a Commonwealth motion to disqualify defense counsel may have the effect of precluding the Commonwealth from presenting evidence. That is, the rule relating to conflicts of interest serves the purpose of encouraging free communication between counsel and client. If, as occurred in this case, a witness is faced with the possibility of being cross-examined by former counsel, the witness is unlikely to want to undergo the experience. Also, the Commonwealth is faced with the prospect of calling a recalcitrant witness who is more vulnerable to attacks on his or her credibility because of the former relationship, thereby diminishing the value of the testimony. The Commonwealth's inability to protect its witnesses via a pretrial appeal disserves the interests for which the conflict rule exists.

It was not at all clear, then, that the <u>Cosnek</u> rule necessarily precluded a Commonwealth appeal under the circumstances of this case, even after that opinion issued, and the Commonwealth did not act in bad faith by pursuing what appeared to be a legitimate avenue of appeal.

Love posits two primary arguments in this regard. He first argues that all Commonwealth appeals are subject to the expiration of the time permitted under Rule 600. Nothing in Rule 600 so provides, and <u>Matis</u> and other cases are to the contrary: a Commonwealth appeal tolls Rule 600 unless it is taken in bad faith. Indeed, if a Commonwealth appeal did not toll Rule 600, it would be fruitless for the Commonwealth to appeal in the vast majority of cases, as the time permitted would nearly always expire during the pendency of the appeal.

Love also claims that the Commonwealth took the second appeal in bad faith, as evidenced by this Honorable Court's finding that the appeal was untimely. After this Honorable Court quashed the first appeal, the Commonwealth entered into an agreement with the defense that was approved by the trial court. Under that agreement, the trial court would certify the Commonwealth's appeal as interlocutory. In return, Love was granted bail and the trial court certified an interlocutory appeal of the denial of Love's Rule 600 motion. Love (like the Commonwealth) filed a Motion for Leave to File Pretrial Appeal Nunc Pro Tunc on May 5, 2004, and the trial court granted that motion on June 4, 2004.

Contrary to Love's position that any appeal continued to be subject to the expiration of the time permitted under Rule 600, Love's entry into the agreement tolled

the clock. "If the defense indicates approval or acceptance of the continuance, the time associated with the continuance is excludable under Rule 600 as a defense request." Commonwealth v. Brown, 875 A.2d 1128, 1135 (Pa. Super. 2005) (quoting Commonwealth v. Hunt, 858 A.2d 1234, 1241 (Pa. Super. 2004), which cited Commonwealth v. Guldin, 502 Pa. 66, 71, 463 A.2d 1011, 1014 (1983)). Love indicated acceptance of the continuance when he entered into the agreement because he knew that the Commonwealth would appeal based on the certification permitted under the agreement. Despite defense counsel's assertions that Rule 600 would continue to apply, entry into the agreement tolled Rule 600 as a matter of law. The time therefore is excludable as a defense request.

Furthermore, the Commonwealth based its second attempt to appeal in large part on a Concurring Statement by Judge Klein in the first appeal. While agreeing with the majority that Cosnek precluded review under Rule 311(d), Judge Klein opined:

> In this case, I think proceeding with the Public Defender representing Love can easily create problems that could result in a mistrial or set up a PCRA claim. The potential conflicts are legion. This is not a misdemeanor or summary offense that is being charged. It is first degree murder. I cannot see why the Public Defender, in the face of multiple conflicts, wishes to persist in representing Love, and why the trial court would permit these multiple conflicts to continue in such a serious case. While the Commonwealth did not request certification of an interlocutory appeal from an adverse pretrial order under Pa.R.A.P. 1311, under the prior law by this Court that did not appear necessary. I would hope that it would not be deemed untimely if the Commonwealth would attempt to do that on remand.

(Memorandum Opinion filed January 12, 2004, Concurring Statement at 2).

Relying on the opinion of a respected appellate judge hardly amounts to "bad faith" on the part of the Commonwealth.

As such, the Commonwealth respectfully submits that Rule 600 was tolled during the pendency of the two appeals. The first appeal was pending between November 1, 2002, through March 8, 2004 (493 days), and the second appeal was pending between April 14, 2004, and November 23, 2004 (223 days). The adjusted run date, formerly March 19, 2004, becomes March 5, 2006.

Even if the time after this Honorable Court quashed the first appeal is counted against the Commonwealth, that is, after January 12, 2004, the time between November 1, 2002, and that date is 437 days, and the adjusted run date would be January 8, 2006.

The other possibility is to count the time from the issuance of <u>Cosnek</u> as no longer tolling the time under Rule 600, that is, after November 24, 2003. The time between November 1, 2002, and that date is 388 days, and the adjusted run date would be November 20, 2005.

For any of these events, the trial started on September 12, 2005, well within the time permitted under Rule 600.

As noted, Love also makes an argument based on constitutional speedy trial principles. The Commonwealth takes the position that the issue is waived, but will address the claim on the merits.

> In <u>Commonwealth v. Africa</u>, 524 Pa. 118, 569 A.2d 920 (1990), our Supreme Court articulated that a two-step process is used to analyze alleged violations of

Pennsylvania's speedy trial rule.  Preliminarily, we must determine if the delay itself was sufficiently long to be presumptively prejudicial.  Id. at 123, 569 A.2d at 923.  If we determine the delay to be presumptively prejudicial, the court then applies a balancing test wherein four factors are considered: the length of delay, reason for delay, defendant's assertion of the right to a speedy trial, and any prejudice to the defendant arising from the delay.[9]  Id.

---

[9] The balancing test was originally set forth in Barker v. Wingo, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).

Kimbrough, at 1256.  The delay in this case is sufficiently long to be presumptively prejudicial under Africa.  See Kimbrough at 1257.

The length of the delay was approximately four years.  The reason for the delay was the conflict of interest on the part of the Public Defender's Office and the Commonwealth's appeals from the denial of its motion to disqualify the Public Defender's Office.  As noted by Judge Klein, the Public Defender insisted on representing Love despite multiple, actual conflicts of interest.  The Commonwealth established the merit of its motion in the briefs filed in the quashed appeals.

The Constitution of the Commonwealth of Pennsylvania provides, "In all criminal prosecutions the accused hath a right to be heard by himself and his counsel…"  PA. CONST. art. 1, § 9.  This provision gives to a criminal defendant the right to counsel of his or her own choosing.  Commonwealth v. Hess, 532 Pa. 607, 620, 617 A.2d 307, 314 (1992).  The right to counsel of choice, however, is not absolute and may be impaired or eliminated by state regulation designed to provide for overriding state interests or individual constitutional guarantees that are in conflict with the right to chosen counsel.  Id.

In balancing these conflicting interests, four factors must be considered: "(1) Whether the state interest sought to be achieved can be effectively

accomplished in some manner which will not infringe
upon interests protected by constitutional rights; (2)
Whether the state interest is sufficiently compelling
when compared with the interests affected, justifies
any infringement of those interests; (3) Whether the
state interest is sufficiently compelling to justify the
degree of infringement that is necessary to effectuate
that interest; (4) Whether the provision under
challenge represents the narrowest possible
infringement consistent with effectuating the state
interest involved."

Id., at 621, 617 A.2d at 314 (quoting Moore v. Jamieson, 451
Pa. 299, 310-11, 306 A.2d 283, 289 (1973)).  See also Pirillo
v. Takiff, 462 Pa. 511, 529-30, 341 A.2d 896, 905 (1975)
(same factors).

When the case involves a conflict of interest on the
part of an attorney, the trial court, in the exercise of its
inherent power to control litigation and supervise attorneys
appearing before the court, has the power to grant a motion
to disqualify and remove the offending lawyer.  Pirillo at 529,
341 A.2d at 904.

The test for determining whether there is an impairing
conflict is probability, not certainty… A court is not
bound to sit back and wait for a probability to ripen
into a certainty; it may restrain conduct which has the
potential for evolving into a breach of ethics before
such conduct becomes ripe for disciplinary action. …

Id., at 529, 341 A.2d at 905 (citations omitted).

The other source of the right to counsel of choice is
the Sixth Amendment to the Constitution of the United
States, which provides, "In all criminal prosecutions, the
accused shall enjoy the right … to have the assistance of
counsel for his defence." U.S. CONST. amend. VI.  A criminal
defendant has the right to conflict-free counsel under the
Sixth Amendment because the type of effective assistance
of counsel necessary to put the government to its proofs in
an adversarial manner requires such counsel.  United States
v. Moscony, 927 F.2d 742, 748 (1991) (citing United States

v. Cronic, 466 U.S. 648, 656, 656 n.15, 661 n.28 (1984)). In determining whether to accept a waiver of conflicts of interest on the part of counsel, a court must consider:

> (1) the court's institutional interest in protecting the truth-seeking function of the proceedings; (2) the defendant's right to the effective assistance of counsel, regardless of the proffered waiver; protection of attorney-client communications, and the candor between counsel and client such protection engenders; (4) promotion of respect for the court in general through enforcement of ethical rules; and (5) protection of a fairly rendered verdict from trial tactics designed to generate issues for appeal.

United States v. Stansfield, 874 F. Supp. 640, 643 (M.D. Pa. 1995) (citing Moscony, at 749).

Courts examining motions to disqualify counsel under the Sixth Amendment consistently have ruled in favor of disqualification when counsel will be cross-examining a former client. See United States v. Albert, No. Crim. A. 97-404-01, 1997 WL 773155, at *3 (E.D. Pa. 1997) (collecting cases).

This case involves several conflicts of interest. As noted by the trial court, "Both the Defendant and a man known as LaQuan Williams were suspects in the murder investigation." Memorandum Opinion filed December 24, 2002. Indeed, there is evidence that Williams made statements to the effect that he knew that Iris Fennell had informed the police as to his whereabouts after he committed a brutal rape and attempted murder. (Notes of Testimony of Pretrial Hearing dated October 29, 2002, at 30-31). Also, there was evidence that Williams was present at the scene of Iris Fennell's murder. Id. at 27-28. Rather obviously, then, Williams had the opportunity and the motive to kill Iris Fennell, and, since there is no evidence of other persons present at the scene, plainly is the likely killer of Iris Fennell if Love is not the murderer. The Dauphin County Public Defender's Office represented Williams during the pendency of the rape charge.

A second conflict of interest involves Andre Knight, the boyfriend of Guillermina Cruz at the time of the murder of Iris Fennell. Knight has been represented on a number of occasions by the Public Defender's Office.

Finally, Cruz[29] herself was represented by the Public Defender's Office because, initially, she provided a false statement amounting to an alibi for herself and Love. She later was adjudicated delinquent for hindering apprehension or prosecution based on that statement. After admitting her knowledge of Love's involvement in Iris Fennell's murder, Cruz began to recant that statement during a preliminary hearing. The hearing was continued by the District Justice and, when it resumed, Cruz asserted her Fifth Amendment privilege against self-incrimination on the advice of counsel from the Public Defender's Office.

Cruz now is a key Commonwealth witness and has signed a statement specifically refusing to waive any conflict of interest on the part of the Public Defender's Office.

The applicable ethical standard reads as follows:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are **materially adverse** to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation; or

---

[29] In an Order directing the Commonwealth to show cause why the instant appeal should not be quashed as untimely, this Honorable Court noted that the appeal was filed more than thirty days after the trial Court's Order denying the Commonwealth's Petition to Disqualify Counsel. That Petition and Order dealt with the conflict of interest as it relates to Cruz. Given the necessity to review all of the circumstances of the case and the factors outlined above, the Commonwealth respectfully submits that the circumstances surrounding Cruz remain relevant to the analysis.

> (b) use information relating to the
> representation to the disadvantage of the
> former client except as Rule 1.6 would permit
> with respect to a client or when the information
> has become generally known.

Pa. R.Prof. Conduct 1.9 (emphasis added). Of course, when multiple lawyers are associated in a firm, none of the lawyers may represent a client when any one of those lawyers would be barred from doing so under, *inter alia*, Rule 1.9. Pa. R. Prof. Conduct 1.10(a). Public defenders are members of the same law firm for purposes of conflicts of interest. Commonwealth v. Westbrook, 484 Pa. 534, 539-540, 400 A.2d 160, 162 (1979) (citing Commonwealth v. Via, 455 Pa. 373, 316 A.2d 895 (1974)).

Obviously, as a prime suspect in this case, Williams has an interest in the conviction of another person, i.e. Love. Love has the same interest in pointing the finger at Williams. Because the Public Defender's Office has represented Williams, it is privy to information concerning his past and specifically to the rape for which he stands convicted. If that information is used, the Public Defender's duty of confidentiality to Williams, see Pa. R. Prof. Conduct 1.6, would be violated. If that information is not used, there would be a violation of the duty to advocate on behalf of Love. See Pa. R. Prof. Conduct 3.1 and Comment ("The advocate has a duty to use legal procedure to the fullest benefit of the client's cause, …").

Additionally, Knight has an interest adverse to Love. Knight attempted to help Cruz fell the jurisdiction to avoid further questioning about the Iris Fennell murder. The boyfriend of Cruz at the time, Knight later was charged with criminally trespassing in Cruz's home. On January 13, 2003, Knight entered a plea of guilty to a reduced charge of stalking and was sentenced to 4 to 23 months in jail. Commonwealth v. Knight, No. 515 CR 2002 (Dauphin County). Knight is subject to being called as a witness by the Commonwealth based on his knowledge of Cruz's flight. The Public Defender's Office has represented him on numerous occasions in the past, but filed a petition for the appointment of conflict counsel in the criminal trespass case.

Once again, a former client of the Public Defender's Office would be subject to cross-examination by his former attorney.

Finally, Cruz clearly has an interest adverse to that of Love. She now is a key Commonwealth witness against Love. If the Public Defender's Office is not disqualified, she would be the third former client to be subject to cross-examination by the Public Defender's Office. She has declined to waive the conflict of interest.

While ruling against the Commonwealth with respect to the disqualification of defense counsel, the trial court appears to concede that there is a conflict of interest or at least a serious potential for conflict of interest. The trial court, in its Orders dated August 8, 2002, and October 30, 2002, directed that "Chinese walls" be erected to prevent current counsel from learning any confidential information concerning these cases. There would be no reason for such an action absent at least a serious potential for conflict of interest.

According to the trial court, the Commonwealth must establish that there is confidential information in the possession of the Public Defender's Office that could be used against Cruz, Williams, and/or Knight on cross-examination, and that such information is not a matter of public record. This is a self-defeating proposition: If the Commonwealth were aware of any such information, it would not be confidential, and the Commonwealth's recitation of any such information in a motion or brief would make the information a matter of public record. As the opinions on the subject consistently make clear, the proof of a conflict of interest need not be, indeed cannot be, so specific as the trial court required of the Commonwealth in this Case:

> Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of

interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics. Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.

United States v. Wheat, 486 U.S. 153, 162-163 (1988).

The primary opinion cited by the trial court in its Memorandum of December 24, 2002, is Commonwealth v. Cassidy, 390 Pa. Super. 359, 568 A.2d 693 (1989), in which the Commonwealth moved to disqualify defense counsel based on a conflict of interest. The only information recited by the Commonwealth was summarized by this Honorable Court:

> In the Commonwealth's Petition to Disqualify Counsel, it is alleged that Mr. Fitzpatrick represented former police officer Leo Ryan in a federal prosecution in 1987. Following Ryan's conviction, he began to cooperate with the federal government and the Commonwealth. The Commonwealth alleges that Leo Ryan "will testify at Cassidy's trial and his testimony will relate to his personal observations of Cassidy as well as [ ] conversations he had with Cassidy [and that] Mr. Fitzpatrick can not effectly [sic] cross examine Mr. Ryan without revealing confidences he learned by representing Mr. Ryan or at a minimum, appearing to do so."

<u>Cassidy</u>, at 370, 568 A.2d at 698.  This Honorable Court found this information to be insufficient to warrant a finding of an actual conflict of interest or even a serious potential for a conflict of interest.  <u>Id</u>., at 371-72, 568 A.2 at 699.

In contrast to <u>Cassidy</u>, however, in which defense counsel formerly had represented a single potential witness in a separate proceeding, counsel in this case has represented a key Commonwealth witness in proceedings relating to *this* case, and represented the only other suspect in this case in proceedings relating to *this* case.  A closer analogy may be drawn to <u>Commonwealth v. Coffey</u>, 415 Pa. Super. 131, 608 A.2d 560 (1992), in which the same defense attorney represented two defendants who were alleged to have furnished alcohol to minors.  Because one of the defendants had given a statement admitting that the alcohol had been purchases and shared with the minors but denied making the purchase himself, the defendants had divergent interests and defense counsel was properly disqualified.  Williams, Cruz and Knight all have interests adverse to Love.  In the case of Cruz, there is an actual conflict of interest, while there are at least nascent conflicts relating to Williams and Knight.  <u>See also</u> <u>United States v. Calabria</u>, 614 F. Supp. 187 (E.D. Pa. 1985)(grounds for disqualification existed where defense counsel formerly represented key prosecution witness, based on attorney's continuing duty of confidentiality to witness).

In terms of the factors discussed in <u>Hess</u>, there is plainly a compelling state interest in protecting the integrity of court proceedings.  As in <u>Coffey</u>, the best means to achieve that interest is to disqualify defense counsel.  The alternative imposed by the trial court, a "Chinese wall," is insufficient.  In fact, the "Chinese wall defense" is a very limited concept.

> "'Chinese Walls' have been used to avoid disqualification in relatively few cases.  They are most commonly accepted by the courts when an attorney has moved from government to private practice and is now a member of a private firm which represents clients who are current adversaries of the government agency at which that attorney was formerly employed.

Disqualification has been avoided in some cases when the 'Chinese Wall' was established prior to the arrival of the new attorney at the firm and when the 'Chinese Wall' in question is a formal, written, screening procedure." INA Underwriters Insurance Co. v. Nalibotsky, 594 F. Supp. 1199 (E.D. Pa. 1984).

Heimbuch v. Manufacturer's Ass'n of Northwestern Pennsylvania, 46 Pa. D.&C.4th 208, 210 (2000). See also Maritrans GP Inc. v. Pepper, Hamilton & Scheetz, 529 Pa. 241, 264-266 and nn.1-3, 602 A.2d 1277, 1289-90 and nn. 1-3 (1992) (Nix, C.J. dissenting). The defense is based on Rule 1.11 of the Model Rules of Professional Conduct, found in the Pennsylvania Rules of Profession Conduct at Rule 1.10. The defense applies primarily to instances in which a new lawyer becomes associated with a firm (Rule 1.10(b)). It simply does not apply to instances in which multiple members of a law firm (the Public Defender's Office) have represented the defendant along key witnesses and suspects in a murder case, particularly when the representation took place before and during the course of the murder prosecution.

Additionally, the imposition of the "Chinese walls" comes far too late to protect the rights of persons other than Love. Numerous attorney, investigators, paralegals, etc., have been involved in the cases of Love, Cruz, Williams, and Knight. A "Chinese wall" is intended to prevent the spread of information through a law firm before it starts, not long after the information has become available within the firm. See Heimbuch at 210 (factors to be considered in examining adequacy of "Chinese Wall" include timing of the screen, prohibition of discussion of sensitive matters, restricted circulation of sensitive documents, and restricted access to files). Imposing a "Chinese wall" at this time is like building a dam after the flood.

The trial court also placed great emphasis on Love's purported waiver of the conflict on the part of his counsel. Actually, the waiver is not likely to be found knowing and intelligent since it was done after consultation with counsel subject to the conflict. Regardless, Cruz not only did not waive the conflict for her own part, she specifically declined

> to effect such a waiver. Nothing in the record indicates the
> intentions of Williams or Knight as to a waiver of the
> conflicts. Because other persons' interests are involved,
> Love's waiver is of no moment to the determination of the
> request for disqualification.
>
> In short, then, there are multiple conflicts of interest,
> both actual and nascent, present in this case. This individual
> defendant's right to counsel of choice is vastly outweighed
> by the state interests in providing a fair trial, protecting the
> integrity of the proceedings, and protecting the rights of
> persons not on trial. The remedy chosen by the trial court,
> and no alternative was suggested by the defense, simply is
> insufficient to remedy the problem. Under the circumstances
> of this case, any attorney from the Dauphin County Public
> Defender's Office should be disqualified.

(Brief for Appellant filed by the Commonwealth in the first appeal). It is respectfully

submitted that, not only was the Commonwealth correct in its assertion that conflicts of

interest existed, the Commonwealth constitutional duty to ensure a fair trial required it to

make the efforts that it did to protect not only the other witnesses and potential

witnesses, but Love himself. The Commonwealth had very good reason for its appeals.

It should be noted in this context that continuances requested by the

defense constituted a large portion of the delays in this case. In fact, Love requested

continuances from March 14, 2005, to September 12, 2005, *after* the Commonwealth's

appeals. Plainly, Love was in no hurry to proceed to trial.

As to the defendant's assertion of his rights, Love first moved for nominal

bail on September 18, 2002. He did not file his motion to dismiss until December 8,

2003, while the case was on appeal. Of course, because the case was on appeal, the

trial court did not have jurisdiction to rule on the motion.[30]  Love took no action with

respect to Rule 600 in a court with jurisdiction until arguing it after the remand, and then

he waived his rights under Rule 600 by agreeing to the certification of the second

appeal.  He further waived those rights by continuing the case for another six months.

Finally, there was little, if any, prejudice to the defense.  Love points to

minor lapses in memory on the part of witnesses, all of which were corrected by

refreshing the witness's recollection.  These instances do not amount to substantial

prejudice.  Love points to no witness that he would have called that had become

unavailable.

In short, then, while there was a delay, there were very good reasons for

the delay, Love asserted his speedy trial rights half-heartedly in the wrong court and

then waived his rights, and there was no substantial prejudice arising from the delay.

Love's constitutional right to a speedy trial was not violated.

Love also makes an argument that the trial court erred by granting the

Commonwealth's motion for reinstatement of the right to appeal *nunc pro tunc*.  This

issue is moot because the appeal was quashed.  With respect to the impact on the Rule

600 analysis, as noted above, the action taken by the Commonwealth was suggested in

Judge Klein's concurring opinion and Love acceded to the reinstatement.  There was no

bad faith on the part of the Commonwealth in attempting that avenue of appeal.

---

[30]  Indeed, although the trial court issued a Rule to Show Cause on the Commonwealth, it had
no jurisdiction to require an answer to Love's motion.

B. THE TRIAL COURT PROPERLY PERMITTED INTRODUCTION
OF THE PRELIMINARY HEARING TESTIMONY OF A
COMMONWEALTH WITNESS WHO WAS UNAVAILABLE
FOR TRIAL WHEN THE DEFENSE HAD A FULL AND FAIR
OPPORTUNITY TO CROSS-EXAMINE THE WITNESS AT
THE TIME OF THE PRELIMINARY HEARING.

Love contends that the trial court erred by permitting the Commonwealth

to read into evidence the transcript of the testimony of Guillermina Cruz at the

preliminary hearing.

> "The admission or exclusion of evidence is within the
> sound discretion of the trial court, and in reviewing a
> challenge to the admissibility of evidence, we will only
> reverse a ruling by the trial court upon a showing that it
> abused its discretion or committed an error of law." B.K. v.
> J.K. 823 A.2d 987, 991-92 (Pa. Super. 2003). "Thus our
> standard of review is very narrow.… . To constitute reversible
> error, an evidentiary ruling must not only be erroneous, but
> also harmful or prejudicial to the complaining party."
> Hawkey v. Peirsel, 869 A.2d 983, 989 (Pa. Super. 2005)
> (citing Turney Media Fuel, Inc. v. Toll Bros., 725 A.2d 836,
> 839 (Pa. Super. 1999)).

McManamon v. Washko, 2006 PA Super 245, 11-12 (August 31, 2006).

The trial court permitted the testimony under Pa.R.E. 804, which provides

in relevant part:

> **(a) Definition of unavailability.** "Unavailability as a
> witness" includes situations in which the declarant:
> 
> …
> 
> (5) is absent from the hearing and the proponent of
> a statement has been unable to procure the
> declarant's attendance … by process or other
> reasonable means.

**(b) Hearsay Exceptions.** The following statements, as hereinafter defined, are not excluded by the hearsay rule if the declarant is unavailable as a witness:

> (1) *Former testimony.* Testimony given as a witness at another hearing of the same or a different proceeding, … if the party against whom the testimony is now offered, … had an adequate opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Pa.R.E. 804(a)(5), (b)(1). <u>See also</u> 42 Pa.C.S.A. §5917 (to same effect).

After a hearing, the defense conceded that Cruz was unavailable (N.T.III 31) due to her failure to appear for court and the Commonwealth's extensive efforts to locate her. (N.T.III 5-30). For present purposes, then, the issue is whether the defense had a "full and fair opportunity to cross-examine the witness at the first proceeding." <u>Commonwealth v. Strong</u>, 825 A.2d 658, 662 (Pa. Super. 2003) (quoting <u>Commonwealth v. Chmiel</u>, 558 Pa. 478, 499, 738 A.2d 406, 417 (1999); emphasis omitted).

While prior inconsistent statements of a witness may be admissible to impeach the credibility of the witness, "[m]ere dissimilarities or omissions in prior statements … do not suffice as impeaching evidence; the dissimilarities or omissions must be substantial enough to cast doubt on a witness' testimony to be admissible as prior inconsistent statements." <u>McManamon</u>, at 11 (citing <u>Commonwealth v. Bailey</u>, 469 A.2d 604, 611 (Pa. Super. 1983)).

During a hearing outside the presence of the jury, the trial court repeatedly tried to ascertain from defense counsel what materials were not available for

impeachment at the time of the preliminary hearing.  (See N.T.III 34 (asking for specific objection), 40 (trying to ascertain what material was available and what was unavailable), 45 (asking about alleged inconsistencies in grand jury testimony), 49 (asking for any other materials not available to the defense at the time of the preliminary hearing), 50-51 (same), 51-52 (same)).

It turned out that at least one piece of evidence, a statement by Cruz on December 20, 1996, that the defense claimed was unavailable had in fact been turned over to prior defense counsel.  (N.T.III 56-57).

Love points to statements given by Cruz on March 24, 2001, and on February 19, 2002.  However, he points to no impeachment material in those statements, and so he cannot claim to have been prejudiced by the unavailability of those statements.

Love next argues that he needed Cruz's grand jury testimony of March 28, 2001, which was not disclosed due to grand jury secrecy rules.  He points to testimony by Cruz that she did not see Williams (Kazar) at Fennell's apartment on the morning of the murder.  This testimony, however, is consistent with Cruz's prior statements and preliminary hearing testimony.[31]  Cruz in effect was reverting to her prior statements, which were available to Love.

---

[31]  Love does not indicate why he would impeach Cruz on the absence of Williams in the apartment, since proving that fact would make it more likely that Love was the shooter.

Love claims that he needed information that Cruz had given different versions of events. That information was available from the first preliminary hearing (as continued).

Love also indicates that he did not have information that Cruz had made a statement that she met him later in the day and that he told her to provide the alibi story she first gave to police. That statement would corroborate, not impeach, Cruz, since it would explain why she gave the earlier, inconsistent statement. It should be noted that Love did not identify this statement to the trial court when asked. (See citations above regarding trial court trying to focus Love's objection).

Love next argues that some of this information was not available to Monty Batson, Esquire, the Assistant Public Defender who cross-examined Cruz at the second preliminary hearing. A "full and fair opportunity" does not mean that the Commonwealth has to re-provide statements and information every time a new attorney represents a defendant. The information was provided or otherwise available to the defense.

Finally, Love points to statements by other witnesses that were not available. He does not indicate how a statement by another person must be available for full and fair cross-examination. To the contrary, those statements must take the form of testimony and the credibility of each witness is left to the jury. Further, Love never identified these statements as part of his objection at the time of trial,[32] and so the argument is waived.

---

[32]   Indeed, the record does not establish that these statements and witnesses were unavailable to the defense at the time of the preliminary hearing.

As the trial court points out, there simply was no "vital impeachment evidence" that was not available to the defense at the time of the preliminary hearing in 2002. Memorandum Opinion Pursuant to Rule 1925(a) at 4.

      C.     THE TRIAL COURT PROPERLY EXCLUDED EVIDENCE OFFERED UNDER Pa.R.E. 404 RELATING TO A PRIOR RAPE AND ATTEMPTED MURDER BY A THEORETICAL ALTERNATIVE SUSPECT WHEN THE PRIOR "BAD ACT" DID NOT CONSTITUTE A SIGNATURE CRIME.

Love contends that the trial court erred by excluding evidence of a prior rape and attempted murder by Williams. Love argued that this evidence was admissible under Pa.R.E. 404(b) as evidence of the identity of the perpetrator. He concedes that the acts must be similar enough to show the "signature" of the perpetrator. (Brief for Appellant at 65 (citing Commonwealth v. Frank, 577 A.2d 609, 614 (Pa. Super. 1990)).

Corporal George Cronin of the Criminal Investigation Assessment Office of the Pennsylvania State Police testified about his experience investigating homicides and serial sex offenders. (N.T.I 32-34). Part of his job entails determining a suspect's modus operandi and evidence of signature aspects of a crime scene. (N.T.I 32-33). He pointed out substantial differences between the two crimes scenes, including the disordered nature of the Fennell scene versus the relatively neat scene of Ames' rape, the moving of Fennell's body and posing in a sexually provocative manner, the excessive violence inflicted on Fennell versus the absence of excessive force once Williams had control over Ames, etc.

To this it might be added that, despite the sexual posing of Fennell's body, there was no evidence of a sexual assault. The attack on Ames plainly was for the purpose of a sexual assault, with the homicide attempt constituting an effort to cover up the crime. The attack on Fennell, by contrast, was a murder with the sexual aspect of the crime an afterthought, i.e., the body was posed in a sexually degrading manner *after* the homicide. There was no evidence that the attack on Fennell was sexually motivated at the outset.

Given these dissimilarities, the trial court properly concluded that any probative value of evidence of the rape of Ames was outweighed by the potential for prejudice.

### D. THE TRIAL COURT PROPERLY EXERCISED ITS DISCRETION AT THE TIME OF SENTENCING.

This Honorable Court has stated the standard governing review on appeal from the discretionary aspects of sentencing. A defendant is not automatically entitled to appeal the discretionary aspects of sentencing, but allowance of appeal will be granted at the discretion of the appellate court. The record must demonstrate that there is a substantial reason for allowing appeal. Initially, a defendant must include in the brief for appellant concise statement of the reasons relied upon for allowance of appeal. This Honorable Court will allow an appeal from the discretionary aspects of sentencing when the appellant advances a colorable argument that the sentencing court's actions were inconsistent with a specific provision of the Sentencing Code or contrary to the

fundamental norms that underlie the sentencing process.  Commonwealth v. Celestin, 825 A.2d 670, 676 (Pa. Super. 2003).  See also Pa.R.A.P. 2119(f); Commonwealth v. Tuladziecki, 513 Pa. 508, 522 A.2d 17 (1987).

Love has failed to include in his Brief for Appellant the statement required under Rule 2119(f).  The Commonwealth hereby objects to the omission and submits that the issue is waived.  Because this Honorable Court may determine to review the issue, the Commonwealth will address the claim on the merits.

In Celestin, this Honorable Court also recited the standard for reviewing the merits of an appeal from the discretionary aspects of sentencing:

> "[S]entencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion."  [Commonwealth v. Kenner, 784 A.2d 808, 811 (Pa. Super. 2002).]
>
> A sentencing court has broad discretion in choosing the range of permissible confinements which best suits a particular defendant and the circumstances surrounding his crime.  However, the choices *must* be "consistent with the protection of the public, the gravity of the offense, *and* the rehabilitative needs of the defendant."
>
> Commonwealth v. Moore, 420 Pa. Super. 484, 617 A.2d 8, 12 (Pa. Super. 1992) (quoting Commonwealth v. Devers, 519 Pa. 88, 546 A.2d 12, 13 (1988) (emphasis added)).  This Court is required to vacate a sentence and remand for resentencing if we find, as the Commonwealth argues here, that "the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable." 42 Pa.C.S.A. §9781(c)(3).  In determining whether a sentence is unreasonable, an appellate court shall have regard for:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant[;]

(2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation[;]

(3) The findings upon which the sentence was based[; and]

(4) The guidelines promulgated by the commission.

42 Pa.C.S.A. §9781(d).

Celestin, at 676.

Additionally, when there is a presentence investigation, an appellate court presumes that the sentencing judge was aware of and considered any relevant information regarding the defendant's character. Commonwealth v. Devers, 519 Pa. 88, 101-102, 546 A.2d 12, 18 (1988); Commonwealth v. Griffin, 804 A.2d 1, 8 (Pa. Super. 2002).

Love correctly points out that the sentencing guidelines in effect at the time of the offense established a standard range sentence of 10 to 20 years. The trial court based its sentence on the fact that those guidelines had been in effect prior to an increase in the maximum penalty for Murder of the Third Degree from 20 to 40 years. That is, the guidelines called for a maximum sentence until the maximum sentence was increased; at the time that Love murdered Fennell, the guidelines had not yet been amended to reflect the new maximum penalty. As such, the trial court was within its discretion to impose a sentence that more accurately reflected what the Legislature and

the Sentencing Commission (once the guidelines were amended) considered to be an appropriate sentence.

Additionally, Love badly beat Fennell prior to shooting her and then posed her body in a manner that can only be seen as a final insult. There was ample cause for imposing a greater sentence.

V.

## CONCLUSION

WHEREFORE, the Commonwealth respectfully requests that this Honorable Court affirm the judgment of sentence of the Dauphin County Court of Common Pleas.

Respectfully submitted,

James P. Barker
Deputy District Attorney

## CERTIFICATE OF SERVICE

I hereby certify that I am this day serving the foregoing document(s) upon

the persons and in the manner indicated below, which service satisfies the

requirements of Pa.R.App.P. 121:

**Service by personal service addressed as follows:**

Joshua Vecchio, Esquire
Public Defender's Office
Administration Building, 2nd Floor
2 South 2nd Street
Harrisburg, PA   17101
(717) 780-6370

James P. Barker
Deputy District Attorney
Dauphin County Court House
Front and Market Streets
Harrisburg, PA   17101
(717) 780-6767

Dated:  September 29, 2006